**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————
)
MICHAEL J. QUIGLEY, *et al.*,            )
)
Plaintiffs,            )
)
v.            )            Civ. A. No. 07-600 (RBW)
)
INTERNATIONAL UNION OF            )
OPERATING ENGINEERS, *et al.*,            )
)
Defendants.            )
———————————————————)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND JUDGMENT ON THE PLEADINGS

Pursuant to Rule 12(c) and Rule 56 of the Federal Rules of Civil Procedure,

Defendants International Union of Operating Engineers and Vincent J. Giblin, by and

through their attorneys of record, hereby move for summary judgment on count one of

Plaintiffs' complaint and for judgment on the pleadings for a lack of standing, or, in the

alternative, for summary judgment on count two of Plaintiffs' complaint in the above-

captioned case, and submit the accompanying Memorandum in support of these motions.

Respectfully submitted,


—————/s/——————
Robert Weinberg (DC 085530)
Leon Dayan (DC 444144)
Matthew Clash-Drexler (DC 477334)
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW
Suite 1000
Washington, DC   20005
202-842-2600
202-842-1888 (fax)

*Counsel for Defendants International Union*
*of Operating Engineers and Vincent J. Giblin*

1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
MICHAEL J. QUIGLEY, *et al.*,             )
                                          )
            Plaintiffs,                   )
                                          )
      vi.                                 )          Civ. A. No. 07-600 (RBW)
                                          )
INTERNATIONAL UNION OF                    )
OPERATING ENGINEERS, *et al.*,            )
                                          )
            Defendants.                   )
_____)



**DEFENDANTS' MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

Introduction and Summary of Argument ..................................................................................1

Statement of the Facts ..........................................................................................................4

ARGUMENT ......................................................................................................................12

The Standards for Summary Judgment ..................................................................................12

I.      The Campaign Website Resolution is a "Reasonable Rule" that Protects the
        Union's Legitimate Interests as an Institution and, as such, is Facially Valid
        Under the LMRDA's Proviso to LMRDA Section 101(a)(2) .....................................13

II.     Plaintiffs Lack Standing to Enjoin the IUOE Constitution's Exhaustion of
        Remedies Provision ...............................................................................................28

CONCLUSION ...................................................................................................................31

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................12

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...........................................................19

*In re Berbiglia, Inc.*, 233 N.L.R.B. 1476 (1977) .........................................19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................12

*Champ Corp.*, 291 N.L.R.B. 803 (1988), *enforced*, 933 F.2d 688 (9th Cir. 1990) .....................20

*Deacon v. International Union of Operating Eng'rs*, 273 F. Supp. 169 (C.D. Cal. 1967) ................................................................................22

*George v. Local 639, Teamsters*, 134 L.R.R.M. (BNA) 3241 (D.D.C. 1990), *aff'd in relevant part,* 100 F.3d 1008, 1012 (D.C. Cir. 1996).................................18

*Guzman v. Local 32B-32J*, 151 F.3d 86 (2d Cir. 1998).................................................27

*Harvey's Wagon Wheel, Inc. v. NLRB*, 550 F.2d 1139 (9th Cir. 1976) ........................................20

*Illinois Educ. Labor Relations Bd. v. Homer Cmty. Consol. Sch. Dist. No. 208*, 547 N.E.2d 182 (Ill. 1989) ..................................................................20

*Laningham v. United States Navy*, 813 F.2d 1236 (D.C. Cir. 1987) ......................................12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................28

*Mallick v. International Brotherhood of Teamsters*, 749 F.2d 771 (D.C. Cir. 1984) ................................................................................17

*Massey v. Inland Boatmen's Union of the Pac.*, 886 F.2d 1188 (9th Cir. 1989) ..........................25

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................................13

*Monzillo v. Biller*, 735 F.2d 1456 (D.C. Cir. 1984).......................................................30

*Ornellas v. Oakley*, 618 F.2d 1351 (9th Cir. 1980) .......................................................29

*Steelworkers v. Sadlowski*, 457 U.S. 102 (1982) ........................................... 5, 13-16, 19, 22, 23

* Cases upon which we principally rely are marked with asterisks.

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) ................................................................20

*Texas v. United States*, 523 U.S. 296 (1998) ...................................................................................30

*Trans Union Corp. v. FTC*, 245 F.3d 809 (D.C. Cir. 2001) ..........................................................28

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 ..............................28

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ............................................................................29, 30

## STATUTES, RULES & LEGISLATIVE HISTORY

29 U.S.C. § 411(a)(2) ...........................................................................................................2, 3, 13

29 U.S.C. § 411(a)(4) ......................................................................................................................29

29 U.S.C. § 431(b) ..........................................................................................................................17

29 U.S.C. § 431(c) ..........................................................................................................................17

29 U.S.C. § 435 ...............................................................................................................................17

29 U.S.C. § 481(c) ..........................................................................................................................27

29 U.S.C. § 481(g) ..........................................................................................................................15

68 Fed. Reg. 58387 (Oct. 9, 2003).................................................................................................18

1105 Cong. Rec. 6721 (1959) .........................................................................................................14

S. Rep. No. 1684, 85th Cong., 2d Sess., 4-5 (1958) ......................................................................14

Fed. R. Civ. P. 56(c) .......................................................................................................................12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MICHAEL J. QUIGLEY, *et al.*,           )
                                        )
        Plaintiffs,                     )
                                        )
        vii.                            )        Civ. A. No. 07-600 (RBW)
                                        )
INTERNATIONAL UNION OF                  )
OPERATING ENGINEERS, *et al.*,          )
                                        )
        Defendants.                     )
_____)

## Introduction and Summary of Argument

Defendant International Union of Operating Engineers ("IUOE") is an international labor organization composed of 138 autonomous local unions representing approximately 396,000 members.

In January 2007—after careful study, and in response to reports from union members that employers were monitoring campaign websites of local union office candidates and gathering from those websites confidential, sensitive information about union negotiation and organizing strategies—the IUOE General Executive Board concluded that there was a straightforward method of ameliorating that problem while also enhancing the ability of candidates for local union office to discuss and share such information with the union's members themselves. The method was to require those who choose to set up local union campaign websites to add a password-protection feature limiting access to the web sites to union members—a feature that the would not impose significant costs or burdens on the member beyond those inherent in setting up a website in the first instance.

A password-protection feature, the Board concluded, would promote the freer flow of information to the union's members, because candidates who might otherwise feel inhibited from posting their views on matters such as negotiating or organizing strategy (since posting would risk revealing the strategy to employers or other outsiders with interests adverse to the union), would *not* be inhibited by that prospect under a regime in which nonmembers would be denied access to campaign websites and all IUOE members would be granted access through a Union-provided password and member-verification process.

Given that password protection would serve the International Union's interest in keeping sensitive information from the hands of employers while also serving the union's interest in promoting a robust local union election system that facilitates the most open and full-throated debate possible among union members, the Board adopted in January 2007 a resolution styled the Campaign Website Resolution (or "Resolution"). The Resolution's effective date initially was April 15, 2007, but was later extended to July 1, 2007. *See* Letter from V. Giblin to IUOE Local Union Business Managers (Apr. 10, 2007) (attached as Exhibit 4 to the Giblin Declaration).

On March 29, 2007, five plaintiffs filed this lawsuit against Defendant IUOE and Defendant Vincent J. Giblin, the General President of the IUOE, challenging the Resolution as inconsistent with the Labor Management Reporting and Disclosure Act ("LMRDA") and seeking to enjoin the Resolution's enforcement. In particular, the Plaintiffs allege that the Resolution, on its face, violates Section 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2). That provision of the LMRDA affords members of labor organizations the right to "express any views, arguments, or opinions" and qualifies that right through a proviso that expressly preserves "the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member

toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." *Id.*

The undisputed evidence, which is summarized below and set out in full in the accompanying Statement of Material Facts Not in Dispute ("Facts"), shows that Plaintiffs' pre-enforcement facial challenge to the Campaign Website Resolution cannot succeed. The Resolution imposes no limit on "the views, arguments, or opinions" that may be expressed on a campaign website or elsewhere. Instead, the Resolution only adopts a narrow and neutral time, place, and manner restriction on one specific medium of communication: websites, a medium particularly susceptible of being monitored imperceptibly at low cost by employers or other parties with interests adverse to the union, and under circumstances where the candidate is not likely to intend or expect that the information posted will be conveyed to such parties. All *other* media of communication are outside the scope of the Resolution, meaning that the rare candidate who may wish to communicate his or her campaign message to an employer, for example, still can do so without running afoul of the Resolution, but must simply make a deliberate decision to direct the communication to the employer.

The Resolution therefore does not interfere with the core LMRDA right of candidates to freely communicate with their fellow members; and, in any event, the Resolution adopts a rule that is eminently reasonable and therefore lawful, as it falls squarely within the above-quoted proviso that preserves "the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution." 29 U.S.C. § 411(a)(2). The Plaintiffs' LMRDA challenge to the Resolution therefore cannot survive summary judgment.

A second, and unrelated, claim asserted in the Complaint seeks to enjoin a provision of the IUOE Constitution that authorizes the union "[t]o the extent permitted by law" to require members to exhaust reasonable internal union remedies for four months before suing the union and to fine a member who violates the exhaustion requirement. That claim must be dismissed on the pleadings under Fed. R. Civ. P. 12(c), because the Plaintiffs lack standing to enjoin the provision in question.

Plaintiffs do not allege that the provision in question, Article XVII, Section 4, caused them to exhaust the claims they assert in this action out of fear that it might be held applicable to them. Indeed, Plaintiffs did not in fact attempt to exhaust those claims internally, nor were they required to do so, since it is clear that the next opportunity for a member to bring an internal challenge to the Resolution would be at the next IUOE quinquennial convention in 2008 (*see* Complaint ¶ 6), which is more than four months away, meaning that, under the IUOE's interpretation of the rule, exhaustion is not required. Nor does any Plaintiff allege that he or she is imminently likely to be charged with a violation of the provision in connection with some other grievance against the Union, or that he or she has refrained from suing the Union out of fear of being charged or penalized under the provision. Plaintiffs therefore are seeking an advisory opinion on a wholly abstract question—an opinion that the "Case or Controversy" requirement in Article III of the United States Constitution forbids. Moreover, Plaintiffs' attack on Article XVII, Section 4 is predicated on a misapprehension as to the meaning of that provision and the enforcement policy under it; and that attack therefore fails on the merits as well.

### Statement of the Facts

**1.** The IUOE, as noted, is an international labor organization composed of 138 autonomous local unions and approximately 396,000 members. Facts ¶ 2. With respect to those

local unions, the IUOE Constitution sets forth the "laws, rules and procedures by which Local Unions [that are chartered by the IUOE] shall conduct their affairs." Facts ¶ 13. In particular, the IUOE Constitution establishes the requirements for candidates to run for office and the procedures governing the conduct of those elections. Facts ¶ 14. For example, the Constitution mandates that local union elections "shall be held in the month of August" and that the "nominations shall be made at a regular meeting . . . no . . . earlier than the May meeting preceding the election." Facts ¶ 15. And, consistent with the LMRDA's "reasonable rules" proviso to its free speech clause, the Constitution includes an "outsider rule" that prohibits candidates for union office from accepting campaign contributions from persons other than members of the IUOE. Facts ¶ 15; *see also Steelworkers v. Sadlowski*, 457 U.S. 102 (1982) (upholding a similar outsider rule against a candidate's LMRDA free speech challenge, on the ground that the outsider rule was within the proviso); *see also infra* at 13-16 (discussing *Sadlowski* at length).

As part of its role in setting the "rules and procedures" for local unions, the IUOE General Executive Board, in January of 2007, adopted the "Campaign Website Resolution." Facts ¶ 16. As General President Giblin stated in a letter announcing the Resolution, the Resolution "will not in any way limit the content of what is said on [campaign] websites." *See* Facts ¶ 20. Instead, the Resolution requires that candidates for local union elections or their supporters who set up campaign websites include a password-protection function to limit access to union members. The Resolution in pertinent part provides:

> NOW THEREFORE BE IT RESOLVED THAT the General Executive Board, in order to assure the fullest expression of free speech by candidates in Local Union elections while protecting the Local Unions from adverse actions by employers, directs that, starting with Local Union

> elections to be held in 2007, Local Unions and their election committees
> shall require all candidates and their supporters who have set up or wish to
> set up campaign websites to include a password protection function.

Facts ¶ 17.

As stated in the text of the Resolution, the impetus for adopting the Rule was that the IUOE had been made aware through complaints by members that there had been "instances where employers have misused information obtained from candidates' websites to the detriment of IUOE Local Unions in organizing campaigns and contract negotiations." Facts ¶ 32.

For example, the IUOE learned of a series of incidents involving campaign websites at Local Union 30, which represents mainly stationary engineers in the New York City area as well as Connecticut. Facts ¶ 41. In particular, Local 30 members informed the IUOE that information on campaign websites had negatively impacted contract negotiations and organizing drives, including the effort to organize employees at a Connecticut hospital in the late 1990s. Facts ¶¶ 42-43. In fact, Local 30 members informed the IUOE that employers were quoting excerpts from the various websites (which included chat rooms for those visiting the web site) at collective bargaining negotiating sessions. Facts ¶ 43. As a result of these incidents, at least four members of Local 30 requested that the IUOE require that such campaign websites be password protected in order to prevent employers from having access to the information and the discussions occurring on those web sites. Facts ¶ 44.

In addition to direct incidents of employer misuse of campaign websites, at the time the Resolution was adopted, the IUOE General Executive Board was also aware of instances where candidates have posted confidential union documents on their publicly accessible websites that were intended to be available only to union members. For example, in IUOE Local 66, a

candidate posted the minutes from local union meetings on his campaign website.[1]  Facts ¶ 45.

While the contents of local union board minutes and local union general membership meeting

minutes contain important union matters that are appropriate for, and indeed highly worthy of,

discussion by local union candidates in their campaigns (such as organizing strategy or whether a

particular member's grievance against the employer merits the union's expenditure on an

arbitration proceeding), the availability of such often-sensitive materials to employers or other

nonmembers has the potential to compromise the legitimate confidentiality interests of the union

as an institution – as well as the confidentiality interests of its members, who are apt to feel free

to be more candid in stating their views, whether about the employer, the union, or the merits of

their fellow members' grievances, if they do not fear that the minutes of what they say will be

made readily accessible to the employer.  Facts ¶¶ 23, 38, 40, 45

As it was becoming aware of these problems associated with campaign websites, the

General Executive Board remained mindful of the enormous advantages of the Internet as an

inexpensive, efficient, useful, and increasingly popular tool to enable candidates for union office

to communicate their ideas to the members who form the union's electorate.  Facts ¶¶ 25-26.  In

addition, the speed at which information can be disseminated and updated on the Internet

provides additional benefits that enable candidates and the members who visit campaign

websites to debate the issues before the union in a manner that cannot be accomplished through

other means.  Facts ¶ 28.  Previously, a candidates' principal method for distributing campaign

literature to members was to mail the literature to each of them at their home addresses—a

process far more costly and cumbersome to candidates than posting the information

electronically.  Facts ¶ 27.  At the same time, the Board recognized that the very attributes of

---

[1] IUOE local union meetings are not open to nonmembers of the union.  Facts ¶ 36.

websites that make them so valuable as a tool for instantaneous, low-cost candidate-to-member communication—that they can easily be found and accessed from anywhere at any time—is also an attribute that can be surreptitiously exploited by employers and other nonmembers not generally expected to be among those with whom candidates for union office intend to communicate, or share union-meeting minutes or other information, through their website postings.  Facts ¶ 31.

Thus, in attempting to preserve the manifest benefits of member-generated Internet communications about union affairs while also responding to the prospect that the problems of employer monitoring of the kind just described would continue—and in all likelihood worsen— with the increasing proliferation of low-cost websites, the IUOE sought to forge a solution that would (a) fully protect member-to-member campaign communications; (b) keep the International Union and its local unions out of the business of monitoring and scrutinizing campaign websites to prevent disclosures to nonmembers of confidential union records or strategy discussions; and (c) ameliorate the problems of employer access to campaign website materials.  Facts ¶¶ 22, 31, 35, 46-47.  The solution determined to be the soundest means of satisfying these criteria was to require members maintaining campaign websites to limit access to the members of the IUOE through a password protection function.  Facts ¶¶ 16-17, 46-47.  Hence, the Board adopted the January 2007 Campaign Website Resolution.  Facts ¶¶ 16-17.

**2.**  As set forth in the attached Declaration of Joanna Pineda, an expert on web site design, development, maintenance, and hosting services, the resources required to set up and maintain a website with a password protection function differ only marginally from those required to set up and maintain a website in the first instance.  Facts ¶ 50.  Depending on the web hosting service involved, these additional costs range from zero to three or four dollars per

month (beyond the most basic package of each service).  Facts ¶¶ 51-53.  In the system that the

IUOE intends to use in implementing the Regulation, the task of entering the code into the

password-protected web pages is one that is within the technical capability of a computer user

able to set up a website in the first instance and that involves only a minimal commitment of

time.  Facts ¶ 54.  In addition, to ensure that members interested in setting up campaign websites

will be able to comply with the Resolution, the IUOE, as explained below, has committed to

providing the services of an independent technical assistance firm, which will assist those having

any difficulty.  Facts ¶¶ 18(ii), 55(ii).

    **3.**  In May 2007, the General Executive Board adopted guidelines explicating the

Resolution and specified the procedures according to which the Resolution will be implemented.

The IUOE thereafter sent a letter to all local unions setting forth those guidelines.  Facts ¶ 18.

    First, paralleling the IUOE "outsider rule" referenced above, which allows candidates for

local union office to accept campaign contributions from any member of the International Union

(and not just from members of their local union), the letter makes clear that the Campaign

Website Resolution allows for local union candidate campaign websites to be made accessible to

any member of the International Union, and not, as Plaintiffs' complaint suggests, only to

members of the particular local.  Facts ¶ 18(i).

    Second, while the IUOE adopted the Resolution with the understanding that the

installation of a password protection feature would not impose significant costs or burdens on

those members wishing to set up and maintain campaign websites, Facts ¶ 21, the IUOE

Executive Board approved of an implementation procedure according to which the IUOE will

retain an outside, independent information technology consulting firm to provide technical

assistance where requested to members affected by the Resolution to enable those members to

comply with the Resolution. Facts ¶ 18(ii). The IUOE is making this assistance available at no cost to the affected members. Facts ¶ 18(ii).

The Union expects that the use of the consulting firm should promptly resolve any technological problems members might experience in establishing compliant campaign websites, but as an additional protection to members maintaining campaign websites, the Executive Board also set up a mechanism under which a member facing technological difficulties can apply for and obtain a waiver from the requirement. Facts ¶ 18(iii). The determination of whether the waiver should be granted will be made by the independent consulting firm, based on its technical expertise; and if the firm grants a waiver, the International Union will not review that determination and the member will be excused from compliance.[2] Facts ¶ 18(iii) (citing to Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007)) (attached as Exhibit 5 to the Giblin Declaration). No member will be subject to discipline for noncompliance during any period in which the member can document that he or she attempted diligently and in good faith to comply with the Resolution by using the services of the firm. Facts ¶ 18(iii).

Finally, the IUOE also has advised local unions that, pursuant to its established practice of providing opinions interpreting the IUOE's rules governing election campaigns, it will respond promptly in writing to member inquiries as to the scope and coverage of the Campaign Website Resolution, or other matters involving the interpretation of the Resolution. Facts ¶ 18(iv), 19. For example, a member who is in doubt as to whether his or her website would be considered a "campaign" website subject to the Resolution may request an opinion as to the

---

[2] The consultant will focus on whether compliance by the particular member with the Resolution would require a significant expenditure of money or significant delay in establishing and maintaining a password-protection feature beyond that which would typically be involved in establishing a password-protected campaign website. Facts ¶ 18(iii) (citing to Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007)) (attached as Exhibit 5 to the Giblin Declaration).

Resolution's application by submitting the request to the General President.[3]  Facts ¶ 18(iv), 19.

A member who has truthfully disclosed the facts in making such a request and who is advised by

the International Union in an opinion issued pursuant to this procedure as to whether his or her

website is, in whole or in part, outside the coverage of the Resolution, will not be subject to

discipline for failure to comply with the Resolution if he or she relies on the advice given in the

opinion.  Facts ¶ 18(iv).

        **4.**  Each of the plaintiffs in this action is a member of the IUOE and one of its chartered

local unions.  *See* Facts ¶ 61.  Plaintiff Joseph Ward, a member of Local Union 150, is a

candidate for the Business Manager of the local union, the highest elected office in that local, in

the upcoming August 2007 election.  Facts ¶ 62.  Plaintiff Ward is a former officer of Local 150,

having been elected and re-elected to the position of treasurer several times, and was also on the

payroll of that local for many years as a staff employee.  Facts ¶ 63.  Plaintiff Ward, along with a

slate of other candidates for Local 150 elected positions, has had a website established

(www.150election.com) to promote his candidacy and that of his fellow slate members.  Facts ¶

64.  Plaintiff Ward's campaign website contains numerous postings on what is occurring in

Local 150 and other matters of concern to the campaign.  Among the items posted are minutes

from local union board meetings and statements and opinions regarding upcoming contract

negotiations.  Facts ¶ 65.

        Two other Plaintiffs, Paul Gonter and Paul Mueller, are not currently running for any

position, but allege that they intend to do so in the future.  *See* Facts ¶ 66.  Plaintiff Patricia Kohl

alleges that she "intends to support candidates for election . . . in IUOE Local 18," which will

---

[3] The IUOE has utilized this very process to respond to other election-related inquiries over the years, and it issues opinions typically within days of the inquiry.  Facts ¶ 19 (citing Decisions & Opinions of the General President (attached as Exhibit 6 to the Giblin Declaration)).

occur in August of 2008.  *See* Facts ¶ 67.  Plaintiff Kohl alleges that she "operates a web site at

http://www.local18membersvoice.org," and that she will use the website to support candidates

for local union office.  Facts ¶ 67. [4]  That website, which "expresses views about issues in the

local union as well as the national union," *see* Facts ¶ 67, contains two separate password-

protected discussion forums that allow those who join to, among other things, "report corruption

and to promote union democracy."  *See* Facts ¶ 67.

## ARGUMENT

## <u>The Standards for Summary Judgment</u>

A court should grant summary judgment when the pleadings and discovery, together with

any affidavits, show that there exists no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

A defendant may move for summary judgment by pointing out the absence or

insufficiency of evidence in support of essential elements of the plaintiff's claims.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986).  In response, a plaintiff may not rest upon mere

denials or allegations in the pleadings; nor may that party rely upon conclusory allegations in

affidavits; instead, the plaintiff must identify affirmative and admissible evidence of record

supporting each essential element of its claims.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256-57 (1986); *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

And the Court must find that a plaintiff has failed to present sufficient evidence "where the

---

[4] While Plaintiff Kohl alleges that she "operates a web site at
http://www.local18membersvoice.org," Compl. (d/e 1) at ¶ 23, that web site states that it is
maintained not by Plaintiff Kohl, but instead by "Laborers for JUSTICE Jim McGough."
Answer (d/e 4) at ¶ 23; *see also* http://www.local18membersvoice.org <last visited May 7,
2007>.

record taken as a whole could not lead a rational trier of fact to find for the non-moving

party . . . ." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

I.    **The Campaign Website Resolution is a "Reasonable Rule" that Protects the Union's Legitimate Interests as an Institution and, as such, is Facially Valid Under the LMRDA's Proviso to LMRDA Section 101(a)(2)**

Section 101(a)(2) of the LMRDA provides as follows:

> FREEDOM OF SPEECH AND ASSEMBLY – Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

A.    The starting point for any analysis of the validity of a union rule challenged under §

101(a)(2) is the Supreme Court's decision in *Steelworkers v. Sadlowski*, 457 U.S. 102, 108

(1982). There, the Court stated that "[t]o determine whether a union rule is valid under the

statute, we first consider whether the rule interferes with an interest protected by the first part of

§ 101(a)(2). If it does, we then determine whether the rule is 'reasonable' and thus sheltered by

the proviso in § 101(a)(2)." 457 U.S. at 111.

The Court added that, while these inquiries must be conducted so as to preserve the

"principal First Amendment value—the right to speak one's mind without fear of reprisal,"

"there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical

to the scope of the First Amendment." *Id.*    As the Court explained, the LMRDA's legislative

history demonstrated that Congress deliberately chose *not* to make union member free speech

rights coterminous with citizens' free speech rights.  In particular, the proviso was added on the

floor of the Senate in response to Senator Kuchel's concern that the bill as then worded could be

construed to impose a broad limitation on union authority that could be used to "'unduly harass

and obstruct legitimate unionism.'  105 Cong. Rec. 6721 (1959), 2 Leg. Hist. 1233." *Sadlowski*,

457 U.S. at 110.  Adoption of the proviso, the Court observed, put § 101(a)(2) in conformity with

the Act's overarching philosophy that "unions should be left free to 'operate their own affairs, as

far as possible.'"  *Id.* at 117 (quoting S. Rep. No. 1684, 85th Cong., 2d Sess., 4-5 (1958); *see also*

*id.* (noting "Congress' desire to permit unions to regulate their own affairs and to minimize

governmental intervention").

The lesson, then, is that whereas "First Amendment freedoms may not be infringed

absent a compelling government interest [and] [e]ven then, any government regulation must be

carefully tailored, so that rights are not needlessly impaired," "[u]nion rules, by contrast, are

valid under § 101(a)(2) so long as they are reasonable." *Id.* at 111.  Thus, where a member's

free speech interest within the ambit of § 101(a)(2) is implicated by a labor organization rule,

"[t]he critical question is whether a rule that partially interferes with a protected interest is

nevertheless reasonably related to the protection of the organization as an institution." *Id.* at

111-12.

Applying that test to a union's rule that prohibited candidates for international union

office from accepting or receiving campaign contributions from nonmembers of the union –

often referred to as the "outsider" rule – the Supreme Court began with the observation that the

outsider rule, by limiting candidates' access to funds, would be expected to "reduce the number

of issues discussed, the attention that is devoted to each issue, and the size of the audience

reached."  *Id.* at 113.  The Court held that the outsider rule therefore plainly did "implicate rights protected by § 101(a)(2)."  *Id.* at 115.

Despite that impact, the Court nevertheless held that the union's outsider rule in *Sadlowski* was valid under the proviso to § 101(a)(2), because "it serves a legitimate [union institutional] purpose that is clearly protected under the statute."  *Id.*  In particular: "The union adopted the rule because it wanted to ensure that nonmembers do not unduly influence union affairs.  [The union] feared that officers who received campaign contributions from nonmembers might be beholden to those individuals and might allow their decisions to be influenced by considerations other than the best interests of the union."  *Id.*  In concluding that this interest was a legitimate interest of the "organization as an institution" within the meaning of the proviso, the Court noted that Congress itself recognized the legitimacy of an analogous interest by enacting § 401(g) of the LMRDA, 29 U.S.C. § 481(g), which prohibits employers from making any contributions to "promote the candidacy of any person in any election" of union officers. *Sadlowski*, 457 U.S. at 114-15.

In keeping with its admonition at the outset that Congress did not intend for union rules to be subject to "the stringent tests applied in the First Amendment context"—tests that demand "narrow[] tailor[ing]" to serve a "compelling governmental interest," *id.* at 111-12 —the *Sadlowski* Court rejected a series of objections by the plaintiff there to the effect that the union could have achieved its objective through any number of less restrictive alternatives, including contribution ceilings from outsiders rather than a flat ban, allowing the friends and family of members of candidates to contribute rather than only union members, or simply requiring disclosure of contributions so that the amount of outside influence could itself become a campaign issue.  Though the existence of such less restrictive alternatives would have posed

15

significant obstacles to the rule's validity under ordinary First Amendment "narrow[] tailor[ing]" criteria, the Court held that their existence did *not* defeat the outsider rule's validity, because the rule merely needed to be "rationally related to th[e] [union's] purpose" of limiting outsider influence over union elections to pass muster under the LMRDA. *Id.* at 118.

    **B.**  Application of the *Sadlowski* analysis to the Campaign Website Resolution at issue here compels the conclusion that the Resolution is a facially valid rule.

    **1.**  The Resolution serves a legitimate objective of a labor organization as an institution: keeping sensitive information – *e.g.,* negotiating, organizing, and grievance handling strategy and tactics – from falling into the hands of employers who are the union's adversaries. And the Resolution advances that legitimate institutional objective of the union through means that are eminently reasonable; indeed through means that on balance *promote*, rather than interfere with, the core free speech interest protected by the LMRDA, *viz*, the interest of union members in communicating with their fellow union members regarding union affairs in the context of union elections.

    That the union's confidentiality interest is legitimate, and that the Resolution advances that interest by promoting core LMRDA-protected speech rather than by unreasonably interfering with it, follow from these propositions.

    *First.*  In numerous contexts, federal law has recognized that unions possess highly sensitive information that if placed in the wrong hands—particularly the hands of an adversary employer—would harm the union's ability to be an effective negotiator in collective bargaining with employers, an effective representative of bargaining unit employees in the grievance/arbitration process, and an effective organizer of the employees of nonunionized employers.

For example, in the LMRDA itself, Congress, after providing in § 201(b) that reports containing general information about unions' financial condition and operations is appropriate for the Secretary of Labor to make available to the general public, *see* 29 U.S.C. §§ 431(b), 435, went on to make clear in the next paragraph—§ 201(c)—that unions have a legitimate interest in *protecting* from public disclosure the union records providing the details as to specific financial transactions underlying those reports, *id.* § 431(c).

Indeed § 201(c) provides that even union *members* do not have an absolute right to examine such union records, but only a right to do so where the member can show "just cause." 29 U.S.C. § 431(c).   As the District of Columbia Circuit held in *Mallick v. International Brotherhood of Teamsters*, 749 F.2d 771 (D.C. Cir. 1984), Congress intended, by adopting the "just cause" standard in § 201(c), to provide that unions need not make union records available— even to union members who have a proper purpose for examining such records—where the union can show that the information in question is confidential or highly sensitive.  *Id.* at 785.  In particular, the D.C. Circuit held that, in cases where a union member with a proper purpose sues to compel examination of union records, "examination should be refused" by the district court "[i]f the [union] demonstrates that disclosure of th[e] information would be comparable to … a union's disclosure of organizing strategy, negotiating plans, or other secrets."  *Id.*  The court of appeals reached that conclusion after observing that the "just cause" limitation was added on the floor of the Senate in response to concerns that the examination right "could be used as a tool for harassing unions *or passing their confidential information to management*."  *Id.* at 778 (emphasis added).[5]

---

[5] Here, of course, the Union is not attempting through its Resolution to shield negotiating plans and organizing strategy from disclosure to its own members, nor is it seeking to prevent candidates from sharing such information as they might possess with other members.  Rather, the

To the same effect, the Secretary of Labor, in promulgating Title II LMRDA regulations in 2003 that dramatically expanded the scope of unions' public financial reporting obligations, nevertheless stated that "certain information need not be made available to the general public [because] disclosure could be … adverse to union interests." 68 Fed. Reg. 58387 (Oct. 9, 2003). And, in identifying the categories of information exempt from public disclosure on that basis, the Secretary included information "that might provide insight into the . . . union's organizing strategy" and information "that might provide a tactical advantage to parties with whom the . . . union . . . is engaged or will be engaged in contract negotiations." *Id.*

There is, in short, no room to dispute the proposition that unions have a legitimate interest in shielding certain kinds of sensitive information from disclosure to nonmembers. *See also George v. Local 639, Teamsters,* 134 L.R.R.M. (BNA) 3241 (D.D.C. 1990), *aff'd in relevant part,* 100 F.3d 1008, 1012 (D.C. Cir. 1996) (holding that it is entirely proper for a union to "exclude[] non-members from its meetings").

Moreover, there can be no contention here that the Union's concern about disclosure on websites of sensitive bargaining or organizing strategy matters is merely theoretical. As set out above, members of an IUOE Local had reported to the IUOE that an employer had used information gleaned from a campaign website to impede an organizing campaign by that local. And problems of that nature are likely to recur, since local union election campaigns typically (and properly) involve debate regarding organizing strategy or collective bargaining goals or objectives. Indeed, the campaign website of one of the Plaintiffs here, Plaintiff Ward, reveals statements and opinions regarding upcoming collective bargaining negotiations. *See, e.g.,* Facts

---

Union wishes to facilitate member-to-member sharing of information and opinions while only seeking to thwart the ability of management and other outsiders to access such information readily and directly.

¶ 65 (citing to Exhibit 2 of the Johnson Declaration, which discusses 2007 contract negotiations by IUOE Local 150).  There is consequently a real risk that an employer could learn or infer from a campaign website, for example, a union's bottom line in an upcoming negotiation; that a strike threat would not be pursued; or where and to what extent a union would direct its organizing resources.  The legitimacy of a union's institutional interest in preventing adversary employers from having free and ready access to such confidential union information cannot be questioned.[6]

    *Second.*  The law has recognized in diverse contexts that there are certain rules that, by limiting particular acts of disclosure, operate to promote speech by fostering communication between and among interested parties that is apt to be *more* open, candid, robust, or pertinent to the relevant parties than the communication that would obtain in the absence of the rule.

    For example, the Supreme Court observed in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), that the "[p]rivacy of communication is an important interest," and that absent rules adopted to protect that interest, the "fear of public disclosure of private conversations might well have a chilling effect on private speech," including "inhibiting . . . the willingness to voice critical and constructive ideas."  *Id.* at 532-33 (internal quotations marks and citations omitted).

---

[6] Moreover, because IUOE local union campaign websites could include – and indeed have included in the past – chat rooms or discussion forums, campaign websites that are accessible to nonmembers pose the additional concern that outsiders to the union, including adversary employers, could participate in these discussions and, thus, intervene improperly in the elections themselves.  *See* Facts ¶ 33.  This was one of the precise concerns that the Supreme Court identified when it upheld a union's rule prohibiting all nonmembers from making contributions to support a candidate for international union office.  *See supra* at 13-16.  Specifically, the Supreme Court found that the outsider rule "serves a legitimate [union institutional] purpose" because "it wanted to ensure that nonmembers do not unduly influence union affairs." *Sadlowski*, 457 U.S. at 115.  The legitimate interest found by the Court in *Sadlowski* applies with equal force in the common context of campaign websites with an interactive feature.

Closer to home, the National Labor Relations Board, with court approval, has recognized an evidentiary privilege that allow unions to protect from discovery confidential materials that reveal a union's negotiating or organizing strategy.  *See, e.g.*, *In re Berbiglia, Inc.*, 233 N.L.R.B. 1476, 1495 (1977) (sustaining objections to subpoena calling for, *inter alia,* "communications between the Union and its members" aimed at discovering the motivation behind a strike, even though the union's motive was the key fact in dispute; and reasoning that, "[i]f collective bargaining is to work," a union must be able formulate its position and devise its strategies in consultation with its members "without fear of exposure."); *Harvey's Wagon Wheel, Inc. v. NLRB*, 550 F.2d 1139, 1143 (9th Cir. 1976) (statements given by union representatives to NLRB investigators are  protected from disclosure under the Freedom of Information Act, since otherwise "fear of exposing crucial material regarding pending union negotiations" might cause union witnesses to "withhold[] relevant information").  *See also Champ Corp.*, 291 N.L.R.B. 803, 817 (1988), *enforced*, 933 F.2d 688 (9th Cir. 1990); *Illinois Educ. Labor Relations Bd. v. Homer Cmty. Consol. Sch. Dist. No. 208*, 547 N.E.2d 182, 183-88 (Ill. 1989).[7]

*Third.*  The very same confidential or sensitive information that would most harm the union's interests if disclosed to employers will tend to be information that informed, responsible members desiring to exercise their democratic rights within the union would have a heightened interest in knowing and in discussing and debating with their fellow members generally – particularly in the context of an election of union officers.

---

[7] Many other evidentiary privileges, including of course the attorney-client privilege, are also predicated on the judgment that communications among parties with shared goals or interests will be more open and candid if the parties do not expect that their communications will be disclosed to outsiders, adversaries or others with hostile interests.  *See Swidler & Berlin v. United States,* 524 U.S. 399, 400, 408 (1998) ("Knowing that communications will remain confidential … encourages the client to communicate fully and frankly.… [W]ithout the privilege, the client may not have made such communications in the first place.").

Thus, in the *absence* of a rule limiting campaign websites to union members, those candidates who are both (a) knowledgeable about the vulnerability of website postings to being monitored and intercepted and (b) respectful of the union's institutional need to keep sensitive internal strategy discussions out of the hands of employers, will, ironically, be inclined to self-censor their websites by declining to use that otherwise valuable and efficient medium to express their views and opinions on negotiating strategy and other matters of the greatest interest to the membership.[8]  In contrast, the *presence* of a password-protection regime would remove those inhibitions and promote a more open, full, and free discussion among the members themselves—who are, of course, the persons who constitute the relevant electorate—and thereby enrich union democracy and foster a more informed electorate.

The upshot is that the IUOE's Campaign Website Resolution, like the USWA outsider rule upheld in *Sadlowski*, serves a legitimate union purpose, and is indeed *more* "reasonable" in LMRDA free speech terms than the USWA rule, because the Resolution—unlike the USWA

---

[8] They will likewise be inclined to refrain from posting on their websites certain documents highly relevant to members but inappropriate for disclosure to employers.  A prime example of such documents are minutes of union meetings.  Because many members cannot or do not attend all (or even most) union meetings, a campaign website could provide a unique and effective means for a candidate to post the minutes of important meetings and to inform the membership about decisions made at those meetings, to challenge the existing leadership's decisionmaking, and to propose new alternatives, such as a change in organizing strategies or collective bargaining goals.  Facts ¶ 40.  While a full and frank discussion of these issues with the electorate would often enrich an election campaign in the IUOE, as in unions throughout the labor movement, union meetings are open only to union members and, likewise, minutes of union meetings may not be circulated to nonmembers.  Facts ¶¶ 36-40.  If websites are open to nonmembers, many candidates will (appropriately) feel constrained from posting meeting minutes, because they are documents restricted to circulation to members only and because those minutes can reveal, not only bargaining strategy discussions, but also discussions that disclose private information about a member or doubts expressed by the union about the merits of expending union funds to pursue to arbitration a fellow member's grievance against the employer.  A scrupulous candidate would not wish to risk revealing such information to employers.

rule—advances rather than interferes with the core LMRDA interest of fostering speech between and among union members.

**2.** Though it is our submission that the Resolution, on balance, is apt to generate more and richer LMRDA-protected speech than would be expected in its absence, we would add that that the Resolution's validity under *Sadlowski* and § 101(a)(2) is by no means dependent on the view that the Resolution is a speech-promoting rule.   The USWA outsider rule at issue in *Sadlowski* had no speech-promoting effect—indeed, as noted, the Court described the rule there as one that would "reduce the number of issues discussed, the attention that is devoted to each issue, and the size of the audience reached," 457 U.S. at 113—and yet the rule there was of course upheld as reasonable.

Thus, even on an analysis that takes no account of the speech-promoting effect of the Resolution, but treats the Resolution as one that involves a tradeoff between a legitimate union institutional interest on the one hand and member free- speech interests on the other, the Rule still easily passes muster as a "reasonable rule[] as to the responsibility of every member toward the organization as an institution" within the meaning of § 101(a)(2).

The Resolution imposes no restrictions whatsoever on "the views, arguments, or opinions" (§ 101(a)(2)) that may be expressed by a member on a campaign website, or elsewhere.  A member can criticize the union or its leaders with impunity under the Resolution. The Resolution merely imposes a modest and neutral time, place, and manner restriction on one specific medium of communication, websites—a medium particularly vulnerable to being monitored by employers or other parties with interests adverse to the union, and under circumstances where the candidate is not likely to intend, and may well not even expect, that the information posted will fall into the hands of such parties.  Because the Resolution applies only

to websites, a member who, for example, wishes to write a letter to the editor of a public newspaper to express his or her views about the union is not prevented from doing so in the least by the Resolution.  *Cf. Deacon v. International Union of Operating Eng'rs*, 273 F. Supp. 169 (C.D. Cal. 1967) (finding violation of Section 101(a)(2) where member was disciplined for article that appeared in newspaper).

By the same token, there is nothing in the Resolution that would prevent the rare union member who might *want* to provide information about the union to the employer, or send the employer his or her campaign literature, from doing so through any means of communication other than a website.  Such a member simply must make a conscious decision to convey the communication to the employer and then take an affirmative act, such as mailing or emailing the communication to the employer, instead of passively posting it on a website and allowing impersonal forces to determine whether or not the employer receives the candidate's message.[9]

While it may be objected that if the Resolution does not bar a candidate from communicating directly and intentionally with the employer as to the confidential matters we have described, the Resolution cannot advance the union's confidentiality interests.   That is not

---

[9] The Complaint suggests § 101(a)(2) creates not only a right in union members to communicate to fellow members of the union, but also an independent, freestanding right to communicate to the general public (and presumably to employers as well).  We believe the better understanding of § 101(a)(2), read in its context and against the backdrop of the legislative history and legislative purpose of the LMRDA, is that in the context of union election campaign, where, by definition, the matter at issue is a decision to be made exclusively by union members, union members may have a protected interest in engaging in election-related communications with nonmembers, but that that interest is protected as an incident of the protection of the members' core right to communicate with fellow members.  Thus, for example, a candidate may use a letter to the editor of a newspaper of general circulation as a means to communicate with members of the union.  The validity of the Resolution here does not turn on this distinction, because, even if viewed as a freestanding right, the Resolution's impact on the putative right to communicate with nonmembers is minimal as explained in the text; and the putative right would be limited by the same "reasonableness" proviso as the core right of members to communicate with their fellow members.

the case.  The reality is that a candidate who would contemplate engaging in such direct communications would be doing so with full awareness of the implications of that action and would be accountable to the electorate for that action if it came to light.[10]  Fear of electoral accountability would thus provide a significant deterrent to that kind of overt breach of the union's confidentiality interest.   Thus, there is no ground for concluding that the Resolution will be ineffective in advancing union confidentiality interests.

Perhaps more fundamentally, outside of the website context, the IUOE has not experienced a problem with confidential information being conveyed to employers, and it is perfectly reasonable for the IUOE to focus on a known problem rather than deal with problems that have not materialized.  Indeed, precisely because, under the *Sadlowski* test as opposed to the First Amendment test, union rules are evaluated for whether they are "rationally related" to the union's objective, rather than whether they are "narrowly tailored," objections to the effect that a rule is "underinclusive" do not establish invalidity in the LMRDA context.  *See  Sadlowski*, 457 U.S. at 112-13 (the fact that the outsider rule there prohibited nonmember campaign contributions to candidates in international election, but did not prohibit outsider contributions to local union elections or outsider contributions to non-candidate union members interested in engaging in issue advocacy within the union, did not render the rule invalid).

Indeed, the fact that the IUOE's Executive Board here adopted the Resolution in response to a specific well-delineated problem that had generated complaints from union members, *see supra* at 6 – and that the Board did not attempt to adopt rules broader than necessary to address the problem—serves to underscore the reasonableness of the Resolution.

---

[10] In contrast, a candidate who (in the absence of a password protection requirement) merely posted the same kind of information on his website could more than plausibly deny accountability for any surreptitious monitoring or retrieval of the information by the employer by pleading that he lacked any intent that the information would fall into the employer's hands.

Nor, finally, can it be objected that, rather than the password-protection approach, the only means available to the IUOE to further its legitimate interest in protecting the confidentiality of sensitive bargaining and organizing strategy information is to examine each and every page and line of each and every campaign website and then bring charges against those candidates who disclose sensitive information.  Such an approach would have numerous serious disadvantages.  First, given the unique nature of websites and the speed with which such sites can be changed and updated, such an approach would be prohibitively costly and impossible to administer.  Second, and more fundamental, even if the task could be undertaken, it would put the IUOE in the business of monitoring the content of websites, which would threaten to be far more intrusive of candidates' speech rights than a content-neutral password protection requirement, and which would be apt to raise corrosive suspicions, well-founded or not, about selective enforcement.  Third, IUOE monitoring of the content of campaign websites to determine whether charges should be brought for breaches of confidentiality would destroy the salutary speech-promoting effects of the Resolution described above.  Candidates would be expected to remove from websites sensitive information that the union members themselves have every right to discuss and debate, and candidates would be left with less efficient means of discussing such information.

Quite apart from this, "reasonableness" analysis under *Sadlowski* simply does not demand of a union that it show it has exhausted all less restrictive alternatives to a rule affecting speech as a condition of enforcing such a rule.  *See supra* at 15-16.  *See also Massey v. Inland Boatmen's Union of the Pac.,* 886 F.2d 1188, 1190 (9th Cir. 1989) (upholding a union rule that required members to perform picket duty as applied to a member who "disagree[d]" with the message conveyed by the picketing; while the union could have achieved its ends—"plac[ing]

25

pressure on management and … elicit[ing] support of other workers and of the public for a lawful strike"—through means that would not have required enlisting members who disagreed with the union's message, "the [LMRDA] offers a considerably narrower protection to speech than does the First Amendment," because a union "rule does not have to be necessary to be protected by the proviso of section 101(a)(2). It only need be reasonable.").

For all these reasons, the Resolution is a facially valid, "reasonable" rule under LMRDA § 101(a)(2).

**3.**      In addition to challenging the Resolution as substantively unreasonable, the Complaint also alleges that the Resolution is void for vagueness. The vagueness argument appears to be that because the Resolution does not define the term "campaign website," and because it is not always clear when a campaign begins or whether a particular communication concerns a candidacy or an issue, some members contemplating setting up a website will not know whether they are covered by the Rule and thus may err on the side of password protecting a site outside the Rule's coverage. Complaint (d/e 1) ¶ 40.

That argument is doubly defective.

First, the Resolution's application is clear in a broad core area of cases. Where a member has been nominated for office and sets up a website seeking the votes of fellow members, no one could dispute that the member has set up a "campaign website." Nor is there any doubt where a member, before nominations, sets up a website soliciting votes and support for an upcoming election. The Complaint's "vagueness" allegation, then, is not that Resolution's application is incapable of being understood, but rather that there may be particular circumstances where its application would present a line-drawing issue. That, however, can be said of virtually any new rule, and it cannot form a basis on which to invalidate the Resolution.

Moreover, the Resolution here will not even present the interpretive problems typical of many new rules, because the LMRDA itself includes a provision, § 401(c), 29 U.S.C. § 481(c), that presents line-drawing issues precisely analogous to those presented by the Campaign Website Resolution, and the judicial interpretations of that provision, will provide guidance in interpreting the Resolution.

Section 401(c) distinguishes between mailings by a union of "campaign literature" and other materials, and it makes a union member's right to demand that the union mail campaign literature to other members turn on whether the member is a "bona fide candidate." In enforcing that provision, the courts have developed a body of law specifying what "campaign literature" is and when a "candida[cy]" begins. *See, e.g., Guzman v. Local 32B-32J*, 151 F.3d 86 (2d Cir. 1998). That body of law provides a ready-made source of materials to aid in the interpretation of the IUOE Campaign Website Resolution and ameliorates any concern that there will be insufficient guidelines for determining whether a website is a "campaign" website.

Second, even if Plaintiffs' facial "vagueness" challenge had some substance, the challenge evaporates once it is recognized that the IUOE has in place an established procedure according to which members can obtain from the IUOE prompt determinations—issued often within days—as to the application of an IUOE election rule to particular proposed conduct. *See supra* at 10-11& n.3. Members who disclose accurate information about the circumstances of their case are, moreover, entitled to rely on the opinion. Facts ¶ 18(iv)(B). As explained *supra* at 10-11, the IUOE Executive Board recently took action to confirm that the procedure would be available with respect to members seeking guidance on the scope of the Campaign Website Resolution. And the D.C. Circuit, recognizing that the central purpose of the vagueness doctrine is to ensure that persons have "a reasonable opportunity to know what is prohibited," has held

that the existence of an administrative review process whereby regulated parties could secure and rely on advisory opinions, defeats a vagueness challenge to an otherwise ambiguous regulation. *See Trans Union Corp. v. FTC,* 245 F.3d 809, 817 (D.C. Cir. 2001) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498) (1982)).

## II.    Plaintiffs Lack Standing to Enjoin the IUOE Constitution's Exhaustion of Remedies Provision

A second, and unrelated, count asserted in the Complaint seeks an injunction that would require the IUOE to "rescind" Article XVII, § 4 of the IUOE Constitution (hereinafter "§ 4"), which authorizes the Union "to the extent not limited by law" to require members to exhaust reasonable internal union remedies for four months before suing the union, and to levy a fine in the amount of the union's legal costs against a member who violates the exhaustion requirement. *See* IUOE Constitution, Article XVII, Section 4 (attached as Exhibit 1 to the Giblin Declaration). Plaintiffs' merits theory is that the exhaustion provision includes a sentence that authorizes the imposition of a fine on a member who fails to exhaust remedies in circumstances when exhaustion is required, and that, so interpreted, the provision is inconsistent with LMRDA § 101(a)(4), captioned "Protection of the right to sue," and is therefore invalid.

**A.**  Plaintiffs' second count must be dismissed on the pleadings under Fed. R. Civ. P. 12(c), because the Plaintiffs lack standing to enjoin the provision in question.

To satisfy the standing requirement required by Article III of the United States Constitution, a plaintiff must have suffered an "injury in fact—an invasion of a legally-protected interest which is . . . actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).

**1.**  Here, the Plaintiffs have failed, first of all, to plead that they have suffered any *actual* (or present) injury connected in any way to § 4's appearance in the IUOE constitution.  In

28

particular, the Plaintiffs do not allege that they have been charged with a violation of § 4, let alone that they have been found guilty or been fined for such a violation.  Nor do Plaintiffs allege that § 4's appearance in the IUOE Constitution has caused any of them to exhaust, or even begin to invoke, any internal union remedies in circumstances where, but for the appearance of § 4, they would have proceeded directly to court.

Not only have Plaintiffs failed to *allege* that that the appearance of § 4 has caused them to invoke internal union remedies and delay proceeding to court out fear that they would be charged, but it is plain from the Complaint that, consistent with the facts, they could not make such an allegation.  That is because they did not in fact invoke any internal union remedies as a prelude to, or in conjunction with, the instant lawsuit.   Nor did § 4 require them to invoke union remedies in conjunction with this lawsuit, as it clear that the next opportunity for a member to bring an internal challenge to the Campaign Website Resolution would be at the next IUOE quinquennial convention in 2008 (*see* Complaint ¶ 47), which is more than four months away, meaning that exhaustion is not required under § 4.  *See* Facts ¶¶ 11, 58.  *See also* 29 U.S.C. § 411(a)(4) (limiting the period of time during which a member may be required to exhaust internal union remedies to four months); *Ornellas v. Oakley*, 618 F.2d 1351 (9th Cir. 1980) (holding that where convention provided next available remedy and convention not scheduled to take place within four months, exhaustion excused).

**2.**  Since it is clear beyond question that no Plaintiff has suffered any actual, or present injury, the only conceivable basis for allowing plaintiffs to proceed here would be if they were seeking to prevent a threatened future injury.  In order to have standing in a suit to prevent a future injury, a plaintiff must show that the injury is "imminent" or "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  "Allegations of *possible* future injury do not

satisfy the requirements of Art. III." *Id.* (emphasis added).  In addition, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted).

Under these standards, Plaintiffs have failed to establish Article III standing.   No Plaintiff here has alleged that he or she is imminently likely to be charged with a violation of § 4 in connection with some other grievance against the Union, or that he or she has ever refrained from or delayed in suing the Union out of fear of being charged or penalized under § 4.   Indeed, from all that appears, the Plaintiffs' sole reason for asserting Count II is to have this Court render an advisory opinion on a wholly abstract question that is unlikely to affect Plaintiffs in any discernable manner.  That is precisely what the "Case or Controversy" requirement in Article III of the United States Constitution forbids.

**B.**   Plaintiffs' attack on § 4 is predicated on a misapprehension as to the meaning of that provision and the enforcement policy under it, and that attack therefore fails on the merits as well.

Section 4's first sentence expressly states that the rules governing exhaustion of IUOE procedures are applicable only "to the extent not limited by law."  The officer of the IUOE empowered to interpret the IUOE Constitution, General President Giblin, has interpreted the quoted clause to apply to, and to thereby limit, the entirety of § 4—including the sentence that appears to be the focus of Plaintiffs' concern, which provides for the union to recover legal fees from a member who fails to exhaust legally required remedies.  *See* Facts ¶ 57.   That interpretation, which is plainly reasonable, is therefore binding.  *See Monzillo v. Biller*, 735 F.2d 1456 (D.C. Cir. 1984).

The Plaintiffs apparently have been laboring under the misconception that the "to the extent not limited by law" proviso applies only to the first half of § 4 and not its entirety. Thus, Plaintiffs have misattributed to the Union the position that the Union possesses the authority to recover, as a sanction for violations of § 4, legal fees from members who fail to exhaust their remedies without a legally valid excuse—even if such a sanction is not a lawful sanction under the LMRDA case law. That is not the Union's position, and once that is recognized, it becomes clear that § 4 is a valid rule and not an unlawful rule. As such, the Plaintiffs' claim that § 4 is facially invalid fails on its merits.

Furthermore, the IUOE recognizes that, under the state of the current law, a union may not impose sanctions against a union member for failure to properly exhaust internal remedies, but may only seek dismissal of the member's lawsuit. Given the state of the law, and given § 4's "to the extent not limited by law" proviso, the IUOE has determined that it will not impose any penalties under § 4 unless and until there is a change in the law. Facts ¶ 59.[11]

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion for summary judgment on count one and motion for judgment on the pleadings for lack of standing or, in the alternative, for summary judgment on count two.

Respectfully submitted,


_____/s/_____
Robert Weinberg (DC 085530)
Leon Dayan (DC 444144)
Matthew Clash-Drexler (DC 477334)
Bredhoff & Kaiser, P.L.L.C.

---

[11] That enforcement, or rather non-enforcement, determination, further confirms that Plaintiffs are not under any imminent threat of being harmed, chilled, or affected in any way by § 4.

805 15th Street, NW
Suite 1000
Washington, DC   20005
202-842-2600
202-842-1888 (fax)

*Counsel for Defendants International Union
of Operating Engineers and Vincent J. Giblin*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
MICHAEL J. QUIGLEY, *et al.*,                 )
                                              )
              Plaintiffs,                     )
                                              )
       viii.                                  )          Civ. A. No. 07-600 (RBW)
                                              )
INTERNATIONAL UNION OF                        )
OPERATING ENGINEERS, *et al.*,                )
                                              )
              Defendants.                     )
_____)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Defendants, by and through their undersigned counsel, submit pursuant to Local Rule 56.1 of the United States District Court for the District of Columbia, this statement of material facts for which there is no genuine issue to be tried.

**<u>IUOE Governance</u>**

1.     The International Union of Operating Engineers ("IUOE") is an international labor organization with approximately 396,000 members. *See* Declaration of Vincent J. Giblin ("Giblin Decl.") at ¶ 6.

2.     The IUOE has 138 chartered and autonomous local unions across the United States and Canada. *See id.*

3.     The IUOE primarily represents Operating Engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and Stationary Engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. The IUOE also represents approximately 3,600 registered nurses and other medical personnel. *See id.* at ¶ 8.

4.      The governing document for the IUOE is its Constitution.  *See* IUOE Constitution (attached as Exhibit 1 to the Giblin Declaration).

5.      The principal officer of the IUOE is Defendant Vincent J. Giblin, who is the General President of the IUOE.  *See* Giblin Decl. at ¶ 1.

6.      General President Giblin has served as the General President since March 1, 2005. *See id.*

7.      Before becoming the IUOE General President, General President Giblin was the General Secretary-Treasurer of the IUOE, the second highest ranking officer in the IUOE. General President Giblin held the General Secretary-Treasury position from December 1, 2002 until he became the General President.  *See id.* at ¶ 3.

8.      The IUOE Constitution authorizes the General President to "interpret the provisions of the [IUOE] Constitution," and "decide questions of law arising [under the IUOE Constitution]."  *See id.* at ¶ 2; *see also* IUOE Constitution, Art. VI, Section 2 (attached as Exhibit 1 to the Giblin Declaration).

9.      The General President serves as the chairman of the IUOE's General Executive Board.  *See* Giblin Decl. at ¶ 2.

10.      When in session, the IUOE is governed by the General Convention, which, according to Article III, Section 3 of the IUOE Constitution, is composed of legally elected officers of the IUOE, members of the IUOE General Executive Board and the Board of Trustees, and representative delegates from IUOE local unions.  *See* IUOE Constitution, Art. III, Section 3 (attached as Exhibit 1 to the Giblin Declaration); Giblin Decl. at ¶ 9.

11.      The General Convention meets every five years, with the next convention scheduled for April of 2008.  *See* Giblin Decl. at ¶ 9.

12.     In between General Conventions, the IUOE is governed by the General Executive Board, which meets at least quarterly.  *See id.*

13.     The IUOE Constitution sets forth the "laws, rules and procedures by which Local Unions [that are chartered by the IUOE] shall conduct their affairs."  IUOE Constitution, Article XXIV (attached as Exhibit 1 to the Giblin Declaration).

14.     The IUOE Constitution establishes the requirements for candidates to run for local union office and the procedure for how those elections will occur.  IUOE Constitution, Article XXIV, Subdivision 1(a), 1(e) (attached as Exhibit 1 to the Giblin Declaration).

15.     The IUOE Constitution mandates that local union elections "shall be held in the month of August" and that the "nominations shall be made at a regular meeting . . . no . . . earlier than the May meeting preceding the election."  IUOE Constitution, Article XXIV, Subdivision 1(e) (attached Exhibit 1 to the Giblin Declaration).  Additionally, the IUOE Constitution includes an "outsider rule" that prohibits candidates for union office from accepting campaign contributions from persons other than members of the IUOE.  *See id.*

### Campaign Website Resolution

16.     In January of 2007, the IUOE adopted the Campaign Website Resolution ("Resolution").  *See* Giblin Decl. at ¶ 24; *see also* Campaign Website Resolution (attached as Exhibit 2 to the Giblin Declaration).

17.     The Resolution in part provides:

> NOW THEREFORE BE IT RESOLVED THAT the General Executive Board, in order to assure the fullest expression of free speech by candidates in Local Union elections while protecting the Local Unions from adverse actions by employers, directs that, starting with Local Union elections to be held in 2007, Local Unions and their election committees shall require all candidates and their supporters who have set up or wish to set up campaign websites to include a password protection function.

Campaign Website Resolution (attached as Exhibit 2 to the Giblin Declaration).

18.    In a letter sent on May 11, 2007 to the Business Managers of all IUOE local unions, General President Giblin advised them of the General Executive Board's adoption of four implementation guidelines with respect to the Campaign Website Resolution (*see* Giblin Decl. at ¶ 31; Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration):

(i)    First, the Resolution requires that only persons who are not members of the IUOE must be excluded from local union campaign websites by the password protection feature described in the Resolution.  *See* Giblin Decl. at ¶ 31(i); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration).

(ii)    Second, the IUOE will retain an outside, independent information technology consulting firm to respond to inquiries by members affected by the Resolution regarding any technological issues that might arise in seeking to comply with the Resolution and to provide such assistance as might be necessary to enable the members to comply with the Resolution. The IUOE is making this assistance available at no cost to the affected members.  *See* Giblin Decl. at ¶ 31(ii); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration).

(iii)    Third:

(a) The IUOE set up a process to address concerns regarding any technological burden imposed by the Resolution.  If the consulting firm is unable to resolve promptly any technological problems members might experience in establishing compliant campaign websites, the affected member may seek and obtain a waiver of the Resolution's requirements.  *See* Giblin

4

Decl. at ¶ 31(iii); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration).

(b)  No member will be subject to discipline for noncompliance during any period in which the member can document that he or she attempted diligently and in good faith to comply with the Resolution by using the services of the independent consulting firm to resolve any technological problems in maintaining the password protection feature and/or by expeditiously seeking a waiver under this procedure.  *See* Giblin Decl. at ¶ 31(iii); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration).

(iv) Fourth:

(a) The General President will promptly respond to written requests by members for clarification concerning the application or scope of the Resolution.  The IUOE will make the decisions of the General President regarding the application or scope of the Resolution available to members of the union.  *See* Giblin Decl. at ¶ 31(iv); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration).

(b)  A member who has truthfully disclosed the facts in making a request for clarification and who is advised by the International Union in an opinion issued pursuant to this procedure as to whether his or her website is, in whole or in part, outside the coverage of the Resolution, will not be subject to discipline for failure to comply with the Resolution if he or she relies on the advice given in the opinion.  *See* Giblin Decl. at ¶ 31(iv); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration).

19.    The IUOE has an established process whereby candidates, local unions, and local union election committees may obtain from the General President an interpretation on an IUOE Constitutional provision and its election-related requirements.  The General President's interpretations are collected and maintained in a form available to interested members.  *See* Giblin Decl. at ¶ 31(iv); Letter from V. Giblin to IUOE Local Union Business Managers (May 11, 2007) (attached as Exhibit 5 to the Giblin Declaration); Decisions & Opinions of the General President (attached as Exhibit 6 to the Giblin Declaration).

20.    On February 12, 2007, General President Giblin sent a letter to the Business Managers of IUOE local unions stating that the Resolution "will not in any way limit the content of what is said on [campaign] websites; it will merely attempt to assure that sensitive information concerning Local Union affairs is shared among members, and is not available to employers and others with interests contrary to those of the Local Unions as institutions."  *See* Letter from V. Giblin to IUOE Local Union Business Managers (Feb. 12, 2007) (attached as Exhibit 3 to Giblin Declaration); *see also* Giblin Decl. at ¶ 29 (stating that "the IUOE adopted a rule that imposes no limitation on what a candidate can post on his or her campaign website, including criticism or dissent of the IUOE, any local union of the IUOE, any of their officers, or any of the actions or decisions made by the unions or their officers").

21.    At the time that the Resolution was adopted, the IUOE General Executive Board was informed that the installation of a password-protection function would not impose any undue technological burden or undue expense.  *See* Giblin Decl. at ¶ 27.

## IUOE's Reasons For Adopting the Resolution

22.    In adopting the Resolution, the IUOE sought to balance the IUOE's interest in protecting sensitive information from disclosure to nonmembers with the goal of not limiting in any way the content of what a candidate can post on his or her campaign website. *See id.* at ¶ 26.

23.    The IUOE adopted the Resolution to "assure the fullest expression of views by members" by fostering robust and uninhibited debate and discussion between and among members of the union on campaign websites without the inhibiting effects on such member speech that would occur if the debate and discussion were readily accessible by nonmembers, including employers. Campaign Website Resolution (attached as Exhibit 2 to the Giblin Declaration); *See* Letter from V. Giblin to IUOE Local Union Business Managers (Feb. 12, 2007) (attached as Exhibit 3 to the Giblin Declaration); Giblin Decl. at ¶ 26.

24.    At the time the Resolution was adopted, the IUOE General Executive Board was aware that "candidates for Local Union office and their supporters have taken advantage of the ease of communication over the Internet to establish websites to promote their candidacies" and that campaign websites "have become a common feature of contests for Local Union office." *See* Letter from V. Giblin to IUOE Local Union Business Managers (Feb. 12, 2007) (attached as Exhibit 3 to the Giblin Declaration).

25.    At the time the Resolution was adopted, the IUOE General Executive Board was aware that candidates had created campaign websites that were accessible by nonmembers in past elections in at least the following IUOE locals:  Local 3, Local 12, Local 18, Local 30, Local 39, Local 49, Local 66, Local 139, Local 302, and Local 501.  *See* Giblin Decl. at ¶ 14.

26.    General President Giblin has stated that the increasing use of websites by candidates for local union office has the potential to expand the quality of local union elections, and that campaign websites provide an inexpensive means for candidates to express their views

about issues affecting the local union.  *See* Giblin Decl. at ¶ 13; *see also* Letter from V. Giblin to IUOE Local Union Business Managers (Feb. 12, 2007) (attached as Exhibit 3 to the Giblin Declaration).

27.    Before the use of the Internet, a candidate's principal method for distributing campaign literature was to mail the literature to the members at their home addresses – a process that is more costly and cumbersome than posting the information electronically.  *See* Giblin Decl. at ¶ 13.

28.    General President Giblin stated that as a result of the speed at which information can be disseminated and updated on a campaign website and the ability of members to access that information from anywhere and at any time, candidates and the members who visit campaign websites are able to debate the issues before the union in a manner that cannot be accomplished through other means.  *See id*.

29.    Some campaign websites have incorporated discussion forums or chat rooms to allow for a more interactive discussion and debate of the issues between candidates and the members of the union.  *See id*.

30.    The IUOE has created its own website – www.iuoe.org – and nearly 60 IUOE local unions have created local union websites.  *See* Giblin Decl. at ¶ 12.

31.    At the time the Resolution was adopted, the IUOE General Executive Board had concluded that, in situations where local union campaign websites are accessible by nonmembers, the very nature of campaign websites that makes them effective campaign tools also creates a risk to the interests of the IUOE and its ability to represent the interests of its members.  *See* Giblin Decl. at ¶ 14.

32.    The IUOE General Executive Board adopted the Resolution with the understanding that "there have been instances where employers have misused information obtained from candidates' websites to the detriment of IUOE Local Unions in organizing campaigns and contract negotiations."  Campaign Website Resolution (attached as Exhibit 2 to the Giblin Declaration); *see also* Letter from V. Giblin to IUOE Local Union Business Managers (Feb. 12, 2007) (attached as exhibit 3 to the Giblin Declaration) (stating that "employers with interests contrary to Local Unions have used information obtained from campaign websites to harm Local Unions in collective bargaining negotiations and organizing campaigns"); Giblin Decl. at ¶¶ 15-16.

33.    The IUOE General Executive Board determined that local union campaign websites that are accessible to nonmembers are potentially harmful to the interests of the union because local union elections frequently involve the discussion and debate of sensitive union matters, including collective bargaining or organizing goals, strategies, and tactics.  *See* Giblin Decl. at ¶ 19; *see also* Campaign Website Resolution (stating that campaign "websites . . . allow . . . access to frequently sensitive information about the Local Unions") (attached as Exhibit 2 to the Giblin Declaration).  Moreover, because of the use of chat rooms and discussion formus, campaign websites pose the additional concern that outsiders to the union could intervene improperly in the elections themselves.  Giblin Decl. at ¶ 23.

34.    General President Giblin stated in his February 12, 2007 letter to IUOE local union business managers that "unprotected web sites are open to anyone with access to a computer and the Internet, and allow non-members, including employers, access to such sensitive information. . . .  [T]he Board was also concerned about the ability of unscrupulous non-members to take advantage of website-generated information to harm Locals in negotiations

9

and organizing, as well as the potential for such non-members to intervene improperly in the elections themselves." Letter from V. Giblin to IUOE Local Union Business Managers (Feb. 12, 2007) (attached as Exhibit 3 to the Giblin Declaration).

35.     The General Executive Board concluded that a union's ability to represent its members can be significantly compromised if these sensitive matters are disclosed to employers or other adverse parties. Giblin Decl. at ¶ 15.

36.     The IUOE Constitution provides that local union meetings are open only to members of the union and not to the general public. *See* IUOE Constitution, Article XXIV, Subdivision 2(g) (attached as Exhibit 1 to the Giblin Declaration).

37.     Local unions throughout the labor movement, including the IUOE, open local union meetings only to union members. Giblin Decl. at ¶ 16.

38.     The reasons for restricting access to local union meetings to union members are:

    (i)     A members-only meeting prevents the decisions of the local union from being disclosed to employers or others with interests adverse to the union. Giblin Decl. at ¶ 16.

    (ii)     Without closed meetings, the local union would be unable to have a free, open, and robust discussion and debate of bargaining and organizing strategies, tactics, and goals. Giblin Decl. at ¶ 16.

    (iii)     If local union meetings were open to nonmembers, members could be deterred from speaking their minds out of fear that their employers would retaliate against them for positions that they advocate. Giblin Decl. at ¶ 16.

39.     The minutes of local union meetings both within the IUOE and the labor movement generally are not made available to nonmembers. Giblin Decl. at ¶¶ 20-21.

40.     General President Giblin has stated that meeting minutes often contain matters that are appropriate for and indeed should be a topic of discussion and debate in local union elections and that a campaign website that protected its information from dissemination to nonmembers could provide an effective vehicle for members to debate, discuss, and criticize the decisions made at those meetings and could propose alternative courses for the local union to take.  Giblin Decl. at ¶ 21.

41.     The IUOE General Executive Board first became aware of the risk posed by campaign websites through a dispute that arose in IUOE Local Union 30 that involved, among other things, the use of campaign websites in a local union election.  *Id.* at ¶ 17.

42.     During the hearing on International Supervision for Local 30, which was attended by more than 750 members and included the testimony of 100 members of the local union, General President Giblin (who was then the IUOE's General Secretary-Treasurer) learned that employers had been monitoring campaign websites of Local 30 candidates and were using the information found on the websites to defeat organizing campaigns and to improve their position at the bargaining table.  *Id.* at ¶ 19.

43.     Members reported at the hearing on International Supervision for Local 30 that their employer was quoting excerpts from campaign websites during negotiations, and that the information on campaign websites was used to defeat the Local's organizing campaigns, including a campaign to organize hospital workers in Greenwich, Connecticut.  *Id.*

44.     Four members specifically requested at the hearing on International Supervision for Local 30 that the IUOE require that campaign websites be password protected.  *Id.*

45.     In 2005, a candidate for local union office in IUOE Local 66 posted the minutes from local union meetings on his campaign website.  General President Giblin informed the

11

candidate for local union office in IUOE Local 66 that, because employers may use information gathered from the minutes to gain a strategic edge at the bargaining table or to oppose ongoing or planned organizing drives, he was not permitted to post those minutes on a campaign website that is accessible to nonmembers. *Id.* at ¶ 20.

46.     The IUOE considered alternatives to the Resolution's password-protection requirement, including reviewing campaign websites for sensitive information, contacting candidates who had posted such information, and asking them to remove it. *Id.* at ¶ 28.

47.     The IUOE rejected that alternative for the following reasons:

(i)     The IUOE rejected that alternative to the Resolution's password-protection requirement because the IUOE was concerned that policing campaign websites for sensitive information would create the perception that the IUOE was favoring certain types of speech over others or targeting specific candidates. *Id.*

(ii)     The IUOE rejected that alternative to the Resolution's password-protection requirement because it concluded that reviewing each individual campaign website would impose a substantial administrative burden on the IUOE, as the IUOE would need to identify each individual website and constantly monitor it because those websites can be constantly changed and updated. *Id.*

(iii)     The IUOE rejected that alternative to the Resolution's password-protection requirement because it concluded that a request that a candidate remove information already posted on the Internet is too late to protect the information from dissemination to nonmembers. *Id.*

### The Technology For The IUOE's Password Protection System

48.     The IUOE will contract with an independent third-party web hosting service to provide remote authentication of IUOE members' User IDs and passwords so that IUOE members and only IUOE members can readily access the information on any campaign website. *See* Declaration of Don Chism ("Chism Decl.") at ¶ 4.

49.     Remote authentication of IUOE members' User IDs and passwords means that the database containing the list of User IDs and corresponding passwords will be hosted by an independent third-party web hosting firm.  Declaration of Joanna Pineda ("Pineda Decl.") at ¶ 9.

50.     Joanna Pineda, Defendants' expert witness, concluded that installing a password protection feature on a website through remote authentication will impose little to no additional cost on members, above and beyond the cost of establishing and maintaining a campaign website in the first instance.  Pineda Decl. at ¶¶ 10, 13

51.     The most basic web hosting package provided by Network Solutions and GoDaddy.com will allow remote authentication at no additional cost.  *See id.* at ¶ 13.

52.     YahooGeoCities.com and Brinkster.com require a user to pay three or four dollars per month extra (beyond the most basic package of each service) to enable remote authentication.  *See id.*

53.     The cost of a web hosting service with remote authentication on YahooGeoCities is $6.71 per month, which is nearly $5 per month cheaper than the basic web hosting package offered by Network Solutions.  *See id.*

54.     Joanna Pineda, Defendants' expert witness, has concluded that the Campaign Website Resolution will not require a significant amount of additional technical competence for a member who is already able to establish a website in the first instance.  *See id.* at ¶¶ 10, 12.

13

55.     The conclusion of the expert witness stated in paragraph 54 is based on the following considerations:

(i)     Joanna Pineda, Defendants' expert witness, concluded that the method of password protection the IUOE intends to use is a particularly simple and user friendly method, and, when combined with the technical support the IOUE will provide, it will not impose any significant additional burdens on members who choose to maintain campaign websites.  *See id.* at ¶ 12.

(ii)     The contract between the IUOE and the independent third-party web hosting service will require the independent third-party web hosting service to create and supply to any interested members who wish to set up a campaign website the text of what they will need to type into their web sites in order to enable password protection on those websites.  Pineda Decl. at ¶ 12; Chism Decl. at ¶ 6.

**The IUOE's Rule on Exhaustion of Internal Remedies**

56.     Article XVII, Section 4 of the IUOE Constitution requires, among other things, that a member "resort to internal remedies for a period not exceeding four (4) months" before commencing any "suit or other action at law or equity" against the IUOE.  IUOE Constitution, Art. XVII, Section 4 (attached as Exhibit 1 to the Giblin Declaration).

57.     Article XVII, Section 4 begins "[t]o the extent not limited by law."  General President Giblin has, based on his constitutional authority to "interpret the provisions of the [IUOE] Constitution," and "decide questions of law arising [under the IUOE Constitution]," determined that the phrase "[t]o the extent not limited by law" modifies all of Article XVII, Section 4, including the four month exhaustion requirement and the ability of the IUOE to

impose any penalties for failing to comply with the exhaustion requirement. *See id.*; *see also* Giblin Decl. at ¶ 32.

58.    Because the final internal remedy available to members is an appeal to the IUOE General Convention, *see* IUOE Constitution, Article XVII, Section 2 (attached as Exhibit 1 to the Giblin Declaration), which is only held every five years, the IUOE has interpreted Article XVII, Section 4 to mean that if the General Convention is more than four months away, the exhaustion requirement of this provision does not apply. *See* Giblin Decl. at ¶ 33.

59.    Because of the state of current law and the requirement in Article XVII, Section 4 that penalties can be imposed only "[t]o the extent not limited by law," the IUOE has determined that it will not impose any penalties under this provision unless and until there is a change in the law. *Id.* at ¶ 34.

60.    The United States Department of Labor, as part of its general oversight of labor unions, has recently reviewed the IUOE Constitution for compliance with existing laws and did not identify Article XVII, Section 4 as a provision out of compliance with the law. *Id.* at ¶ 35.

## The Plaintiffs' Websites

61.    Each of the plaintiffs in this action is a member of the IUOE and one of its chartered local unions. *See* Answer (d/e 4) ¶ 3 (admitting ¶ 3 of Complaint).

62.    Plaintiff Joseph Ward, a member of Local Union 150, is a candidate for the Business Manager of the local union, the highest elected office in that local, in the upcoming August, 2007 election. *See* Answer (d/e 4) at ¶ 22.

63.    Plaintiff Ward is a former officer of Local 150, having been elected and re-elected to the position of treasurer several times, and was also on the payroll of that local for many years as a staff employee. *See id.*

64.    Plaintiff Ward, along with a slate of other candidates for Local 150 elected positions, had established a website (www.150election.com) to promote his candidacy and that of his fellow slate members.  *See id.*

65.    Plaintiff Ward's campaign website contains numerous postings on what is occurring in Local 150 and other matters of concern to the campaign; among the items posted are minutes from local union executive board meetings and statements and opinions regarding upcoming collective bargaining negotiations.  *See, e.g.,* Declaration of Patrick Johnson, Exhs. 1-3.

66.    Two other Plaintiffs, Paul Gonter and Paul Mueller, are not currently running for any position, but allege that they intend to do so in the future.  *See* Compl. (d/e 1) at ¶¶ 23-24.

67.    Plaintiff Patricia Kohl alleges that she "intends to support candidates for election . . . in IUOE Local 18," which will occur in August of 2008  *See id.* at ¶ 23.  Plaintiff Kohl alleges that she "operates a web site at http://www.local18membersvoice.org," and that she will use the website to support candidates for local union office.  Compl. at ¶ 23.  That website, which "expresses views about issues in the local union as well as the national union," *see id.*, contains two separate password-protected discussion forums that allow those who join to, among other things, "report corruption and to promote union democracy."  *See* http://www.membersvoice.net/forum <last visited May 7, 2007>; *see also* Yahoo Groups, http://www.local18membersvoice.org <last visited May 7, 2007>.

Respectfully submitted,


_____/s/_____
Robert Weinberg (DC 085530)
Leon Dayan (DC 444144)
Matthew Clash-Drexler (DC 477334)

Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW
Suite 1000
Washington, DC   20005
202-842-2600
202-842-1888 (fax)

*Counsel for Defendants International Union*
*of Operating Engineers and Vincent J. Giblin*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL J. QUIGLEY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civ. A. No. 07-600 (RBW) |
| | ) |
| INTERNATIONAL UNION OF | ) |
| OPERATING ENGINEERS, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF VINCENT J. GIBLIN

1.      I am the General President of the International Union of Operating Engineers ("IUOE"). I have held this position since March 1, 2005. The General President is the principal officer of the IUOE.

2.      As the General President, I have the authority pursuant to Article VI, Sections 1 and 2 of the IUOE Constitution to, among other things, "preside at all meetings of the [IUOE] General Convention," "interpret the provisions of the [IUOE] Constitution," and "decide questions of law arising [under the IUOE Constitution]." A true and correct copy of the IUOE Constitution is attached as exhibit 1. As the General President, I also serve as the chairman of the IUOE's General Executive Board.

3.      Before becoming the IUOE General President, I was the General Secretary-Treasurer of the IUOE, the second highest ranking officer in the IUOE. I held this position from December 1, 2002 until I became the General President.

4.      From 1989 until becoming General Secretary-Treasurer I was a General Vice President of the International Union and member of its General Executive Board.

5.      From 1975 until 2004, I served as the Business Manager for IUOE Local Union 68. The Business Manager is the principal officer of an IUOE local union. I have been a member of Local 68 for nearly forty years.

6.      The IUOE is an international labor organization with approximately 396,000 members and with 138 chartered and autonomous local unions across the United States and Canada. Each IUOE member is assigned a unique register number and is given a membership card containing that number.

7.      IUOE local unions range in size from 14 members up to over 40,000 members.

8.      The IUOE primarily represents Operating Engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and Stationary Engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. The IUOE also represents approximately 3,600 registered nurses and other medical personnel.

9.      When in session, the IUOE is governed by the General Convention, which is composed of legally elected officers of the IUOE, members of the IUOE General Executive Board and the Board of Trustees, and representative delegates from IUOE local unions. The General Convention meets every five years, with the next convention scheduled for April of 2008. In between general conventions, the IUOE is governed by the General Executive Board, which meets at least quarterly.

10.     Elections for local union officers are held in August. Nominations for those elections are to be made no earlier than the May membership meeting before the election.

11.    Throughout my time as General President and General Secretary-Treasurer of the IUOE, I have become aware that candidates for local union positions have with greater frequency created campaign websites to support their candidacies.

12.    As the General President of the IUOE, I am fully supportive of the expanding use of the Internet to convey information about our union and as part of the election process.  Indeed, the IUOE has created its own website – www.iuoe.org – and nearly 60 IUOE local unions have created local union websites.

13.    The increasing use of websites by candidates for local union office has the potential to expand the quality of local union elections.  Previously, a candidates' principal method for distributing campaign literature was to mail the literature to the members at their home addresses – a process that is more costly and cumbersome than posting the information electronically.  Campaign websites provide an inexpensive means for candidates to express their views about issues affecting the local union.  Moreover, the speed at which information can be disseminated and updated on websites and the ability to access that information from anywhere and at any time allows candidates and the members who visit candidate websites to debate the issues before the union in a manner that cannot be accomplished through other means.  For instance, I am aware that some campaign websites have incorporated discussion forums or chat rooms to allow for a more interactive discussion and debate of the issues between candidates and the members of the union.

14.    It has also come to my attention that the very nature of campaign websites that makes them effective campaign tools also creates a risk to the interests of the IUOE and its ability to represent the interests of its members.  In particular, unless candidates take steps to limit access to campaign websites, those websites may be readily accessed not only by members

3

of the IUOE but by any nonmember, which could include employers or organizations or individuals with interests adverse to the union. In this regard, I am aware that, in past elections, candidates have created campaign websites that are accessible to nonmembers in elections in at least the following IUOE locals, Local 3, Local 12, Local 18, Local 30, Local 39, Local 49, Local 66, Local 139, Local 302, and Local 501.

15.    The IUOE General Executive Board determined that local union campaign websites that are accessible to nonmembers of the IUOE – particularly to employers with whom IUOE might deal – are potentially harmful to the interests of the union because local union elections frequently involve the discussion and debate of sensitive union matters, including collective bargaining or organizing goals, strategies, and tactics. A union's ability to represent its members can be significantly compromised if these sensitive matters are disclosed to employers or other adverse parties.

16.    The risks associated with local union campaign websites that are accessible to nonmembers of the IUOE are similar to many of the concerns that have caused local unions, throughout the labor movement, including the IUOE, to open local union meetings only to union members. First, a members-only meeting prevents the decisions of the local union from being disclosed to employers or others with interests adverse to the union. Second, without closed meetings, the local union would be unable to have a free, open, and robust discussion and debate of strategies, tactics, and goals. Moreover, if local union meetings were open to nonmembers, members could be deterred from speaking their minds out of fear that their employers would retaliate against them for the positions being advocated. In sum, the openness and frankness of the debate and discussion at local union meetings benefit from the knowledge that the meeting is closed to outsiders.

17.    The IUOE General Executive Board first became aware of the risk posed by campaign websites through a dispute that arose in IUOE Local Union 30 that involved, among other things, the use of campaign websites in an election.

18.    In the fall of 2000, then General President Frank Hanley appointed me to serve as the Chairman of a panel of three IUOE General Vice Presidents to preside at a hearing to determine whether the General President should place Local 30 under International Supervision (the equivalent of trusteeship).

19.    During the hearing on International Supervision for Local 30, which was attended by more than 750 members and included the testimony of 100 members of the local union, I learned that employers had been monitoring websites of Local 30 candidates and were using the information found on the websites to defeat organizing campaigns and to improve their position at the bargaining table. For example, members reported that their employer was quoting excerpts from campaign websites during negotiations, and that the information on campaign websites was used to defeat the Local's organizing campaigns, including a campaign to organize hospital workers in Greenwich, Connecticut. Finally, during the hearing, at least four members specifically requested that the IUOE require that websites be password protected.

20.    In addition to instances where the IUOE was told that employers had misused information posted on campaign websites, it has also come to the attention of the IUOE General Executive Board that candidates have frequently posted sensitive union matters on their campaign websites. For example, in IUOE Local No. 66, a candidate in 2005 posted the minutes from a local union board meeting and the meeting of the trustees of the union's pension fund on his campaign website. As explained above, local union meetings and the meetings of the trustees of the union's pension fund are not open to the public. Accordingly, I informed the candidate

5

that, because employers may use information gathered from the minutes to gain a strategic edge

at the bargaining table or to oppose ongoing or planned organizing drives, he was not permitted

to post those minutes on a campaign website that is accessible to nonmembers.

21.     While the union's interests and ability to represent its members can be harmed by

the posting of meeting minutes on a publicly-accessible campaign website, I do believe that

meeting minutes often contain matters that are appropriate for and indeed should be a topic of

discussion and debate in local union elections.  Not all members of a local union are able to

attend each and every union meeting.  Accordingly, a campaign website that protected its

information from dissemination to the public could provide an effective vehicle for members to

debate, discuss, and criticize the decisions made at those meetings and propose alternative

courses for the local union to take.

22.     Based on the problems illustrated by these past incidents and because of the free,

open, and indeed robust debate of issues that typically occurs on campaign websites, the IUOE

General Executive Board became concerned that allowing campaign websites to be accessible to

nonmembers, which would include employers, poses a significant risk of harm to the interests of

union in representing their membership, primarily in collective bargaining negotiations and in

organizing campaigns.

23.     Moreover, campaign websites, which have in the past included chat rooms and

discussion forums, pose the additional concern that outsiders to the union could intervene

improperly in the elections themselves.

24.     Accordingly, in January of 2007, the IUOE adopted the Campaign Website

Resolution ("Resolution").  A true and correct copy of the Campaign Website Resolution is

attached as Exhibit 2.

25.    On February 12, 2007, I sent a copy of the Resolution to the Business Managers of all IUOE local unions. A true and correct copy of the February 12, 2007 letter is attached as Exhibit 3.

26.    The Resolution sought to balance the IUOE's interest in protecting sensitive information from disclosure to nonmembers with the goal of not limiting in any way the content of what a candidate can post on his or her campaign website and, thus, the content of a candidate's communication with the members of the union. Indeed, in the ways described above, the Resolution would foster robust and uninhibited debate and discussion between and among members of the union. Accordingly, the Resolution requires that candidates for local union elections or their supporters who set up campaign websites must include a password-protection function that limits access to the sites to members of the IUOE.

27.    The IUOE General Executive Board was informed that the installation of a password-protection function would not impose any undue technological burden or undue expense.

28.    The IUOE considered alternatives to the password-protection requirement, including constantly reviewing campaign websites for sensitive information and contacting candidates who had posted such information and asking them to remove it. The IUOE rejected that alternative. First, policing campaign websites for sensitive information would create the perception that the union was favoring certain types of speech over others or targeting specific candidates. Second, reviewing each individual campaign website would impose a substantial administrative burden on the IUOE, as the IUOE would need to identify each individual website and constantly monitor it because those websites can be constantly changed and updated.

7

Finally, a request that a candidate remove information already posted on the Internet is too late to protect the information from dissemination to nonmembers.

29.     Given the concerns with an approach that would require the IUOE to monitor the content of the individual campaign websites, the IUOE adopted a rule that imposes no limitation on what a candidate can post on his or her campaign website, including criticism or dissent of the IUOE, any local union of the IUOE, any of their officers, or any of the actions or decisions made by the unions or their officers.

30.     The initial effective date of the Resolution was April 15, 2007. On April 10, 2007, the IUOE extended the effective date of the Resolution until July 1, 2007. A true and correct copy of the April 10, 2007 letter is attached as exhibit 4.

31.     On May 11, 2007, I sent a letter to the Business Managers of all IUOE local unions advising them of the General Executive Board's adoption of four implementation guidelines. A true and correct copy of the May 11, 2007 letter is attached as exhibit 5. As stated in exhibit 5, those four guidelines are as follows:

(i)     First, the IUOE made clear that only persons who are not members of the International Union must be excluded from local union campaign websites by the password protection feature described in the Resolution.

(ii)    Second, while the IUOE adopted the Resolution with the understanding that the installation of a password-protection feature would not impose an undue technological burden on any candidates or their supporters, the IUOE informed its local unions that it will be retaining an outside, independent information technology consulting firm to respond to inquiries by members affected by the Resolution regarding any technological issues that might arise in seeking to comply with the Resolution and to provide such assistance as might be necessary to

8

enable the members to comply with the Resolution. The IUOE is making this assistance available at no cost to the affected members.

(iii)    Third, the IUOE set up a process to address concerns regarding any technological burden imposed by the Resolution. Specifically, if the consulting firm is unable to resolve promptly any technological problems members might experience in establishing compliant campaign websites, the affected member may seek and obtain a waiver of the Resolution's requirements. The letter also provides that no member will be subject to discipline for noncompliance during any period in which the member can document that he or she attempted diligently and in good faith to comply with the Resolution by using the services of the independent consulting firm to resolve any technological problems in maintaining the password protection feature and/or by expeditiously seeking a waiver under this procedure.

(iv)    Fourth, the IUOE has a well-established process and procedure whereby disputes regarding the interpretation of IUOE rules applicable to a local union election may be brought to the IUOE General President for guidance. The May 11, 2007 letter provided that, consistent with this process and procedure, the General President will promptly respond to written requests by members for clarification concerning the application or scope of the Resolution. In order to provide guidance to other members, the IUOE will make the decisions of the General President regarding the application or scope of the Resolution available to members of the union. Moreover, a member who has truthfully disclosed the facts in making a request for clarification and who is advised by the International Union in an opinion issued pursuant to this procedure as to whether his or her website is, in whole or in part, outside the coverage of the Resolution, will not be subject to discipline for failure to comply with the Resolution if he or she relies on the advice given in the opinion.

The IUOE has utilized a similar process to respond to other election-related inquiries. Under this process, candidates, local unions, and local union election committees have the ability to request that the General President provide an interpretation on an IUOE Constitutional provision and its election related requirements. For example, the IUOE has received numerous questions regarding whether a candidate meets the IUOE constitutional requirements for eligibility to run for local union office. Through this process, the IUOE is able to provide prompt interpretations of election-related issues. A true and correct copy of the most recent bound version of the decisions rendered by the General President is attached as exhibit 6.

32.    Article XVII, Section 4 of the IUOE Constitution requires, among other things, that a member "resort to internal remedies for a period not exceeding four (4) months" before commencing any "suit or other action at law or equity" against the IUOE. Article XVII, Section 4 begins "[t]o the extent not limited by law." As the General President and with the authority granted by the IUOE Constitution to interpret the provisions of the Constitution, it is my interpretation that the phrase "[t]o the extent not limited by law" modifies all of Article XVII, Section 4, including the four month exhaustion requirement and the ability of the IUOE to impose any penalties for failing to comply with the exhaustion requirement.

33.    Further, because the final internal remedy available to members is resort to the IUOE General Convention, which is only held every five years, the IUOE has interpreted Article XVII, Section 4 to mean that if the General Convention is more than four months away, the exhaustion requirement of this provision does not apply. Where the General Convention is less than four months away, the IUOE retains the right to assert exhaustion as a defense to any legal or administrative proceeding.

34.    Because of the state of current law and the requirement in Article XVII, Section 4 that penalties can be imposed only "[t]o the extent not limited by law," the IUOE will not impose any penalties under this provision unless and until there is a change in the law.

35.    The United States Department of Labor, as part of its general oversight of labor unions, has recently reviewed the IUOE Constitution for compliance with existing laws and did not identify Article XVII, Section 4 as a provision out of compliance with the law.

I declare under penalty of perjury that the facts stated herein are true and correct.

Dated:

Vincent J. Giblin

# Exhibit 1 to Giblin Declaration
# (part 1)



CONSTITUTION

ORGANIZED DEC. 7 1896 · INTERNATIONAL UNION OF OPERATING ENGINEERS · A VINCIT QUI LABORAT

INTERNATIONAL UNION OF OPERATING ENGINEERS



**International Union of Operating Engineers**
**1125 17th Street, N.W., Washington, D.C. 20036**

# The
# CONSTITUTION
### Governing
# THE INTERNATIONAL UNION OF OPERATING ENGINEERS
### And
## All Subdivisions, Bodies, Local Unions and Members Thereof

**The International Union of Operating Engineers**
Organized December 7, 1896
*Affiliated with AFL-CIO*

Compiled by the Constitution Convention Sept. 30, 1938, and adopted by Referendum Vote of Entire Membership Dec. 31, 1938.

| | |
|---|---|
| Amended by 21st Int. Convention | April 1940 |
| Amended by 22nd Int. Convention | April 1944 |
| Amended by Referendum | September 1, 1947 |
| Amended by 23rd Int. Convention | April 1948 |
| Amended by Referendum | August 1, 1951 |
| Amended by 24th Int. Convention | April 1952 |
| Amended by 25th Int. Convention | April 1956 |
| Amended by 26th Int. Convention | April 1960 |
| Amended by 27th Int. Convention | April 1964 |
| Amended by 28th Int. Convention | April 1968 |
| Amended by 29th Int. Convention | April 1972 |
| Amended by 30th Int. Convention | April 1976 |
| Amended by Referendum | September 28, 1977 |
| Amended by 31st Int. Convention | April 1980 |
| Amended by 32nd Int. Convention | April 1984 |
| Amended by 33rd Int. Convention | April 1988 |
| Amended by 34th Int. Convention | April 1993 |
| Amended by 35th Int. Convention | April 1998 |
| Amended by 36th Int. Convention | April 2003 |

---

★ ★ *International Union of Operating Engineers*
★
★ 1125 SEVENTEENTH STREET NORTHWEST ★ WASHINGTON, D. C. 20036
★ AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS
★
★ OFFICE OF GENERAL PRESIDENT • (202) 429-9100

To: All IUOE Members

This International Constitution, as amended and revised by the delegates to the 36th General Convention held in April 2003, spells out your rights and obligations as members of the International Union of Operating Engineers.

For well over a century, the IUOE has been recording significant and substantial achievements in improving the livelihood and quality of life for its members and their families. Our goal is to build and expand on this proud history, using available resources to create opportunities that advance and expand our members' interests.

The continued progress, vitality and viability of the IUOE and its local unions depend ultimately on your individual participation and the collective strength of the membership. All of us pulling together are a formidable, collective force with considerable influence. If we do that, our progress and future advancement will be secure and unlimited.

Fraternally,

Vincent J. Giblin
General President

# CONTENTS

| | | |
|---|---|---|
| Preface | Suggested Order of Business | 4 |
| Art. I. | Name, Purposes, Government and Ritual | 5 |
| Art. II. | Emblem | 7 |
| Art. III. | General Conventions, Powers, Delegates, Etc. | 8 |
| Art. IV. | General Officers, Election, Etc. | 15 |
| Art. V. | General Executive Board | 18 |
| Art. VI. | General President | 21 |
| Art. VII. | General Vice Presidents | 25 |
| Art. VIII. | General Secretary-Treasurer | 25 |
| Art. IX. | Board of Trustees | 28 |
| Art. X. | Membership | 29 |
| Art. XI. | Income of International Union | 30 |
| Art. XII. | Territorial Jurisdiction | 33 |
| Art. XIII. | Craft Jurisdiction | 33 |
| Art. XIV. | Charters | 37 |
| Art. XV. | Transfer, Clearance, Service Dues, Withdrawal Cards and General Office Membership | 43 |
| Art. XVI. | Discipline and Expulsion | 56 |
| Art. XVII. | Appeals | 58 |
| Art. XVIII. | Amending and Revising Constitution, Initiative, and Recall | 61 |
| Art. XIX. | Defense Fund, Lockouts, Strikes | 62 |
| Art. XX. | Death Benefits | 64 |
| Art. XXI. | Joint Executive Boards | 70 |
| Art. XXII. | District Councils | 71 |
| Art. XXIII. | State, Interstate and Provincial Organizations | 71 |
| Art. XXIV. | Government of Local Unions | 74 |
| Art. XXV. | Apprenticeship | 105 |
| Art. XXVI. | District Administration Form of Local Union Government | 106 |
| Art. XXVII. | The General Pension Fund Plan | 109 |
| Art. XXVIII. | Honorary Positions Created | 109 |
| Art. XXIX. | Savings Clause | 110 |
| | Index | 111 |

2

3

# PREFACE

## SUGGESTED ORDER OF BUSINESS FOR LOCAL UNIONS

1. Meeting called to order per Ritual.
2. Examination of dues books and/or cards by Conductor.
3. Roll call of officers.
4. (a) Minutes of the previous meeting.
   (b) Minutes of the Local Executive Board.
5. Presentation of applications for membership.
6. Reports of committee on applications.
7. Reading of communications by the Recording-Corresponding Secretary.
8. Reading of receipts for the per capita tax and other monies sent to the General Secretary-Treasurer.
9. Election and installation of officers.
10. Reports of sickness, accident and death of members.
11. (a) Reports pertaining to apprentices.
    (b) Reports pertaining to Branch Locals.
12. Unfinished business.
13. New business.
14. Reports of (a) Officers
    (b) Delegates
    (c) Committees:
        (i) Safety and health
        (ii) Legislation and political action
        (iii) Other
    (d) Business Representatives
    (e) Trustees
    (f) Auditors
    (g) Treasurer.
15. Subjects for the good and welfare.
16. Appropriations for monies from the treasury (drawing orders signed by the President and the Recording-Corresponding Secretary authorizing the payment of bills and other expenses).
17. Motion or order for adjournment.

4

# THE CONSTITUTION OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS

## ARTICLE I

## NAME, PURPOSES, GOVERNMENT AND RITUAL

### Name

**Art. I.**
**Section 1.** This organization shall be known as the International Union of Operating Engineers and it shall be the policy of this organization to be affiliated with the AFL-CIO and such of its departments as this organization may deem expedient.

### Purposes

**Art. I.**
**Section 2.** The objects and purposes of this organization are to elevate the trade of operating engineers (by which trade the membership thereof earn a livelihood for themselves and their dependents) to its proper position in all industrial activity and the ranks of organized workers; to encourage a higher standard of skill among its members; to cultivate feelings of friendship among the men of the craft and those who may employ its members; to organize all persons working in the jurisdiction of this International Union without regard to race, creed, color, sex, religion, age or national origin; to promote the health, welfare and safety of its members and their families; to promote, foster and develop apprentice programs, training programs and other means to advance the skills, efficiency and working knowledge of its members; to assist its members in securing and stabilizing employment; to assist employers in obtaining skilled craftsmen; to secure improved wages, hours, and working conditions through assisting affiliated Local Unions in negotiating collective bargaining agreements and through legisla-

5

tive action and other appropriate means; to further, directly and indirectly, the joint interest of the members of the International Union in the betterment of general economic and social conditions in the world, by engaging in legislative, political, educational, civic welfare, and other appropriate activities; while preserving the integrity and autonomy of this International Union, to work within the AFL-CIO and to cooperate with other International Unions for the advancement of the entire labor movement, and to assist and cooperate with free and democratic labor organizations throughout the world; to provide aid and assistance for, and to bring about cooperation and coordination of effort among affiliated Local Unions; to insure the better protection of life and property by securing the enactment of state, provincial and city Engineers' License Laws and by other appropriate means; and to protect and strengthen our democratic institutions and to vigorously oppose the efforts of those who advocate the overthrow of the established order, either of government or of this organization, by force or violence or subversive tactics.

## Government

**Art. I.**
**Section 3.**    The International Union of Operating Engineers shall be governed by the following bodies:
1. General Convention
2. General Executive Board
3. Officers
4. Board of Trustees
5. State and Provincial Organizations
6. Joint Executive Boards
7. District Councils
8. Parent Local Unions

and each of such bodies shall constitute a distinct entity each with its own separate identity but functioning in conformity to the Constitution and Ritual. No Local Union or its officers, employees or members, shall have power or authority to act, nor be deemed to act, on

6

behalf of or agent for, or legally bind any other Local Union or member thereof, the General Convention, the General Executive Board, any of the General Officers, or the International Union of Operating Engineers, unless such authority is expressly granted by the provisions of this Constitution or by the General Executive Board. No Local Union, officer or member thereof, Supervisor or Representative, shall be authorized or permitted to accept service of summons, subpoena, or make entry of appearance, for or on behalf of the International Union, any General Officer, the General Executive Board, the Board of Trustees, or any other Local Union or other subdivision of the International Union of Operating Engineers.

## Ritual

**Art. I.**
**Section 4.**    The Ritual and Obligation shall form a part of this Constitution and shall be administered in such form, and from time to time, revised in such manner as the General President, with the approval of the General Executive Board, may direct.

## ARTICLE II

# EMBLEM

## Description

**Art. II.**
**Section 1.**    The official emblem of the International Union of Operating Engineers, duly registered as a trademark, is as follows:



7

**Use of Emblem**

**Art. II.**
**Section 2.** This emblem shall be generally used on all printed matter, including charters, supplies and stationery of the organization and its various subdivisions, and in forms to be worn by members.

**Seals and Facsimiles**

**Art. II.**
**Section 3.** The official seal of the organization shall bear this emblem. The seal of each General Officer and subdivision of the organization shall likewise bear this emblem together with the title of such officer or the name of such subdivision using the same. No seal shall be held or used by any General Officer or subdivision of the organization, nor shall the use or holding of any seal confer authority unless such seal shall have been furnished by the General Secretary-Treasurer. All seals shall be the property of the International Union of Operating Engineers. No facsimile of the emblem shall be used except such as are supplied by the General Secretary-Treasurer.

**ARTICLE III**

# GENERAL CONVENTIONS

**Powers**

**Art. III.**
**Section 1.** All the sovereign power, including the legislative, executive, administrative and judicial, of the International Union of Operating Engineers shall be vested in its General Convention when in session. Specifically, but not in limitation of the power thus vested, the General Convention may grant and issue charters for Local Unions and subdivisions thereof and local, State and Provincial organizations and such other subdivisions of the International Union as from time to time may be deemed advisable; set the cost for said charters and necessary supplies issued with said charters; suspend and revoke any of said charters; adopt and issue a seal for the

8

International Union, its General Officers, its Local Unions, local, State and Provincial organizations and any other subdivisions; adopt, print and issue dues books and/or cards for the use of the membership; print and issue per capita tax dues stamps and collect for same; print, issue and mail an official journal; print and issue such books, stationery, supplies and paraphernalia and sell the same to affiliated Local Unions, local, State and Provincial organizations and any other subdivisions for the proper keeping of their records and affairs; invest the funds of the International Union; buy and sell real estate (improved or otherwise) and bonds and other securities; establish, impose and collect per capita tax; establish, impose and collect assessments upon members, charter applicants, Local Unions, local, State and Provincial organizations and any other subdivisions as hereinafter provided; impose an initiation fee and an initiation fee tax; establish Defense Fund and pay strike benefits; establish revise, amend and from time to time change the Death Benefit Fund and pay regulated benefits therefrom; supervise the operation of Local Unions, local, State and Provincial organizations and any other subdivisions and appoint supervisors and receivers when necessary; prefer charges against Local Unions, local, State and Provincial organizations and any other subdivisions and officers (individually or collectively) and order trials with authority to discipline those affected; prefer charges and order trials with authority to discipline any General Officer or any member of the Board of Trustees; register, copyright and trademark the name of its official journal, its emblem and any document of the organization; establish and maintain a general headquarters in Washington, D.C.; employ clerical and other help; employ organizers and deputies; confiscate and sue for the possession of all real and personal property, paraphernalia, books, charters, records, card indexes, seals and funds of a Local Union, local, State or Provincial organization and any other subdivision;

9

Case 1:07-cv-00600-RBW    Document 7-3    Filed 05/12/2007    Page 8 of 22

establish a General Executive Board with full powers of the Convention between Conventions; include and adopt as part of the Constitution a procedure for the government and regulation of Local Unions, subdivisions thereof, local, State and Provincial organizations and any other subdivisions; establish, define, segregate, assign and amend craft jurisdiction and territorial jurisdiction to which Local Unions, their subdivisions, local, State and Provincial organizations and any other subdivisions already established or hereinafter chartered shall confine their activities; establish, enter into, amend or abrogate understandings or written agreements with other craft unions affiliated with the AFL-CIO; amalgamate competitive craft unions with the International Union of Operating Engineers and by such amalgamation compel all individual officers and members of the amalgamated union to be subservient to the Constitution, amendments thereto and decisions and orders of the General Executive Board and the General President of the International Union; review and decide appeals from decisions properly filed with it; provide for the general welfare of the organization and its members; take all steps necessary to protect the interests of the organization; make all disbursements necessary or appropriate in the exercise of the above powers or in the fulfillment of the objects and purposes of the International Union; together with all other rights, powers, privileges and immunities not herein specifically denied.

## Method of Holding Conventions

**Art. III.**
**Section 2.** A General Convention of the International Union of Operating Engineers shall be held during the month of April 1988 and every five (5) years thereafter during the month of April, or if the logistics of arranging the Convention so require, during any period between March 20 and May 10, at such place as the preceding Convention may determine, unless referred to the General Executive Board by the Convention for selection.

10

## Composition of Convention

**Art. III.**
**Section 3.** The General Convention shall be composed of legally elected General Officers, members of the General Executive Board and the Board of Trustees and the duly elected representative delegates from Local Unions, and none but these shall be entitled to vote. Local Unions may choose to elect alternate delegates not to exceed one alternate for every five delegates nor more than a total of three alternates. The election of delegates and alternates shall be held at an election in the said Local Unions in February prior to the Convention, unless under the provisions of the Local Union bylaws they are elected prior thereto but in no event more than one (1) year prior to the first day of the Convention, except that Local Unions may by their bylaws designate as delegates to the Convention not more than six of their officers, elected subsequent to the adoption of such bylaws.

The election of delegates shall be conducted by secret ballot. In order to be eligible to be a candidate for delegate for those Conventions held after 1998, a member must, at the time of nomination, be in good standing with respect to payment of dues and meet the requirements contained in the second paragraph of Article XXIV, Subdivision 1, Section (b). Adequate safeguards to insure a fair election shall be provided by the Local Union in accordance with the International Constitution, applicable law, and such rules and regulations as may be promulgated by the General Executive Board. The ballots and all other records pertaining to the election of delegates shall be preserved for one (1) year by the appropriate official or officials designated by the Local Union.

Where there are no more candidates nominated for delegates and alternates than are authorized by said local union signifying no opposition, the secret ballot election may be dispensed with and, in such event, the Recording Corresponding Secretary shall be directed to cast one ballot for all the unopposed candidates for delegates and alternates, who shall then be duly elected.

11

## Officers of the General Convention

**Art. III. Section 4.** The duly elected General Officers of the International Union of Operating Engineers shall be the officers of the General Convention.

## Basis of Representation

**Art. III. Section 5.** The basis of delegate representation shall be as follows:

## Local Union Membership

| Minimum | Maximum | Number of Delegates |
| --- | --- | --- |
| UNDER 251 | | 1 |
| 251 | 500 | 2 |
| 501 | 900 | 3 |
| 901 | 1,300 | 4 |
| 1,301 | 1,700 | 5 |
| 1,701 | 2,100 | 6 |
| 2,101 | 2,500 | 7 |
| 2,501 | 3,000 | 8 |
| 3,001 | 3,700 | 9 |
| 3,701 | 4,400 | 10 |
| 4,401 | 5,100 | 11 |
| 5,101 | 5,900 | 12 |
| 5,901 | 6,700 | 13 |
| 6,701 | 7,500 | 14 |
| 7,501 | 8,400 | 15 |
| 8,401 | 9,300 | 16 |
| 9,301 | 10,200 | 17 |
| 10,201 | 11,200 | 18 |
| 11,201 | 12,200 | 19 |
| 12,201 | 13,200 | 20 |
| 13,201 | 14,200 | 21 |
| 14,201 | 15,200 | 22 |
| 15,201 | 16,200 | 23 |
| 16,201 | 17,200 | 24 |
| 17,201 | 18,200 | 25 |
| 18,201 | 19,200 | 26 |
| 19,201 | 20,200 | 27 |
| 20,201 | 21,200 | 28 |
| 21,201 | 22,200 | 29 |
| 22,201 | 23,200 | 30 |
| 23,201 | 24,200 | 31 |
| 24,201 | 25,200 | 32 |
| 25,201 | 26,200 | 33 |
| 26,201 | 27,200 | 34 |
| 27,201 | 28,200 | 35 |
| 28,201 | 29,200 | 36 |
| 29,201 | 30,200 | 37 |
| 30,201 | 31,200 | 38 |
| 31,201 | 32,200 | 39 |
| 32,201 | 33,200 | 40 |
| 33,201 | 34,200 | 41 |
| 34,201 | 35,200 | 42 |

OVER 35,201
One additional delegate
per 5,000 members

Each delegate seated and present at the Convention shall have one vote regardless of the number of members on which the Local Union has paid per capita tax. The number of delegates to which a Local Union may be entitled shall be based on the average number of members on which the Local Union has paid per capita tax through the month of September of the calendar year prior to the date of the Convention. No delegate shall be permitted to represent more than one Local Union.

## Credentials of Delegates

**Art. III. Section 6.** Delegates to the Convention must present credentials on blanks furnished by the General Secretary-Treasurer, properly attested under the seal of the Local Union of which they are members in good standing. To be entitled to have its delegate or delegates seated and have a vote in a General Convention, both the delegates and their alternates, as well as the Local Union represented by them, must not be in arrears in the payment of the per capita tax or any other indebtedness to the

## Attendance of General Officers

**Art. III.**
**Section 10.**   The General Officers, Members of the General Executive Board and the Board of Trustees shall be required to attend all Conventions and their expenses shall be paid out of the funds of the International Union of Operating Engineers. By virtue of his office each shall be a delegate at large, having one vote, unless elected as a regular delegate by the Local Union in which he holds membership.

## ARTICLE IV

# GENERAL OFFICERS

### Titles and Terms of Office

**Art. IV.**
**Section 1.**   The officers of the International Union of Operating Engineers shall consist of a General President, General Secretary-Treasurer, First General Vice President, Second General Vice President, Third General Vice President, Fourth General Vice President, Fifth General Vice President, Sixth General Vice President, Seventh General Vice President, Eighth General Vice President, Ninth General Vice President, Tenth General Vice President, Eleventh General Vice President, Twelfth General Vice President, Thirteenth General Vice President, Fourteenth General Vice President, and five Trustees. Each Officer shall hold office for a term of five years or until his successor shall be elected and qualified, and each shall be nominated, elected, installed and take office only in the manner and only at the time hereinafter specified.

### Nominations

**Art. IV.**
**Section 2.**   Candidates for the positions of General Officers shall be nominated at the Convention on the morning of the first day of the Convention and any member of the organization who is entitled to hold office in his Local Union shall be eligible for office. Beginning with the election conducted at

15

International Union due on or prior to the 31st day of December next preceding the Convention. The right of delegates to be seated in a General Convention shall be upon report and approval of the Credentials Committee. An appeal from a decision of the Credentials Committee may be made to the Convention, and delegates affected thereby shall not be seated until said appeal shall have been voted thereon by the Convention.

### Expenses of Delegates

**Art. III.**
**Section 7.**   The mileage and expenses for the attendance of delegates to the Convention shall be defrayed by the Local Union they represent. In cases of hardship, and upon good cause shown, the Local Union may appeal to the General Executive Board for financial assistance in securing representation of a delegate at a Convention.

### Quorum

**Art. III.**
**Section 8.**   A quorum for the transaction of business shall consist of a majority of the delegates seated at the Convention.

### Appointment of Committees

**Art. III.**
**Section 9.**   Upon the opening of the Convention the General President shall appoint his committees, except that the Committees on Law, Officers' Reports, Credentials and Resolutions shall be appointed by him prior to the Convention, and report at the call of the General President. The General Secretary-Treasurer shall furnish the General President a list of delegates whose Local Unions are in good standing as required by the Constitution. After the report of the Committee on Credentials has been acted upon, the General President shall appoint such other committees as may be necessary. The members of the committees so appointed shall receive remuneration for the services they render in an amount determined by the General President.

14

the General Convention to be held in 2008, the nominations of candidates for the offices of General President and General Secretary-Treasurer must be supported by the written petition of at least six Local Union delegations, which shall be submitted to the Chair. Nominations must be made by delegates from Local Unions seated at the Convention.

### Election of General Officers

**Art. IV.**
**Section 3.** The election of General Officers shall take place at the Convention as the first order of business on the afternoon of the first day of the Convention. Officers shall be elected by plurality vote, except that the five candidates receiving the highest number of votes for the office of Trustee shall be elected. Elections shall be by roll call vote where there is more than one candidate for any office except that of Trustee, and where there are more than five candidates for the Office of Trustee. If there is only one candidate for any office other than that of Trustee and there are no more than five candidates for the Office of Trustee, there shall be no roll call vote and such candidate or candidates shall be declared elected. Each delegate shall be entitled to cast the number of votes prescribed by Article III, Section 5. However, one delegate, unless objection is voiced at the time the Local Union's number is called by a delegate from such Local Union, may cast the vote of the entire delegation of such Local Union.

On a roll call vote, the presiding officer shall appoint three (3) tellers to record, certify and report the results of the voting for each office. The election shall be by written ballot and conducted in such fashion that until the completion of the voting, no delegate shall be able to ascertain the number of votes cast for any candidate. However, the foregoing requirement shall not prevent delegates from the same Local Union designating one or more of their number to perform the physical function of casting the votes of the delegates from that Local Union.

No candidate (including a prospective candidate) for General Office, and no supporter of a candidate for General Office, may solicit or accept any direct or indirect financial support from any nonmember of the International Union of Operating Engineers or from any foundation, corporation or other entity whose funds are derived in whole or in part from any person not a member of this International Union.

**Art. IV.**
**Section 5.** The General Secretary-Treasurer shall preserve for one (1) year the credentials of the delegates and all minutes and other records of the Convention pertaining to the election of officers.

**Art. IV.**
**Section 6.** The newly elected General Officers shall be installed within thirty (30) days following the adjournment of the Convention, and shall assume their official duties immediately upon installation.

**Art. IV.**
**Section 7.** The newly elected officers shall appear before a Notary Public prior to taking office and make oath that they will perform the duties of the offices to which they have been elected to the best of their ability and in accordance with the Constitution of the International Union, and a certificate signed by the Notary Public before whom such oath of office is taken shall be filed by the newly elected officers with the General Secretary-Treasurer.

### Bonding

**Art. IV.**
**Section 8.** Every officer, employee or other representative of the International Union who handles funds or other property thereof shall be bonded for the faithful discharge of his duties in such amount and as otherwise required by applicable law. The expense of such bond shall be paid by the International Union.

# ARTICLE V
## POWERS AND DUTIES OF THE GENERAL EXECUTIVE BOARD

**Art. V.**
**Section 1.** The General Executive Board shall consist of the General President, General Secretary-Treasurer, First General Vice President, Second General Vice President, Third General Vice President, Fourth General Vice President, Fifth General Vice President, Sixth General Vice President, Seventh General Vice President, Eighth General Vice President, Ninth General Vice President, Tenth General Vice President, Eleventh General Vice President, Twelfth General Vice President, Thirteenth General Vice President, and Fourteenth General Vice President, and each member of the Board shall be provided with an official seal.

### Powers

**Art. V.**
**Section 2.** All the powers of the General Convention when in session shall, when the same is not in session, pass to and vest in the General Executive Board, with the exception of such powers as may herein be specifically delegated to the various officers and subdivisions of the International Union. Specifically, but not in limitation of its power, it may initiate amendments to the Constitution and conduct referendums thereon, and it may formulate and establish pensions for such of the General Officers of the International Union of Operating Engineers and the employees of the said International Union as the General Executive Board shall deem worthy, and it may order that payments be made thereon for the terms allotted, in such manner as to vest irrevocably the benefits thereof; provided, however, that any and all pension applications so adopted shall be reasonable and nondiscriminatory.

Effective April 1, 1977, and annually thereafter, the General Executive Board may increase the salaries of all General Vice Presidents by a percentage of the salary being paid to each such officer not to exceed the

18

percentage of increase in the National Consumers Price Index published by the Bureau of Labor Statistics of the United States Department of Labor for the twelve-month period ending February 28 immediately preceding April 1st.

### Vacancy in Office

**Art. V.**
**Section 3.** In case of death, resignation or removal of the General President, the General Secretary-Treasurer shall call a meeting of the General Executive Board within fifteen (15) days, and said Board shall elect from among its members a General President, who shall take office immediately following his election by the Board. The General Executive Board shall and is hereby ordered to fill any vacancy occurring in the General Executive Board or the Board of Trustees. All charges against General Officers shall be heard and decided by the General Executive Board.

### Meetings

**Art. V.**
**Section 4.** The General Executive Board shall hold sessions at such places and at such times as it may decide. It shall meet at the call of the General President, or at the request of three members of the General Executive Board. In addition to the salary paid to a General Officer, the International Union shall compensate and pay the expenses of the members of the General Executive Board, as authorized by the General President, in connection with their participation in General Executive Board meetings and other authorized work performed by them.

### Quorum

**Art. V.**
**Section 5.** A quorum for the transaction of any business by the General Executive Board shall consist of a majority of the members thereof.

### Transacting Business

**Art. V.**
**Section 6.** The General Executive Board may transact any business before it without holding

19

a session and record the votes of the members by mail, telegram, telephone, facsimile copy, teleconferencing, or any other technology that allows for communication by the Board members.

## Hearings

**Art. V. Section 7.** The General Executive Board may hold hearings and conduct trials and decide appeals in connection with any matter, complaint, business or case coming before it and the decision of the General Executive Board thereon, and its findings of facts, shall be final, conclusive and binding. It shall have full power to determine the method of procedure and the times and place for the holding of hearings, trials and appeals, including the power to appoint a panel of one or more persons to conduct a full and fair hearing on any matter on behalf of the Board. Upon the conclusion of such hearing, the panel shall make a complete report to the General Executive Board, and the final decision shall be made by the Board. The General Executive Board shall also be empowered to interpret the provisions of this Constitution and decide questions of law arising thereunder.

## Defense of Litigation

**Art. V. Section 8.** The International Union is authorized, upon affirmative vote of the General Executive Board, to pay all expenses for investigation services, employment of counsel and other necessary expenditures in any cause, matter, case or cases where an International officer, representative, employee, agent or one alleged to have acted on behalf of the International is charged with any violation of any law or is sued in any civil action with respect to any matter arising out of his duties, except if such officer, representative, employee or agent is charged with a breach of his trust to the International or any affiliate or member thereof, in which event he may be indemnified only if the action is terminated favorably to him.

# ARTICLE VI
# POWERS AND DUTIES OF THE GENERAL PRESIDENT

## As Presiding Officer of Convention

**Art. VI. Section 1.** It shall be the duty of the General President to preside at all meetings of the General Convention. At least thirty (30) days prior to the holding of a General Convention he shall publish all decisions rendered by him during his term of office and shall mail copies of same to each Local Union in sufficient numbers to allow a copy for each delegate to the Convention.

## To Review Cases and Interpret Laws, Etc.

**Art. VI. Section 2.** He shall review all cases, complaints and charges filed with the General Executive Board or the General Secretary-Treasurer. He shall be empowered to render decisions on the merits of such cases, complaints and charges and his findings on the facts shall be final and conclusive. He shall also be empowered to interpret the provisions of the Constitution and decide questions of law arising thereunder. He shall be vested with all the administrative powers of the organization.

## To Invoke and Administer International Supervision and Other Peremptory Powers

**Art. VI. Section 3.** The General President shall have the power to require Local Unions, Local Officers and any other subdivision of the International Union and members to comply with this Constitution and any lawful rulings or orders of the International Union. For the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of the International Union, including the

observance of the Ritual, Obligation, law, rules or decisions of the organization or its duly constituted authorities, he shall have full power to suspend or remove such Local officers, suspend or revoke charters of such Local Unions or place such Local Unions and their officers and members under International Supervision. He shall have power to designate and appoint persons to fill the places of those Local officers of Local Unions suspended, removed or placed under International Supervision, which appointees shall conduct the affairs over which they have been appointed for such time and in such manner as he may direct. All of the business, finances, affairs and government of any Local Union whose charter shall have been suspended by the General President or shall have been placed under International Supervision by him, shall be fully and completely conducted and administered by the General President or his deputy thereunto appointed with full power of control therein and thereover. During such suspension or International Supervision all rights and powers of the Local Union to conduct its own affairs shall be suspended. He or his deputy shall countersign all vouchers and checks for payment of monies or for withdrawing funds from the bank. He shall have power to appoint Local officers pro tem and all committees not otherwise provided for; to deputize any member in good standing to perform any of the powers and duties of his office.

Whenever the General President exercises his power under this Section to suspend or remove Local officers, suspend or revoke charters of Local Unions, or place such Local Unions and their officers and members under International Supervision, a hearing shall be held before him or his authorized representative, to determine the necessity for taking such action, with the General President making the ultimate decision. Reasonable notice of such hearing shall be afforded the officers and members of the subordinate union involved. If the General President determines that an emergency exists requiring immediate action

22

to be taken prior to a hearing, he may take such action, but the hearing shall be held within a reasonable time thereafter. In all other cases the action will not be taken until a hearing has been held.

Failure of the General President to exercise the authority vested in him under this Section shall not in itself be considered as authorization for, or ratification or condonation of, any act or any failure to act on the part of the International Union, or other subdivision of the International Union, or their officers, employees, members or agents.

## To Issue Charters, Require Mergers, and Appoint Representatives, and Negotiate and Enter Into Agreements

**Art. VI. Section 4.** He shall be vested with full discretionary power to issue charters. Subject to the approval of the General Executive Board, he shall have the power, on such terms as he determines to be appropriate, to require the merger of Local Unions and to merge other labor organizations into the International Union. He shall have power to appoint Representatives of the International Union in such localities as shall appear to him to be for the best interest of the organization, as well as International Monitors of the administration of Local Unions. He shall have the authority to negotiate and enter into collective bargaining agreements binding on the Local Unions.

## As Chairman of General Executive Board, Etc.

**Art. VI. Section 5.** He shall preside as chairman of the General Executive Board and shall make a full report of the work in his office at each Board meeting. He shall devote his full time to the duties of his office. He shall have power to call upon any and all subdivisions, officers and members for assistance and advice when occasion demands or requires it. He shall be strictly accountable and responsible for the faithful performance of his duties and shall administer and enforce every law, rule, regulation and requirement of the Constitution, Ritual and Obligation. He shall be

23

vested with unlimited discretion in the application and administration of his powers and duties. He shall be vested with such other powers and duties as the General Executive Board may from time to time specifically delegate to him.

### Hearings for Members

**Art. VI.**
**Section 6.** Any and all members, Local officers and Local Unions affected or aggrieved by an act or decision of the General President, may demand a hearing thereon before the General Executive Board, with appeal to the General Convention in the manner hereinafter prescribed.

### Compensation

**Art. VI.**
**Section 7.** The General President shall receive in semi-monthly installments an annual salary to be determined by the General Executive Board, which shall not be less than the annual salary in effect in April, 1980. Salary determinations by the General Executive Board once made shall constitute the new minimum.

When the conduct of his office requires the General President to travel outside the metropolitan area of Washington, D.C., within or without the continental limits of the United States, he is authorized, in his discretion, to have his spouse accompany him and the reasonable expenses of such spouse, when so traveling, shall be paid by the International Union.

The General President shall, by virtue of his office, be one of the delegates representing this Organization at the Conventions of the AFL-CIO or sessions of any of its departments.

### To Make Visitations

**Art. VI.**
**Section 8.** Should any Local Union be involved in trouble or submit grievances to the General President or the General Executive Board, the General President shall visit such Local Union in person or send a deputy.

### Vested With All Powers of General Executive Board in Interim, Etc.

**Art. VI.**
**Section 9.** All powers heretofore vested in the General Executive Board when in session shall, when the same is not in session, pass to and vest in the General President. All of the acts and decisions of the General President shall be reviewable by the General Executive Board and shall continue in full force and effect until revoked by action of the General Executive Board.

## ARTICLE VII

## POWERS AND DUTIES OF VICE PRESIDENTS

**Art. VII.**
**Section 1.** Subject to revision pursuant to Article V, Section 2, the General Vice Presidents shall receive as salary in such capacity $33,500 per anum.

The General Vice Presidents of the International Union of Operating Engineers shall be members of the General Executive Board. They shall assist the General President in the discharge of his official duties in such manner as he may direct and shall have such other powers and duties as from time to time may be specifically delegated to them by the General Executive Board.

## ARTICLE VIII

## POWERS AND DUTIES OF THE GENERAL SECRETARY-TREASURER

### To Keep Record of Minutes

**Art. VIII.**
**Section 1.** The General Secretary-Treasurer shall keep a correct record of the minutes and proceedings of the General Convention and of the General Executive Board. On the first day of January

preceding a General Convention he shall notify all Local Unions of the holding thereof, which notices shall set forth the provision of the Constitution relating to the basis of representation of delegates to the General Convention.

## To Collect and Pay Monies

**Art. VIII.**
**Section 2.** He shall collect and receive all monies and funds due from all Local Unions, subdivisions, officers, members or other persons to the General Office and deposit the same in such bank or banks as may be designated by the General Executive Board. He shall have custody of the Official Seal. He shall issue all drafts and checks in payment of general expenses, salaries and other bills in the manner and form provided by the General Executive Board and shall take receipts therefor. He shall maintain a General Office Membership and perform the duties incident thereto.

## Furnish Bond and Make Investments

**Art. VIII.**
**Section 3.** He shall give bond for the faithful performance of his duties. Such bond shall be in such amount and with such bonding companies as required by applicable law. He shall, when authorized by the General Executive Board, invest the funds of the International Union in the manner and form directed.

## Membership Records and Monthly Reports

**Art. VIII.**
**Section 4.** He shall keep a correct record of the membership of each Local Union and subdivision and issue quarterly to each Local Union a report as to his receipts and disbursements. He shall make a monthly report to the General President and the General Executive Board and the Board of Trustees. He shall transmit to the Financial Secretaries of Local Unions per capita tax dues stamps or other appropriate record of payment, as provided for in this Constitution and shall keep a record thereof.

26

## Compensation

**Art. VIII.**
**Section 5.** The General Secretary-Treasurer shall receive in semi-monthly installments an annual salary to be determined by the General Executive Board, which shall not be less than the annual salary in effect in April, 1980. Salary determinations by the General Executive Board once made shall constitute the new minimum.

When the conduct of his office requires the General Secretary-Treasurer to travel outside the metropolitan area of Washington, D.C., within or without the continental limits of the United States, he is authorized, in his discretion, to have his spouse accompany him and the reasonable expenses of such spouse, when so traveling, shall be paid by the International Union.

## Editor of the Journal

**Art. VIII.**
**Section 6.** He shall edit and distribute the official journal subject to recommendations of the General Executive Board and the General President and shall promptly publish therein a record of the amendments to the International Constitution adopted by a General Convention and allow reasonable space for the inclusion of articles submitted by Local Unions upon any measure submitted to vote of the membership. He shall distribute to each Convention delegate a copy of the record of the proceedings and measures adopted by a General Convention promptly thereafter.

## Reports to General Convention

**Art. VIII.**
**Section 7.** He shall, each month, pay all per capita taxes due from this organization to the AFL-CIO or other bodies with which this organization may be affiliated. He shall make a full report of all matters relating to his office, his official acts and work, the amount of monies received and disbursed by him, the balance on hand and where deposited, to each General Convention.

27

## Accounting for Stewardship

**Art. VIII. Section 8.** He shall at the end of his term of office deliver to the Board of Trustees all books, monies, property and other belongings of the International Union in his keeping. His books, records, transactions and affairs shall always be open for inspection by the General Officers.

## Delegate to AFL-CIO, Etc.

**Art. VIII. Section 9.** He shall, by virtue of his office, be one of the delegates to represent the International Union at the convention of the AFL-CIO or its departments. He shall devote his full time to the duties of his office and shall have such other and further duties as may from time to time be delegated or assigned to him by the General Executive Board.

# ARTICLE IX

# BOARD OF TRUSTEES

## Composition of Board

**Art. IX. Section 1.** There shall be a Board of Trustees consisting of five members elected in the manner hereinbefore stated. One of the members of the Board shall be elected by the Board to serve as Chairman thereof during the term of his office as a Trustee. The salary of the Trustees shall be set by the General President with the concurrence of the General Executive Board.

## Meetings of the Board

**Art. IX. Section 2.** Meetings of the Board of Trustees shall be held from time to time as the members thereof may designate or upon call of the General Executive Board.

## Quorum

**Art. IX. Section 3.** A quorum for the transaction of business by the Board of Trustees shall consist of a majority of the members thereof.

28

## Powers and Duties of the Board of Trustees

**Art. IX. Section 4.** The Board of Trustees shall be the auditors of both the General Executive Board and the General Officers of the International Union of Operating Engineers. They shall audit the books of the General Secretary-Treasurer at least once every six months and report thereon to the General Executive Board. They shall render a report of their duties to the General Convention. They shall take an annual inventory of the property belonging to the International Union of Operating Engineers and shall see that the finances of the International Union are safeguarded by proper bonds. They shall audit and examine all bills, expenditures and expense accounts and all receipts of the General Office. They shall recommend to and advise the General Executive Board and the General Officers upon bookkeeping methods and accounting systems. They shall be the custodians of all bonds of General Officers. Upon the termination of office of any General Officer or upon a vacancy occurring among the General Officers, they shall receive and hold the funds, books, papers, documents and other property in the possession of the said officer or officers and turn the same over to the General Officer succeeding to said position upon being given proper receipt. They shall perform such other duties as from time to time may be delegated and assigned to them by the General Convention, the General Executive Board or the General President.

# ARTICLE X

# MEMBERSHIP

## Qualifications

**Art. X. Section 1.** Any engineer engaged in the craft over which this organization exercises craft jurisdiction, or other person who may qualify to become a junior engineer, assistant engineer, or registered apprentice engineer therein, and any other engi-

29

neer engaged as an inspector of boilers or other machinery or as an examiner of engineers, or any other person, may upon application, acceptance and initiation in the manner and form required in this Constitution, become a member of the International Union of Operating Engineers. No person who is otherwise eligible under the qualifications fixed herein, but who is opposed to organized labor, shall be admitted to membership. No person shall be denied membership on the basis of race, creed, color, sex, religion, age or national origin. No applicant for membership shall apply to or be accepted by any Local Union other than the one within the jurisdiction in which he is employed unless such Local Union shall consent to his affiliation therewith.

## Minimum and Maximum Initiation Fees and Dues

**Art. X.**
**Section 2.** The minimum initiation fee in all Local Unions shall be not less than Five Dollars ($5.00) per applicant. The minimum monthly dues in all Local Unions that do not charge administrative, supplemental or working dues, shall not be less than Fourteen Dollars and Seventy-five Cents ($14.75) per month per active member effective July 1, 2003 and Fifteen Dollars and Twenty-five Cents ($15.25) per month per active member effective July 1, 2005. Maximum initiation fees and maximum dues charged by Local Unions to their applicants or members may, from time to time, be fixed by the General President. No proposed increase in initiation fees may be voted upon by a Local Union unless and until the proposed increase is approved by the General President.

## ARTICLE XI

# INCOME OF INTERNATIONAL UNION

## Per Capita Tax

**Art. XI.**
**Section 1.** Each Local Union must pay the General Secretary-Treasurer a per capita tax of

$7.75 per month effective July 1, 2003 and $8.25 per month on and after July 1, 2005 for each member of the Local Union and its Subdivisions who has not been reported to the General Secretary-Treasurer as suspended, withdrawn, transferred or expelled, and in addition an amount equal to the per capita tax must be paid for each person making payments to the Local Union in lieu of dues under agency shop or similar provisions. The per capita tax report signed by the Financial Secretary must be transmitted to the General Secretary-Treasurer on or before the fifteenth day of the month following that for which the per capita tax is due.

A payment computed on the closing membership for the month ($7.75 per month effective July 1, 2003 and $8.25 per month on and after July 1, 2005) and the initiation fee tax (25% of the current initiation fee) on each member initiated for the month, must be submitted with the per capita tax report. Thereafter, the General Secretary-Treasurer shall transmit to the Financial Secretary a receipt for the initial amount remitted with a statement covering the remaining amounts due for the month for which the per capita tax was filed, for assessments and back per capita tax on suspended members reinstated, expelled members reinstated, members admitted on withdrawal cards, per capita tax for members deducted deceased and members deducted on withdrawal cards and differences of initiation fee tax. The per capita tax due shall immediately be remitted to the General Secretary-Treasurer by the Financial Secretary. The General Secretary-Treasurer shall return a receipt covering payment of balances due.

However, if in the judgment of the General Executive Board, a different form of billing procedure may be desired, such change may be made by the Board.

## Distribution of Per Capita Tax

**Art. XI.**
**Section 2.** The General Executive Board shall maintain a General Fund, a Death Benefit Fund, a Defense Fund, a General Pension Fund, and such other Funds as it may determine. The per capita

tax received for each member and other income of the International Union shall be allocated among these Funds as the General Executive Board shall determine.

## Charter Fees and Assessments

**Art. XI.**
**Section 3.** Before the issuance of any charter to a Local Union, the Financial Secretaries in the cases of existing Local Unions and the applicants for charters in all other instances shall forward to the General Secretary-Treasurer the following:

(a) Charter Fee – Twenty-five ($25.00) Dollars.
(b) Assessment for each signatory to application – One ($1.00) Dollar.

The same charter fee shall be paid in the case of the issuance of a charter to any other subdivision of the International Union, except that in the case of subdivisions of Local Unions the charter fee paid by Local Unions shall be Ten ($10.00) Dollars except for an '0' branch charter which shall be issued without fee.

## Initiation Fee Taxes and International Initiation Fees

**Art. XI.**
**Section 4.** The Financial Secretaries of Local Unions shall forward to the General Secretary-Treasurer with the report required by this Article for the month in which new members have been initiated into membership in the Local Union or any subdivision thereof the following for each newly initiated member:

Initiation Fee Tax – Twenty-five (25) percent upon the initiation fee established as of the date of reporting the new member. The initiation fee shall be deemed to include all fees, assessments and other charges required to be paid upon admission to membership howsoever identified, but shall not be deemed to include any assessment for the maintenance of a Local Union death benefit fund.

## Reinstatement Assessments

**Art. XI.**
**Section 5.** The Financial Secretaries of Local Unions shall forward to the General Secretary-

Treasurer with the report required for the month in which members are reinstated the following:

(a) Five ($5.00) Dollars for each member reinstated to membership who has held a withdrawal card as provided in Article XV.
(b) Five ($5.00) Dollars for each member reinstated to membership after suspension or expulsion, plus per capita tax for each month required, and such other charges as may be provided for in Article XXIV.

## Other Fees, Taxes and Assessments

**Art. XI.**
**Section 6.** Subject to applicable laws, other fees, taxes, assessments and other charges for obtaining income for the International Union for any purpose may be increased, decreased, changed or added from time to time by the General Convention or the General Executive Board.

# ARTICLE XII

# TERRITORIAL JURISDICTION

**Art. XII.**
**Section 1.** The territorial jurisdiction of any Local Union heretofore or hereafter established shall be such as described on the face of the charter issued to such Local Union, together with any limitations, extensions and restrictions regarding such territorial jurisdiction as may be added thereto. No charter to a Local Union shall hereafter be granted unless the same shall distinctly state upon its surface a description of the territorial jurisdiction conferred, qualified by a statement that such territorial jurisdiction so conferred may be amended, restricted, or enlarged by the International Union of Operating Engineers.

# ARTICLE XIII

# CRAFT JURISDICTION

## Division of Jurisdiction

**Art. XIII.**
**Section 1.** Jurisdiction of the International Union of Operating Engineers shall include but

not be limited to persons engaged in the following crafts:

## (a) Stationary Engineers' Craft Jurisdiction:

All persons engaged in supervising, controlling, operating or assisting in operating, maintaining or assisting in maintaining (including apprentices to the craft) all boilers, nuclear reactors (fission or fusion types), solar or geothermal equipment or other devices (irrespective of pressure or heat source and including hot water and/or other hot liquid or gas systems); pressure vessels, engines (both internal and external combustion types), turbines (hydro, steam and gas types), motors, pumps, air compressors, generators, alternators, refrigeration and/or air conditioning machines, units, plants and systems (including cryogenic equipment and systems), fans and ventilating systems, siphons, heating systems and all components thereof, bridges (including turntable, jack-knife and span-lift types), and any and all instrumentation and controls (including remote instrumentation and controls) used on or in the above equipment, devices or systems including all equipment, controls and instrumentation used in the handling, preparing and delivery of fuel (irrespective of type) from and/or to storage bins, yards, tanks or reservoirs up to and into the equipment using, consuming or converting the fuel (irrespective of the motive power); all instrumentation, controls and appurtenances utilizing energy from nuclear fission or fusion and its products, such as radioactive isotopes, including materials and processing; the supervision, operation and maintenance of all of the above when connected with and/or used in power and plant operation in all governmental, commercial and industrial activity including but not limited to railroads, utilities (public and private), hydroelectric plants, water filtration and purification plants, pump stations, reservoirs, control centers, garbage disposal plants and incinerators, waste water purification plants and systems (both active and passive types), fuel conversion plants or processes, breweries, distilleries, canneries, reduction plants, legitimate and motion picture theaters, ice and cold storage plants, coal

**34**

yards, dairies, creameries, and other dairy products plants, office and municipal buildings, schools, hotels, apartment hotels, apartment houses and condominiums, hospitals, department stores, laundries, metal and other junk yards and junk segregating plants, oil drilling, refining and producing plants (including control of pressure and temperature of gases, liquids and otherwise), chemical and petro-chemical plants, and pipe line pumping and boosting stations; the operation of valves, gates, locks and all machinery on dams or spillways; and bakeries, paper and pulp mills, newsprint plants, shipbuilding and ship repair yards; and all other persons engaged in capacities other than supervising, operating or maintaining capacities in the aforementioned plants, systems, industries, services and/or institutions.

## (b) Hoisting and Portable Engineers' Craft Jurisdiction:

All persons engaged in supervising, controlling, erecting, dismantling and repairing, operating or assisting in operating, erecting, dismantling, or the repairing of, all hoisting and portable machines, all refrigerating machines or units and engines used on open and heavy construction work; all hoisting and portable machines and engines used in or upon wrecking, digging, boring, soil testing, building and erecting foundations, buildings, tunnels and subways, dams, reservoirs, disposal plants, bridges, railroads, streets (paving and repair), road building, construction (including grading, repair and surveying), sewers, water, gas and oil lines, allotment development construction, harbor and river dredging, the construction and repair of all docks, wharves, piers, shipyards, and seawalls, all sand, gravel and stone pits; quarries and material yards (permanent and temporary, sand, rock and gravel screening machines; motor generators (when used for welding and cutting or for converting or transforming electric currents, irrespective of their motive power); all machines used to sweep, clean and remove debris and snow from streets and roads; all mine hoists, telphers, grab buckets, pumps, siphons, pulsometers, generators, concrete mix-

**35**

ers (irrespective of capacity), concrete pumps of all sizes and capacities, stone crushers, air compressors, all water-test and blast-hole drilling machines; all sandblasting and other machines and boilers used in the cleaning and washing of buildings; all boilers (irrespective of size) used for furnishing temporary heat on buildings under construction, or for the heating of materials, or heating water, or furnishing steam for the operation of all machines, engines and other appurtenances herein specified; all locomotive, tractor and truck type cranes; all derricks, boom hoists (of all descriptions and capacities), and automatic hoists; house and all elevator (permanent and temporary) used for hoisting building material or lowering debris or carrying workmen from floor to floor in buildings under construction and repair; all street rollers, steam and other motive power shovels; all Le Tourneu and other types of scoops; pull shovels, mucking machines, draglines and cableways; all clam-shell and orange peel buckets when used in connection with any machine or with derrick or boom hoist for excavating, handling, storing, loading or unloading materials; all land and floating pile drivers, floating derrick barges and boats, floating and self-propelled dredges and rock drilling plants; all dinkey and standard locomotives, derrick cars, tractors and all tractor-propelled machinery; all power and elevator graders, scarifiers, bulldozers, Barber Green loaders, all trenching and ditching machines, all mechanical hoe-type machines, back fillers and conveyors; all cranes, derricks, machines, engines and boilers used in asphalt and concrete mixing plants and all other engines and machines (irrespective of motive power) used on building and construction work, or in the loading, unloading or storage of commodities at or in terminals; all persons engaged in supervising, controlling, operating or assisting in operating, maintaining and assisting in maintaining all facilities, including all instrumentation and appurtenances utilizing, energy from nuclear fission or fusion, and its products, such as radioactive isotopes, all electronically controlled con-

struction equipment, all nuclear powered equipment including all drilling for nuclear operations and methods, all equipment used in oil drilling, all Laser beams, all emulsion distributing machines, and all remote control machinery used in operating equipment; all persons engaged in or assisting in surveying; all operation and servicing of helicopters used in construction.

**Art. XIII. Section 2.** The General Executive Board may from time to time as it deems proper for the protection of the jurisdiction of the International Union of Operating Engineers exercise and maintain jurisdiction over persons engaged in work other than described in this Article, including but not limited to public employees, and such jurisdiction over such persons shall have the same Constitutional force and effect as though fully defined and set forth in this Article.

## Conflict of Jurisdiction

**Art. XIII. Section 3.** In cases where there shall be conflict between the craft jurisdiction of the Stationary Engineers' Branch and the craft jurisdiction of the Hoisting and Portable Engineers' Branch of this organization and one of said branches has already assumed certain craft jurisdiction of the other branch and has organized the same and entered into contractual relations with third parties involving such craft jurisdiction, such status may remain as now in effect.

## ARTICLE XIV
## CHARTERS

## Classification of Charters

**Art. XIV. Section 1.** Charters of the International Union of Operating Engineers may be granted to Local Unions, District Councils, Local Joint Executive Boards, Local, State and Provincial Organizations, to Local Unions for Junior and Assistant Engineers' Subdivisions, Registered Apprentice Engineers' Subdivisions, and Branch Engineers' Subdivisions, and to

such other subdivisions as may from time to time be authorized and established.

### Application for Charters

**Art. XIV. Section 2.** An application for a charter of a Local Union shall be upon the form prescribed by the International Union of Operating Engineers and shall be signed by not less than fifteen (15) applicants, none of whom shall be members of the International Union, which requirements may be changed by the International Union. The requirements for all other applications for charters shall be established by the General Executive Board.

### Qualification of Applicants

**Art. XIV. Section 3.** Upon receipt of an application for a charter, the General President shall proceed to satisfy himself that the applicants are qualified, and if found to be so he shall direct the General Secretary-Treasurer to issue the charter. In the formation of new Local Unions the members thereof shall be charged such charter fees, entrance fees and organization fees as the International Union shall establish.

### Junior and Assistant Subdivisions, Registered Apprentice Subdivisions and Branch Subdivisions

**Art. XIV. Section 4.** Local Unions as such may make application for sub-charters covering junior and assistant engineers, registered apprentice engineers and branch engineers in such manner and form as prescribed by the International Union and the said sub-charters shall confer no greater craft jurisdiction than that held by the parent Local Union making such application.

### Government of Junior and Assistant Engineers' Subdivisions, Registered Apprentice Subdivisions and Branch Engineers' Subdivisions

**Art. XIV. Section 5.** Any Junior and Assistant Engineers' Subdivision, Registered Apprentice Engineers' Subdivision or Branch Engineers' Subdivision hereto-

fore or hereafter created by the sub-charters referred to in this Article, shall function under the direction and control of the parent Local Union to which the same belongs. They shall be accountable to and function under their parent Local Union and they shall respond to, be under the control of and be governed by the said parent Local Union; provided, however, that the members of the said Junior and Assistant Engineers' Subdivision, Registered Apprentice Engineers' Subdivision and the Branch Engineers' Subdivision, if in good standing as required by the International Union and credited with their per capita tax paid to and remitted by the parent Local Union, may vote upon such referendums as shall be submitted to the parent Local Union for them by the International Union. They shall be entitled to such participation in the Death Benefit Fund as may be provided for them by the International Union. Except as otherwise provided in this Constitution, they may not hold office in their parent Local Union. There shall be no officers in the subdivisions.

Branch engineers and junior and assistant engineers shall have equal rights to nominate, vote for and be delegates to General Conventions and to State, Interstate and Provincial Organizations. They shall have equal rights to nominate candidates and to vote in elections and referendums of the parent Local Union, to attend its membership meetings, and to participate in the deliberations and business of such meetings. Members of Registered Apprentice Engineers' Subdivisions shall have equal rights to vote for delegates to General Conventions and to State, Interstate and Provincial Organizations, to vote in elections and referendums of the parent Local Union, and to attend its membership meetings.

A Local Union may provide in its bylaws that any person applying for membership in a Junior and Assistant Engineers' Subdivision or a Branch Engineers' Subdivision shall, as a condition of acceptance and continuation of membership in such subdivisions, agree to pay in three yearly installments any differential in the initiation fee charged for membership in such

# Exhibit 1 to Giblin Declaration
# (part 2)

Subdivision and that charged for membership in the parent Local Union. Upon the expiration of the three year period and upon payment in full of the differential in the initiation fee, if any, such member shall be transferred into the parent Local Union and shall, if otherwise qualified, be eligible for nomination and election to office in the parent Local Union.

Any member initiated into a Junior and Assistant Engineers' Subdivision or a Branch Engineers' Subdivision whose membership therein continues for *two* consecutive years immediately prior to election shall be eligible, whether or not he has transferred into the parent Local Union, for nomination and election to office in the parent Local Union if he is otherwise qualified under the provisions of the International Constitution.

### Definition of Junior and Assistant Engineers

**Art. XIV.**
**Section 6(a).** Junior and assistant engineers are defined as including all persons who work at the craft over which this organization exercises craft jurisdiction and who begin as oilers, firemen, or helpers under such tutelage and guidance as a parent Local Union may direct.

### Definition of Registered Apprentice Engineers

**Art. XIV.**
**Section 6(b).** Registered apprentice engineers are defined as including all persons who aspire through training, effort and application to become masters of the craft over which this organization exercises craft jurisdiction and who are indentured as registered apprentice engineers under such tutelage and guidance as a parent Local Union may arrange.

Registered apprentice engineers shall be admitted to the Registered Apprentice Engineers' Subdivision under the following conditions: (a) successful completion of a probationary period as an indentured apprentice, not to exceed six months; (b) tender of the regular, uniform initiation fee established for the Registered Apprentice Engineers' Subdivision.

Registered apprentice engineers shall be entitled to

40

transfer to the parent Local Union or to the appropriate branch of their Local Union upon application and fulfillment of the following requirements: (a) successful completion of a uniform period of apprenticeship within a Local Union as a member of a Registered Apprentice Engineers' Subdivision; (b) successful demonstration of capacity to meet reasonable and uniform qualifications as journeymen engineers as prescribed by the parent Local Union; and (c) tender of any differential in the initiation fee and dues fixed for membership in the parent Local Union of the appropriate branch, as the case may be. Cancellation of an apprentice's agreement, for a just cause, after written and specific notice and a full and fair hearing by the apprenticeship committee, shall automatically cancel his membership in the International Union of Operating Engineers and in the Local Union.

The apprenticeship committee shall notify the Financial Secretary of the Local Union of all such cancellations.

Other provisions of this Constitution notwithstanding, there shall be no appeal to the International Union by a registered apprentice engineer, for cancellation of his membership through action of the apprenticeship committee.

### Definition of Branch Engineers

**Art. XIV.**
**Section 7.** Branch Engineers are defined as those persons who, qualified by craft to become members of the International Union of Operating Engineers, may desire to be constituted a Subdivision thereof through the application of a parent Local Union and who are employed in any class of employment existent within the territorial jurisdiction of a parent Local Union which class of employment shall not have become organized nor be engaged in employing members of said parent Local Union.

### Property of Local Unions

**Art. XIV.**
**Section 8(a).** The supplies furnished with a charter for a Local Union will be a voucher and

41

receipt book, one seal, Financial Secretary's book, Treasurer's book, one minutes book, one day book, three rituals, one hundred letterheads, one hundred envelopes (stock), fifty application cards and fifteen copies of the Constitution. Membership books and/or cards, the charter, seal and all books and other paraphernalia shall be the property of the International Union and shall be delivered to the General President of the International Union upon demand by the General Executive Board, or by order of the General Convention.

**Art. XIV. Section 8(b).** If at any time a Local Union or other subdivision shall withdraw, lapse, dissolve, be suspended, placed under supervision or expelled from the International Union, or shall have its charter revoked, all of its real and personal property, paraphernalia, books, charter, seal, records, card indexes and funds shall immediately revert to the International Union and the General President shall at once, in person or by deputy, take possession of such property, paraphernalia, books, charter, seal, records, card indexes and funds of said Local Union or other subdivision, all of which he or his deputy shall receipt for; and he or his deputy shall forward the same to the General Office or hold as directed.

**Art. XIV. Section 8(c).** The officers and members of said Local Union or other subdivision, individually and collectively, shall be held strictly responsible for all such property, paraphernalia, books, charter, seal, records, card indexes and funds until they are turned over to the General President or his authorized representative and receipted for.

**Art. XIV. Section 8(d).** They shall be individually and collectively accountable therefor to the International Union, and suit may be instituted through the General President to recover the real and personal property, paraphernalia, books, charter, seal, records, card indexes and funds, or for money damages if any of them have been concealed or destroyed.

**Art. XIV. Section 8(e).** All supplies necessary for the proper functioning of Local Unions shall be uniform, and all Local Unions must secure such supplies from the General Secretary-Treasurer, application to be made therefor, on the official order blank, accompanied by the necessary monies to cover the cost of the same, and no Local Union, under penalty of expulsion, shall furnish any other Local Union with any of such supplies, nor use any such supplies unless furnished by the International Union.

### Form of Charter

**Art. XIV. Section 9.** No charter to a Local Union shall hereafter be granted unless the same shall distinctly state upon its face a description of the territorial and craft jurisdiction conferred, qualified by a statement that such territorial and craft jurisdiction so conferred may be amended, restricted or enlarged by the International Union. Charters issued in accordance with this Article shall be in such form as the General Executive Board shall prescribe, consistent with the Constitution and laws of the International Union of Operating Engineers.

## ARTICLE XV

## TRANSFER AND CLEARANCE CARDS, SERVICE DUES, WITHDRAWAL CARDS AND GENERAL OFFICE MEMBERSHIP

### Transfer Cards

**Art. XIV. Section 1.** When a Local Union has been dissolved, suspended, or when its charter has been revoked or surrendered or otherwise becomes inoperative, any member in good standing of such Local Union may, through the General Secretary-Treasurer, upon application to and by consent of a majority of the General Executive Board, be given a transfer card

which will entitle him to make application for admission to the nearest Local Union in his vicinity.

## Clearance Cards

**Art. XV.**
**Section 2(a).**    Any member desiring a clearance card for the purpose of transferring his membership to another Local Union shall apply to the Financial Secretary of his Local Union, and if such member is in good standing in his Local Union, and no charges are pending against him, the Financial Secretary shall grant a clearance card upon the payment by the member of any unpaid dues, or other obligations, plus One ($1.00) Dollar for the clearance card.

**Art. XV.**
**Section 2(b).**    If an applicant for a clearance card has been a member of the International Union for less than six months, then upon the granting of a clearance card he shall pay to said Local Union the sum of Fifteen ($15.00) Dollars as a fee therefor.

**Art. XV.**
**Section 2(c).**    Thereafter a member obtaining a clearance card must present the same to the Local Union into which he desires to transfer, for acceptance by it, and the matter shall be referred to a committee of such Local Union, which shall report to the Local Union on the character and qualifications of the member making application for transfer, and said Local Union may, by a majority vote, accept or reject said clearance card, such acceptance or rejection to be entirely within the discretion of the Local Union.

**Art. XV.**
**Section 2(d).**    No member desiring to transfer into another Local Union shall negotiate for, accept or commence work until his clearance card has been accepted or a service dues receipt shall have been issued to him as hereinafter provided. Enforcement of this provision shall be wholly a matter of internal discipline. A violation of this provision shall not be used as a basis for any action adversely affecting employment rights, except in accordance with the terms of a valid union security agreement. If and when his clearance card is accepted, he shall be governed by the wage

scale, rules and bylaws of said Local Union and if the Local Union into which such member enters has a higher initiation fee and the bylaws of such Local Union require it, he may be required to pay the amount of the difference to the receiving Local Union, in which event, the initiation fee tax on such difference shall be charged and collected by the General Secretary-Treasurer. In the event the said bylaws waive the payment of this difference, then there shall be no initiation fee tax charged or collected by the General Secretary-Treasurer.

**Art. XV.**
**Section 2(e).**    Local Unions shall purchase clearance cards from the General Secretary-Treasurer and said cards shall be drawn up by the General Secretary-Treasurer in duplicate and designated "Coupon No. 1" and "Coupon No. 2." Upon entering the Local Union into which he may transfer the member shall sign both coupons, Coupon No. 1 being retained by the Financial Secretary of the Local Union into which he transfers and Coupon No. 2 being transmitted by the Financial Secretary of the Local Union into which he has transferred to the Financial Secretary of the Local Union which issued the card no later than the last day of the month in which the member was accepted. Thereafter the Financial Secretary of the Local Union into which the member has transferred, shall, on the next monthly report, set forth the name and membership number of the member so admitted.

## Travel Service Dues

**Art. XV.**
**Section 3(a).**    Members of one Local Union shall not seek employment, be employed, or remain at work at the craft within the territorial jurisdiction of another Local Union without the consent of such other Local Union, which consent may be evidenced by its acceptance of the clearance card presented to it by the member involved, as provided in the Constitution, or by the issuance of the service dues receipt hereinafter described. If the member involved

44

45

fringe benefit issues, and any other issues that may arise. "Key employees" are defined as those operating engineer employees who have been covered by a collective bargaining agreement with the IUOE or one of its Local Unions and who are regularly and customarily employed by the employer whenever it has work or who have been employed by it sometime during the past six months, and who, because of their knowledge, experience, special skills and/or training, are critical to the success of the particular project; under no circumstances will a key employee be allowed to serve as a master mechanic unless agreed to at the pre-job. Key employees will be laid off in the same order in which they were hired. All operators hired (referred or dispatched) after the twelfth person hired will be laid off prior to any key employee being laid off, unless the employer determines its need for the key employee is finished. The principle of "money follows the employee" will govern health and welfare contributions for all traveling employees; pension and annuity contributions will similarly be governed by "money follows the employee," and the applicable fringe benefit funds will be obligated to adopt any necessary provisions to make such a procedure possible. With respect to the rate of the fringe benefit contributions, the employer will contribute, on behalf of the key employee, at the rate of the home Local agreement, unless the rate is higher in the Local agreement of the Local in whose jurisdiction the work is being performed, in which event that higher rate will apply. Contributions to other funds (such as apprenticeship and training, industry advancement, labor-management cooperative trust, etc.) will be made on behalf of the key employees to those relevant funds required by the agreement in the jurisdiction in which the work is being performed. The employer agrees that, as a condition of having key employees on its project, it will pay the key employees not less than the applicable wage rate called for in the Local agreement of the Local in whose jurisdiction the work is being performed, and it will recognize the local working dues

47

does not present a clearance card to such other Local Union, or the Local Union to which the clearance card is presented fails to act thereon, or the Local Union to which the clearance card is presented acts thereon and refuses to affiliate such member, and the Business Representative of such other Local Union, in such cases, shall thereupon consent to the issuance of the service dues receipt (described herein), then the member involved shall be entitled to receive and required to secure successively, during the period within which said consent be granted and his work continue, such number of weekly service dues receipts if he is a hoisting and portable engineer, or monthly service dues receipts if he is a stationary engineer, as shall be issued to him by the said Business Representative under the regulations established by the General Executive Board. Such service dues receipts shall, for the period issued, allow the holder thereof to seek, accept, and hold employment within the territorial jurisdiction of such other Local Union out of which said service dues receipts shall be issued, but subject always to such regulations as shall be imposed thereon by the General Executive Board.

Provided, however, that, pursuant to the August 4, 2003 action of the General Executive Board, as authorized by the 36th General Convention, employers shall have the right to bring in four key employees—as the third, sixth, ninth, and twelfth person hired (other hires to be from Local in whose jurisdiction the work is performed). On projects where less than twelve employees are dispatched, key employees will be hired (referred or dispatched) according to this formula until the staffing requirements of the project are met. An employer wishing to exercise the ability to bring in key employees will be obligated to sign (if it is not already signatory to) the Local Union master agreement in the area in which the job is located, and have a pre-job conference before the start or move-in of each and every project. The purpose of the pre-job will be for the employer to identify by name each key employee it wishes to bring onto the project, as well as to address

46

and/or administrative dues, if any, and charge and collect from "key employees" those dues and forward them to the Local Union in whose jurisdiction the work is being performed.

The provisions of the preceding paragraph will apply to key employees, unless the Local Union in whose jurisdiction the relevant work is to be performed is a member of an IUOE Regional Conference subject to a conference-wide key employee agreement binding on each Local Union in the Conference, in which case the terms of the conference-wide agreement will apply.

Travel service dues collected pursuant to this Section shall have as their primary purpose the defraying of the additional administrative and collective bargaining cost incurred by a Local Union in providing services for traveling members from sister Local Unions who are working within its jurisdiction, and the International Union's cost of recording members' movements in the labor market. Payment of travel service dues is an obligation arising as an incident of membership in the International Union. Failure of a traveling member to comply with this requirement shall subject him to an appropriate penalty as provided by the International Constitution for the violation of an obligation under the Constitution. Failure of a traveling member to pay travel service dues shall not be used as a basis for any action adversely affecting employment rights, except in accordance with the terms of a valid union security agreement. Enforcement of the collection of travel service dues shall be wholly a matter of internal Union discipline.

**Prior Payments of Current Dues Required**

**Art. XV. Section 3(b).** The consent referred to in this Article shall not be granted by the said other Local Union or its Business Representative, nor shall travel service dues be collected from or service dues receipts be issued to, any said member who shall not, at the time when requesting a service dues receipt, have had his current monthly dues paid into the Local

48

Union to which he belongs. Upon the issuance to him of the said service dues receipt the same shall always be available for inspection and certification as to its authenticity.

**Applicants' Service Dues**

**Art. XV. Section 3(c).** In each Local Union where applicants for membership engage at the craft upon work within the jurisdiction of said Local Union, the Local Union shall charge to and collect from each such applicant, applicants' service dues. Such dues shall be charged only so long as the applicant has not tendered full initiation fees and has not complied with the same requirements for admission generally applicable to other members. In no case, however, may applicants' service dues be charged for more than twelve (12) months after an individual has become an applicant for membership. Each Local Union retains the right to determine whether it will establish the procedure of accepting the payment of applicants' service dues as a temporary alternative to the payment of full initiation fees and regular periodic dues.

Failure by an applicant for membership to pay service dues shall not be used by the Union as a basis for an action adversely affecting the employment rights of the applicant, except in accordance with the terms of a valid union security agreement. Under no circumstances shall payment of service dues be made a condition precedent to an applicant's obtaining employment in the first instance.

Local Unions with Registered Apprentice Engineers' Subdivisions retain the right to determine if the provisions of this Section shall apply to Registered Apprentice Engineers during the probationary period prior to their initiation into the Registered Apprentice Engineers' Subdivision.

**Amount of Applicant Service Dues**

**Art. XV. Section 3(d).** Each Local Union shall charge to and collect from all those persons within its ter-

49

ritorial jurisdiction to whom this Article applies, applicant service dues in a minimum amount of two dollars ($2.00) per week, and, in addition, any amount paid by members of the Local Union as administrative, supplemental or working dues, or the monthly equivalent of said sum. The maximum amount of service dues to be charged and collected shall be five dollars ($5.00) per week or the monthly equivalent of said sum and, in addition, any amount paid by members of the Local Union as administrative, supplemental or working dues. In lieu of said amount, a Local Union may elect to charge and collect applicant service dues in an amount not to exceed the weekly equivalent of the amount of regular dues paid by members of the Local Union. Upon payment of the proper dues, there shall be issued an applicant service dues receipt for each applicant for membership.

## Amount of Travel Service Dues

**Art. XV.**
**Section 3(e).**  Each Local Union shall charge to and collect from all persons within its territorial jurisdiction to whom this Article applies, travel service dues in the amount of five dollars ($5.00) per week, and, in addition, any amount paid by members of the Local Union as administrative, supplemental or working dues, or the monthly equivalent of said sum. In lieu of said amount, a Local Union may elect to charge and collect travel service dues in an amount not to exceed the weekly equivalent of the amount of dues, including regular dues and administrative, supplemental or working dues, paid by members of the Local Union. Upon payment of the proper dues, there shall be issued a travel service dues receipt for each traveling member.

## Form of Service Dues Receipt and Distribution of Copies

**Art. XV.**
**Section 3(f).**  The form of the service dues receipt issued to traveling members and to applicants shall be substantially as follows:

## INTERNATIONAL UNION OF OPERATING ENGINEERS

(Seal)

Date _____ ,20_____

Received from _____

Reg. No. _____ Member of Local No. _____

City of _____ State _____

SERVICE DUES for

Week ending _____ through _____

Months of _____

Service dues paid in Local No. _____

City _____ State _____

Dues paid for month of _____

Initiation Fee being paid

If more than one week is paid for, then additional service dues receipts to cover must be attached hereto and serial numbers noted hereon.

No. _____

The total number of weeks paid for shall be checked below and the serial numbers of all service dues receipts attached shall be entered hereon.

Weeks                                              Number

| Weeks | | Number |
|---|---|---|
| ☐ | One | Serial No. _____ |
| ☐ | Two | Serial No. _____ |
| ☐ | Three | Serial No. _____ |
| ☐ | Four | Serial No. _____ |
| ☐ | Five | Serial No. _____ |
| ☐ | Six | Serial No. _____ |
| ☐ | Seven | Serial No. _____ |
| ☐ | Eight | Serial No. _____ |
| ☐ | Nine | Serial No. _____ |
| ☐ | Ten | Serial No. _____ |

Amount paid _____

Representative _____

In case of applicants for membership the information required above with reference to register number and Local Union data shall be omitted.

Each service dues receipt shall be printed in duplicate labeled "Original" and "Duplicate." The original

shall be issued to the member, the duplicate shall remain bound in the Service Dues Book.

**Printing and Distribution of Service Dues Book**

**Art. XV. Section 3(g).** The General Secretary-Treasurer shall cause the service dues receipts described herein, or those Local Unions that do not utilize electronic data processing for processing service dues payments, to be printed and made available to Local Unions.

**Art. XV. Section 3(h).** The General Executive Board is authorized and empowered to establish, amend, alter and administer the terms, conditions, and rates under which the service dues receipts herein provided shall be issued and enforced. No service dues receipt as described in this article shall be issued to or used by any person who is not, at the time, either a member of the International Union of Operating Engineers or an applicant for membership therein, and the attempted issuance of such a service dues receipt above referred to by any officer or employee of the organization to any other person than those described herein shall be unauthorized, null and void. Registration fees, if charged by a Local Union, must bear a reasonable relationship to the service provided to the registrant by the Local Union and shall not be in excess of the fixed monthly dues.

**Data Processing Service Dues**

**Art. XV. Section 3(i).** Local Unions that employ electronic data processing equipment may systematize the processing of service dues, including computer-generated service dues receipts.

**Withdrawal Cards**

**Art. XV. Section 4(a).** Any member of the International Union who ceases to perform the work of an engineer, may, at the option of his Local Union, be given a withdrawal card; but no withdrawal card shall be issued to any member of the International Union who is employed as an engineer. This section, however, shall not apply to any members of the International

Union who are serving or acting in any capacity for a Local Union or the International Union, whose duties prevent them from working at the trade, or engineers who hold positions as inspectors of boilers or other machinery, or examiners of engineers.

**Art. XV. Section 4(b).** A fee of not to exceed Five ($5.00) Dollars may be charged for each withdrawal card.

**Art. XV. Section 4(c).** Local Unions shall purchase withdrawal cards from the General Secretary-Treasurer. When a holder of such card desires to reinstate himself in full good standing membership, he shall present this card and it shall be acted upon in the same manner as hereinbefore provided in the case of clearance cards.

**Art. XV. Section 4(d).** Any member entering a Local Union on a withdrawal card shall pay the difference in initiation fee as hereinbefore provided in the case of clearance cards. If he shall enter said Local Union within a period of time less than thirteen (13) months dated from the month in which the withdrawal card was issued, he shall be required to pay all dues and assessments accruing in such period of time in the Local Union which issued the same, and said dues and assessments shall be paid to the Local Union admitting the member and shall be forwarded to the Local Union which issued the withdrawal card. At the same time he shall pay an assessment of Ten ($10.00) Dollars or such amount as shall be fixed by the General Executive Board, Fifty (50) per cent of which assessment shall be forwarded by the Local Union to the General Secretary-Treasurer. Members who enter said Local Union during the thirteenth (13th) month following the month in which the withdrawal card was issued shall be considered as having been on withdrawal for exactly one (1) year.

If the member shall enter said Local Union after more than thirteen (13) months since the issuance of the withdrawal card, he shall pay an assessment of Ten ($10.00) Dollars or such amount as shall be fixed by

the General Executive Board, and a similar amount for each successive year or part thereof. Fifty (50) per cent of which assessment shall be forwarded by the Local Union to the General Secretary-Treasurer. Provided, however, the total payment so required shall not exceed the amount of the regular current initiation fee in the Local Union to which the application is made.

All members of the International Union who have been granted withdrawal cards by their Local Unions and were then in good standing in the Death Benefit Fund may continue their good standing therein by paying on or before June 1 of each year, in advance and directly to the General Secretary-Treasurer, the sum of Nine ($9.00) Dollars per annum; but they shall not be in good standing in any other respect. Provided, however, members initiated on or after July 1, 1973, shall not participate in the Death Benefit Fund.

**Art. XV.
Section 4(e).** However, members holding withdrawal cards and desiring to continue in good standing in the Death Benefit Fund must make application to the General Secretary-Treasurer within thirty (30) days from the date the withdrawal card was issued and he must be paid up to and including the month of his death, or his death must have occurred within thirty (30) days after his dues and obligations shall have become due and payable, in order that his beneficiary may be entitled to the death benefits. In the event any member granted a withdrawal card violates any of the Articles of this Constitution, any Local Union or the General Executive Board shall cancel said withdrawal card, and he and his beneficiaries automatically lose his and their rights under the Death Benefit Fund.

**General Office Membership**

**Art. XV.
Section 5.** When a Local Union has lapsed, been dissolved, suspended or had its charter

54

revoked, or has otherwise become inoperative, any member thereof who was in good standing at the time of such dissolution, suspension or revocation shall become a member of the General Office Membership, provided that within thirty (30) days from the date of such dissolution, suspension or revocation he pays to the General Secretary-Treasurer any unpaid dues or other obligation due to said Local Union from him, or due to the International Union from said Local Union in his behalf, including per capita tax, together with a fee of Five ($5.00) Dollars, or such other fee as may be fixed by the General Executive Board, and at the same time makes application to the General Secretary-Treasurer for a transfer card to another Local Union as provided for in Section 1 of this Article; and he shall remain in the General Office Membership only until his transfer card is accepted by another Local Union, and while a member of the General Office Membership he shall pay dues to the General Office, monthly in advance, in the amount of Five ($5.00) Dollars per month or such other amount as may be fixed by the General Executive Board. The General Secretary-Treasurer may suspend or expel any such member for non-payment of dues to the General Office or for any violation of the Constitution.

**Junior and Assistant Engineers' Subdivision Clearance Cards**

**Art. XV.
Section 6.** Any member of a Junior and Assistant Engineers' Subdivision desiring a Junior and Assistant Engineers' Subdivision clearance card for the purpose of transferring his membership to another Junior and Assistant Engineers' Subdivision of another Local Union, shall do so in the same manner as prescribed in Section 2 of this Article, provided the Local Union in which he is a member of the Junior and Assistant Engineers' Subdivision shall, by a majority vote, consent to the issuance of said clearance card.

55

# ARTICLE XVI
# DISCIPLINE AND EXPULSION IN GENERAL

### Penalty for Issuing Defamatory Literature

**Art. XVI. Section 1.** In addition to the provisions of this Constitution setting forth the causes and the manner and form in which Local Unions, officers and members thereof may be disciplined and penalties may be invoked, any Local Union, subdivision or member thereof publishing or circulating literature of a defamatory nature in violation of their responsibility toward the International Union or any of its subordinate bodies as an institution, or engaging in conduct that would interfere with the performance by the International Union or any of its subordinate bodies of their legal or contractual obligations, may be tried by the General Executive Board upon charges filed with it, and upon conviction, may be disciplined or expelled as the General Executive Board may determine.

### Penalty for False Applications

**Art. XVI. Section 2.** Any person making a misrepresentation or misstatement in his application for membership, or who shall belong to more than one Local Union of this organization, shall, on trial therefor and conviction thereof, be expelled from the International Union of Operating Engineers.

### General Executive Board May Prosecute

**Art. XVI. Section 3.** Any violation of the Constitution, Laws, Obligation and Ritual, or the rules, regulations and edicts issued by any officer or subdivision thereunto authorized by any member, subdivision or officer, may, if not prosecuted by the subdivision thereunto authorized, or if no provision has been made therefor, be prosecuted, heard and penalized by the General Executive Board.

56

### Penalty for Disruption, Radicalism, Etc.

**Art. XVI. Section 4.** Any member who is found guilty after trial of advocating or otherwise supporting the overthrow of the established order, either of the Government or of this organization, by force or violence or subversive tactics, shall forthwith be expelled from membership or otherwise disciplined as the circumstances may require, which action may be taken and penalty imposed by either the Local Union of which the guilty party is a member or by the General President.

### Charges by General Officers

**Art. XVI. Section 5.** Any General Officer may file charges in any Local Union against any member thereof.

### Good Standing Required of Officers

**Art. XVI. Section 6.** No person shall become or remain President, Vice President, Secretary, Treasurer, Business Manager, Business Agent or other officer or representative of any Local Union unless he is a member thereof in good standing. In the event such person shall cease to be a member in good standing or holds a withdrawal card, he shall be disqualified from further serving in such official capacity and the exercise by him of all rights, powers, privileges, authority and duties connected with his office shall automatically be revoked and cease.

### Violations of Welfare Plans Administration

**Art. XVI. Section 7.** Where a salaried union official serves as employee representative or trustee in the administration of a health, welfare, retirement, training or death benefit program, or any other fund of a similar nature, such service should be regarded as one of the functions expected to be performed by a union official in the normal course of his duties and not as an extra function requiring further compensation, over and above his salary, from the funds of such programs. Therefore, officials who already receive full time pay from their union

57

shall not receive fees or salaries from the funds of such programs. However, the provisions of this Section shall not bar the receipt of per diem and other reasonable expense allowances for such positions. Union officials, employees, or any other persons acting as agent, representative or officer of the union who exercise responsibility or influence in the administration of health, welfare, retirement, training or death benefit programs or any other fund of a similar nature, or the placement of insurance contracts must be entirely free of any compromising personal ties, direct or indirect, with outside agencies such as insurance carriers, brokers, consultants and others doing business with the welfare and death benefit plans. Such ties cannot be reconciled with their duty to be guided solely by the best interests of the membership in any transactions with such agencies. Any union official found to be involved in such ties to his own personal advantage, or to have accepted inducements, benefits or favors of any kind from such outside agencies, or who induces or directs associates or subordinates to accept financial participation and remuneration from health, welfare, retirement, training or death benefit programs or any other fund of a similar nature shall be deprived of privilege to hold office in Local Unions and the International Union.

# ARTICLE XVII
# APPEALS

## Appeals to General Executive Board

**Art. XVII.**
**Section 1(a).** Any General Officer who shall have filed in a Local Union charges against a member thereof, and any officer or member of a Local Union, may appeal to the General Executive Board from the adoption of an action by said Local Union, or from a decision rendered by the General President, where such action or decision is not committed to the exclusive discretion of the Local Union or a particular officer. Any Local Union or member thereof which

58

belongs to a Local, State or Provincial Organization, Joint Executive Board or District Council may appeal to the General Executive Board from an act or decision of said Local, State or Provincial Organization, Joint Executive Board or District Council. Notice of such appeal must be in writing and filed with the General Secretary-Treasurer within thirty (30) days from the date of the adoption of said action or the rendition of said decision by the General President.

Requests to modify, continue, amend, withdraw or invoke International Supervision, together with official actions or inaction thereon shall constitute appealable matters and be processed in the manner and form regulating appeals under the Constitution. Any such request, when signed by not less than twenty-five (25) percent of the members in good standing of a Local Union, shall cause a referendum on the subject to be submitted to the membership by the General President, who shall be guided by the results thereof in his decision on the question involved therein.

**Art. XVII.**
**Section 1(b).** The party making such appeal must file with the notice of appeal a written statement covering the decision of the General President complained of, together with sufficient facts to permit the General Executive Board's consideration of the same, or a complete statement of the evidence, exhibits and decision in the case of an appeal from the act of a Local Union or subdivision herein referred to, and at the same time file a copy of said evidence, exhibits and decision with the said Local Union or subdivision affected. The General Secretary-Treasurer shall thereupon notify the party against whom the appeal is taken, which party shall be allowed thirty (30) days from such notice within which to file an answer or defense. When both parties have properly filed the matters hereinbefore required, or upon the expiration of the period allowed for such filing, the General Executive Board shall proceed to hear the appeal, either upon the record or upon retrial, or both, and render its decision thereon.

59

**Art. XVII. Section 1(c).** All interpretations and decisions by the General Executive Board involving the organic law of the International Union of Operating Engineers shall be subject to review only by the General Convention, and all findings of facts by the General Executive Board shall be final, conclusive and binding.

### Appeals to General Convention

**Art. XVII. Section 2.** Any subdivision within the International Union of Operating Engineers, and any officer or member thereof, and any General Officer may appeal from the decision of the General Executive Board to the General Convention. Notice of such appeal, together with a complete statement of the record, findings and exhibits in the case must be filed within thirty (30) days from the rendition of a decision by the General Executive Board by delivery of said documents and notice of appeal to the General Secretary-Treasurer.

### Pendency of Appeals

**Art. XVII. Section 3.** Except as otherwise provided in this Constitution, pending the termination of any appeal, the action or decision appealed from shall remain in full force and effect.

### All Court Actions Superseded

**Art. XVII. Section 4.** To the extent not limited by law, no suit or other action at law or equity shall be brought in any court and no proceeding shall be initiated before any administrative agency by any member, officer or subdivision of the International Union of Operating Engineers until and unless all rights, remedies and reasonable provisions for hearing, trial and appeal within the Organization shall have been properly followed and exhausted by the member, officer or subdivision complaining. This provision shall only require resort to internal remedies for a period not exceeding four (4) months. Any member violating this provision, shall, in addition to the penalties prescribed in the Constitution

and Ritual, be subject to a fine equal to the full amount of the costs incurred in the defense of any such action by the Union, together with such costs additional as the court may fix or assess against said member.

## ARTICLE XVIII

## METHODS OF AMENDING AND REVISING CONSTITUTION AND INVOKING INITIATIVE AND RECALL

### Amending Constitution at General Convention

**Art. XVIII. Section 1.** The Constitution may be amended or revised at a General Convention provided the proposal to amend or revise be made in writing and be filed with the General Secretary-Treasurer not less than seventy-five (75) days prior to the date of the calling of said Convention. Such proposal to amend or revise the Constitution shall emanate from a Local Union in good standing or a General Officer of the Organization and must bear the seal of the Local Union or General Officer proposing the same. The General Secretary-Treasurer shall submit all such proposals properly filed with him to the General Executive Board and to all Local Unions in good standing not less than thirty (30) days prior to the date of the General Convention.

### Initiative and Recall

**Art. XVIII. Section 2.** Whenever forty (40) percent of all Local Unions in good standing and representing at least forty (40) percent of the entire membership of the International Union in good standing, by a majority vote of the entire membership of each, shall file with the General Secretary-Treasurer a petition requesting the recall from Office of any General Officer, the General Secretary-Treasurer shall thereupon submit the same to the membership and a vote shall be taken thereon. Upon receipt of such petition the General Secretary-Treasurer shall set the time within which the Local Unions shall

vote. No recall petition shall prevail unless there shall be cast thereon the votes of not less than fifty-five (55) percent of the entire membership of the International Union in good standing and a majority vote of the entire membership in good standing cast in favor thereof.

## Method of Voting

**Art. XVIII. Section 3.** The voting upon any proposition arising under this Article shall be conducted by the General Secretary-Treasurer upon tally sheets and ballots transmitted by the General Secretary-Treasurer to the Local Unions. Ballots shall be transmitted to all members in good standing. The referendum shall be conducted by mailed secret ballot. Adequate safeguards to insure a fair vote shall be provided by the Local Union in accordance with the International Constitution, applicable law and such rules and regulations as may be promulgated by the General Executive Board. The General Executive Board shall appoint three (3) tellers and retain a Certified Public Accountant to certify and announce the results of the voting on the basis of the tally sheets transmitted to them by the Local Unions. After the vote shall have been taken by the Local Unions in the manner herein prescribed, the report of said vote upon the tally sheets shall be transmitted by the Local Unions to the tellers and a Certified Public Accountant appointed by the General Executive Board, and the tellers and Certified Public Accountant shall report the result of said vote to the General Secretary-Treasurer, who shall cause it to be published in the next issue of the journal.

# ARTICLE XIX

# DEFENSE FUND, LOCKOUTS AND STRIKES

## Defense Fund

**Art. XIX. Section 1.** There shall be a Defense Fund which shall be drawn upon for the purpose of

defending the International Union and its members in efforts to prevent lockouts and strikes, by assisting in sustaining the members in cases of lockouts and authorized strikes, in protecting and defending the International Union and its members in any legal proceedings brought against it or its members, to employ counsel, and for any other purpose which the General President, subject to the approval of the General Executive Board, shall deem necessary for the further protection of the International Union and its members.

## Lockouts and Strikes

**Art. XIX. Section 2.** When a strike has been authorized by the General President, and a lockout, including lockouts caused by strike action of an affiliated union have been reported and investigated by the General President, upon good cause shown, he shall instruct the Financial Secretary-Treasurer to remit to the Financial Secretary of the Local Union involved, strike benefits in the amount of not less than Thirty-Five ($35) Dollars per week per member affected, for the purpose of assisting in sustaining such Local Union during the pendency of the lockout or strike. The continuance of such payments shall be until further order of the General President, subject to a review by him in the event the strike or lockout exceeds thirty (30) days.

## Strike Benefits

**Art. XIX. Section 3.** No financial assistance shall be given to any Local Union or Unions until a period of one (1) week has elapsed from the time a lockout or strike began; but thereafter it shall continue for such period of time as in the judgment of the General President may be necessary. Those members entitled to strike benefits shall be reported to the General President by the Financial Secretary of the Local Union or Unions involved in such lockouts or strikes on forms provided for such purpose by the General Secretary-Treasurer. No strike benefits shall be paid to any member who is not actually a striker or a victim of

a lockout, and such benefit shall cease when the member involved secures employment.

## ARTICLE XX
## DEATH BENEFITS

**Art. XX.**
**Section 1.** All death benefits, or claims shall be paid from the Death Benefit Fund in conformity with the provisions of this Article only, and no other funds or property of the International Union shall be liable for the payment thereof, nor shall the International Union be liable beyond the amount at any time available in the Death Benefit Fund.

**Art. XX.**
**Section 2.** Effective August 1, 1968, the amount of death benefits payable to the beneficiary or beneficiaries of a member who has been granted a withdrawal card prior to that date shall be computed on the basis of the number of years such member has been in good standing as of August 1, 1968, and shall not thereafter be increased during the period such member remains on withdrawal card. The amount of the death benefits payable to the beneficiary or beneficiaries of a member who is granted a withdrawal card on or after August 1, 1968, shall be computed on the basis of the number of years such member has been in good standing as of the date on which the withdrawal card is granted, and shall not be increased thereafter during the period such member remains on withdrawal card.

Death benefits are payable only upon the death of a member in good standing who was initiated prior to July 1, 1973.

All death benefits which have been accumulated by members in good standing on or before July 1, 1973 are frozen as of that date and no further benefits accrue.

Death benefits shall be paid to beneficiaries as follows and not otherwise:

Class I. Beneficiaries of members who on July 1, 1973 have been in good standing for a period of one (1) year to five (5) years shall receive One Hundred

64

($100.00) Dollars and this amount shall not thereafter increase.

Class II. Beneficiaries of members who on July 1, 1973 have been in good standing for a period of five (5) years to ten (10) years shall receive Two Hundred ($200.00) Dollars and this amount shall not thereafter increase.

Class III. Beneficiaries of members who on July 1, 1973 have been in good standing for a period of ten (10) years to fifteen (15) years shall receive Four Hundred ($400.00) Dollars and this amount shall not thereafter increase.

Class IV. Beneficiaries of members who on July 1, 1973 have been in good standing for a period of fifteen (15) years to twenty (20) years shall receive Five Hundred ($500.00) Dollars and this amount shall not thereafter increase.

Class V. Beneficiaries of members who on July 1, 1973 have been in good standing for a period of twenty (20) years or more shall receive Seven Hundred Fifty ($750.00) Dollars and this amount shall not thereafter increase.

**Art. XX.**
**Section 3.** For the purpose of establishing and maintaining a right to benefits under this Article, a member in good standing is a member who is not suspended by the operation of any section of this Article or of any other Article of this Constitution, and who also has paid his dues and all other obligations to the date of his death, or whose death has occurred within thirty (30) days after said dues and obligations shall have become due and payable.

**Art. XX.**
**Section 4.** The beneficiaries of members who transfer from one Local Union to another, and who remain in continuous good standing, shall receive benefits the same as though the member had continuously remained a member of the same Local Union.

**Art. XX.**
**Section 5.** Any member who was suspended or expelled from a Local Union or by the

65

General Executive Board, for any reason whatsoever, and later became reinstated, must have been a member in good standing for one year after his reinstatement before his beneficiaries are entitled to death benefits, and then his beneficiaries shall be entitled to the amount only in his class according to the length of time that he was a member in good standing after such reinstatement. Provided, however, members reinstated on or after July 1, 1973, shall not participate in the Death Benefit Fund.

**Art. XX.**
**Section 6.** The beneficiaries of any member who becomes suspended or expelled by his Local Union or the General Executive Board, for any cause whatsoever, lose their right to death benefits unless said member has complied with Section 5 of this Article.

**Art. XX.**
**Section 7.** The Financial Secretary of each Local Union shall keep the General Secretary-Treasurer advised in his monthly report to the General Office of all additions to their membership, and all deductions, and such additional members shall be entitled to benefits as mentioned in this Article.

**Art. XX.**
**Section 8.** The members of any Local Union two (2) months in arrears with its per capita tax shall be suspended from all benefits accrued in the Death Benefit Fund under this Article, until such times as the Local Union pays its arrearages of per capita tax, and has complied with all other obligations required in the Constitution, and has been reinstated; and from the date of reinstatement the members of such Local Union shall be entitled to again begin to accrue benefits, and in case of death of any such member occurring not less than one (1) year after such reinstatement, his beneficiaries shall be entitled to the payment of benefits designated according to the class that the deceased member had established at the time of his death and from the date of such reinstatement of his Local Union.

A member of a Local Union which has withdrawn, lapsed, dissolved, been suspended or expelled, or whose charter has been revoked, if such member is in good standing in his Local Union on the date of such withdrawal, lapse, dissolution, suspension, expulsion or revocation of charter, shall not forfeit or waive any of his accrued benefits earned in such Local Union, but such accrued benefits shall be continuous with that earned after transfer to another Local Union; provided, such member shall within thirty (30) days cause to be invoked and have made use of the privilege accorded such member to transfer to another Local Union in accordance with Article XV of this Constitution.

## Who Shall Be Beneficiaries

**Art. XX.**
**Section 9.** A member may change his designation of beneficiary as often as desired by written request filed with the Recording-Corresponding Secretary of his Local Union, or in the case of a member holding a withdrawal card and who has qualified under the provisions of Article XV, Section 4(e) of this Constitution, with the General Secretary-Treasurer. Such designation, and/or change, will take effect as of the date of the execution of such request, whether or not the member be living at the time of such filing, but without prejudice to the International Union on account of any payment made by it before receipt of such request.

Except as may otherwise be specifically provided by the member:

(1) if more than one beneficiary is designated, the designated beneficiaries will share equally;

(2) if any designated beneficiary predeceases the member, the share which such beneficiary would have received if living will be payable equally to the remaining designated beneficiaries, if any, who survive the member; and

(3) if no designated beneficiary survives the member, payment will be made to the member's widow or widower if surviving the member; if not surviving the

member, in equal shares to the member's children who survive the member; if none survives the member; to the member's parents, equally or to the survivor; if neither survives the member, in equal shares to the member's brothers and sisters who survive the member; or if none survives the member to the member's executors or administrators. When a member designates his or her spouse as beneficiary and thereafter the marriage to that designee is terminated by divorce, it shall be presumed, in the absence of evidence to the contrary, that the designation of the spouse as beneficiary is revoked.

**Art. XX.**
**Section 10.** All claims shall be made for said death benefit within a period of sixty (60) days from the date of death. The beneficiary shall present, within the sixty-day (60) period, to the Secretary of the Local Union a death certificate signed by the proper authority authorized to issue death certificates, if there be one, together with an affidavit of the claimant showing the relationship of the deceased to the beneficiary, and stating who is entitled to said payment, and identifying the person named in accompanying death certificate as the same person named in said death certificate.

The Financial Secretary of said Local Union shall thereupon promptly forward said documents to the General Secretary-Treasurer. The General Secretary-Treasurer shall then check said claim with the list of members in good standing as otherwise herein provided, and shall remit within a reasonable time, upon reasonable proof of death, to the beneficiary, through the Local Union of which he was a member, the amount of the benefit due said beneficiary.

**Art. XX.**
**Section 11.** Immediately upon the death of a member, the Financial Secretary of the Local Union shall notify the General Secretary-Treasurer by mail, and on the established form of certificate of death furnished by him, giving the name, address, register number, the date of the last payment of dues to the Local Union and the month paid for by the deceased,

his age, date of death and date of initiation, and any other information required, including the name or names, addresses and relationship of his beneficiaries, all to be properly certified to by the President and Financial Secretary of the Local Union with its seal affixed.

**Art. XX.**
**Section 12.** No suit shall be brought against a Local Union or member and no local Union or member thereof shall be liable for the death benefit herein provided for. The General Secretary-Treasurer shall have the authority to investigate the legality of any claim, and the President and Financial Secretary of any Local Union out of which a disputed claim originates shall, upon demand by the General Secretary-Treasurer, furnish a sworn statement concerning said claim.

Any Financial Secretary of any Local Union altering the dues book and/or card of any member or deliberately reporting him suspended when he should not have been, or fraudulently recording any payment of dues for a deceased member after his death, shall be expelled and forever barred from membership in the International Union, and the Local Union shall be fined the amount due the beneficiary of such deceased member, subject only to the right of appeal to the General Executive Board and from their decision to the Convention of the International Union.

**Art. XX.**
**Section 13.** The General Secretary-Treasurer shall cause to be published in each issue of the journal the names and Local Union of those who have died, the cause of death of the member, and the amount paid and to whom paid. After this plan is adopted, it is understood that members who allow themselves to become suspended or expelled from the International Union lose all rights whatsoever that they may enjoy under this plan.

**Art. XX.**
**Section 14.** The provisions of this Article shall prevail over any other Article of this Constitution which may conflict with this Article. In the event it

becomes expedient for the General Executive Board to amend the rules governing the operation of this Article, they shall do so, as may to them seem necessary, and the changes shall be binding upon the members.

All of the provisions of this Article are to be construed together.

## ARTICLE XXI

## JOINT EXECUTIVE BOARDS

### Formation

**Art. XXI. Section 1.**    A Joint Executive Board may be formed in any city or town where two or more Local Unions exist. Such Boards shall be composed of three delegates from each Local Union, elected by the Local Unions at the regular election of officers, and shall hold office for not less than one nor more than four years or until their successors, as determined by the Local Union, shall be elected and qualified.

### Officers

**Art. XXI. Section 2.**    The officers of Joint Executive Boards shall consist of a Chairman, Vice Chairman and Secretary-Treasurer, each of whom shall be elected by said Board, and shall hold office for one year, or until their successors are elected and qualified.

### Quorum

**Art. XXI. Section 3.**    A quorum for the transaction of business before a Joint Executive Board shall consist of a majority of the members thereof.

### Powers

**Art. XXI. Section 4.**    A Local Joint Executive Board shall have power to adjudicate grievances arising between Local Unions within the jurisdiction; to summon and examine any member of any such Local Unions; to adopt bylaws and trade rules with the con-

sent of the General President, and not in conflict with this Constitution and approved by a majority vote of all Local Unions affiliated with the said Board.

### Minutes

**Art. XXI. Section 5.**    Copies of all minutes and proceedings of any meeting of the Joint Executive Board shall immediately thereafter be sent to the General President by the Secretary-Treasurer of the Joint Executive Board.

## ARTICLE XXII

## DISTRICT COUNCILS

The General President, subject to the approval of the General Executive Board, shall have the authority to issue rules governing the affairs, conduct, activities, property and finances of District Councils and governing the suspension, expulsion and termination of such Councils. Such rules shall define the power of the General President, or his designee, with respect to disciplinary action against such Councils or their officers and shall provide for appeals to the General Executive Board and to the Convention from disciplinary action taken. However, such rules shall provide that actions and decisions appealed from shall remain in full force and effect pending any appeal.

## ARTICLE XXIII

## STATE, INTERSTATE AND PROVINCIAL ORGANIZATIONS

### Formation

**Art. XXIII. Section 1.**    State, Interstate and Provincial Organizations may, with the consent of the General President, be formed in any State or Province having

three or more Local Unions, or in combinations of States or Provinces, provided that the organizer thereof has notified all Local Unions in said State or Province at least thirty (30) days prior to the filing of a petition therefore with the General Secretary-Treasurer.

## Officers

**Art. XXIII. Section 2.** The officers of a State, Interstate, or Provincial Organization shall consist of a President, Vice President, Secretary-Treasurer, and three (3) Trustees. Their term of office shall begin at the convention of the State, Interstate or Provincial Organization to which they shall have been elected and continue for one (1) year, or until their successors are elected and qualified, but in no event shall be for more than four (4) years. Not more than two (2) of the officers described herein shall hold membership in any one (1) Local Union affiliated with a State, Interstate or Provincial Organization.

## Executive Boards

**Art. XXIII. Section 3.** State, Interstate and Provincial Organizations may provide for the creation of State, Interstate or Provincial Executive Boards consisting of the President, Vice President, Secretary-Treasurer, and the three (3) Trustees. All the powers of State, Interstate or Provincial Organizations when in session shall, when the same is not in session, pass to and vest in the State, Interstate or Provincial Executive Board.

## Voting

**Art. XXIII. Section 4.** Local Unions belonging to State, Interstate or Provincial Organizations shall be entitled to one (1) delegate for three hundred (300) members or less, together with one (1) delegate or one (1) vote for each succeeding three hundred (300) members or majority fraction thereof. No delegate shall be permitted to represent more than one (1) Local Union. In no case shall a Local Union be entitled to more than six (6) votes.

72

## Powers

**Art. XXIII. Section 5.** State, Interstate and Provincial Organizations shall have power to adopt, with the consent of the General President and not in contravention of this Constitution, such laws as will assist them in organizing, protecting and strengthening the Local Unions belonging thereto, and their officers shall be held responsible for compliance with all requirements of the Constitution, Obligation and Ritual of the International Union.

## Meetings

**Art. XXIII. Section 6.** State, Interstate and Provincial Organizations shall meet in general convention annually upon a date set by the preceding convention or by the State, Interstate or Provincial Executive Board or, in the event a date has not been so fixed, by a vote by the majority of the Local Unions affiliated with said State, Interstate or Provincial Organization.

## Minutes

**Art. XXIII. Section 7.** Copies of the minutes of each General Convention and of each meeting of the State, Interstate or Provincial Executive Board shall be transmitted to the General President by the Secretary-Treasurer of the State, Interstate or Provincial Organization immediately following the holding of any meeting thereof. The word "Provincial" as used in this article shall include "Inter-Provincial" Organizations.

## Bonding

**Art. XXIII. Section 8.** Every officer, employee or other representative of a State, Interstate or Provincial Organization who handles funds or other property thereof shall be bonded for the faithful discharge of his duties in such amount and as otherwise required by applicable law. The expenses of such bond shall be paid by the State, Interstate or Provincial Organization.

73

Ca... 2:07-cv-... DBW   Document 7-... Filed 05/12/2007   Page 19... of 3...

# ARTICLE XXIV
# GOVERNMENT OF LOCAL UNIONS

The laws, rules and procedures by which Local Unions shall conduct their affairs shall be as follows:

## ART. XXIV – SUBDIVISION 1
## OFFICERS

### Titles

**Art. XXIV. Subdiv. 1. Section (a).** The officers of a Local Union shall be the President, Vice President, Recording Secretary, Corresponding Secretary, Financial Secretary, and Treasurer. There shall also be three (3) Trustees, who shall not be automatically designated members of the Local Union's Executive Board by virtue of their position, but may be included on the Executive Board if the Local Union so provides in its bylaws.

A Local Union may provide in its bylaws for a Business Manager, in which case he shall be elected and be an officer. Where a Local Union has a business representative, an agent, an assistant, or more than any one of these, then such Local Union must elect a Business Manager.

The Business Manager shall be the chief executive officer of a Local Union. He shall appoint any and all representatives, agents, and assistants, whose wages and allowances shall be determined as provided in Local Union's bylaws. They shall work directly under his supervision. He may terminate them at any time. Should the Business Manager discharge any such employee, then said employee shall not be reemployed or paid by the Local Union in any capacity during the term of office of such Business Manager, unless his prior approval has been given.

Because of the special burdens and heavy responsibilities imposed on the Business Manager of a Local Union, no member shall be eligible for election to, be elected to, nor hold the office of Business Manager, unless he shall

have been continuously in good standing in the Local Union electing him for a period of two (2) years, in addition to fulfilling the qualifications for other Local office.

Officers of a Local Union may not seek, be elected to or hold more than two (2) offices in the Local Union and any two (2) offices may be combined and be held by one person, except that the offices of Financial Secretary and Treasurer shall not be combined or be held by the same person. In addition to the constitutional officers enumerated above, a Local Union shall elect three (3) auditors, a conductor, and a guard, and may also elect or appoint such committees and delegates, other than delegates to the General Convention and to State, Interstate or Provincial Organizations, it deems advisable, consistent with applicable law.

### Terms of Office and Conditions of Eligibility

**Art. XXIV. Subdiv. 1. Section (b).** The terms of all Local Union officers shall be three (3) years, except that when and if permitted by applicable law, the terms of Local Union office may be four (4) years. No member shall be eligible for election, be elected, nor hold office unless he shall have been a member continuously in good standing in the Local Union electing him for one (1) year preceding the month of nominations; and provided that no member shall be eligible for election, be elected, nor hold office unless he shall also have been a member of the organization for two (2) years immediately prior to election. He shall also have filed with the Recording-Corresponding Secretary of the Local Union, within ten (10) days after having been notified by the Recording-Corresponding Secretary of his nomination to Local Union office, a written acceptance of his nomination to office and, in addition, shall have been in regular attendance at all regularly scheduled Local Union membership meetings and home district membership meetings held after nomination and before elections, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family. Local Unions may also impose a requirement that candidates for office

must file nominating petitions in support of their candidacies signed by not more than two-hundred (200) members or two percent (2%) of the entire membership, whichever is less. Within five (5) days after the nominations have been concluded the Recording-Corresponding Secretary shall mail to each member nominated, at his last known home address, notice of his nomination and of the office to which he has been nominated, and shall read or cause to be read the name of each nominee and identify the office to which such nominee seeks election at each regularly scheduled Local Union membership and district membership meeting held after receipt of the nominee's written acceptance of nomination. Any Local Union which has not been in existence for a period of one (1) year may elect officers for the period between the date of its organization and the next annual meeting, from among its members in good standing.

No member shall be eligible for election, be elected nor hold office who has not during the year, and in the case of one seeking the office of Business Manager two (2) years, immediately prior to the month of nominations, been continuously employed at the trade, or who has not actively sought continuous employment at the trade. This restriction, however, shall not apply to any member employed by or working for a Local Union or the International Union, or who has been assigned by his Local Union or the International Union to perform work in furtherance of the interests of organized labor, in either case in a sufficiently time-consuming capacity so as to preclude meeting the requirement of continuous employment at the trade or active seeking of continuous employment at the trade.

If no member fulfills the foregoing conditions of eligibility for a particular office, any member currently in good standing in the Local Union, and otherwise eligible, shall, upon being nominated, be eligible to be elected to, and to hold, that office.

Notwithstanding any other provision of this Constitution, no member retired from work at the trade shall be eligible for election, be elected nor hold

76

office in any Local Union. This restriction, however, shall not be applicable to any member so retired who, at least one (1) year, and, in the case of one seeking the office of Business Manager at least two (2) years, immediately prior to the month of nominations, has ceased to accept retirement benefits and returned, or actively and continuously sought to return, to full time work at the trade. This restriction does not prohibit or preclude the Local Union from naming any officer as "Emeritus," or from using the peculiar talents of a given retired individual for the best interests and advancement of the Local Union. No member owner/operator of an entity that employs operating engineers shall be eligible for election, be elected nor hold office in any Local Union nor nominate candidates in any Local Union election.

In the event of the death, between nomination and the time of the last meeting preceding the election, of any constitutional officer who has been nominated for office in the forthcoming election, any member of the Local Union, who is otherwise eligible, shall be eligible to be nominated and, upon his filing with the Recording-Corresponding Secretary of his acceptance of such nomination, shall be eligible to be elected to, and if elected, to hold the office to which the deceased officer had been nominated. If the death occurs after the last meeting preceding the election, nomination shall be effected by filing a statement of candidacy with the Recording-Corresponding Secretary prior to the election, but in no event more than five (5) days after the deceased officer's death.

### Executive Board

**Art. XXIV. Subdiv. 1. Section (c).** The Executive Board of a Local Union shall be composed of the President, Vice President, Recording-Corresponding Secretary, Financial Secretary and Treasurer, and the Business Manager where the Local Union has such a position, together with such other members of the Local Union as may be elected thereto by the membership of the Local Union.

77

## Powers of the Executive Board

**Art. XXIV.**
**Subdiv. 1.**
**Section (d).** The Executive Board shall be the policy-making and administrative tribunal of the Local Union. It shall have such power as may from time to time be delegated to it by action of the Local Union, or conferred by the Constitution. All acts of the Executive Board shall be reviewable by the Local Union but shall be maintained in full force and effect, subject to revocation by action of the membership of the Local Union if taken at the next subsequent membership meeting following the adoption of the act in question. Local Unions are authorized, upon affirmative vote of the Executive Board, to pay all expenses for investigation services, employment of counsel, and other necessary expenditures in any cause, matter, case or cases where a Local Union officer, representative, employee, agent or one alleged to have acted on behalf of the Local Union is charged with any violation of any law or is sued in any civil action with respect to any matter arising out of his official duties, except if such officer, representative, employee or agent is charged with a breach of his trust to the Local Union or any member thereof, in which event he may be indemnified only if the action is terminated favorably to him.

## Election of Officers

**Art. XXIV.**
**Subdiv. 1.**
**Section (e).** Except in Local Unions operating under District Administration Form of Government, the election of officers of a Local Union shall be held in the month of August, and the nominations shall be made at a regular meeting prior to the election, but in no event earlier than the May meeting preceding the election. The installation of newly elected officers shall take place at the first regular meeting in September, unless an earlier installation is directed by the General President. The Local Union may adopt the Australian ballot system, in which event the polls shall be kept open for a period of twelve (12) consecutive hours between the hours of 6 a.m. and 10 p.m. on the date of the election, or may hold the elec-

tion through referendum conducted by mail. The election shall be conducted by secret ballot. Officers shall be elected by a plurality of votes cast, except that the three (3) candidates receiving the highest number of votes for the office of Trustee and the position of Auditor shall be elected. Adequate safeguards to insure a fair election shall be provided by the Local Union, in accordance with the International Constitution, applicable law, and such rules and regulations as may be promulgated by the General Executive Board.

No candidate (including a prospective candidate) for Local Union office, and no supporter of a candidate for Local Union office, may solicit or accept any direct or indirect financial support from any non-member of the International Union of Operating Engineers or from any foundation, corporation or other entity whose funds are derived in whole or in part from any person not a member of this International Union.

Where all candidates duly nominated to Local Union elective office are unopposed for election, a Local Union may dispense with a secret ballot vote and, in such event, the Local Union may direct the Recording-Corresponding Secretary to cast one ballot for the nominees, who shall then be declared duly elected to their office. Where any single candidate is duly nominated to Local Union elective office, and he is unopposed for election to that office, a Local Union may dispense with a secret ballot vote for that office and, in such event, the Local Union need not place on the ballot the name of such candidate or the office to which he has been nominated, and may direct the Recording-Corresponding Secretary to cast one ballot for the nominee who shall then be declared duly elected to such office.

## Vacancies in Office and Removal of Officers

**Art. XXIV.**
**Subdiv. 1.**
**Section (f).** A vacancy in any office shall be filled by appointment for the unexpired term thereof, upon vote of a majority of the following officers, viz: President, Vice President, Recording-Corresponding Secretary, Financial Secretary, Treasurer,

# Exhibit 1 to Giblin Declaration
# (part 3)

Case 2:17-cv-00368-RAJ Document 7-5 Filed 05/12/2017 Page 2 of 2

## ART. XXIV – SUBDIVISION 2
## POWERS AND DUTIES OF OFFICERS

### President

**Art. XXIV. Subdiv. 2. Section (a).** It shall be the duty of the President to preside at all meetings, enforce the Constitution, Laws, Rules, Ritual and customs of the organization; to decide all questions of order subject to an appeal to the Local Union; to cast the deciding vote in case of a tie; to sign all orders on the Treasurer for the disposition of funds authorized by the Local Union; to appoint all committees unless otherwise provided for; to be custodian of the quarterly password and examine the credentials of any member before bestowing the same; to furnish the General President full and complete information on any subject within his control or knowledge when requested; and to perform such other duties as appertain to his office or which may from time to time be delegated to him by action of the Local Union or other authorities in the organization.

### Vice President

**Art. XXIV. Subdiv. 2. Section (b).** The Vice President shall assist the President in the discharge of his office, fill his place in his absence and have such other duties as are customarily incident to his office.

### Recording-Corresponding Secretary

**Art. XXIV. Subdiv. 2. Section (c).** It shall be the duty of the Recording-Corresponding Secretary to keep the minutes of each meeting; to read all correspondence and documents; to issue notices for the calling of meetings; to sign all orders on the Treasurer for the disposition of funds authorized by the Local Union; to notify the General Secretary-Treasurer of all newly elected officers; to keep a record of all applications for membership; to have charge of the seal and affix the same to all official documents; to maintain a correct list of the membership and their addresses; to include a copy of the Financial Secretary's monthly report to the General

and the Business Manager where the Local Union has such a position. In the event the said officers shall fail to fill said vacancy within thirty (30) days after the same shall occur, then said position shall be filled by secret ballot vote of the majority of the membership in good standing present at the next regular meeting of the Local Union following the expiration of the said thirty (30) days. The office of any officer who shall fail to discharge the duties of his office for four (4) successive meetings may be declared vacant by a majority vote of the membership in good standing. Any officer or representative of a Local Union may be removed after due trial, for causes provided in this Article, upon an affirmative vote of three-fourths of the membership in good standing in the same manner and form provided in the trial of members in this Article.

### Protests and Appeals

**Art. XXIV. Subdiv. 1. Section (g).** Any protest relating to the nominations and elections of officers, and any protest relating to the nominations and elections of delegates, must be made to the Local Union by registered mail within thirty (30) days after the election, setting forth in writing the specific reasons for such protest. Any member making a timely protest may appeal the decision of the Local Union thereon to the General Executive Board and the General Convention in accordance with Article XVII of this Constitution.

Notwithstanding the above, any protest relating to the nominations and elections of delegates conducted in January or February prior to a General Convention must be filed with the office of the General Secretary-Treasurer within fifteen (15) days after the election, setting forth in writing the specific reasons for such protest. All such protests timely filed shall be referred by the General Secretary-Treasurer to the Credentials Committee of the General Convention for consideration. An appeal from a decision of the Credentials Committee may be made to the Convention, and delegates affected thereby shall not be seated until said appeal shall have been voted thereon by the Convention.

Secretary-Treasurer in the minutes; to furnish the General President full and complete information on any subject within his control or knowledge when requested, and such other duties as are customarily incident to his office or which may from time to time be delegated to him by the Local Union or others in authority. The Recording-Corresponding Secretary shall within fifteen (15) days after election of delegates and alternates to a General Convention report to the General Secretary-Treasurer the names and addresses thereof, and upon failure to do so he shall be subjected to a fine of Five ($5.00) Dollars. Upon failure of the Recording-Corresponding Secretary to include in the minutes a copy of the Financial Secretary's monthly report to the General Secretary-Treasurer he shall be subjected to a fine of Five ($5.00) Dollars in each instance. In the absence of both the President and Vice President from a meeting the Recording-Corresponding Secretary shall call the same to order and a President pro tem shall be elected who shall serve as presiding officer for said meeting.

## Financial Secretary

**Art. XXIV.**
**Subdiv. 2.**
**Section (d).** It shall be the duty of the Financial Secretary to receive all monies and all funds paid to the Local Union; to pay all funds received by him to the Treasurer upon receiving Treasurer's receipt therefor; to keep a correct financial account of each member together with the name and address of each; to announce before the adjournment of each meeting the amount of funds collected thereat by him; to report at the end of each month to the Local Union the number of members in good standing; to make a monthly written report to the General Secretary-Treasurer of all admissions, deaths, resignations, expulsions and suspensions, keep a record thereof and furnish the Recording-Corresponding Secretary a copy thereof, to keep a record of the dues stamps received and disbursed. He shall furnish the General President full and complete information on any subject within his control or knowledge when requested and perform

such other duties as are customarily incident to his office or which from time to time may be delegated to him by the Local Union or other authorities.

## Treasurer

**Art. XXIV.**
**Subdiv. 2.**
**Section (e).** It shall be the duty of the Treasurer to receive and hold all Funds collected by the Financial Secretary and delivered to him; to give receipt for monies delivered to him; to make no disbursements without approval of the Local Union and only upon written order of the President and Recording-Corresponding Secretary; to make an itemized statement and report to the Local Union at the end of each quarter on the condition of his accounts and the transactions of his office; to submit his books and accounts for inspection by the Trustees when called upon by them; to furnish the General President full and complete information on any subject within his control or knowledge when requested and to perform such other duties as are customarily incident to his office or which from time to time may be delegated to him by the Local Union or other authorities.

## Conductor

**Art. XXIV.**
**Subdiv. 2.**
**Section (f).** It shall be the duty of the Conductor to examine all present at meetings; to ascertain that the dues book and/or card of each is paid up to date; to receive the quarterly current password; to report to the President all who are without the password; to conduct all candidates through the initiatory ceremony, and see that the Ritual is properly administered; to see that all candidates comply with the Ritual; to see that no one remains at the meeting or in the station save such as are members in good standing and who know the password; to furnish the General President full and complete information on any subject within his control or knowledge when requested and perform such other duties as are customarily incident to his office or which may from time to time be delegated to him by the Local Union or other authorities.

Case 1:05-cv-05345-RBW Document 55-2 Filed 05/22/2007 Page

## Guard

**Art. XXIV. Subdiv. 2. Section (g).** It shall be the duty of the Guard to take charge of the doors at meetings to see that none but members in good standing and with the quarterly password enter; to allow no member to retire without the consent of the President; to announce the names of all those without the password desiring admission and to admit such as the President shall designate; to furnish the General President full and complete information on any subject within his control or knowledge when requested and to perform such other duties as are customarily incident to his office or which from time to time may be delegated to him by the Local Union or other authorities.

## Trustees

**Art. XXIV. Subdiv. 2. Section (h).** It shall be the duty of the Trustees to have supervision over all funds and property of the Local Union under such instructions as they shall from time to time receive from the Local Union; to see that the funds of the Local Union are deposited by the proper officers in such banks and accounts therein as the Local Union shall designate; to examine the bank books and records of the Treasurer and any other officer holding funds of the Local Union and see that the same are correct; to be custodians of the bonds covering the Financial Secretary and Treasurer and such other officers as the Local Union may require to be bonded; to furnish the General President full and complete information on any subject within his control or knowledge when requested. They shall have such other duties as are customarily incident to their office or which shall from time to time be delegated to them by other authorities. In those instances in which the Local Union is audited not less than annually by an independent public accountant, the Trustees shall certify on the basis of the audit of such independent public accountant. In carrying out the duties imposed upon them by this Section, the Trustees shall act as a Board of Trustees and no Trustee shall separately act in his individual capacity as a Trustee.

84

## Auditors

**Art. XXIV. Subdiv. 2. Section (i).** It shall be the duty of the Auditors to audit the books and accounts of the Recording Secretary, Corresponding Secretary, Financial Secretary, Treasurer, and any other officer or representative holding funds of the Local Union, at the end of the official quarter each year; and to report thereon at the first meeting of the Local Union in the months of January, April, July and October. However in those instances in which the Local Union is audited not less than annually by an independent public accountant, the Auditors shall not separately audit the books and accounts, and shall report on the basis of such audit. The Auditors shall have power to summon any officer or member to explain the condition of his records or any discrepancy that may appear therein, and any officer so summoned shall be required to turn over to the Auditors all papers, records, books, and property belonging to the Local Union demanded by them; however, the Auditors shall take care not to exercise this power in a manner so as to interfere with the ongoing duties of the independent public accountant where a Local Union engages such. They and any independent accountant performing an audit of the Local Union shall furnish the General President full and complete data on any subject within their control or knowledge when requested. In carrying out the duties and powers enumerated in this Section, the Auditors shall act as a Board of Auditors and Auditor shall separately act in his individual capacity as an Auditor.

## Bonding

**Art. XXIV. Subdiv. 2. Section (j).** Every officer, employee or other representative of a Local Union who handles funds or other property thereof shall be bonded for the faithful discharge of his duties in such amount and as otherwise required by applicable law. The expense of such bond shall be paid by the Local Union.

85

## Incapacity of Officers

**Art. XXIV. Subdiv. 2. Section (k).** In the event a Local Union officer whose signature is required by any provision of this Constitution or law is physically or mentally incapacitated and unable to act or refuses to perform his constitutional duties, the Local Union Executive Board may appoint any constitutional officer properly bonded to act in his place and stead and such act shall be that of the person acting and the officer who is unable to act shall not be responsible therefor. In cases where the Local Union Executive Board fails or refuses to act, the General President may take whatever action he deems necessary.

## ART. XXIV – SUBDIVISION 3
## DUTIES OF MEMBERS

**Art. XXIV. Subdiv. 3. Section (a).** Members of Local Unions shall conform to and abide by the Constitution, Laws, Rules, Obligation and Ritual, and the decisions, rulings, orders and directions of any authority of the International Union empowered by this Constitution to make them. Each member shall keep the Recording-Corresponding Secretary properly and promptly notified of his residence and any change thereof. Consistent with applicable law, each member shall do all in his power to advance the cause of organized labor through the encouragement of the use of union goods and services. Members may, upon proper credentials being produced, obtain admission to meetings of other Local Unions of the organization.

**Art. XXIV. Subdiv. 3. Section (b).** The admission to membership in conformity to the Constitution, Obligation and Ritual constitutes a contract between the member, his Local Union, the International Union and every other member therein, whereby, in consideration of the benefits bestowed by such membership, he agrees that he will not violate the Constitution, Laws,

86

Rules, Obligation and Ritual, and the decisions, rulings, orders and directions of the International Union or its subordinate branches, nor the trade rules of the locality in which he works, and that he will not enter into the employment of any person conditioned on severing his membership with this organization.

**Art. XXIV. Subdiv. 3. Section (c).** All business transactions and affairs of the International Union, its subordinate subdivisions and officers within the knowledge of any member shall be held, inviolate and private, from persons outside the Organization.

## ART. XXIV – SUBDIVISION 4
## LOCAL OFFICE

Local Unions may establish and maintain a local office or headquarters and employ any of their elected officers or such business representatives and clerks as may be deemed necessary in the management thereof and, where lawful and appropriate, may prescribe the delegation of duties of the several duly elected officers to such business representatives and clerks, together with such other duties as from time to time may be deemed advisable; provided, however, that no one person shall perform the duties of both Financial Secretary and Treasurer.

## ART. XXIV – SUBDIVISION 5
## COMMITTEES

Each Local Union shall establish a standing committee on Safety and Health and a standing committee on Legislation and Political Action, unless circumstances within a Local Union renders such establishment impracticable, as well as such committees as it may desire and delegate specific duties to them. The standing committees on Safety and Health and Legislation and Political Action shall be appointed by the Business

87

Manager. All committees shall render reports promptly to the Local Union and deliver all funds collected or held by them to the Financial Secretary, and perform such other acts and in such manner as the Local Union may from time to time direct.

## ART. XXIV – SUBDIVISION 6

## PROCEDURE ON APPLICATIONS

Applicants for membership shall be referred to a committee which may consist of the Local Executive Board in the Local Union, which committee shall investigate the character and qualifications of the applicants, and shall make a determination as to the qualifications of the applicant for membership in the Local Union. This determination shall be made on the basis of uniform standards, and shall not be discriminatory in any manner and shall be in accordance with all applicable law. The applicant, if approved by the committee, shall be so notified and his name and address shall be placed on the records, and he shall be furnished a copy of the Constitution and his book and/or card of membership. If an applicant is rejected, his initiation fee shall be returned to him. A rejected applicant may reapply for membership after a lapse of ninety (90) days following his rejection.

## ART. XXIV – SUBDIVISION 7

## DUES, REMITTANCES, ARREARAGES, CHARGES, REINSTATEMENT AND TRIALS

### How Dues Fixed

**Art. XXIV. Subdiv. 7. Section (a).** The dues required to be paid by the members to their Local Union shall be fixed by a majority vote of the members in good standing, voting by secret ballot at a membership meeting, after reasonable notice of the intention to

88

vote upon such question, or by a majority vote of the members in good standing voting in a membership referendum conducted by secret ballot, but shall not be less than the minimum dues provided under the Constitution. When the per capita tax payable to the International Union is increased pursuant to the provisions of Article XI, Section 1, the dues charged by a Local Union shall be increased in a corresponding amount in order to ensure the financial health of the International Union and its Local Unions; provided, however, that upon application of a Local Union, such increase may be waived by the General President if he determines that such waiver is necessary to protect and preserve the best interests of the Local Union.

### Fixing Current Due Dates

**Art. XXIV. Subdiv. 7. Section (b).** Such dues may be fixed and charged on a monthly, quarterly, semi-annual or yearly basis and shall become due and payable on the first day of the terms so fixed. Dues for any one of such terms shall be known as current dues for that term.

### Good Standing Defined With Relation to Dues

**Art. XXIV. Subdiv. 7. Section (c).** No member shall be in good standing unless he has paid all current dues to the Local Union within thirty (30) days after they shall have become due and payable. No member whose dues have been withheld by his employer for payment to the Local Union, pursuant to his voluntary authorization provided for in a collective bargaining agreement, shall be declared ineligible to vote or be a candidate for office in the Local Union solely by reason of alleged delay or default in the payment of dues.

### Penalties for Members in Arrears to Local Union

**Art. XXIV. Subdiv. 7. Section (d).** Members who have not tendered their current dues on or before the day such dues shall have become due and payable may be removed from employment where valid collec-

89

tive bargaining agreements or applicable law permits. Members who have not paid their current dues or assessments within thirty (30) days after they shall have become due and payable may upon vote of the Local Union he denied voice and vote therein.

Members who have not paid their current dues or assessments within sixty (60) days after they shall have become due and payable may upon vote of the Local Union be barred from meetings or removed from committees or both, or suspended from membership.

Officers who have not paid their current dues or assessments within ninety (90) days after they shall have become due and payable may upon vote of the Local Union be removed from office.

Members who have not paid their current dues or assessments within six (6) months after they shall have become due and payable may, upon report thereof by the Financial Secretary at a regular meeting of a Local Union, be expelled by a majority vote of the members present.

The Local Executive Board is likewise authorized and empowered to take the same action provided hereinabove and to enforce the foregoing penalties for arrearages against members, whenever, upon findings by it said arrearages are found to exist, and the same authority and power is conferred upon Supervisors in charge of Local Unions under International Supervision.

No member of any Local Union shall seek to affiliate with another Local Union save in the manner and form required by the Constitution. Such member shall be required to make full disclosure to such other Local Union of his previous memberships including all facts as to any fine, penalty or other disability imposed within the organization, and existing and unsatisfied against him, and in addition such member shall strictly conform to and discharge any and all constitutional requirements governing the lifting of the said fine, penalty or disability.

In addition to the penalties hereinabove provided, Local Unions may also impose the penalties provided

for the causes herein set forth. Except for failure to tender dues, no member shall be subjected to any of the penalties above enumerated unless the trial procedures set forth in Subdivision 7, Section (l)-(q) of this Article have been followed.

## Other Causes for Fines, Suspensions or Expulsion

**Art. XXIV.**
**Subdiv. 7.**
**Section (e).** Any officer or member of a Local Union who becomes an habitual drunkard; who wrongs a fellow member or defrauds him; who commits an offense discreditable to the International Union or its subdivisions; who creates dissension among the members; who destroys the interest and harmony of the Local Union; who seeks to dissolve any Local Union or separate it from the general organization; who wilfully engages in slander or libel where such slander or libel is contrary to the responsibility of every member toward the Organization as an institution or specifically interferes with the Organization's performance of its legal or contractual obligations; who violates the trade rules of the locality in which he is working; who fraudulently receives, misapplies, converts or embezzles the funds of any subdivision of the International Union of the monies of any member entrusted to him; who violates his obligation or any section of the Constitution, Rules, Edicts and Ritual of the International Union; who divulges the password to anyone except the officer authorized to receive the same; who is guilty of insubordination; or who refuses to acknowledge or perform the lawful command of those authorized within the International Union to issue the same, may be disciplined or, upon trial therefor and conviction thereof, be fined, suspended or expelled from his Local Union.

Any member working contrary to a declared strike or the rules established by the Local Union by reason of a lockout shall, upon trial and conviction thereof be subject to a fine of not less than Twenty-five ($25.00) Dollars, or expulsion, or both. His name shall be reported to his Local Union, which shall enforce this

Section, charge and collect the fine so imposed, under penalty of expulsion. Local Unions shall have the power to fix such other offenses as from time to time may be determined by them. Notwithstanding the foregoing provisions of this Section, the penalty prescribed upon a traveling member shall not exceed that amount normally imposed by a Local Union against its own members who have been found guilty of a similar offense or violation.

### Payment of Fines

**Art. XXIV. Subdiv. 7. Section (f).** All fines legally levied or imposed shall be charged by the Financial Secretary against the member from whom due and must be paid by the member involved to the Financial Secretary within thirty (30) days. Wherever a fine is imposed upon a member, his sentence shall automatically be read to incorporate the following provisions. Members thirty (30) days in arrears in the payment of fines shall be denied voice and vote in their Local Union, and thereafter until the fine is paid no dues owed by such member can be received or accepted by the Local Union. Such refusal to accept dues shall not, however, form the basis for removal from employment unless authorized by law. Members sixty (60) days in arrears in the payment of fines shall be removed from committees, barred from meetings and suspended from membership. Members ninety (90) days in arrears shall be removed from office. Members six (6) months in arrears shall be expelled from membership. In addition to the penalties provided for herein, Local Unions are authorized to secure the payment of fines through appropriate legal proceedings.

### Where Other Local Unions are Involved

**Art. XXIV. Subdiv. 7. Section (g).** Any fines levied by any Local Union on a member of another Local Union shall be reported to and entered upon the books of the Local Union to which he belongs, which shall charge the same to and collect from the member involved.

Upon collection of the same such Local Union shall forward the money to the Local Union which levied the same. Failure to transmit such fine as provided shall provide grounds for suspension of the charter of the Local Union charged with such duty.

### Reinstatement of Suspended Members

**Art. XXIV. Subdiv. 7. Section (h).** A member who has been suspended under the provisions of this subdivision may be restored to membership in good standing and to his membership number only by making application together with the payment of all dues, assessments and fines then in arrears, the reinstatement assessment and in addition an amount equal to three (3) months' dues. When all the foregoing requirements have been fulfilled by the applicant, notice thereof shall be given by the Financial Secretary to the General Secretary-Treasurer on the next monthly report, accompanied by the reinstatement assessment and other charges due thereon. However, in cases where the cost of reinstatement exceeds the amount of the current initiation fee, the Local Union may accept such individuals as new members.

### Reinstatement of Expelled Members

**Art. XXIV. Subdiv. 7. Section (i).** A member who has been expelled for any of the causes provided in this Article may be restored to membership in good standing and to his membership number only by application therefor on the form furnished by the General Secretary-Treasurer, together with the payment of all dues, assessments and fines in arrears, the reinstatement assessment and, in addition, an amount equal to six (6) months' dues. When all the foregoing requirements have been fulfilled and the approval of the General President has been endorsed on said application for reinstatement, and the Local Union by vote shall have granted said application, notice thereof shall be given by the Financial Secretary to the General Secretary-Treasurer on the next monthly report, accom-

## Trials

**Art. XXIV.**
**Subdiv. 7.**
**Section (l).** A Local Union shall have the power to discipline, fine, suspend or expel its members, upon causes provided in this Article, and provided further that any member charged with the offenses designated in this Article shall be tried within the jurisdiction of the Local Union where said offense was committed, in which case a copy of the verdict shall be sent to the Local Union to which the member charged belongs.

**Art. XXIV.**
**Subdiv. 7.**
**Section (m).** All charges must be preferred in writing and signed by the complainant. Where the President is not the complainant, the charges must contain a signed statement of either the complainant or some other member that he has personal knowledge of the facts which form the basis of the charges. Charges must be filed within thirty (30) days of the event or circumstance giving rise to the charge, or within thirty (30) days of learning of the event or circumstance, whichever is later. Charges are to be filed with the Recording-Corresponding Secretary and read by the Recording-Corresponding Secretary at the next succeeding meeting following the filing of same. Immediately upon filing of such charges the Recording-Corresponding Secretary shall notify the defendant in writing, enclosing a copy of said charges, and of the date set for the filing of the answer or defense or the entering of a plea by the defendant, which date shall be not less than two (2) nor more than four (4) weeks thereafter. In addition, where the defendant is a traveling member, the Recording-Corresponding Secretary shall immediately send a copy of the charges to the Recording-Corresponding Secretary of the defendant's Local Union. Charges shall be specific, stating clearly, concisely and as accurately as possible the time, place, nature and circumstances of the offense alleged.

**Art. XXIV.**
**Subdiv. 7.**
**Section (n).** Within thirty (30) days after the pleadings are filed, or the plea entered, or the time elapsed in which the same must be filed or

95

panied by all documents, reinstatement assessment and other charges due thereon. The affiliation with a Local Union of any person previously expelled from any Local Union of the International Union of Operating Engineers and not reinstated as hereinabove provided shall be null and void and, upon discovery of the fact by the General Executive Board or the General Officers, shall be cancelled upon the records of the International Union of Operating Engineers and the Local Union with which such person has become affiliated shall immediately strike his name from its records.

## Local Unions Charged Upon Reported Status of Members

**Art. XXIV.**
**Subdiv. 7.**
**Section (j).** The General Secretary-Treasurer shall charge to the Local Unions and the Local Unions must pay all per capita taxes and assessments due from the Local Union to the General Office upon the status of members reported by the Local Union to the General Secretary-Treasurer, which per capita taxes and assessments shall continue to be charged to and collected by the General Secretary-Treasurer from the said Local Union until a change in the status of any member shall be reported to and filed with the General Secretary-Treasurer.

## When a Local Union Not Charged With Certain Per Capita Taxes

**Art. XXIV.**
**Subdiv. 7.**
**Section (k).** In instances where the penalty of suspension or expulsion is invoked upon members as provided in this article, or where members have died or have properly transferred or withdrawn, Local Unions may, upon report to the General Secretary-Treasurer of each suspension, expulsion, transfer, withdrawal, or death, be relieved from further payment (including that due for the month in which the report is made but not for the month in which the death occurs or withdrawal is made) of the per capita tax due from the Local Union to the General Secretary-Treasurer on such members reported.

94

The said members shall vote by ballot either guilty or not guilty on the merits of each individual charge.

**Art. XXIV. Subdiv. 7. Section (o).** Three tellers shall be appointed, one by the defendant, one by the complainant and one by the President (if the President is either complainant or defendant then the third teller shall be elected by the meeting), which tellers shall collect the ballots and announce the verdict. A three-fourths vote of the membership recorded as present shall be required for conviction in cases involving expulsion, and a majority vote in cases involving other penalties. If a verdict of guilty is returned, the President shall then prescribe the penalty permitted by the vote to be imposed.

**Art. XXIV. Subdiv. 7. Section (p).** In the event the complainant fails to appear at the time set for trial the President may dismiss the charges unless otherwise determined by a two-thirds vote of the members present. In the event the defendant wilfully fails to appear at the time of the trial the said trial may be conducted in his absence, a vote taken by the tellers appointed by the President, a verdict announced and a penalty imposed.

**Art. XXIV. Subdiv. 7. Section (q).** Any member other than the President of the Local Union preferring charges against another member as provided herein, must at the time of filing the charges deposit Fifty Dollars ($50.00) in cash or certified check for each individual charge and for each signatory to each such individual charge against each member. In the event a charge is proved, the deposit for that charge shall be returned to the member filing the same, and if not proved, shall be forfeited to the Local Union. Any member of a Local Union fined, disciplined or expelled shall have the right to appeal to the General Executive Board in the manner and form provided in the Constitution and the Laws and Rules established thereunder. Any appeal rightfully taken and properly filed

entered, the Local Executive Board, or any other Board within the Local Union established for the purpose, may at its discretion, order a pre-trial hearing and direct the complainants and defendants to appear at said hearing. All parties shall be notified in writing by Certified or Registered Mail providing the date, time and place of the hearing and the specific charges to be pre-tried. The purpose of the hearing shall be to define the issues and to make a preliminary determination as to whether the charges have merit. The Board, upon hearing all the parties, may at its discretion, decline to process these charges after such hearing, as being without merit. However, such decisions of the Board not to process the charges, shall be appealable to the General Executive Board in accordance with the provisions of this Article. The failure of the complainant to appear at such pre-trial hearings may result in a dismissal of the charges by the Board. The Board shall also have the power to settle the matter at such hearing in the event such settlement is mutually agreeable to all parties. In the event the Board does not invoke the pre-trial procedures within the time set forth herein, or invokes the procedures and determines to proceed with the charges on their merits, the following provisions shall then become effective: After the pleadings are filed or the plea entered, or the time elapsed within which the same must be filed or entered, and the pre-trial procedure has been envoked, and/or time limitation for same expired, the President shall cause the parties to be notified of the trial date, which must be the next regular meeting thereafter. Unless a request for postponement of the trial shall have been made to and granted by the President, the trial shall proceed upon the date set. Complainants and defendants may present their own cases or by counsel selected from among the membership of the International Union of Operating Engineers. After all the evidence is in, and a full and impartial hearing has been had upon the issues, the President shall distinctly state the charge or charges and present the matter to the members present at said meeting for a vote.

The decision of the Local Executive Board, whether it be to decline to process the charges as being without merit or to submit the charges for trial within the Local Union, shall be subject to appeal to the General Executive Board in the manner governing appeals under the Constitution. If, on appeal, the General Executive Board upholds the decision of the Local Executive Board not to process the charges, or if the General Executive Board reverses the decision of the Local Executive Board to submit the charges for trial within the Local Union, there shall be no Local Union trial and the charges shall be dismissed. Notwithstanding any other provision of this Constitution there shall be no further appeal from such decision. If the General Executive Board reverses the decision of the Local Executive Board not to process the charges, or if the General Executive Board upholds the decision of the Local Executive Board to submit the charges for trial within the Local Union, it shall remand the charges to the Local Union for trial within the Local Union in the manner provided by this Article. Under the procedure herein provided, a reading of the charges at a membership meeting prescribed in Subdivision 7, Section (m) of this Article, shall be postponed until such time as the charges are ripe for trial at a membership meeting.

**Art. XXIV. Subdiv. 7. Section (s).** The Local Union shall keep minutes of all trials conducted by it. A stenographic record of trial proceedings need not be taken unless the presiding officer of the trial so orders, or unless the charging party or the charged member so requests within seven (7) days of receipt of the notice of trial. The party requesting that such recording be made shall be responsible for the cost of the recording and the preparation of the transcript by a competent reporter, chosen by the presiding officer. Three (3) copies of the transcript shall be prepared so that each party and the Local Union may have one. The reporter shall attach an affidavit to each copy, stating that it is a true and accurate transcript of the proceeding.

wherein the penalty of expulsion is imposed shall cause the order of expulsion to be stayed until decision of the General Executive Board thereon. Unless by action of the General Executive Board thereon, waiving the requirement, no member may appeal from the imposition of a fine unless and until such fine shall first be paid by him.

Trials of members within Local Unions under International Supervision shall be by and before the General President, or his deputy thereunto assigned, who shall be authorized and empowered to hear and decide the same. In all such cases charges of infractions of the Constitution, bylaws Ritual and rules against a member shall be filed with the Supervisor who shall serve the accused with copies thereof and upon reasonable notice thereafter, the General President or his deputy thereunto assigned shall hear, try and decide the case, and administer the penalty from which sentence the aggrieved party may appeal to the General Executive Board in the manner governing appeals under the Constitution.

In the event the President of the Local Union is the complainant or the defendant he shall not participate as a member of the Local Executive Board in the pre-trial functions entrusted to the Board under Section (n) of this Subdivision, and shall not exercise any of the functions entrusted to the President under said Section (n) or under Sections (o) and (p) of this Subdivision. All functions entrusted to the President under said Sections (n), (o) and (p) shall, when the President is either the complainant or the defendant, be exercised by the Vice President or, if he is either the complainant or the defendant, then by any other Local Union officer selected by the Local Executive Board.

**Art. XXIV. Subdiv. 7. Section (r).** In the event charges are filed by a member against an officer of a Local Union, the Local Executive Board must conduct a pre-trial hearing of the nature and in the manner described in Subdivision 7, Section (n) of this Article.

## ART. XXIV – SUBDIVISION 8

### RECALL OF OFFICERS

Whenever twenty-five (25) percent of the members in good standing in a Local Union shall file with the Recording-Corresponding Secretary a petition requesting the recall from office of any officer of the Local Union elected and holding office for a term of more than one year and within thirty (30) days thereafter a special meeting of the Local Union shall have been called and held with all petitioners present thereat, which special meeting shall have been devoted to verifying the signatures of all petitioners to said recall petition and the certifying by the Financial Secretary of the good standing of each petitioner, then and not otherwise the Recording-Corresponding Secretary shall notify all members in good standing of: 1st, the filing of the petition; 2nd, the holding of such special meeting, and 3rd, the date set for the voting upon the recall (which date shall be the third regular meeting following the mailing of such notice) and a vote thereon shall be taken at such meeting. The voting upon the recall shall be by secret ballot conducted by three tellers one of whom shall be a petitioner, one appointed by the President and one elected by the members present at the meeting. No officer shall be recalled unless there be cast a two-thirds vote of the entire membership in good standing in favor thereof, and upon the rendition of the required vote the said office shall become vacant.

## ART. XXIV – SUBDIVISION 9

### QUORUM

A quorum for the transaction of business at meetings of a Local Union shall consist of not less than seven (7) members in good standing.

## ART. XXIV – SUBDIVISION 10

### MEETINGS

#### Monthly Meetings

All Local Unions shall have at least one regular meeting each month, except that a Local Union may dispense with monthly meetings during a vacation period, not to exceed three successive months in one calendar year. Local Unions may also hold as many other regular meetings as may be necessary for the proper transaction of business. Where Local Unions are authorized to operate under a District Administration Form of Government, or have received special dispensation, the meetings thereof, whether general or district, regular or special, shall be as required by the bylaws.

**Art. XXIV. Subdiv. 10. Section (a).**

#### Annual Meetings

The annual meeting of Local Unions shall be the last meeting in June of each year.

**Art. XXIV. Subdiv. 10. Section (b).**

#### Special Meetings

Special meetings shall be called when ordered by the President or by a majority of the following officers: Vice President, Recording-Corresponding Secretary, Financial Secretary, and Treasurer, or upon written request of one-third of the members of the Local Union in good standing.

**Art. XXIV. Subdiv. 10. Section (c).**

## ART. XXIV – SUBDIVISION 11

### RELATIONS WITH EMPLOYERS

#### Grievances and Procedures

No action shall be taken by any Local Union, Local Executive Board, Officer, Committee or Business Representative of a Local Union affecting the relations between an

3. Violation by the employer of the written contract.
4. To protect the craft jurisdiction or the territorial jurisdiction of the Local Union.

## Sanction of the General President

**Art. XXIV. Subdiv. 11. Section (d).** If the dispute shall not be settled and the Local Union shall desire assistance or strike benefits from the International Union, the General President shall be informed of all the facts thereof; and, if in his opinion the grievance is a just one, he may give his sanction and give the support of the International Union to the action contemplated or already entered into by the Local Union, its Committee, Local Executive Board or Business Representative. If, under any circumstances, the General President shall be represented by a deputy in the investigation of a dispute or a contemplated action or an action that has already been entered into on the part of a Local Union, its Local Executive Board, its Committees or its Business Representative, the deputy shall report in detail to the General President and the General President can through a deputy convey such sanction and support required as though present in person.

## Contracts

**Art. XXIV. Subdiv. 11. Section (e).** Proposed collective bargaining agreements and modifications thereof may be negotiated for Local Unions by the Business Manager, by a committee, by the Local Executive Board, or by the Business Representative. Such agreements and modifications thereof shall not be executed until they have been presented at the next membership meeting following the negotiation of the proposed agreement and have been approved by the membership affected, provided, however, that a Local Union may delegate to its Local Executive Board or to its bargaining committee authority to approve such agreements and modifications without such submission of the same to vote of its membership. When such

103

employer and the Local Union or its members unless authorized as hereinafter provided.

**Art. XXIV. Subdiv. 11. Section (b).** When a difficulty or a dispute arises between an employer and a member or members in good standing in a Local Union such member or members shall first report the same to the Business Representative or the Local Executive Board or the Local Union. The Business Representative, Local Executive Board or the Local Union shall immediately investigate the facts and confer with the employer with a view of adjusting said difficulty or dispute. If no settlement of the dispute has been effected, then the authority investigating the facts connected with said dispute may, if vested with the power to do so, immediately order and direct any necessary action deemed as required under the circumstances, through the removal of the member or members affected, through strike or by stoppage of all work, or by securing a strike of all such other trades and workmen as can be obtained. Where Local Unions are affiliated with Councils of Labor and like bodies in their respective communities such Local Unions may take such action upon grievances or disputes between employers and employees as shall be recommended or authorized by the Labor Councils and other bodies with which they may be associated regardless of whether such grievances or disputes arise between members of a Local Union in this organization or members of any other union, with employers.

**Art. XXIV. Subdiv. 11. Section (c).** No Local Union through its Committee, Local Executive Board or Business Representative shall attempt to take or take any action involving a rupture of relations existing under a legal contract with any employer or declare a strike where such contract exists except upon the following reasons, viz:

1. Assisting trade unions or other union workmen.
2. Assisting Councils of Labor or other bodies with which the Local Union is affiliated.

102

approval has been obtained, the agreement shall be signed by the Local Union's President, Recording-Corresponding Secretary, and Business Manager where the Local Union has such a position. Copies of final agreements and modifications thereof negotiated by Local Unions shall be filed with the General President immediately after execution.

**Art. XXIV. Subdiv. 11. Section (f).** Any vote taken under and pursuant to Article XXIV, Subdivision 11, Section (a) through (e) may, if so voted by a majority of the membership of a Local Union voting, be limited to those members who have not retired under any negotiated pension plan, employer-financed employee plan, the General Pension Fund, or headquarters staff plan. Each such retired member shall, however, be entitled to have a voice at any such meeting.

### Pension Reciprocity

**Art. XXIV. Subdiv. 11. Section (g).** In order to advance the common interest by assuring full reciprocity of pension benefits among all plans covering Operating Engineers, it shall be the duty and obligation of each Local Union, consistent with applicable law, to secure provisions for pension reciprocity in all pension benefit plans negotiated by the Local.

### ART. XXIV – SUBDIVISION 12
### BYLAWS AND TRADE RULES

Local Unions may adopt and amend bylaws and trade rules by a majority vote of the members voting at a regular membership meeting, at a special meeting called for that purpose, or in a mail referendum of the membership. No bylaws or trade rules may be adopted or amended in contravention of the Constitution, Laws, Rules, Obligation or Ritual of the International Union, or the decisions, rulings, orders and directions of any authority of the International Union empowered by this Constitution to make them. Copies of all bylaws

and trade rules, immediately following their adoption or amendment, shall be transmitted by the Recording-Corresponding Secretary to the General President and the General Secretary-Treasurer.

Bylaws and trade rules or amendments thereto, in order to become effective, must first be adopted by Local Unions and thereafter approved by the General President. Where a Local Union does not adopt bylaws of its own, the provisions of the International Constitution shall be its bylaws wherever applicable.

### ART. XXIV – SUBDIVISION 13
### DISSOLUTION

No Local Union shall dissolve or withdraw from the International Union of Operating Engineers over the dissent of seven (7) members in good standing.

### ART. XXIV – SUBDIVISION 14
### PARLIAMENTARY LAW

Roberts' Rules of Order shall be the parliamentary authority on all procedure not covered by the Constitution, Laws, Rules, Obligation and Ritual of the International Union or Local Unions subordinate thereto.

### ARTICLE XXV
### APPRENTICESHIP

Local Unions should establish an apprenticeship and training committee which shall have the responsibility of developing and operating registered apprenticeship programs and such other programs as may be desirable to train members in the complete mastery of our craft jurisdiction. Where Local Unions have established joint apprenticeship committees with employers, and where Local Unions have adopted standards for training

apprentices, such apprenticeship standards shall not be less than the minimum standards established by the National Joint Apprenticeship and Training Committee for Operating Engineers.

Each Local Union shall register with the General Secretary-Treasurer its current apprenticeship standards.

All of the registered apprentice engineers of this International Union shall be subject to the rules and regulations thereof, and they shall also be subject to fines and penalties the same as journeymen members of the International Union of Operating Engineers.

## ARTICLE XXVI

## DISTRICT ADMINISTRATION FORM OF LOCAL UNION GOVERNMENT

**Art. XXVI. Section 1.**   Where the circumstances of a Local Union so require, and appropriate bylaws have been adopted by the Local Union and thereafter approved by the General President, it may proceed under a district administration form of government and shall:

(a) Designate or amend the districts into which its territorial jurisdiction is confined;

(b) Provide for the organization, administration and supervision of its districts;

(c) Provide for the holding of regular monthly or quarterly district meetings with authority limited to making recommendations to the Local Union, initiating legislation to the Local Union, holding trials of members and electing such representation to the Local Executive Board, committees and similar bodies as may be provided under its bylaws;

(d) Designate and empower the Local Executive Board, in addition to its constitutional powers, to act for the Local Union in business and administrative matters (including reinstatement of mem-

106

bers and similar duties) in the interim between regular meetings of the general membership of the Local Union, all of which acts of the Local Executive Board to remain in full force and effect subject only to revocation by action of the general membership of the Local Union if taken at the next subsequent general membership meeting following the adoption of the act in question;

(e) Authorize and empower the acts of a Local Business Manager;

(f) Adopt or amend bylaws in accordance with Article XXIV, Subdivision 12, and fix dues in accordance with Article XXIV, Subdivision 7, Section (a);

(g) Provide for the holding of but two or more regular meetings of the general membership per year and the method of convening other called meetings thereof, all of which meetings to be deemed regular meetings of the general membership for the purposes outlined in the Constitution;

(h) Provide for the nomination of Local Union officers at district or general membership meetings prior to the election, but in no event earlier than a May meeting preceding the election, with elections during the month of August by mail referendum conducted by secret ballot among the general membership or by Australian ballot system, in which event the polls shall be kept open for a period of twelve (12) consecutive hours between the hours of 6 a.m. and 10 p.m. on the date of election and with the installation of elected officers during the month of September;

(i) Provide for the nomination of delegates to General Conventions at district or general membership meetings during the months of December or January prior to the Convention, with elections during the month of February by mail referendum conducted by secret ballot among the general membership or by Australian

107

## ART. XXVII

## THE GENERAL PENSION FUND PLAN

The terms and provisions of the General Pension Fund Plan, as amended from time to time by the trustees thereof, are printed in a separate booklet available through each Local Union and distributed to each participant. Participation in the General Pension Fund Plan is mandatory obligation of all Local Unions.

## ART. XXVIII

## HONORARY POSITIONS CREATED

There are hereby established the Honorary Title of GENERAL PRESIDENT EMERITUS, GENERAL SECRETARY-TREASURER EMERITUS and GEN-ERAL COUNSEL EMERITUS and such titles may only be conferred by the General Convention when in session or the General Executive Board and only upon officials who have served not less than five years in either of the positions of General President, General Secretary-Treasurer or General Counsel.

The General President Emeritus and the General Secretary-Treasurer Emeritus shall have a voice but no vote in the Convention and all meetings of the General Executive Board and may be delegated such other duties as the General President with the advice and consent of the General Executive Board may from time to time determine. The General Counsel Emeritus shall be a legal consultant of the International Union. Each shall be reimbursed for all traveling expenses and per diem allowances incurred in the performance of their respective duties. Each holder of an honorary title so conferred upon him shall be paid an annual emolument equal to his previous salary paid by the International Union less such sum as he may receive as a retirement pension by reason of his former position.

---

ballot system, unless under the provisions of the Local Union bylaws they are elected prior thereto, but in no event more than one (1) year prior to the first day of the Convention;

(j) Provide for adequate safeguards to ensure a fair election in elections conducted pursuant to subsections (h) and (i) of this Section, in accordance with the International Constitution, applicable law and such rules and regulations as may be promulgated by the General Executive Board;

(k) Exercise such other powers as may be deemed necessary and incidental in effectuating the normal administration of business of the Local Union.

## TRIALS OF MEMBERS UNDER DISTRICT ADMINISTRATION FORM OF GOVERNMENT

**Art. XXVI.** Whenever a Local Union shall be quali-**Section 2.** fied to proceed under the District Administration Form of Government, the trials of any of its members, upon charges, may if its bylaws so provide, be before the district membership meeting and in such cases any infraction of the Constitution, Ritual, bylaws or rules by a member invoking discipline against him which would otherwise be triable under the Constitution before a general membership meeting of a Local Union shall, under this section and with the same force and effect, be heard and acted upon by and before the regular district membership meeting in the district wherein the infraction or cause arose. All pertinent constitutional procedure governing trials, charges and penalizing of members, shall apply to such trial and procedure before regular district membership meetings, and any member aggrieved by such procedure or the penalty assessed therein may appeal therefrom directly to the General Executive Board in the manner and form governing appeals under the Constitution.

# ART. XXIX

## SAVINGS CLAUSE

If any provision of this Constitution is held to be invalid by operation of law or by any competent authority or tribunal, the remainder of the Constitution or the application of such provision to persons or circumstances other than those as to which it has been held illegal or invalid shall not be affected thereby. If any provisions of this Constitution shall be found or declared to be illegal, invalid or inoperative by any competent authority of the legislative, executive, judicial or administrative branch of a Federal, State or Provincial government, the General Executive Board is empowered to substitute during the period of its invalidity a provision which will meet the objections to its invalidity and which will be consistent with the intent and purpose of the invalid provision.

Notwithstanding any other provision of this Constitution, if, at any time, the General Executive Board shall deem it necessary for the protection of the welfare and best interest of the International to amend any provision of this Constitution because of any finding, declaration, order or judgment by any competent authority of the legislative, executive or administrative branch of a Federal, State or Provincial government, it shall be empowered to enact such amendment and such amendment shall have the same force and effect as any other provision of this Constitution.

Wherever reference is made to gender in this Constitution the same shall be interpreted and construed as including both male and female. This interpretation shall also be applied by Local Unions and other subordinate bodies of the International Union to their respective bylaws.

---

## INDEX

| | Article | Section | Page |
|---|---|---|---|
| ACTIONS AGAINST DEATH BENEFITS | XX | 12 | 68 |
| AFFILIATION WITH AFL-CIO | I | 1 | 8 |
| AGENCY SHOP | XI | 1 | 30 |
| ALTERING DUES BOOK AND/OR CARD, penalty | XX | 12 | 67 |
| ALTERNATES TO GENERAL CONVENTION | III | 3 | 12/13 |
| AMENDING CONSTITUTION | XVIII | 1 | 60 |
| AMENDMENTS BY GENERAL EXECUTIVE BOARD | V | 2 | 18 |
| AMOUNT OF APPLICANT SERVICE DUES | XV | 3-d | 49 |
| AMOUNT OF TRAVEL SERVICE DUES | XV | 3-e | 50 |
| APPEALS TO GENERAL EXECUTIVE BOARD | XVII | 1-a, b, c | 58 |
| APPEALS TO GENERAL CONVENTION | XVII | 2 | 65 |
| APPEALS, pendency of | XVII | 3 | 60 |
| APPEARANCE, entering in law suit barred | I | 3 | 4 |
| APPLICANTS SERVICE DUES | XV | 3-c | 45 |
| Amount of | XV | 3-d | 45 |
| APPLICATION FOR CHARTERS | XIV | 2 | 38 |
| APPLICATIONS, full disclosure on APPLICATIONS, misrepresentation | XXIV | Sub. 7-d | 88 |
| APPRENTICE ENGINEERS: (See Registered apprentice engineers) | | | |
| APPRENTICESHIP | XVI | 2 | 56 |
| ARREARS, penalties | XXV | Sub. 7-d | 105 |
| ASSESSMENTS: General | XXIV | Sub. 7-d | 89 |
| By General Convention and | XI | 3 | 32 |
| General Executive Board | XI | 6 | 33 |
| Reinstatement | XI | 5 a-b | 32 |

| Entry | Article | Section | Page |
|---|---|---|---|
| AUDITORS OF LOCAL UNIONS | XXIV | Sub. 2-i | 85 |
| AUSTRALIAN BALLOT: | | | |
| Election of Local Union Officers | XXIV | Sub. 1-e | 78 |
| Under District Administration | | | |
| BENEFICIARIES | XXVI | 1-h, i | 107 |
| Form | XX | 9 | 67 |
| BONDING: | | | |
| General Secretary-Treasurer | VIII | 3 | 26 |
| International Union Officers, Employees, Representatives | IV | 8 | 17 |
| Local Union Officers, Employees, Representatives | XXIV | Sub. 2-i | 85 |
| Local Union Trustees | XXIV | Sub. 2-h | 84 |
| State, Interstate and Provincial Organizations | XXIII | 8 | 73 |
| BRANCH ENGINEERS: | | | |
| Application for sub-charters | XIV | 4 | 38 |
| Definition | XIV | 7 | 41 |
| Form of charter | XIV | 9 | 43 |
| Government of | XIV | 5 | 38 |
| Voting rights | XIV | 5 | 38 |
| BUSINESS AGENTS AND REPRESENTATIVES: | | | |
| Appointed and terminated by Business Manager | XXIV | Sub. 1-a | 74 |
| Good standing | XVI | 6 | 57 |
| BUSINESS MANAGER: | | | |
| Authority to appoint and terminate Representatives, Agents and Assistants | XXIV | Sub. 1-a | 74 |
| Chief Executive Officer | XXIV | Sub. 1-a | 74 |
| Constitutional Officer | XXIV | Sub. 1-a | 74 |
| Member, Local Executive Board | XXIV | Sub. 1-c | 77 |
| Qualifications | XXIV | Sub. 1-a | 74 |
| Where Mandatory | XXIV | Sub. 1-a | 74 |
| BYLAWS OF LOCAL UNION | XXIV | Sub. 12 | 104 |
| CAUSES FOR SUSPENSION OR EXPULSION: | | | |
| Altering Dues Book and/or Card of Deceased | XX | 12 | 69 |
| Belonging to more than one Local Union | XVI | 2 | 56 |
| Circulating defamatory literature | XVI | 1 | 56 |
| Disruption, Radicalism, Etc. | XVI | 4 | 51 |
| Dissension, slander, libel, embezzling, drunkenness, defrauding, offenses, wrongs. | XXIV | Sub. 7-e | 51 |
| Filing law suit | XVII | 4 | 91 |
| Fines | XXIV | Sub. 7-f, g | 66 |
| Making Fraudulent Application | XVI | 2 | 91 |
| Non-payment of dues | XXIV | Sub. 7-d, e, f | 56 |
| Violating trade rules, oath, insubordination | XXIV | Sub. 7-e | 89 |
| CHARGES: | | | |
| By General Convention | III | 1 | 91 |
| By General Executive Board | XVI | 1 | 56 |
| By General Officer against member | XVI | 5 | 57 |
| By General President | VI | 2 | 57 |
| By General Secretary-Treasurer | XV | 5 | 21 |
| By Local Union | XXIV | Sub. 7-m | 95 |
| By Member | XXIV | Sub. 7-m | 95 |
| CHARTERS: | | | |
| Application for | XIV | 2 | 37 |
| Classifications of | XIV | 1 | 37 |
| Death Benefits under suspension of | XX | 8 | 60 |
| Fees | XI | 3 | 35 |
| Forms of | XIV | 9 | 43 |
| Granted and suspended by: | | | |
| General Convention | III | 1 | 18 |
| General Executive Board | V | 2 | 23 |
| General President | VI | 4 | 43 |
| Jurisdiction described on face of | XIV | 9 | 43 |

| | Article | Section | Page |
|---|---|---|---|
| COURT ACTIONS BARRED | XVII | 4 | 60 |
| COURT COSTS CHARGED MEMBERS | XVII | 4 | 60 |
| CRAFT JURISDICTION DEFINED | XIII | 1 | 3 |
| CREDENTIALS, GENERAL CONVENTION | III | 6 | 13 |
| DATA PROCESSING SERVICE DUES | XV | 3-i | 6 |
| DEATH BENEFIT FUND: | | | |
| Beneficiaries | XX | 9 | 6 |
| Claims | XX | 10 | 6 |
| Junior, Assistant, Registered & Branch Engineers | | | |
| Participation | XIV | 5 | 38 |
| Members on withdrawal | XV | 4-d | 5 |
| Suits Barred | XX | 12 | 6 |
| DEFENSE FUND | XIX | 1,2,3 | 6 |
| DELEGATE, AFL-CIO | VIII | 9 | 2 |
| DELEGATES, GENERAL CONVENTION: | | | |
| Credentials of | III | 6 | 13 |
| Election of | III | 3 | 11 |
| Election under District form | XXVI | 1-i | 10 |
| Expenses | III | 7 | 14 |
| DISBURSEMENTS by General Convention | III | 1 | 8 |
| DISCIPLINE AND EXPULSION: | | | |
| General | XVI | 1,2,3,4 | 56 |
| Penalties for members in arrears to Local Union | XXIV | Sub. 7-d | 89 |
| DISCLOSURE REQUIRED ON APPLICATIONS | XXIV | Sub. 7-d | 89 |
| DISRUPTION, penalties for | XVI | 4 | 57 |
| DISSOLUTION | XXIV | Sub. 13 | 105 |
| DISTRICT ADMINISTRATION: | | | |
| General | XXVI | 1 | 106 |
| Trials of members | XXVI | 2 | 108 |
| DISTRICT COUNCILS | XXII | | 71 |

115

| | Article | Section | Page |
|---|---|---|---|
| Records under suspension of | XIV | 8-b | 42 |
| Revocation of, under International Supervision | VI | 3 | 21 |
| Responsibilities of officers and members under suspension of | XIV | 8-a, b, c, d | 41 |
| CLEARANCE CARDS | XV | 2 & 6 | 44 |
| COMMITTEES: | | | |
| General Convention | III | 9 | 14 |
| Local Union | XXVII | Sub. 5 | 87 |
| CONFLICT OF JURISDICTION. | XIII | 3 | 37 |
| CONDUCTOR, Local Unions | XXIV | Sub. 2-f | 83 |
| CONSTITUTION: | | | |
| Amending | XVIII | 1 | 61 |
| Savings Clause | XXIX | | 110 |
| CONTRACT, of membership | XXIV | Sub. 3-b | 86 |
| CONTRACTS WITH EMPLOYERS | XXIV | Sub. 11-e | 103 |
| CONVENTIONS: | | | |
| Attendance of General Officers. | III | 10 | 15 |
| Committees | III | 9 | 14 |
| Composition of | III | 3 | 11 |
| Credentials | III | 6 | 13 |
| Delegates at large | III | 10 | 15 |
| Expense of Delegates | III | 7 | 14 |
| Method of holding | III | 2 | 10 |
| Officers of | III | 4 | 12 |
| Powers of General | III | 1 | 8 |
| Quorum | III | 8 | 14 |
| Representation at | III | 5 | 12 |
| State, Interstate and Provincial. | XXIII | 4 & 6 | 72 |
| Voting at | III | 5 | 12 |
| CORRESPONDING-RECORDING SECRETARY, LOCAL UNIONS: | | | |
| Duties | XXIV | Sub. 2-c | 81 |
| Member of Local Union Executive Board | XXIV | Sub. 1-c | 77 |
| Vacancy in office and removal of officers | XXIV | Sub. 1-f | 79 |

114

**116**

| | Article | Section | Page |
|---|---|---|---|
| **DUES:** | | | |
| Current due dates | XXIV | Sub. 7-b | 89 |
| Fixed by Local Union | XXIV | Sub. 7-a | 88 |
| Minimum required | X | 2 | 30 |
| Penalties for non-payment | XXIV | Sub. 7-d | 89 |
| Prior payments of current dues required | XV | 3-b | 48 |
| Relation to good standing | XXIV | Sub. 7-c | 89 |
| **DUTIES OF MEMBERS** | XXIV | Sub. 3 | 86 |
| **EMBLEM:** | | | |
| Description | II | 1 | 7 |
| Improper use of | II | 3 | 8 |
| Use of | II | 2 | 8 |
| **ELECTION:** | | | |
| Of delegates to General Convention | III | 3 | 11 |
| Of delegates to General Convention under District Form | XXVI | 1-i | 107 |
| Of General Officers | IV | 3-7 | 16 |
| Of Local Union Officers | XXIV | Sub. 1-a, 1-e | 74,78 |
| Of Local Union Officers under District Form | XXVI | 1-h | 107 |
| **EMPLOYEES, International Union Pensions** | V | 2 | 18 |
| **EMPLOYERS:** | | | |
| Contracts with | XXIV | Sub. 11-e | 103 |
| Relations with Local Union | XXIV | Sub. 11-a,b,c,d | 101 |
| **ENGINEERS' LICENSE LAWS, Endorsement** | I | 2 | 5 |
| **EXECUTIVE BOARDS, Local Union:** | | | |
| Composition of | XXIV | Sub. 1-c | 77 |
| Powers | XXIV | Sub. 1-d | 78 |
| Suspensions by | XXIV | Sub. 1-d | 78 |
| Under District Form | XXVI | 1-c,d | 106 |
| **EXPULSION AND DISCIPLINE:** | | | |
| By General President | VI | 3 | 21 |
| By General President | XVI | 4 | 57 |
| By Local Union | XVI | 4 | 57 |

**117**

| | Article | Section | Page |
|---|---|---|---|
| Causes for | XXIV | Sub. 7-d, e | 89 |
| General | XVI | 1-7 | 56 |
| **FEES, TAXES, ASSESSMENTS** | XI | 6 | 33 |
| **FEES, Withdrawal cards** | XV | 4-b | 52 |
| **FINES:** | | | |
| Causes | XXIV | Sub. 7-e | 9? |
| Collection for other Local Unions | XXIV | Sub. 7-g | 9? |
| For arrears in dues | XXIV | Sub. 7-d | 89 |
| Paid before dues accepted | XXIV | Sub. 7-f | 9? |
| **FINANCIAL SECRETARY:** | | | |
| Duties | XXIV | Sub. 2-d | 89 |
| Receipts from committees | XXIV | Sub. 5 | 8? |
| **FINDING OF FACT, by General Executive Board** | XVII | 1-c | 60 |
| **FINDING OF FACT, by General President** | VI | 2 | 2? |
| **FORMS:** | | | |
| Charter | XIV | 9 | 4? |
| Service dues receipt | XV | 3-f | 50-? |
| **FRAUDULENT APPLICATIONS** | XXIV | Sub. 7-d | 89 |
| Penalty | XVI | 2 | 56 |
| **GENERAL BOARD OF TRUSTEES:** | | | |
| Composition | IX | 1 | 2? |
| Powers and duties | IX | 4 | 2? |
| Quorum and meetings | IX | 3, 2 | 2? |
| Terms and election | IV | 1-3 | 15? |
| **GENERAL EXECUTIVE BOARD:** | | | |
| Conducting Hearings | V | 7 | 20 |
| Fees, taxes, assessments | XI | 6 | 3? |
| Meetings | V | 4 | 19? |
| Members | V | 1 | 18 |
| Powers of | V | 2 | 18? |
| Power to alter Death Benefit | XX | 14 | 66? |
| Quorum | V | 5 | 19 |
| To initiate trials | XVI | 3 | 56 |
| Transacting Business | XVI | 6 | 19 |
| Vacancy on | V | 3 | 19 |

| Entry | Article | Section | Page |
|---|---|---|---|
| GENERAL OFFICE MEMBERSHIP DEFINED | XV | 5 | 54 |
| GENERAL OFFICERS: | | | |
| Bonding of | IV | 8 | 17 |
| Defined | IV | 1 | 15 |
| Honorary Positions | XXVIII | | 109 |
| How elected | IV | 3-7 | 16 |
| How recalled | XVIII | 2 | 61 |
| Installation of | IV | 6 | 17 |
| Nomination of | IV | 2 | 15 |
| Vacancy in office | V | 3 | 19 |
| GENERAL PRESIDENT: | | | |
| Acts of, Reviewable | VI | 9 | 25 |
| Appoints Committees | III | 9 | 14 |
| Approves Local Union Bylaws | XXIV | Sub. 12 | 104 |
| Chairman of General Executive Board | VI | 5 | 23 |
| Charges and Trials | VI | 6 | 24 |
| Granting, Suspending and Revoking charters | VI | 3, 4 | 21 |
| International Supervision | VI | 3 | 21 |
| Powers and duties | VI | 1, 2 | 21 |
| Salary | VI | 7 | 24 |
| Term and election of | IV | 1, 3 | 15 |
| GENERAL SECRETARY-TREASURER: | | | |
| General Office Membership | XV | 5 | 54 |
| Powers and duties | VIII | 1-9 | 25 |
| Salary | VIII | 5 | 27 |
| Term and election | IV | 1-3 | 15 |
| GOOD STANDING DEFINED: | | | |
| As to dues | XXIV | Sub. 7-c | 89 |
| Business Agents | XVI | 6 | 57 |
| Candidates | XXIV | Sub. 1-b | 75 |
| Local Officers | XVI | 6 | 57 |
| GOVERNMENT OF BRANCH LOCALS | XIV | 5 | 38 |
| GOVERNMENT OF INTERNATIONAL | I | 3 | 6 |

| Entry | Article | Section | Page |
|---|---|---|---|
| GUARD, Local Unions | XXIV | Sub. 2-g | 84 |
| HOISTING AND PORTABLE: | | | |
| Engineers' Jurisdiction | XIII | 1-b | 35 |
| Conflict of Jurisdiction | XIII | 3 | 37 |
| HONORARY POSITIONS | XXVIII | | 109 |
| INCAPACITY OF LOCAL UNION OFFICERS | XXIV | Sub. 2-k | 86 |
| INCOME OF INTERNATIONAL UNION: | | | |
| Charter fees & assessments | XI | 3 | 32 |
| Initiation fee & tax | XI | 4 | 32 |
| Other fees, taxes & assessments | XI | 6 | 33 |
| Per capita tax | XI | 1 | 30 |
| Reinstatement assessments | XI | 5 | 32 |
| INITIATION FEES: | | | |
| Minimum fixed | X | 2 | 30 |
| New Local Unions | XI | 3 | 32 |
| New Members | XI | 4 | 32 |
| INITIATION TAX WAIVED | XV | 2-d | 44 |
| INITIATIVE AND RECALL | XVIII | 2 | 61 |
| INSTALLATION OF GENERAL OFFICERS | IV | 6 | 17 |
| INSTALLATION OF LOCAL UNION OFFICERS | XXIV | Sub. 1-e | 78 |
| INTERPRETATION OF CONSTITUTION: | | | |
| By General Executive Board | XVII | 1-c | 60 |
| By General President | V | 7 | 20 |
| INTERNATIONAL SUPERVISION: | | | |
| Appeals regarding | XVII | 1-a | 58 |
| Defined | VI | 3 | 21 |
| Exercised by General President | XXIV | Sub. 7-d | 89 |
| How Local Union affairs administered | VI | 3 | 21 |

| | Article | Section | Page |
|---|---|---|---|
| Power of Local Union | | | |
| superseded by | VI | 3 | 21 |
| Referendums on | XVII | 1-a | 58 |
| Requests to invoke, etc | XVII | 1-a | 58 |
| Trials under | XXIV | Sub. 7-r | 98 |
| INTERSTATE, STATE & | | | |
| PROVINCIAL | | | |
| ORGANIZATIONS | XXIII | 1-8 | 71 |
| JOURNAL: | | | |
| Proceedings of General | | | |
| Convention | VIII | 6 | 27 |
| Publication of | VIII | 6 | 27 |
| Publishing articles | VIII | 6 | 27 |
| Publishing votes on referendum | XVIII | 3 | 62 |
| JUNIOR & ASSISTANT | | | |
| ENGINEERS: | | | |
| Application of sub-charters | XIV | 4 | 38 |
| Clearance Cards | XV | 6 | 55 |
| Defined | XIV | 6-a | 40 |
| Form of charter | XIV | 9 | 43 |
| Government of | XIV | 5 | 38 |
| Voting rights | XIV | 5 | 38 |
| JUNIOR & ASSISTANT | | | |
| ENGINEERS, REGISTERED | | | |
| APPRENTICE ENGINEERS & | | | |
| BRANCH ENGINEERS' | | | |
| PARTICIPATION | XIV | 5 | 38 |
| JURISDICTION: | | | |
| Conflict of | XIII | 2 & 3 | 37 |
| Described on charter | XIV | 9 | 43 |
| Hoisting & portable craft | XIII | 1-b | 35 |
| Stationary craft | XIII | 1-a | 34 |
| Territorial | XII | 1 | 33 |
| LAPSED LOCAL UNIONS: | | | |
| Disposition of membership | XV | 5 | 54 |
| Disposition of property | XIV | 8-a-d | 41 |
| LAW SUITS BARRED | XVII | 4 | 60 |
| LITIGATION, defense of | V | 8 | 20 |
| | XXIV | Sub. 1-d | 78 |

120

| | Article | Section | Page |
|---|---|---|---|
| LOCAL UNIONS: | | | |
| Application for charters | XIV | 2 | 38 |
| Arrears, penalties | XXIV | Sub. 7-d | 89 |
| Auditors | XXIV | Sub. 2-i | 85 |
| Bonding | XXIV | Sub. 2-j | 85 |
| Business Agents & | | | |
| Representatives | XXIV | Sub. 1-a | 74 |
| Business Manager | XXIV | Sub. 1-a | 74 |
| Bylaws & trade rules | XXIV | Sub. 12 | 104 |
| Charges by members | XXIV | Sub. 7-n | 95 |
| Clearance Cards | XV | 2-a-e | 44 |
| Committees | XXIV | Sub. 5 | 87 |
| Conductor | XXIV | Sub. 2-f | 83 |
| Constitutes separate entity | I | 3 | 6 |
| Dispensing with monthly | | | |
| meetings | XXIV | Sub. 10-a | 101 |
| Dissolution | XXIV | Sub. 13 | 105 |
| District Administration Form. | XXVI | 1 | 106 |
| Dues, how fixed | XXIV | Sub. 7-a | 88 |
| Duties of members | XXIV | Sub. 3 | 86 |
| Election of officers | XXIV | Sub. 1-e | 78 |
| Executive Board | XXIV | Sub. 1-c-d | 77 |
| Financial Secretary | XXIV | Sub. 2-d | 82 |
| Fines, payment of | XXIV | Sub. 7-f | 92 |
| Good standing | XXIV | Sub. 7-c | 89 |
| Guard | XXIV | Sub. 2-g | 84 |
| Incapacity of officers | XXIV | Sub. 2-k | 86 |
| Local office | XXIV | Sub. 4 | 87 |
| Meetings | XXIV | Sub. 10 | 101 |
| Officers | XXIV | Sub. 1-a | 74 |
| Parliamentary law | XXIV | Sub. 14 | 105 |
| President | XXIV | Sub. 2-a | 81 |
| Qualification of officers | XXIV | Sub. 1-b | 75 |
| Quorum | XXIV | Sub. 9 | 100 |
| Recall of officers | XXIV | Sub. 8 | 100 |
| Recording-Corresponding | | | |
| Secretary | XXIV | Sub. 2-c | 81 |
| Relations with employers | XXIV | Sub. 11 | 101 |
| Rules of government | XXIV | Sub. 1-14 | 74 |
| Suspensions | XXIV | Sub. 7-e | 91 |

121

| | Article | Section | Page |
|---|---|---|---|
| Local Unions, good standing | XXIV | Sub. 1-a-b | 74 |
| Qualifications, good standing | XVI | 6 | 57 |
| State, Interstate & Provincial Organizations | XXIII | 2 | 72 |
| ORDER OF BUSINESS | | Preface | 4 |
| PENALTIES: | | | |
| Altering dues book and/or card | XX | 12 | 69 |
| Defamatory literature | XVI | 1 | 56 |
| Disruption, Radicalism, etc | XVI | 4 | 57 |
| False application | XVI | 2 | 56 |
| Vice President | XVII | 3 | 60 |
| PENDENCY OF APPEALS | | | |
| PENSION FUND PLANS: | | | |
| General Pension Fund Plan | XXVII | | 109 |
| International, provisions for (Constitutional Authorization) | | | |
| Pension Reciprocity | V | 2 | 18 |
| PER CAPITA TAX: | XXIV | 11-g | 104 |
| Distribution of | XI | 2 | 31 |
| Local Unions charged with | XXIV | Sub. 7-j | 94 |
| Local Unions not charged, when | XXIV | Sub. 7-k | 94 |
| Report and payment | XI | 1 | 30 |
| PRESIDENT, Local Union | XXIV | Sub. 2-a | 81 |
| PRIOR PAYMENTS OF CURRENT DUES REQUIRED | XV | 3-b | 48 |
| PROPERTY OF LOCAL UNIONS | XIV | 8 | 41 |
| PROTEST & APPEALS REGARDING NOMINATION & ELECTION TO LOCAL UNION OFFICE | XXIV | Sub. 1-g | 80 |
| PROVINCIAL, STATE AND INTERSTATE ORGANIZATIONS | XXIII | 1-8 | 71 |
| PURPOSES OF INTERNATIONAL UNION | I | 2 | 5 |
| QUALIFICATIONS: | | | |
| Charter | XIV | 2, 3 | 38 |
| Membership | X | 1 | 29 |

| | Article | Section | Page |
|---|---|---|---|
| Terms of office | XXIV | Sub. 1-b | 75 |
| Transfer card | XV | 1 | 43 |
| Travel service dues | XV | 3-a | 45 |
| Treasurer | XXIV | Sub. 2-e | 83 |
| Trials | XXIV | Sub. 7-1-s | 95 |
| Trials in districts | XXVI | 2 | 108 |
| Trustees | XXIV | Sub. 2-h | 84 |
| Under International Supervision | VI | 3 | 21 |
| Vacancy & removal of officers | XXIV | Sub. 1-f | 79 |
| Vice President | XXIV | Sub. 2-b | 81 |
| LOCKOUTS: | | | |
| Defense Fund | XIX | 1-3 | 62 |
| Local Union | XXIV | Sub. 11 | 101 |
| MEETINGS: | | | |
| General Executive Board | V | 4 | 19 |
| Local Unions | XXIV | Sub. 10 | 101 |
| Under District Form | XXVI | 1 | 106 |
| MEMBERSHIP: | | | |
| Application for | XXIV | Sub. 6 | 88 |
| Confined to one Local Union | XVI | 2 | 56 |
| Discipline & expulsion | XVI | 1-5 | 56 |
| Duties of | XXIV | Sub. 3 | 86 |
| In lapsed Locals | XV | 5 | 54 |
| Initiation fees | X | 2 | 30 |
| Qualifications for | X | 1 | 29 |
| Reinstatement of | XXIV | Sub. 7-h-i | 93 |
| Voting upon | XXIV | Sub. 6 | 88 |
| NAME OF INTERNATIONAL UNION | I | 1 | 5 |
| NOMINATIONS: | | | |
| General officers | IV | 2 | 15 |
| Local Unions | XXIV | Sub. 1-e | 78 |
| Under District Form | XXVI | 1-h-i | 107 |
| OBJECTS OF INTERNATIONAL UNION | I | 2 | 5 |
| OFFICERS: | | | |
| Failure to discharge duties | XXIV | Sub. 1-f | 79 |
| General Convention | III | 4 | 12 |
| International Union | IV | 1 | 15 |

| Entry | Article | Section | Page |
|---|---|---|---|
| QUORUM: | | | |
| Board of Trustees | IX | 3 | 28 |
| General Convention | III | 8 | 14 |
| General Executive Board | V | 5 | 19 |
| Joint Executive Board | XXI | 3 | 70 |
| Local Unions | XXIV | Sub. 9 | 100 |
| RADICALISM, penalty for | XVI | 4 | 57 |
| RECALL: | | | |
| General Officers | XVIII | 2 | 61 |
| Local Union Officers | XXIV | Sub. 8 | 100 |
| RECORDING-CORRESPONDING SECRETARY | XXIV | Sub. 2-c | 81 |
| REGISTERED APPRENTICE ENGINEERS: | | | |
| Application for sub-charters | XIV | 4 | 38 |
| Cancellation of membership | XIV | 6-b | 40 |
| Defined | XIV | 6-b | 40 |
| Form of charter | XIV | 9 | 43 |
| Transfer to parent body | XIV | 6-b | 40 |
| Government of | XIV | 5 | 38 |
| Voting rights | XIV | 5 | 38 |
| REGISTRATION FEES | XV | 3-h | 52 |
| REINSTATEMENT: | | | |
| Expelled Members | XXIV | Sub. 7-i | 93 |
| Fees | XI | 5 | 32 |
| Suspended Members | XXIV | Sub. 7-h | 93 |
| REMOVAL OF LOCAL UNION OFFICERS: | | | |
| By General President | XXIV | Sub. 1-f | 79 |
| Under International Supervision | VI | 3 | 21 |
| RITUAL, part of Constitution | I | 4 | 7 |
| RULES OF ORDER, Local Unions | XXIV | Sub. 14 | 105 |
|  | XXIX | | 110 |
| SAVINGS CLAUSE: | | | |
| Description of | II | 1 | 7 |
| SEAL: | | | |
| Property of International Union | II | 3 | 8 |

| Entry | Article | Section | Page |
|---|---|---|---|
| Unlawful use of | II | 3 | 8 |
| Use of | II | 2 | 8 |
| SERVICE DUES: | | | |
| Amount of Applicant | XV | 3-d | 49 |
| Amount of Travel | XV | 3-e | 50 |
| Applicants | XV | 3-c | 49 |
| Books, Printing and distributing | XV | 3-g | 52 |
| Data Processing | XV | 3-i | 52 |
| Form of receipt | XV | 3-f | 50 |
| Travel | XV | 3-a | 45 |
| SERVICE OF SUMMONS OR SUBPOENA | I | 3 | 6 |
| STATE, INTERSTATE AND PROVINCIAL ORGANIZATIONS: | | | |
| Bonding | XXIII | 8 | 73 |
| Executive Board | XXIII | 3 | 72 |
| Formation | XXIII | 1 | 71 |
| Meetings | XXIII | 6 | 73 |
| Minutes | XXIII | 7 | 73 |
| Officers of | XXIII | 2 | 72 |
| Powers | XXIII | 5 | 73 |
| Voting at | XXIII | 4 | 72 |
| STATIONARY ENGINEERS' JURISDICTION: | XIII | 1-a | 34 |
| Conflict of Jurisdiction | XIII | 3 | 37 |
| STRIKES: | | | |
| Defense Fund | XIX | 1-3 | 62 |
| Procedure | XXIV | Sub. 11-b, c | 102 |
| SUBVERSIVENESS: | | | |
| Opposition | I | 2 | 5 |
| Penalty | XVI | 4 | 57 |
| SUITS AT LAW BARRED | XVII | 4 | 60 |
| SUPERVISION OF LOCAL UNIONS (See International Supervision) | VI | 3 | 21 |
| SUPPLIES: | | | |
| Issued with charter | XIV | 8-a | 41 |
| Penalty for improper use of | XIV | 8-e | 43 |

| | Article | Section | Page |
|---|---|---|---|
| Property of International Union | XIV | 8-a | 41 |
| **SUSPENDED LOCAL UNIONS:** | | | |
| Disposition of Membership | XIV | 8 | 41 |
| Disposition of Property | XIV | 8 | 41 |
| **SUSPENSION OF CHARTERS:** | | | |
| Death Benefits Protected | XX | 8 | 66 |
| Membership Protected | XV | 5 | 54 |
| Property of Local | XIV | 8-a | 41 |
| **SUSPENSION OF MEMBERS** | XXIV | 7-d, e, f | 89 |
| **TAXES, FEES AND ASSESSMENTS** | XI | 6 | 33 |
| **TERMS OF OFFICE:** | | | |
| General Officers | IV | 1 | 15 |
| Local Union Officers | XXIV | Sub. 1-b | 75 |
| State, Interstate and Provincial Officers | XXIII | 2 | 72 |
| **TRADE DISPUTES** | XXIV | Sub. 11-b | 102 |
| **TRADE RULES** | XXIV | Sub. 12 | 104 |
| **TRANSFER CARDS** | XV | 1 | 43 |
| **TRANSFERS** | XV | 2-d | 44 |
| **TRAVEL SERVICE DUES:** | | | |
| Amount of | XV | 3-a | 45 |
| | XV | 3-e | 50 |
| **TREASURER, Local Unions** | XXIV | Sub. 2-e | 83 |
| **TRIALS:** | | | |
| Appeals from | XVII | 1-4 | 58 |
| By General Convention | III | 1 | 8 |
| By General Executive Board | V | 7 | 20 |
| By General President | VI | 2 | 21 |
| Procedure of Local Union | XXIV | Sub. 7-l-s | 95 |
| Under District Form | XXVI | 2 | 108 |
| Under International Supervision | XXIV | Sub. 7-r | 98 |
| **TRUSTEES:** | | | |
| Board of | IX | 1-4 | 28 |
| Local Unions | XXIV | Sub. 2-h | 84 |
| **VACANCY IN OFFICE:** | | | |
| General Officers | V | 3 | 19 |
| Local Unions | XXIV | Sub. 1-f | 79 |

| | Article | Section | Page |
|---|---|---|---|
| **VICE PRESIDENTS:** | | | |
| General, election, etc. | IV | 2-7 | 15 |
| General, duties | VII | 1 | 25 |
| Local Unions | XXIV | Sub. 2-b | 81 |
| **VOTING:** | | | |
| Convention | III | 5 | 12 |
| Elections, General Officers | IV | 3-7 | 16 |
| Elections, Local Union Officers | XXIV | Sub. 1-e | 78 |
| Junior, Apprentice and Branch Engineers | XIV | 5 | 38 |
| State, Interstate and Provincial Organizations | XXIII | 4 | 72 |
| **WELFARE PLANS ADMINISTRATION, violations of** | XVI | 7 | 57 |
| **WITHDRAWAL CARDS** | XV | 4 | 52 |

NOTES

128

# Exhibit 2 to Giblin Declaration

## Campaign Website Resolution

**WHEREAS**, in recent years, candidates for office in IUOE Local Union elections have increasingly used Internet websites to promote their candidacies; and

**WHEREAS**, these campaign websites offer an inexpensive means to communicate the candidates' positions; and

**WHEREAS**, these websites also allow non-members, including employers, access to frequently sensitive information about the Local Unions; and

**WHEREAS**, there have been instances where employers have misused information obtained from candidates' websites to the detriment of IUOE Local Unions in organizing campaigns and contract negotiations; and

**WHEREAS**, IUOE members' protected free speech rights are subject to reasonable rules as to the responsibility of members toward the Local Union as an institution; and

**WHEREAS**, Article XXIV, Subdivision 1, Section (e) of the International Constitution authorizes the General Executive Board to promulgate rules and regulations concerning adequate safeguards to insure fair Local Union elections;

**NOW THEREFORE BE IT RESOLVED THAT** the General Executive Board, in order to assure the fullest expression of free speech by candidates in Local Union elections while protecting the Local Unions from adverse actions by employers, directs that, starting with Local Union elections to be held in 2007, Local Unions and their election committees shall require all candidates and their supporters who have set up or wish to set up campaign websites to include a password protection function; and

**BE IT FURTHER RESOLVED THAT** the International Union shall work with the Local Unions and their election committees to establish appropriate password protection mechanisms using members' register numbers or another appropriate mechanism to identify membership status.

# Exhibit 3 to Giblin Declaration



# International Union of Operating Engineers

AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS

VINCENT J. GIBLIN
*GENERAL PRESIDENT*

CHRISTOPHER HANLEY
*GENERAL SECRETARY-TREASURER*

*GENERAL VICE PRESIDENTS*
WILLIAM C. WAGGONER

WILLIAM E. DUGAN

JAMES MCLAUGHLIN

BRIAN E. HICKEY

GARY KROEKER

JOHN M. HAMILTON

ALLAN B. DARR

KENNETH CAMPBELL

PATRICK L. SINK

WILLIAM K. DUFFY

GERALD ELLIS

JERRY KALMAR

PHILIP SCHLOOP

RUSSELL E. BURNS

*TRUSTEES*
MARK HOLLIDAY
*CHAIRMAN*

JOHN T. AHERN

MICHAEL GALLAGHER

RODGER KAMINSKA

KUBA BROWN

*GENERAL COUNSEL*
RICHARD GRIFFIN

February 12, 2007

**TO ALL IUOE LOCAL UNION BUSINESS MANAGERS**

Dear Brothers and Sisters:

In recent years, candidates for Local Union office and their supporters have taken advantage of the ease of communication over the Internet to establish websites to promote their candidacies. These campaign websites offer an inexpensive means to promote the candidacies of both challengers and incumbents, and have become a common feature of contests for Local Union office. Given the free flow of debate in such campaigns, campaign websites frequently feature sensitive—and not always entirely accurate—information about Local Union affairs. Unfortunately, unprotected websites are open to anyone with access to a computer and the Internet, and allow non-members, including employers, access to such sensitive information. As a consequence, employers with interests contrary to Local Unions have used information obtained from campaign websites to harm Local Unions in collective bargaining negotiations and organizing campaigns.

In light of its authority under Article XXIV, Subdivision 1, Section (e) of the International Constitution to promulgate rules and regulations concerning adequate safeguards to insure fair Local Union elections, the General Executive Board took up the question of campaign websites at its most recent meeting in Phoenix, Arizona. The Board recognized the value of such websites to promote candidacies and the free flow of information among members. However, the Board was also concerned about the ability of unscrupulous non-members to take advantage of website-generated information to harm Locals in negotiations and organizing, as well as the potential for such non-members to intervene improperly in the elections themselves. In order to assure the fullest expression of views by members while limiting the opportunity for unscrupulous non-members to take advantage of sensitive information, the Board adopted a resolution (copy attached) directing Local Unions and their Election Committees, starting with Local Union elections to be held in 2007, to require all candidates and their supporters who have set up or wish to set up campaign websites to include a password protection function using members' register numbers or another appropriate mechanism to identify membership status.

Requiring campaign websites to have a membership-related password protection function will not in any way limit the content of what is said on such websites; it will merely attempt to assure that sensitive information concerning Local Union affairs is shared among members, and is not available to employers and others with interests contrary to those of the Local Unions as institutions.    In passing the resolution, the General Executive Board recognized that some candidates and their supporters may have gotten an early start on the upcoming 2007 election and have campaign websites up and running already.    The Board decided that these members should be granted a reasonable amount of time—sixty days—to bring their websites into compliance with the resolution.    Therefore, existing websites have until April 15, 2007 to comply or be faced with internal union disciplinary sanctions.

Finally, Local Unions have official websites, as does the International Union.  In the spirit of the General Executive Board's resolution, Local Unions should review their official websites (and I am directing a review of the International Union's own site) to assure that any sensitive information on these sites is also password protected.

Fraternally,

Vincent J. Giblin
General President

VJG:as
Attachment

## Campaign Website Resolution

**WHEREAS**, in recent years, candidates for office in IUOE Local Union elections have increasingly used Internet websites to promote their candidacies; and

**WHEREAS**, these campaign websites offer an inexpensive means to communicate the candidates' positions; and

**WHEREAS**, these websites also allow non-members, including employers, access to frequently sensitive information about the Local Unions; and

**WHEREAS**, there have been instances where employers have misused information obtained from candidates' websites to the detriment of IUOE Local Unions in organizing campaigns and contract negotiations; and

**WHEREAS**, IUOE members' protected free speech rights are subject to reasonable rules as to the responsibility of members toward the Local Union as an institution; and

**WHEREAS**, Article XXIV, Subdivision 1, Section (e) of the International Constitution authorizes the General Executive Board to promulgate rules and regulations concerning adequate safeguards to insure fair Local Union elections;

**NOW THEREFORE BE IT RESOLVED THAT** the General Executive Board, in order to assure the fullest expression of free speech by candidates in Local Union elections while protecting the Local Unions from adverse actions by employers, directs that, starting with Local Union elections to be held in 2007, Local Unions and their election committees shall require all candidates and their supporters who have set up or wish to set up campaign websites to include a password protection function; and

**BE IT FURTHER RESOLVED THAT** the International Union shall work with the Local Unions and their election committees to establish appropriate password protection mechanisms using members' register numbers or another appropriate mechanism to identify membership status.

# Exhibit 4 to Giblin Declaration



# International Union of Operating Engineers
#### AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS

April 10, 2007

VINCENT J. GIBLIN
GENERAL PRESIDENT

CHRISTOPHER HANLEY
GENERAL SECRETARY-TREASURER

GENERAL VICE PRESIDENTS
WILLIAM C. WAGGONER

WILLIAM E. DUGAN

JAMES MCLAUGHLIN

BRIAN E. HICKEY

GARY KROEKER

JOHN M. HAMILTON

ALLAN B. DARR

KENNETH CAMPBELL

PATRICK L. SINK

WILLIAM K. DUFFY

GERALD ELLIS

JERRY KALMAR

PHILIP SCHLOOP

RUSSELL E. BURNS


TRUSTEES
MARK HOLLIDAY
CHAIRMAN

JOHN T. AHERN

MICHAEL GALLAGHER

RODGER KAMINSKA

KUBA BROWN


GENERAL COUNSEL
RICHARD GRIFFIN

**VIA FACSIMILE**

**TO ALL IUOE LOCAL UNION BUSINESS MANAGERS**

Dear Brothers and Sisters:

On February 12, 2007, I wrote to provide you with a copy of a resolution on the use of campaign websites in Local Union elections which the General Executive Board had adopted at its January meeting. In the resolution, the Board cited the value of websites as one effective means of campaigning for both challengers and incumbents, and did not seek in any way to limit the content of what candidates could place on such sites. Rather, recognizing that websites could easily be monitored by employers and others who had interests contrary to Local Unions and their membership, the resolution sought to limit these outsiders' ease of access by providing that campaign websites must have a password protection function based on membership status.

On March 29, 2007, five members from three different Locals—one long-time Local officer now running for Business Manager of his Local, two retirees, and two members contemplating future candidacies—filed a lawsuit in the District of Columbia federal district court seeking to have the resolution declared an unlawful infringement of their rights under the Landrum-Griffin Act. They contend, among other things, that the password protection requirement is too technologically burdensome, and that they do not want to limit the audience for their websites to members of their Local Union, but rather want the public, including employers, to have access to all the information they post on any website they create now or in the future.

In response, on Monday, April 2, 2007, the General Executive Board convened via conference call to reconsider the resolution. The Board reaffirmed the resolution and approved the hiring of special outside counsel to defend the lawsuit aggressively. In addition, **the Board revised the resolution's effective date to July 1, 2007.** The Board is determined to defend the IUOE's authority to adopt reasonable rules to protect our Local Unions' institutional interests. I will keep you advised of further developments in this litigation, and I appreciate your support of the General Executive Board's action.

Fraternally,

Vincent J Giblin
General President

**Exhibit 5 to Giblin Declaration**



# International Union of Operating Engineers
### AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS

May 11, 2007

VINCENT J. GIBLIN
*GENERAL PRESIDENT*

CHRISTOPHER HANLEY
*GENERAL SECRETARY-TREASURER*

*GENERAL VICE PRESIDENTS*
WILLIAM C. WAGGONER

WILLIAM E. DUGAN

JAMES McLAUGHLIN

BRIAN E. HICKEY

GARY KROEKER

JOHN M. HAMILTON

ALLAN B. DARR

KENNETH CAMPBELL

PATRICK L. SINK

WILLIAM K. DUFFY

GERALD ELLIS

JERRY KALMAR

PHILIP SCHLOOP

RUSSELL E. BURNS


*TRUSTEES*
MARK HOLLIDAY
*CHAIRMAN*

JOHN T. AHERN

MICHAEL GALLAGHER

RODGER KAMINSKA

KUBA BROWN


*GENERAL COUNSEL*
RICHARD GRIFFIN

**VIA FACSIMILE**

**TO ALL IUOE LOCAL UNION BUSINESS MANAGERS**

Dear Brothers and Sisters:

As I advised you by letter dated February 12, 2007, at its meeting in Phoenix in January the General Executive Board passed a Campaign Website Resolution, which by subsequent action was made effective July 1, 2007. This week the General Executive Board approved the attached Implementation Guidelines to facilitate compliance with the resolution. The guidelines: 1) indicate that only nonmembers of the International Union must be excluded pursuant to the resolution's password protection provisions; 2) set up a procedure for an independent outside information technology firm to be available to assist affected members in their compliance with the resolution, and provide for a waiver procedure in the event the firm determines that technological difficulties in compliance will result in significant expenditures or delay; and 3) indicate that the usual procedure for obtaining a Decision and Opinion from the General President's office will be available to resolve questions from a member who is in doubt about whether his or her website is a "campaign" website subject to the resolution.

Please forward these guidelines to your Local's Election Committee and anyone else involved in your Local's election procedures.

Fraternally,

Vincent J. Giblin
General President

Attachment

**Implementation Guidelines Regarding General Executive Board Resolution on Campaign Websites**

In order to implement the General Executive Board Resolution on Campaign Websites, the Board has adopted the following guidelines and procedures to facilitate compliance with the Resolution.

1. Only persons who are not members of the International Union must be excluded by the password protection feature described in the Resolution.

2. For the elections that will be held this August, an outside, independent information technology consulting firm will be retained by the International Union to respond to inquiries by members affected by the Resolution regarding any technological issues that might arise in seeking to comply with the Resolution and to provide assistance as might be necessary to enable the members to comply with the Resolution. The assistance provided by the outside consulting firm will be available at no cost to those members covered by the Resolution. While the Board expects that the use of this resource should promptly resolve any technological problems members might experience in establishing compliant campaign websites, in the event the consulting firm is unable to resolve promptly the member's technological problem, the member may seek a waiver of the Resolution. Any request for a waiver of the Resolution because of technological issues shall be made in writing and explain the technological problems preventing compliance with the Resolution and the efforts taken by the member to address those problems. The independent consulting firm shall determine, based on its technical expertise and in its sole discretion, whether compliance by the particular member with the Resolution would require a significant expenditure of money or significant delay in establishing and maintaining a password protection feature beyond that which would typically be involved in establishing a password protected campaign website. If the firm answers that question in the affirmative, the member shall be excused from compliance with the Resolution. No member will be subject to discipline for noncompliance during any period in which the member can document that he or she attempted diligently and in good faith to comply with the Resolution by using the services of the firm to resolve any technological problems in maintaining the password protection feature and/or by expeditiously seeking a waiver under this procedure.

3. The International Union will promptly respond to written requests by members for clarification concerning the application or implementation of the Resolution. As an example (not intended to limit the subject matter of other possible requests), a member who is in doubt as to whether his or her website would be considered a "campaign" website subject to the Resolution may request an opinion as to the rule's application by submitting the request to the General President. The member requesting the opinion and the election committee of the member's local shall be provided with copies of opinions given in response to such requests, and the opinions shall also be made available by the International Union on the request of any member. A member who has truthfully disclosed the facts in making such a request and who is advised by the International Union in an opinion issued pursuant to this procedure as to whether his or her website is, in whole or in part, outside the coverage of the Resolution, will not be subject to discipline for failure to comply with the Resolution if he or she relies on the advice given in the opinion.

# Exhibit 6 to Giblin Declaration
# (part 1)

# DECISIONS & OPINIONS of the GENERAL PRESIDENT



IUOE

ORGANIZING
EDUCATING
TRAINING

## Providing the skills to Succeed

THIRTY-SIXTH GENERAL CONVENTION
APRIL 7, 2003 • LAKE BUENA VISTA, FLORIDA

# DECISIONS AND OPINIONS

## *of the*

# GENERAL PRESIDENT

## *of*

# IUOE



January 1998 through December 2002

———

# International Union of Operating Engineers
# Washington, D.C.

# INDEX

| Date | Local No. and City | Issue | Page |
|---|---|---|---|
| Apr. 3, 1998 | 701, Gladstone, Oregon | Eligibility for Office: Receiving GPP Benefits | 1 |
| May 26, 1998 | 35, Eagan, Minnesota | Validity of Motion to Reinstate Expelled Members | 1 |
| June 8, 1998 | 520, Granite City, Illinois | Eligibility for Office: Attendance at Nominating Meeting | 2 |
| July 23, 1998 | 428, Phoenix, Arizona | Eligibility for Office: Working at the Trade: Holding Local Union Office; Seeking Work at the Trade | 2 |
| July 28, 1998 | 428, Phoenix, Arizona | Eligibility for Office: Working at the Trade: Holding Local Union Office; Seeking Work at the Trade | 3 |
| Aug. 11, 1998 | 925, Mango, Florida | Eligibility for Office: Attendance at Meetings: Good Cause Excuse | 4 |
| Sept. 4, 1998 | 653, Mobile, Alabama | Local Union Election: Ineligible Candidates | 5 |
| Oct. 7, 1998 | 653, Mobile, Alabama | Validity of Motion for Revote of Election | 5 |
| Nov. 12, 1998 | 324, Livonia, Michigan | Business Manager's Authority: Appointment of Steward | 6 |
| Mar. 12, 1999 | 70, St. Paul, Minnesota | Eligibility to Continue in Office: Retirement | 7 |
| May 27, 1999 | 400, Helena, Montana | Eligibility for Office: Working at the Trade: Long Term Disability | 7 |
| June 4, 1999 | 612, Tacoma, Washington | Eligibility to Continue in Office: Dues Delinquency | 8 |
| June 10, 1999 | 470, Aiken, South Carolina | Eligibility for Office: Branch Members | 9 |
| June 11, 1999 | 302, Bothell, Washington | Eligibility for Office or to Nominate: Owner of Signatory Contractor Employing Operating Engineers | 9 |
| June 28, 1999 | 571, Omaha, Nebraska | Local Union Election: Faxed Letter of Acceptance | 10 |
| July 9, 1999 | 400, Helena, Montana | Eligibility for Office: Receiving Pension | 10 |
| Aug. 9, 1999 | 103, Indianapolis, Indiana | IUOE Emblem: Use in Campaign Literature | 11 |
| Aug. 31, 1999 | 571, Omaha, Nebraska | Local Union Election: Tie Vote | 12 |
| Sept. 3, 1999 | 400, Helena, Montana | Local Union Election: Ineligible Candidates | 13 |
| Sept. 16, 1999 | 30, Richmond Hill, New York | Filling of Vacancy: Applicability of Election Protest Procedure and Voting Procedure | 13 |
| Nov. 16, 1999 | 35, Eagan, Minnesota | Eligibility to Continue in Office: Termination from Employment | 15 |
| Mar. 15, 2000 | 963, Vancouver, British Columbia | Membership List: Personal Possession by Recording-Corresponding Secretary | 15 |
| Apr. 7, 2000 | 428, Phoenix, Arizona | Membership Action Relating to Trust Funds | 16 |
| May 3, 2000 | 647, Allen, Kansas | Local Union General Membership Meetings: Number | 17 |
| May 26, 2000 | 49, Minneapolis, Minnesota | Local Union Election: No Eligible Nominees | 18 |
| June 26, 2000 | 882, Burnaby, British Columbia | Eligibility of Wife of Nominee to be Candidate | 18 |
| July 5, 2000 | 98, East Longmeadow, Massachusetts | Eligibility for Office: Continuous Good Standing and Working at the Trade | 19 |
| July 19, 2000 | 9, Denver, Colorado | Eligibility for Office: Continuous Good Standing: Quarterly Dues and Calculation of Period | 20 |
| Aug. 16, 2000 | 653, Mobile, Alabama | Validity of Motion to Dispense with Business Agent | 21 |
| Aug. 17, 2000 | 147, Norfolk, Virginia | Local Union Election: Death of a Candidate | 21 |
| Feb. 5, 2001 | 400, Helena, Montana | Retired Members: Ability to File Charges | 22 |
| Feb. 15, 2001 | 302, Bothell, Washington | Eligibility to Hold Office: Working at the Trade: Assigned by Local to Perform Work in Furtherance of the Interests of Organized Labor | 22 |
| Apr. 23, 2001 | 234, Des Moines, Iowa | Eligibility for Office: Continuous Good Standing | 23 |
| July 3, 2001 | 564, Lake Jackson, Texas | Eligibility for Office: Attendance at Meetings: Good Cause Excuse | 24 |
| July 26, 2001 | 428, Phoenix, Arizona | Eligibility for Office: Continuous Good Standing: Calculation of Period | 24 |
| July 31, 2001 | 670, Ardmore, Oklahoma | Eligibility for Office: Continuous Good Standing: Withdrawal | 25 |

i

# I N D E X  (Continued)

| | Date | | Local No. and City | Issue | Page |
|---|---|---|---|---|---|
| Aug. | 29, | 2001 | 320, Florence, Alabama ............ | Local Union Election: Tie Vote .......................... | 26 |
| Jan. | 10, | 2002 | 520, Granite City, Illinois ........... | Vote on Referral Rules Incorporated in Collective Bargaining Agreement ............................... | 26 |
| Feb. | 1, | 2002 | 139, Pewaukee, Wisconsin ......... | Validity of Motion Setting Salary for Local Union Treasurer .. | 27 |
| Apr. | 10, | 2002 | 302, Bothell, Washington ........... | Contributions from Signatory Contractor/Member to Candidate for Office ................................. | 27 |
| June | 7, | 2002 | 66, Monroeville, Pennsylvania ...... | Eligibility for Office: Continuous Good Standing .......... | 28 |
| July | 31, | 2002 | 302, Bothell, Washington ........... | Eligibility for Office: Attendance at Meetings: Good Cause Excuse ...................................... | 28 |

# DECISIONS and OPINIONS of the GENERAL PRESIDENT

---

## LOCAL NO. 701

March 20, 1998

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear Sir and Brother:

I would like an interpretation on our local union members who are drawing the General Pension running for and or holding local union office. Our Local By-Laws do not allow retired members to run for or hold office if they've retired with our local trust. I would appreciate your interpretation on this matter at your earliest convenience.

Fraternally yours,
Mark Holliday
*Business Manager &
Financial Secretary
IUOE Local 701.*

---

## Decision

April 3, 1998

Mr. Mark Holliday
Business Manager
IUOE Local Union No. 701
555 E. First Street
Gladstone, OR 97027

Dear Sir and Brother:

Reference is made to your letter of March 20, 1998, asking for my opinion as to whether Local Union members who are receiving General Pension Plan benefits but are also working at the trade are eligible to run for or hold Local Union office.

Article XXIV, Subdivision 1, Section (b) of the International Constitution provides that those "retired from work at the trade" shall not be eligible for Local Union office, and also requires that those seeking office must be continuously employed at work at the trade or have been seeking such employment for the one or two year period immediately prior to nominations, depending upon the office being sought.

Where, as here, members are receiving pension benefits from the General Pension Plan but are also working at the trade, in my opinion they are not "retired from work at the trade" within the meaning of Article XXIV, Subdivision 1, Section (b) of the International Constitution. Therefore, such members would be eligible to run for Local Union office so long as they meet the other requirements for candidacy contained in the Constitution, including having been continuously employed or seeking work at the trade for the requisite period.

Fraternally yours,
Frank Hanley
*General President.*

---

## LOCAL NO. 35

May 6, 1998

Mr. Dick Griffin
General Counsel
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear Mr. Griffin:

A motion was brought before the membership at the last General Membership Meeting regarding reinstatement of two former members of the International Union of Operating Engineers, Local 35 who had been expelled from membership (per Article XXIV, Subdivision 7, Section (f) Payment and Fines) for failing to pay fines owed to the local.

The motion reads as follows: "Motion made that the union apologize to Doug Spencer and Don Ortega and invite both to rejoin the union at no cost to them and all lawsuits against the union be dropped."

The motion was ruled out of order by the Chair because the motion violated the procedures for "reinstatement of expelled members" as spelled out in the constitution under Article XXIV, Subdivision 7, Section (i).

I would appreciate hearing your opinion on whether or not the ruling of the Chair was appropriate.

Sincerely,
Ed LeClair
*Business Manager.*

---

## Decision

May 26, 1998

Mr. Ed LeClair
Business Manager
IUOE Local Union No. 35
3470 Washington Drive, Suite 159
Eagan, MN 55122

Dear Sir and Brother:

Reference is made to your letter of May 6, 1998 to General Counsel Richard Griffin which, because it calls for an interpretation of the International Constitution, has been referred to my office for response. Your letter states that a motion was made at a membership meeting to reinstate at no cost two members who had been expelled from membership for failure to pay fines, which motion was ruled out of order by the chair. You request an opinion as to whether the ruling of the chair was appropriate.

Please be advised that Article XXIV, Subdivision 7, Section (i) of the International Constitution prescribes the only proper procedure for reinstatement of expelled members. Moreover, as set forth in Robert's Rules of Order, a motion to reverse an expulsion

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

is not in order and the only way to reverse an expulsion is to follow the procedure for reinstatement set forth in the governing documents. Accordingly, in my opinion the ruling of the chair that the motion was out of order was proper and required by the International Constitution.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 520

May 29, 1998

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

Local 520 would appreciate your interpretation of Article XXIV, Subdivision 1, Section (b), as to whether or not a member must be at the meeting for nomination to office *in order to be nominated.* This question has been brought to my attention and we would appreciate an answer on this matter as soon as possible, as our nominations for office will be held June 12, 1998.

Fraternally,
DOUGLAS JAMES
*Business Manager.*

# Decision

June 8, 1998

MR. DOUGLAS JAMES
Business Manager
IUOE Local Union No. 520
520 Engineer Road
Granite City, IL 62040

DEAR SIR AND BROTHER:

Reference is made to your letter of May 29, 1998, in which you request my opinion as to whether or not a member must be in attendance at the nominating meeting in order to be nominated.

Please be advised that Article XXIV, Subdivision 1, Section (b) of the International Constitution requires that, in order for a member to be eligible for election, the member "shall have been in regular attendance at all regularly scheduled Local Union membership meetings and home district membership meetings *held after nomination and before elections,* subject, however, to a reasonable excuse based upon good cause . . ." (emphasis added). Therefore, in answer to your question, a member need not be in attendance at the meeting at which he or she is nominated in order to be eligible for election.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 428

July 22, 1998

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

As Chairman of the Election Committee and past president of Local No. 428, I am writing this letter on behalf of the full committee to seek your opinion as to the eligibility of a candidate running for the office of Business Manager and Recording-Corresponding Secretary. The Election Committee for Local 428 feels that the candidate, Charles Veazey, is not eligible based on Article XXIV, Subdivision 1, Section (b), paragraph 2, where it states, "No member shall be eligible for election, be elected, nor hold office who has not during the year, and in the case of one seeking the office of Business Manager two years, immediately prior to the month of nominations, been continuously employed at the trade, or who has not actively sought continuous employment at the trade. This restriction, however, shall not apply to any member serving or acting in any capacity for a local union or the International Union, or who has been assigned by his local union or International Union to perform work in the furtherance of the interests of organized labor."

The facts of this case are as follows: Charles Veazey, the member in question is the current elected President of the local union. However, he is not employed nor does he work for the local union in any capacity and in fact was fired by the business manager on or about October, 1996. Since then, even though his name has appeared on the out of work list, he has not attempted to seek work at the trade and has in fact turned down every job he has been called for from the local union dispatch office, which is evidenced by his work record. Since he was fired from the local union, he purchased a video store where he sells and rents movie videos to the public and has been working full time in this store for approximately the past two years.

Additionally, as stated above, he was fired as a business representative in October of 1996 and has not worked for the local union or related organizations since that time. He also has not been assigned by the local union or appointed to serve or act in any capacity for the local union or International Union to my knowledge.

The main question for our Election Committee, which is meeting today, July 22, is this: Since he has not worked at the trade in the last two years, in fact has worked outside the trade continuously during this time period, he has not worked for the local union or any related organizations or the International Union and has not been appointed or assigned by either of the above, can a person be a candidate for Business Manager or any office, by merely holding an elected position without having fulfilled any of the above constitutional requirements?

I would respectfully request that you render a decision on this very important matter as soon as possible so that our committee can make a well informed decision on this matter. If you will, please fax your decision to Local Union No. 428 at (602) 257-8674, since we need an answer in order to get the ballots to the printer and be mailed in a timely manner.

· Thank you very much for your time and assistance in this matter.

Fraternally,
MERLE E. LANGFELDT
*Election Committee Chairman.*

JANUARY 1998 THROUGH DECEMBER 2002

# Decision

July 23, 1998

MERLE E. LANGFELDT
Election Committee Chairman
IUOE Local Union No. 428
1426 North First Street
Phoenix, AZ85004

DEAR SIR AND BROTHER:

Reference is made to your July 22, 1998 letter to me, written on behalf of the Local 428 Election Committee, expressing the Committee's feeling that a candidate for Business Manager is ineligible to run for office under the provisions of Article XXIV, Subdivision 1, Section (b) and seeking my opinion with respect to the matter.

I understand from your letter that the candidate in question, Charles Veazey, currently is the President of the Local Union. I further understand from your letter that, since October 1996, Brother Veazey has turned down every referral from the Local Union hiring hall he has received and has worked outside the trade at a video store that he owns, selling and renting movie videos to the public. Moreover, you also indicate that, since October 1996, Brother Veazey has not been employed by the Local Union in any capacity, nor has he been appointed to or assigned by the Local Union to perform any work in furtherance of the interests of organized labor.

As you indicate in your letter, Article XXIV, Subdivision 1, Section (b) of the International Constitution requires, in pertinent part, that, in order to be eligible to be a candidate for Business Manager, a member must have worked at the trade or actively sought work at the trade for the two years immediately prior to the month of nominations. There is an exception to the working-at-the-trade requirement for service or action in any capacity on behalf of the Local Union or International Union. I interpret this exception to the general rule narrowly to require that the service on behalf of the Local or International must be sufficiently time consuming to preclude the member from working at the trade or actively seeking work at the trade. Under the circumstances described in your letter, where a member has been employed outside the trade for more than a year and a half and during this time has uniformly turned down referrals from the hiring hall, I agree with the feeling of your Committee that such an individual is not eligible to run for Business Manager and the mere holding of an elected office, without more, is insufficient to render him eligible.

Fraternally,

FRANK HANLEY
*General President.*

---

## LOCAL NO. 428

July 27, 1998

Mr. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

RE: ELECTION ELIGIBILITY DECISION
CHARLES VEAZEY

DEAR PRESIDENT HANLEY:

I am writing this to ask you to reverse your previous decision, in your letter dated July 23, 1998, regarding my eligibility to run for Business Manager of Local 428.

I feel you had only one sided, bias information. I also feel you should have heard both sides before making your decision, that is why I put in two telephone calls to you on July 23rd, and at least three calls to you on July 24th, all which were never returned. I

think the following information is necessary in rendering a fair decision.

I have been a loyal Union member for over 30 years, and have always been in good standing. I have served as Trust Fund Coordinator from 1983-1995. In March 1995, I was asked to fill the remaining term of the retiring President. In August, I then ran for President and was voted in for the next three years, 1995-1998. I was also employed as business agent, but was then terminated as business agent by Dennis Teel in November 1996, but that is another story in itself which has two sides. I remained in the capacity of President, and fulfilled all duties as required as President. At the time I was also serving as a trustee on the Health & Welfare Trust fund, which Mr. Teel removed me from immediately, with no explanation. I continued to serve as a trustee on the State Apprenticeship Board and a member of the Phoenix Joint Apprenticeship Committee until Mr. Teel removed me on April 17, 1997, again, with no explanation nor reason, as I always attended every meeting and fulfilled my duties.

First of all, your letter refers to October 1996, and I was not terminated as business agent and put on the out of work list until mid November 1996. In your letter you state I have turned down every referral from the hiring hall. I am enclosing a copy of my work history card from there. It shows a total of 17 entries, of which:

6 calls were noted to have just left a message to which I never received

2 calls I checked in

1 call of no response

8 job refusals

Of the job refusals, two were turned down because the companies involved were in financial trouble and were not paying benefits to the Trust Fund. One job was turned down because it involved working over 100 feet in the air, and I am scared of heights. The other five were turned down, over the distance of the jobs or the short duration of the jobs, which is my discretion as a Union member in good standing. As you can note, the months of Dec. 1996, Feb., June, July, Sept., Oct., Nov., and Dec. 1997, Feb., March, and July 1998, there were no job offers. So the reference to my working at my wife's and my video store, which is our own personal affair, was because I was not offered any jobs with any substance.

Article XXIV, Subdivision 1, Section (b) of the International Constitution states, the restriction, that I needed to be continuously employed at the trade for two years previous, does not apply to any member serving or acting in any capacity for the Local Union, which I am doing, as President. I have been actively involved in any aspect of the Union as President, as much as I was allowed to be by Mr. Teel. It does not state that that service had to be time consuming to prevent me from seeking work at the trade. You are interpreting something that is not even written or referred to.

After reviewing these facts, I am hoping you will reverse your decision to the election committee and allow me to run for Business Manager of Local 428. The members of this Local deserve a fair and democratic election process.

Sincerely,

CHARLES V. VEAZEY
*President Local 428.*

---

3

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

# Decision

July 28, 1998

MR. CHARLES V. VEAZEY
5231 N. Tuthill Road
Litchfield Park, AZ 85340

DEAR SIR AND BROTHER:

Reference is made to your July 27, 1998 letter, in which you take issue with my July 23, 1998 letter written in response to a request from the Local 428 Election Committee. Merle E. Langfeldt, the Chairman of the Local 428 Election Committee, had written to me expressing the Election Committee's feeling that you were ineligible to run for the office of Business Manager under the provisions of Article XXIV, Subdivision 1, Section (b) of the International Constitution because you had not been working at the trade or actively seeking work at the trade for the relevant period of time. Brother Langfeldt, on behalf of the Election Committee, sought my opinion concerning the matter and, based on the facts contained in his letter, I concurred with the Election Committee's view that you are ineligible.

In your letter, you indicate that you feel I did not have all of the facts before I answered the Election Committee. You indicate that, while you have not worked at the trade since late in 1996, there are explanations for your turning down the eight referrals you agree you received from the Local Union. These explanations are: two of the companies involved were delinquent in their contribution obligations to the Local's trust funds; one of the referrals required working 100 feet off the ground and you are afraid of heights; and the remaining five jobs required travel or were of short duration. You further indicate that, during this time, you worked in your and your wife's video store because you were not offered jobs of any substance. On a final note, you contend that the Constitution's working-at-the-trade requirement should not apply to you because of your service as President of the Local Union.

Please be advised that, in my opinion, the information you have provided further supports the Election Committee's view that you are ineligible to be a candidate for Business Manager in the upcoming Local Union election. You indicate that you have in fact not worked at the trade for a major portion of the two years immediately preceding the month of nominations. While your name has been on the out-of-work list, you confirm that you have rejected a number of referrals from the Local Union. Article XXIV, Subdivision 1, Section (b) requires work at the trade or the *active* seeking of work at the trade. In my opinion, a member who rejects eight (8) referrals over a one-and-a-half year period can not be accurately characterized as actively seeking work at the trade, particularly where, as here, during this time the member is actually working outside the trade.

With respect to your service as President of the Local Union, as I indicated in my July 23 letter, the International Constitution provides an exception to the working-at-the-trade requirement for service on behalf of the Local Union or the International Union. You question my interpretation that this provision applies to work on behalf of the Local or International that is sufficiently time consuming to preclude the member from working at the trade or actively seeking work at the trade. My interpretation of this exception is derived from the Law Committee's report to the 1984 General Convention which adopted the language in question. In its report, the Law Committee stated that: "At the same time, however, your committee would not want such a restriction to apply to members who may not have been working at the trade during the specified time periods, but were *working* for the local or International Union; or *working* on an assignment from the local or International in furtherance of the interests of organized labor." (Emphasis added). The Committee's emphasis on "working" indicates that it contemplated the exception to apply to members engaged in employment by the Local or International, which employment precluded the opportunity to engage in work at the trade. Service as an elected officer, without more, is therefore in-

sufficient to trigger the exception. Under the above-outlined circumstances, I continue to concur with the Election Committee's view that you are ineligible to run for Business Manager.

Fraternally,

FRANK HANLEY
*General President.*

---

## LOCAL NO. 925

August 1, 1998

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

In reference to the International Constitution, Article XXIV, Subdivision 1, Section (b), a member running for office "shall have been in regular attendance at all regularly scheduled Local Union membership meetings and home district membership meetings held after nomination and before elections, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family."

We have an election coming up August 28, 1998. Two candidates missed the regularly scheduled meeting 7/31/98. One wanted to spend time with his family which I deemed not a reasonable excuse and disqualified him as a candidate. The other situation is more complex. This candidate was working crane rental and did not get back to the shop with his crane until 8:30 p.m. He was approximately 35 minutes from our meeting hall at that time. Our meeting started at 7:00 p.m. and did not conclude until approximately 9:40 p.m. He did not feel he could make it to the meeting and decided to go home. Should he be disqualified from running for office?

I would appreciate your consideration in rendering a decision at your earliest convenience. To expedite your decision, please fax (813) 623-1381. Thank you.

Fraternally yours,

DAVID A. VARNUM
*President.*

---

# Decision

August 11, 1998

MR. WILLIAM R. PIPER, III
Business Manager
IUOE Local Union No. 925
10201 East Hillsborough Avenue
P.O. Box 398
Mango, FL 33550

DEAR SIR AND BROTHER:

Reference is made to a letter dated August 1, 1998 from Local Union President David Varnum, requesting my opinion as to the eligibility of two candidates who apparently did not attend the July 31 membership meeting and the reasonableness of their excuses for their absences.

Please be advised that Article XXIV, Subdivision 1, Section (b) of the International Constitution requires in pertinent part that candidates for Local Union office "shall have been in regular attendance at all regularly scheduled Local Union membership

meetings and home district membership meetings held after nomination and before elections, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family." The Local Union's Election Committee has the responsibility in the first instance to review candidate eligibility, including evaluating whether a candidate's reason for missing a required meeting constitutes a reasonable excuse of the type described in the International Constitution.

Turning to the first excuse referenced in President Varnum's letter, in my opinion, a candidate's wish to spend time with family, without more, ordinarily would not constitute "reasonable excuse based upon good cause" for missing a required meeting. With respect to the second excuse, prior decisions of the General President have recognized that a candidate's conflicting work assignment may constitute good cause excusing an absence from a required meeting, depending on circumstances such as a work assignment at a considerable distance from the meeting. It is for the Election Committee to make a determination on eligibility, applying the principles above to the particular factual situations before it.

Fraternally yours,
FRANK HANLEY
*General President.*

---

### LOCAL NO. 653

September 3, 1998

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

This is a request for an interpretation of the constitution in regards to eligibility for office of Auditor. Local 653 had four (4) members nominated at the June nomination meeting. The Election committee met after the July meeting to determine eligibility before the August election. Of the four, one member attended the July meeting, one was ineligible due to not being active the previous year, the other two missed the July meeting. The question is, would the two that missed the July meeting be eligible for office since there were only three nominated that met requirements, other than attendance of the meeting between nomination and election. Are the two that missed the meeting, to be elected by directed vote or would those two offices be filled by appointment of the Executive Board?

Please give Local 653 an answer as soon as possible since the newly elected officers will be sworn in Friday, Sept. 11, 1998.

Fraternally yours,
J. BARNEY LUSK
*Recording Corresponding
Secretary
IUOE Local 653.*

---

# Decision

September 4, 1998

MR. LARRY W. FINCHER
Business Manager
IUOE Local Union No. 653
801 Spring Hill Avenue
Mobile, AL 36602

DEAR SIR AND BROTHER:

Reference is made to the letter dated September 3, 1998 from the Recording Corresponding Secretary of IUOE Local 653, requesting my opinion as to the proper procedure to follow where three of the four members nominated for the three auditor positions have been declared ineligible, one by virtue of his having been inactive the previous year and two for having missed the July membership meeting. Specifically, the letter asks whether the two who missed the meeting may be elected in any event or whether those two offices should be filled by appointment by the Executive Board.

Please be advised that Article XXIV, Subdivision 1, Section (b) of the International Constitution provides that, in order to be eligible for election, nominees must be "in regular attendance at all regularly scheduled Local Union membership meetings and home district membership meetings held after nomination and before election, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family." Where nominees are found to be ineligible for election under the above provision, the Local Union's officers are not Constitutionally empowered to fill the positions pursuant to Article XXIV, Subdivision 1, Section (f) of the International Constitution. That provision is applicable only where a vacancy occurs in an unexpired term, such as upon the death or resignation of a duly-elected officer during his term. The provision has no applicability here, where the condition existing is one of an expired term.

In the circumstances present here, the proper course is for the Local Union to hold a special election of the membership to fill the vacant positions, wherein nominations for the offices are re-opened following appropriate notice.

Fraternally yours,
FRANK HANLEY
*General President.*

---

### LOCAL NO. 653

September 23, 1998

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

This is a request for an opinion of action taken at the September 11, 1998 meeting of IUOE Local 653.

A protest, filed by Harold Welborn, of the August 14, 1998 election was to be heard by the Executive Board at the September meeting, there was no Executive Board meeting due to a lack of a quorum. The protest was then heard before the general membership, which up-held the protest. (Attachment #1).

The following is a history of events leading to this: On June 12, 1998 Local 653 held nominations. (Minutes of meeting attached—Attachment #2). The election committee and President met July 12, 1998 and ruled Mr. Welborn ineligible due to not having worked at the trade for previous two (2) years. (Attachment #3). Mr. Welborn worked from approximately March 1996 until May 19, 1997 for Layher Scaffolding, a non-signatory company as a

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

Safety Man, turning down several short term jobs from the Union as not being long enough in duration. From May 19, 1997 until April 1998, he worked through the Local Union. On April 17, 1998 Mr. Welborn took a voluntary termination from a signatory contractor to again go to work as a Safety Man for Cowboy Scaffolding, another non-signatory company.

Mr. Welborn appealed this disqualification, it was heard at a special called Executive Board meeting August 2, 1998, the Board up-held his appeal. (Minutes of meeting attached—Attachment #4).

The election was held August 14, 1998. The vote totals were: Ballots cast at the Union hall by voting machine, Harold Welborn - 32, Larry Fincher - 53. Absentee Ballots cast were, Harold Welborn - 1, Larry Fincher - 23. For the following totals, Welborn 33 - Fincher 76.

I am therefore asking, should the election for Business Manager be conducted again as called for in the September 11, 1998 meeting and would Mr. Harold Welborn be eligible to run for the office of Business Manager.

Thanking you in advance.

Fraternally,

LARRY W. FINCHER
*Business Manager.*

(Attachments not reprinted)

---

## Decision

October 7, 1998

MR. LARRY W. FINCHER
Business Manager
IUOE Local Union No. 653
801 Springhill Avenue
Mobile, AL 36602

DEAR SIR AND BROTHER:

Reference is made to your September 23, 1998 letter to me concerning a motion made, seconded, and carried at the September 11, 1998 Local 653 monthly membership meeting to have a mail-in revote of the Local's recently conducted election for Business Manager. I understand from your letter that the defeated candidate for Business Manager, Brother Harold Welborn, had previously filed a protest concerning the conduct of the election, that his protest was unable to be heard at the Local's September Executive Board meeting because of a lack of a quorum, and that the membership meeting vote to rerun the election by mail ballot came after the Executive Board's inability to meet.

Please be advised that the action of the membership at the September meeting is null and void because the motion to revote the election was out of order given that the matter had already been properly referred to the Local's Executive Board. Brother Welborn's election protest should be heard at the next meeting of the Local's Executive Board, either at a regular meeting or a special meeting called for such purpose, at which each side should be given the opportunity to present evidence supporting its position. The action of the Executive Board on the protest will then be subject to review by the International Union's General Executive Board if any appeal is filed pursuant to Article XXIV, Subdivision 1, Section (g) and Article XVII of the International Constitution.

Fraternally,

FRANK HANLEY
*General President.*

---

## LOCAL NO. 324

October 29, 1998

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

I am in receipt of a challenge by the Operating Engineers employed at the Stoneco Inc., Maybee, Michigan Plant, regarding the appointment of a Union Steward.

If you could please refer this to Legal Counsel for their determination on a Business Manager's authority to appoint Union Stewards for any company which we represent their employees through our membership. Please be advised that on page 9, Section 3 (b) of the International Union of Operating Engineers Local 324 By-Laws it states:

The Business Manager is authorized to employ and terminate all business representatives and assistants, and be responsible to the membership for their supervision and direction and the capable performances of their duties. He shall set the rate of pay of his assistants with approval of the Local Union.

Fraternally,

SAM T. HART
*Business Manager and
General Vice President.*

---

## Decision

November 12, 1998

MR. SAM T. HART
Business Manager
IUOE Local Union No. 324
37450 Schoolcraft, Suite 110
Livonia, MI 48150

DEAR SIR AND BROTHER:

Reference is made to your letter of October 29, 1998, in which you indicate that a question has arisen as to the authority of the Business Manager of Local 324 to appoint a union steward at a particular facility and request my opinion on the question.

Please be advised that Article XXIV, Subdivision 1, Section (a) of the International Constitution gives to the Business Manager, as chief executive officer of the Local Union, the authority to "appoint any and all representatives, agents and assistants . . ." Under longstanding prior interpretations of the Constitution, this provision vests in the Business Manager the exclusive authority to appoint stewards, since they act as agents of the Local Union. The authority of the Business Manager under the Constitution is also repeated in the Local's bylaws. Accordingly, in my opinion there is no question that the Business Manager of Local 324 has the exclusive authority to appoint the steward in question.

Fraternally yours,

FRANK HANLEY
*General President.*

## LOCAL NO. 70

March 9, 1999

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear Sir and Brother:

I would like to request an interpretation of the International's Constitution under Article XXIV, Subdivision 1, Section (b).

Our Vice President, James Nash, retired from Lockheed Martin Tactical Defense Systems in January 1998. Brother Nash is sixty-three years of age, and to the best of my knowledge is currently receiving retirement benefits from his Employer.

Until further clarification of the above mentioned clause, Brother Nash is unwilling to resign his office.

My interpretation of the Constitution is that no member who is retired and is no longer working at the trade may hold office.

I look forward to your response.

Fraternally,
Dick Lally
*Business Manager.*

---

# Decision

March 12, 1999

Mr. Richard Lally
Business Manager
IUOE Local Union No. 70
2417 Larpenteur Avenue West
St. Paul, MN 55113

Dear Sir and Brother:

Reference is made to IUOE Local Union No. 70's recent letter requesting an interpretation of the International Constitution concerning the Local Union's Vice President, who has, since his election to office, retired from employment.

Pursuant to Article XXIV, Subdivision 1, Section (b) of the International Constitution, retirees on pension, who are not actively seeking continuous work at the trade, may not continue to hold Local Union office subsequent to retirement from work at the trade. Accordingly, the position of Vice President should be declared vacant and the vacancy filled in accordance with the provisions of Article XXIV, Subdivision 1, Section (f) of the International Constitution.

Fraternally yours,
Frank Hanley
*General President.*

## LOCAL NO. 400

May 13, 1999

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear President Hanley:

The IUOE, Local 400 Election Committee would request that you render a decision with regard to Article XXIV, Subdivision 1, Section (b) of the International Constitution. Local 400 currently has a member who is disabled and paying disability dues, therefore she has not been continuously employed at the trade nor has she actively sought employment at the trade. She has been nominated for a position on the Executive Board for Local 400.

The member's disability started in September of 1995 and continued until March of 1996 at which time the member returned to active status, and stayed active until September of 1996. During September of 1996 the member returned to disabled status and has remained on disabled status to the present time. The member has not been continuously employed at the trade since July of 1995 and has not actively sought continuous employment at the trade since August of 1996. Have there been any exemptions of Article XXIV, Subdivision 1, Section (b) of the Constitution because of disability in the past or should there be in this case?

The office of Labor-Management Standards has indicated that short terms of disability should not disqualify a person from being eligible to run for office. However they do question the length of disability in this case, and would also question whether or not the individual would be able to return to work in the near future. At this time we don't know the answer to the latter question. The OLMS also indicates that working or seeking work at the trade is a reasonable qualification for being eligible to run for Union office. To this point this member does meet all other qualifications for being nominated to hold office. The Election Committee has declared her eligible to run for office pending your decision on this issue.

We would greatly appreciate an expedited answer to this question. The Election Committee's next meeting is scheduled for June 3, 1999. Thank you for your time and consideration in this matter. If you have any questions or need additional information please contact me at (406) 442-9597.

Fraternally,
John C. Caldwell
*Business Manager.*

---

# Decision

May 27, 1999

Mr. John C. Caldwell
Business Manager
IUOE Local Union No. 400
2737 Airport Road
Helena, MT 59601

Dear Sir and Brother:

Reference is made to your letter of May 13, 1999, in which you request my opinion as to whether a member is eligible for office who has been on disabled status since September 1996. As I understand it, the member has not been employed at the trade since July 1995 and has not been on the referral list since August 1996. It appears that the member will not be able to return to work at the trade for the foreseeable future.

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

Please be advised that Article XXIV, Subdivision 1, Section (b) of the International Constitution provides that no member shall be eligible for office who has not during the year, or in the case of one seeking the office of Business Manager two years, immediately prior to the month of nominations, been continuously employed at the trade or who has not actively sought continuous employment at the trade. There is no explicit disability exception from this requirement. In my opinion, while a short-term disability or leave of absence may not render a member ineligible to run for office under the above-quoted provision, a long-term disability of the many-year duration here, which has entirely precluded the member from working or seeking work at the trade, renders the member ineligible to run for office.

Fraternally,
FRANK HANLEY
*General President.*

---

## LOCAL NO. 612

May 27, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

Your help is needed in resolving a serious problem that exists in Local 612 in regards to Good Standing.

First, per IUOE Constitution; Good Standing defined with relation to Dues, Article XXIV, Subdivision 7, Section C states "No member shall be in good standing unless he has paid all current dues to the Local union within thirty (30) days after they shall have become due and payable. No member whose dues have been withheld by his employer for payment to the Local Union, pursuant to his voluntary authorization provided for in a collective bargaining agreement, shall be declared ineligible to vote or be a candidate for office in the Local Union solely by reason of alleged delay or default in the payment of dues."

Second, Good Standing required of Officers Article XVI, Section 6 states, "No person shall become or remain President, Vice President, Secretary, Treasurer, Business Manager, Business Agent or other officer or representative of any Local Union unless he is a member thereof in good standing. In the event such person shall cease to be a member in good standing or holds a withdrawal card, he shall be disqualified from further serving in such official capacity and the exercise by him of all rights, powers, privileges, authority and duties connected with his office shall automatically be revoked and cease."

The problem is as follows: IUOE Local 612 has not received a Dues payment from President William Henry for April 1999 Monthly Dues within thirty (30) days after they shall become due and payable.

Our next Local 612 Executive Board meeting is scheduled prior to our Semi-Annual meeting, for June 5, 1999 at 11:00 a.m.

Additionally, I am enclosing a copy of the minutes of our regularly scheduled monthly Executive Board Meeting held on May 17, 1999.

As the minutes reflect the Executive Board meeting was called to order by President William Henry. I (Howins) called a point of order regarding Henry being able to chair a meeting as president when he was not currently in Good Standing per IUOE Constitution. I explained to the entire Executive Board (Henry was present) that IUOE Local 612 has not received a dues payment from Henry for April 1999 monthly dues as of May 17, 1999. I distributed copies of Article XVI, Section 6—Good Standing Required of Officers in the IUOE Constitution. The discussion that followed

was without order and the meeting was adjourned as the minutes reflect.

Regular scheduled Executive Board meetings take place prior to the regular scheduled District I Monthly Meeting in Tacoma. Henry and two other Executive Board Members (Anderson & Goodwin) left and did not attend the District meeting. After the District meeting, a Special Meeting of the Executive Board was called by Financial Secretary Howins, Recording Corresponding Secretary Burnett and Vice President Evans to discuss Article XVI, Section 6 of the IUOE Constitution. The minutes reflect our concurrence with IUOE Constitution. Our question is to whether we are correct in interpretation and ask your concurrence in this matter.

I wish to re-iterate Henry was present at the May 17, 1999 Executive Board Meeting and was notified that Henry's Dues for April 1999 had not been received by Local 612 as of 5/17/99. In addition, Local 612 did receive a three-month payment for regular dues ($60.00) but did not receive payment until 5/25/99.

The majority of Officers of the IUOE Local 612 Executive Board believes that Article XVI, Section 6 of the IUOE Constitution is very clear and precise as it relates to Good Standing of Officers and William Henry should be removed from the Office of President of Local 612. The Executive Board requests the concurrence of your office as to whether our interpretation of Article XVI, Section 6 is correct.

Good Standing is a very important issue to the Officers and members of IUOE Local 612 especially in determining eligibility of candidates for Local Union Elections. Local 612 Election Committees have used the dues payment on the date when received by the Local Union to determine Good Standing, i.e., (No more than 30 days after they became due). I trust you concur with our Local 612 Executive Board and agree with our interpretation of Article XVI, Section 6 that this action is automatic.

Your timely response will be greatly appreciated.

Fraternally yours,
GORDON P. HOWINS
*Business Manager &*
*Financial Secretary.*

---

# Decision

June 4, 1999

GORDON HOWINS
Business Manager
IUOE Local Union No. 612
1555 So. Fawcett Avenue
Tacoma, WA 98402

DEAR SIR AND BROTHER:

Reference is made to your May 27, 1999 letter to me in which you raise the question of whether an officer who has failed to pay his dues in a timely manner must be removed from office. You point out that Article XXIV, Subdivision 7, Section (c) of the International Constitution provides that, in order to be considered in good standing with respect to dues, a member must have paid all current dues to the Local Union within thirty days of when the dues have become due and payable. You further reference Article XVI, Section 6 which states: "No person shall become or remain President, Vice President, Secretary, Treasurer, Business Manager, Business Agent or other officer or representative of any Local Union unless he is a member thereof in good standing. In the event that such person shall cease to be a member in good standing or holds a withdrawal card, he shall be disqualified from further serving in such official capacity and the exercise by him of

8

all rights, powers, privileges, authority and duties connected with his office shall automatically be revoked and cease." You indicate that the April 1999 dues of the President of Local 612 were not received until May 25, 1999, and state that the Executive Board of Local 612 believes that, in light of these constitutional provisions and on these facts, the President should be removed from office. The Executive Board seeks my concurrence with this determination.

The language of Article XVI, Section 6 certainly supports the proposition that an officer who is more than 30 days delinquent in his dues is automatically disqualified from continuing service in his office. Because of the harsh results this provision has in displacing democratically elected officers, before such a result is reached it is necessary for the Local to assure that the officer was on notice of the delinquency and that the disqualification remedy was (and had been) uniformly applied to all officers who were delinquent. Such determinations with respect to notice and uniformity must be made in the first instance by the Local Union. Moreover, I understand that in this instance the President contends that a prior check for his dues had been mailed in a timely manner, but that this earlier check was somehow intercepted and destroyed. It thus appears that the President is raising a factual issue as to whether his dues were received by the Local Union in a timely manner, which dispute should also be resolved in the first instance by the Local Union when it makes its decision whether to disqualify him from continuing service in his office based on the provisions of Article XVI, Section 6.

> Fraternally yours,
> FRANK HANLEY
> *General President.*

---

## LOCAL NO. 470

June 1, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

I am presently serving as Chairman of Local 470 Election Committee. A question arose concerning the requirement of holding a parent body book, being a necessary requirement for eligibility to hold or run for office on the Local's Executive Board.

Upon reviewing Article XIV, Section 5, page 40 and 41 of the IUOE Constitution, the Bylaws Committee has asked for a clear interpretation we find this article confusing the last paragraph seems to contradict the first. We respectfully await your decision.

> Fraternally,
> RANDALL D. TEAL
> *Chairman of*
> *Election Committee.*

---

# Decision

June 10, 1999

RANDALL D. TEAL
Chairman, Election Committee
IUOE Local Union No. 470
227 Park Avenue, S.E.
P.O. Box 2462
Aiken, SC 29802

DEAR SIR AND BROTHER:

Reference is made to your June 1, 1999 letter to me asking whether it is necessary to hold a parent body book in order to be eligible to hold or run for office on Local Union No. 470's Executive Board. Please be advised that the final paragraph of Article XIV, Section 5 of the International Constitution provides:

Any member initiated into a Junior and Assistant Engineers' Subdivision or a Branch Engineers' Subdivision whose membership therein continues for two consecutive years immediately prior to election shall be eligible, whether or not he has transferred into the parent Local Union, for nomination and election to office in the parent Local Union if he is otherwise qualified under the provisions of the International Constitution.

Thus, a member who has been in a Local Union subdivision for two consecutive years immediately prior to the election is eligible to hold or run for office if the member meets the other qualifications for Local Union office contained in the International Constitution. The only exception to this rule is that members of Registered Apprentice (RA) Subdivisions are not eligible to run for or hold Local Union office.

> Fraternally yours,
> FRANK HANLEY
> *General President.*

---

## LOCAL NO. 302

June 8, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

Local 302 is holding an election of officers this year. We have held our first District meeting accepting nominations wherein a member who is currently a signatory employer was nominated and nominated others for office. Is an employer/member eligible to run for office or nominate other members?

The name of the company is Mayfield Hoisting Service, Inc. Taylor Mayfield, Jr. is the owner of the company and has 11 Operating Engineers employed at this time.

Please let me know as soon as possible so that I may notify him within the time constraints of the Constitution and our Bylaws. Thank you.

> Fraternally,
> JACK JAKUBIEC
> *Recording Corresponding*
> *Financial Secretary.*

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

# Decision

June 11, 1999

MR. CLYDE WILSON
Business Manager
IUOE Local Union No. 302
18701 120th Avenue, N.E.
Bothell, WA 98011

DEAR SIR AND BROTHER:

Reference is made to a letter from the Recording-Corresponding and Financial Secretary of Local 302, requesting my opinion as to whether a member who owns a signatory employer employing 11 operating engineers is eligible to run for Local Union office or to nominate other members for Local Union office.

Please be advised that regulations of the U.S. Department of Labor specifically note that the Labor Management Relations Act makes it an unfair labor practice for any employer to dominate or interfere with the administration of any labor organization and prohibits an employer or contractor from being a candidate or holding Local Union office. An employer or contractor would similarly interfere with a labor organization if permitted to nominate members for Local Union office. Accordingly, in my opinion, the individual in question—a signatory contractor who employs operating engineers—is ineligible to run for office or to nominate other members for office. In order to run for office, those members nominated by the contractor should be nominated by another member at a remaining meeting.

Fraternally yours,
FRANK HANLEY
*General President.*

---

### LOCAL NO. 571

June 16, 1999

RICHARD GRIFFIN
General Counsel
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

Local No. 571 is in the process of determining eligibility of nominees for office for our August 1999 mail referendum ballot election. A question was raised as to whether or not a faxed letter of acceptance with the name typed instead of being in handwriting would legally qualify.

Please advise on this matter so our Election Committee can take appropriate action.

Fraternally,
EUGENE L. GILSON
*Chairman*
*Election Committee.*

---

# Decision

June 28, 1999

EUGENE L. GILSON
Chairman, Election Committee
IUOE Local Union No. 571
4660 South 60th Avenue
Omaha, NE 68117-1205

DEAR SIR AND BROTHER:

Reference is made to a letter from you, dated June 16, 1999, to IUOE General Counsel Richard Griffin. Since your letter sought an interpretation of a provision of the International Constitution, it has been forwarded to my office for a reply. You asked whether a faxed letter of acceptance with the name typed instead of being in handwriting would qualify as an acceptance of nomination by a candidate for office under the requirements of Article XXIV, Subdivision 1, Section (b) of the International Constitution. Please be advised that a faxed acceptance of nomination with a typed-in name is acceptable.

In a separate June 16 letter to General Counsel Griffin, you asked whether there had been any changes in the International Constitution involving Local Union elections since the last Convention and also requested two copies of the most recent Constitution. Please be advised that none of the changes to the Constitution enacted at the 1998 Convention involved elections for Local Union officers. Article III, Section 3 of the Constitution was revised to specify qualifications for candidates for the position of delegate to the Convention. I am also enclosing two copies of the most recent Constitution.

Fraternally yours,
FRANK HANLEY
*General President.*

---

### LOCAL NO. 400

July 6, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR PRESIDENT HANLEY:

As President of Operating Engineers Local 400, I am asking the International Union to determine whether Frank Foot is eligible to run for office in the Local 400 election.

Frank Foot is retired as a stationary engineer from Flathead County and is currently collecting a pension that was negotiated by Local 400.

Frank Foot has been paying retiree dues since July, 1997. This clearly shows Frank Foot considers himself a retired member of Local 400. It also shows that the local union recognizes Frank Foot as being retired.

Under the International by-laws, retired members are not allowed to run for office in their local union. Thus, it is the opinion of myself and many hoisting and portable members that Frank Foot should not be allowed to run for an elected office in his local union.

I would appreciate the International Union informing Local 400 Election Committee as to whether Frank Foot is eligible to run for office in Local 400.

Since the ballots will be mailed out next month, I would appreciate a response from the International Union as soon as possible.

Sincerely yours,

JIM KEANE

*President Local 400.*

———

# Decision

July 9, 1999

JOHN C. CALDWELL
Business Manager
IUOE Local Union No. 400
2737 Airport Road
Helena, MT 59601

DEAR SIR AND BROTHER:

Reference is made to a July 6, 1999 letter to me from Local 400 President Jim Keane asking for a determination as to whether Brother Frank Foot is eligible to run for office in Local 400. Ordinarily, eligibility determinations with respect to candidates for Local Union office are left, in the first instance, to the Local Union Election Committee. However, because Brother Foot's situation has caused a number of inquiries to be made to various offices of the International Union and because there is a relevant prior history with which I am familiar, I am setting out here my definitive views on this question.

Brother Foot's situation was informally brought to my attention some time ago, when he was serving as an Executive Board member from Local 400's District #6. At that time, Brother Foot was receiving his county pension and was contemplating taking his Central Pension Fund (CPF) pension. Your office asked whether, if he took his CPF pension and ceased working at the trade or actively seeking work at the trade, Brother Foot would be eligible to continue in office as an Executive Board member. Your office was orally advised at that time that, if Brother Foot took his CPF pension and retired from work at the trade, he would be ineligible to continue in office under the provisions of Article XXIV, Subdivision 1, Section (b) of the International Constitution. You then subsequently advised that Brother Foot had decided not to take his CPF pension and had put his name on the out-of-work list, thereby actively seeking work at the trade. Under these circumstances, you were advised, again orally, that Brother Foot's continuation in office was appropriate under the International Constitution.

Recently, Brother Foot was nominated for the office of President of Local 400. The International Union received a number of telephone calls inquiring about Brother Foot's eligibility, and I have now received Brother Keane's letter raising this same question. In his letter, Brother Keane emphasizes that Brother Foot has been receiving his pension from Flathead County and is paying retiree dues. While these matters make this a close question, it is my understanding that Brother Foot is actively seeking work at the trade by keeping his name on the out-of-work list and that, under the Local Union's established practice, he will cease paying the lower dues rate at the point that he is referred out to work. Under these circumstances and in light of the prior advice with respect to Brother Foot's continuing in office, my decision and opinion is that Brother Foot is eligible to run for office.

This situation is similar to a number of others that have arisen over the past several years where an officer or nominated candidate for office is receiving a pension, but at the same time is working at the trade or actively seeking work at the trade. These situations come up because it is possible to receive certain types of pension (such as a single employer pension, a public pension or a military pension) and still work at the trade or actively seek work at the trade. My office has consistently drawn a distinction between these types of situations—where I have ruled the person eligible to run for, or continue in, office—and those situations where the person at issue has clearly completely retired (as demonstrated, for example, by the individual's receipt of a type of pension—such as one from the CPF—that would be suspended if the person were to return to work at the trade), where I have found the person ineligible to run for, or continue in, office.

I trust the above discussion fully addresses the question of Brother Foot's eligibility.

Fraternally,

FRANK HANLEY

*General President.*

———

## LOCAL NO. 103

August 5, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

RE: LOCAL UNION NO. 103
1999 ELECTION OF OFFICERS

DEAR MR. HANLEY:

As has been the case in prior officer elections of Local Union No. 103, our office has been asked by the Business Manager and Executive Board to handle and supervise the election for them. It has just come to my attention that two (2) candidates for office have issued campaign literature that has the logo and emblem of the International Union of Operating Engineers in the background or on the literature. Along with this letter that I am faxing to you, I am also faxing a copy of both pieces of campaign literature. I am sending this to you in light of your October 23, 1998 letter addressed to all Business Managers relating to unauthorized use of the logo or emblem of the International Union of Operating Engineers.

Basically, my main question is whether or not the International Union has a policy or position as to whether or not a candidate for Local Union office may use the emblem of the International Union on his or her campaign literature. In addition, if it is permitted by the International Union, then, my second question is whether or not a candidate wishing to use the logo needs to request permission from someone at the International Union before using the logo in campaign literature. The urgency of this request is highlighted by the fact that we intend to mail out the ballots for the Local No. 103 election tomorrow, August 6, and I am aware of two (2) requests by candidates for assistance from the Local Union in mailing out campaign literature. I obviously am not aware as to whether or not either candidate intends to use the International Union logo on his campaign literature that will be mailed to the membership, but in the event such is the case, what should our office do to protect the integrity of the election in accordance with the rules and procedures of the International Union.

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

In summary, I would like to know the position of the International Union with respect to this issue so I can inform the candidates of what is expected of them. Then, if a candidate wants to do something that is not in accord with the position of the International Union, what should be the position of the Local Union. I am aware of the position of the Department of Labor that a Union may not censor or require a candidate to let the Local Union read campaign literature before it is mailed to the membership.

Thank you in advance for your cooperation with our office and the Local Union Executive Board in this matter.

Very truly yours,
EDWARD J. FILLENWARTH, JR.
*Fillenwarth Dennerline*
*Groth & Towe.*

————————

# Decision

August 9, 1999

EDWARD J. FILLENWARTH JR., ESQ.
Fillenwarth Dennerline Groth & Towe
1213 N. Arlington Avenue, Suite 204
Indianapolis, IN 46219

DEAR MR. FILLENWARTH:

Reference is made to your letter of August 5, 1999 concerning the propriety of the use of the official emblem of the International Union of Operating Engineers in the campaign literature of candidates for Local Union office.

The official emblem of the IUOE is a registered trademark and is the exclusive property of this International Union. Article II, Section 3 of the International Constitution prohibits the use of any facsimile of the emblem except such as are supplied by the General Secretary-Treasurer. This prohibition is especially applicable to candidates for Local Union office inasmuch as use of the emblem creates the appearance of official union support for the candidate employing its use.

Please advise all candidates of this prohibition forthwith.

Sincerely,
FRANK HANLEY
*General President.*

## LOCAL NO. 571

August 31, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

The Election Committee sent out a total of 515 ballots on August 4, 1999 with a closing date of August 24, 1999.

The ballot box was picked up August 30, 1999 at 6:00 p.m. by three members of the Committee and counted by the entire Committee with one teller from Dean Hightree's selection.

Enclosed is a copy of our minutes.

Fraternally yours,
EUGENE L. GILSON
*Chairman*
*Election Committee.*

(Attached election tally reflecting tie vote not reprinted)

————————

# Decision

August 31, 1999

MR. EUGENE L. GILSON
Chairman, Election Committee
IUOE Local Union No. 571
4660 South 60th Avenue
Omaha, NE 68117

DEAR SIR AND BROTHER:

Reference is made to your facsimile earlier today advising that your Election Committee had counted the ballots in the election for Business Manager of IUOE Local Union No. 571 and that there was a tie between candidate Eugene Lewis and Dean Hightree. In order to resolve this tie, the Local Union is directed to hold a run-off election for the office of Business Manager as soon as possible, with the names of the two candidates who were tied in the regular election on the run-off ballot. The run-off election should be held in the same manner as the regular election with notice to all members informing them of the procedures for the conduct of the election.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 400

August 31, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR MR. HANLEY:

We are soliciting the opinion of your office regarding vacancies on the Executive Board of Local 400. Upon completion of our recent election, Local 400 has two District Executive Board seats and one Trustee position vacant due to the fact that there were no eligible nominees. It is our understanding that an election must be run for these open seats. Please advise this office on the proper course of action.

We thank you for your time and consideration of this issue. If you have any questions or require additional information or documentation, please contact this office.

Sincerely,
JOHN C. CALDWELL
*Business Manager.*

---

# Decision

September 3, 1999

MR. JOHN C. CALDWELL
Business Manager
IUOE Local Union No. 400
2737 Airport Road
Helena, MT 59601

DEAR SIR AND BROTHER:

Reference is made to your letter of August 31, 1999, in which you advise that upon completion of the recent Local 400 election of officers, there were three positions open due to the lack of any eligible nominees. You request advice as to the proper course to fill the open positions.

Please be advised that, pursuant to longstanding decisions and opinions of the General President, the proper course in the circumstances you describe is to hold a special election of the membership to fill the position. The Local Union's line officers are not constitutionally empowered to fill the positions under Article XXIV, Subdivision 1, Section (f) of the International Constitution, since the condition existing is one of expired terms, not vacancies during a term of office.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 30

August 31, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR PRESIDENT HANLEY:

Enclosed is a letter from brother L. Treacy proporting to protest the filling of line board officer vacancies.

I am writing to ask your opinion concerning the following questions:

1. Do protest provisions of Article XXIV, Subdivision 1, Section (g) of the International Constitution apply to the filling of vacancies?

2. Is there any validity to the challenge of the procedure followed in either the prospective resignation of brothers Hach and Ahern or the filling of the resultant vacancies by the incumbent officers?

Thank you for your opinion and any further advice you may wish to offer.

Fraternally yours,
JAMES GANNON
*Recording and Corresponding Secretary.*

---

August 24, 1999

MR. JAMES GANNON
Recording-Corresponding Secretary
International Union of Operating Engineers
Local 30 A-B-C-D
115-06 Myrtle Avenue
Richmond Hill, NY 11418

Re:Filing of a Protest concerning election of Officers on
    August 2, 1999.

DEAR MR. GANNON:

We are filing formal charges against the election of John T. Ahern to the positions of Business Manager and Financial Secretary and the election of Michael J. Hach to the position of President.

Mr. Hach called a line officers meeting on August 2, 1999 at 3 pm. Mr. Hach opened the meeting by stating there are rumors around that he is retiring and in fact he intends to retire. He then produced his letter, dated August 2, 1999, to the line officers resigning his position of Business Manager and Financial Secretary effective with the close of business at 4:30 PM on Friday, September 3, 1999 (copy enclosed). After Mr. Hach produced his letter of resignation, he nominated Mr. Ahern for the positions of Business Manager and Financial Secretary. I asked Mr. Hach about the legality of a vote on a line officer position prior to the officer vacating the position, and how he, Mr. Hach, could vote for any line officer position since he was vacating the positions of Business Manager and Financial Secretary. Mr. Hach said do you think I am foolish enough not to check with higher authority. I guess he meant the International Union of Operating Engineers Headquarters in Washington, D.C. I asked whom he spoke to, but he refused to say. I then asked Mr. Hach why are we breaking the traditional and ethical practice of replacing line officers after they retire, leave office or pass on, as has been done for generations in the International Union of Operating Engineers. Mr. Hach's answer was he could do it. I said I didn't think it was legal and the meeting continued. Both Vice President Joseph Bialkowski and I,

13

Treasurer, requested of Mr. Hach a few days to consider such an important matter to our local union. Mr. Hach said, No! To paraphrase Mr. Hach's words, he said you can discuss now, but before you leave this office this afternoon, we vote on Mr. Ahern's elevation to Business Manager and Financial Secretary. Both Vice President Joseph Bialkowski and I appealed further to Mr. Hach but to no avail. Mr. Hach then said he would leave the office while Mr. Ahern, Mr. Bialkowski, Mr. Gannon, and I discussed the matter. We discussed the matter with Mr. Ahern, who could not provide us with a clear vision of how I.U.O.E. Local 30 would be led under his administration other than to say he would visit the jobs. Vice President Joseph Bialkowski and I explained to Mr. Ahern that we did not believe he could lead our local, and many of our Brother and Sister members have problems with Mr. Ahern's demeanor and presentation. This discussion lasted approximately five minutes until Mr. Hach's return. Upon Mr. Hach's return, he called for a vote for the positions of Business Manager. We then voted with Mr. Ahern voting for himself, Mr. Hach and Mr. Gannon voting for Mr. Ahern, and Mr. Bialkowski and myself voting against Mr. Ahern's elevation to Business Manager and Financial Secretary.

After the vote was concluded, Mr. Ahern produced his letter dated August 2, 1999 to the line officers, resigning his position of President, effective with the close of business on Friday, September 3, 1999 (copy enclosed). Mr. Ahern then nominated Mr. Hach for the position of President. Mr. Bialkowski stood up and said he was leaving because the actions of Mr. Ahern and Mr. Hach were an outrageous Flim-Flam. Mr. Hach asked Mr. Bialkowski to sit down and listen to him which Mr. Bialkowski did proceed to do. Mr. Hach explained he wanted to work until some time next year and he wanted his retirement party. This statement was completely contrary to Mr. Hach's earlier statement that he was retiring. At that point, Mr. Bialkowski and myself said this is ridiculous and that we refused to vote, as we thought these were illegal proceedings, and left the room.

The I.U.O.E. Executive Board met at 5 PM that evening and either Mr. Hach or Mr. Gannon produced a set of minutes from the Officers meeting which I disputed. An important statement in the disputed officers minutes was the vote for President, as minutes said that there were three (3) votes for Mr. Hach and two (2) abstentions. That is not the case. Joseph Bialkowski and I refused to vote, because we felt the two elections were illegal and bogus elections and left Mr. Hach's office in protest.

Therefore, pursuant to Article 24, Subdivision 1, Section (g). Protests and Appeals of the International Union of Operating Engineers Constitution and the International Union of Operating Engineers Local 30 A-B-C-D By-laws and General Rules Article 3 Section 13, Protests and Appeals, I am filing a protest that Mr. Hach violated Article 24 Subdivision 1. Section (f). Vacancies in Office and Removal of Officers of the International Union of Operating Engineers and the International Union of Operating Engineers Local 30 A-B-C-D By-laws and General Rules Article 3, Section 9-Vacancies in Office, both state: "A vacancy in any office shall be filled by appointment for the unexpired term thereof, upon vote of a majority of the following officers, viz: President, Vice President, Recording-Corresponding Secretary, Financial Secretary, Treasurer and the Business Manager where the Local Union has such a position. In the event the said officers shall fail to fill said vacancy within thirty (30) days after the same shall occur, then said position shall be filled by secret ballot vote of the majority of the membership in good standing present at the next regular meeting of the Local Union following the expiration of the said thirty (30) days."

Vice President Joseph Bialkowski and I, as Treasurer, know what the remedy is. It is to follow the International Union of Operating Engineers Constitution and the I.U.O.E. Local 30 By-laws and General Rules. An Officers meeting should be scheduled after Mr. Hach resigns the Business Manager's position and Mr. Ahern resigns the President's position on September 3, 1999 just as in the past. If the officers cannot agree on an interim Business Manager and President, then it should go to our members and they can decide who the next Business Manager and President will be when they vote at the next scheduled union meeting as the tradi-

tional and historic interpretation of the I.U.O.E. Local 30 By-Laws call for.

Officers terminating their positions should not be deciding future leadership of Local 30. Prior Business Managers knew this, but Mr. Hach and Mr. Ahern are trying to rewrite the history and traditions of the International Union of Operating Engineers and specifically Local 30 and deny our members their voting rights. Maybe Mr. Hach and Mr. Ahern are fearful our membership will not support their Flip-Flop.

Please do not hesitate to contact me as soon as possible, as the members want and need our leadership issues to be settled in a prompt and effective manner.

Fraternally,

LIAM K. TREACY
*IUOE Local 30 Treasurer*

---

# Decision

September 16, 1999

JOHN AHERN
Business Manager
IUOE Local Union No. 30
115-06 Myrtle Avenue
Richmond Hill, NY 11418

DEAR SIR AND BROTHER:

Reference is made to the August 31, 1999 letter to me from then-IUOE Local 30 Recording-Corresponding Secretary James Gannon, which forwarded an August 24, 1999 letter he had received from IUOE Local 30 Treasurer Liam Treacy and requested my opinion on certain matters. In his letter, Brother Treacy sought to protest, pursuant to the provisions of Article XXIV, Subdivision 1, Section (g) of the International Constitution, the filling of the vacancies created in the officers of Local 30 Business Manager/Financial Secretary and President respectively by the resignations of Brother Michael Hach and yourself.

As I understand the facts from Brother Treacy's letter, on August 2, Brother Hach submitted his resignation as Business Manager, effective September 3, 1999. The Local's line officers then voted to select you to fill Brother Hach's position. Brother Hach participated in the vote to fill the vacancy. Then you submitted your resignation as President, effective September 3, 1999, and the line officers voted to fill the President's position with Brother Hach. You participated in the vote to fill the vacancy. Brother Treacy contends that the vacancies in office did not occur until September 3, the effective date of the resignations, and the vote to fill the vacancies should not have occurred until that date.

In Brother Gannon's letter, he asked my opinion on whether the protest provisions of Article XXIV, Subdivision 1, Section (g) apply to the filling of vacancies. He also asked whether the procedure followed for filling the vacancies was appropriate in this particular instance.

Article XXIV, Subdivision 1, Section (g) provides in relevant part that:

- Any protest relating to the nominations and elections of officers . . . must be made to the Local Union by registered mail within thirty (30) days after the election, setting forth in writing the specific reasons for such protest. Any member making a timely protest may appeal the decision of the Local Union thereon to the General Executive Board and the General Convention in accordance with Article XVII of this Constitution.

Please be advised that the above-quoted provision applies only to the regularly scheduled nominations and elections of Local Union officers described in Article XXIV, Subdivision 1, Section

(e) of the International Constitution, and does not apply to the filling of vacancies in office covered under Article XXIV, Section 1, Section (f). Thus, a member who wishes to raise questions concerning some aspect of the filling of a vacancy does not have to first file a protest with the Local Union, but is able to file an appeal directly with the General Executive Board pursuant to the provisions of Article XVII. Turning to the situation presented by Brother Treacy's protest, I am forwarding a copy of this letter to Brother Treacy. If, after he has received it, Brother Treacy still wishes to pursue review of the actions taken at the August 2 meeting of line officers, the thirty (30) days during which he must exercise his right of appeal to the General Executive Board will be counted from the date of this letter, and not August 2.

With respect to the procedure followed to fill the vacancies, it is an allowable practice under the International Constitution, as well as an accepted business practice generally, for an officer of a Local Union to submit a resignation on a particular day with the resignation to take effect on a subsequent, later date. It is also allowable for the incumbent line officers to act to fill the vacancy created by the prospective resignation. This practice allows for an orderly transition of authority within the Local Union. Moreover, the practice comports with the method frequently followed by the International Union in filling vacancies on the General Executive Board. Finally, in light of the prospective date of your resignations, Brother Hach and you still held your respective offices at the time of the vote to fill the vacancies created by the prospective resignations, and it was therefore appropriate for you to cast votes.

Fraternally yours,
FRANK HANLEY
*General President.*

---

### LOCAL NO. 35

November 5, 1999

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

I would like to request an interpretation of our Constitution under Article XXIV, Subd. 1, Section (b).

Our Treasurer, Ronald Bellfield, was terminated by his employer, the Metropolitan Council Environmental Services (MCES) on October 28, 1999.

I.U.O.E. Local 35 has a Stationary Charter that is limited to the "Plants and Facilities of the Twin Cities Metropolitan Waste Control Commission (the predecessor to the Metropolitan Council Environmental Services) in Anoka, Carver, Dakota, Hennepin, Ramsey, Scott and Washington Counties in the State of Minnesota."

The Local has no idea whether or not Brother Bellfield will seek employment in the trade with another employer, but we are certain that he cannot practice the trade in the employ of the MCES whose workers we, I.U.O.E., Local 35, represent.

The Local Union would like your opinion as to whether or not Brother Bellfield can continue to maintain his membership in our Local and also continue to hold the office of Treasurer of our Local.

I would appreciate a response as soon as possible so we can proceed with filling the vacancy, if necessary. Thank you in advance for your consideration and please feel free to contact me at (651)686-6447 if you have any questions regarding this matter.

Fraternally,
Ed LeClair
*Business Manager*

---

# Decision

November 16, 1999

MR. ED LECLAIR
Business Manager
IUOE Local Union No. 35
3470 Washington Drive, Suite 159
Eagan, MN 55122

DEAR SIR AND BROTHER:

Reference is made to your letter of November 5, 1999, in which you ask my opinion on the question of whether Brother Ronald Bellefield is eligible to continue to hold Local Union office as Treasurer where he has been terminated from employment in the only unit represented by the Local Union pursuant to its charter.

Please be advised that under the circumstances described in your letter, Brother Bellefield is not eligible to continue to hold Local Union office. Local 35's jurisdiction is limited by charter to the plants and facilities of the Twin Cities Metropolitan Waste Control Commission, the predecessor to the current employer, Metropolitan Council Environmental Services (MCES). As I understand it, MCES discharged Brother Bellefield and he has not grieved the discharge, nor is he eligible for hire by MCES. In these circumstances, where Brother Bellefield cannot work or seek work at the trade in the only facilities over which Local 35 has jurisdiction, Brother Bellefield does not meet the requirement for continued eligibility to hold Local Union office specified in the second paragraph of Article XXIV, Subdivision 1, Section (b) of the International Constitution.

Accordingly, a vacancy in the office of Treasurer should be declared and the vacancy filled in compliance with the provisions of Article XXIV, Subdivision 1, Section (f) of the International Constitution.

Fraternally yours,
FRANK HANLEY
*General President.*

---

### LOCAL NO. 963

February 23, 2000

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR GENERAL PRESIDENT HANLEY;

I am asking you to rule on an appeal concerning the interpretation of the constitution. Our local's President Frank McKenna has ruled to deny my request for a copy of the member's list of which I am obligated to update as outlined in the constitution. Under Article XXIV, Subdivision 2, Section (c) the constitution states:

"... It shall be the duty of the Recording Corresponding Secretary ... to maintain a correct list of the membership and their addresses...."

# Exhibit 6 to Giblin Declaration
# (part 2)

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

Brother McKenna informed me today that since there is a copy of this list on file at the local's office, I am not required to possess nor am I to have access to this list. I consider this a serious violation of the constitution and an attempt to interfere with the carrying out of the duties of my office.

In the past I have been allowed access to the membership list and can see no reason why I am now being denied this duty.

Incidentally, our Business Manager, Phillp N. Bitz, agreed with Brother McKenna's ruling when contacted.

I would appreciate a quick response to this appeal and would also request it be addressed confidential to myself, since Brother Bitz has previously intercepted mail addressed to me personally.

I remain fraternally yours,

THORINN OAKUNSHEYLD
*Recording Corresponding Secretary*
*IUOE Local 963*

---

# Decision

March 15, 2000

MR. THORINN OAKUNSHEYLD
Recording-Corresponding Secretary
IUOE Local Union No. 963
707 Durward Street
Vancouver, BC V5V 2Y9 CANADA

DEAR SIR AND BROTHER:

Reference is made to your letter received in this office on March 6, 2002 in which you request my opinion as to whether, as Recording-Corresponding Secretary of IUOE Local Union No. 963, you are entitled to possess the official membership list of the local union. In your letter, you state that Local 963 President Frank McKenna has ruled that since there is a copy of the membership list on file at the local union office available for review and inspection, you are not required to have possession of the membership list.

Article XXIV, Subdivision 2, Section (c) of the International Constitution provides in part, "It shall be the duty of the Recording-Corresponding Secretary to . . . maintain a correct list of the membership and their addresses. . . ." Please be advised that while the International Constitution does state that the Recording-Corresponding Secretary shall maintain a list of the membership and their address, it does not grant the Recording-Corresponding Secretary the right to personally possess the membership list. Since the membership list is on file at Local 963's office and available for review and inspection, you are able to fulfill your duties under the International Constitution. Therefore, based on the foregoing, the decision of President McKenna to deny your request of personal possession of the membership list was appropriate.

Fraternally yours,

FRANK HANLEY
*General President.*

---

## LOCAL NO. 428

March 29, 2000

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

I am writing to seek your opinion as to the propriety of a membership motion to appoint "special observers" to perform certain oversight functions for the Operating Engineers Local 428 Health and Welfare and Pension Trust Funds. At our March 26, 2000 semi-annual meeting held in Casa Grande, Arizona, a motion was made and passed to appoint special observers who would have the authority to attend Board of Trustees' meetings and "be given access to any and all records and documents which pertain or relate to the administration, investments and operations of our Union. They should be provided copies of any and all documents they deem necessary." The motion also directs the appointment of two specific members to serve as "special observers." A copy of the motion is attached for your immediate reference.

I do not believe that the motion can stand for two reasons. First, Article XXIV, Subdivision 2, Section (a), of the IUOE Constitution provides that a local union president "will appoint all committees unless otherwise provided for." Second, and more importantly, the motion directs the Board of Trustees of the Pension and Health and Welfare funds to allow the special observers to attend board meetings, to review all trust fund documents, and to be provided with "all documents they deem necessary." I believe that a motion directing the Board of Trustees of the Pension and Health and Welfare Trust Funds to take action is out of order. The agreements and declarations of trust for the Pension and Health and Welfare Plans provide that the Union will appoint three trustees to each fund. Those appointments have already been made.

I am enclosing copies of two decisions and opinions from the General President which bear on the issues of this case. In a 1985 case involving Local No. 953, the General President noted that "Board of Trustees are not committees" under the IUOE Constitution. The second decision involves Local 542. In that decision, the General President concluded that the general membership did not have the authority to direct boards of trustees of fringe benefit trust funds to take certain actions - in that case, ordering an actuarial study.

I respectfully request that you provide us with a decision as to whether the membership has the authority to appoint such a committee, and whether the membership has the authority to direct the Boards of Trustees of the Pension and Health and Welfare Funds to take any action.

I thank you in advance for your immediate attention to this very important matter. If I can be of any assistance to you, please do not hesitate to call on me.

Fraternally Yours,

DENNIS TEEL
*Business Manager and*
*Recording-Corresponding Secretary*

JANUARY 1998 THROUGH DECEMBER 2002

# Decision

April 7, 2000

MR. DENNIS TEEL
Business Manager
IUOE Local Union No. 428
1426 North First Street
Phoenix, AZ 85004

DEAR SIR AND BROTHER:

Reference is made to your letter of March 29, 2000, in which you advise of a membership motion appointing "special observers" to attend future meetings of the Boards of Trustees of the Pension and the Health and Welfare Funds and directing the Trustees to give the observers access to and copies of all records and documents of the Funds. You ask whether the membership has the authority to appoint such a committee of special observers or to direct the Boards of Trustees to allow them access to meetings and records.

Please be advised that, in my opinion, the motion in question was out of order and is of no force and effect. As I have previously stated in my May 30, 1996 decision and order involving Local 542 (copy attached), by law a pension or health and welfare fund is an entirely different legal entity from the union, and must be administered by an independent board of trustees. The trustees are not agents of the union or the employers and are not subject to direction by them regarding either admittance to meetings or access to records and documents. Moreover, the motion undercuts the Business Manager's authority to appoint trustees to the Funds. Accordingly, while the membership is free to express its views on the Funds' operations and request that information about the Funds be provided by the Local's officers, it is not appropriate for the membership to direct the Funds to take any action or to appoint observers to the Funds' meetings.

Fraternally yours,
FRANK HANLEY
*General President.*

---

## LOCAL NO. 647

April 13, 2000

HOWARD MILLS, JR.
Regional Director, Region II
International Union of Operating Engineers
11452 Highway 62, Suite 194
Charlestown, IN 47111

DEAR SIR AND BROTHER:

This letter is a follow up of our telephone conversation of April 11, 2000. Local 647 is examining different ways in which to cut our expenses.

One thing being considered is eliminating our Fall Membership Meeting which is always held in Wichita, Kansas. The Local pays mileage to those attending the meeting. For quite some years there has been an extremely low attendance at this meeting. The Local still pays mileage, expenses and wages to the Executive Board for this meeting regardless of what the attendance is. In addition to these expenses we are responsible for rent of the meeting room and refreshments.

The fall is when we have our auditors in just prior to the General Membership Meeting. The expense for that includes three days (3) wages, three (3) days expenses and mileage for three (3) auditors. The auditors complete their work in one (1) day. We are considering a reduction which would pay the auditors two (2) days wages and one (1) days expenses and the usual mileage. The audit and General Membership Meeting in the fall of 1999 cost almost ten thousand dollars ($10,000.00). By implementing the

changes suggested, that cost could be reduced to approximately one thousand five hundred dollars ($1,500.00).

We intend to reduce the Union Board's expenses to one day anytime we are doing business and paying only one day's wages to Board members whenever possible.

All these matters will be presented and discussed at our upcoming membership meeting in Wichita, Kansas, April 29, 2000. We will ask for a vote of the people at that time.

My request from you is to ascertain if these proposals are legal and permissible as allowed for in the Constitution of International Union of Operating Engineers.

I will appreciate hearing from you and thank you for your time.

Fraternally,
LESTER E. RITTER
*Business Manager*

---

# Decision

May 3, 2000

MR. LESTER E. RITTER
Business Manager
IUOE Local 647
572 Road 390
Allen, KS 66833

DEAR SIR AND BROTHER:

Reference is made to your letter to Regional Director Howard Mills in which you request that Local Union No. 647 be allowed to reduce the frequency of its General Membership meeting from twice a year to once per year. Your letter has been forwarded to my office for a response.

Please be advised that pursuant to Article II of the Local 647 Bylaws, "Local Union No. 647, does, by these By Laws, accept and adopt the provisions of the International Constitution extending to Local Unions the right of operating under a District Administration form of Government." Article XXVI, Section 1 (g) of the International Constitution provides:

> Where the circumstances of a Local Union so require, and appropriate bylaws have been adopted by the Local Union and thereafter approved by the General President, it may proceed under a district administration form of government and shall provide for the holding of but two or more regular meetings of the general membership per year and the method of convening other called meetings thereof, all of which meetings to be deemed regular meetings of the general membership for the purposes outlined in the Constitution.

Therefore, based on the foregoing, Local Union No. 647 must continue to hold at least two regular meetings of the general membership per year.

Fraternally yours,
FRANK HANLEY
*General President.*

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

## LOCAL NO. 49

May 25, 2000

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear Sir and Brother:

Currently, the position of Recording-Corresponding Secretary would be an open vacancy on our General Elections Ballot this fall due to the person who was originally nominated for this position submitting an acknowledgement that he was declining his nomination.

As there are no other nominees for the Recording-Corresponding Secretary position, we are respectfully requesting your approval to re-open nominations at our next General Membership Meeting being held on June 21, 2000, at Local 49's main headquarters located at 2829 Anthony Lane South, Minneapolis, Minnesota, for the position of Recording-Corresponding Secretary.

I remain,

Fraternally yours,
Fred P. Dereschuk
*Business Manager*
*Financial Secretary*

────────

## Decision

May 26, 2000

Mr. Fred Dereschuk
Business Manager-Financial Secretary
IUOE Local Union No. 49
2829 Anthony Lane South
Minneapolis, MN 55418

Dear Sir and Brother:

Reference is made to your May 25, 2000 facsimile to me in which you advised that the only candidate nominated for the position of Recording-Corresponding Secretary in the upcoming Local 49 elections has declined the nomination, thereby leaving the Local without any nominee for that position. You propose to reopen nominations for the position of Recording-Corresponding Secretary at the next Local 49 General Membership meeting, to be held June 21 at Local 49's headquarters in Minneapolis.

Please be advised that, pursuant to long-standing interpretations of the International Constitution, when circumstances result in there being no eligible nominee for an officer position, the Local Union must reopen nominations for the position. Your request to reopen nominations for the Recording-Corresponding Secretary position at the next Local 49 general membership meeting in Minneapolis is in compliance with these interpretations of the Constitution and is therefore approved, provided that appropriate notice of the time and place for nomination is given to the Local 49 membership.

Fraternally yours,
Frank Hanley
*General President.*

## LOCAL NO. 882

June 22, 2000

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Brother Hanley:

I am sending you this letter in the hope to receive your ruling on an issue that has come up during our general election. One of our members, Sister Maureen Metcalfe, has received nominations for the posts of Treasurer, Trustee, and President. The apparent problem lies in the fact that her husband, Al Bowering, is currently the Financial Secretary/Business Manager and is seeking re-election for this post. Several members have mentioned to our committee, if Sister Metcalfe were to be elected to the position of Treasurer, this could be perceived as a possible conflict of interest.

As a committee, we felt that Sister Metcalfe had the right to run for whichever two positions she decided on, and that if the electorate felt there was a conflict, they would show their opinion at the polls. However, in conversations with Brother Richard Griffin it was suggested that the International Branch might have a concern with this.

As your opinion is deemed final it these matters, we are asking for your ruling.

In the effort to protect Sister Metcalfe's rights in this matter, we ask that you forward your ruling before 4:00 pm pacific time on Tuesday, 27 June, as that is the closing time and date for acceptance of nominations.

Thank you for your considerations.

Fraternally yours,
David Simmons
*Chairperson Election Committee*
*IUOE Local 882, 882B, 882H*

────────

## Decision

June 26, 2000

Mr. David Simmons
Chairperson, Local 882 Election Committee
5918-188A St.
Surrey, British Columbia
Canada V3S 7T3

Dear Sir and Brother:

Reference is made to your facsimile dated June 22, 2000, in which you advise that Sister Maureen Metcalfe, the wife of the Local 882 Financial Secretary/Business Manager, has been nominated for three offices, including the office of Treasurer. You report that the Election Committee feels that Sister Metcalfe has the right to run for whichever two positions she decides on, and request my opinion as to whether her election to the position of Treasurer would present a conflict of interest.

Please be advised that Article XXIV, Subdivision 1, Section (a) of the International Constitution provides that the offices of Financial Secretary and Treasurer shall not be combined or held by the same person. Here, since the member nominated for the office of Treasurer is not the same person seeking reelection as Financial Secretary/Business Manager, there is no conflict with the International Constitution in allowing one member to run for Treasurer and the other to run for Financial Secretary, regardless

of how the two members are related. Accordingly, the Election Committee's view that Sister Metcalfe may run for whichever two offices she decides on is consistent with the Constitution.

Fraternally yours,
FRANK HANLEY
*General President.*

---

**LOCAL NO. 98**

June 27, 2000

THEODORE F. KULESZA JR.
Regional Director
IUOE, Region 1
Two Greenwood Square #407
Bensalem, PA 19020

DEAR SIR AND BROTHER:

At the regular monthly meeting of Local 98 on Monday, June 26, 2000, nominations for officers were held. All officers were duly elected, except for Business Manager, President and Recording-Corresponding Secretary. These offices have opposition. In light of Local 98's recent history with elections, I took the precaution of having Karen Jalkut of the American Arbitration Association monitor the nominations and if needed, oversee the election.

The Local's secretary, as is her responsibility, copied the dues records for the four nominees to insure that all dues were paid in a timely manner. It was discovered that Brother Walter Bobowiec, had on two occasions this year, been in arrears of his dues (copies attached). Brother Bobowiec has been nominated for President and Business Manager. In reference to Article XXIV, Subdivision 1, Section (a) of the International Constitution, I respectfully request a decision of record from the International regarding this matter.

In addition, Brother John Youmell nominated for Recording-Corresponding Secretary has only three hundred and ninety hours at the trade, in the last ten years. His records, from our Benefit Office are attached. He has been offered jobs by all of Local 98's Business Representatives, both past and present. He, however, continues to work for a non-union trucking company. In accordance with Article XXIV, Subdivision 1, Section (b), I respectfully request a decision of record from the International regarding this matter as well.

This morning, I spoke informally with Brother Dick Griffin at the International about this matter, so he is somewhat informed. Please give this matter your special attention and I respectfully request such decision as soon as possible.

With best and kindest regards, I am

Fraternally yours,
JOHN J. RICHARDS
*Business Manager/President*

---

# Decision

July 5, 2000

MR. JOHN RICHARDS
Business Manager
IUOE Local Union No. 98
Two Center Square
P.O. Box 217
East Longmeadow, MA 01028

DEAR SIR AND BROTHER:

Reference is made to your letter of June 27, 2000 to Regional Director Theodore Kulesza which, since it requires an interpretation of the International Constitution, has been referred to my office for response. In your letter, you request my opinion as to the eligibility of two nominees for office. You state that the first nominee has been in arrears in his dues on two occasions this year, and that the second has only 390 hours at the trade in the last ten years, has been offered jobs through the local in the past, but continues to work for a non-union trucking company.

With respect to the eligibility of the first member, who was nominated for the office of President and Business Manager, Article XXIV, Subdivision 1, Sections (a) and (b) of the Constitution requires that no member shall be eligible for election unless he shall have been a member continuously in good standing in the Local Union electing him for one (1) year, and in the case of a candidate for Business Manager, two (2) years, preceding the month of nominations. Article XXIV, Subdivision 7, Section (c) of the Constitution defines "good standing" as having paid all current dues to the Local Union within thirty (30) days after they become due and payable. Where a nominee has not paid his or her dues within the 30-day grace period during the relevant one or two-year period (for example, by the 31st day of a month with 30 days, or by the 1st day of the next month where a month has 31 days), the longstanding opinion of this office is that the member has not maintained continuous good standing membership and is not eligible under the Constitution to run for Local Union office.

With respect to the eligibility of the second member, who was nominated for the office of Recording-Corresponding Secretary, Article XXIV, Subdivision 1, Section (b) provides that no member shall be eligible for election who has not during the year immediately prior to the month of nominations been continuously employed at the trade or actively sought continuous employment at the trade. Where a nominee has not been employed at the trade at all during the relevant period, he or she does not meet the "continuously employed at the trade" requirement cited above. Under prior decisions and opinions of this office, where a nominee refuses to accept the Local's referrals to work at the trade, he or she does not meet the "actively sought continuous employment at the trade" requirement cited above, particularly where the nominee is employed outside the trade. In both instances, the nominee would not be eligible under the Constitution to run for Local Union office.

Although ordinarily it is for a Local Union's election committee to apply in the first instance the principles set forth above to the particular facts, here, based on the information provided in your letter, it is my opinion that neither nominee in question is eligible to run for office.

Fraternally yours,
FRANK HANLEY
*General President.*

---

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

### LOCAL NO. 9

July 17, 2000

RICHARD GRIFFIN
General Counsel
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

RE: LOCAL UNION ELECTION ELIGIBILITY

DEAR MR. GRIFFIN:

The IUOE, Local 9 Election Committee has a problem regarding eligibility determination for two candidates nominated for union office with Operating Engineers, Local 9. The IUOE, Local 9 Election Committee has contacted the U.S. Department of Labor, Office of Labor-Management Standards for guidance. The Office of Labor-Management Standards has advised the IUOE, Local 9 Election Committee to discuss this issue with the International Union. That is why you are being sent this letter.

Briefly, on June 1st, the IUOE, Local 9 Election Committee found two nominated candidates to be ineligible for election to office because of late payment of dues, which according to the Local 9 election rules includes working assessment. On June 21st, one of the candidates who had been ruled ineligible appeared before the IUOE, Local 9 Election Committee with legal representation. Based on arguments made by the attorney, the IUOE, Local 9 Election Committee changed its prior decision, and now ruled these two individuals eligible for election.

Since that June 21st decision, the IUOE, Local 9 Election Committee has received two written protests. One of those who is protesting the decision would have had no opposition for elected office had the initial eligibility decision been unchanged. The statements in the protests seem to have merit.

So that you have more background on this matter I am enclosing copies of election rules, the minutes of the June 1st and June 21st Election Committee meetings and the two protests.

The IUOE, Local 9 Election Committee wants to make the correct decision. The Election Committee is meeting this Wednesday, July 19th. The election ballot will be finalized at this meeting. I apologize for the short time period for you to respond to this letter.

Joanne Spiker and Gwen Willis are on the Local 9 clerical staff and are assisting the IUOE, Local 9 Election Committee with clerical matters. You may call them during regular business hours at (303) 623-3194, extensions 28 and 18. The Local 9 fax number is (303) 623-8179. If you need to speak with me, my home phone number is (303) 423-6815.

Thank you for your prompt attention to this letter. We await your response.

Fraternally yours,
ERNIE DAHLBERG
*Chairman, IUOE, Local 9*
*Election Committee*

----

# Decision

July 19, 2000

MR. ERNIE DAHLBERG
Chairman, Election Committee
IUOE Local Union No. 9
990 Kalamath Street
P.O. Box 40008
Denver, CO 80204-0008

DEAR SIR AND BROTHER:

Your July 17, 2000 fax to IUOE General Counsel Richard Griffin, along with the subsequent information provided to him, has been referred to my office for a reply since it requires an interpretation of the International Constitution. I understand from these documents that the Local 9 Election Committee originally ruled two candidates for office in the upcoming Local 9 election ineligible for failure to maintain continuous good standing membership for one year preceding the month of nominations, as required by Article XXIV, Subdivision 1, Section (b) of the International Constitution. The Committee then reversed itself. Now several Local 9 members have raised questions concerning the reversal. The Election Committee is meeting today and seeks my guidance on the eligibility questions so that the election ballot can be finalized. I further understand that, pursuant to Article XII of Local 9's By-laws, dues are paid quarterly and that, of the two individuals in question, one completed paying the dues for the first quarter of 2000 on February 17, 2000, while the other completed payment of the dues for the second quarter of 1999 on May 12, 1999.

Ordinarily, eligibility determinations for candidates for Local Union office are left to the Local Union Election Committee in the first instance. Here, because of the apparent confusion arising from the Election Committee's changing view of the two candidates' eligibility, I will first state the constitutional requirements governing such determinations and then apply the requirements to the two candidates at issue.

Article XXIV, Subdivision 7, Section (b) of the International Constitution provides, with respect to the time when dues become due and owing, that:

Such dues may be fixed and charged on a monthly, quarterly, semi-annual or yearly basis and shall become due and payable on the first day of the terms so fixed. Dues for any one of these terms shall be known as current dues for that term.

Article XXIV, Subdivision 7, Section (c) of the International Constitution provides a "grace period" for the payment of dues and states, in pertinent part, that:

No member shall be in good standing unless he has paid all current dues to the Local Union within thirty (30) days after they shall have become due and payable.

Pursuant to these provisions, where a Local Union fixes and charges its dues on a quarterly basis, as Local 9 apparently does, the current dues become due and payable on the first day of the quarter and the dues for the entire quarter must be paid within thirty days after the first day of the quarter in order for a member to maintain good standing.

As indicated above, Article XXIV, Subdivision 1, Section (b) of the International Constitution requires that candidates for offices other than Business Manager "shall have been a member continuously in good standing in the Local Union electing him for one (1) year preceding the month of nominations." As Local 9's nominations were held at the May 2000 district meetings, in order to meet this requirement candidates were required to maintain continuous good standing from May 1999 through April 2000.

Examining the dues records of the two candidates at issue, the first (Ronald Stede) completed payment of the dues for the first quarter of 2000 on February 17, 2000, more than thirty days after the dues became due and payable on January 1, 2000. The second (Jerry Dorn Jr.) completed payment of the dues for the second quarter of 1999 on May 12, 1999, more than thirty days after the dues became due and payable on April 1, 1999. Therefore, apply-

JANUARY 1998 THROUGH DECEMBER 2002

ing the constitutional requirements to the facts, both candidates are ineligible.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 653

August 15, 2000

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

As of August 1, 2000 I hired a Business Agent for Local 653. At the August 11, 2000 meeting a motion was presented and passed that Local 653 not have an agent. Is this motion out of order according to Article XXIV of the International Constitution?

Please respond as soon as possible. Thanking you in advance.

Fraternally,
LARRY W. FINCHER
*Business Manager*
*IUOE Local 653*

---

# Decision

August 16, 2000

MR. LARRY W. FINCHER
Business Manager
IUOE Local Union No. 653
801 Spring Hill Avenue
Mobile, AL 36602

DEAR SIR AND BROTHER:

Reference is made to your letter of August 15, 2000, advising that a motion that the Local Union not have a business agent passed at the August 11, 2000 membership meeting and requesting my opinion as to whether the motion was in order.

Please be advised that Article XXIV, Subdivision 1, Section (a) of the International Constitution vests the Business Manager with the sole authority to appoint and terminate all Local Union employees, including business agents. Consistent with the long-standing interpretation of the International Constitution, the Business Manager's authority to appoint employees as he sees fit may not be restricted by action of the Local Union eliminating the position of business agent. Accordingly, the motion you describe conflicts with the International Constitution and is of no force and effect.

Fraternally yours,
FRANK HANLEY
*General President:*

## LOCAL NO. 147

August 17, 2000

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

IUOE, Local No. 147 held nominations for officers in June of this year. After nominations and the determination of eligible candidates for office, only two officer positions are being contested. More than one eligible candidate was nominated and accepted the nomination for the offices of Business Manager and Recording-Corresponding Secretary. Each of the other offices of the Local Union has only one eligible candidate running for the office and their name does not appear on the ballot.

IUOE, Local No. 147 conducts its officers' elections by mail referendum. The Election Committee prepared and mailed the appropriate ballot packages to each member on August 5, 2000. Ballots are to be picked up by the Election Committee on the morning of August 26, 2000 and the results tallied.

On August 10, 2000, one of the two candidates for the office of Recording-Corresponding Secretary died suddenly. As stated earlier the ballots for the election of the contested offices were mailed on August 5, 2000. No union meeting is scheduled between the mailing of the ballots and the date on which the ballots will be picked up by the election committee.

I am respectfully requesting a Decision & Opinion from your office on how the Election Committee should proceed with the election of the office of Recording-Corresponding Secretary. I am assuming that no change should be made in regards to the tallying of the votes for the office of Business Manager. Due to the time constraints involved we look forward to your response at your earliest convenience.

Fraternally yours,
C. RAY DAVENPORT
*Business Manager*

---

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

# Decision

August 17, 2000

MR. RAY DAVENPORT
Business Manager
IUOE Local Union No. 147
3 Kroger Executive Center, Suite 123
Norfolk, VA 23502

DEAR SIR AND BROTHER:

Reference is made to your letter of August 17, 2000, in which you advise that one of two eligible candidates for the office of Recording-Corresponding Secretary died suddenly, after the ballots for the Local Union's election of officers had been mailed out but before the date for returning and tallying them, and ask what procedure to follow in these circumstances.

Please be advised that the election with respect to the office other than the office of Recording-Corresponding Secretary should proceed as scheduled. With respect to the office of Recording-Corresponding Secretary, the votes should not be tallied. Rather, in light of the unusual circumstance—the death of one of the two candidates for the office at a time when there is insufficient time prior to the regular election to reopen nominations—it is my opinion that, after the regular election, the Local Union must reopen nominations and hold a special election for the office of Recording-Corresponding Secretary.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 400

January 3, 2001

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

I am writing to request an opinion on the restrictions for retired members.

Thank you for your time and consideration on this important issue.

Fraternally,
TERRY LEISHMAN
*Business Manager*

# Decision

February 5, 2001

MR. TERRY LEISHMAN
Business Manager
IUOE Local Union No. 400
2737 Airport Road
Helena, MT 59601

DEAR SIR AND BROTHER:

Reference is made to your letter of January 3, 2001, requesting "an opinion on the restrictions for retired members." Specifically, your office has advised that you seek an opinion as to whether retiree members are restricted from filing charges against non-retiree members.

Please be advised that individuals who are retired from work at the trade but who remain members in good standing of the Local Union by paying the required dues are not restricted by the International Constitution from filing charges against fellow members.

Fraternally yours,
FRANK HANLEY
*General President.*

## LOCAL NO. 302

February 5, 2001

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR GENERAL PRESIDENT HANLEY:

The purpose of this letter is to request your opinion as to my eligibility to hold the position of Business Manager for the International Union of Operating Engineers, Local 302. Previous to being elected by the line officers of Local 302, I was employed as the Executive Secretary of the Washington State Building and Construction Trades Council, AFL-CIO.

I am a member in good standing with Local 302 and have been for thirty years. I have held two elected positions with Local 302 during that time. While employed with the Building and Construction Trades Council I remained an officer with Local 302. Only at the time of my election as Business Manager, did I resign my Trustee position.

Having stated the above I now turn to our Constitution. Article XXIV, Subdivision 1, Section (b). Terms of Office and Conditions of Eligibility. Paragraph two states, "No member shall be eligible for election, be elected nor hold office who has not during the year, and in the case of one seeking the office of Business Manager two years, immediately prior to the month of nominations, been continuously employed at the trade, or who has not actively sought continuous employment at the trade. This restriction, however, shall not apply to any member serving or acting in any capacity for a Local Union or the International Union, or who has been assigned by his Local Union or the International Union to perform work in furtherance of the interests of organized labor."

While serving with the Building and Construction Trades Council, it was my belief that I worked for all of the trades to further the interests of labor. However, I strongly believed that as an Operating Engineer employed by the Council gave me a greater opportunity to further the agenda of my home Local Union, Local 302.

To that end, former Business Manager Clyde Wilson nominated me for the position of Executive Secretary. His strong support for me indicated that he believed I would be able to strengthen our craft through my position at the Building and Construction Trades Council.

I spoke with our general counsel, Mr. Russell (Russ) Reid, on this matter and I requested that he speak with your general counsel. It is from those discussions that I was instructed to generate this letter. I would appreciate your interpretation of the Constitution with respect to this issue. As you know, Local 302 continues to experience some difficulties with each election so I am requesting a point of clarification.

General President Hanley, you have been good to our Local Union and your support is always appreciated. We are building our future each day and we can only continue doing so if we maintain stability within our Local Union.

Thank you for your courtesy and attention to this matter.

In Solidarity,

ALLAN B. DARR

*Business Manager*

———

# Decision

February 15, 2001

MR. ALLAN B. DARR
Business Manager
IUOE Local Union No. 302
18701 120th Avenue N.E.
Bothell, WA 98011

DEAR SIR AND BROTHER:

Reference is made to your letter of February 5, 2001, in which you request my opinion as to your eligibility to hold the position of Business Manager. You state that prior to your election by the line officers to fill a vacancy in office, you were employed as Executive Secretary of the Washington State Building and Construction Trades Council, AFL-CIO, having been nominated to that position by the Business Manager of Local 302, and during your employment you also held the office of Trustee in the Local.

Please be advised that Article XXIV, Subdivision 1, Section (b) of the International Constitution provides:

No member shall be eligible for election, be elected nor hold office who has not during the year, and in the case of one seeking the office of Business Manager two years, immediately prior to the month of nominations, been continuously employed at the trade, or who has not actively sought continuous employment at the trade. This restriction, however, shall not apply to any member serving or acting in any capacity for a Local Union of the International Union, or who has been assigned by his Local Union or the International Union to perform work in furtherance of the interests of organized labor.

In my opinion, under the circumstances you describe, where your prior employment for the Washington State Building and Construction Trades Council was at the behest of the Local Union's Business Manager, you meet the exception to the working at the trade requirement as set forth above in that you were "assigned by [the] Local Union . . . to perform work in furtherance of the interests of organized labor." Accordingly, you are eligible to continue to hold office as Business Manager of Local Union No. 302.

Fraternally yours,

FRANK HANLEY

*General President.*

## LOCAL NO. 234

April 9, 2001

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

RE: GOOD STANDING: REQUEST FOR OPINION

DEAR SIR AND BROTHER:

I want to run in this year's election at Local 234. A question has arisen concerning good standing and paying of dues. I have never been more than thirty days late upon paying my dues at Local 234 and never been suspended or expelled or have been involved in any dispute of any kind. I am requesting your definitive interpretation of the Operating Engineers Constitution as to whether my late pay of dues would effect my ability to run in this year's election.

Fraternally Yours,

ROBERT A. WILLIAMS

*Member Local 234*

———

# Decision

April 23, 2001

MR. ROBERT WILLIAMS
1007 Clinton Street
Dunlap, IA 51529

DEAR SIR AND BROTHER:

Reference is made to your letter of April 9, 2001, in which you ask for my opinion as to whether your late payment of dues would affect your ability to be a candidate in the upcoming election of officers of IUOE Local Union No. 234.

Please be advised that Article XXIV, Subdivision 7, Section (c) of the International Constitution provides that:

"No member shall be in good standing unless he has paid all current dues to the Local Union within thirty (30) days after they have become due and payable. . . ."

This section has been consistently interpreted to mean that where dues are payable on the first day of a month, a member shall be considered to be in good standing if the dues are paid within thirty (30) days of the first, i.e., the thirty-first day of the month for those months having thirty-one days, and the first of the next month for those months having thirty days. The application of these principles to a particular situation in determining the eligibility of a candidate under the continuous good standing requirement of Article XXIV, Subdivision 1, Section (b) is the responsibility in the first instance of the Local Union's election committee.

Fraternally yours,

FRANK HANLEY

*General President.*

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

## LOCAL NO. 564

June 29, 2001

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear President Hanley:

I am in need of clarification from the International regarding election of officers.

At our Regular meeting on June 5th we had nomination of officers. Article XXIV, Subdivision a. Section b. Terms of Office and Conditions of Eligibility (pg. 76) of the constitution states, that attendance at the regular meetings is mandatory with exceptions, until elections take place. What are these exceptions, who determines who is excused and what is excusable?

Our operators are shift workers; some of our nominees will have to work unless they can find someone to fill their shift. Also, several members have had vacations scheduled for months and monies already paid out, community service commitments, etc.

Our next meeting is July 3rd. Could you please respond as soon as possible to this request.

In Solidarity,
Charlie Singletary
*Business Manager*

––––––––––

## Decision

July 3, 2001

Mr. Charlie Singletary
Business Manager
IUOE Local Union No. 564
223 South Ave. C
Freeport, TX 77541

Dear Sir and Brother:

Reference is made to your letter of June 29, 2001, in which you ask for my opinion as to what constitutes a "reasonable excuse" for a candidate's absence from a regular membership meeting under the International Constitution and how a determination as to reasonable excuses is to be made.

Please be advised that Article XXIV, Subdivision 1, Section (b) of the International Constitution requires in pertinent part that candidates for Local Union office "shall have been in regular attendance at all regularly scheduled Local Union membership meetings and home district membership meetings held after nomination and before elections, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family." Prior decisions of the General President have made clear that reasonable excuses are not limited to the ones enumerated in the provision and that the Local Union's Election Committee has the responsibility in the first instance to evaluate whether a candidate's reason for missing a required meeting constitutes a reasonable excuse.

Your letter notes three excuses that you apparently anticipate being raised by candidates for their failure to attend a membership meeting. Given the hypothetical and undetailed nature of these excuses, it is inappropriate for me to make a definitive determination here as to whether these excuses constitute good cause. Nevertheless, I will provide broad principles as guidance for the Election Committee. It is for the Election Committee to apply the following principles in a uniform way to the particular factual situations before it in determining eligibility.

As to the first excuse—shift work assigned for the time of the meeting—prior decisions of the General President have recognized that a candidate's conflicting work assignment may constitute good cause excusing an absence from a required meeting, depending on whether circumstances such as the time of the assignment or the distance of the work from the meeting made it impossible to attend the meeting. With respect to the second excuse—vacations—while prior decisions of the General President have generally concluded that a conflicting vacation, without more, does not constitute a good cause, it is for the Election Committee to consider all the circumstances, including how far in advance the dates of membership meetings are known and the particulars of the vacations. Finally, with respect to the third excuse—community service commitments—in light of the unique circumstances of the community theatre performance apparently at issue, good cause is peculiarly appropriate for determination in the first instance by the Election Committee, which will be more familiar with the local situation.

Fraternally yours,
Frank Hanley
*General President.*

––––––––––

## LOCAL NO. 428

July 25, 2001

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear Sir and Brother:

In regard to Article XXIV, Subdivision 1, Section (b), the provision for a candidate to be eligible states "he shall have been a member continuously in good standing in the Local Union electing him for one (1) year preceding the month of nominations. . . ." Our question to you is as follows:

Since our local union nominations take place during the month of June, 2001, is the one year period for good standing from May, 2000 through May 2001?

We appreciate your time and consideration of this question.

Fraternally,
Edward A. Yarco
*Election Committee Chairman*

––––––––––

## Decision

July 26, 2001

Mr. Edward A. Yarco
Election Committee Chairman
IUOE Local Union No. 428
6601 N. Black Canyon Hwy
Phoenix, AZ 85015

Dear Sir and Brother:

Reference is made to your letter of July 25, 2001, in which you ask how to calculate the one year period referenced in Article XXIV, Subdivision 1, Section (b) of the International Constitution.

As you note in your letter, Article XXIV, Subdivision 1, Section (b) of the International Constitution requires that candidates for offices other than Business Manager "shall have been a member continuously in good standing in the Local Union electing him for

24

one (1) year preceding the month of nominations. . . ." Inasmuch as Local 428's nominations were held during the month of June 2001, in order to meet this requirement candidates for offices other than Business Manager must have been in continuous good standing from June 2000 through May 2001.

Fraternally yours,

FRANK HANLEY

*General President.*

---

## LOCAL NO. 670

July 26, 2001

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR SIR AND BROTHER:

Local 670 is holding officer elections this year and the Election Committee has requested I submit the following to you for your determination on eligibility.

Nominations were held on June 7, 2001. James D. Phillips has been nominated as Business Manager. Mr. Phillips worked for UNICCO Maintenance at the Dayton Tire Plant in Oklahoma City until he was banned from being on the premises August 31, 2000, by UNICCO's customer, Dayton Tire Plant. This was following a verbal altercation with a contractor at the plant on August 23, 2000, at which time Mr. Phillips was temporarily suspended from work. Therefore, Mr. Phillips has not actively worked among that bargaining group since August 23, 2000. Mr. Phillips' dues were paid through August, 2000. He was granted a withdrawal card on September 30, 2000. He was admitted on card effective May 1, 2001. During this time, he has worked for UNICCO at another facility, while awaiting arbitration and the decision.

The arbitration was held on April 19, 2001. The arbitrator's decision was received July 13, 2001. In summarizing, the arbitrator states that since he has no authority over Dayton, it is not possible to issue a remedy against Dayton on a violation of the Contract Bargaining Agreement. UNICCO placed Mr. Phillips with another company at another location, which the arbitrator states did not show collusion with Dayton in order to remove Mr. Phillips. The arbitrator's decision avoided reinstating an employee to a job he could not attend. He required UNICCO to pay Mr. Phillips for twenty (20) months, beginning September, 2000, for the wages and benefits he would have earned had he remained employed in the bargaining unit, less any amounts and benefits earned by Mr. Phillips at his present location. It also requires UNICCO to request Dayton remove its ban on grievant's presence at least every four months. If the ban is removed, UNICCO shall reinstate Mr. Phillips to his prior position in the bargaining unit with full seniority.

While awaiting the arbitration and decision and working for a separate UNICCO company in a facility not represented by Local 670, Mr. Phillips continued to be actively involved in the UNICCO bargaining unit and served on the negotiating committee.
Our questions are:

(1) Is Mr. Phillips eligible to run as Business Manager considering he has not actively been employed with 670's bargaining group since August, 2000.

(2) Pursuant to the constitution, a member is required to attend all regularly scheduled Local Union membership meetings and home district membership meetings held after nomination and before election, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family. Mr. Phillips does not have, at this point, a home group meeting because his employer is not represented by Local 670. Up until the arbitrator's decision, dated July 11, 2001, Mr. Phillips was consid-

ered to be in the UNICCO Maintenance bargaining unit. Based on the arbitrator's award, the election committee still considers the UNICCO Maintenance bargaining unit meetings to be Mr. Phillip's home district meeting which he must attend as referenced above. Is this a correct interpretation?

(3) UNICCO, one of Local 670's largest groups of membership, is located within the Dayton Tire Plant in Oklahoma City. Dayton, as owner of the plant, has forbidden Mr. Phillips from being on the property. Is Mr. Phillips qualified to be Business Manager since he will not be able to meet with management or members at this location?

Your assistance in this is greatly appreciated.

Fraternally,

BILL RUSHING

*Business Manager*
*Local 670*

---

# Decision

July 31, 2001

MR. BILL N. RUSHING
Business Manager
IUOE Local No. 670
58 Broadlawn, P.O. Box 2418
Ardmore, OK 73402

DEAR SIR AND BROTHER:

Reference is made to Local Union 670's July 26, 2001 letter in which you request guidance on the eligibility of member James D. Phillips for the office of Business Manager.

Your letter states Mr. Phillips, who is an employee of UNICCO Maintenance, was banned by UNICCO's customer, Dayton Tire Plant, from Dayton premises on August 31, 2000. Shortly thereafter, UNICCO placed Mr. Phillips at another location that is not covered by the agreement between UNICCO and Local 670. While awaiting arbitration on his discharge from UNICCO and an arbitral award, Mr. Phillips was granted a withdrawal card on September 30, 2000. Mr. Phillips was re-admitted to Local 670 effective May 1, 2001. On July 13, 2001, the arbitrator found that UNICCO's removal of Mr. Phillips from the bargaining unit violated the collective bargaining agreement between UNICCO and Local 670, but declined to order reinstatement to a job that Mr. Phillips cannot attend.

Article XXIV, Subdiv. 1, Section (a) provides that "no member shall be eligible for election to, be elected to, nor hold the office of Business Manager, unless he shall have been continuously in good standing in the Local Union electing him for a period of two years, in addition to fulfilling the qualifications for other Local office." In light of the fact that Mr. Phillips withdrew from membership for a seven-month period during the two-year period prior to the election, Mr. Phillips is ineligible to run for the office of Business Manager.

In view of my disposition of Local 670's first inquiry, this decision does not reach the issues of whether Mr. Phillips satisfied the meeting attendance requirements of the International Constitution or whether Dayton's continuing ban of Mr. Phillips from its property renders him unqualified.

Fraternally yours,

FRANK HANLEY

*General President.*

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

## LOCAL NO. 320

August 27, 2001

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear President Hanley:

We are writing in regard to the tie vote we still have after a re-count of Trustee votes on August 23, 2001.

Since our By-Laws state election by mail referendum, would you please furnish us with a letter stating whether an Australian Ballot may be used or mail referendum.

Both candidates have expressed a desire for mail referendum, but we are looking at the over-all expense of holding a mail referendum election.

We would appreciate an answer from your office as soon as possible.

Fraternally,
Danny L. Williams
*Business Manager*

———

## Decision

August 29, 2001

Mr. Danny Williams
Business Manager
IUOE Local Union No. 320
405 Dr. Hicks Boulevard, East
Florence, AL 35630

Dear Sir and Brother:

Reference is made to your letter of August 27, 2001, in which you ask whether Local Union 320 may conduct the run-off election for the office of trustee, which is required as a result of a tie vote, by Australian ballot. You note that the Local's bylaws provide that the election of officers shall be by mail referendum, but also raise concerns about the expense of conducting another mail referendum for the run-off election.

Please be advised that, in the unusual circumstances presented here, in my opinion the Local Union may conduct the run-off election for the one office in question by Australian ballot. Adequate notice of the election, i.e., 15 days minimum, should be supplied to all members, and all rights and safeguards applicable in the regular election of officers should also be provided in the run-off election.

Fraternally yours,
Frank Hanley
*General President.*

## LOCAL NO. 520

January 10, 2002

Mr. Frank Hanley
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

Dear President Hanley:

This is a request for an interpretation of the Constitution governing the International Union of Operating Engineers concerning a membership vote to be conducted with respect to Local 520's referral system.

A vote is to be conducted among affected members at a regular monthly meeting on Friday, January 11, 2002 on the question of the Local Union's adoption of a first-in, first-out referral system. A faction of the membership opposing change from the present seniority system argues that because this is a special issue, a two-thirds vote in support of the proposition would be required. The Local's view is that because the subject matter involves working rules which have been incorporated in our labor agreements, only a simple majority is required for change. See Article XXIV, Subdivision 11, Section (f).

Because the vote is imminent, we request your written interpretation and decision as promptly as possible.

Respectfully,
Delbert Birkner
*Business Manager*

———

## Decision

January 10, 2002

Mr. Delbert Birkner
Business Manager
IUOE Local Union No. 520
520 Engineer Road
Granite City, Illinois 62040-2893

Dear Sir and Brother:

Reference is made to your facsimile transmission to me today in which you request my interpretation of the International Constitution concerning a membership vote to be taken at Local 520's membership meeting tomorrow evening. The vote will be on modifications to the Local's referral rules. I understand that the referral rules have previously been incorporated into the Local's collective bargaining agreements. You indicate that certain members are contending that a two-thirds vote in support of the modifications is required, while the Local's view is that a simple majority is sufficient.

Please be advised that the Local's view is correct. Under the circumstances you describe, the requirements of Article XXIV, Subdivision 11, Section (e) of the International Constitution will be met by a simple majority vote of the members present at tomorrow night's meeting, and there is no requirement for a two-thirds vote.

Fraternally yours,
Frank Hanley
*General President.*

## LOCAL NO. 139

January 16, 2002

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

RE: TREASURER SALARY

DEAR SIR AND BROTHER:

At the regularly-scheduled General Membership Meeting conducted on January 12, 2002, a Motion was made under New Business by Brother Russell Retzack, seconded, and carried, "that Treasurer Patrick Rukamp receive $1,123.60 per week, plus receipt that expenses not to exceed $1,000.00 per month." It is my belief that this Motion should have been ruled out of order and ask the opinion of the General President on this issue.

As I understand it, the Constitution of the International Union of Operating Engineers does not require that the Office of the Treasurer be compensated in any way, nor do the By-Laws of the International Union of Operating Engineers, Local 139 require that the Treasurer be paid a salary. In fact, under Article XXIV, Subdivision 1, Section (a) of the Constitution:

OFFICERS, TITLES

The Business Manager shall be the chief executive officer of the local union. He shall appoint any and all representatives, agents, and assistants, whose wages and allowances shall be determined as provided in the By-Laws. They shall work directly under his supervision. He may terminate them at any time. Should the Business Manager discharge any such employees, then said employees shall not be re-employed or paid by the Local Union in any capacity during the term of office of such Business Manager, unless his prior approval has been given.

Indeed, under the Local 139 By-Laws, the Business Manager shall "appoint any and all representatives, agents, and assistants and set their salaries and allowances."

No provision of the By-Laws permits the General Membership to employ and/or set salaries of any individual officer or agent of the local union.

My reading of these documents suggests that there is no constitutional or by-law authority to allow the Motion which was made and passed on January 12, 2002 and to require Local 139 to pay a salary to Treasurer Rukamp. My question to you, sir, is whether any precedent exists for what occurred, and then whether I should consider this Motion to have been out of order?

Thank you for your attention and guidance in this matter.

Fraternally,

DALE A. MILLER
*Business Manager*

# Decision

February 1, 2002

MR. DALE A. MILLER
Business Manager
IUOE Local Union No. 139
N27 W23233 Roundy Drive
P.O. Box 130
Pewaukee, WI 53072

DEAR SIR AND BROTHER:

Reference is made to your letter of January 16, 2002, in which you ask my opinion as to the validity of a membership motion to pay the Treasurer a salary of $1,123.60 a week and expenses not to exceed $1,000.00 a month.

Please be advised that in my view the motion in question in effect requires the employment of the Treasurer as an employee of the Local Union and is therefore directly contrary to Article XXIV, Subdivision 1, Section (a) of the International Constitution, which gives the Business Manager the sole authority to employ all representatives, agents and assistants of the Local Union. Accordingly, the motion was out of order and is of no force and effect.

Fraternally yours,

FRANK HANLEY
*General President.*

## LOCAL NO. 302

April 1, 2002

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR GENERAL PRESIDENT HANLEY:

Local 302 is holding their election of officers this year. Nominations are in June and the ballots are to be counted the last of August. A question of financial support for candidates has been posed. If a member owns a company that is signatory to IUOE Local 302, can he/she make a personal campaign contribution to any candidate? If so, could the contribution be paid by company check or only by a personal check, cash, or money order?

I look forward to your reply.

Sincerely,

MALCOLM J. AUBLE
*Financial Secretary*

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

# Decision

April 10, 2002

MR. ALLAN B. DARR
Business Manager
IUOE Local Union No. 302
18701 120 th Ave., N.E.
Bothell, WA 98011

DEAR SIR AND BROTHER:

Reference is made to a letter from the Financial Secretary of Local Union No. 302, requesting my opinion on the question of whether a member who owns a company that employs operating engineers and is signatory to a Local 302 contract is permitted to make campaign contributions to a candidate for Local Union office and whether such contributions, if permitted, may be paid by company check or only by a personal check, cash or money order.

Please be advised that the Labor Management Reporting and Disclosure Act prohibits campaign contributions from employers to a candidate for union office. In addition, Article XXIV, Subdivision 1, Section (e) of the International Constitution prohibits a candidate from accepting any direct or indirect financial support from any corporation or other such entity. In my opinion, in light of these prohibitions, the individual in question—a signatory contractor who employs operating engineers—should not make contributions to a candidate for Local Union office and a candidate should not accept such contributions.

Fraternally yours,
FRANK HANLEY
*General President.*

---

## LOCAL NO. 66

June 5, 2002

DICK GRIFFIN
General Counsel
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

RE: ELECTION ELIGIBILITY

DEAR MR. GRIFFIN:

Please confirm eligibility status of attached member by phone at 1-800-231-8071 with a follow-up letter concerning this matter. Thank you. We appreciate your assistance.

Fraternally,
DENNY MANOWN
*Business Manager*

(Attachment not reprinted)

---

# Decision

June 7, 2002

MR. DENNIS C. MANOWN
Business Manager
IUOE Local Union No. 66
300 Seco Road
Monroeville, PA 15146

DEAR SIR AND BROTHER:

Reference is made to your facsimile to IUOE General Counsel Richard Griffin concerning the eligibility of a candidate for office in the upcoming Local 66 election. As the matter involves an interpretation of the IUOE Constitution, it has been referred to my office for a reply.

The candidate involved paid his dues for April, May and June 2001 on June 13, 2001. I understand that Local 66 accepts dues payments on a monthly, quarterly or annual basis and Article XIII, Section 1 of Local 66's bylaws references monthly dues. Article XXIV, Subdivision 1, Section (b) of the International Constitution requires candidates for Local Union office to maintain continuous good standing for one year preceding the month of nominations. In this instance, the month of nominations was June 2002; therefore, the year for which continuous good standing is required is June 2001 through May 2002. Since Local 66 has monthly dues, the dues for June 2001 became due on June 1. Pursuant to Article XXIV, Subdivision 7, Section (c), there is a 30-day grace period within which dues must be paid in order to maintain good standing. Thus, June 2001's dues had to be paid within 30 days of June 1 to maintain good standing for that month. Since, in this instance, the dues were paid on June 13, it appears that the individual involved maintained his good standing membership during the relevant time period.

Fraternally yours,
FRANK HANLEY
*General President.*

---

## LOCAL NO. 302

July 29, 2002

MR. FRANK HANLEY
General President
International Union of Operating Engineers
1125 17th Street, N.W.
Washington, D.C. 20036

DEAR GENERAL PRESIDENT HANLEY:

A question has arisen over Article XXIV, Subdivision 1, Section (b), which states in part, ". . . in addition, shall have been in regular attendance at all regularly scheduled Local Union membership meetings and home district membership meetings held after nomination and before elections, subject, however, to a reasonable excuse based upon good cause such as physical incapacity or death in family."

Enclosed is a copy of a letter sent to the Election Committee from member Ann Rector concerning her absence at her district meeting. Our question is, would she be eligible to run for office?

Our ballots are to be mailed out on August 5th. A quick response in the form of a fax from your office would be greatly appreciated.

Fraternally,
JACK JAKUBIEC
*Local 302 Election
Committee Chairman*

---

JANUARY 1998 THROUGH DECEMBER 2002

July 28, 2002

MALCOM AUBLE
IUOE Local 302
18701 120th Ave. NE
Bothell, WA 98011-9541

RE: YOUR LETTER DATED JULY 26, 2002 MEETING ATTENDANCE

DEAR MALCOLM:

I have been working on the Grays Harbor Energy Project at Satsop since February of this year and have been attending regular union meetings in Aberdeen. I have rented an apartment in Montesano, where I stay during the week. I usually get to Seattle late Saturday evening and leave again early Monday morning.

We are working long hours on this project and on the Friday that Bothell held its meeting I worked from 6:45 a.m. till 5:30 p.m. and then again Saturday from 6:45 a.m. till 3:30 p.m. I didn't think I could safely make that meeting and return to Satsop for work on Saturday morning. We did not have a meeting scheduled in Aberdeen. I'm wondering if the July and August meetings are considered regular or special. The July meeting at the Bothell hall was on the second Friday of the month instead of the first Friday. It is the usual practice of Local 302 to cancel our regular meetings during the summer months because that's when we are all working long hours and are pretty tired by the end of the day. In fact, I don't remember a time in the 24 years that I've been a member when we have had summer meetings. This coming week I will be working 4-12 hour shifts, 2-10 shifts and possibly 8 hours on Sunday. I will do my best to make the August meeting, even if I'm late.

I am a proud member of Local 302 and have always done my best to support my brothers and sisters. We have our hands full on this jobsite with Fluor-Daniels and its various subcontractors. We are working under the National Stabilization Act and are having to fight in the trenches. Chasing ironworkers and boilermakers off forklifts, electricians off boom trucks, and laborers off bobcats, all under the threat of being terminated by Fluor-Daniels. This last Wednesday all of the Fluor-Daniels operators stood together and refused to work overtime and left the jobsite together. We were intending to leave after 8 hours on Thursday as well and the management of Fluor-Daniels was planning to meet us at Brass Alley with our checks. Grant Alexander had to come in and save the day which he did masterfully. Some battles we win some we lose but we are doing the work we're supposed to be doing as good members of our union.

I hope this helps the election committee when they are considering my reasons for not making the July Bothell meeting.

Sincerely,

ANN RECTOR

———————

July 30, 2002

RICHARD GRIFFIN
General Counsel
International Union of Operating Engineers
1125 17th Street NW
Washington, D.C. 20036

DEAR RICHARD:

A question about the requirement for attendance at regular meetings has been raised for candidates running for office.

At the June nomination meeting, it was motioned, seconded and passed to move the regularly scheduled July meeting from the first Friday of the month, July 5, to the second Friday of the month, July 12, due to the Independence Day holiday. The question applies to persons who were nominated but not in attendance at the June nominations meeting in District 1, and were not

notified of the change in the July meeting schedule because no notification was sent to the membership. Would such persons be excused from missing the July meeting and not be ruled ineligible for the election?

If you have further questions, I may be contacted at (425) 806-0302 ext. 112. Please respond by fax as quickly as possible before July 31, 2002, to (425) 806-0030.

Thank you.

Fraternally,

MALCOLM AUBLE
Recording, Corresponding,
Financial Secretary

———————

# Decision

July 31, 2002

MR. JACK JAKUBIEC
Election Committee Chairman
IUOE Local Union No. 302
18701 120th Avenue N.E.
Bothell, WA 98011-9514

DEAR SIR AND BROTHER:

Reference is made to your July 29, 2002 letter to me in which you request my interpretation of the part of Article XXIV, Subdivision 1, Section (b) of the International Constitution concerning reasonable excuses for candidates who miss membership meetings held between nomination and election. You attach a letter from a candidate, Dorothy Ann Rector, explaining the reasons why she was unable to attend a particular meeting. In addition, Local 302 Recording-Corresponding/Financial Secretary Malcolm Auble sent a July 30, 2002 facsimile to IUOE General Counsel Richard Griffin, raising a question about whether failure to notify members specifically of a rescheduled meeting should give rise to a reasonable excuse under the same provision of the Constitution. Since Brother Auble's letter requests an interpretation of the Constitution, it has been referred to my office for a response. Moreover, since both your letter and Brother Auble's letter raise issues concerning the same constitutional provision, I will respond to both letters together here.

As I understand the situation, historically the Local Union has exercised the discretion granted it by Article XXIV, Subdivision 10, Section (a) of the International Constitution to cancel its July meeting. This year, the decision was made at the June meeting not to cancel the July meeting, but rather to move it from July 5 to July 12 due to the Independence Day holiday. No special notice was sent out to the membership concerning the decision to move the meeting date. A number of candidates who were nominated at the June meeting were not in attendance at that meeting and thus were not present when the decision was made to hold the July meeting and move its date to July 12. Brother Auble asks whether this lack of notice concerning the meeting and its new date is a sufficient excuse for candidates who did not attend the July meeting. Sister Rector indicates that, because of her work schedule and her work location, she did not think she could safely get to the July 12th meeting and then make it back to work the next day. Thus, she did not attend the meeting.

Please be advised that, as a general matter, candidate eligibility determinations are to be made in the first instance by the Local Union Election Committee. Thus, the Election Committee should review, for each nominated candidate who missed a meeting between nomination and election, the reason that the individual missed the meeting and whether the reason constitutes a reasonable excuse under the relevant constitutional provision. In this regard, prior Decisions and Opinions of the General President have

DECISIONS AND OPINIONS OF THE GENERAL PRESIDENT

held that working at a substantial distance from the meeting in question constituted a reasonable excuse, and Sister Rector's situation should be reviewed in light of that precedent. Similarly, in my opinion, if the Election Committee were to determine that failure to receive a notice of the changed date of a relevant meeting constituted a reasonable excuse, such a determination would not be contrary to the International Constitution and its prior interpretations.

Fraternally yours,
FRANK HANLEY
*General President.*



**INTERNATIONAL
UNION OF
OPERATING
ENGINEERS**

1125 Seventeenth
Street, N.W.
Washington, D.C. 20036

Frank Hanley
*General President*

Vincent J. Giblin
*General Secretary-Treasurer*



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL J. QUIGLEY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Civ. A. No. 07-600 (RBW) |
| | ) |
| INTERNATIONAL UNION OF | ) |
| OPERATING ENGINEERS, *et al.*, | ) |
| | ) |
| Defendants. | ) |

### DECLARATION OF JOANNA M. PINEDA

1.    The defendants in *Quigley et al. v. International Union of Operating Engineers et al.*, Civ. A. No. 07-600 (RBW) (D.D.C.) have retained me to offer an expert opinion regarding the feasibility of password protecting a campaign website so that the website would be restricted to the 396,000 members of the International Union of Operating Engineers ("IUOE").

2.    I am the founder and CEO of Matrix Group International, Inc. ("Matrix"), which is a full-service Web solutions company that provides web design, development, maintenance, and hosting services. I founded Matrix in May of 1999; since then, Matrix has provided services to a diverse set of clients that includes individuals, non-profits, corporation, and government agencies. A major component of the work that Matrix performs for its clients is to develop password protected websites for members, customers and subscribers.

3.    In my work with Matrix and in other positions I have held involving online and web-based applications (since 1991, I have helped organizations develop websites that have password protection functionality), I have assisted individuals with a wide-range of technical abilities, including novices, in establishing, installing and maintaining websites.

4.   Since founding Matrix in May of 1999, I have spoken regularly at conferences on the topics of Web-enabling an organization, marketing a company through the Web and e-mail, using the Web to deliver member services, creating online marketplaces, and creating a personalized customer experience using Web technologies.

5.   In addition, I have published a number of articles on managing web-based projects and web development strategies.

6.   I have a BA from Stanford University and an MA from The Johns Hopkins University. My resume, along with a list of my publications, is attached as exhibit 1 to this declaration.

7.   I am being compensated at a rate of $250 per hour.

8.   It is my understanding that the IUOE has adopted a Campaign Website Resolution that requires candidates for local union office and their supporters who set up campaign websites to include a password-protection function that limits access to the sites to members of the IUOE.

9.   I have also been informed that the IUOE will utilize a password protection system that provides for remote authentication   meaning that the database containing the list of User IDs and corresponding passwords will be hosted by an independent, third-party web hosting firm. Under this system, when an IUOE member visits a campaign website, he or she will be directed to a third-party web site to enter his or her User ID and password. Once the correct register number and name is entered (or authenticated), the member is automatically redirected back to the original website with the ability to view the web pages on the campaign site.

10.   Based on my experience in establishing web sites and working with individuals and organizations with a range of technical expertise, it is my opinion that those members with the minimal technical expertise required to establish and maintain a campaign website will find it

feasible to add a password protection feature and will not encounter any significant technical

obstacles in doing so.  It is also my opinion that installing a password protection feature on a

website through remote authentication will impose little to no additional cost to members, above

and beyond the cost of establishing and maintaining a campaign website in the first instance.

11.    With respect to the feasibility of remote authentication, I have determined, based

on a survey of the major web hosting services     those popular among home, small business, and

other unsophisticated users    that many of the most popular web hosting services permit a

feature called "scripting," and therefore will support remote authentication. Scripting support

means that the web host will allow programming to be executed on the web server.  The remote

authentication described above requires that a few lines of programming be included in every

page to be password protected in order for the remote authentication system to work.  For

example, the most basic web hosting package provided by Network Solutions and GoDaddy.com

allow scripting and therefore remote authentication.  Two of the other popular web hosting

services   YahooGeoCities.com and Brinkster.com    also allow scripting. .

12.    My opinion that the Campaign Website Resolution will not require a significant

amount of additional technical competence for a member who is already able to establish a

website in the first instance is based on the following considerations.   First, I have been

informed that the third-party independent web hosting firm that the IUOE plans to retain to

provide the remote authentication service will supply all members interested in maintaining

campaign websites with the specific scripts that  they will need to add to all the protected files on

their web sites in order to enable password protection on those web sites.  Members will be

provided with the scripts and detailed instructions for adding the scripts to their web pages.  The

scripts will also be provided in all major programming languages on the Web today, including

3

PHP, Perl, ASP, ASP.NET and Cold Fusion.  Second, I have also been informed that the IUOE

has agreed to retain an outside, independent information technology consulting firm to assist

members experiencing any difficulty entering the programming scripts necessary to enable the

password protection feature.  This assistance should enable even very inexperienced computer

users to implement the password protection feature because the technology firm can walk them

through copying the scripts onto the pages, or perform the work on their behalf.  Active

technical support of this kind is a service that Matrix strongly recommends to all of its clients

Third, the method of password protection that the IUOE has chosen is a particularly simple and

user friendly method.  Members will simply add the programming scripts to their pages.  The

scripts will handle the link to the remote authentication and the automatic redirect back to the

campaign websites.  When combined with the technical support the IOUE will provide, this

remote authentication method is one that, in my opinion, will not impose any significant

additional burdens on members who choose to maintain campaign websites.

      13.     My opinion that password protection through remote authentication will impose

little to no additional cost on a member maintaining a campaign website is based on the survey

referenced above of the major web hosting services.  The most basic web hosting package

provided by Network Solutions and GoDaddy.com allows scripting and therefore remote

authentication, at no additional cost.  For two of the other popular web hosting services

YahooGeoCities.com and Brinkster.com   a user will be required to pay, respectively, three or

four dollars per month extra (beyond the most basic package of each service) to support

scripting.  I would note, however, that, because the cost of the most basic YahooGeoCities

package is very low, the cost of a web hosting service with scripting support on YahooGeoCities

is $6.71 per month, which is nearly $5 per month cheaper than the basic web hosting package

4

offered by Network Solutions.  Attached as exhibit 2 to this declaration are the web hosting

packages offered by each of these web hosting services.

14.    It has been suggested that members who are not candidates, but who are interested

in visiting candidates' websites, will be deterred from entering websites that require entry of a

user identification number and a password.  In my opinion, that is not likely to be the case.  Over

the past few years, web sites that were previously all public have increasingly added some type

of authentication feature.  For example, many news sites (The Washington Post, the New York

Times, the LA Times) that were previously all public now employ password protection systems

where interested visitors can register and login to view protected content.  Moreover, one cannot

perform any type of e-commerce function online without logging in.  In my opinion, web site

visitors are increasingly accustomed to the idea of having to login to a site to access content and

services, and are not deterred by such login procedures.  Indeed, the vast majority of Matrix

clients incorporate some type of password protection on their sites to restrict content to

subscribers, members or registrants.

15.    One of the primary reasons that my clients have expressed for password

protection is to ensure the confidentiality of the information contained on the web site.  Clients

wish to limit access to specific groups of people, e.g., members, Board and committee

volunteers, subscribers, etc.  In addition, once information is posted on the Internet and is made

available without any password protection, it is difficult to ever remove that information from

the public domain.  There are several third-party sites and services that index and archive

information that is posted on the Internet indefinitely (e.g., www.archive.org and Google Cache).

With these archives, even though content has been removed from a web site, it may continue to

be available to the public without the knowledge of the original authors.  Moreover, because of

5

the development of more sophisticated search engines, information on the Internet is easily searchable and, thus, information that a web site owner might intend to be available to members can in fact be located, searched and viewed by the public.

I declare under penalty of perjury under the laws of the United States of America that the facts stated herein are true and correct.

Dated:  May 11, 2007

Joanna M. Pineda

# Exhibit 1 to Pineda Declaration

JOANNA PINEDA
Matrix Group International, Inc.
1033 N. Fairfax Street, 2nd Floor
Alexandria, VA 22314
(703) 838-9777
jpineda@matrixgroup.net

PROFESSIONAL EXPERIENCE

**Matrix Group International Inc.,** *Alexandria, VA*                        April 1999 - present
*Founder and CEO*
- Matrix is a complete, outsourced Internet solutions provider, helping organizations develop and implement complete Internet programs.
- Matrix products and services include: Web-based association management software, Web design, custom database development, hosting, maintenance, and strategic planning
- Matrix works with clients in a variety of industries across the country
- Responsible for all new business development in the corporate, government, and private, not-for-profit sectors.
- Assist clients with their Internet strategy, back office integration, and online marketing
- Areas of expertise include: Internet technology planning, Web Site integration with internal systems, e-commerce, and Web Site promotion.

**Business Information Network, Inc. (BIN),** Alexandria, VA                   October 1994-March 1999
*President*
- Led company's transition away from proprietary bulletin board technology to Web technologies; by end-1995, all bulletin boards were moved to the Web.
- Was responsible for all new business development
- Helped clients understand, choose and implement Internet technologies, especially in the area of Web Site integration with internal databases, e.g., customer and billing systems
- Oversaw all aspects of operations, including finances, hiring, training, and infrastructure.
- Company enjoyed a solid reputation in the association community as a niche player, providing non-profit organizations with excellent Web solutions, exceptional customer service, and innovative technology.

**Business Information Network, Inc. (BIN),** Ft. Washington, MD              October 1991-September 1994
*Asst. to the President/Vice President*
- Was responsible for all new business development.
- Project Manager for the Resolution Trust Corporation's real estate and loan inventory online networks.
- Project Manager for the Federal Communication Commission's online bidding system used during the 1993-1994 PCS auctions.
- Oversaw the re-development of the proprietary bulletin board system from Clipper to C++.

**Ernst & Young,** Washington, DC                                            September 1989-July 1991
*Market Research Assistant,* International Trade Advisory Services Group
- Prepared reports on export and investment opportunities in Europe and Asia for small- and medium-sized companies, especially those new-to-export.
- Authored several chapters of *The Ernst & Young Resource Guide to Global Markets.*

**U.S. Department of State,** Washington, DC                                  June 1990-August 1990
*Sloan Program Intern,* Bureau of Refugee Programs
- Reviewed a cooperative agreement with an outside agency and recommended changes that resulted in savings to the federal government of nearly $500,000.

**San Francisco Education Fund,** San Francisco, CA
*Program Developer/Development and Public Information Coordinator*        August 1987-July 1989
- Achieved fundraising goals for six school-community projects whose budgets totaled $800,000.
- Wrote solicitation letters, proposals, and reports to foundations and corporations.

- Coordinated public relations and marketing efforts, e.g., direct mail and fundraising events.

EDUCATION

**The Johns Hopkins University, School of Advanced International Studies (SAIS),** Washington, DC
*Master of Arts in International Studies and Economics*                    Awarded May 1991
- Book Review Editor, *SAIS Review*
- Robert Harris Fellow

**Stanford University,** Stanford, CA
*Bachelor of Arts in International Relations. Graduated with distinction.*          Awarded June 1987
Studied six months in Paris, France at L'Institut d'Etudes Politiques and L'Université de Paris.
- President, AIESEC-Stanford
- Resident Assistant, La Maison Française
- Teaching Assistant, Sociology Department
- Instructor, Innovative Academic Courses

PROFESSIONAL ACTIVITIES
- Executive Board, DC Web Women
- Board member, Doorways for Women and Families
- Speaks regularly on the subject of

PUBLICATIONS
- April 2005 - Top Ten Lessons From Managing Web Projects, ASAE Technoscope Newsletter
- July 2004 - 17 Tips for Web-Based Trade Show Management - ASAE Meetings & Expositions Section Newsletter
- June 2004 - Land of the Online Giant, Washington Business Journal
- May 2004 - 18 Tips for Web-Based Meetings Management, ASAE Meetings & Expositions Section newsletter
- April 2004 - Small Strategies Growth Strategies, Washington Business Journal
- March 2004 - Washington Business Journal: Winning Back Customers
- Dec 19, 2003 - Annual Checkup, Washington Business Journal
- Nov 10, 2003 - Marketing Tips for Small Budgets, Washington Business Journal
- Sept 29, 2003 - Minority Marketing Outreach, Washington Business Journal
- April 2002 - Creating an Online Pressroom, ASAE Communication News Newsletter
- December 2001 - Nurture a Successful E-Mail List, ASAE Communication News Newsletter
- October 2001 - Creating an Effective Logo, ASAE Communication News Newsletter
- May 2000 - .Orgs Competing in a .Com World, GWSAE Executive Update
- May 1997 - Interviewing and Evaluating Technical Staff, ASAE Technoscope Newsletter
- May 1996 - Five Technology Good Ideas to Increase Productivity, ASAE Technoscope Newsletter

PERSONAL INFORMATION
- Foreign Languages: French (proficient); Tagalog (native).
- Personal: Engaged; excellent health; enjoys cooking, dancing; avid *Star Wars* follower
- Extensive travel throughout the world, including Western Europe, Asia, Africa, Middle East and Australia

**Exhibit 2 to Pineda Declaration**

» **Close window**

# Web Hosting Package Comparison Chart

New! Blog feature for all Unix®-based Web hosting packages. <u>More Info</u>

| | STANDARD WEB HOSTING PACKAGE | ADVANCED WEB HOSTING PACKAGE | PRO HOSTING PACKAGE |
|---|---|---|---|
| **Price:** | | BEST VALUE | |
| **Annual** | **$9.96 a month** with annual agreement ( $119.50 a year) | **$13.30 a month** with annual agreement ( $159.50 a year) | **$29.13 a month** with annual agreement ( $349.50 a year) |
| **Monthly** | **$11.95** | **$17.95** | **$34.95** |
| **Basic Features:** | | | |
| <u>Disk Space</u> | 7 GB | 15 GB | 30 GB |
| <u>Monthly Data Transfer</u> | 150 GB | 400 GB | 500 GB |
| **Blogs:** Unix Only | | | |
| **Auto-Install** | ✓ | ✓ | ✓ |
| **Multiple Blogs** | ✓ | ✓ | ✓ |
| **Customizable Templates** | ✓ | ✓ | ✓ |
| **Multiple Authors** | ✓ | ✓ | ✓ |
| **Spam Protection** | ✓ | ✓ | ✓ |
| **RSS Feeds** | ✓ | ✓ | ✓ |
| **Multi-media (photos, videos, more)** | ✓ | ✓ | ✓ |
| **Privacy Options** | ✓ | ✓ | ✓ |
| **Import Existing Blog** | ✓ | ✓ | ✓ |
| **Domain Features:** | | | |
| <u>Free Domains*</u> | 1 | 1 | 1 |
| **Additional Domains** | $11.99 | $11.99 | $11.99 |
| <u>Domain Pointers / Subdomains</u> | 100 | 100 | 100 |
| <u>Directory Pointers</u> | 20 | 40 | 50 |
| **Email Features:** | | | |
| <u>E-mailboxes</u> | 50 | 100 | 200 |
| <u>E-mailbox Storage</u> | 500 MB | 500 MB | 500 MB |
| <u>Virus Scanning</u> | ✓ | ✓ | ✓ |
| <u>Spam Protection</u> | ✓ | ✓ | ✓ |
| <u>POP3 & SMTP</u> | ✓ | ✓ | ✓ |
| <u>IMAP (over SSL)</u> | - | - | ✓ |
| <u>E-mail Aliases (per e-mailbox)</u> | 3 | 3 | 3 |
| <u>Unlimited E-mail Forwarding</u> | ✓ | ✓ | ✓ |

| | STANDARD WEB HOSTING PACKAGE | ADVANCED WEB HOSTING PACKAGE | PRO HOSTING PACKAGE |
|---|---|---|---|
| **Catch All E-mail Address** | 1 | 1 | 1 |
| **Autoresponders (per e-mailbox)** | 1 | 1 | 1 |
| **Webmail** | ✓ | ✓ | ✓ |
| **Address Book** | ✓ | ✓ | ✓ |
| **External Mail** | ✓ | ✓ | ✓ |
| **Multi-User Calendars** | ✓ | ✓ | ✓ |
| **Task Manager** | ✓ | ✓ | ✓ |
| **Photo Albums** | ✓ | ✓ | ✓ |
| **Journal Manager** | ✓ | ✓ | ✓ |
| **Internet Bookmark Manager** | ✓ | ✓ | ✓ |
| **File Storage** | ✓ | ✓ | ✓ |
| **Instant Messenger** | ✓ | ✓ | ✓ |
| **Web Site Management Tools:** | | | |
| **FTP Accounts** | 3 | 6 | 15 |
| **ImageCafé® Web Site Creator** | ✓ | ✓ | ✓ |
| **FrontPage® Extensions** | ✓ | ✓ | ✓ |
| **Counter** | ✓ | ✓ *** | ✓ |
| **Form-Mail Scripts** | ✓ | ✓ | ✓ |
| **Unix - Web Site Statistics** | Webalizer | Webalizer | Webalizer |
| **Windows - Web Site Statistics** | WebTrends® | WebTrends® | WebTrends® |
| **EZpolls** | ✓ | ✓ *** | ✓ |
| **Guestbook** | ✓ | ✓ *** | ✓ |
| **Message Boards** | ✓ | ✓ *** | ✓ |
| **Logfile Access** | ✓ | ✓ | ✓ |
| **FileManager** | ✓ | ✓ | ✓ |
| **Backups & Restore** | ✓ | ✓ | ✓ |
| **Web Site Development Features:** | | | |
| **CGI-Bin Directory** | ✓ | ✓ | ✓ |
| **Server Side Includes (SSI)** | ✓ | ✓ | ✓ |
| **Perl** | ✓ | ✓ | ✓ |
| **PHP 4** | ✓ (Unix only) | ✓ (Unix only) | ✓ (Unix only) |
| **Java Servlets** | - | - | ✓ (Unix only) |
| **Windows - ASP** | ✓ (Windows only) | ✓ (Windows only) | ✓ (Windows only) |

5/10/2007 8:56 PM

| | STANDARD WEB HOSTING PACKAGE | ADVANCED WEB HOSTING PACKAGE | PRO HOSTING PACKAGE |
|---|---|---|---|
| Windows - .NET | ✓ (Windows only) | ✓ (Windows only) | ✓ (Windows only) |
| **Security:** | | | |
| Shared SSL Cert | ✓ | ✓ | ✓ |
| Password Protected Directories | ✓ | ✓ | ✓ |
| **Application & Database Features:** | | | |
| Windows - Cold Fusion MX | - | - | ✓ (Windows only) |
| Real Audio/ Video Stream | ✓ | ✓ | ✓ |
| Windows Media Streaming | ✓ | ✓ | ✓ |
| Unix - MySQL Database | 4 (400MB) (Unix only) | 6 (500MB) (Unix only) | 10 (600MB) (Unix only) |
| Windows - MS Access | 5 DSN (Windows only) | 7 DSN (Windows only) | 10 DSN (Windows only) |
| Windows - MS SQL Database | - | 1 (200MB) (Windows only) | 2 (300MB) (Windows only) |
| phpMyAdmin | ✓ (Unix only) | ✓ (Unix only) | ✓ (Unix only) |
| **Marketing Tools:** | | | |
| Search Engine Submission | ✓ | ✓ | ✓ |
| E-mail Marketer™ by Constant Contact® FREE 60 DAY TRIAL** | ✓ | ✓ | ✓ |
| $50 Yahoo!® Sponsored Search Credit** | ✓ | ✓ | ✓ |
| $25 Google AdWords™ Credit** | ✓ | ✓ | ✓ |
| **Customer Support:** | | | |
| 24x7 Phone and E-mail Support | ✓ | ✓ | ✓ |
| Online User Guide | ✓ | ✓ | ✓ |
| Flash Tutorials | ✓ | ✓ | ✓ |
| **Hardware and Network:** | | | |
| Redundant Tier 1 OC-192 Backbone Connections | ✓ | ✓ | ✓ |
| UPS Battery Backup | ✓ | ✓ | ✓ |
| Diesel Generator Backup | ✓ | ✓ | ✓ |
| HVAC cooling system with humidity control | ✓ | ✓ | ✓ |
| VESDA system fire protection | ✓ | ✓ | ✓ |
| 24x7 physical security | ✓ | ✓ | ✓ |
| Tape Backup | ✓ | ✓ | ✓ |

Back to top

Web Hosting Packages

* Free domain name service is for one year and contingent upon a minimum annual purchase of a new Web site,

E-Commerce or Hosting package. Free one-year domain name service is for new domain registrations, domain renewals and domain transfers of .com, .net, .org, .us, .biz, .info & .name extensions. Only one free domain is available per order. If you wish to purchase an additional package and receive an additional free one-year domain name, please complete a separate transaction. If you select an eligible domain during the initial purchase process, the domain will be discounted on the "View Your Order" page. If you do not select a domain during the purchase process, a coupon for the free domain will be e-mailed to you after you complete your order, which must be redeemed within 30 days to take advantage of the offer. Valid for initial purchase only and only on domains registered with or transferred to Network Solutions. This offer is not valid with any other offer.

The trademarks, service marks and logos (the "Trademarks") used and displayed on this Site are registered and unregistered Trademarks of Network Solutions LLC or their respective owners.

** Instructions for redeeming these offers will be delivered via e-mail within five business days. All orders subject to validation.

*** This feature is free when you use Image Café to edit your website.

Affordable, full service web hosting packages          https://www.godaddy.com/gdshop/hosting/shared.asp?ci=260#tabs



Start a domain search: [_____] com [GO!]  ▷ 24/7 Sales & Support: (480)505-8877  ▷ Today's Offers  SALE

Go Daddy.com Make a .com name with us!®

SPECIAL OFFER for RegisterFly.com— Customers!

HOT SPOT — See our latest ads, photos events & more!

Quick Podcast Host and share your own podcast!

▷ BobParsons.com
When Saigon fell.
A special message for Vietnam Vets.

| Domains | Hosting & Servers | Email | Site Builders | Business | SSL Certificates | Domain Auctions | Reseller Plans |

Go Daddy Home > Hosting > Checkout

⊞ My Account        Logout
⊞ My Renewals
⊞ My Cart Currency [US$ ▼]
⊞ My Email
⊞ My News
⊞ My Radio News
Site Search: [_____] [GO]
Earn Money - Be A Reseller!  $$

# Hosting Plans
### The world's largest hostname provider!*

FREE Setup!
200 GB Storage
2000 GB Transfer!
99.9%
Network Uptime!

GoDaddy.com hosting plans are ideal for most individuals and small businesses. We're the affordable, reliable place to host your site - with a 99.9% network uptime commitment, 24/7 support, and free access to our exclusive Metropolis Hosting Community - with EVERY hosting plan!. No set up fee, no ad banners or pop-ups, no annual commitment required!

Go Daddy Exclusive
metropolis
hosting community
Over 30 FREE applications help you get the most out of your hosting!

Hosting Support Wait Time: Less than 5 min.

## Choose your hosting plan!

### Economy Plan

○ 2 mo: **$3.99/mo**
○ 12 mo: **$3.59/mo SAVE 10%!**
○ 24 mo: **$3.19/mo SAVE 20%!**

Linux/Windows [Linux ▼]

See Hosting Plan comparison chart

**Plan Features**
• 5 GB Space
• 250 GB Transfer
• 500 Email Accounts
• FREE! Software
• 10 MySQL Databases
• 50 Email Forwards
• Forums, Blogging, Photos
• Metropolis Hosting Community

### Deluxe Plan

○ 1 mo: **$6.99/mo**
● 12 mo: **$6.29/mo SAVE 10%!**
○ 24 mo: **$5.59/mo SAVE 20%!**

Linux/Windows [Linux ▼]

See Hosting Plan comparison chart


[🛒 ADD]

**Plan Features**
• 100 GB Space
• 1,000 GB Transfer
• 1,000 Email Accounts
• Unlimited Web sites
• FREE! Software
• 25 MySQL Databases
• Unlimited Email Forwards
• Forums, Blogging, Photo Galleries
• Metropolis Hosting Community
• $25 Google® AdWords® Credit [1]

### Premium Plan

○ 1 mo: **$14.99/mo**
○ 12 mo: **$13.49/mo SAVE 10%!**
○ 24 mo: **$11.99/mo SAVE 20%!**

Linux/Windows [Linux ▼]

See Hosting Plan comparison chart

**Plan Features**
• FREE! SSL Certificate, $19.99 value!!
• 200 GB Space
• 2,000 GB Transfer
• 2,000 Email Accounts
• Unlimited Web sites
• FREE! Software
• 50 MySQL Databases
• Unlimited Email Forwards
• Forums, Blogging, Photos
• Metropolis Hosting Community
• $25 Google® AdWords® Credit [1]

[1] One promotional credit per customer for a new Google® AdWords® account.    View details.
** On Network

| Overview | Each Plan Features | **Compare Plans -Windows** | Compare Plans -Linux | EXCLUSIVE! Metropolis Community | FAQs | Support |



| **ALL-NEW UPGRADED PLANS!** | ★ Economy Plan | ★★★ Deluxe Plan | ★★★★★ Premium Plan |
|---|---|---|---|
| **Monthly Fee** No Setup Fees! | $3.99 | $6.99 | $14.99 |
| **Min. Purchase Length** | 2 months | 1 month | 1 month |
| No Long-Term Contract Required! | | | |
| **Discounts Available** | 12 or 24 months | 12 or 24 months | 12 or 24 months |
| **Disk Space** | 5 GB | 50 GB 100 GB | 100 GB 200 GB |

Affordable, full service web hosting partners... https://www.godaddy.com/gdshop/hosting/shared.asp?ci=260#tabs

| | 250 GB | ~~500 GB~~ 1,000 GB | ~~1,000 GB~~ 2,000 GB |
|---|---|---|---|
| **Monthly Data Transfer** | 250 GB | ~~500 GB~~ 1,000 GB | ~~1,000 GB~~ 2,000 GB |
| **FTP Users** | 1 | 1 | 1 |
| **Email Accounts** | | | |
| Number of Addresses | 500 | 1,000 | 2,000 |
| Disk Space | 10 MB | 10 MB | 10 MB |
| Webmail | • | • | • |
| "Light" Webmail w/PDA | • | • | • |
| Greeting Cards-200+ designs | • | • | • |
| Forwarding | • | • | • |
| Auto-Responder | • | • | • |
| Catch-All Email Address | • | • | • |
| Fraud, Virus & Spam Protection | • | • | • |
| Message Encryption | • | • | • |
| **Databases** | | | |
| MS Access | • | • | • |
| MS SQL | 1x200 MB | 2x200 MB | 3x200 MB |
| MySQL | 10 | 25 | 50 |
| **Domains** | $1.99* | $1.99* | $1.99* |
| DNS Management | • | • | • |
| Access w/o "www." | • | • | • |
| External Domains | Unlimited | Unlimited | Unlimited |
| Subdomains | 25 | Unlimited | Unlimited |
| Multiple Web sites | -- | Unlimited | Unlimited |
| Alias Domains | • | • | • |
| **General Features** | | | |
| Site Statistics | • | • | • |
| Firewall Protection | • | • | • |
| SSL Certificate | $19.99/yr | $19.99/yr | Included - $19.99 value |
| 24/7 Phone/Email Support | • | • | • |
| Google® AdWords® Credit | -- | $25 | $25 |
| Getting Started Guide | | | |
| Forums | • | • | • |
| Blogging | • | • | • |
| Photo Gallery | • | • | • |
| **Language Support** | | | |
| Frontpage Server Ext. | • | • | • |
| ASP | • | • | • |
| ASP.NET v1.0/2.0 | • | • | • |
| ASP.NET AJAX | • | • | • |
| ColdFusion | $1.99/mo | $1.99/mo | $1.99/mo |
| **FREE Pre-Installed Apps.** | | | |
| MS IE Web Controls | • | • | • |
| WSE 2.0 | • | • | • |
| ASPUpload 3.0 | • | • | • |
| ASPJPEG 1.4 | • | • | • |
| GUIDMaker | • | • | • |
| ASPCrypt | • | • | • |
| **FREE Add-On Apps.** | metropolis | metropolis | metropolis |
| Community Server 2.0 | • | • | • |
| DotNetNuke 4.0 | • | • | • |
| ASP.NET 2.0 Personal Web site Starter Kit | -- | • | • |
| ASP.NET 2.0 Club Site Starter Kit | -- | • | • |
| ASP.NET 2.0 Time Tracker Starter Kit | -- | • | • |

*Plus ICANN fee of 22 cents per domain name year. Certain TLD's only. One 1 yr $1.99* .com, .us, .biz, .info, .name, .net, or .org domain registration transfer or renewal with each qualifying purchase. Recurring billing charges, renewals, premium domain names, and domain backorders are excluded.   More...

⊟ Customers who bought this also purchased:

### ColdFusion MX7

ColdFusion MX7 Add Language Support Learn More
**Just $1.99/mo!** (3 month minimum purchase)

☐ 🛒 Add to cart!

### Traffic Facts



Get valuable information about your visitors! Gather, manipulate and report make-or-break data. Includes data export, raw log files, and graphs. Learn More
**Just $2.99/mo!** (3 month minimum purchase)

☐ 🛒 Add to cart!

Select Months  3 ▾

### SSL Certificates



Powerful, affordable Web site security! Keep your transactions safe with up to 256-bit encryption, 99% browser recognition. Learn More

☐ 🛒 **Add Turbo SSL®** to cart! FREE w/ Premium Hosting Plans

2 Years: $17.99/yr Save 10% ▾

☐ 🛒 **Add High-Assurance SSL to cart!**

2 Years: $74.99/yr Save 17% ▾

☐ 🛒 **Add NEW! Extended Validation SSL to cart!**

2 Years: $399.99/yr Save 20% ▾

### Dedicated Hosting IP



Get a dedicated IP. Learn More
**Just $2.99/mo!** (2 month minimum purchase)

☐ 🛒 Add to cart!

Select Months  2 ▾

 ADD TO CART

⊟ Customer Reviews                                                              1 of 2  >next

**"I know that Go Daddy hosting isn't going to let me down," says Cochrane. "I'm never worried about having enough bandwidth or disk space, and the 99.9% uptime guarantee means my site is always going to be live without interruption for my readers."**

- Todd Cochrane
  author of "Podcasting, The Do-It-Yourself Guide"

* GoDaddy.com is rated the world's largest hostname provider according to Netcraft®.

| Help and Support | About Go Daddy® |
|---|---|
| ■ Frequently Asked Questions  ■ Email Support | ■ Security Center  ■ Go Daddy News Center |
| ■ Telephone Support & Sales  ■ Report Spam | ■ Company Info & Jobs  ■ Customer Testimonials |
| ■ Help Center  ■ User's Guides | ■ What's New  ■ Why Our Prices Are So Low |
| ■ Domain Name Basics Guide  ■ Test Our Products | ■ RSS Feeds  ■ Watch Our Commercials |
|  | ■ GoDaddyGirls.com  ■ Go Daddy HOT Spot |

➠24/7 Sales and Support: (480) 505-8877   ➠Billing Questions? Call (480)505-8855

Free Email Updates! Enter address  GO

Home | Contact Us | Catalog | Cart | How to Pay | Legal | Report Spam | Jobs | Site Index | Whois | Affiliates | Resellers | Link to Us

       

GoDaddy.com is the world's No. 1 ICANN-accredited domain name registrar for .COM, .NET, .ORG, .INFO, .BIZ and .US domain extensions. Source: Name Intelligence, Inc. 2006

Copyright © 1999 - 2007 GoDaddy.com, Inc. All rights reserved.

 




Yahoo! - Help

### Yahoo! GeoCities Plus

No ads on your site.

~~$4.95~~ **$3.71**/mo.[1]

(save 25% for 3 mos.)

[ Upgrade ]

$10 setup fee WAIVED [1]

### Yahoo! GeoCities Pro

Plus get a domain name (e.g. www.widgetdesigns.com).

~~$8.95~~ **$6.71**/mo.[1]

(save 25% for 3 mos.)

[ Upgrade ]

~~$15 setup fee WAIVED~~ [1]

### Yahoo! Web Hosting

Plus get 24-hour phone support

~~$11.95~~ **$8.96**/mo.[1]

(save 25% for 3 mos.)

[ Upgrade ]

$25 setup fee WAIVED [1]

**Tired of ads on your site?**
**Upgrade now and get more**

| Quick Summary | GeoCities Plus | GeoCities Pro | Web Hosting Starter |
|---|---|---|---|
| Ads on your site | No | No | No |
| Your own domain name | No | Yes | Yes |
| Disk space | 500MB | 2,000MB | 5,000MB |
| Data transfer | 25GB | 100GB | 200GB |
| 24-hour toll-free phone support | No | No | Yes |
| Monthly web hosting fee | ~~$4.95~~ **$3.71/mo.**[1] (for 1st 3 mos.) | ~~$8.95~~ **$6.71/mo.**[1] (for 1st 3 mos.) | ~~$11.95~~ **$8.96/mo.**[1] (for 1st 3 mos.) |
| One-time setup fee | **$10 WAIVED**[1] | **$15 WAIVED**[1] | **$25 WAIVED**[1] |
| | Upgrade | Upgrade | Upgrade |

| Detailed Comparison | GeoCities Plus | GeoCities Pro | Web Hosting Starter |
|---|---|---|---|
| **Email** | | | |
| Email addresses (sales@widgetdesigns.com) | 0 | 5 | 200 |
| Storage per email account | N/A | 1GB | 2GB |
| POP and SMTP email access | N/A | Yes | Yes |
| Spam and virus protection | N/A | Yes | Yes |
| **Design and Scripting Tools** | | | |
| PageBuilder and PageWizards online site building tools | Yes | Yes | Yes |
| Yahoo! SiteBuilder desktop site building software with 380+ web site designs | No | No | Yes |
| Perl, PHP, and MySQL scripting and database tools | No | Yes | Yes |
| **Customer Support** | | | |
| 24-hour toll-free phone support | No | No | Yes |
| Online help center and priority email support | Yes | Yes | Yes |
| **Exclusive Marketing Discounts** | | | |

| | GeoCities Plus | GeoCities Pro | Web Hosting Starter |
|---|---|---|---|
| **Search engine sponsored search** | | | |
| $100 credit: Yahoo! Search Marketing | No | Yes | Yes |
| $50 credit: Google AdWords | No | No | Yes |
| **Search engine submission and optimization** | | | |
| Automatic submission to Yahoo! Search | No | Yes | Yes |
| Automatic submission to Google AdWords | No | No | Yes |
| 3-month free trial: Submitnet | Yes | Yes | Yes |
| **Local online business search** | | | |
| 30% off Yahoo! Local Enhanced Listings | No | Yes | Yes |
| **Email marketing** | | | |
| 3-month free trial: Campaigner by GOT | Yes | Yes | Yes |

| GeoCities Plus | GeoCities Pro | Web Hosting Starter |
|---|---|---|
| Upgrade | Upgrade | Upgrade |

---

[1]25% discount is applied to monthly hosting fees for a period of 3 months. Normal monthly hosting fees resume after this initial period. Price offer is open to new GeoCities Plus, GeoCities Pro, and Web Hosting customers only. Limit one offer per customer, and one use per customer on a single account.

Waived setup fee offer is open to new GeoCities Plus, GeoCities Pro, and Web Hosting customers only. Limit one offer per customer, and one use per customer on a single account.

Offer expires 3/31/2007. Offers may not be combined with any other offers or discounts, separated, redeemed for cash, or transferred. Other terms and conditions apply; see the Yahoo! Small Business Terms of Service when you sign up.

Address Book · Auctions · Autos · Briefcase · Calendar · Careers · Chat · Classifieds · Domains · Finance · Games · GeoCities · Greetings · Groups · Kids · Mail · Maps · Member Directory · Messenger · Mobile · Movies · Music · My Yahoo! · News · PayDirect · People Search · Personals · Photos · Radio · Shopping · Sports · TV · Travel · Weather · Web Hosting · Yellow Pages · more...

---

Copyright © 2007 Yahoo! Inc. All rights reserved.
Privacy Policy - Copyright Policy - Terms of Service - Help

About Us  .  Contact Us  .  Webmail Login  .  Customer Login

 **Windows Packages**

For Linux Packages
Click Here

 **LIVE CHAT**

**More Products:**

- High Assurance SSL. Try It for Free!
- Increase Your Sales Today!
  Talk To Your Site Visitors For Free!
- Get A Merchant Account. Apply For Free!
- Build Your Own Photo Album. It's Free!
- Get Email Marketing For Only $9.95/mo
- Get the Developer, Only $10 More!
- Get $25 credit towards Yahoo Search
- See our Linux Packages

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| *FREE DOMAIN NAME INCLUDED | 1 | 1 | 1 |
| WEB SPACE | 200 GB | 300 GB | 400 GB |
| WEB TRAFFIC | 2000 GB | 3000 GB | 4000 GB |
| POP3 E-MAIL ACCOUNTS | 50 | 400 | 500 |
| MS SQL SERVER DATABASE | — | — | 50 MB |
| MYSQL DATABASE AT NO ADDITIONAL COST | — | 100 MB | 100 MB |
| FTP ACCESS | ✓ | ✓ | ✓ |
| 24/7/365 LIVE SUPPORT VIA E-MAIL, PHONE AND LIVE CHAT | ✓ | ✓ | ✓ |
| ONLINE FILE MANAGER | ✓ | ✓ | ✓ |
| WEBSITE BUILDER | ✓ | ✓ | ✓ |
| BRINKSTER CONTROL PANEL | ✓ | ✓ | ✓ |
| | PERSONAL | PROFESSIONAL | DEVELOPER |
| **DOMAIN FEATURES** | | | |
| *FREE DOMAIN NAME INCLUDED | 1 | 1 | 1 |
| EXTERNAL DOMAIN NAMES POINTED TO BRINKSTER NAME SERVERS | 50 | 100 | 200 |
| SUB DOMAINS | 50 | 100 | 200 |
| BRINKSTER DOMAIN NAME MANAGER | ✓ | ✓ | ✓ |
| | PERSONAL | PROFESSIONAL | DEVELOPER |
| **SUPPORTED TECHNOLOGIES** | | | |
| ASP 3.0 | — | ✓ | ✓ |
| ASP.NET | — | ✓ | ✓ |
| PHP | — | ✓ | ✓ |
| FRONTPAGE 2003 | ✓ | ✓ | ✓ |
| 25+ ASP COMPONENTS | — | ✓ | ✓ |
| FTP | ✓ | ✓ | ✓ |

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| XML 4.0 | | ✓ | ✓ |
| WAP ENABLE | ✓ | ✓ | ✓ |
| FLASH ENABLE | ✓ | ✓ | ✓ |
| MS SQL SERVER 2000 DATABASE | | | 50 MB |
| MYSQL DATABASE | | 100MB | 100 MB |
| SSI – SERVER SIDE INCLUDES | | ✓ | ✓ |
| MDAC 2.8 | | ✓ | ✓ |
| MS ACCESS | | ✓ | ✓ |
| .NET MOBILE INET TOOLKIT | | ✓ | ✓ |
| USE OF A DEDICATED SSL CERTIFICATE | | | ✓ |
| SHARED SSL SUPPORT | | ✓ | ✓ |
| VERISIGN PAYFLOW PRO DLL | | ✓ | ✓ |
| ONLINE FILE MANAGEMENT | ✓ | ✓ | ✓ |
| | PERSONAL | PROFESSIONAL | DEVELOPER |

**E-MAIL ESSENTIALS**

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| POP3 E-MAIL ACCOUNTS WITH 500 MB EACH | 50 | 400 | 500 |
| E-MAIL ALIASES | 100 | 500 | 1000 |
| BRINKSTER WEBMAIL | ✓ | ✓ | ✓ |
| ONLINE E-MAIL MANAGER | ✓ | ✓ | ✓ |
| E-MAIL FORWARDING | ✓ | ✓ | ✓ |
| AUTO-RESPONDERS | ✓ | ✓ | ✓ |
| VIRUS PROTECTION | ✓ | ✓ | ✓ |
| | PERSONAL | PROFESSIONAL | DEVELOPER |

**DATA CENTER/SERVER FEATURES**

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| WINDOWS 2003 IIS 6 | ✓ | ✓ | ✓ |
| HOT SWAPABLE HARDWARE REDUNDANT FILE STORAGE | ✓ | ✓ | ✓ |
| DAILY DATA BACKUPS | ✓ | ✓ | ✓ |
| FULLY REDUNDANT CONNECTIONS TO OC48 BACKBONE | ✓ | ✓ | ✓ |
| REDUNDANT NETWORK FIREWALL | ✓ | ✓ | ✓ |

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| 24/7 NETWORK MONITORING | ✓ | ✓ | ✓ |
| 24/7 WEB SERVER MONITORING | ✓ | ✓ | ✓ |

**SUPPORT**

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| 24/7/365 E-MAIL, LIVE CHAT, AND PHONE SUPPORT | ✓ | ✓ | ✓ |
| 90 DAY MONEY BACK GUARANTEE | ✓ | ✓ | ✓ |

**MISCELLANEOUS FEATURES**

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| TRAFFIC STATS | ✓ | ✓ | ✓ |
| ACCESS RAW LOG FILE | ✓ | ✓ | ✓ |
| BRINKSTER CODE BANK ACCESS | ✓ | ✓ | ✓ |

**PAYMENT OPTIONS**

| | PERSONAL | PROFESSIONAL | DEVELOPER |
|---|---|---|---|
| SETUP FEE | $25 WAIVED | $25 WAIVED | $25 WAIVED |
| 3 MONTHS | $7.95 | $11.95/MO | $21.95/MO |
| 6 MONTHS | $6.95/MO | $10.95/MO | $20.95/MO |
| 12 MONTHS | $5.95/MO | $9.95/MO | $19.95/MO |
| 24 MONTHS | $4.95/MO | $7.95/MO | $17.95/MO |
| | Buy Now | Buy Now | Buy Now |

*Requires a 12 or 24 month sign up.

Click here to tell a friend about Brinkster.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MICHAEL J. QUIGLEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 07-600 (RBW) |
| | ) | |
| INTERNATIONAL UNION OF | ) | |
| OPERATING ENGINEERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF DON CHISM

1.      I am the Director of the Information Technology Department for the International

Union of Operation Engineers ("IUOE").

2.      I have served as the Director of the Information Technology Department since

January 17, 2006.

3.      I am aware that the IUOE in January of 2007 adopted the Campaign Website

Resolution ("Resolution") that requires that candidates for local union elections or their

supporters who set up campaign websites must include a password-protection function that limits

access to the sites to members of the IUOE.

4.      In order to assist members in complying with the Resolution, the IUOE will

contract with an independent third-party web hosting service to provide remote authentication of

IUOE members User IDs and passwords in order to access the information on any campaign

website.

5.      The contract between the IUOE and the independent third-party web hosting service will require the IUOE to provide a list of the User IDs and reference numbers for the active membership of the IUOE.

6.      The contract between the IUOE and the independent third-party web hosting service will require the independent third-party web hosting service to create and supply to any interested candidates or their supporters who wish to set up a campaign website the text of what they will need to type into their web sites in order to enable password protection on those websites.

7.      The contract between the IUOE and the independent third-party web hosting service will prohibit the independent third-party web hosting service from logging any data that would identify which member is seeking to access any particular campaign web site or from which geographic location any member is seeking to access any particular campaign web site.

8.      Should any such logging information be created, the contract between the IUOE and the independent third-party web hosting service will further prohibit the IUOE from requesting and the independent third-party web hosting service from providing to the IUOE any such logging information.

I declare under penalty of perjury under the laws of the United States of America that the facts stated herein are true and correct.

Dated:  5/11/07

_____
Don Chism

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL J. QUIGLEY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.                            ) | Civ. A. No. 07-600 (RBW) |
| ) | |
| INTERNATIONAL UNION OF ) | |
| OPERATING ENGINEERS, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### DECLARATION OF PATRICK JOHNSON

1.      I am the paralegal administrator at the law firm of Bredhoff & Kaiser, P.L.L.C.

("Bredhoff & Kaiser"). Bredhoff & Kaiser represents the Defendants in this matter.

2.      On May 11, 2007, I visited the website www.150election.com.

3.      Attached as exhibit 1 to this declaration is a true and correct copy of the minutes

from a February 23, 2006 executive board meeting that were posted on the website

www.150election.com.

4.      Attached as exhibit 2 to this declaration is a true and correct copy of a posting on

the website www.150election.com concerning 2007 contract negotiations by IUOE Local 150.

5.      Attached as exhibit 3 to this declaration is a true and correct copy of the minutes

from an October 19, 2006 IUOE Local 150 meeting that were posted on the website.

I declare under penalty of perjury under the laws of the United States of America

that the facts stated herein are true and correct.

Dated: _____          _____

                                                            Patrick Johnson

# Exhibit 1 to Johnson Declaration

# EXECUTIVE BOARD MINUTES

## 6200 JOLIET ROAD, COUNTRYSIDE, ILLINOIS

### February 23, 2006

Meeting was called to order by Chairman, Steven M. Cisco at 3:00 p.m.

## ROLL CALL

| | | |
|---|---|---|
| William E. Dugan | Ronald Ranieri | Lance Yednock |
| James Sweeney | Donald Matteson | Tim Loftus |
| Steven M. Cisco | Ray Stevens | Greg Allen |
| Dave Fagan | Roger Allen | Roger Hoffman |
| Joseph Ward | | |

Also present:  Matt Ruane, Conductor          Patrick Feeney, Guard

Absent:     William E. Dugan
            Joseph Ward
            Dave Fagan
            Ray Stevens

The Advisory Board recommendations for the month of February was read by Steven Cisco.   On a motion made by Greg Allen and second by Roger Allen, the Advisory Board recommendations were approved.   Motion carried.

A list of members to be suspended for non-payment of dues for six (6) months, along with a list of members twelve (12) months delinquent and to be expelled were reviewed.  On a motion by Don Matteson and second by Lance Yednock, the above action was approved.  Motion carried.

Steven M. Cisco and James Sweeney gave a report on a problem about permits.   After a lengthy discussion, the following procedures (copy attached) were passed on motion by Lance Yednock and second by Roger Allen.  Motion carried.

Each Executive Board Member gave a report on their District.

## ADJOURNMENT

There being no further business, a motion for adjournment was made by Don Matteson and second by Ron Ranieri.   Motion carried.   Meeting adjourned at 4:30 p.m.

Respectfully submitted,

| | |
|---|---|
| *[signature]* | *Donald H Matteson* |
| *Steven M. Cisco* | *Roger F. Allen* |
| *[signature]* | *Tim Loftis* |
| *Joseph P Ward* | *Lance Yedwerk* |
| *David A Fagan* | *Roger S. Hoffman* |
| *Greg Allen* | *Ronald R. Ranieri* |
| *Raymond Stevens* | |

Minutes by Steven M. Cisco

# Exhibit 2 to Johnson Declaration

# 150 Negotiations 2007

## Don't be fooled by the U.E.P. Monkeys

Many 150 members are being told that our election issues will cause a problem with contract negotiations. Steve Cisco said the sky is falling, Jim Sweeney wants everyone on strike, and Bill Dugan, well, he hasn't a clue. Lets look at the facts. Those of you who attended COMET classes will remember the 2 most important factors necessary for negotiating a good collective bargaining agreement.

MARKET SHARE: the amount of union density in a geographic area, not just in your craft but all the associated trades as well.



When you look at the facts it is easy to see that we have all the ingredients necessary for a good contract. In fact we have so many issues on our side a monkey could negotiate our contract!    Enough said.

ECONOMICS: the state of the economy, local and regional.

FACT: We have the largest Union density in the 1,2,3 agreement Area.
FACT: We have the best economy ever in District 1,2,3 and have had for the last 15 years.
FACT: Other crafts have already negotiated good contracts and the Contractors are not going offer much over their settled agreements.

1

# Exhibit 3 to Johnson Declaration

MINUTES OF MEETING OF INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 150 A,B,C, & RA
HELD AT UTICA, ILLINOIS OCTOBER 19, 2006

Meeting called to order by Treasurer Joe Ward.

Minutes of the previous meeting were read by Kevin Troglio.

Executive Board minutes were read by Lance Yednock. Lance gave a detailed report
on the Permit process and why it was overturned by the Executive Board.

Reading of the Per Capita Tax and other monies sent to the General Secretary-
Treasurer
              Per Capita for August, 2006 paid in October, 2006 $183,164.00

A list of sickness, accidents, and deaths was read and members stood for a
moment of silent prayer.

REPORTS OF OFFICERS AND BUSINSESS REPRESENTATIVES

Judge Vicki Wright addressed the membership. Motion was made by Ivon Sharkey
for District #5 to endorse Judge Vicki Wright for Appellate Court. District #5
membership voted approval.

Dean Rankovich reported on work at Citgo. Members asked questions on Citgo job.
Over 100 operators at Citgo. Discussion held on small equipment at Citgo.

Kevin Troglio reported on work in District #5 and problems with windmill. Questions
on ethanol plant in Hennepin from floor and questions about why Dugan didn't help
with Task Force.

Dale Letterly was introduced to District #5 members and questions were addressed
to him. Members told Dale what they expect of him if he represents District #5.

Joe Ward reported on ethanol plant and that the Organizing Department should be
involved on the ethanol plant.

Members discussed the shape of organizing in the Local.

Members asked Joe Ward about the $100.00 per month paid by Business Agents into
a Christmas fund. Joe reported that Bill Dugan gave all agents a $1200.00
raise to pay it.

Members asked Joe Ward how many lawyers are on staff and if they are members
and why?

Members asked Mike Foulk if he hauled corn to Bill Dugan's home in Hancock, Maryland with Apprenticeship truck. Mike answered yes he did. The corn came from the Local 150 property. Members asked Mike Foulk if he bought a car from the Local. He said no, his girlfriend did. Mike was asked if he charged any repairs on that car to the Local. Mike said no. Joe Ward asked Mike Foulk if he kept the proper logs for the semi. Mike said he did not keep any logs at all.

Members asked Joe about AFL-CIO mail-outs and if Bill Dugan had called AFL-CIO and had AFL-CIO not send out mailings to Local 150 members. Bill Dugan did have AFL-CIO NOT send information to members. Bob Paddock called AFL-CIO and had them start sending information.

Bill Markut addressed members about District #5 Retirees Club luncheon on Wednesday, Ocotber25th.

Ron Chiado addressed members about comments made by Steve Cisco about voting rights of retired members. Steve said he would like to take voting rights away from retirees.

Mark Poulos reported on ethanol plant and took questions about the ethanol plant in Hennepin.

SUBJECTS FOR THE GOOD OF THE ORGANIZATION

Dues drawing was won by Franklin C. Read, Reg. #2180799.

35 Year pins were awarded to Gerald Oeschlager, Reg.#1503524, and Jeff Skinner, Reg.#1499091.

40 Year pins were awarded to Tim Yednock, Reg.#1255616 and Ron Chiado, Reg.#125536.

50 Year pin was awarded to Marvin Gum, Reg. #906935.

The Political Action Committee PAC collected $33.00.

Terry Waldron asked Mark Poulos if he talked to Bill Dugan as to who owned property in Hennepin plant. Mark answered yes-Ed Heil and Don Hammond, two Local 150 signatory Contractors.

Roger Hoffman, District#8 Executive Board member addressed members of District#5 about the District #8 meeting.

NEWBUSINESS

Ron Chiado asked if Bill Dugan receives free Health & Welfare through the International. Answered yes- $90.000.00 salary and free Health & Welfare.

Meeting closed per ritual by Joe Ward at 9:20p.m.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                 )
MICHAEL J. QUIGLEY, et al.,      )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )          Civ. A. No. 07-600 (RBW)
                                 )
INTERNATIONAL UNION OF           )
OPERATING ENGINEERS, et al.,     )
                                 )
          Defendants.            )
_____)
```

## ORDER

      The matter came before the Court on Defendants' Motion for Summary Judgment on Count One of Plaintiffs' Complaint and Motion for Judgment on the Pleadings for a Lack of Standing, or, in the alternative, for Summary Judgment on Count Two of Plaintiffs' Complaint.

      The Court having considered the submission of the parties and for good cause shown,

      It is **ORDERED** that Defendants' Motion for Summary Judgment on Count One is **GRANTED.**

      It is **FURTHER ORDERED** that Defendants' Motion for Judgment on the Pleadings for a Lack of Standing on Count Two is **GRANTED**.

      It is **FURTHER ORDERED** that judgment shall be entered in favor of Defendants.

Dated: _____

                                 _____

                                   Judge Reggie B. Walton
                                   UNITED STATES DISTRICT JUDGE