This is a union democracy case in which union members seek to enforce their statutory right to communicate with fellow members and with the public about problems in their union, especially during union elections in which they or others are running for office. The Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") guarantees members' right to speak both to each other and to the general public about union affairs generally and about elections in particular, both in and out of union hall. The LMRDA was enacted to give union members an opportunity to hold their union officials accountable, both within the union and in the arena of public opinion, through the exercise of their right to criticize leaders forcefully and through free and fair elections. Congress specifically considered members' need to communicate with non-members, and included separate language intended to guarantee that right.

Like citizens in other walks of life, members of unions have seized on the Internet as a vital tool for democracy, breaking the stranglehold that incumbents in many unions have on the effective channels of intra-union communication, as well as for reaching out to the general public to explain the problems they are having in their unions. In an effort to assert control over members' use of the Internet, defendants adopted a new rule that forbids members from placing communications about union elections on the Internet unless the web sites are "password protected" so that only members of that union can view them. Because the rule interferes with the right to communicate with members as well as non-members, plaintiffs ask the Court to enjoin enforcement of the rule. Because the new rule will take effect on July 1, members who do not comply as of that date will be subject to discipline, plaintiffs ask the court to issue a preliminary injunction or, in the alternative, to grant summary judgment striking down the rule.[1]

---

[1] Count Two of the complaint challenged a provision in the union constitution that allows union members to be fined for suing the union without exhausting intra-union remedies. In response to this action, defendants have acknowledged that this provision is legally unenforceable under United States law, and at a deposition, defendants committed to begin steps to remove the offending

**FACTS**

The plaintiffs in this case are members of three local unions of defendant International Union of Operating Engineers ("IUOE"), a union with nearly 400,000 members that mostly represents operating engineers, who work on construction sites, and stationary engineers, who work in building and industrial complexes and in service industries. Like most American unions, the IUOE elects its international officers every five years, the maximum term of office permitted by the LMRDA, and its local unions hold their elections every three years, the maximum term permitted by the LMRDA. In IUOE locals, elections are held in August, preceded by a nominating period that begins as early as May. The next IUOE Convention will be held in the spring of 2008. In between Conventions, the IUOE is governed by a General Executive Board ("GEB'), which is headed by the General President of the IUOE, defendant Vincent J Giblin.

Plaintiffs Michael J. Quigley and Joseph Ward are members of IUOE Local 150, a local with 22,000 members who work on construction sites located in Illinois, Indiana, and Iowa. The next election in Local 150 will be held in August 2007. Quigley is the webmaster of the web site for a slate of candidates called Team 150; the web site is located at www.150election.com. This web site sets forth the Team 150 program, as well as containing harsh attacks on the incumbent leadership. Ward is running on the Team 150 Slate for the office of Business Manager, which, as in every other IUOE Local, is the principal officer of the Local. Ward is currently the elected Treasurer of Local 150, and in that capacity has been employed by Local 150. However, because the staff of a local union serve at the pleasure of the principal officer (unless themselves represented by a union and protected by a union contract), Ward's supporters on the Local 150 staff were fired last year once

provision from their constitution. Accordingly, the parties will ask the Court to defer ruling on Count Two for the time being.

Ward's plan to run for Business Manager became known.

Plaintiffs Patricia Kohl and Paul Gonter are members of IUOE Local 18, a local with 15,000 members who work on construction sites located in most parts of Ohio as well as several counties in Northern Kentucky. Kohl and Gonter ran together on a slate of candidates in the last Local 18 election, in 2005. During the 2005 election, Kohl operated a web site, located at www.local18membersvoice.org, which presented statements by herself and Gonter about their reasons for running for office as well as various information about Local 18 and criticisms of the incumbents. After the election ended, Kohl decided to keep the web site in operation, to serve as a platform for continued commentary on union affairs. Kohl wants her criticisms of the Local to be to be read not only by members of the union, but also by the general public, because she believes that public disapproval of wrongdoing by union officers is an important part of holding those officers accountable for their misdeeds. Kohl also intends to use the Members Voice web site to support candidates in the next Local 18 election in August, 2008, when Gonter plans to run again.[2]

Plaintiff Paul Mueller is a member of IUOE Local 39, a local union representing 17,000 stationary engineers employed in Northern California and Nevada. Mueller attempted to run for office in Local 39's last election, in 2005, but was unable to gather enough signatures on a nominating petition. Other candidates had campaign web sites but Mueller did not. In fact, Mueller had never operated a web site and is very unsure of his ability to create one. He plans to attempt a candidacy again in 2008 and has opened a blog for that purpose. His blog could not be password protected pursuant to the system that the union has adopted.

---

[2] Kohl has retired, making her ineligible to run for office. However, in the IUOE, retirees have the option of paying dues and thus remaining active members of the union. Thus, both she and Quigley, who is also retired, have full rights to speak and vote in the union, and are protected by the Union Members' Bill of Rights.

Over the past few years, union members who are dissatisfied with the direction of their unions have seized on the Internet as a way to communicate with each other, and with the general public, about their concerns. Web sites have also played an increasing role both in union elections and in reaching out to the broader public to talk about problems within unions, in the IUOE and elsewhere. It is undisputed between the parties that the Internet has the potential to transform union politics by providing a cheap, yet effective, means of spreading campaign messages.

As the Supreme Court said in another context,

> From a publisher's standpoint, [the Internet] constitutes a vast platform from which to address and hear from a world-wide audience of millions of readers, viewers, researchers and buyers. . . . Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of web pages, . . . the same individual can become a pamphleteer.

*Reno v. American Civil Liberties Union*, 521 U.S. 844, 853, 870 (1997).

Unions have mailing lists but individual members cannot get copies of that list. Candidates for union office have a statutory right to send campaign mailings, at their own expense, to all members, but in a local with between 17,000 and — members, a single mailing can cost $10,000 or more (assuming $.39 per letter plus printing and processing costs). In union elections, members can also campaign at the workplace but, particularly in a construction union, there are a large number of work sites each of which has a small number of members of any given construction union, reducing the cost-effectiveness of such campaigning. The geographical size of plaintiffs locals makes campaigning in person through the local a particularly daunting task. The various tools for online communication – not just traditional web sites, but more contemporary developments such as YouTube, MySpace and blogs – provide a crucial alternative to these means of communicating campaign messages.

Although web sites have been used both by incumbent candidates and insurgent candidates, they are especially important for insurgent candidates, because the principal officer of a local union controls the official channels of communication within the local as well as many of the unofficial ones. The incumbent officers preside at all meetings and control the agenda. There is one union newspaper, controlled by the incumbents and features their pictures and activities, which is mailed to every union member. If there is a union web site, the union's leader controls its content, too. As a consequence of the Business Manager's ability to hire and fire the staff, including for taking the wrong stances with respect to an election, the Business Manager can, in effect, direct all staff to support him in an election at the risk of their jobs. In Locals 18 and 150, the incumbent enjoys the support of a patronage army of 50 and 200 staff, respectively, most of whom are continually in touch with the membership and can communicate political messages in the course of their union duties. This patronage army goes to work sites at union expense, or receive calls from union members looking for help on workplace problems, and can discuss politics with members "incidental to union business." The union leader also controls the staff at affiliated apprenticeship funds and other funs jointly managed with employer representatives but, as a practical matter, under the union's leadership. In a construction local, members also depending for work referrals on the union hiring hall (run by appointed staff), which gives a leader extra clout when talking to members. Given all of these factors, as well as the absence of many of the institutions that support democracy in our national, state and local governments, observers have long noted that unions operate as one-party states, in which there is a significant need to "level the playing field" to allow effective electoral challenges. Summers, *Democracy in a One-Party State,* 43 Md.L.Rev. 93, 117-118 (1984).

As is true elsewhere, the Internet has the potential to change this dynamic and "level the

playing field" for electoral challengers in a labor union.  Kohl credits her campaign web site, in part, for the unusually strong showing in the Local 18 election in 2005.  The web site at http://goldticket.deltaspark.net/index.html, operated by the Gold Ticket, an insurgent slate in the IUOE's largest local, Local 3 in Northern California, has been credited with playing an important role in that slate's upset victory in 2006.  *See* Zeltzer, *IUOE Seeks to Thwart Open Labor Websites,* www.labornet.org/news/0407/iuoecrit.htm.

In January 2007, the IUOE's General Executive Board ("GEB") reacted to this situation by adopting a new rule restricting "campaign websites" operated by "candidates and their supporters. " The GEB is comprise of the IUOE's General President, defendant Vincent J. Giblin, its Secretary Treasurer, and fourteen vice-presidents, each of whom serves simultaneously as the Business Manager of an IUOE local union and thus has an intense interest in a campaign method that threatens to undercut their control of the channels of communication among union members.  The resolution provided that, as of April 15, such web sites would have to be "password protected," so that only union members, using their names and membership numbers as a password, could view the web site. The purported purpose for this rule is to ensure that "sensitive information" about the union does not get into the hands of employers.  However, unlike some other unions, the IUOE does not have any general prohibition on disclosing "union affairs" to non-members (such provisions are not lawful). Instead, the union claims the legal authority to adopt this rule based on a fragment of the IUOE's meeting ritual, in which, at the end of every meeting, members are required to chant together a statement that includes, "our secrets we will keep."  The GEB also relied on its constitutional authority to adopt regulations providing for the fairness of union elections.   Article XXIV, § 1(e). Thus, although the "guard our secrets" rationale would extend to any web site, regardless of whether

it pertains to a union election, the GEB purported to limit its prohibition to "campaign web sites" that relate to union elections.[3]

According to Giblin, anything that a union member says about the union's organizing, negotiating or strategies, as well as undefined other topics, necessarily implicates "sensitive information" that reveals a union "secret."[4] Accordingly, Giblin believes, the union has the power to prohibit a member to criticize the union publicly on these issues, and to insist that such criticisms be set forward only in places to which only union members have access.

As justification for this extraordinary new rule, the union has pointed to two specific incidents, one in Local 30 seven years ago, and one in Local 66 two years ago. The alleged events in Local 30 emerged at a hearing attended in the year 2000 by defendant Giblin, who was at the time an Vice-President of the IUOE, to decide whether to place IUOE Local 30 in trusteeship. During the hearing, Giblin avers that some members complained that employers had been reading the internal union web sites, and had quoted statements on those web sites to the union's disadvantage in both organizing campaigns and contract negotiations. Thus, according to Giblin, the new web site resolution was required to protect union "secrets" from employers who could misuse them to the union's disadvantage. At his deposition, however, Giblin was unable to provide the specifics of what had been said on those web sites. He could, and could not even say for certain whether the statements had appeared on the web sites during **election** campaigns (which would make them comparable to the web sites regulated under the union's rule), or between elections, when the sites

---

[3]As discussed below, however, the line is not a clear one, and hence the right to operate **any** web site about union affairs is implicated by the resolution.

[4]For example, at his deposition, at —, Giblin claimed that a statement by a union leader that the local would "reward its friends and punish its enemies" in the political arena reveals a union "secret" and thus could not be mentioned on a public web site.

would be more comparable to a caucus web site which the union's rule purports not to regulate.[5]

The second incident involved a campaign web site, www.votebeasleyhay.com, operated by Jay Hay and Joe Beasley, who were running against the incumbents in the 2005 election in IUOE Local 66. *Action in the Operating Engineers: reformers campaign in Locals 18 and* 66, Union Democracy Review No. 157, available at http://www.uniondemocracy.org/UDR/99-Action%20in %20Operating%20Engineers%20Locals%2066%20and%2018.htm. According to Giblin, Beasley and Hay posted some minutes of the Executive Board on their web site, and were "informed" by defendant Giblin that minutes are a union secret and may not be revealed publicly. Giblin Affidavit, –; In fact, Beasley and Hay were convicted by their local union and fined $5000. *Action in the Operating Engineers*, Kohl Affidavit —. At his deposition, however, Giblin acknowledged that not everything that happens at a union meeting is a secret, and that not all parts of union minutes must necessarily be kept secret; rather, the need for secrecy depends upon exactly what was said and exactly what the minutes reveal. Dep –. Giblin was unable to recall the specifics of what was in the minutes posted by Beasley and Hay. Dep. —. [6]

Indeed, at his deposition, Giblin acknowledged that the GEB's own minutes are published in the union magazine, and he had no idea whether the magazine goes to libraries or other public places; he also acknowledged that, until the Beasley and Hay situation arose, GEB minutes were included in the pages of the magazine that were publicly posted on the IUOE's own web site. To

_____

[5]The union has the transcript of that hearing but has decided not use the document to establish the factual basis for its justifications of the rule. Apart from the double or triple hearsay problem, plaintiffs question whether Giblin's vague recollections of what he was told during the hearing should be admissible under the Best Evidence Rule.

[6]As with the Local 30, the IUOE has the relevant documents, Giblin Dep. –, but again has decided not to use them to establish the factual basis for the rule.

this day, some IUOE locals proudly post meeting minutes on their web sites. http://www.iuoelocal 317.org/meeting_minutes.htm; http://iuoelocal25.org/minutes.html.

To justify the GEB's invocation of its power to guarantee "fair elections," the union makes the remarkable argument that the resolution **enables** candidates' use of the Internet, by giving them a means to make campaign statements online without being "inhibited" by concern that employers might take advantage of what they say about the union. However, at his deposition Giblin admitted that during the GEB's discussion of the rule, nobody had articulated this as a reason for adopting the rule. Dep —. He also acknowledged that any candidates who **wanted** to password protect their own web sites could readily do so without the rule, because the union could supply member register numbers and names to the candidates or their Internet Service Providers. Thus, the theory of enhancing campaign speech does not support a rule that **requires** that web site be restricted to union members.

On February 12, defendant Giblin announced the new web site restriction rule in a letter to all Business Managers, which directed them to have their local election committees work with candidates in the locals to bring their web sites into compliance with the rule by April 15. Originally, the union planned to provide the necessary data to each candidate's ISP. However, after plaintiffs brought this challenge, the union agreed to postpone the implementation date to July 1, so that the case could litigated on a more orderly schedule, on cross-motions for summary judgment. At the same time, the union undertook substantial refinements to the way the rule would be applied, in an apparent effort to make the rule more defensible. Several "implementation guidelines" were adopted by the GEB on May 11, announced to all IUOE local union business managers in a letter

of that date, and revealed to plaintiffs in the union's summary judgment filed on May 12, 2007.[7]

Under the new version of the rule, instead of allowing each web site operator to construct his own password system, with access to union membership data, the union decided to hire its own contractor to operate the password protection system, and to require all campaign web sites to incorporate a special piece of code, called a "script," that will direct the Internet browser of any person seeking to examine any page on the campaign site to a central database where the Internet user would have to "log in" by entering password information.    Pineda Aff, ¶ –.  There is to be a separate screen reassuring members both that although they are entering their names and register numbers to gain access, their identifying information will not be recorded.  As drafted, the page makes no reference to the involvement of any independent contractor, but implies that the IUOE is directly involved.   Second, recognizing that entering these scripts into a web site might be beyond the capabilities of a rank-and-file member who was not technically adept, the union stated its intention to retain a separate technology firm to help members enter the scripts.  Third, in an attempt to meet the vagueness problem created by some of the loose terms of the rule, the union decided that, instead of announcing standards to decide whether online speech will be free or restricted, members will have to ask Giblin for a ruling on the facts of their situation.   At his deposition, Giblin repeatedly refused (with one exception) to say whether particular web site was within the requirements of the rule, or to articulate any standards by which the rule would be applied, insisting that he would only address individual web site on a case-by-case basis, with advice of counsel,

---

[7]Plaintiffs were advised that the union would be refining the rule, and defendants' proposed a litigation schedule under which they would file the first motion for summary judgment, at which time they would present the newly revised rule.  The parties agreed to try to resolve the case by cross-motions for summary judgment, leaving for later discussion whether the was a need ofr a further stay of the implementation date.

eventually evolving common law standards over a period of months to determine how the rule is to be applied.

The rule continued to evolve even after the union filed its summary judgment papers. Originally, the plan was for the password protection rule to apply to the entire campaign web site, but during the deposition of the union's expert witness on May 18 (who was also retained to create and maintain the password protection system, at least assuming that it survives this case), it became apparent that the union was considering a change whereby the home page of the campaign web site could be accessed without a password, and it would be only the internal pages of the web site that would have to be password-protected. At the deposition of defendant Giblin on May 22, the union announced that campaign web site home pages could only be a "billboard" showing the names of the candidates and the positions for which they are running, and would not be password protected, but that all the links into the web site from the home page (and within the web site beyond that).would be password protected. During his deposition, Giblin gave contradictory answers about what could be on the billboard. Several of the other questions about the application of the rule that arose at the May 18 depositions were answered by letter on May 24, 2007.

Although the principal legal objections posed by plaintiffs in this case are that the rule improperly bars members from communicating about their intra-union concern with the general public, and that the objectives that the rule is said to advance will not, in fact, be served, there are several undisputed facts that show that the rule will also interfere with members' communications with other union members.

First, the accessibility of a web site to the general public is a very significant part of the way in which Internet  hosts reach out to the specific audience whom they want to reach, and as

established by plaintiffs' expert witness Mark Brenner, and largely acknowledged by the union's expert witness Joanne Pineda, the union's password protection requirement prevents web site operators from using those mechanisms. For example, the major way in which Internet users locate web sites in which they may be interested, without knowing the precise Internet address (the "URL") of such sites, is through the use of search engines such as Google. Pineda herself advises her audiences that they must be very visible on Google and similar search engines if they want to be seen online, **CITES**, although during her deposition she downplayed that advice, saying that it doesn't apply in cases where the site owner knows how to reach the target audience directly.[8]  Pineda conceded, however, that search engines cannot index password protected web sites – indeed, her affidavit gave invisibility to Google as one of the reasons **supporting** the rule, on the assumption that the site contained certain content that the site operator did not want exposed to permanent public view. Dep –.  Similarly, intra-union web site operators want their web sites to be visible to the media and to other web sites that union members may see, both because coverage in those locations both gives higher visibility and credibility to their campaigns in the eyes of union members, and because the newspaper report or web site may publish the URL of a web page that its writer found interesting. That is much less likely to happen if all of the substantive content of the web site remains inaccessible to outsiders. Internet users also use RSS feeds to keep track of new material being posted to web sites in which they are interested; the RSS feeder either delivers the new content so that the user can see it without bothering to go to the site itself, or the RSS message induces them to go back to the web site so that they can see the news. But RSS feeds and other similar services cannot be used for password protected web sites. Brenner Aff; Pineda Dep.

---

[8]Pineda admitted that she did not know whether candidates **do** have contact information for union members to convey the URL of their web sites to members.

Second, although there are a number of Internet Service Providers that can host a web site and allow the insertion of scripting code, there are many site hosts that do **not** support scripting, as Brenner explains and Pineda conceded in her depositions. Many of the hosts that do not support scripting are ones that allow the posting of material on the Internet without any technical expertise, and they are often the more contemporary kinds of sites that are popular with tech-savvy and younger audiences. These services include social networking sites such as MySpace, blog hosts such as Blogspot, sites for the posting of videos of photographs such as YouTube and Flickr, and sites for downloading Podcasts. Modern campaigns, whether for President of the United States or for union office, use these sites both because target audiences can be reached there, and because they make it easy to post content and to link back to that content from other sites. The union's password protection system, however, prevents union members from using these resources altogether. In effect, the union's system confines member campaigning to old Internet technology, cutting off use of the emerging technologies that are making it easier and easier to place content online.

Third, the affidavit of plaintiffs' expert witness, Mark Brenner, shows that there is widespread uneasiness on the part of Internet users generally, and of union members specifically, about logging into web sites and providing identifying information to do so. Even the union's Information Technology director implicitly conceded the existence of this concern when he testified that the reason why the union was entering contracts that were bar logging of identifying data, and at the same time bar provision of logged identifying data to the union, is that members worried about such identification. The affidavits of the plaintiffs themselves confirm that members of their locals are worried about having their access to web sites on the "wrong" side of union politics be tracked.[9]

---

[9] Although the login page will apparently contain an express assurance of confidentiality, such assurances could simply remind members of the technical possibility of being tracked by the

The union's expert witness, Joanne Pineda, downplayed the existence of any general reluctance on the part of Internet users to log in to get valued information on an Internet web site, but she based this opinion entirely on two practical examples that she retracted at her deposition. (And properly so, according to the Brenner Affidavit). First, she stated that three major newspapers – the New York Times, Los Angeles Times, and Washington Post, all require log-in to obtain access to protected content on their web sites. At her deposition, however, she acknowledged that each of those newspapers allows access to some information without log-in, and when she was shown research reports and statements by newspaper professionals to the effect that it is only a minority of newspapers that require log-in, and that newspapers are retreating for mandatory log-in because they are worried about losing viewers who do not want to have to log-in, she said first that she really does not know much about the practices of the newspaper industry, and second (after overt coaching from union counsel, at 39, 44) that the example is inapposite, because newspapers require registration but the union's system only requires log-in using information that the union already has. Her affidavit's second example was that "performance of e-commerce functions" require log-in, but at her deposition she acknowledged that "some" e-commerce sites allow viewers to shop and only require log-in to make a purchase (that is, once the viewer has found something on the site that she really wants), and again made the point that the comparison was inapposite because the union requires only log-in and not registration. Pineda seems not to have noticed that even assuming that registration is different from log-in, the newspaper and e-commerce examples were her own, and indeed provided the **only** basis for her opinion that Internet viewers do not mind logging in.

Fourth, although members will certainly know their own names, members are unlikely to

---

union itself.

have memorized their seven or eight digit member register numbers, and they do not do not necessarily carry their union cards with them at all times.   They may be unable to log in for that reason alone.  Indeed, the authentication system requires entry of the member's precise name, and even the error of omitting the middle initial if that is what the union card provides, or including the middle initial if the union card does not provide it, or using a nickname that does not appear in the union record (or not using the nickname), is enough to cause the log-in to be denied.  To be sure, the union member can then go looking for the union card, or, during business hours can call the local union (or the International) to ask for the proper log-in information.[10]  The draft log-in page offers the telephone number of the IUOE's Records Department as the way to obtain the proper information for log-in if entering information from the union card does not work.  But plaintiffs worry about whether every union member will be willing to persist beyond the first failed log-in, or indeed whether the member who is only casually willing to come look at their campaign web sites will both going forward if reaching their web site is not quick and easy.  As one blogger put it in explaining his reaction to newspaper registration and log-in pages, "I am at the point where I am not  going to register to read any content unless it's the New York Times."  A dissenting union member is scarcely the New York Times, and when union members are operating a campaign web site, they want every vote.  A password protection systems that discourages even a small number of members from viewing a candidate's messages on line is of concern, and the undisputed evidence here is that the rule is likely to interfere to a large extent with member access to campaign messages.

---

[10]The password authentication system will set a "cookie" on the user's browser which will, if the user accepts cookies, allow the user to continue looking at other pages on the web site without re-entering the log-in information, but if the user wants to come back on a different occasion, the user will have to enter the log-in information all over again.  CITE.  Moreover, because some Internet users refused to accept cookies as a privacy matter, those users will have to log-in every time they wish to follow a link within the same campaign web site.  Dep. –.

The undisputed facts also undercut the sole justification provided by the union for the password protection rule – that it is needed to protect "sensitive information" from the eyes of employers who may use it to the union's detriment either in collective bargaining negotiations. Even apart from the question whether the union vastly overestimates the extent to which certain information is properly deemed so sensitive that a union member's right to discuss it publicly s overridden by the union's interest in concealment – an issue addressed in the argument section of this brief – the following facts show that the rule cannot effectively serve that objective.

First, as the affidavits of plaintiffs Kohl and Quigley demonstrate, many employers tend to know what is happening within the locals whose members they employ. This is partly true because the relationship between members and union officials on the one hand, and on contractors and their supervisory personnel on the other hand, is not quite so adversarial as the Giblin affidavit makes them seem. Many contractors and many supervisors are themselves former rank and file employees, and they talk to each other about internal union events. Contractors sit on joint boards with union leaders, and they tend to learn about all the major controversies within the local. Indeed, many union members, who have membership cards and register numbers, are themselves employers, who can therefore use that information to log onto any password protected sites. SMF – (*see also* Quigley Aff. ¶ 18. These members range from both small "owner-operators," who simply own a piece of heavy equipment and employ one of two fellow members, to the executives of major contractors who sit at the bargaining table on the employer side of contract negotiations, and include as well various supervisory personnel and foremen for such larger companies. All of these employer personnel hold into their membership status, for a variety of reasons, and all of them have direct access to campaign web sites by using that information.

Second, the union's password protection system does nothing to prevent campaign accusations from getting to employers through other methods, such as by publishing ads in newspapers, writing letters to the editors of print publications, free coverage in the media whether in response to press releases or otherwise. Dep. –. Indeed, because the GEB purported to act under its authority to provide for fair elections, the rule purports not to regulate continuing web sites created by intra-union caucuses, or even an individual union member who has a beef but chooses not to run in an election or to expressly support a candidate for union office. In its brief, the union touts this limit as a way of showing that it really is not limiting much speech, but at the same time what these facts show is that the union's rule does little to accomplish its purported objective.

Third, the union does nothing to thwart the many ways in which its effort to restrict campaign web site information to union members only can be sidestepped. First of all, the union does not guard the secrecy of membership register numbers, which are kept in a variety of locations with little apparent security. Quigley Aff. –. Is the union so confident that employers have no access whatsoever to member register numbers? They surely know the members' names. One peek at a single union membership card gives them the information they need to gain access to any campaign web site in the country! Giblin acknowledged that if a member published his name and register number, that would not violate any union rule. Dep –. Nor would it violate any union rule for a member to print out the entire text of a web site that he viewed online and ship that text directly to an employer. Dep. –. Indeed, the union's expert witness acknowledged that any member who had entered his password data could then download the entire electronic file of a web site and ship it to a non-member, because the union has no security features either to prevent that from happening or even to detect that it was happening. Dep. —. The member's action would also not violate any

union rules, Giblin Dep. –, and of course if a **nonmember** the published the web site with the exact same information, the union would have no recourse because non-members cannot be disciplined by the union.  **CITE** The union's expert witness also admitted during her deposition the common occurrence of the phenomenon of Internet users creating "mirror" web sites, which copy the entirety of another web site that has been threatened with censorship, not out of agreement with the web site's message but simply as an angry response to censorship.  Dep. —.  Apparently, the union is willing to assume that information found on campaign web site is sensitive enough that unscrupulous employers are willing to read through pages of union member web sites in order to find these gems, but that they are not unscrupulous enough to ask their fellow employers with access to provide copies, ot to look around for member names and register numbers that may be easily retrievable.[11]

### Proceedings to Date

Plaintiffs filed their complaint on April 18, 2006.  Even before this date, the parties conferred and agreed on a litigation schedule whereby defendants would refine their rule and file a motion for summary judgment no later than May 11, 2007; then plaintiffs would depose defendants' witnesses and cross-move for summary judgment no later than May 28, 2007.  Defendants are to depose plaintiffs' witnesses and oppose plaintiffs' motion no later than June 8, 2007; and plaintiffs are to file their final reply brief no later than June 15, 2007.  In this way, the parties agreed that they would present the case to the Court for final disposition in advance of the July 1 date when the rule is to be implemented.

---

[11]What is more, because the union has decided not to impose any limits on the number of consecutive times a given Internet user may try to enter a web site using the log-in system, the system is wide open to "hacking," whereby an employer could use a computer to test the log-in system with repeated logins until finding a register number that works.  CITES Because a password that consists only of numbers is relatively easy to hack, the union's log-in system is particularly insecure.  **CITE**

The parties have discussed the question whether the rule's implementation might be postponed further in the event the Court cannot rule by July 1, but defendants were unwilling to make any commitments in that regard until they saw plaintiffs' papers. Plaintiffs still hope that they address the timing issue with defendants on a consensual basis, as they have been able to do with respect to other procedural aspects of the case. However, in the event defendants are unable to agree to any further stay of the implementation date, plaintiffs have made this motion one for summary judgment or, in the alternative, for a preliminary injunction. The following argument addresses the case under the appropriate standards for each alternative motion.

## SUMMARY OF ARGUMENT

The union's threat to impose internal union discipline on any union member who runs for union office or supports a candidate for union office, and creates a campaign web site but fails to limit access to that web site to union members, represents a direct attack on one of the core free speech provisions of the Union Members' Bill of Rights – the right to speak not just to union members but to other members of society about wrongdoing within their union and about efforts to hold their unions accountable. Both the language of the statute and the legislative history reveal that Congress considered the issue of speaking outside the union and deliberately decided to protect outside speech as well as inside speech, and case law going back to the 1960's shows that the court have consistently protected that right. Defendants have tried to downplay their assault on that right, by contending that they seek to restrict speech only on web sites and only during elections, but the Court should make no mistake about what is at stake in this case. If defendants can succeed in taking away the right to speak during elections – the time when the right of free speech is at its apogee, and when the need to speak is at its apogee – or if they can succeed in restricting online

speech on the ground that it is too effective a way for union members to communicate with other union members and with the public – this case will just represent the camel's nose in the tent. If defendants win this case, other unions whose leaders feel threatened by the ease with which union members are able to criticize them online will quick to follow this union's lead, and indeed to expand the prohibited list of forums in which members may speak, lest their speech fall into the hands of the employers.

The union's argument is based in part on a series of false analogies and comparisons. Despite the union's heavy reliance on the Supreme Court's ruling in *Sadlowski v. Steelworkers*, 457 U.S. 102 (1984), which upheld a union rule forbidding candidates from accepting financial contributions to non-members to support their election efforts, this case has nothing to do with outsider involvement in elections – rather, the question is whether union members can, at the same time that they are telling union members why they should vote their leaders out of office, also tell the public why they believe the union leaders are running the union badly. The union also relies on an analogy to the closure of the union's own meetings to outsiders, because union members need to be able to discuss some issues privately. To be sure, when the union calls a meeting, it is entitled to decide who can attend, and who must be excluded; but when union members call a meeting, they too have the right to decide who can attend and who is to be excluded. Other members (or union officers) who do not want to participate in an open meeting are free not to attend (or the dissenters may choose to exclude them, for that matter); the right to caucus under terms of members' own choosing has also been long recognized by the courts. Similarly, if union members decide that they want to discuss their election-related concerns in a public online form, members who do not want to be in a discussion on those terms may choose not to participate, but they may not prohibit such

public discussions.

Plaintiffs fully recognize that there are some secrets that they may learn at a union meeting, such as the exact time when the union plans to walk off the job, or the planned fall-back position in contract negotiations if the union's opening offer is not accepted, or the names of the inside organizers at a particular place of employment – that the union may properly punish them for disclosing. But the right to criticize the decisions, actions, or failures of union officers may not be restricted simply because those failures relate in some way to collective bargaining or organizing. In that regard, the union's assertion that its adoption of a prophylactic rule forbidding all public campaign speech should be tolerated because it is too difficult to monitor campaign speech to decide which speech makes disclosures of secret information, and to impose punishment appropriately, fails because it is apparent that the union vastly overestimates the scope of the speech that it is entitled to prohibit.

Even apart from plaintiffs' basic argument, that the rule violates the LMRDA because its objective of barring public speech represents a fundamental attack on one of the LMRDA's core protections, the rule should be invalidated for three additional reasons. First, the undisputed facts show that in addition to preventing members from communicating with the public, the rule interposes creates several obstacles to communications with members. The log-in procedure is likely to discourage member viewing by making entry into the web sites more difficult and threatening to privacy; password protection prevents campaigners from using public sources such as the media, other web sites, RSS readers and search engines as intermediaries to more effectively bring their criticisms to the attention of members; and the particular technical means chosen by the union for its password authentication process precludes the use of several important means of Internet

-21-

communication beyond the creation of a traditional web site, such as blogs, social networking sites, and video and picture sharing sites, which can easily be used by union members with a minium of technical expertise

Second, the undisputed facts cast substantial doubt on whether the union's rule will actually do much to serve the purpose of keeping campaign web sites from the purview of employers who are determined to see what is there. Many employers actually retain membership in this union, and hence can use their own register numbers to look at every campaign web site across the country, and then share what they find with other employers. Nor are member register numbers treated by the union as secret information, and an employer need only identify a single member's number un order to compromise the protection of every campaign web site. Indeed, a single unhappy member could subvert entire rule by the simple device of posting his name and number online, not to speak of printing a web site or downloading the HTML code or other files from a web site and forwarding to a non-member to display without password protection. Because the rule limiting speech is so easily evaded, its substantial adverse impact on speech by members who want only to play by the rules is simply not worth tolerating.

Finally, the terms "campaign web site" and "supporters" of a candidate are so vague that members will often be unsure whether their speech is outside the rule, and hence protected, or forbidden by the rule, and hence subject to discipline. Indeed, discipline imposed by this union can be quite heavy, including expulsion from union as well as fines of $5000 and higher. Although the union has put forward an "administrative procedure" whereby members of the union may send their proposed speech to defendant Giblin for a ruling, the existence of an administrative remedy is better suited to avoiding a vagueness challenge to regulations under the Due Process Clause, or to rules that

limit commercial speech, than it is when core political speech is at issue. Moreover, it became apparent at Giblin's deposition that he is unwilling to articulate **any** standards that will be applied to such requests for clarification. Instead, he intends to apply qadi justice, taking each case on its own facts and consulting with his attorney, with the promise only that justice will be swift and that, after several months of living under the system, speakers may eventually be able to discern the pattern of his rulings and judge their own situations accordingly. When the speech at issue is core political speech about union affairs, particularly during election periods when free speech protections are at their apogee, that system would not be an adequate response to a vagueness challenge under the First Amendment, and should not be accepted under the LMRDA.

In the final analysis, the rule that the union has adopted simply makes no sense unless the reason for the rule is to chill free speech. If the union's only interest were protecting against disclosure of genuinely secret information, it could adopt a rule against distributing that information. It could even offer a voluntary password protection system and offer it to candidates as a safe harbor – if you use this, you don't have to worry about being disciplined for what you put on your web site. Moreover, there is no obvious connection between secret or even merely "sensitive" information and web sites used for **election campaigns.** The fact that the union has chosen to limit its rule to campaign web sites strongly implies a different motive – the incumbent local union officers (or former local officers) who comprise the GEB are trying to protect themselves against further examples of what happened in Local 3 last year.

### ARGUMENT

**I.    THE UNION"S RULE INFRINGES PLAINTIFFS' RIGHT TO COMMUNICATE WITH NON-MEMBERS ABOUT UNION AFFAIRS**.

**A.  The LMRDA Guarantees Members' Right to Communicate with Non-Members**.

This action seeks to enforce the right of free speech afforded by the Bill of Rights for Members of Labor Organizations in Title I of the LMRDA (also know n by its House sponsors as the Landrum-Griffin Act), 29 U.S.C. §§ 411 *et seq*. Section 101(a)(2) of the Act provides:

Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Section 102 of the LMRDA, 29 U.S.C. § 412, specifically authorizes injunctions to enforce this statute:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

Plaintiff's claim must be considered in the context of the events and concerns which led to the enactment of Title I of the LMRDA.  The LMRDA, and particularly Title I, was the product of hearings conducted in the late 1950's by the Senate Select Committee on Improper Activities in the Labor-Management Field, chaired by Senator McClellan.  S. Rep. No. 187, 86th Cong., 1st Sess. 2 (1959), reprinted in I NLRB, *Legislative History of the LMRDA* 398 (1959) ("Legis. Hist.").  The McClellan Committee investigations revealed many different ways in which corrupt union leaders had dominated unions and remained unaccountable to their members.

Unfortunately, Congress found that union officials did not always subscribe to democratic

views of what is in the best interest of their members.  According to one view, widely-held in the labor movement,

> labor unions should be regarded as military organizations, for their function is to wage economic warfare with employers . . . .  As a wartime army can neither brook divided leadership nor tolerate active dissidents, so must a union punish the trouble-makers in order to close ranks against employers and rival organizations.
>
> Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 829 (1960).

But when it enacted the LMRDA, Congress rejected that view, concluding that the needs of workers would be better served by truly democratic unions in which policies were formulated and adopted after open discussion, debate, and criticism.  *Id.*

As initially reported by the Senate Committee on Labor and Public Welfare, the LMRDA neither protected union members' rights to speak about candidates or to deliberate on union business, nor gave members a right to sue when union leaders retaliated against them for exercising those rights.  Indeed, the Senate Committee consciously decided not to legislate on that topic lest it interfere with unions' internal affairs. I Legis. Hist. 403.  In so doing, the Senate Committee rejected Senator McClellan's proposed Bill of Rights of Union Members.  However, the full Senate repudiated the Committee's attempt to minimize intrusion into union affairs when it adopted the Bill of Rights offered by Senator McClellan as a floor amendment.  These amendments were modified by a set of clarifying amendments offered by Senator Kuchel, and the House confirmed the Senate's action by adopting the Landrum-Griffin substitute for the House Committee's bill.  See Levy, Legal Responses to Rank-and-File Dissent, 30 Buff. L. Rev. 663, 681 n.22, 684 n.118 (1981).

As one court has put it, "the balance was struck in favor of union democracy," *Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir. 1967), *see also Salzhandler v. Caputo*, 316 F.2d 445, 451 (2d

Cir. 1963). Congress applied free speech principles drawn from the Bill of Rights to the activities of the participants in union government. II. NLRB, *Legislative History of the LMRDA*, 1103, 1104 (Senator McClellan), 1104 (Rep. Landrum). In light of this background, although the First Amendment and section 101(a)(2) are not co-extensive, courts have frequently looked to First Amendment principles to guide the interpretation of the LMRDA by analogy. Thus, for example, in *Steelworkers v. Sadlowski*, 457 U.S. 102 (1982), the Supreme Court ruled that "First Amendment principles may be helpful, although they are not controlling," *id.* at 111, and it looked to First Amendment precedents for guidance, although it found them distinguishable. Similarly, in *Reed v. UTU*, 488 U.S. 319, 325-327 (1989), the Court looked to First Amendment principles for analogies in order to decide which statute of limitations to borrow for section 101(a)(2) cases. And in *Black v. Ryder/PIE Nationwide*, 970 F.2d 1461 (6th Cir. 1992), the court looked to a First Amendment case by analogy in formulating jury instructions for a case involving retaliation based on free speech activity in violation of section 101(a)(2).

The specific language in section 101(a)(2) on which plaintiffs rely is the second of three rights, each of which is set apart from the other by semi-colons: "and to express any views, arguments, or opinions;" In the original set of McClellan Amendments, there were separate provisions for the right to speak freely and the right to assemble freely. Under his Bill of Rights, "no longer will a man have to cringe in terror because he may have spoken a word that offended a petty tyrant." II Legis. Hist. at 1098. As Senator McClellan explained, his proposed amendment

> gives union members the right to assemble in groups, if they like, and to **visit their neighbors and to discuss union affairs**, and to say what they think, or perhaps discuss what should be done to straighten out union affairs, or perhaps discuss the promotion of a union movement, or perhaps a policy in which they believe...."

Senator Senator Kuchel's substitute amendment for the bill of rights, as originally introduced,

combined Senator McClellan's right of speech and right of assembly into a single provision, which set forth the same three rights as does the statute as passed, but separated the rights by commas. Senators were concerned that this language was ambiguous about whether speech was protected only at union meetings, or whether union member speech in public was encompassed by the protection of the bill of rights. Senator McClellan proposed the addition of the semicolons for clarity. *Id.* at 1230, 1234. Senator Cooper then stated that it was "wise to make some legislative history on the point," and that he assumed "the purpose of placing a semi-colon at that point, is to assure, if there is any question about it, that the constitutional safeguards of free speech shall be preserved outside the union hall." *Id.* at 1230. Senator McClellan responded: "The purpose is to make certain that union members shall have freedom of speech not only in a union hall but outside." *Id.* Other senators subsequently agreed and the amendment was accepted. *Id.* Courts have agreed that this legislative history definitively shows that the statute intended to protect speech to non-members. *Deacon v. Operating Engineers Local 12*, 273 F. Supp. 169, 173 (C.D. Cal. 1967); *see also Farnum v. Kurtz*, 2 Cal. App. 3d Supp. 1 (Cal. Super. 1969) (citing inter alia *Deacon*, 273 F. Supp. at 172-73, for the proposition that "it has been established by prior decisions . . . [that] freedom of speech is protected outside of the union halls as well as within.").

Consistent with these early cases, federal courts have consistently recognized that section 101(a)(2) protects the right to speak to non-members as well as members, or to speak to members in forums that are open to view by non-members. This interpretation is wholly supported by many cases protecting speech made outside the confines of a union hall or union membership audience. *Helton v. NLRB*, 656 F.2d 883, 895-96 (D.C. Cir. 1981) (finding member's rights violated when the union removed an article posted on an open-use bulletin board at the place of employment because

the article described corruption in the union); *Keeffe Brothers v. Teamsters Local Union No. 992*, 562 F.2d 298, 301 (4th Cir. 1977) (finding the member protected for making a statement "in a public place" that the union official had embezzled money); *Giordani v. Upholsterers*, 403 F.2d 85, 86 (2d Cir. 1968) (protecting a member who wrote a letter to public officials, including elected representatives at all levels, charging union with misappropriating welfare and pension funds); *Deacon*, 273 F. Supp. at 172 (finding a publicly published newspaper article written by a member protected); *Caldwell v. ILA Local 1694*, 696 F. Supp. 132, 134 (D. Del. 1988) (protecting members' right to write a letter published in a local newspaper critical of the union and union leadership); *Pearl v. Tarantola*, 361 F. Supp. 288, 294 (S.D.N.Y. 1973) (protecting statements published in a newspaper attacking union as colluding with employer); *Leonard v. M.I.T. Employee's Union*, 225 F. Supp. 937, 939-40 (D. Mass. 1964) (protecting member who distributed and publicly posted leaflets harshly criticizing union leadership even though union claimed it had the effect of "weakening the union in a critical moment of its negotiations with the employer…."); *Graham v. Soloner*, 220 F. Supp. 711, 713 (E.D. Pa. 1963) (protecting public picketing outside union's offices by union members carrying signs addressed to public officials); *Gartner v. Soloner*, 220 F. Supp. 115, 117 (E.D. Pa. 1963) (protecting public picketing of union by member holding signs with disparaging comments about the union officials).

In fact, speech critical of the union made by a union member directly to an employer has been equally protected under the LMRDA. *Maxwell v. UAW Local 1306*, 489 F. Supp. 745 (C.D. Ill. 1980) (protecting members who issued a letter addressed to the employer expressing criticism of the union for not enforcing certain contract provisions); *Farnum v. Kurtz*, 2 Cal.App.3d Supp. 1, 81 Cal.Rptr. 924 (Cal. App. Dep't Super. Ct. 1969) (protecting a letter that was very critical of the union

sent to both the employer and to the press); *Boilermakers v. Rafferty*, 348 F.2d 307 (9th Cir. 1965) (upholding a compensatory damage award for members punished for distributing a handbill critical of the union to other members, members of other unions, supervisors and employers).

Both this Court and the DC Circuit have been fully committed to the proposition that the right of free speech under the LMRDA includes speech to non-members, or at least speech in forums where non-members can see them. In *Bishop v. Iron Workers*, 310 F. Supp.2d 33 (D.D.C. 2004), the court struck down several provisions in the union's constitution as a violation of section 101(a)(2), including one forbidding members to "reveal any private business or proceedings of this Local Union or of the International Association." Similarly, in *Helton v. NLRB*, 656 F.2d 883, 895-96 (D.C. Cir. 1981), the issue was whether a union had violated members' rights under the National Labor Relations Act by removing a leaflet from a bulletin board maintained by the union on the employer's premises. In the course of the decision, the court of appeals discussed whether the union's action violated any of the core policies of the labor laws, and held that section 101(a)(2) extended to protect the rights of the members of an intra-union caucus to promote its views by posting on the work-place bulletin board. It is, therefore, well-established precedent in this Court that members' speech in forums open to non-members is fully protected by the LMRDA.

**B.     The Web Site Restriction Rule Cannot Past Muster as a "Reasonable Rule" Governing the Member's Responsibility Toward the Union as an Institution.**

Although ignoring the portion of section 101(a)(2) that its rule violates, defendants place the entire weight of their defense of their rule on the proviso that allows a union to adopt "reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." In this regard, the union cites *Steelworkers v. Sadlowski*, 457 U.S. 102 (1984), and

argued that the rule is needed to protect "sensitive information" from being revealed to employers.

Before explaining why the rule does not serve this interest, it is important to lay to rest another purported purpose that the union's brief and Statement of Material Facts repeatedly invoke. Defendants' papers contain fine words about the union's respect for the right of free speech, about the importance of the Internet as a means of campaigning that the union's desire to foster such speech and, indeed, full or professions of concern about whether, absent password protection, some candidates for union office or other members might feel inhibited about speaking candidly, for fear that their words would be taken out of context and cited against the union in some future bargaining or organizing context. However, nothing about the union's rule is needed to enable members to create web sites to discuss union affairs. It is undisputed in the record that IUOE members and candidates have been creating and using web sites addressed to union affairs since the end of the 20th century, and there is **no evidence in the record that a single member has felt the slightest inhibition** about saying what he wanted to say on a web site based on the concern that defendants' counsel put forward. Moreover, at his deposition, defendant Giblin admitted that, in the course of the discussions leading to the adoption of the rule, not a single member of the GEB said anything about the possibility the some members might feel inhibited about what they put on web sites in the absence of password protection, or stated that a purpose of the rule would be to remove such inhibitions. Indeed, two members of the current GEB, William Dugan and Russell Burns, **currently** have campaign web sites online, each of which discusses subjects that defendants say they want to protect from employer scrutiny, and includes information that Giblin regards as "sensitive" material that the rule is intended to keep to members only. It appears that neither member has the slightest concern of the sort that the union's papers assume that any good union member might have. The

-30-

theory that the rule is needed to promote speech is just an argument by the lawyers that finds no basis in the realities of union politics.

Moreover, every one of the reasons that the union gives for its rule would apply just as well to other forms of speech in which union members speak in forums open to public (and employer scrutiny). To be sure, the union goes out of its way to emphasize that in limiting speech on web sites, it is not limiting the right of union members to issue press releases, send letters to the editor, take out newspaper advertisements, distribute leaflets at the workplace, or indeed, direct their communications about the union's supposed secrets directly to an employer. But each of these means of communication is more or less likely to come to the attention of employers, and it is only as a matter of grace that the union has chosen to limit its rule to that. If the union prevails in this case, however, that grace will quickly be abandoned, by these defendants and by other unions. Indeed, little more than ten years ago a candidate for union office was kicked out of the Operating Engineers for telling a newspaper reporter that the union was not running a fair election, Giblin Dep., Exh. –, and in the experience of undersigned counsel other unions have brought charges about going to the press or handing out caucus newspapers that the employer might see. Here, the union confined itself to web site speech, and says it won't restrict any other, but in past cases the speech du jour that had to be restricted was in a newspaper.

The purpose that the union does assert in this case is the need to protect union secrets from being revealed to employers. In order to sustain its burden under the proviso, defendants must make a "showing that the union as an institution would be seriously harmed," *Stachan v. Weber*, 535 F.2d 1202, 1203 (9th Cir. 1976), and must introduce "proof" of such harms. *Keubler v. Clevland Lithographers*, 473 F.2d 359, 363 (6th Cir. 1973). But defendants Material Facts are carefully

phrased to say only what defendants "thought" or "concluded"; they have not introduced **evidence** of serious harms. At most, they recite some hearsay evidence to claim that this happened once several years ago in IUOE Local 30, and cite cases holding that unions may not be **compelled** to disclose certain "highly sensitive and confidential" information, to members or to employers (or that similar records are exempt from disclosure under the FOIA). Def. Mem. 17-20. Plaintiffs agree that there are, in fact, some union secrets that a member could properly be forbidden to disclose, such as the union's fall-back position in collective bargaining ("we'll open by asking for an increase of ten cents a hour but if they offer five cents we'll take it"). But the record makes clear that the sort of "sensitive information" that defendants seek to protect sweeps far more broadly, and includes **anything** that members may say that relates in any way to three "critical issues" – contract negotiations and bargaining, organizing, and union strategies – and indeed several other unspecific topics.

For example, at his deposition, defendant Giblin stated that a statement that, in dealing with politicians, a local union follows the policy of "reward our friends and punish our enemies" is the sort of statement that the rule is intended to keep from employers. SMF ¶ 64(a). Statements by incumbents, bragging that pensions had quadrupled over the past fee years, or that he had negotiated "the best agreement any member of the local has ever worked under," or criticisms by insurgents, complaining the employees in a large bargaining unit had decertified the union because they incumbent did not provide good representation, or the mere use of the words "worried about contract negotiations read on," all represent the type of information that the union's rule is trying to protect from being disclosed to employers. *See* SMF ¶ 64. Given that the union sees its power to prevent public criticism as extending so broadly, it is not surprising that the union claims that it wants a

prophylactic rule that protects it from having to say exactly was public speech ought to be prohibited. Had the union sought to punish these candidates for speaking these words publicly, not a single such case would survive an LMRDA claim under section 101(a)(2).

The one example that the union cites pertaining to any of the five plaintiffs further illustrates the unsupportable breadth of the union's attempt to censor speech. The union cites a leaflet provided on the web site of plaintiffs Ward and Quigley that contains opinions about upcoming contract negotiations. Def. Mem. 18-19. The court is urged to look at the document, which, apparently responding to statements by the incumbent business manager suggesting that Ward's arguments threaten the union's ability to negotiate a good agreement. The leaflet argues that a union's ability to get a good contract rests on the extent of its organization and other factors, and that the union is so strong that "even a monkey could negotiate a good contract." It is hard to understand what insights about the union's strategy defendants think an employer could derive from such talk, that the employer would not have thought for itself.

Defendants also suggest that their rule is needed to preserve the sanctity of secret union meetings, in light of the fact that some campaign web sites include the minutes of union meetings. However, defendant Giblin conceded at his deposition that not everything that is said at union meetings needs to be kept secret, and that not every portion of union minutes needs to be kept secret. SMF ¶¶ –. Indeed, at his deposition Giblin undercut the broad claims in his affidavit that the IUOE jealously guards the secrecy of minutes of GEB meetings, SMF —, and some locals **still** proudly post their minutes on their web sites. *Id.* ¶ –. If there is a problem with respect to the posting of minutes on web sites, the problem can be addressed specifically, noit by a prophylactic rule forbidding any

publish speech on campaign web sites.[12]  Moreover, the fact that a union may exclude non-members from its own meetings, out of a desire to foster membership debate there, does nto bmean that the union is entitled to tell union members who operate their own caucus or campaign whom they may invite to their own meetings, or whether those meetings may be held in a forum open to public view.

Defendant also cite repeatedly to the Supreme Court's ruling in *Sadlowski*, but apart from setting forth general standards, that case has no relevance to the rule at issue here.  In *Sadlowski*, the question was whether a union can forbid candidates in a union election to accept campaign contributions from non-members of the union, against the backdrop of legislative history suggesting that Congress wanted to keep union's free of improper control by certain outsiders.  There is no issue of outsider involvement in the union here, however.  The question here is whether members are forbidden to allow access to campaign web sites to non-members, not because they seek assistance in the election, but because they want non-members to read their criticisms of the union (or do not care whether that happens), and the relevant legislative history makes clear that Congress wanted to **protect** the right to communicate with non-members about union issues.  Another important distinction between this case and *Sadlowski* is that the rule at issue there had been adopted overwhelmingly by the democratically elected delegates to a union convention.  The IUOE's rule, was elected by an executive board comprised almost entirely of Vice-Presidents who simultaneously serve as Business Managers of local unions, and who have an intense interest in protecting themselves from the use of the Internet to foster more effective electoral challenges.[13]

---

[12] The union cites an example from a campaign web site in IUOE Local 66 two years ago, on which members posted union minutes.  Def, Mem.  –; At his deposition, however, Giblin could not say anything specific about what was in the minutes – namely whether they reveal any secrets.

[13] The GEB invoked its authority under the IUOE Constitution to adopt procedures to ensure fair local union elections as the sole legal authority for the rule.  SMF –.  However, the rule has

The union's "reasonable rule" defendant should also be rejected because the rule is so unlikely to accomplish the supposed purpose of preventing the union's supposed secrets from being seen by employers. First, this is a union in which many members are employers, ranging from small contractors who own one or two pieces of heavy equipment and employ other IUOE members, to the heads of large contracting companies, and every level of employer supervisor in between, and in which these employers and employer representatives frequently talk with rank-and-file members and learn about intra-union controversies that way. SMF –. Second, the union does not bar members from publishing the very same "secrets" in leaflets given out at the work place, where they are likely to fall into the employer's hands, or in newspaper ads, letters to the editor, or other kinds of public communication. Third, the union does not make a secret of member names and register numbers – the passwords that will have to be entered in order to gain access to campaign web sites. SMF –. Indeed, a single member could either publish his name and password online, or send that information to an employer, and that information would be enough to allow any employer in the country from accessing any IUOE campaign web site. SMF –. Nor, indeed, does the union's rule (or its password protection system) prevent a member from either printing out the web site and sending it to an employer, or indeed from downloading the web site files in electronic form and sending them to a non-member to republish them with immunity from the union's disciplinary power. Indeed, the union's own expert acknowledged that Internet users who oppose censorship will often "mirror" sites, not because they agree with the site owner's opinion, but simply out of outrage against

_____

nothing to do with the fairness of union elections, given the fact that members have been perfectly capable of erecting campaign web sites without the benefit of this rule.

censorship.[14]

Yet another reason why the union's rule cannot accomplish its purported purpose is that its applied only to **election** campaign web sites, but does not bar members form plaving the sane criticisms – and the same supposed secrets – on intra-union web sites that do not promote candidacy for union office.  Indeed, in the one specific case that the union cites as showing the need for the rule – certain web sites in IUOE Local 30 that were allegedly monitored by employers and whose contents were allegedly cited back at the union on contract negotiations and in organizing campaigns – it is not at all clear that the web sites involved **election** campaigns, as opposed to intra-unino caucuses that were attacking a previous elected incumbent. The union's only evidence on this incident is the affidavit of defendant Giblin about what he remembers about hearsay statements at an intra-union hearing in the year 2000, and at his deposition it became quite apparent that his recollections were exceedingly unspecific.  Indeed, a contemporaneous press account strongly suggests that web sites in Local 30 continued past the election.  SMF –. Yet, if it was a "caucus"web site rather than an election campaign web site, even if the union's rule had been in effect in 2000, it would not have prevented the harm that the union says it is trying to prevent.

But the union's invocation of the events in Local 30 casts doubt on the real reason for the rule.  These events – the only **specific** example cited by the union when statements on a campaign web site supposedly revealed sensitive information to the union's disadvantage – occurred more than six years before the rule was adopted.  Much closer in time to the rule's adoption was the effective use of a web site in defeating an incumbent GEB member in his August 2006 local union election,

---

[14]The union's only response to these possibilities is to suggest that if a **candidate** sent his web site to an employer, he could be held politically accountable for doing so.  Def Mem. –.  But any one of the nearly 400,000 members of the IUOE could do the same thing..

SMF –,  not to speak of Ward and Quigley's contemporaneous use of a web site as part of their campaign to unseat the second most senior member of the GEB, William Dugan.  The members of the GEB evidently feel threatened by campaign web sites, and they have responded with a rule that is **limited** to election related web sites.  Because that rule infringes member' right to communicate publicly, and does not any legitimate union purpose,. the rule should be struck down even without regard to the ways it limits members' ability to use web sites to communicate with members, as discussed in the next section of this memorandum.[15]

## II.    THE UNION'S RULE ALSO INTERFERES WITH EFFECTIVE USE OF THE INTERNET TO COMMUNICATE CAMPAIGN MESSAGE TO MEMBERS.

In addition to improperly restricting members right to communicate to non-members, the web site restriction rule also interferes with union members' right to use the Internet too communicate with members of the IUOE whose support – and votes – they seek to enlist.

In this regard, although incumbents as well as insurgents use campaign web sites, web sites provide an especially important resource to a challenger, given the many ways in which incumbent union officers control the official and unofficial channels of communication within the union.  In the IUOE, as in many unions, the Business Manager controls the union newspaper, the union web site, and the union staff which is constantly talking to the member and can be ordered to support the Business Manager's reelection or lose their jobs.  SMF –.  The Fourth Circuit recognized the importance of such factors, in a somewhat different context, in deciding how to construe the

---

[15] Another reason to be skeptical of the union's profession of concern about disclosure of "sensitive information" is its apparent lack of interest in avoiding the disclosure of information on union web sites.  In announcing the rule to local union business managers, Giblin stated that local union web sites and the IUOE's own site should be reviewed to be sure that sensitive informatino is pasasword protected.  Not only are defendants taking no steps to do that, but they left highly confidential information on their own web site open to public scrutiny  SMF –.

LMRDA:

> "[T]he . . . unquestioned purpose of Congress was to ensure fair and democratic elections. Congress recognized that one of the major obstacles to meaningful elections was the inherent advantage of incumbents and it sought to curb the advantage." Summers, *Democracy In A One-Party State: Perspectives From Landrum-Griffin*, 43 Md.L.Rev. 93, 117-118 (1984). When the union bureaucracy has exclusive control of the union membership lists, with addresses, as in this case, and that bureaucracy has continuous contact with the union membership . . . the advantages of incumbency over any attempt of an insurgent to promote his candidacy . . . are obvious.
>
> *Brown v. Lowen*, 857 F2d 216, 218 (1988), *opinion adopted en banc*,  889 F.2d 58 (4th Cir. 1989), *aff'd*, 498 U.S. 466 (1991).

Moreover, the unions' rule is directed at limiting speech in union elections, the time when "this freedom is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership." *Teamsters Local 82 v. Crowley*, 467 U.S. 526, 537 (1984), *quoting Sadlowski*.  The union's restrictions should, therefore, be subject to especially exacting scrutiny.

The undisputed facts, set forth both in plaintiffs' own affidavits and the affidavit of their expert witness Mark Brenner, and largely conceded by the union's affiants during their depositions, show that the password protection rule threatens to interfere with communication to members in a variety of ways.  First, by limiting speech directed to the general public, the union;'s rule interferes indirectly with member access to the web site operator's speech.  SMF —.  For example, the principal way that members of the public, including members, find web pages that contain information in which they may be interested is by using search engines, but a password protected web page cannot be indexed by search engines, and hence will not be returned as a search result.

SMF –.[16]  Candidates often seek press coverage and links on web sites that members may read both to reach out to members and to lend their campaigns greater legitimacy; but the press is not likely to link to a web site that the reporter cannot read.  Internet users also employ RSS readers and other similar techniques to follow new developments on web pages in which they may be interested, but these techniques cannot be used for password protected sites.

Next is the problem of whether all members whom plaintiffs want to each will both to log in when they are confronted with a log in page.  One of the main advantages of communicating over the Internet is ease of use, and when web pages or web sites require login, the natural result is that those who are not highly motivated to view the underlying information may decide to go elsewhere.  SMF —.  This phenomenon is encountered by other web site operators, such as newspapers, some of which require log-in but most of which avoid such requirements because they worry about losing web site traffic.  SM —.  But the problem is compounded in the case of union members surfing online, partly because they may worry about being "tracked" by the union and found to be looking at political propaganda from the "wrong side", SMF –, but also because of the quite practical problem that members rarely memorize their member register number, SMF –. and if they do not have their union card handy they will be unable to enter the proper login information.  SMF –.  To be sure, the union member who is committed to getting onto a campaign web site may ultimately find a way to do so – he can call the union to get the login information, he can come back whether

---

[16]In an apparent effort to address this problem, after they filed their motion for summary judgment, defendants announced during their depositions that they were changing the rule to provide that the campaign web site's home page would not be password protected, but would be limited to a billboard" stating the name of the candidate, office sought, and picture.  SMF–.  In the same deposition, defendant gave inconsistent answers about what could be on the "billboard" page. In any event, as shown by the Brenner Affidavit, a billboard page of the sort described by defendants severely limits the ability to attract Internet traffic through search engines.  **CITE**

he find his union card, and the like – but plaintiffs worry about losing readership by the union

member whose interest in reading campaign speech is only casual.  After all, every vote counts!

Third, the undisputed facts show that the technique adopted by the union for password

protection – which requires members to enter certain code called "scripts" into each of their web

pages so that anyone trying to view those pages will be referred to a web site attached to the union's

centralized password protection database – effectively prevents members from placing their

campaign content on a variety of user-friendly sites that allow the placement of campaign material

without having any technical skill at web site creation.  Modern campaigns, in unions and elsewhere,

typically use social networking sites such as MySpace, blogging sites such as Blogspot, facilities for

placing photos, videos, or audio files such as YouTube and Flickr, and similar facilities, but scripts

cannot be placed on any of those web sites.  For example, plaintiff Mueller was recently able to

create a campaign blog without having any technical expertise, but if the union's rule is upheld he

will have to shut it down.  Indeed, the union's rule forces members to adopt an increasingly

outmoded form of Internet site, assuming the existence of a "home page" located as a domain name

registered by the candidate, with several other pages branching out from that page.

Because the union's rule interferes with the right of plaintiffs and other union member who

start campaign web sites to communicate online with members, and not just with the general public,

the rule should be struck down as a violation of section 101(a)(2).

### III.  THE UNION'S RULE IS VOID FOR VAGUENESS.

As under the First Amendment, union rules may be struck down under section 101(a)(2) of

the LMRDA if they are vague.  *Semancik v. UMW District 1*, 466 F.2d 144, 153 (3d Cir. 1972).  In

this case, although the reach of the term "candidate" is relatively clear, the terms "campaign web

site" and "supporters" is very unclear, espcaily in light of the fact that the union defends its rule on

the ground that it does not limit the right of members to have web sites that are **not** campaign sites.

*Cf. Sadlowski*, 457 U.S. at 115 (outsider rule has less impact on free speech because not applicable

to member speech on issues not directed to elections).

For example, plaintiff Kohl operates a web site that pertains mostly to her 2005 election

campaign, and as such is outside the scope of the rule which applies only to elections beginning in

2007. But Kohl wants to express views on her web site about current elections. For example, there

is scrolling text on her web site supporting the candidacy of plaintiff Ward and his slate, Team 150.

Is that enough to bring her web site within the password protection requirement? And if not, how

much more could she say without having to institute password protection. Similarly, there is

currently a noncampaign web site created by a member of IUOE Local 3 that simply addresses issues

within the local; however, plaintiff Quigley send the site operator a message commending Local 3

for "turning the bums out," recounting the efforts of members of Local 150 to do the same, and

identifying some of the Team 150 platform. Giblin Dep. Exh.'x 13, 14. Does Quigley violate the

password protection rule by placing electioneering comments on an otherwise non-campaign site,

and does the host of that sut Or, what about a "sucks" site, which denounces a person who is

running for office, and urges members to reject him, but does not support any specific candidate?

What about a site that denounced defendant Giblin for his support for the web site rule, but does not

engage in "express advocacy" about whether he (or an opponent) should be elected at the IUOE's

next convention? Indeed, even the term "web site" may be vague because, when shown a YouTube

video at his deposition that the "Gold Ticket" slate used in the 2006 Local 3 election, defendant

Giblin expressed uncertainty about whether it was a "web site." At his deposition, Giblin not only

refused to answer questions about how the rule would apply to such cases, but his lawyers refused to allow him to be asked about the "standards" he would apply in deciding how to construe the rule. The vagueness of these terms will have a chilling effect on member speech.

In response plaintiffs' vagueness claim, defendants offer the availability of an "administrative procedure" whereby members of the union can ask defendant Giblin for an interpretation of the rule as it applies to their particular facts. Def. Mem. 28, *citing Trans Union Corp. v. FTC*, 245 F.3d 809 (D.C. Cir. 2001), and *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489 (1982).

The union's system of administrative interpretation does not save its rule. First of all, *Trans Union* and *Hoffman Estates* both involved challenges to "classic economic regulation" – in *Trans Union* the sale of lists of debtors to marketing companies, and in *Hoffman Estates* the sale of drug paraphernalia. In both cases, the courts were at pains to distinguish the cases before them from non-commercial speech. 455 U.S. at 496, 498; 245 F.3d at 817. When noncommercial speech is at stake, "a more stringent vagueness test should apply." 455 U.S. 699.

Moreover, this in not a case in which there is already a body of interpretation to which members can look to understand how the rule will apply to them. Giblin claimed during his deposition that he would consider each case individually, in a strictly case by case basis, and he agreed that only by looking to see if they could find a pattern in his decisions could a member be able to predict how his case might come out. **CITE**

Sch a regime is quite troubling as applied to core political speech, especially when the practicalities are considered. Member X is thinking about putting a message on a non-campaign web site that is not password protected. But before he does so, he has to write a letter to Giblin asking

whether, as written, the message would provike applicatino of the rule.  Perhaps the member would be wise to send Giblin a range of possible comments, with greater or lesser detail, and witrh more or less explicit reference to an election or to voting, asking which of the alternjatives is too much to escape the rule.  And the web site host who is thinking about whether to include a comment - or deciding what to put on the next web page that he is writing – and must write to defendant Giblin to ask whether this or that detail may be included without running afoul of the password protection requirement.  Nor is it clear exactly what a member must submit to get a ruling.  Giblin testified that sometime it will be necessary to examine the entire web site to make a decision, and sometimes only part of the site will have to be reviewed.    SMF –.  This is precisely the sort of content-specific review of core political speech that most offends the First Amendment, and it should similarly be forbidden under section 101(a)(2).

Indeed, the union;'s invocation of an "administrative review process" should not be permitted to obscure the fact that it is not just interpretation that is being promised – the rule itself keeps changing.  In January 2007, the union first adopted its web site password protection requirement, but it is apparent that the union had not carefully considered the free speech and practical ramifications of its rule, because almost every time the union says something about the rule, it is apparent that the rule has changed.  In the course of explaining why the union was unwilling to give firm answers to issues of interpretation and application during the Giblin deposition, the unions's lead counsel gave the game away – the rule "is in the process of evolution," SMF —,  and, implicitly, the administrative review process will continue the process of evolution. In the end, the union has put forward not a rule but a generalized desire to limit "campaign speech," whatever that might mean in the context of an individual case.  The vague and ephemeral nature of the restriction simply

enhances its chilling effect, and the "rule" should be struck down for vagueness.

## IV.    THE COURT SHOULD EITHER GRANT SUMMARY JUDGMENT OR SHOULD ISSUE A PRELIMINARY INJUNCTION BARRING ENFORCEMENT OF THE RULE.

Plaintiffs have argued above that, based on the undisputed facts, they are entitled to summary judgment invalidating the union's rule forbidding members from placing operating campaign web sites without adopting the union's password protection system.  In the event, however, that the union introduces evidence creating any genuine issues with respect to the material facts, however, plaintiffs ask in the alternative that the Court issue a preliminary injunction barring enforcement of the rule pending the resolution of such factual conflicts.

> When deciding whether to grant a preliminary injunction, the district court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." Id. at 1317-18 A court must balance these factors, and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."
>
> *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (DC Cir. 2007),.quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 (D.C.Cir.1977).

Plaintiffs have shown about that they are highly likely to succeed on the merits of their claim, on at least one of three independent grounds – violation of their right to speak publicly, violation of their right to speak to members, and the vagueness of the union's rule. Moreover, plaintiffs will be severely and irreparably injured if they are denied the right to speak to their fellow union members to solicit their support in the upcoming elections.  First, as the Supreme Court has held, deprivations of rights of free speech are presumed to cause severe, irreparable injury sufficient to warrant the grant of preliminary relief, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and this principle has been held applicable to deprivation of union members' rights under the LMRDA.  *Hummel v. Brennan*, 469

F. Supp. 1180, 1187 (E.D. Pa. 1979); *Ostrowski v. Utility Workers Local 1-2*, 530 F. Supp. 208, 215 (S.D.N.Y. 1980). Indeed, in urging his colleagues to provide a civil action instead of criminal sanctions as a means of enforcing the LMRDA, Senator Javits reassured his colleagues that "a court will act, and act in time." II *Legis. Hist* 1240, 1241.

There is no reason to believe that the union will suffer appreciable injury should the motion be granted. It has introduced **no** evidence of real harm to its interests over the several years that campaing web sites have been in existence in various locals, and any such web sites as now exist have been in existence all year. Under the current schedule, the union will not be implementing its rule until July 1, justy one month before end of the IUOE election season in August of this year. Although there is no doubt that the union would prefer to be able to begin applying its rule this year, the addition of that one month without password protection will scarcely cause substantial injury to the union's legitimate interests. Moreover, even if summary judgment cannot be granted at this time, the parties should be able to conclude the litigation of this case by the end of the year, in time for the rule to be either implemented, or not, during the election season next year.

Finally, the public interest supports the granting of the preliminary injunction. "The public has an interest in assuring that unions, which have taken on a fiduciary duty with respect to workers in the United States, and in which those workers have reposed their trust, do not abuse their power." *v. McCarthy*, 743 F. Supp. 894, 901 (D.D.C. 1990). Moreover, the public interest is served by the issuance of a preliminary injunction "where, as here, there has been a violation of the LMRDA's bill of rights." *Bauman v. Presser*, 117 LRRM 2393, 2401 (D.D.C. 1984). *Accord, Lorangeteli v. Critelli*, 853 F.2d 186, 196 (3d Cir. 1988) (public interest lies in vindicating the principles of union democracy).

-45-

**CONCLUSION**

Plaintiffs, motion for summary judgment, or in the alternative for a preliminary injunction,

should be granted.

                                                Respectfully submitted,

                                    _____/s/ Paul Alan Levy_____

                                    Paul Alan Levy (DC Bar No. 946400)

                                    Gregory Beck (DC Bar No. 494479)

                                    Public Citizen Litigation Group

                                    1600 - 20th Street, N.W.

                                    Washington, D.C. 20009

                                    (202) 588-1000

May 28, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*                )
                                         )
                    Plaintiffs,          )
                                         )
          v.                             )          No. 07-600 (RBW)
                                         )
Vincent J. Giblin, *et al.*,             )
                                         )
                    Defendants.          )

**RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

1.  Admitted.

2.  Admitted.

3.  Admitted.

4.  Admitted.

5.  Admitted.

6.  Admitted.

7.  Admitted.

8.  The IUOE constitution itself, which is in the record, is the best evidence of its own contents.  It is admitted that the constitution contains the quoted words.  However, the General President's authority to construe the constitution is limited to reasonable interpretations.

9.  Admitted.

10.  Admitted.

11.  Admitted.

12.  Admitted.

13.  Admitted.

14.  It is admitted that the constitution established requirements for candidates to run for

office and that some of the procedures for those elections are contained in the constitution, subject to the constraints of the Landurm-Griffin Act.

15. Admitted.

16. Admitted.

17. Admitted.

18, 18(i), 18(ii), and 18(iii)(b), are admitted. With respect to 18(iii)(a), it is admitted that the IUOE intends its process to address the concerns stated in this subparagraph. Whether that process will be successful remains to be seen. Quigley Affidavit ¶ 10. Moreover, the technological problems cannot be overcome with respect to many important forms of web hosting technologies that are increasingly used in union campaigns. Brenner Aff. ¶¶ 9-16; Pineda Aff. at 108-110. Defendants admit that the fact that a given web host does not support scripting will **not** be a sufficient basis to obtain a waiver. Giblin Dep. 119. With respect to 18(iv), it is admitted that the attachment to the affidavit speaks of addressing a variety of issues concerning the scope of the resolution, but the Giblin Affidavit only avers that the process will address the question whether a given web site is a "campaign web site." Giblin said that the "process" will address each site individually on a case-by-case basis. Dep. 123. He declined to set forth any standards that would govern his decisions, and said only that members would hopefully be able to discern a pattern in his decisions after a few months of rulings. Dep. 116.

19. The first sentence of this paragraph is admitted, The second sentence of the paragraph is not admitted, because affidavit does not say that, and none of the attachments constitutes evidence that this second sentence is true.

20. It is admitted that the cited letter contains the statements contained in this paragraph.

There is no evidence that the statements are true.

21.  It is admitted that Giblin reports that the General Executive Board ("GEB")  was told this.  No evidence is cited to show the GEB was given correct information, and the affidavits of plaintiffs Kohl, ¶ 23,  Mueller, ¶ 3,  and Quigley ¶ 23, and of plaintiffs' expert Mark Brenner, ¶¶ 9-20, show that the information was not correct.

22.  It is admitted that Giblin's affidavit contains this self-serving characterization of the "IUOE"'s purpose.  There is no evidence cited to show that these two ends were properly or reasonably balanced, which is a question of law.  However, the fact that the rule applies only to web sites that are devoted to elections in which the members of the GEB (who approved the rule) stand to lose their local union positions, and not to non-electoral web sites, undercuts the GEB's claim of altruistic motives.  So too does the fact that the rule is so easily evaded and so unlikely to prevent information from getting into the hands of employers.

23.  It is admitted that Giblin's affidavit contains this self-serving characterization of the "IUOE"'s purpose.  There is no evidence cited to show that **any** members of the union would be inhibited from discussing the issues before the union by the fact that **some** members of the union were discussing those issues on non-password-protected web sites.  In fact, at least two members of the GEB, William Dugan and Russell Burns, have continued to maintain their campaign web sites without password protection; obviously they are not inhibited by the absence of password protection. Quigley Affidavit ¶ 20.  *See also* http://goldticket.deltaspark.net/index.html (campaign web site from Local 3 election in 2006, discussing various collective bargaining issues, remains online).

24.  Admitted.

25.  Admitted.

-3-

26. Admitted.

27. Admitted, except that it is further noted that another way to distribute literature was to give it out at the workplace, where employers would inevitably see it.  Kohl Affidavit, ¶ 5; Giblin Dep. 52.

28. Admitted.

29. Admitted.

30. Admitted.

31. It is admitted that Giblin's affidavit contains this self-serving characterization of the mental state of the GEB and its members.  No evidence is cited that campaign web sites create any genuine risk to the interests of the IUOE (as opposed to the incumbent officers who do not like to be challenged in elections or in member web sites) or to the ability of the institution to represent the interests of its members.  Nor has any admissible evidence been provided to show that this has ever happened.

32. It is admitted that Giblin's affidavit contains this self-serving characterization of the mental state of the GEB and its members.  No admissible evidence cited shows that this actually happens.  The cited paragraphs of Giblin's declaration relies entirely on a hearsay account of what he heard from some persons who spoke at a hearing that he attended.

33. It is admitted that Giblin's affidavit contains this self-serving characterization of the mental state of the GEB and its members.   No admissible evidence cited shows that this actually happens.  With respect to the final sentence, no evidence is cited to show that expressions of opinion on chat rooms or discussion forums by anonymous speakers have in the past constituted improper campaign contributions from an employer, or that such anonymous expressions of opinions would

be improper.  The provision in the IUOE Constitution about outsider involvement forbids only direct or indirect **financial** contributions.

34.    It is admitted that Giblin's letter contains these self-serving statements and characterizations of the mental state of the GEB and its members.   No evidence is cited that any of the reported events has actually happened.  The Giblin letter is admissible only to show what Giblin said in an unsworn document; it is not evidence that any of the statements in the letter is true.

35.  It is admitted that Giblin's affidavit contains this self-serving characterization of the mental state of the GEB and its members.  It is further admitted that there are **some** truly confidential matters, which, if disclosed to employers, could hurt the union's legitimate interests.  No evidence is cited that any such disclosures have occurred on any campaign web site.

36.  Admitted.

37.  Admitted.

38.  It is admitted that these are among the reasons why unions typically hold members-only meetings, although it is not at all unusual for unions to invite outside guests, chosen by the leadership of the meeting, and to allow them to remain for selected parts of the meeting or for the entire meeting.  It is noted that an organization that holds a meeting is entitled to decide who can come to the meeting, and who may not come to the meeting, for whatever reasons it may choose.  However, it is also noted that the LMRDA guarantees the right of individual members to meet and assemble with whomever they choose, including with non-members of their choosing.

39.  It is admitted that the IUOE and its locals generally do not send the minutes of their meetings to nonmembers, but the evidence shows that they do reveal minutes publicly sometimes.  Giblin admitted that GEB minutes have been disclosed to non-members.  Dep. 33.  He did not know

whether the magazine issues containing minutes had been sent to libraries, or whether they have been given out in organizing drives so help the union impress prospective members. In fact, Giblin admitted that, in the past, the IUOE had posted the minutes pages from its magazine on the IUOE web site. Giblin Dep. 35-36; Kohl Aff. ¶ 29. IUOE Locals 25 and 317 also post minutes on their web sites. www.iuoelocal317 and www.iuoelocal25.org; Kohl Aff ¶ 28.

40. Admitted. It is noted, however, that nothing in this paragraph asserts that disclosure of minutes to non-members will harm the legitimate interests of the union.

41. It is admitted that Giblin's affidavit discussed alleged events in Local 30 to this effect, and that the GEB learned about them; however, no admissible evidence is submitted to establish that what Giblin or the GEB was told was true.

42. It is admitted that Giblin's affidavit says that he was told the various things mentioned in this paragraph. However, no admissible evidence is submitted to establish that what Giblin or the GEB was told was true; the cited paragraph in Giblin's affidavit is entirely based on hearsay. In addition, at his deposition, Giblin admitted that he could not remember whether the web sites at issue were the web sites of continuing caucuses which existed between elections (and which are at least nominally not covered by the campaign web site resolution) or web sites of candidates and their supporters. Moreover, for the reasons set forth by Quigley in his affidavit, at ¶ 17, the alleged occurrences in Local 30 are not representative of what would happen in a local union of operating engineers rather than stationary engineers.

43. It is admitted that Giblin's affidavit says that he was told the various things mentioned in this paragraph. However, no admissible evidence is submitted to establish that what Giblin or the GEB was told was true; the cited paragraph in Giblin's affidavit is entirely based on hearsay. In

addition, at his deposition, questioned whether the web sites at issue weren't the web sites of continuing caucuses which existed between elections (and which are at least nominally not covered by the campaign web site resolution), as opposed to web sites of candidates and their supporters, Giblin did not know.  Dep. 43.  A contemporaneous press story about the impending hearing suggests that the web sites attacked the incumbent leader of the local for many months **after** his election. Levy Aff. ¶ 6 and Exh. D.  Moreover, the transcript of the hearing is the best evidence of what was stated there, and Giblin's characterization of the statements should not be accepted to prove what was said.  Defendants have the transcript, Giblin Dep. at 39, but have decided not to rely upon it.  At his deposition, Giblin could not remember the specifics of what was said at the hearing. *Id.* at 40.  In addition, for the reasons set forth by Quigley in his affidavit, at ¶ 17, the alleged occurrences in Local 30 are not representative of what would happen in a local union of operating engineers rather than stationary engineers.

44.  It is admitted that Giblin's affidavit asserts that four members stated this at a hearing. However, the transcript of the hearing is the best evidence of what was stated there (including whether other members disagreed with the alleged statements of the four), and Giblin's characterization of the statements should not be accepted to prove what was said.  Defendants have the transcript, Giblin Dep. at 39,  but have decided not to rely upon it.

45.  The first sentence of this paragraph is admitted.  It is admitted that Giblin's affidavit avers that he "informed" the members this.  Giblin did this in a letter, which the union still has. Giblin Dep. at 36.  The letter itself is the best evidence of its contents, and Giblin's account of its contents should not be admitted to prove those contents.  Moreover, although Giblin's affidavit reflects the argument contained in this paragraph, the affidavit does not say that information actually

injurious to the union's interests was actually reflected in the minutes posted on the campaign web site in Local 66.  Minutes vary in detail, and may or may not contain information that a member is barred from disclosing even on the union's own expansive notions about what information it is entitled to keep secret.  *See* Minutes attached to the Johnson Declaration.  Although the IUOE still had the minutes at issue in the Local 66 situation, it has not submitted them.  Giblin Dep. 36.

46.  It is admitted that Giblin's affidavit asserts that these alternatives were considered by the "IUOE", by which it is assumed that he means the GEB considered the stated alternatives.

47.  It is admitted that Giblin's affidavit attributes this reasoning to the "IUOE" (by which, we assume, he means the GEB).  It is not admitted that the factual statements subsumed in the "alternatives" are true, and no evidence has been cited or provided that those statements are true. Nor is it admitted that the stated alternatives represent genuine problems that need to be solved.  There is no evidence that the problems are genuine.

48.  It is admitted that the staff and officers at the IUOE have plans to enter such contracts. At his deposition, however, at 18-19, Chism indicated that he had not yet seen the drafts of such contracts.  Both Chism and Pineda, the IUOE's expert witness, acknowledged that in some circumstances the intended system might not allow members to obtain access to the information on the web sites, Pineda Dep. 105-107, Chism Dep. 42-50, and that the system would not prevent nonmembers from getting access to that information.  Pineda Dep. 110-114, Chism Dep. 37-38.  In addition, the affidavits of plaintiffs  Kohl ¶¶ 10-14,  Mueller ¶ 4,  and Quigley ¶¶ 4-8, and of Mark Brenner ¶¶ 22-28, show that the system will effectively interfere with access by members to the information.

49.  Admitted.

50.  It is admitted that Pineda stated this opinion.  At her deposition, however, Pineda admitted that her opinion was not based on any data or other knowledge specific to the Operating Engineers, or indeed specific to the issue of union members getting access to web sites.  Pineda Dep. 28-29.  Both Chism and Pineda admitted that, even if her expert witness fee is non-contingent, Pineda stands to make money from administering the password protection system if it is not rejected by this court.  Pineda Dep. 10-13; Chism Dep. 20-22.  Pineda also admitted that her compensation from the administration (between $3000 and $5000 up front, plus between $200 and $500 per month for an indefinite period) would be higher than the direct compensation for her affidavit and deposition (10 to 14 hours at $250 per hour).    Pineda Dep. 10, 12.  Her total compensation, therefore, is highly contingent on the outcome of this litigation and her opinions suspect for that reason.  Pineda's affidavit gave only two bases for her opinion that members will not resist login– that the New York Times, Los Angeles Times, and Washington Post require "authentication" for access to certain information on their web sites, and that e-commerce "functions" cannot be performed without log-in.  At her deposition, however, Pineda admitted being unaware that requiring log-in is very controversial in the newspaper industry; that according to studies that she was shown during her deposition, most of the 100 biggest newspapers do not require login, Dep. 46-48 and Exhibit 7; that some people in that industry say that newspapers' requirement of login is a declining phenomenon because newspapers are worried about driving the public away from their web sites, Dep. 36-42 and 60-61, and that newspapers "dread" having links to their articles on search engines and news aggregators labeled "registration required," although she professed not to understand why this label is "dreaded."  Dep. 62-64  Pineda also admitted that although login is required on many e-commerce web sites to "buy", it is generally not required to access information about what is for

sale (that is, to shop).  Dep. 66-69.   Instead, after defendant's counsel interrupted the questioning

to suggest a response, she adopted counsel's argument that registration and login on media and e-

commerce sites are not analogous to the entry of usernames and passwords on defendants.  Dep. 39-

40, 44-45.  She did not explain why, if the comparisons are inapposite, she gave them as the sole

basis for her opinion that members would not be deterred from logging in.  Similarly, on the web site

of a client who she has held up as an example in a presentation as recently as March, Pineda admitted

that there were many, many pages of information that could be accesssed without log-in.  Only the

most commercially valuable pages are password protected.  *Id.* 17-21.  This company leaves many

pages unprotected because they do not include information that needs to be protected.  *Id.* 21-22, 24.

She also admitted that the availability of unpassword protected information on their web sites can

help increase viewers' interest in getting access to the password protected matter.  Dep. 22, 25-26.

 The affidavits of plaintiffs and of their expert witness Mark Brenner show that a login requirement

may deter many members from accessing the web site, and that the password protection system may

make it harder for members to find a campaign web site by making it harder or impossible for search

engines to index the site.  Kohl. Aff. ¶ 10-14, 23; Quigley Aff. ¶ 4-8, 19; Brenner Aff. ¶ 20-28.

Pineda admitted that when speaking and writing to general audiences who were not paying for

partisan opinions, she cites accessibility to search engines as one of the most important

considerations in bringing a new web site to the attention of general target audiences.  Pineda Dep.

76-77, and Exh. 4, 10**.**  *See also* Pineda Dep. 82.  Moreover, the technology required for

implementation of the password protection system will preclude the use of many popular forms of

Internet communications, such as blogs, social networking sites, RSS readers, and the like.  Pineda

Deposition 108-110; Brenner Affidavit ¶¶ 9-16.  Indeed, although some of the web hosting services

cited by Pineda make it possible to incorporate scripts into their web pages, once the scripts are installed the pages can no longer be edited without knowledge of HTML, thus cancelling the very ease that might make those hosts attractive to a technically unsophisticated IUOE member.  Brenner Affidavit ¶ 12.

     51.  Admitted.

     52.  Admitted.

     53.  Admitted.

     54. It is admitted that Pineda expressed this opinion, but she ignored the fact that although some of the web hosting services cited by Pineda make it possible to incorporate scripts into their web pages, once the scripts are installed the pages can no longer be edited without knowledge of HTML, thus cancelling the very ease that might make those hosts attractive to a technically unsophisticated IUOE member.  Brenner Affidavit ¶ 12.  The union admitted that it will not provide any technical assistance in creating or editing the web pages themselves.   Chism Dep. 56-58. Moreover, the technology required for implementation of the password protection system will preclude the use of many popular forms of Internet communications, such as blogs, social networking sites, RSS readers, and the like.  Pineda Deposition 108-110; Brenner Affidavit ¶¶ 9-16.

     55. It is admitted that Pineda expressed this opinion, but she ignored the fact that although some of the web hosting services cited by Pineda make it possible to incorporate scripts into their web pages, once the scripts are installed the pages can no longer be edited without knowledge of HTML, thus cancelling the very ease that might make those hosts attractive to a technically unsophisticated IUOE member.  Brenner Affidavit ¶ 12.  The union admitted that it will not provide any technical assistance in creating or editing the web pages themselves.  Chism Deposition 57-58.

-11-

Moreover, the technology required for implementation of the password protection system will preclude the use of many popular forms of Internet communications, such as blogs, social networking sites, RSS readers, and the like. Pineda Deposition 108-110; Brenner Affidavit ¶¶ 9-19.

**PARAGRAPHS 56-60**

During the Giblin Deposition, defendants stated that the union has, as a result of this action, recognized that the last sentence of Article XVII, Section 4 is unlawful and unenforceable in the United States. They have stated that they plan to take steps at the next GEB meeting to suspend any enforcement of the provision and to notify members of this decision through inclusion in the minutes of the GEB meeting which are published in the union's magazine, and to include repeal of that sentence in their recommendations to the delegates to the next IUOE Convention in 2008. Consequently, plaintiffs agreed to postpone further litigation of that issue pending the outcome of those efforts; the parties will work to present language to the Court addressing the manner in which the litigation should be suspended. Pending that time, plaintiffs ended the deposition without addressing that issue, and they do not respond to these paragraphs

    61. Admitted.

    62. Admitted.

    63. Admitted.

    64. Admitted.

    65. Admitted, subject to the qualification that the cited exhibit shows that the web site contains the opinions of the campaign (that is to say, the opinions of the authors of the web site) about upcoming negotiations.

    66. Admitted.

67. The first sentence is admitted; indeed, the web site currently endorses candidates in Local 150. The second sentence is admitted. Indeed, even without the GEB's new rule, any member of the IUOE can require passwords for access to, or for the ability to post on, any part of their own web sites, or all of their own web sites, as they choose. The issue in this case is whether password protection is **allowed**, but whether union members (or union leaders) who decide that this is appropriate for their own web sites, in whole or in part, may impose their views on others who decide otherwise, by punishing anyone who speaks but chooses not to require passwords.

Respectfully submitted,

_____/s/ Paul Alan Levy_____
Paul Alan Levy (DC Bar No. 946400)
Gregory Beck (DC Bar No. 494479)

Public Citizen Litigation Group
1600 - 20th Street, N.W.
Washington, D.C. 20009
(202) 588-1000

Attorneys for Plaintiffs

May 28, 2007

-13-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*         )
                                        )
            Plaintiffs,        )
                                        )
            v.                )     No. 07-600 (RBW)
                                        )
Vincent J. Giblin, *et al.*,       )
                                        )
            Defendants.     )

**PROPOSED ORDER GRANTING SUMMARY JUDGMENT FOR PLAINTIFFS
AND DENYING SUMMARY JUDGMENT FOR DEFENDANTS**

The Court has considered the evidence and the legal arguments submitted by the parties, and finds that on the material facts about which there is no genuine issue, plaintiffs are entitled to prevail on their claims as a matter of law. Accordingly, defendants' summary judgment motion is denied, and summary judgment is granted in favor of plaintiffs.

IT IS HEREBY ORDERED that defendants are enjoined from implementing the Web Site Resolution Rule adopted by the General Executive Board of the defendant union, from requiring members of the union to "password protect" web sites, or from punishing members of the union who do not comply with the Web Site Resolution. The union is ordered to promptly notify the Business Managers of every local of this decision, and to include in that notification a copy of this order. Nothing in this order shall limit defendants in making a password protection system available on a voluntary basis for any members who wish to use it for their web sites.

Dated: June ___, 2007                _____

                                          United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*                    )
                                             )
                         Plaintiffs,         )
                                             )
              v.                             )         No. 07-600 (RBW)
                                             )
Vincent J. Giblin, *et al.*,                 )
                                             )
                         Defendants.         )

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I filed the accompanying Motion for Summary Judgment

or in the Alternative for a Preliminary Injunction, with accompanying statement of material facts,

memorandum of law and supporting affidavits, deposition transcripts and exhibits, and proposed

orders, and response to defendants' statement of material facts, through the Court's ECF system, thus

causing copies to be served on all counsel.

                                        /s/ Paul Alan Levy
                              Paul Alan Levy (DC Bar No. 946400)

                                Public Citizen Litigation Group
                                1600 - 20th Street, N.W.
                                Washington, D.C. 20009
                                (202) 588-1000

                                Attorney for Plaintiffs

May 28, 2007