UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*                )
                                         )
                    Plaintiffs,          )
                                         )
        v.                               )        No. 07-600 (RBW)
                                         )
Vincent J. Giblin, *et al.*,             )
                                         )
                    Defendants.          )

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT
OR IN THE ALTERNATIVE FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

A.    The Union's Reasonable Rules Defense Must Be Based on Evidence and Not
      Speculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    The Union's Rules Will Severely Impair Protected Free Speech Rights. . . . . . . . . . . . . 3

C.    The Union's Limits on Free Speech Need Not Be Tolerated Given Defendants'
      Inability to Show That They Are Needed To Serve Legitimate Union Interests, or
      That They Will Serve Those Interests Effectively. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      1.    There Is No Showing That Public Campaign Web Sites Harm the Union's
            Institutional Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      2.    There Is No Showing That Password Protection of Campaign Web Sites Will
            Effectively Screen The "Sensitive Information" That The Union Claims to Be
            Trying to Protect From Being Seen by Employers. . . . . . . . . . . . . . . . . . . . . . . 14

D.    The Union's Rule Is Void for Vagueness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

## CASES

*Black v. Ryder/P.I.E. Nationwide,*
    970 F.2d 1461 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Helton v. NLRB,*
    656 F.2d 883 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Keubler v. Cleveland Lithographers,*
    473 F.2d 359 (6th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Konop v Hawaiian Airlines,* ,
    302 F.3d 868 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*\*Reno v ACLU,*
    521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Stachan v. Weber,*
    535 F.2d 1202 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*\*Steelworkers v. Sadlowski,*
    457 U.S. 102 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATUTES AND RULES

Electronic Communications Privacy Act,
    18 U.S.C. § 2701(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    18 U.S.C. §2701(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Labor-Management Reporting and Disclosure Act of 1959

    Section 101(a)(2),  29 U.S.C. § 411(a)(2)

## MISCELLANEOUS

SEO Tools, *Link Popularity,*
    http://www.seochat.com/ seo-tools/link-popularity/ (last viewed June 14, 2007) . . . . . . . 7
SEOmoz.org, *Search Engine Ranking Factors v2,*

http://www.seomoz.org/article/search-ranking-factors (last viewed June 14, 2007) . . . . 7

Wikipedia, *Link Popularity,*
        http://en.wikipedia.org/wiki/Link_popularity (last viewed June 14, 2007) . . . . . . . . . . . 7

The central issue in this case is whether the union has provided a sufficient showing to justify its "reasonable rules" defense for a new union rule that admittedly restricts free speech by requiring that all campaign web sites be "password protected" so that only union members who identify themselves by name and membership number can enter. Defendants freely admit that the free speech provision of the Union Members Bill of Rights, section 101(a)(2) of the LMRDA, includes the right to speak to the public. But, they say, that right must yield here because of a union rule that is supposedly based on the danger of harm to legitimate union interests. In order to mount such a defense, however, the union must present **evidence** of the harm that it claims to fear from the public availability of campaign web sites. Moreover, the purported justifications for the rule must fit with the restrictive effect of the rule as well as with the exceptions that the union has made to make its rule appear less onerous.

The union argues, however, that it need not present any evidence that the rule is needed to prevent harm to legitimate union interests, and that it is enough to speculate about the harm that might be caused, based on vaguely recalled complaints made by a few members more than six years before the rule was adopted. Similarly, the union argues that an attack on the rule on the ground that it cannot achieve the rule's purposes, such as because the rule is severely underinclusive, must fail so long as the union speculates – again without presenting any evidence – that the problem identified as justifying the rule might not apply to the unaddressed area. If the union's burden were so limited, it would be able to adopt **any** restriction on free speech in its unquestioned discretion, and section 101(a)2) would be rendered unenforceable in the courts.

**A. The Union's Reasonable Rules Defense Must Be Based on Evidence and Not Speculation**.

In our opening brief, we cited several cases, culminating in *Steelworkers v. Sadlowski*, 457 U.S. 102 (1982), which consider first the impact of a rule on protected speech, and then whether the

rule in fact serves a legitimate purpose protected under the LMRDA. In both respects, the courts demand a showing based on evidence. Throughout the *Sadlowski* opinion, the court cited the evidence in the record supporting the various parts of its reasoning, 457 U.S. at 114 & nn.7 and 8, 115 & n.9, 118, 119 n.11, 120, noting that because of the summary judgment context the Court was assuming that the evidence from the respondents (against whom the Court ruled) was true, while considering the union's evidence only if it was uncontradicted. 457 U.S. at 114 n.7. Evidence was cited and treated as determinative in determining the outcome of the balancing test – both the impact on speech interests and the impact on the union's legitimate interests.

The union (Opp. Mem. 18-19 n.5) seeks to distinguish the court of appeals rulings in *Stachan v. Weber*, 535 F.2d 1202, 1203 (9th Cir. 1976) and *Keubler v. Cleveland Lithographers*, 473 F.2d 359, 363 (6th Cir. 1973), each of which overturned union discipline because of the union's failure to make a **showing** or carry its **burden** of proving that the prohibited activity was harmful to union interests. The union says that *Stachan* should not be considered because the reason for which the members were disciplined – refusing to salute the flag and recite the pledge of allegiance – had "no discernible nexus to traditional union interests." First of all, the *Stachan* court did not say that it was applying a "discernible nexus" test to decide whether the union rule was reasonable This is a test of the union's own invention. But even assuming that the maintenance of solidarity and patriotism, which was a very significant issue in the labor movement in the 1950's and 1960's in this writer's recollection, is deemed unrelated to traditional union interests, the same cannot be said of *Keubler*, which the union dismisses as being "to much the same effect at *Stachan*." Union Mem. 19 n.5. In that case, members were disciplined for holding a rump meeting during a long strike, to express to each other their unhappiness about the union negotiating committee's failure to make progress

getting the membership back to work.  This is the very sort of "divisiveness" that the union in this case insists might be communicated to the employers if they could see campaign web sites; it is scarcely lacking in nexus to traditional union interests.

**B.    The Union's Rules Will Severely Impair Protected Free Speech Rights.**

Here, there can be no question that the union's rule will severely impair free speech rights that are protected by the LMRDA.  The union concedes that the LMRDA protects the right to communicate about union affairs with the public, and indeed with employers.  And the very purpose of the rule is to prevent communications about union elections to be delivered to the public.  There is, therefore, no need to consider any further evidence to decide that the union's rule will prevent protected speech.

The union discounts this aspect of plaintiffs' claim on two grounds. First, it argues, based on a misstatement of the testimony of two of the plaintiffs at their depositions, that their election campaign web sites were directed solely at the union's own members, and **not** at the general public (defendants chose not to depose plaintiffs Gonter or Ward).   But neither plaintiff so testified. Plaintiff Kohl was asked whether she had sent specific communications to the general public, and she said that she had not; she was asked whether she had spent money on campaign mailings beyond the districts in which she was running, and she said that she had not; and she was asked to agree that reaching the general public was not what she needed to do to win office in an election, and she agreed, "no, not to win an office."  Union Br. at 7-8.  The union concludes that these questions and answers show that **the** purpose of campaign web sites is to reach the electorate.  *Id*. at 9.  But none of this contradicts her statements in her affidavit that she affirmatively wanted her campaign web site to be read by members of other unions and by the general public, and indeed by employers,

because in her view that is part of her effort to hold the union and its officers accountable for their misdeeds.  The union chose not to ask Kohl about these aspects of her affidavit, which remain uncontradicted in the record.  Kohl has reaffirmed her intent to use her web site to reach out to the public as well.  Second Kohl Affidavit ¶ 3.

In effect, Kohl's campaign web site had, and has, multiple purposes and multiple audiences. This is one of the things that makes the Internet distinctive: the simple equivalent of newsletters or leaflets.  Web sites have multiple functions and multiple audiences: they are a caucus meeting, a press conference, a newsletter, personal conversation, poster, mailing, open forum, diary and other means of communication all rolled into one.  One of the most chilling aspects of the union's rule is its attempt to deprive rank-and-file web sites of their multi-purpose and multi-audience character, insisting instead that they be confined to the one audience approved by the union.

Similarly, the union misrepresents its deposition questions to Quigley, which asked only whether certain statements on his campaign web site, such as leaflets soliciting attendance at campaign rallies, were directed at members.  Quigley Dep. 55-56, 68.  The union never asked him whether or not statements on his web sites were also aimed at the public.  Quigley values the opportunity to look at the web sites of members of other unions, and does not want to have members of other unions shut off from learning about what is happening in his local so that they can learn from him as he has learned from them.  *See* Quigley Aff. ¶ 24; Second Quigley Aff. ¶ 4.

The union also argues that its attack on free speech is less significant because it has not (yet) forbidden members from writing letters to the editor (which may or may not be printed), sending emails to particular individuals (if they know the right email address), or handing out leaflets at shopping centers (in order to reach hundreds rather than potentially thousands or millions of people

at a time).  The problem here, of course, is that these methods are either more expensive, or more time consuming, or less effective – or all three of the above – than the creation of an Internet web site whose content is crawled by search engines and/or linked from other web sites, and thus can be found by the general public when the content of the web site matches something that the public is looking for online (or, indeed, finds through surfing).  As the Supreme Court said in *Reno v ACLU*, the ability to post web sites can make any individual into the "town crier" or a "pamphleteer" with the ability to reach a vast audience.  521 U.S. 844, 853, 870 (1997).  That the union is willing to allow these lesser alternatives – at least for now – is not much comfort.[1]

Although it is a sufficient objection to the rule that it improperly restricts speech to non-members of the union, the rule **also** limits speech to members.  These restrictions are particularly problematic for candidates running against an incumbent business manager, because it is undisputed that Internet web sites provide a potential means for insurgent candidates to "level the playing field" by enabling them to bypass the official channels of communication within a local union which are

---

[1]The union also argues that it "only" restricts election campaign web sites, "where the paramount interest of the union is in fostering the fullest possible discussion and debate among its members," while allowing other web sites that do not advocate the election of candidates.  Wholly apart from the underinclusiveness issue that this raises, discussed in the next section of this brief, there is no evidence that a **mandatory** password protection rule is needed to foster intra-union debate.  The union could make its password protection system available to those who want it in the event there is anyone who would feel less inhibited in campaign discussion if their site was password protected.  There is, however, no evidence that such a person exists, and it is now conceded that nobody on the GEB even articulated this theory as a reason to adopt the rule.

Indeed, if the union's real interest were in fostering full discussion and debate among the union membership alone, it could provide server space and full technical support open to any candidates, make those membership only spaces, and offer this as an alternative to independently run and hosted web sites that are accessible to the general public.  This approach, which would be akin to union magazine "battle pages" that some unions provide, would show whether members would really feel more comfortable speaking in a members-only environment, without in any way restricting the right to have publicly accessible web sites.

controlled by the incumbents.  These facts distinguish the case from *Sadlowski*, where the plaintiffs made a similar argument but the union countered with **evidence** that an insurgent candidate had won without outside contributions, *id.* at 114, that staff in that union had the right not to participate in campaigns, *id*. at 114-115, and indeed that, as a consequence, union staff have also challenged incumbents and won election.  *Id.*  at 115.  There is no such evidence here – quite to the contrary, it is admitted that IUOE union staff can be fired for refusing to support the business manager's re-election, and indeed that is what happened in Local 150 after plaintiff Ward announced his candidacy.  Indeed, defendants' cross-examination of plaintiff Kohl drew out the fact that union staff are required, as a condition of employment, to contribute $100 per month to a political fund that is used at election time to finance the incumbents' re-election campaign.  Kohl Dep. 24.

It is also undisputed that the union's password protection requirement makes it much less likely that newspapers will report on election campaign web sites, or that other web site operators will link to them, and that the loss of this publicity can reduce union member traffic.  There is more controversy about whether the web site restriction rule will limit a web site's visibility on Google.  The union has changed the rule to allow the home page of a web site to serve as a billboard so long as it simply announces a candidacy by giving names, positions sought and photos, but that only provides a means for members searching specifically for the campaign web site to find it.  If a member searched, for example, for "Ray Connors 150", he would find links to the Team 150 web site because Local 150 retiree BA Ray Connors writes a column on that site; those links could not come up if the interior of the site were password protected.  If the member searched for "Bill Dugan Democracy," he would reach various pages on Ward's web site where Ward attacks Dugan for suppressing union democracy.   *See* attached Exh.1.  But Ward is not permitted to say anything

negative about Dugan (his opponent) or Connors (a non-candidate supporter) on the "billboard" section of his web site and so he loses the chance at web traffic from members looking for information about those individuals.[2]

Another series of reasons why the password protection rule interferes with speech to members follows from the undisputed fact that password protection requires members who might otherwise enter a campaign web site to do more than they wold have to do in the absence of a password system. Plaintiffs are concerned because members have told them that they worry about being tracked online, because many members are resistant to logging into web sites for a variety of reasons; defendants counter these concerns with arguments of their own that are intended to suggest that many members will be able and willing to log in. The problem of members fear of the consequences of being identified, given the possibility of subtle retaliation at the union hiring hall, simply compounds the problem, and a paradoxical effect of the disclaimers of logging identifying information could be to make some members **worry** about being identified. These controversies are discussed at great length in Plaintiff's Statement of Material Facts ("PSMF), Defendant's Response to that Statement (DR - SMF), and in Plaintiffs' Reply to that Response ("P Reply SMF), ¶¶ 148 to

---

[2]Web site search engine rankings are also based on such factors as how often the content is updated (so that each new blog entry counts; but a billboard page is **designed** to be static), how many links there are to the website contents (people like to link directly to the relevant page, and are very unlikely to link to the home page of a site that is mostly password protected), the value of the links from the site to other sites (so that the links page should also be outside password protection); and the quantity and relevance of the site content. *See generally*, SEOmoz.org, *Search Engine Ranking Factors v2*, http://www.seomoz.org/article/search-ranking-factors; Wikipedia, *Link Popularity,* http://en.wikipedia.org/wiki/Link_popularity; SEO Tools, *Link Popularity*, http://www.seochat.com/seo-tools/link-popularity/. (all last viewed June 14, 2007)

161, and will not be repeated here.[3]  In the end, plaintiffs recognize that members who really want

to get into a given campaign web site will eventually be able to do so, even if they do not have their

union cards with them at the time they are trying to get access, or even if the card wrongly omits or

includes a middle initial. But the whole purpose of placing campaign messages on web sites is to

make it **easy** for members to see them, even if they are only casually interested.  The imposition of

a password entry system is sure to discourage some members from entering insurgent web sites.[4]

Still another problem is the fact that the union's password protection system cannot be used

on many of the newer web hosting technologies that make it increasingly easy to put content online

without obtaining volunteer assistance from fellow members or sympathetic members of other

unions with technological expertise.  These hosting technologies range from blogs and MySpace

pages to hosts for specialized content such as YouTube (videos) and Flickr (photographs), to pages

that support "RSS feeds" that can tell interested web users when new content has been placed on a

web host that the users are following.   The union's response is that there are other web hosting

---

[3]Defendants set great store on the written procedures governing the operation of union hiring
halls as showing that members need have little fear that being on the wrong side of an election could
hurt their livelihoods.  Plaintiff Quigley, who worked as a business agent for many years,. explains
in a supplemental affidavit that a business agent has many legitimate reasons to go out of order on
the out-or-work list, and has access to information about when is a good time to **be** on the that list,
that gives members a very strong incentive to be on good terms with the business agent.  Second
Quigley Aff. ¶¶ 2-3.

[4]The union points out that union members must write down their member numbers to be able
to cast a mail ballot in both Local 18 and Local 150.  But members have a period of weeks to find
their card and send in the mail ballot.  *See* Kohl Deposition, Exhibit 6, ¶ 23.  The union's observation
that members must (at least under the rules) show a union card to enter a union meeting means little
if, as in most unions, IUOE local union meeting attendance is scanty, and besides, a member who
is motivated to go to a union meeting will take the time to find the union card before he leaves home

platforms that allow content to be placed no the Internet without knowledge of web code.[5] The union also argues that there are ways to put videos online, as Quigley's IT volunteer has been able to do on Quigley's web site.  These disputes are analyzed at length in PSMF, DR - SMF, and P Reply SMF, and space does not permit all of the permutations of this argument to be set forth here.  It is clear at least that it is at least somewhat more difficult to put content online through a traditional web site than through the new technologies, Brenner Aff. ¶ 12, and significantly more difficult to set up the "extras" such as video hosting and podcasting.  *Id.* ¶ 19.   The password authentication system cuts off at least some of the easiest ways of posting content online.  This is another form of limit on member speech that merits consideration in the *Sadlowski* balancing process.[6]

    The union argues that because there is a small section on Kohl's web site that allows the posting of comments only by those who register and log in, and because the Association for Union Democracy has praised some rank-and-file web sites with restricted sections, there cannot be anything wrong with requiring password protection.  There are three responses to this point.  First,

---

    [5] Plaintiffs' expert witness Mark Brenner points out that when such sites are edited with the password protection code, the functionality is lost and any future editing must be done by hand. Brenner Aff. ¶ 12.  In a supplemental affidavit, ¶ 11, Pineda complains that Brenner has made the mechanism for such editing sound more complicated than it really is.  But the point remains – it is no longer simply a matter of typing in content and letting the web host's convenient technology do the rest.  The union complains that Brenner's testimony was not based on "studies" and that he did not "conduct any experiments."  Mem. 24.   But expert testimony may be based either on "professional studies or personal experience."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Indeed, the expert witnesses for both sides in his case have testified based on their professional experience rather than based on studies or experiments.

    [6]As discussed during Brenner's deposition, at 150-152, there are now dozens of younger members of the Operating Engineers on MySpace.  Unions have also begun to use Facebook for organizing purposes, http://openconcept.ca/union_facebook_organizing , and there is a Facebook network for Operating Engineers Funds, http://www.facebook.com/networks/networks.php?view= companies &browse&q=O, as well as for other unions.

the forums on each of these sites constitute a minuscule portion of a larger site, most of which is open to general public scrutiny.  Second, there has apparently been very little participation in these forums, which tends to support plaintiffs' concern about the impact of password protection, rather than rebutting it.  Third, and most important, plaintiffs have no objection to union members (or officers) who make a voluntary decision for their own reasons, good or bad, to maintain some or even all of their web sites under password protection.  Plaintiffs would not object to the union creating a password protection system and urging candidates to participate, or even attempting to shame them by warning that employers could be watching unless they post only under password protection.  But there is no basis for ordering those who want to maintain open web sites, or who do not post any truly secret information that the union is entitled to keep from employers, to impose password protection, thus restricting their right of free speech.

**C.**    **The Union's Limits on Free Speech Need Not Be Tolerated Given Defendants' Inability to Show That They Are Needed To Serve Legitimate Union Interests, or That They Will Serve Those Interests Effectively.**

Given the rule's significant encroachment on protected speech, the Court should next consider whether the union has made an adequate "showing" of the harm that the rule is intended to prevent, and of the fit between this purported harm and the rule.  The union fails miserably in both respects.

**1.**    **There Is No Showing That Public Campaign Web Sites Harm the Union's Institutional Interests.**

First, it is undisputed that the union has presented **no** admissible evidence that any employer has ever gained **anything** by monitoring a union campaign web site, or that any truly confidential information has ever been posted on a campaign web site, not to speak of being posted to the union's

detriment. The union relies on statements that defendant Giblin averred he heard at a union hearing in December 2000, but in response to plaintiffs' objection that his testimony was hearsay, the union responds that it is not offering Giblin's testimony about the hearing to prove the truth of what he heard. DR - SMF ¶ 75. Nor was Giblin able to give even any details about what he heard, which is not surprising given how many years ago this was. The union has not even filed the transcript of the hearing, which would presumably provide those details, or responded to plaintiffs' request to examine the document. The union's refusal to provide the transcript itself creates an inference that the details that would be revealed would be adverse to the union's position. Similarly, the union relies on a 2005 incident in Local 66, when local union minutes were posted on a campaign web site, but also acknowledges that minutes may or may not reveal secrets, depending on what they say (and whether they reveal the details of member discussions, or simply report transactions at the meeting). Thus, Giblin's inability to recall what was in the minutes, coupled with the union's failure to introduce the minutes or Giblin's letters on this issue, or to provide the documents to plaintiffs, precludes the union's reliance on this incident as a justification for the rule's impact on free speech.

Instead of evidence, the union seeks to rely on vague hypotheticals about the advantages that employers might derive if they learned that members were divided about whether to go on strike, or that members thought that they should go on strike over a wage cut instead of over the firing of a union member, or that members were debating the desirability of various organizing techniques. But the union never quite argues that members who express these views publicly can be punished for revealing union secrets, or even that there is a great deal of discussion of such issues on campaign web sites. Absent such concrete examples, the union has simply failed to justify the speech repressive impact of its rule.

-11-

The union also makes much of plaintiffs' acknowledgment that there is such a thing as a union secret whose disclosure may properly be subject to union sanction. But the union substantially overstates the extent of plaintiffs' acceptance of the union's position. During their depositions, both Kohl and Quigley were presented with various hypothetical situations and asked either whether a union appointee who revealed inside information could be punished for revealing it; whether a union leader might be better able to disclose inside information if he were doing so on a password protected web site; and whether employers might derive some benefit from learning what members think about various issues. *E.g.*, Kohl Dep. 145, 163-164; Quigley Dep. 135-141, 151. But the union was careful never to ask plaintiffs whether they agreed that the union could block members from public expression of their opinions about such topics, on the theory that the members' own thoughts and opinions are a union secret. Both plaintiffs reaffirm in the attached affidavits that they do not share the union's view on this point. Quigley Second Affidavit ¶¶ 5-6; Kohl Second Affidavit ¶ 4.

The union also argues that, given its determination to prevent members from revealing "sensitive information" on publicly available campaign web sites, a prophylactic rule that simply requires password protection is better than a system under which the International scrutinizes web sites for punishable disclosures and opens itself up to charges of selective prosecution that discriminates based on political viewpoint. But that argument depends on an unarticulated and very controversial premise – there is a real problem that needs a solution, because campaign web contain a significant volume of disclosures that the union **could** punish without running afoul of the LMRDA. The union has not however, shown the existence of such disclosures. It has yet to identify a single disclosure on any campaign web site that it could lawfully punish.

Indeed, there are two reasons to believe that the union cannot identify examples of punishable disclosures on campaign web sites even apart from the fact that it has not done so. First, during his deposition defendant Giblin described many examples of supposedly "sensitive" information whose disclosure he said the union's rule was intended to prevent, that the union has no legitimate interest in regulating, such as the "secret" that the union's political strategy is to punish its enemies and reward its friends. Nine examples are set forth in paragraph 64 of Plaintiffs' Statement of Material Facts. Defendants' brief does not say anything about the list of nine examples in ¶ 64 of PSMF, but in DR-SMF, they complain that plaintiffs have "mischaracterized, taken out of context, and misquoted . . . Giblin's deposition testimony." It is not clear whether this argument is intended to suggest that Giblin does not really think that the enumerated web site statements are "sensitive," but in any even we stand by our quotations.[7]

The second reason why the Court should doubt defendants' implicit contention that there is a widespread problem of truly secret information being disclosed on campaign web sites is that they take the position that it would **not** violate any union rule to disclose the web sites' contents directly to employers. Surely, if these web sites contained union bottom lines in contract negotiations, or similar information whose disclosure would really threaten the union's interests, defendants would not have such a casual attitude toward the disclosure of such information by other means.

---

[7]DR - SMF specifically addresses only one of the nine examples – the "three monkeys" leaflet in which the Team 150 web site says that the incumbent business manager is wrong to suggest that the questions that the Ward slate is raising about the union's negotiating inadequacies is risking the union's ability to get a good contract, because getting a good contract depends on such factors as the fraction of the market that is organized, and the state of the economy in the area. The union filed this document as DN 13-10, Exhibit 18 to the Quigley Deposition and Exhibit 9 to its filing. Because it provides an excellent example of how extreme are the union's claims of the need for secrecy, it is appended to this memorandum as Exhibit 2.

Given the flimsy evidentiary basis for the union's rule, this case thus presents the question whether such evidence is enough to justify a rule limiting free speech.  If it is enough, then in the next case the union will have no difficulty justifying a rule that forbids rank and file members or groups from posting materials critical of the union's management of a joint union-employer pension fund on workplace bulletin boards, as in *Helton v. NLRB*, 656 F.2d 883, 895-96 (D.C. Cir. 1981), or from picketing in front of the union's offices to complain about hiring hall discrimination, as in *Black v. Ryder/P.I.E. Nationwide,* 970 F.2d 1461 (6th Cir. 1992), or engaging in the various other forms of public communication that was held protected in the cases cited in our opening memorandum at pages 28 to 29.   It is convenient for defendants to say in this case that they respect the rulings in those cases, but if the arguments that they present here are accepted, it will be easy for defendants to find or predict harm from disclosures in letters to the editor or rank-and-file newspapers, and certainly the topics discussed by the members in *Helton* and *Black* are "sensitive" and potentially injurious to the union's institutional interest within the expansive construction of those terms set forth by Giblin during his deposition.  Indeed, if unsupported conjecture were a sufficient basis for a union to limit its members' speech, its discretion would be essentially unlimited.

Accordingly, the union's claimed institutional interest does not justify the rule, and that rule should be declared contrary to Section 101(a)(2) of the LMRDA.

**2.     There Is No Showing That Password Protection of Campaign Web Sites Will Effectively Screen The "Sensitive Information" That The Union Claims to Be Trying to Protect From Being Seen by Employers**.

Finally, even if there were some basis for defendants' contention that the password protection is needed to prevent employers from obtaining information whose disclosure the union is entitled

to punish, the rule is so full of loopholes that it cannot effectively serve that objective. The union's arguments to the contrary are not persuasive.

In our opening brief, we argued that the limitation of the rule to election campaign web sites, while allowing member web sites that are not about election campaigns from 2007 forward to be publicly available, makes the rule fatally underinclusive. In response, defendants argue that they focused on campaign web sites information received from members suggested that the problem of employer monitoring of web sites was confined to campaign web sites, and that, in any event, analysis of underinclusiveness runs counter to *Sadlowski*'s focus on reasonableness rather than narrow tailoring. Mem. 13-15. In fact, however, the plaintiffs in *Sadlowski* did make an underinclusiveness argument, that the union's rule regulated only international and not local elections. Far from rejecting the argument on the ground that underinclusiveness was irrelevant, the Supreme Court rejected it because the **evidence** established a good reason for the distinction – an "unrebutted affidavit" established that the union had a good reason for the distinction, because outsiders have little interest in influencing local union elections. 457 U.S. at 119 n.11.

Quite the opposite is true here. Defendants have introduced **no** evidence that non-election campaign web sites either do not contain "sensitive" information or are not monitored by employers or used by them to the union's disadvantage – defendants' affidavits do not address the issue, which is also ignored in the union's SMF. It is only the union's brief that addresses this distinction and claims that the same problem is not known to exist on non-election web sites. But say-so from the lawyers is no substitute for evidence. Nor is there any reason to believe that the members who spoke at the Local 30 hearing back in 2000 were distinguishing between election campaign web sites and any other form of intra-union campaign web site. Moreover, there is evidence that the kind of

information that Giblin defined as sensitive during his deposition **can** be found on non-password-protected member web sites.  Exhibit 3 attached to this memorandum is the "forum" page from the Local 3 Democratic Union web site (an earlier printing was Exhibit 14 at the Giblin Deposition). There are many membership opinions posted there about contract negotiations, about mismanagement of the union's benefit funds, and other issues which, when discussed on campaign web sites, Giblin said were the sort of disclosures that the union's rule was trying to prevent.  This fact simply reinforces the suspicion that the reason why the GEB, the vast majority of whose members are also incumbent local union business managers, are more worried about election web sites is that those are the sites that threaten their hold on local union office.

On the other hand, if the union's vague speculation about what "sensitive information" might be found on campaign web sites, and about what use employers might make of this information, and the union's contention that a handful of members complained several years ago about misuse of campaign web sites, are sufficient evidence to sustain the union's rule in this case, then if the union wins this case, it will have no difficulty coming up with enough "evidence" to justify a crackdown on member web sites that do not support or oppose candidates for union office.

Finally, the union's rule will not serve its purported objective because the union has made it too easy for employers to obtain the information on the password protected web sites.  This is true, in part, because so many employers belong to the union. The union claims that any member who is a true employer would necessarily be excluded from union membership, or at least from the right to participate in the electoral process.  But Quigley testified during his deposition that while he was a business agent he personally signed up "hundreds and hundreds" of owner operators, many of whom got to be bigger operators over time.  Dep. 127.  Although union counsel represented in the

course of questioning Quigley that the union has records suggesting that the number of contractors who began as owner operators is much smaller, *id.* 128, no such records have been put in evidence. Quigley further testified that there are Operating Engineers members who own multi-million dollar companies, *id.* 129, and identified by name three such members, who employ hundreds of IUOE members, but who nevertheless attended a recent meeting to elect the union's Election Committee; he said that other such contractors were in attendance but that he could not remember their names. *Id.* 131.  Nor has the union said anything to rebut plaintiffs' evidence that, apart from members who are themselves contractors, there are many members who work as supervisory staff for contractors. Quigley Aff. ¶ 17.  These employers and their supervisory staff would have direct access to the password protected campaign web sites because they could simply enter their own names and register numbers.

Even for employers who are not union members, password protection is so easily evaded that it cannot serve the union's purported purpose.  The union makes no efforts to maintain the security of member names and password numbers.  Giblin agreed that it would not violate any union rule for a member to publish his name and register number publicly for others to see.  Giblin Dep. 133-134. Indeed, at her deposition Kohl testified that hundreds of non-members attend the semi-annual Local 18 state-wide union meeting, and any union member who speaks is required to preface her remarks with her name and union register number.  Similarly, during the depositions in this very case, a member name and register number was read into the record, at the behest of the union's own counsel, yet the union has made no effort to ensure that the depositions were filed under seal.  Any employer who wants to get access to statements on a campaign web site need only obtain a register number and log in, or importune one of the union's 396,000 members to log in and send it the

desired information.

The union's main response to this reason why password protection is ineffective is that it would be illegal for an employer to enter a campaign web site using a member's password. Mem. 19, citing the Electronic Communications Privacy Act, 18 U.S.C. § 2701(a). It must first be noted that it is not at all clear that obtaining such access would be illegal. In *Konop v Hawaiian Airlines*, 302 F.3d 868 (9th Cir. 2002), a dissident union member set up a password protected web site to which he allowed access by other union members but expressly forbade management to enter. An official of Hawaiian importuned two union members who were on the list of authorized users to allow him to use their log-in information, and was upset enough about the contents to contact the union to complain. Konop then sued Hawaiian, claiming that its access to the web site violated the ECPA. The Ninth Circuit held, however, that one of the exceptions to ECPA, 18 U.S.C. § 2701(c)(2), allows any user to authorize a third-party to access an otherwise forbidden web site. 302 F.3d at 880. Thus, all an employer would have to do to gain access to a campaign web site would be to ask any one of the 396,000 members of the IUOE to authorize it to enter his name and register number. This result is, indeed, quite consistent with the way employers have historically found out what is happening on the union side – by giving a "snitch" favorable treatment on the job in return for spying on the union and providing desired information.

Moreover, the deterrent effect of the ECPA even on an employer who cannot find a union member willing to be paid to give authorization would surely be lessened by the fact that there are 396,000 authorized users, and that the union's rules do not forbid members from printing out password protected web pages, or even downloading the entire web site and emailing the site to an employer. Giblin Dep. 134-136. Moreover, the union claims that it will not be tracking the IP

-18-

numbers of those who use the password protection authentication system.  So, if an employer wants to use publicly the results of its having looked at a campaign web site, it can easily claim that it got access through legitimate means, and the union will have no recourse.  In effect, this is an untraceable crime, and the deterrent effect of the statute is therefore minimal.[8]

Rather, the only lasting effect of password protection will be to discourage speech on the part of members who want to play by the rules, or who are worried about the severe disciplinary consequences of violating the rules.  The IUOE's campaign web site resolution will not serve its stated purposes, and should be struck down as a plain violation of the LMRDA.

**D.    The Union's Rule Is Void for Vagueness.**

The union argues that most of the situations that would be covered by the union's rule restricting "campaign web sites by candidates and their supporters" are clear, and that plaintiffs have not identified any actual, real-world member web sites that would present a close coverage question under the rules.

In fact, plaintiffs identified two such web sites.  The Local 3 Democratic Union web site appears not to be a campaign web site, but as discussed at Giblin's deposition, Quigley has posted a campaign message on the forum section of that web site.  Giblin was not allowed to say whether either Quigley or the site operator would be in violation of the campaign web site resolution by virtue of that message.  This problem applies generally to other web sites that have forums, including not

---

[8]Moreover, because it is so hard for unions to prove violations and get relief against employers who violate the labor laws, employers frequently break the law in their fight against unions in organizing drives.  Employers seem to have little compunction about firing workers for their union activity, threatening them with adverse consequences if they vote or campaign for the union, and engaging in other anti-union behavior.  Would the IUOE similarly say that members should not worry about employer discrimination or retaliation because that would be illegal?

-19-

only Kohl's web site and the Local 37 Members Voice site, but the guestbook feature on the Woman Operator web site. http://books.dreambook.com/mariannerafferty/woman.html, as well as Yahoo! discussion groups within the Operating Engineers which require members to join but which do not demand any proof of union membership, http://finance.groups.yahoo.com/group/operatingengineers/; and http://finance. groups. yahoo. com/group/operatingengineersunion/.

Moreover, although plaintiff Kohl would prefer to believe that her web site is **not** a campaign site by virtue of a single line advocating the election of the Team150 slate, she is not certain, and does not want to risk a huge fine. Moreover, she is not certain how much more she can add about Team 150 or about other elections, particularly in her own local, without becoming liable for expulsion or a fine. Even with respect to the plaintiffs' own sites, or sites on which they have posted, there is considerable uncertainty about the reach of the resolution.

Moreover, because the rule is limited to "candidates or their supporters," plaintiffs are uncertain whether a "sucks" site that only attacks a candidate without supporting any candidates would be a campaign web site. Defendant Quigley, for example, has reserved series of "sucks" domain names, including mylocal150sucks.info (see attached Exhibit 4), for the purpose of publishing information in the future, and does not want to have to worry about whether that web site could be called a campaign web site if it attacks an individual who may be both a candidate for delegate and a candidate for International office. At his deposition, Giblin was unwilling to answer whether a "sucks" web site is a campaign site. If, as the union argues in its brief, all of these questions are so clearly resolved by reference to existing standards, it is hard to understand why Giblin did not just say so at his deposition.

Accordingly, the chilling effect of the union's vague rule is yet another reason why the rule

should be invalidated under Section 101(a)(2) of the LMRDA.[9]

## CONCLUSION

Plaintiffs' motion for summary judgment, or for a preliminary injunction, should be granted.

Respectfully submitted,

_____/s/ Paul Alan Levy_____
Paul Alan Levy (DC Bar No. 946400)
Gregory Beck (DC Bar No. 494479)

Public Citizen Litigation Group
1600 - 20th Street, N.W.
Washington, D.C. 20009
(202) 588-1000

June 15, 2007                                Attorneys for Plaintiffs

---

[9]The union again points to its "administrative procedure" for resolving questions about how the rule will be applied, but fails to respond to the argument in our opening brief that such administrative procedures are a remedy only for restrictions on commercial speech. Mem. at 41.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*                     )
                                              )
                    Plaintiffs,               )
                                              )
          v.                                  )          No. 07-600 (RBW)
                                              )
Vincent J. Giblin, *et al.*,                  )
                                              )
                    Defendants.               )

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE
TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

**Introduction**

In Defendants' Response to a number of the paragraphs in Plaintiffs' Statement of Material

Facts ("PSMF"), defendants have argued that the cited facts are not material, without citing any

conflicting evidence.  Plaintiffs respond here to many of those contentions of immateriality.  Even

though such facts may not become undisputed by operation of Local Rule 56.1, the evidence

identified in Plaintiffs' Statement of Material Facts, and the further evidence cited in this reply,

remains undisputed on the record in this case, and therefore support summary judgment for plaintiffs.

12.  Defendants quarrel with the assertion that Local 150's members "work on construction

sites."  The Quigley Affidavit at ¶ 17 states that Local 150 is a construction local and thus that events

described with respect to IUOE Local 30, even if true, would not occur in Local 150.  The evidence

is thus undisputed that Local 150 members work in construction; it follows that they work on

construction sites.

18.  The statements in this paragraph – that Ward's supporters on the Local 150 staff were

fired last year once Ward's plan to run for Business Manager became known – is material because

part of the reason why the union's rule is unreasonable is that candidates running against an

incumbent business manager suffer an imbalance of ability to communicate with the membership that Internet web sites are vital to counteract. Moreover, the cited statement in the Quigley Affidavit ¶ 18, that union staff member who supported Ward were fired remains undisputed in the record

19. Defendants quarrel with the assertion that Local 18's members "work on construction sites." The Kohl Affidavit repeatedly refers to members in Local 18 working in construction. It follows that they work on construction sites. In addition, during her deposition, Kohl testified about staff visits to and conversations among members at construction sites. Kohl Dep. 249-251.

21. Although defendants have cited some additional facts, they have not specifically denied the statement in this paragraph, which is therefore deemed admitted,

22. The fact stated in this paragraph is material because it is undisputed that Kohl intends to use the site to support candidates in her own and other locals, thus potentially bringing it within the scope of the union rule at issue here, and because the rule would forbid her from making the web site available to the public. Kohl did not say at the cited deposition transcript page that "campaign communications are not designed or intended for nonmembers," she simply said that campaign communications **are** directed at the voters. A campaign web site thus served two purposes simultaneously. The evidence remains undisputed in the record that Kohl wants the criticisms of the Local that she has placed on her web site to be read by the general public, for the reasons stated in her affidavit, at 16, 17, 24, including that public disapproval of wrongdoing by union officers is an important part of holding those officers accountable for their misdeeds.

23. Defendants' response misstates Kohl's deposition. At her deposition, she stated that union incumbents may have information that they should not share with employers. She did not say that rank and file members should be unable to share with the public, or even with employers, their

-2-

disagreements with officers' positions on such things as collective bargaining strategies. Accordingly, the first sentence of this paragraph remains undisputed. Although Quigley agreed that the existence of divisions within the membership over strike strategy can be sensitive information, he did not agree that a union ought to be able to prevent members from stating their doubts publicly (he was never asked such a question). Moreover, defendants have not disputed the second sentence in this paragraph – that Kohl believes that employers in her local have other ways of learning about internal union controversies. That sentence thus also remains undisputed.

25. Although defendants have cited some additional facts, they have not specifically denied the statement in this paragraph, which is therefore deemed admitted.

28-30. Plaintiffs acknowledge that because plaintiff Mueller was unable to come to Washington DC for a deposition on the required short timetable, and because defendants represented that they needed to depose Mueller in person, plaintiffs have agreed to strike these three paragraphs.

31. Although defendants have cited some additional facts, they have not specifically denied the statement in this paragraph, which is therefore deemed admitted.

33. Although defendants have characterized the facts slightly differently, they have not specifically denied the statement in this paragraph, which is therefore deemed admitted.

35. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Defendants decline to admit that campaigning at a large number of small work sites is not cost-effective, but in light of the fact that many IUOE locals cover entire states, it is obvious that one candidate cannot effectively

campaign at work sites, each of which has a small number of voters. In union elections, members can also campaign at the workplace but, particularly in a construction union, there are a large number of work sites each of which has a small number of members of any given construction union, reducing the cost-effectiveness of such campaigning. Kohl Aff. ¶ 5.

36. Although defendants wish to dispute the following statement: "When leaflets are given out in the workplace, they are likely to fall into the hands of employers," they acknowledge that Giblin testified that there is a "very good chance they would." No conflicting evidence has been cited. *See also* Kohl Affidavit ¶ 5.

37. Although defendants offer a different way of saying this, because defendants do not dispute this fact it is admitted.

38. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Because defendants do not cite any evidence disputing the evidence cited in this paragraph, the fact remains undisputed.

39. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Moreover, the affidavits are not limited by their terms to the newspapers in Locals 18 and 150. Because defendants do not cite any evidence disputing the evidence cited in this paragraph, the fact remains undisputed.

40. This paragraph is material because part of the reason why the union's rule is

unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Plaintiffs do not imply that the newspapers' content has been manipulated in violation of 29 U.S.C. § 481(g). The control of the union newspaper that local union principal officers enjoy allows them to favor themselves without any violation of the law on the theory that what they do is newsworthy.

41.   This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Plaintiffs do not imply that the local unions' web sites have been manipulated in violation of 29 U.S.C. § 481(g). The control of the union web sites that local union principal officers enjoy allows them to favor themselves without any violation of the law on the theory that what they do is newsworthy

42. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Moreover, because defendants do not cite any evidence disputing the evidence cited in this paragraph, the fact remains undisputed.

43.   This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective ability to communicate with the membership. Nor is this an "overstated

assertion of law"; both Kohl and Quigley have been on staff under the control of Business Managers and hence are competent to say whether Business Managers can in effect demand campaign support. Indeed, Kohl's deposition testimony confirmed this fact, because she testified that union staff are "required to pay a hundred dollars a month" to the "CEO Fund, Committee to Elect Officers." Kohl Dep. 24. Moreover, because defendants do not cite any evidence disputing the evidence cited in this paragraph, the fact remains undisputed.

44. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective ability to communicate with the membership.

45. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Moreover, both Kohl and Quigley have been on staff of supposedly independent entities and are thus competent to say whether staff at such entities are effectively under the control of Business Managers. Thus, the cited "evidence" does not put the paragraph in dispute.

46. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Plaintiffs do not imply that there is any violation of 29 U.S.C. § 481(g). Union staff can campaign in the course of their

duties so long as the campaigning is "incidental to union business." 29 C.F.R. § 452.76. This well-known loophole is one of the very important reasons why the "playing field" is not level in union elections. It is particularly not level in a local union with dozens or even scores of union staff.

47.    This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilitis to communicate with the membership. Plaintiffs do not imply that there is any violation of 29 U.S.C. § 481(g). Union staff can campaign in the course of their duties so long as the campaigning is "incidental to union business." 29 C.F.R. § 452.76. This well-known loophole is one of the very important reasons why the "playing field" is not level in union elections. It is particularly not level in a local union with dozens or even scores of union staff.

48.    This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. In any event, defendants have admitted the fact.

49.    This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Moreover, both Kohl and Quigley have been on staff of supposedly independent entities and are thus competent to say whether staff at such entities are effectively under the control of Business Managers. Thus, the cited

"evidence" does not put the paragraph in dispute. Plaintiffs do not imply that there is any violation of 29 U.S.C. § 481(g). Staff can campaign in the course of their duties so long as the campaigning is "incidental to union business." 29 C.F.R. § 452.76. This well-known loophole is one of the very important reasons why the "playing field" is not level in union elections. It is particularly not level in a local union with dozens or even scores of union staff.

50. This paragraph is material because part of the reason why the union's rule is unreasonable is that Internet web sites provide a vital means for an insurgent candidate seeking to run against an incumbent business manager to "level the playing field" in light of the imbalance in the candidates' respective abilities to communicate with the membership. Plaintiffs do not imply that there is any violation of 29 U.S.C. § 481(g). Union staff can campaign in the course of their duties so long as the campaigning is "incidental to union business." 29 C.F.R. § 452.76. This well-known loophole is one of the very important reasons why the "playing field" is not level in union elections. It is particularly not level is a local union with dozens or even scores of union staff.

52. The facts that the union has detailed procedures for the operation of the hiring hall, and that those procedures are legal enforceable by various means, prove neither that those rules are followed, nor that members need not fear the exercise of discretion by union officials in the application of those procedures. Quigley testified at his deposition that the Local 150 hiring hall generally did not follow the rules as set forth in the Local 150 hiring hall agreement, and that despite his years as a business agent he had never heard that the agreement contained language allowing arbitration of claimed hiring hall enforcement of rules against discrimination. Dep. 86-87. "This is a case of perception versus reality." *Id.* During his deposition, Quigley explained some of the ways in which a union business agent can advise the dispatcher go out of order in assigning work

opportunities, through the exercise of discretionary judgments about which union member has the right experience for the right job, based on having seen members working at job sites and knowing whether a member was suited for a particular machine. He said that he gave such advice many times, solicited or unsolicited, while he was working as a business agent. Quigley Dep. 15-16. Other examples are given in the attached affidavit. Quigley Second Aff.¶ 2-3. Plaintiffs acknowledge that neither Kohl nor Quigley have evidence of any individual examples of the discrimination based on a member's speech. Both aver in their affidavits, however, that there is fear among members about disagreeing with union officials because they are aware of the officials' power. Quigley Aff. ¶¶ 6-7; Kohl Aff. ¶ 10. No contrary evidence has been introduced.

55. Kohl's affidavit, averring at ¶ 8 that she made an unusually strong showing in her 2005 election campaign, is the record evidence on which plaintiffs rely. There is no contrary evidence, and the statements are therefore undisputed. Kohl Aff. ¶ 8.

58. Plaintiffs use the words "the purported" only because they do not concede that protection of sensitive information was the real purpose, not because they believe it is undisputed that other purposes exist. The evidence supporting the inference of other purposes is discussed in the briefs. For example, although defendants correctly quote the resolution as putting forward the "fullest expression of free speech" as a reason for the rule, the **evidence** shows that this could not have been the purpose because a voluntary password protection system would adequately serve that purpose, if in fact there were a significant number of union candidates who would feel reassured about speaking freely by the availability of such a system. Giving a false reason creates an inference that there are other motives. Similarly, the union's evident lack of interest in preventing disclosure of "sensitive information" by other means, such as by union member web sites that are not campaigning

to replace incumbent business managers, casts doubt on the genuineness of the claimed motivation.

59, 60 .  Because these facts are admitted, we need not discuss the materiality of the facts here.

62.  Giblin's deposition testimony was **both** that the deliberations of the meeting are secret, and that the words are, "[your] secrets [you] will keep."   Giblin Dep. 18, 26.

64.  The cited deposition testimony is highly material because the union's conception of what expressions of opinion are "sensitive" and thus must be concealed from the employer on pain of discipline show the lack of basis of the rule.   The union gives only one example of alleged "mischaracterization, tak[ing] out of context, or misquot[ing] Giblin's deposition testimony – the reference in ¶ 64(h) to Giblin's testimony about Quigley Dep. Exh. 9 (also Exh. 15 in Giblin's deposition).  The leaflet in question criticized the incumbent Business Manager for attempting to blame the Ward slate for making contract negotiations more difficult by raising unspecified issues about the leaders' approach.

67.  Plaintiffs use the words "purportedly" only because they do not agree the rule has no impact on non-electioneering web sites, in light of the chilling effect discussed under plaintiffs'; vagueness claim, but plaintiffs recognize that defendants claim there is no impact on non-electioneering speech.

68.  Although defendants in their response to this paragraph dispute that speaking about strategy, negotiating, or organizing necessarily, in Giblin's view, implicates "sensitive information" that reveals a union "secret" that needs to be concealed from employers, in the very next paragraph of their response to Plaintiffs' Statement of Material Facts, ¶ 69, defendants say "'strategies, negotiating, [or] organizing' are the issues that [Giblin] believes if disclosed would seriously impair

-10-

members in the collective bargaining process and also in the organizing process." Plaintiffs accept defendants' characterization of what constitutes a significant part of the sensitive information that the rule is supposedly intended to keep from employers.

69. Giblin's use of the phrase "the vast majority of other issues" shows that the disclosures that the union is trying to prevent are not limited to the three cites in ¶ 68, and the union acknowledged that he testified that the lines are not clear cut.

70. Plaintiffs agree that the union's prohibition is not limited to disclosures in the course of criticizing union leaders**,** but it **includes** disclosures in the course of such criticism.

71, 72. Defendants may not like the implication, but it remains undisputed that the alleged incidents in Local 30 and Local 66 are the **only** specific incidents that the union mentions in its papers as showing the need for the new web site rule.

75. Defendants implicitly admit that they have not submitted any evidence about the events in Local 30 that is admissible to prove that such events occurred**.**  Their argument is that no evidence is required.  That argument is addressed in the briefs.

76. Giblin avers that, during the hearing, some members complained that employers had been reading the internal union web sites, and had quoted statements on those web sites to the union's disadvantage in both organizing campaigns and contract negotiations.  Giblin Aff ¶ 19.

77. Although defendants purport to dispute ¶ 77, they do not cite any conflicting evidence. Paragraph 77 states that Giblin could not recall the specifics of what was said on the web sites that employers were monitoring; defendants point to his statement recalling one detail about a campaign in which the unspecified statements were allegedly used against the union (allegedly because his statement is hearsay).

78.   Giblin could not say for certain whether the statements that employers had used had appeared on the web sites during **election** campaigns or between elections, when the sites would be more comparable to a caucus web site which the union's rule purports not to regulate. *Id.* 41.

79, 80.   Plaintiffs acknowledge that the newspaper article, like Giblin's testimony, provides inadmissible hearsay.  Our point here is that given Giblin's inability to recall any specifics, and given a contemporary report showing (apart from the hearsay problem) that non-campaign web sites were under consideration, the Court should not accept Giblin's hearsay assertion that the web sites **were** campaign web sites.

80.   Although defendants claim that they dispute this paragraph, their objection seems to be to having the facts cited without their explanation for Giblin's action.   The facts themselves are undisputed.

81.   Because the fact is admitted, defendants' request to "strike" the cited article is moot.  A response to a statement of material fact is not a substitute for a motion to strike, even assuming that such a motion would be warranted.

83.   Because the fact stated in this paragraph, defendants' expressed concern about the "implication" of the fact is not material to the purpose of a response to a statement of material fact.

85.   Although defendants purport to dispute this paragraph, they cite no evidence that contradicts Giblin's admission of this fact during his deposition testimony.  Defendants cite only two other paragraphs of defendants' response to the statement of material facts, but nothing in those paragraphs provides or cites any **evidence** contrary to the paragraph.  The paragraph therefore stands admitted.

86.   The fact is material to the pending motions, in light of Giblin's admission that the

contents of minutes need not always be kept secret, Giblin's inability to recall the specifics of what was in the minutes that were posted by the Local 66 members undercuts the union's claim that its rule is needed to prevent the disclosure of sensitive information. In fact, the union's acknowledgment that it has no **evidence** that sensitive information was disclosed on campaign web sites in Local 30, coupled with the fact that there is no **evidence** that sensitive information was disclosed in Local 66, shows that there is no **evidence** supporting the rule. That sets up the legal question, discussed in the briefs, whether a union rule restricting speech can be sustained without evidence to support its supposed purposes.

88. The fact is material because, if the union sends its magazine to public libraries, that would tend to undercut the claimed justification for the rule. Plaintiffs acknowledge that there is no evidence in the record showing one way of the other whether the union's magazine containing minutes goes to libraries. Because the union has the subscription list, but has not submitted it, the Court can infer that this evidence would be unfavorable to the union.

91. This fact has not been disputed, and thus stands admitted. Plaintiffs acknowledge that the union claims the encouragement of speech as one reason for the rule, but as discussed above in ¶ 58, the record evidence casts doubt on that claimed purpose.

92. To the extent that the union cites the web site of Kenneth Campbell to show that one of its Vice-Presidents has complied one month early, it is noted that not every page of the Campbell web site is password protected. *See* http://www.thecampbellteam.org/NewsArticleView.aspx?id=1 (copy attached).

93. This fact is material to the action because it shows that the union has no interest in "facilitating speech," only in interfering with access to the speech of those who do not want to

subject their web sites to password protection. In any event, the fact was admitted by Giblin at his deposition and remains undisputed.

96. This fact is material to the action because it tends to support plaintiffs' contention that the incumbent officers of local unions who constitute the vast majority of the IUOE GEB are not interested in restricting the distribution of sensitive information, but only in interfering with web sites that threaten to "level the playing field" and thus threaten their tenure in office. Giblin's citation of the desirability of local union's password protecting their own web sites shows his sensitivity to the disparity.

97. The characterization of the exposure of the union's secrets as being inadvertent is disputed because the union left the problem unresolved, despite its knowledge of the problem, until days after the problem was discussed at the Chism Deposition. Although the union cavils at the suggestion that the information available was "extremely sensitive," the deposition transcript, at 62-63, reflects that the available information in the "organizing" section included some special reports and an organizing database. We dare suggest that such information was far more deserving of protection against disclosure than the examples of "sensitive information" given by Giblin during his deposition. *See also* ¶ 98.

98. Although plaintiffs have no knowledge of when IUOE staff first learned of the problem, Kohl testified at her deposition that she saw the problem two months before her May 30 deposition. Kohl Dep. 256. At the very least, IUOE staff do not make the protection of sensitive information a priority.

99. The fact is material in that, in the months leading up to the original effective date, the union had undertaken none of its efforts to make it possible for candidates to operate password

protected web sites, and because the union's frequent changes in plans under the threat of litigation suggest that protecting the ability of candidates to enjoy the fullest freedom of speech was not actually one of the motives for the resolution.  In any event, the fact stated in this paragraph remains undisputed

100.  The fact is material in that, in the months leading up to the original effective date, the union had undertaken none of its efforts to make it possible for candidates to operate password protected web sites, and because the union's frequent changes in plans under the threat of litigation suggest that protecting the ability of candidates to enjoy the fullest freedom of speech was not actually one of the motives for the resolution.  In any event, the fact stated in this paragraph remains undisputed.

104.  Although the union prefers to present an explanation for this fact, it is undisputed.

105.  To the extent that defendants appear to be suggesting that candidates and their supporters are free to use some other means than the union's remote authentication system to password protect their web sites, the union has not provided any other means for the operators of campaign web sites to comply with the resolution.  It is undisputed that the membership list is not available to candidates and their supporters.

106-109.  It appears that the union changed its approach after informing plaintiffs of its plans so that their briefs could be written on that assumption.

112.  Defendants do not specifically dispute the facts stated in ¶ 112, although they add their own explanations.  Those facts are therefore undisputed.

115.  It is acknowledged that Giblin answered specifically with respect to more than one web site; however, he refused to answer most questions on this subject.

-15-

116. It is acknowledged that plaintiff's counsel was not able to finish his question about the existence of standards because defendants' counsel interrupted the question with a speech that included the following:

> you are not going to use this deposition as an opportunity for you to extract from him in the abstract without any context rulings on a whole variety of different kinds of web sites.

and that plaintiffs' counsel did not insist on an actual instruction from defendants; counsel not to answer the question on that ground. Giblin Dep. 100-101.

117. Defendants do not specifically dispute this fact, which is therefore admitted.

118. Defendants' response to this statement includes the following admission: "the resolution is in the process of evolution." Plaintiffs accept this rewording of the paragraph. Plaintiff note, however, that defendants' assertion, "the Resolution does not impose any limitation on "union member websites that are not password protected," is not correct. Under the Resolution, web sites that are not password protected may not be campaign web sites by candidates or their supporters.

119. Defendants do not specifically dispute this paragraph, but simply add their own characterization. The fact is therefore admitted.

122, 123. Although defendants are apparently defensive about the fact that at pages 45-46 and 73 on the one hand, and page 53 on the other, Giblin stated two different standards for what information could be on the "billboard," the cited pages plainly reveal that this is what happened. Giblin apparently entertained two different versions of his "opinion" within a few minutes of each other.

124. It is admitted that the draft provided on May 23, 2007, has been superseded by a new draft provided on June 9, 2007.

126-127.  These are material because they tend to impeach the credibility of the union's expert witness, whose total compensation is contingent on the union's success.  The fact that the funds go to Pineda's company instead of to Pineda as an individual does not change the fact that she has an interest in the outcome of the case.

129.  The stated fact addresses the main ways that **users** locate web sites, not the various ways the web site operators promote their web sites.  Moreover, the fact that there are other ways to promote web sites does not contradict the statement that searching is the main way for Internet users to locate web sites.  Although the union purports to dispute the stated fact, it had not cited any contradictory evidence, and the fact is therefore not in genuine issue.

130.  Although the union purports to dispute this fact on the ground that Pineda suggested some other means besides accessibility to search engines, those facts do not contradict the fact stated here, that when speaking and writing to general audiences who were not paying for partisan opinions, union expert Joanna Pineda cites accessibility to Google and other search engines as **one of the most important** considerations in bringing a new web site to the attention of general target audiences.  None of the example cited by defendants in ¶ 129 contradict this fact, which is therefore undisputed.

131.  Although it is true that Pineda stated during her deposition that there are various ways to promote web sites, it is also true that she opined that promotion to search engines is not so important where the site owner knows how to reach the target audience directly.  Pineda was apparently assuming that union candidates would have a mailing list for the entire IUOE, and also assuming that most union candidates can afford to finance multiple mailings to members of their own local unions to advertise the URL for their web site at the very outset of their campaigns.  In fact, although the deposition testimony suggests that the Team150 slate is well-financed, Kohl's

deposition testimony makes clear that this was not true of her campaigns. Kohl Dep. 25, 77. To the extent that Pineda may have been assuming that candidates have email lists for the entire membership, that assumption would also have been mistaken.

133. This fact is material to the pending motions because even if the home page can be indexed by search engines, it may well be the content-rich interior pages that will attract more interest from readers. For example, a member searching for the terms "Bill Dugan democracy", or searching for the name "Ray Connors 150," will find interior pages in Quigley's web site where Ward attacks Dugan for suppressing union democracy, or where a Local 150 retiree named Ray Connors gives his opinions favorable to Ward and adverse to Dugan. *See* Exhibit 1. But Quigley is not permitted to say anything Dugan (his opponent) or Connors (a non-candidate supporter) on the "billboard" section of his web site and so he loses the chance to attract web traffic from members looking for information about those individuals. In any event, defendants have neither cited nor introduced any evidence contrary to the facts stated in this paragraph, which are, therefore, undisputed

134. This fact is material to the pending motions because accessibility to the press is an important way for members to publicize their web sites. Defendants mischaracterize the testimony cited in this paragraph. Although plaintiffs Kohl and Quigley did say during their depositions that their web sites were aimed at voters, they never said that the sites were **not** aimed as well at the general public. Neither deponent was specifically asked whether the web sites were aimed at the public **as well**. Moreover, in the Brenner, Kohl and Quigley affidavits cited in this paragraph and submitted with plaintiffs' motion for summary judgment, and in the Second Affidavits from Kohl and Quigley that accompany plaintiffs' reply brief, plaintiffs make clear that their campaign web

-18-

sites had a dual purpose, being aimed both at voters and at a wider audience. These facts remain undisputed.

135.  This fact is material to the pending motions because accessibility to other web sites is an important way for members to publicize their web sites. Defendants mischaracterize the testimony cited in this paragraph. Although plaintiffs Kohl and Quigley did say during their depositions that their web sites were aimed at voters, they never said that the sites were **not** aimed as well at the general public. Neither deponent was specifically asked whether the web sites were aimed at the public **as well**. Moreover, in the Brenner, Kohl and Quigley affidavits cited in this paragraph and submitted with plaintiffs' motion for summary judgment, and in the Second Affidavits from Kohl and Quigley that accompany plaintiffs' reply brief, plaintiffs make clear that their campaign web sites had a dual purpose, being aimed both at voters and at a wider audience. These facts remain undisputed.

136.  Although it is true that prominence on the home page is important, web site operators often want to get traffic directly to their interior pages, and in fact the Pineda testimony cited by defendants recognizes that it is not **only** the home page where placement of the relevant text is important. For example, it is often much more likely that other web sites will link to the content-rich interior pages of a web site, and it is generally accepted that link popularity is a very important consideration in the search and ranking algorithms at Google and similar search engines. *See, e.g.,*, http://en.wikipedia.org/wiki/Link_popularity; http://www.seochat.com/seo-tools/link-popularity/.

137, 138.  Even if it were true that plaintiffs could not identify any IUOE campaign web sites, or intended campaign web sites, that use RSS feeds, the fact would be material because the union's rule prevents candidates and their supporters from using this popular technique to increase site

-19-

traffic.  Moreover, by establishing a blog on Google's blogger, a site host automatically gets an RSS feed.  *See* http://help.blogger.com/bin/answer.py?answer=41450&query=rss&topic=&type=f.  *See also* Brenner Dep. 80.  Therefore, plaintiff Mueller's blog is an example of an existing IUOE campaign web site that has an RSS feed.

139.  Although there is a genuine issue about this fact because the parties respective experts' affidavits squarely conflict, Pineda's affidavit (stating that RSS feeds can be installed through technologically very difficult measures) supports plaintiffs' larger point, which is that the password protection rule interferes with member speech by making it harder for members to use the more user friendly hosting technologies that have evolved recently.

140.  Although the union purports to dispute this fact, the assertion "many hosts do" is not logically inconsistent with the assertion "many hosts do not."  This paragraph thus remains effectively undisputed.

141.  Although defendants take issue with some of the specific points made in Brenner's affidavit, they do not dispute the more general statements in this paragraph.  Even if **some** specific hosts support scripting, that fact is not contrary to the assertion that many hosts do not.  Although defendants may dispute that they have younger members, a cursory review of the MySpace pages that come up when searching with the terms "iuoe" or "+operating +engineers" reveals that there are many such young, tech savvy Operating Engineers.  Brenner Dep. 150-152.  Defendants also take Brenner's deposition testimony about Flickr out of context.  He testified that nothing in the wording of the Campaign Website Resolution necessarily bars use of Flickr.  However, the posting of photographs of a campaign rally, or of a satirical photograph of a candidate for union office, could easily be deemed campaign related, thus implicating the password protection rule.

142.  This statement is material to the outcome of the pending motions because, in light of the fact that the resolution cuts off access to many hosts that make it easy to post sites or content online without being technologically sophisticated (for example, posting videos on YouTube), the union's refusal to supply technical expertise to replace the "easy access" sites means that, for example, a member who wants to put a video on his campaign web site may be prevented from doing so.  Moreover, the union cites no evidence contradicting this statement, which is therefore undisputed.

145.  This statement is material to the pending motion because, even though some IUOE members will be able to get IT experts to help them with their web sites, and thus may be able to post videos to their web sites, many IUOE members may be unable to do so.  Those members need access to the web hosts that simplify the posting of campaign content.  Moreover, the fact that plaintiffs cannot specifically identify anybody who wants to use a particular campaign technique does not serve to justify a union rule that cuts off access to that technique.  Finally, as noted above in ¶ 141, defendants take Brenner's deposition testimony about Flickr out of context.  He testified that nothing in the wording of the Campaign Website Resolution necessarily bars use of Flickr.  However, the posting of photographs of a campaign rally, or of a satirical photograph of a candidate for union office, could easily be deemed campaign related, thus implicating the password protection rule.

146.  This fact is material because defendants selectively cite the evidence.  Although Quigley or Kohl did not identify any IUOE members who have MySpace pages, Brenner testified that he had located many pages posted by IUOE members, using the search terms IUOE or "+operating +engineers."  Brenner Dep. 150-152.  Moreover, there is a network of Facebook pages for persons associated with Operating Engineers Funds.  *See*  http://www.facebook.com/networks/

networks.php?view=companies &browse&q=O.

147.   Defendants selectively cite the evidence.  Brenner's testimony was based on the fact

that many campaigners and union activists, including intra-union campaigners, are turning to these

newer forms of technology, *e.g.*, Brenner Affidavit ¶¶ 15, 16, and there is no reason to think that

Operating Engineers are any different.  Both Kohl and Quigley have stated that they want to use

these newer forms of technology in the future.  Quigley Affidavit ¶ 23; Kohl Affidavit ¶ 27; Kohl

Second Affidavit ¶ 5, and plaintiff Mueller has already started doing so.  *See* http://local39.

blogspot.com/.  For example, Brenner testified that he had located many MySpace pages posted by

IUOE members, using the search terms IUOE or "+operating +engineers."  Brenner Dep. 150-152.

Moreover, there is a network of Facebook pages for persons associated with Operating Engineers

Funds.  *See* http://www.facebook.com/networks/networks.php?view= companies &browse&q=O.

Brenner testified during his deposition, at 216-217, that a union activist has contacted him about

podcasting, although the activist was not a candidate.  And as noted above in ¶ 141, defendants take

Brenner's deposition testimony about Flickr out of context.  He testified that nothing in the wording

of the Campaign Website Resolution necessarily bars use of Flickr.   However, the posting of

photographs of a campaign rally, or of a satirical photograph of a candidate for union office, could

easily be deemed campaign related, thus implicating the password protection rule.

148.   Plaintiffs Kohl and Quigley specifically stated in their affidavits that members are

nervous about being tracked and do not like to login to web sites, Quigley Affidavit ¶¶ 6, 10; Kohl

Affidavit ¶¶ 10, 11.   With respect to the difference between registration and log-in, plaintiffs

acknowledge that the two are not the same.  However, the comparison was introduced by defendants'

expert witness, in giving the example that three major newspapers require login to see some of their

online stories.  She backed away from the analogy only when it turned out that the facts did not support her client's position even in the newspaper industry. For what it is worth, undersigned counsel will often turn away from a web site requiring log-in because it is just too much bother to log in.  Finally, the fact that plaintiff Kohl's web site contains a forum that requires log-in does not show that requiring log-in will not deter viewing.  As plaintiff Kohl shows in her Second Affidavit, ¶ 5, hardly anybody participates in the forum that requires log-in, even though she has had nearly 13,000 visitors to her web site.   Local18MembersVoice.com (last visited June 14, 2007)

149.  This fact is material because the contents of campaign web sites may well not be seen as valuable  by many members who have to decide whether it is worth logging in.

150, 152, 153.  The fact that the assurance of no-tracking may be reassuring to some or even many members does not contradict the fact that many members are concerned about being tracked.  Indeed, the very presence of the assurance could be a reminder to members of the possibility of being tracked.  This is especially true in light of Brenner deposition testimony that the prospect of not logging IP numbers is hard to credit, because without tracking IP numbers it would be difficult to identify and respond to denial of service attacks or other malicious attempts to hack the system. Brenner Dep. 275-277.   Thus, the fact stated in this paragraph remains undisputed. Moreover, the fact that plaintiff Kohl's web site, or other web sites featured by the Association for Union Democracy ("AUD"), contain forum sections that require log-in does not show that requiring log-in will not deter viewing.  As plaintiff Kohl shows in her Second Affidavit, ¶ 5, hardly anybody participates in the forum that requires log-in, even though she has nearly 13,000 visitors to her web site.  Similarly, with respect to the web sites recognized by AUD, none of them required log-in to enter the bulk of the web site; rather, the discussion forums were discrete parts of the web site in

addition to many content pages that were freely accessible to all. *See generally* Kohl Dep. Exhibits 19-24. This is consistent with the experience in the newspaper industry, which generally allows the public to view many pages that advertise their content before the viewer reaches the password protection wall. *See* Pineda Dep. 36-64. Finally, as Kohl observed at her deposition, at 268-269, the figures in Kohl Dep. Exhibit 24, showing the number of "threads" and "posts" on that web site, suggest that it is only a very small number of members of the Allied Pilots Association who participate in the password protected forum on the APA-PDP web site. These figures thus vindicate plaintiffs' concern that requiring log-in may discourage participation.

154, 155, 156, 159, 161. The fact that the union may have arguments showing that there are other ways for IUOE members to obtain the needed log-in information does not make ¶ 154 not material. Moreover, the union's other arguments are not persuasive. For example, members have more than two weeks days to return their ballots in the mail, Kohl Deposition, Exhibit 6, ¶ 23, and thus they need not have their union cards accessible when the ballots first come in the mail. Moreover, members may regard casting a ballot as being worth more effort than simply accessing a web site that they have come across while surfing the Internet. And as for the fact that members are required by a union bylaw to have their union cards on the job does not mean that they always do so, as the Quigley Affidavit makes clear at ¶ 4. The facts that intra-union activists who are signing protest letters, coming to union meetings, or donating money to support a candidate may be motivated to find the necessary membership information does not alter the fact that members whose interest in the election is far more casual may not find it worth their while to telephone a help line, or go look for a union card someplace else in the house, when they come upon a web site that requires membership information for log-in. The point of having a web site is to make it as easy as

possible for members (and others) to see information, and the log-in requirement just creates obstacles that may discourage many people from getting access, especially if their interest in seeing a campaign web site is only casual in the first place. But a candidate and his supporters who run a web site want to get every possible vote, even from members whose interest is only casual.

164. Defendants have misstated what plaintiffs said during their depositions. They did not agree that rank-and-file expressions of opinion are "sensitive information" that members may be punished for revealing. *See* Plaintiffs' reply to ¶ 23, *supra*. Moreover, when plaintiffs said that employers have access to information about what is happening in the local, they did not qualify their affidavits by saying that it was only some kinds of information to which employers had access, and defendants chose not to ask during depositions whether employers had access to particular kinds of information. Thus, this fact remains undisputed.

165, 166, 167 Plaintiff Quigley specifically testified during his deposition that when he was a business agent, he signed up hundreds and hundreds of operators whose businesses grew into substantial operations over time, Dep. at 127. He identified several contractors who employ hundreds of IUOE members, run multi-million dollar businesses, and participate actively as union members and even attended a recent union meeting to vote for the election committee. *Id.* 130-133. Moreover, when plaintiffs said that employers have access to information about what is happening in the local, they did not qualify their affidavits by saying that it was only some kinds of information to which employers had access, and defendants chose not to ask during depositions whether employers had access to particular kinds of information. Thus, this fact remains undisputed.

171. Defendants miscite the testimony. Plaintiffs' counsel asked a series of questions about whether various union member conduct that would evade the password protection system would

violate "the rules" or "any of your rules."  Giblin Dep. 133-135.  Nor has the union identified any other rule that would be violated.  The union has admitted that it does not have any general prohibition against disclosing union affairs to non-members.  PSMF ¶¶ 59-61 and DR-SMF ¶¶ 59-61.

173.  Defendants miscite the testimony.  Plaintiffs' counsel asked a series of questions about whether various union member conduct that would evade the password protection system would violate "the rules" or "any of your rules."  Giblin Dep. 133-135.  Nor has the union identified any other rule that would be violated. Counsel never confined the question about downloading the electronic files of a web site and shipping it to a non-member. In fact, counsel did not ask the question about shipping the electronic files about "the rule" (singular), but about "the rules" (plural):

"Q.    That doesn't violate the rules?

A.    That's correct."

Nor has the union identified any other rule that would be violated.  The union has admitted that it does not have any general prohibition against disclosing union affairs to non-members.  PSMF ¶¶ 59-61 and DR-SMF ¶¶ 59-61.

175.  This fact is material because is undercuts the effectiveness of the union's rule to serve its purported purposes.  In any event, the evidence cited is undisputed in the record.

Respectfully submitted,

_____/s/ Paul Alan Levy_____
Paul Alan Levy (DC Bar No. 946400)
Gregory Beck (DC Bar No. 494479)

Public Citizen Litigation Group
1600 - 20th Street, N.W.
Washington, D.C. 20009

(202) 588-1000

Attorneys for Plaintiffs

June 15, 2007

**Reply Memorandum**

Exhibit 1

Web    Images    Video    News    Maps    Gmail    more ▼                                         Sign in

# Google

[ray connors 150                              ]    Search    Advanced Search
                                                             Preferences

**Web**                          Results **1 - 10** of about **248,000** for <u>ray connors 150</u>. (0.10 seconds)

Mark **Connors** — Russell **Connors** : ZoomInfo Business People Information
**Connors, Ray**, U.S. Department of Agriculture, There was no running water, ...
**Connors**, Raymond, International Union of Operating Engineers - Local **150** ...
www.zoominfo.com/people/level2page7893.aspx - 110k - <u>Cached</u> - <u>Similar pages</u>

eBay - nia peeples, **Connors'** War, DVD, HD DVD Blu-**ray** items on ...
Buy nia peeples, **Connors'** War items on eBay. Find a huge selection of DVD, HD
DVD Blu-**ray**, VHS items and get what you want now!
search.ebay.com/nia-peeples - 103k - <u>Cached</u> - <u>Similar pages</u>

Welcome
Local **150** Treasurer Joseph P. Ward's Illinois Labor Advisory appointment confirmed
... A new weekly newsletter by Brother **Ray Connors**..
150election.com/welcome.htm - 32k - <u>Cached</u> - <u>Similar pages</u>

### TEAM News
TEAM **150** Hits The Streets of Chicago · Bill Dugan is stealing your Livelihood · A new
weekly newsletter by Brother **Ray Connors**...
150election.com/TEAM%20News.htm - 47k - <u>Cached</u> - <u>Similar pages</u>

[PDF] LBTI Mechanical and Structural Element Tom **Connors** Requirements to ...
File Format: PDF/Adobe Acrobat - <u>View as HTML</u>
Tom **Connors**. Requirements to be met within Operational constraints. (Attitude,
Temperature and ... Zemax optical **ray**trace imported into I-deas. and AutoCad ...
lbti.as.arizona.edu/LBTI/7Mechanical%20Elements.pdf - <u>Similar pages</u>

Phys. Rev. **150**, 956 (1966): Wood et al. - Analysis of $\hat{l}^3$-$\hat{l}^3$ ...
9 1 OOOO1 127 keV XK 101g Rh SINGLES 0000- 198 keV z 0 0 5-000- 325 keV 0 50
100 **150** 200 CHANNEL NUMBER FIG. 3. The y-**ray**singles spectrum of Rh'lg' in a ...
link.aps.org/doi/10.1103/PhysRev.**150**.956 - <u>Similar pages</u>

[PDF] HEAVY AND HIGHWAY AGREEMENT
File Format: PDF/Adobe Acrobat - <u>View as HTML</u>
**Ray Connors**/Craig Wonderlich/Marshall Douglas. 10. All engineers with valid Local
**150** Crane Certification operating cranes, booms, or ...
dot.state.il.us/desenv/020604/2x/2xoperatingengineers.pdf - <u>Similar pages</u>

BIBLIOGRAPHY
Arndt, M.B., Ryan, J.R., McConnell, M., **Connors** A., Rank, G. and Schonfelder, V.: "
X-**Ray** and Gamma-**Ray** Measurements of the 15 November 1991 Solar Flare", ...
webhost.bridgew.edu/marndt/Bibliography_publications.htm - 38k -
<u>Cached</u> - <u>Similar pages</u>

George Kellman
Referee: William **Connors** | Judge: Dan Macone | Judge: Mark Streisand | Judge: ...
Bill **Ray** | Judge: Mike Ross ~. 2001-04-21, **150** Juan Arroyo, 146¾, 28-5-1 ...

www.boxrec.com/boxer_display.php?boxer_id=003963 - 54k - <u>Cached</u> - <u>Similar pages</u>

<u>Schuylkill Archives - Census Data</u>
smanheim.txt, South Manheim Township, 15 kb, Nov 1999, Laura **Connors**..
Yatesville.txt, Mahanoy Township - Yatesville ED **150** 182 kb, May 1999 **...**
www.rootsweb.com/~usgenweb/pa/schuylkill/census.htm - 39k -
<u>Cached</u> - <u>Similar pages</u>

**1** 2 3 4 5 6 7 8 9 10    **Next**

Try <u>Google Desktop</u>: search your computer as easily as you search the web.

| ray connors  150 | | Search |

<u>Search within results</u> | <u>Language Tools</u> | <u>Search Tips</u> | <u>Dissatisfied? Help us improve</u>

©2007 Google - <u>Google Home</u> - <u>Advertising Programs</u> - <u>Business Solutions</u> - <u>About Google</u>

Web   Images   Video   News   Maps   Gmail   more ▼        Sign in

# Google

| Bill Dugan Democracy | Search | Advanced Search |
|---|---|---|
| | | Preferences |

**Web**           Results **1 - 10** of about **98,700** for <u>Bill</u> **Dugan** <u>Democracy</u>. (0.28 seconds)

### UU World: Fighting City Hall, by David Wolman and Heather Wax
They've learned that **democracy** in practice isn't necessarily like the **....** but Town
Administrator **Bill Dugan** refused, insisting he had never heard of a **...**
www.uuworld.org/2003/03/feature1b.html - 18k - <u>Cached</u> - <u>Similar pages</u>

### Gamasutra - Features - "Manager In A Strange Land: Sliding **Democracy**"
To quote **Bill Dugan**, executive producer at Treyarch: Personally, **....** What I'm
advocating is sliding **democracy**, where your project starts out with lots of **...**
www.gamasutra.com/features/20040827/fristrom_01.shtml - 60k -
<u>Cached</u> - <u>Similar pages</u>

### Gamasutra - Features - "Manager In A Strange Land: Sliding **Democracy**"
To quote **Bill Dugan**, executive producer at Treyarch: Personally, **....** Too much
disagreement in the name of **democracy** or honesty or good faith can be harmful **...**
www.gamasutra.com/features/20040827/fristrom_pfv.htm - 18k -
<u>Cached</u> - <u>Similar pages</u>

### Why Would a Midwest Union Local Support Two Generally Anti-Union ...
BuzzFlash.org is a pro-**democracy** Web site featuring daily headlines, breaking news,
**...** Website for Local 150 Union Members challenging **Bill Dugan ...**
www.buzzflash.com/articles/analysis/203 - 35k - <u>Cached</u> - <u>Similar pages</u>

### Welcome
Fired For What **Bill Dugan**? Just because you have the power doesn't make it right! Is
this your brand of **Democracy**? Click here to read the article below that **...**
150election.com/welcome.htm - 32k - <u>Cached</u> - <u>Similar pages</u>

### New Page 1
**Bill Dugan** and the IUOE conspire to screw membership. for personal gain and stifle
union **Democracy** and free speech. Dear brother and sister members please **...**
150election.com/IUOE%20**Democracy**.htm - 4k - <u>Cached</u> - <u>Similar pages</u>
[ <u>More results from 150election.com</u> ]

### Operating engineers defend their internet rights
From the March-April 2007 issue of Union **Democracy** Review #167 ... The United
Engineers Party, headed by President/Business Manager **Bill Dugan**, 2. **...**
www.union**democracy**.org/UDR/148-Operating_
engineers_defend_their_internet_rights.htm - 26k - <u>Cached</u> - <u>Similar pages</u>

### Operating engineers defend their internet rights - Working Life
Union **Democracy** Review has reported on how this issue has already arisen ... The
United Engineers Party, headed by President/Business Manager **Bill Dugan**, 2. **...**
www.workinglife.org/blogs/view_post.php?content_id=6412 - 19k -
<u>Cached</u> - <u>Similar pages</u>

### Do we need a **bill** of rights?

Case 1:07-cv-00600-RBW     Document 14-2     Filed 06/15/2007     Page 5 of 5

In **Dugan** (1978), the High Court held that a prisoner, convicted of a **...** of a **bill** of rights nor the current system of majoritarian **democracy** provides an **...**
unya.asn.au/Policy_Platforms/Human_
Rights_and_Diversity/Resources/**Bill**ofRights.htm - 9k - Cached - Similar pages

## United Engineers Party

In any event, these turnouts show me in a dramatic way that **democracy** is alive and well in Local 150. **...** THAT'S WHY THIS IS STILL **BILL DUGAN** COUNTRY.
www.150united.com/**dugan**s_comments/march_05dc.php - 14k - Cached - Similar pages

1 2 3 4 5 6 7 8 9 10     **Next**

Try Google Desktop: search your computer as easily as you search the web.

Bill Dugan Democracy          Search

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve

©2007 Google - Google Home - Advertising Programs - Business Solutions - About Google

**Reply Memorandum**

Exhibit 2

# 150 Negotiations 2007

## Don't be fooled by the U.E.P. Monkeys

**Many 150 members are being told that our election issues will cause a problem with contract negotiations. Steve Cisco said the sky is falling, Jim Sweeney wants everyone on strike, and Bill Dugan, well, he hasn't a clue. Lets look at the facts. Those of you who attended COMET classes will remember the 2 most important factors necessary for negotiating a good collective bargaining agreement.**

**MARKET SHARE: the amount of union density in a geographic area, not just in your craft but all the associated trades as well.**



When you look at the facts it is easy to see that we have all the ingredients necessary for a good contract. In fact we have so many issues on our side a monkey could negotiate our contract! Enough said.

**ECONOMICS: the state of the economy, local and regional.**

**FACT: We have the largest Union density in the 1,2,3 agreement Area.**
**FACT: We have the best economy ever in District 1,2,3 and have had for the last 15 years.**
**FACT: Other crafts have already negotiated good contracts and the Contractors are not going offer much over their settled agreements.**



GIBLIN
EXHIBIT NO. 15
May 22, 2007

**Reply Memorandum**

Exhibit 3



Home          Documents and Reports          Webmaster's Opinion          Open Forum          Contact Us          Links

## Open Forum

This forum page is for you the membership to express your opinions, questions and concerns on the issues facing our union as a whole. The goal of this web site is to remain neutral so neither the webmaster or anyone else will express any of their political opinions on this page, we will attempt to stick to the facts of the issue presented. You are invited the membership of Local 3 to express your opinions to the questions submitted by the membership. Your opinions, questions and comments can be emailed to us at:

**contactus@local3democraticunion.org**
You can also click on this link at the bottom of this page.

**Note:** My real job is far away from my computer during the week so please excuse any lapses in time between receiving and posting your comments. Comments posted could be replaced after enough time has passed which allowed the membership to read and respond to the issues raised in these mailings



**Post Id #100**
**May 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; To my District Repersentitive Tommy Aja, you did a great job in Stockton brother. I hope the promotion was just that and not some sideways move to get you out of the way for not following the party line. Good luck Tom, see you on the next big one. Mike

**Post Id #99**
**May 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; EDU performance evaluation on the Gold Ticket crew
A "Gold" Record? You be the Judge.
The Gold Administration, led by Russ Burns and Rob Wise, have been in charge of Local 3 for nine months now. It is report card time. EDU provides this recap of the Gold Administration's record for our readers to judge for themselves if the Gold Administration has lived up to its promises or not.
• Russ Burns and the Gold Administration FIRED over 50 experienced, qualified, Local 3 staff purely for political reasons. These experienced and dedicated staff have been replaced with Gold Ticket supporters (mostly crane operators) with no experience.
• Favoritism is running rampant. Hiding under the guise of an "independent salary survey" Russ Burns and the Gold Administration are giving huge salary increases to construction Business Agents and District Representatives while Local 3 members sit on the out of work list! To make matters worse they have created a two tier system for agents paying public employee agents far less then construction agents. Russ Burns and the Gold Administration have never divulged who conducted the "independent" salary survey and did NOT share the survey results that are the basis for the huge increases. They cherry picked which salaries they would print in the paper. Why not give us the survey and why not print ALL the salaries in the paper? Because that would prove that they lied about no "favoritism". Is this the Gold Administration's definition of transparency?
• No promised checks and balances have been put in to place. In fact the Executive Board has done quite the opposite giving Russ Burns a blank check when it comes to staff salary adjustments.
• Russ Burns, the Gold Administration and the Executive Board adopted a merit pay system for staff. But of course there will be no "favoritism" involved. Worse yet our employers are now going to use Local 3's merit system against us!
• As for transparency, in Hawaii District 17, Kalani Mahoe was accused of instituting a gambling ring, fired, rehired and promoted. Yet Local 3, according to President Herschbach, will NOT share a copy of the investigation results with the members! Now Russ Burns and the Gold Administration want to fire Nelson Umiamaka, the JAC Director, for telling the truth about what he knew regarding Kalani Mahoe.
• Russ Burns and the Gold Administration lost organizing grants from the International tota ling $720,000.00 per year! In just one year this could have made up the difference of what was paid to Don Doser! Now we are out what was paid to Doser PLUS $720,000.00 per year, every year! The Gold Administration STILL has NOT informed the membership about this!
• Russ Burns and the Gold Administration paid-off Lynn Faris for the Faris Report $110,000.00 of dues money and now Lynn Faris' law firm, Leonard Carder, is doing work for Local 3!
• The Gold Administration representatives of Jim Sullivan, Bob Miller and Business Rep Mike Ayers told members in Elko, Nevada, "You either accept this contract or Local 3 is down the road and won't represent you anymore."
• Russ Burns and the Gold Administration have NOT disclosed information regarding the class action lawsuit against Local 3 by former staff members. (In fact they informed Local 3 staff who asked about it at Winter Training it was none of their business!)
• Russ Burns and the Gold Administration promised NO NEPOTISM yet they hired Dave Slack as the District Representative in the same District his brother Luther Slack serves as the Executive Board member. Not to mention Carl Goff's daughter works for Local 3's lobbyist.
• Russ Burns and the Gold Administration have NOT shared the International's audit of the Doser payout with the membership.
• The Gold Administration has allowed Local 3 elevator & fork lift jobs in several Districts to be performed by non-union and other crafts.
• The Gold Administration has allowed over 150 grievances to pile up with no resolve.
• The Gold Administration has allowed non Local 3 dispatched crane operators to operate cranes in the Oakland District.

• The Gold Administration has allowed excavators to be ran with out oilers.

• The Gold Administration missed contract openers for the surveyors in Nevada so these members will NOT be getting any raises or benefit increases until March 1, 2009! They will have the same hourly rate for 3 years!

• The Gold Administration's Bylaws change touts a dues reduction. The truth is by year 3 the dues will be $21.00 MORE than they are NOW for an average operator!

On the Horizon

If this isn't enough to make you want to flunk the Gold Administration, here is what we have heard is on the horizon!

• Pensioners health and welfare. That's right! The fund is not in as good a shape as we have been led to believe. Hours are down and so the fund is not doing as well as they had hoped. Is it on the chopping block?

• With hours down does this mean the Pension fix is in trouble too? Keep your eyes open, we see a pension factor cut right around the corner! Who will they blame this one on? Doser and Bonilla are gone, look out Miller. Now we know why the Gold Administration put Miller in charge of all the investment committee activities. 11% returns sound good but EDU has learned that other Unions and organizations made 18%. They'll blame this on Miller but remember what Rob Wise told us, "The buck stops with the Business Manager." At least that is what he told us during the election. Look out Russ, you could be Rob's next victim!

• Rob Wise stated during the election that one of the reasons we needed to boot Bonilla was due to "all the lawsuits Bonilla had filed". EDU has learned that one of those lawsuits filed by Bonilla against the Weinberg and Stanton Law Firms and McMorgan just settled with $12 million being collected for our Pension fund! The question that remains is why is the Weinberg Firm STILL doing work for Local 3? Could it had settled for more if the Gold Administration wasn't in bed with the Weinberg Law Firm?

• Speaking of lawsuits, what is happening with the Doser and Weinberg lawsuits? Russ Burns promised he would keep us informed. Rumor has it they are trying to sweep it all under the rug and "move on".

Time will tell.

---

**Post Id #98**
**May 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; I run into to this problem myself and I think the employers use it as a tool or leverage against document-legal employees, undocumented workers don't complain and prefect yes-men and to the union they are just more denaro's.....

It would be interesteing to know just how many undocumented workers are employed in our local. What is the unions position on this? Surely no one will give you a straight answer. As one savvy BA replyed when presented with the Question " that's a political issue. Young man! We don't get involved in politics, let the Government worry about that". (Did I miss something? Are we not a political organization)? " A Democracy."

---

**Post Id #97**
**April 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; From Local 18 member Dave something or other;
www.groups.yahoo.com/group/OperatingEngineers_ (http://www.groups.yahoo.com/group/OperatingEngineers)
www.groups.yahoo.com/group/DavesDirtyRatBastardsHuntingClub_ (http://www.groups.yahoo.com/group/DavesDirtyRatBastardsHuntingClub)
As life long Dissident of IUOE Local 18, Ohio and ran for president or president/ business manager in 1993, 1996, 1999 and 2003 I understand where you Brothers & Sisters are coming from. Now that I have been on disability retirement since 2-2003 I still refuse to give up the fight for Union Democracy. Please cross post on my OperatingEngineers web site. You can contact me at _Davesdrb@aol.com_ (mailto:Davesdrb@aol.com)or 614-231-0999 in Columbus,Ohio.
Good Luck in your efforts.
Dave

---

**Post Id #96**
**May 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; EDU about merit pay! I thought this was a union too guys! Oh yeah good luck to D.J. Robertson in his new career, he was a decent guy.
Local 3 Gold Administration Adopts Merit Pay Policy for Staff!
EDU has learned that the Gold Administration with the blessing of the Executive Board have voted to make Local 3 a Merit Shop. In documents obtained by EDU the new policy states:
"The business manager has the discretion to further adjust the salaries of staff for promotions, demotions, reflect labor market job change, increased responsibilities, merit, retention and other adjustments necessary to the daily operation of Local 3."
EDU can't believe that our President Fred Herschbach would support such a policy let alone our Officers and Executive Board! It was Fred Herschbach's district that drained valuable Local 3 resources year after year to fight Bruce Woolpert (Granite Rock) from getting merit pay provisions in his contracts! What will Local 3 tell Bruce this year? How much money did it cost Local 3 members to fight the battle with Bruce? Fred stated he would never be a part of a merit pay system? What happened?
But even more important and distressing is how will Local 3 be able to fight this fight in the field? How long will it be before all our public employee divisions and the Bruce Woolpert's of the world use this new policy against us the members? It is so sad to think that our Union leadership treats Local 3 staff (who are also Local 3 members) no better than one of our employers! Union's should lead the way and set the example when it comes to the treatment of employees not the other way around! How can we hold our employers to a higher standard than we are willing to hold ourselves to? First it was a two tier system for business agents, now it is merit pay. What's next?
This has to make one question the basic philosophical beliefs of the Gold Administration. If the members and unionism were the focus, as they have repeatedly stated, how could this have happened? How could they do this to their employees? • Has the Gold Administration forgotten where they come from? • Has the Gold Administration forgotten the basic underlying fundamental beliefs of the labor movement? • Has the Gold Administration turned Local 3 into Corporate America?
Many of Local 3 staff were upset and the Gold Ticket complained during the election that Doser and Bonilla would play favorites and give increases to their "pets". Now the Gold Administration has taken it one step further and made it a written policy! In one swipe of the pen they have institutionalized what just a few short months ago they were screaming about to garner our votes! Doser and Bonilla were bums for playing favorites, but Russ Burns isn't? Don't forget that DJ Roberson, Fred Herschbach and Russ Burns were all recipients of these supposed "offensive" Doser and Bonilla 'pet' increases! (see Local 3's LM2's) Did some one say Hypocrites!
What is next? Hold on to your wallets Brothers and Sisters it is going to be a rough road!

Stay tuned for a Hawaii District 17 shocker…

---

**Post Id #95**
**April 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; From Union Man,Island style.
Mike, if anyone would like to follow the Doser case they can type in Google search this (Superior Court of California 05AS03698) and look for this case number 05ASO3698.
Thanks

---

**Post Id #94**
Date Posted on Website: 2007-05-28
Webmasters Note; From Brother Mike Nelson, sounds like a solid operator, thank God he's not operating on me...;)
I read all this crying about how much some people make and it makes me sick. I've been an operator for over 30 years , and have notbeen out of work for over 18years . How do I manage that its simple I do all i can to make myself my union and the company I'm employed by look good . I go the extra mile when needed .I earn over $100,000 per year while not taking any work from my union brothers..I personally convinced two nonunion contractors to go union. Showing them they can get qualified workers and good help by making clear the needs of the company when requesting people out , and the responsabilities of the men dispatched . Not all operators are created equal , some are exceptionally good and some are piss poor . I believe many of the cry babies are of the piss poor variety .My work has taken me from as far east as Harrisburg Pa. to as far west as Los Angelas Ca. . I've worked with good union people and some totally dead weight pretending to be operators. Most but not all of the latter were nonunion this is when I put on the show for the contractor trying to convince them that the training of a good union operator out weights the cheep pay of a scab bastard in quality and quantity of work performed. I am qualified to perform many tasks the normal operator is not . I seldom oerate equipment any more I travel and teach contractors and operators about new equipment and techniques to perform soil prep on a variety of soils in many conditions .I am self taught in engineering as I was tossed from college as a premed student in 1974 . not for failing I was on the deans list it was for a personal choice I dont regret. The operators was a good choice and I tried to pay back as much as I could to the union along the way. I dont like my B.A. but hes my unions man so I support him and say pay is relative to the job . You work and learn and put your time in make the sacrafices you should get the pay.

---

**Post Id #93**
**April 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; From Brother Mike Dodgin on BA pay scale
I would like to clarify my analysis of the Business Agent Pay.
I was very critical in my analysis of the Business Agents Pay rates, allow me explain why. While I was on staff as a business agent my experience was, a certain percentage of the business agents and staff members, did not provide service to the membership that would justify the pay that they received. However there were agents and staff then, and agents and staff now, that do earn every cent of what they are paid and should receive a huge raise based on the service that they provide.
Staff members and Agents, who are more concerned with providing quality service to the membership than they are about complimenting and supporting the Union upper management will be rewarded with extra work assignments, their work will be judged in a derogatory light and any new ideas or suggestions to improve service to the membership will be completely dismissed or ignored and they will receive no support from the administration in doing their job. The agents and staff members that are more concerned with making the right compliments and attending the right functions, will enjoy a lighter work load, will not have the need of administration support . They do not make suggestions or propose new ideas they only support suggestions and ideas of the administration. In the hope of gaining favor, they are always on the lookout for anyway possible, true or false, to belittle or degrade there coworkers.
The most unfortunate thing is, the agents and staff that are dedicated to the membership still on staff, understand how the game is played. Service to the membership must be provided in a covert manner through innuendo and suggestions. To these Agents and Staff members that are able to play the game and remain dedicated to the membership of this Union I offer my admiration and my gratitude.
So based on this explanation I hope I have clarified my earlier post. Basically I believe that we spend enough money on agents pay rates. Lets get rid of those that do nothing and give their salary to those that do everything, That, I believe , would be money well spent.
Fraternally
Mike Dodgin

---

**Post Id #92**
**Arpil 2007**
Date Posted on Website: 2007-05-28
Webmasters Note; From the EDU on the new dues structure, hopefully the table will post correctly!
A Masquerade?
Proposed Bylaws Change Touts Dues Reduction, The Truth is by Year 3 Dues will be $21.00 MORE than they are NOW for Average Operator!
EDU has done an analysis of the proposed Bylaw change dues restructuring and has discovered that by year 3 the average operator (members who work an average of 1500 hours per year) under the California Master Agreement will be paying MORE in dues than the current dues. The table below demonstrates this fact based on a member who works 1500 hours per year under the California Construction Master Agreement:
CURRENT YEAR 1 YEAR 2 YEAR 3 Effective Date July 1, 2007 July 1, 2008 July 1, 2009 Window Dues $49./mo X 12 mo = $588.00 per year $44./mo X 12 mo = $528.00 per year $45./mo X 12 mo = $540.00 per year $47./mo X 12 mo = $564.00 per year Supp Dues $.85 /hr X 1500 hrs = $1275.00 per yr $.83 /hr X 1500 hrs = $1245.00 per yr $.85 /hr X 1500 hrs = $1275.00 per yr $.88 /hr X 1500 hrs = $1320.00 per yr TOTAL DUES $588. + $1275. = $1863.00 per year $528. + $1245. = $1773 per year $540. + $1275. = $1815.00 per year $564. + $1320. = $1884.00 per year REDUCTION $90.00 Year 1 $48.00 Year 2 ZERO! You pay $21. per year MORE than you do now!
NOTES: Window Dues will increase annually based on increases to our wages and fringes NOT including the pension restoration, supplemental dues or retiree health and welfare. For the above calculation we have estimated in year 2 of the $1.90 scheduled increase, $.75 will be included in the window dues calculation rounded to the nearest dollar. For year 3 we estimate $1.50 of the scheduled $1.85 increase will be included in the window dues calculation rounded to the nearest dollar. NOTES: Supplemental dues will increase by 1.9% per year based on these same estimated increases for each year. Therefore, we have estimated $.02 in year 2 and $.03 in year 3.
In all fairness we have to state that the proposed new formula is less then what is currently in the Bylaws. HOWEVER, don't forget that under the

Bonilla administration Supplemental Dues were frozen. ($.10/hr X 1500 hrs= $150.00 per year SAVINGS!) This was $,10 per hour in our pocket which was $150.00 in one year! This is more in one year under Bonilla than the savings unde r the Gold Administration in this proposed plan for life! No telling what Bonilla may have done if he was still around.

---

### Post Id #91

Date Posted on Website: 2007-05-28

Webmasters Note; From Brother Dean Dye. Brother Preston,

This is a copy of the letter sent to all the below regarding the missed contract opening fo r surveyors. The EDU letter about the missed opener was fact. I proof read it prior to it being released. I hope you are doing well.

Dean Dye

Brother Burns,

As you may or may not know, Brother Sullivan has missed the opportunity to open the Survey Contract in North Nevada for wage and fringe increases for the Surveyors.

The date to send the demand letter to open the Survey contract for wages and fringes was De cember 1, 2006. This demand letter was not sent, therefore the Surveyors in North Nevada will be struck with the same wages and fringes unti l March 1, 2009. They (the Surveyors) therefore will not have had a hourly wage increase for three(3) years.

As you should know, the Health and Welfare, as well as most of the other fringe benefits go up each year, so where will the money to continue to provide these brothers and sisters with their deserved wage and fringe increases come from?

I suggest that if Brother Sullivan (the officer in charge of the Survey Department) and Bru ce Noel (Survey Department Director) spent as much time trying to take care of the members as they have in trying to blame the former Director (the under signed) for a perceived misallocation of $0.10 per hour, then they would have more time to actually further the aims of the union, which inclu des obtaining better wage and fringe increases as was done during my tenure as Director.

I. also, have not received any reply to my my letter of Feb. 7, 2007 regarding the theft of the Testing and Inspectors work by the Plumbers and Pipefitters union apprenticeship program and their affiliation with The Quality Control Cou ncil of the USA.

As this is being copied to the IUOE General President, the above paragraph also applies to him.

Russ, ignoring these problems will not make them or me go away. If you chose to continue to ignore these problems and me, you will leave me with no option but to pursue whatever remedies that I have thru Local 3's bylaws or the National Labor Relation Board or the Department of Labor. I continue to hope that your campaign promises will be fulfilled, but based on your track r ecord so far, this may be a vain hope.

Fraternally.

Dean Dye

Register number 1908306

---

### Post Id #90

Date Posted on Website: 2007-05-28

Webmasters Note; News from the EDU about Hawaii.

Who's in charge of the Local?

Rob Wise? Fred Herschbach? Russ Burns? Kalani Mahoe? Or Michael Brandt?

Rumors are swirling out of Hawaii! EDU has learned that Kalani Mahoe, current Gold Administ ration Trustee and former Hawaii District Representative who was accused of gambling on Local 3's dime, is coming back on staff.

EDU believes that if a thorough investigation (not another Faris fiasco political opinion) has been conducted and the DOL, FBI, Hawaii PD and whoever else was involved found no wrong doing by Kalani, that he should be brought back.

THE PROBLEM? Some of the Hawaii staff members and Grievance Committee members have allegedl y informed Russ Burns that if Kalani comes back they will quit! Others support Kalani.

It is no secret that Fred Herschbach has been advocating for Kalani's return from day one. Even though both Fred and Russ are not well liked in Hawaii. And where is Rob? As usual in the cheap seats, directing traffic from his crystal castle in Alameda. We understand that even though Rob masterminded the Bonilla takeover, some Officers are growing weary of his BS control and ar e questioning Russ' leadership because he won't stand up to Rob.

---

### Post Id #89

Date Posted on Website: 2007-05-28

Webmasters Note; Fronm Brother Mike Dodgin

Greetings Brothers and Sisters,

Allow me to provide an update on the protest's that were filed on the recent election of of ficers for the Local. As I have earlier reported the protest's to the election were filed with the local. A hearing was conducted and the Executive Board con cluded that the protest's had no merit and were dismissed. They did however conclude that several unfortunate events did occur during the electi on process, that violated rules set forth in our bylaws, but these violations were not significant enough to require a new election.

Under the rules set forth by the LMDRA (Labor Management Relations Disclosure Act), if a pr otest to an election is filed by a member in accordance with all the rules and regulations required by their International and Local Union and all the timelimits established to file all required paperwork and if all the required paperwork is mailed exactly as is required then the International and loca l union have 90 days to address and satisfy the protest. If they do not, then the protesting parties have the right to file a protest with the DOL.

An appeal was filed with the Department of Labor. To complete their investigation the DOL r equested two thirty day extensions, which were granted by the local.

On April 12, 2007, The DOL could determine that the protest's have no merit and uphold the results of the election or the protest's could be found to be meritorious and the DOL could require that a Re-Election be held.

The International granted an appeal of the Executive Boards Decision on the 18th of April 2 007 in Washington D.C.

It has been stated at several meetings (by staff and ex-staff members) that problems within the Union, should not be taken outside the Union but handled from within.

If any member believes that the By-Laws and Constitution of the Union are being manipulated , bent or completely disregarded for the benefit of one group or another then they have the responsibility to inform their union brothers and siste rs and use any and all corrective process's available to them under established law wether it be internal or external.

Remember brothers and sisters this is OUR Union, if we the Rank and File Members are expect ed to abide by our By-Laws and Constitution, Then those that we the Rank and File Members elect into positions of Responsibility and Authorit y must also be required to abide by them.

The allegations against some of our previous officers and the lawsuits the Union is current ly involved in, are very good examples of what happens

when the membership does not keep a close eye on our elected officials.
I believe the motivation of those in power to produce results, on the promises that they ma de to achieve election, will be much greater, if they understand that we the Members intended to hold them accountable.
Fraternally,
Mike Dodgin

---

**Post Id #88**
**April 2007**
Date Posted on Website: 2007-05-28
Webmasters Note: From Brother Mike Dodgin, Mike I been sitting on my hands for a month or t wo thinking about this situation. I guess they can kick me out of the union if they want but you know what they say.... Greetings Brother Preston,
I am curious if you recieved a letter from Russ Burns about your website, it seems I have 6 0 days to either close the redwhiteandblue website or password protect it.

---

**Post Id #87**
**March 2007**
Date Posted on Website: 2007-05-28
Webmasters Note: Looks like someone dropped the ball, this info is from the EDU
Jim Sullivan the Officer-in-Charge and Bruce Noel the Director of Technical Engineers misse d contract openers for the surveyors in Nevada. The letter to open the contract for wages and fringes was due Dec 1, 2006 but no letter was sen t! The date for the contract change was March 1, 2007, so the surveyors in Nevada will NOT be getting any raises or benefit increases until March 1,  2009. This is stated in the Master Agreement for Surveyors (in the Nevada Addendum). Their last increase was March 1, 2006, so they will have the same  hourly rates for 3 years! Will these members have to pull out of their own pockets for health and welfare increases? What about their pension?
Who will the Gold Administration blame this one on?
The Gold Administration fired (or they quit in protest) ALL but one of the experienced Tech nical Engineers Representatives; Bonilla's gone, so who is left? They will probably blame it on the business agent, the contracts manager, Sharon, or  one of the secretaries! God forbid they blame it on one of the golden boys Jim Sullivan or Bruce Noel.
What happened to the Gold Administration's platform promise?
"The Gold Ticket will develop qualified, committed and experienced Business Agents. All fut ure Business Agents will be required to have experience in the industry for which they are hired"

---

**Post Id #86**
**March 2007**
Date Posted on Website: 2007-03-18
Webmasters Note; Local 150 in the house, good luck guys.
Subject: Local 150
Dear Members of Local 3, I have been watching with great interest your struggles to regain  your Local for the membership. We at Local 150 are also going through a hotly contested election. I am a 38 year member retired. I was a business a gent, Building Trades Pres. and a Prevailing Wage Compliance director in the 20 years with the 150 Administration of Bill Dugan. Unfortunatel y when one is in power for so long they tend to own the local and the members suffer. Bill Dugan used the local as his own piggy bank. He started a  slush fund and forced the staff to contribute cash, he dictated political policy to candidates with anti union voting records and poured hundreds  of thousands of PAC funds into losing candidates that had no interest in labor only gun issues. He never attended district meetings for 10 years and  now is everywhere like the benevolent dictator he is. The TEAM 150 slate is trying to rid corruption from our local once and for all and return the l ocal to the executive board and the membership. Please check out our website and theirs to see both sides. www.150election.com and www.150united.com The real unfortunate issue here is the IUOE and Vince Giblin is helping them at every turn, including shutting down our website. I'm not su re but you think its because Bill Dugan is 2nd VP and on the IUOE exec. Bd? Our ticket plans to institute term limits, a code of ethics and make all fin ancial transactions transparent so everyone can see how their money will be spent. We as members deserve better, its our money and our local. One o ur leaders will figure out that the members own the local not them.
Mike Quigley
IUOE LOcal 150/Retired

---

**Post Id #85**
**March 2007**
Date Posted on Website: 2007-03-18
Webmasters Note; Dean Dye has the floor
Subject: Business reps pay and pension
This is a reply to Mike Dodgin's analysis of the business representative pay. I speak only  for the departments (testing and Inspection and Surveying) of which that I was the director. I know for a fact that I put in a average of 60 to 65 hou rs a week and was on call and did answer my phone during the evenings, weekends and when I was on vacation or sick leave. I also required both of the gu ys that worked for me to put in about the same hours, We were not paid overtime. We attended all the district meetings, excluding Eureka, many ti mes not getting home until midnight or thereabouts. We, also, were required to attend the semi annuals requiring a complete Sunday. Figuring a simp le 7 AM to 5 PM (minus a 1/2 hour for lunch, assuming we took lunch) and 7 AM to 8 PM on Wednesdays, you have about 48 hours. When you factor in the  district meetings that we went to, the Saturday work, contract negotiations until the wee hours of the morning, you can easily see that the  average work week easily exceeded the 55 hours per week that we were getting paid for. The money for the retirement came directly from our pockets in lieu of wages. This was not gift from the sky. It was allocated the same as the rank and file. I can detail the exact amounts if anybody is i nterested (if you went to the district meetings in the last year there was many handouts that detailed exactly how the pension allocation came about), but r est assured this money was from our paycheck. I would also like to state that my disagreement isn't with the Business Agents, they are pawns in this mess the "yellow ticks" got us into. I think that the average agent is underpaid and is deserving of the additional pay raise that they receive.  Look at the LM2's of other unions and you will see that the business reps in Local 3 is under the average for other operating engineer union in the sam e cost of living geographic (Local 3, Local 150, Local 14 and 15). I will add that if the reps are not doing their job, they should go. The District  reps of San Francisco (District 1,Ken Oku), Marysvale/Yuba City (District 60, Dave Slack), Redding (District 70, Eric Sergent) and Fresno (District 50, San  Uhler) being a few that should go. The "officers" of this union are the ones that are not following their campaign promises and engaging in deceit. A re the "officers" worthy of the money and benefits they

are getting? I don't think so. But, remember the members voted these guys in and are not re ceiving the representation that they deserve and were promised. I hope that we, the dissenters of the "yellow ticks" don't get caught up in pres enting information that is not correct, this will make us no better that them. We know that the "yellow ticks" will resort to virtually any lie, any distortion, any character assassination in order to protect themselves. I respect the work that Mike is doing and he has worked very hard to bring the facts to the membership and this is in no way disrepectful of him. Remember, the executive board is not, repeat, is not the friend of th e members, they are yes "men?" for Russ and Rob.
BOHICA,
Dean Dye (proud not to be working for these guys)

---

**Post Id #84**
**March 07**
Date Posted on Website: 2007-03-18
Webmasters Note: Mike great hearing from you again, will check on the issues you've brought up, some information but not enough to report.
Brother Preston,
These are just rumors that I have heard at this point and I havent be able to confirm these allegations. Your thoughts on these issues would be greatly appreciated.
Fraternally,
Mike Dodgin

---

**Post Id #83**
**April 07**
Date Posted on Website: 2007-03-18
Webmasters Note; Personally, I really like the freedom of speech issue put forth by EDU, se ems that'll be in short supply soon, I broach that subject later. Russ Burns mentioned the EDU today at the semi annual as the three letter acronym th at needs to publish their names with their mailings. Russ Burns stated today that he has been contacted by the membership wanting to know if the statements posted by the EDU are true, if so then they say that Russ is in deep trouble and if the statements aren't true the EDU are lia rs. My question would be why do you need the names if you can check the information? Sounds like they want names for a retaliatory witchhunt in my opinion. Secondly, if the EDU must post their names then before I'd do so I'd ask for the names of all the members of the group "Staff Mmembers for Change" another secret rumor and innundo crew which I believe was sponsored by the winning team during the last election. The EDU have sent me fl yers which are a bit hard to post, too much info for the editing I have to do to get a regular article on is large so forgive me. I suggest you sign up for their mailings at the below email address and make your own decision.
From: edu@stealth-email.com
Subject: Executive Board Contact
EDU Subscribers
We wanted to share with you a correspondence we received from Utah E-Board member, Glenn Sm ith and our response to Glenn regarding the Public Employee flyer. To date we have not received a response back from Mr. Smith.
In Solidarity,
EDU
Email from Mr. Smith received March 9, 2007:
I read your last hate mail. What a bunch of lies, half truths,and deliberately missleading info. As an Eboard member I can tell you that I was there for most of what you wrote about and you are not even close to the truth.Why would you delibera tely undermine our union. As far as I'm concerned you are SCUM
Glenn Smith Eboard Utah
EDU's email repsonse to Glenn Smith dated March 9, 2007:
Dear Utah E Board Member:
It is very easy to point fingers and make accusations that are generalized statements regar ding misinformation, lies and half truths. However, it is much more difficult to be specific and factual about what EDU has supposedly lied about. Th erefore, we are hoping that since you are "in the loop" you can tell us specifically what we have lied about. If you cannot be specific then we would have to assume that you are jumping on the defense bandwagon and really don't care about the truth and the truth getting to the membership. ED U's purpose is not to send hate mail but to shed some light on all the "shit" that has been swirling around this local for a year now, which you as an Eboard member are a part of. If you truly care about our union then shed some facts and not more generalized fingerpointing. Lets see if you can ste p up because if not then you are the problem and not the solution. As far as EDU is concerned ALL Local 3 members are entitled to their opinion. I w ould never call a fellow brother member "SCUM" after all, all we have is each other and without each other there is no union. You of all people shoul d know this coming from a right-to-work state. How sad.
In Solidarity
EDU
P.S. We will see you at the Semi-Annual. We do give you credit for at least contacting us.

---

**Post Id #82**
Date Posted on Website: 2007-02-15
Webmasters Note: More Great insight from Mike
Thought you might find this interesting.
A retiree had sent a request to Barbara Boxer to look into our pension fund, the following is a reprint of the response he recieved.
Thank you for your recent correspondence to Senator Boxer, regarding pensions with Operatin g Engineers Local Union #3
Senator Boxer has submitted a formal inquiry to the U.S. Department of Labor (DOL), asking that DOL provide your application with every consideration consistent with their rules and requlations, Please note that DOL's current r esponse time to Senatorial inquires is approximately 4-5 weeks.
Once again, thank you for allowing Senator Boxer the Opportunity to address your concerns.
letter is dated Jan,10,2007
Now it seems that since it appears from this letter that someone might actually do somethin g about what has been going on with the local, several retiree's and active members have begun a letter writing campaign to their Senators and Con gressmen about several concerns with the local throughout the local's jurisdiction.
I would be interested in the EDU's opinion of the bylaws committee, as it seems to me to be a complete farce, especially if you take into consideration that the Constitution superceedes the bylaws, and it seems to me that all the changes that the bylaws commitee have been charged to address are already set in the constitution.

I have also heard that the E-Board did approve a increase to staff of $10,000.00per year. So if the average operator works 1500 hours a year at approximately $31.00 per hour then the average operator makes $46,500.00 per year and 90% o f all the operators out there have to pay for thier own fuel to get to and from work everyday (an expense that these agents do not have) for myself its about $120.00 per week.

So 1500 hours divided by 40 hours a week is 37.5 weeks a year muliplied by $120.00 a week (that is just the money spent to get to and from work, the rest of the year when the average operator is not working he still must pay for his own fuel a burden that does not apply to any of the staff who use union vehicles as they are allowed to use them anytime and the Rank and File Members pay fo r the fuel.) is $4500.00 per year, and the average operator will have to make 2 or 3 oil changes a year at approximately $40.00 a pop thats an other $120.00, So if you take these minor expense burdens that the AVERAGE operator has to deal with that the AGENTS do Not. Then the average operators yearly wage is now, $41,880.00.

If you take a look at the LM-2 Reports you will find that the Average Agent makes between 70 and 80 thousand per year right now, so for the sake of argument lets say they only make $70,000.00 per year with an additional $10,000.00 per year increase thats $80,000.00 per year.

So the AVERAGE agent that is DOING SUCH A FANTASTIC JOB reprenting the AVERAGE RANK and FIL E MEMBER, IS making almost twice as much money per year as HIS BOSS.

The Agents salary comes from the members dues money so is it fair that they get double the salary??? and DOUBLE THE FREAKING PENSION?? They make enough money already especially when you take into consideration the second pensi on from the international.

It appears that the Executive Board of this Local Union are more concerned with the Staff o f the Local then they are concerned with the Well being of the Rank and File Member whom they supposedly represent.

UNLESS, ..... they arrive at these meetings of the executive board via the "Short Bus" and in this case its not thier fault.

Fraternally,
Mike Dodgin

---

**Post Id #81**
**January 2007**
Date Posted on Website: 2007-02-15
Webmasters Note: Dean to Russ Burns, Sullivan and Bruce Noel, go get'em Dean
This is a email that I sent to Burns, Sullivan and Bruce Noel (Director of the Survey and I nspection Departments) regarding the allocation meetings held On Sat Jan20.07,Dean Dye
Bruce,
I attended the surveyor and the inspector allocation meetings today (Sat.1/20/07). You shou ld be ashamed of yourself for not attending and showing some leadership and guidance for the business representatives that were attempting to run t he meeting.
Two(2) of your reps are new, less than around four(4) months as agents, one has over four(4 ) years and they were ill equipped to answer many of the questions and continued to dig pretty deep holes for themselves. You are the director o f the survey and inspection departments and it should be a priority for you to attend all of the meetings pertaining to these departments. By not at tending you demonstrated to all members present, the contempt that the union holds for these members and the departments in general. The members felt disrespected and as one said "we have once again became the stepchildren of OE3." A few that had voted for Burns stated that they have called him numerous times and have received no return calls. They now regret that they voted for him. I will suggest that Sullivan, Burns and you should develop some character (plain old guts), some leadership skills and try to follow the propaganda that you publish in the Engineering New s. To sum up: you or the officer in charge (Sullivan) of these departments (testing and inspection and surveying, about 1300 members) demonstrated blatant discourtesy and disrespect for all of the members of these departments, your staff and OE3 in general by not being at these meetings.
Dean Dye

---

**Post Id #80**
Date Posted on Website: 2007-02-15
Webmaster Note: Dean dye on local 2 to Russ Burns
Russ, In the minutes of the General Executive Board meeting of October 2006, I observed tha t Local 2 is in the process of obtaining a new Non Destructive Testing Agreement for the lower 48 states. This Agreement will greatly affect L ocal 3's Testing and Inspection wage and benefit structure and could affect our prevailing wages.
Previously, Business Managers Doser and Bonilla went to the former Business Manager of Loca l 2 and International President Hanley and received the following decision: (1) When Local 2 members worked in Local 3's coverage area, the Loc al 2 members would receive Local 3 Testing and Inspection SET 2 wages and benefits, (2) Local 2 members would be dispatched from Local 3's dispatch offices and (3) Local 2 members, while working in Local 3's area would pay Local 3's non supplemental dues rate.
My questions to you are: (1) Are you going to demand the same from Local 2?
(2) Are you going to insist that this agreement be put into writing and approved by the Int ernational President?
(3) Are you going to insist that Local 3's area be exempted from Local 2 contract?
I would like a written response to this letter and copies of any agreement (verbal or writt en) that Local 3 enters into with Local 2 or the International regarding the resolution of this problem.
My address is on Mapper or you use my email address which is: dean0283@comcast.net
Dean Dye
Register Number 1908206

---

**Post Id #79**
**February 2007**
Date Posted on Website: 2007-02-15
Webmaster's Note: Dean Dye to Russ Burns
Russ,
The listed webpage shows that the United Association of Plumbing and Pipefitters have an ap prenticeship program for Non Destructive Testing (NDT). They have a Collective Bargaining Agreement (CBA) with the Quality Control Council o f the USA.
http://www.ua.org/media/demos/qcc/index.asp
This classification is covered under the Construction Inspector classification, which was a warded to the International Union of Operating Engineers(IUOE) in the 1960's and approved by George Meany, former President of the AFL-CIO.
I believe that this is a blatant attempt to steal the Testing and Inspection classification from the IUOE in general and in particular Local 3.
I, as a member of Local 3, request that you, as Local 3's highest representative at the Int ernational level, take action to stop this blatant attempt to steal work that rightfully belongs to our members.
I request that, as a member of Local 3, I be keep informed in writing, of any and all, conv ersations and/or agreements, whether written or oral, that

take place with all International Unions, or Local Unions that are involved with this dispute.
I also request that if you decide not to persue any action against the parties involved that I be notified in writing. Please include the reasons why Local 3 has decided not to protect the jobs of Local 3's Testing and Inspection Department members.
I also request an acknowledgement, in writing that you have received this letter.
This problem was brought to the attention of your Business Representatives at the allocation meeting on Jan 20, 2007 at Local 3 headquarters in Alameda, California. Since the Department Director(Bruce Noel) or the Officer in Charge(Jim Sullivan) of the Testing and Inspection Department chose not to be present at this meeting, I could not report this violation to them. I'm sure that you can asertain this information in the minutes that were taken at the meeting.
Fraternally,
Dean Dye (dean0283@concast.net)
Register Number 1908306

---

**Post Id #78**
**February 2007**
Date Posted on Website: 2007-02-15
Webmaster Note: You're new so I'll cut you some slack. Hawaii made it own bed so now their forced to look the new order (Gold) directly in the face, so do tell how is it working over there? A better union? Did you bump your head? Your in the best union there is and don't forget it.
I just came across this site it has some good info. I'm new in local 3, we have a lot of problems over here in Hawaii. We are tired of all the in house fighting on who is our leader. We are losing our work to the other unions and nonunion while they fight over who is in charge. Is there anyway we can get a better union?
Concerned member

---

**Post Id #77**
**Febuary 2007**
Date Posted on Website: 2007-02-15
Webmaster Note: Here it is guys EDU address, feel free to sign up, all imformation is I've seen is pretty much right on the mark.
Local 3 Brothers and Sisters:
By now you may have received one or more of the flyers EDU(Engineers for a Democratic Union) have mailed to Local 3 members regarding issues and information in our union. Our mailing list as well as our resources are limited, however, we want to continue to provide valuable information to Local 3 members regarding issues at our Union and need your help.
To save our limited resources we want to begin sending our information via email, however we have limited email addresses. Therefore, we are asking for your help to expand our database. Interested parties need to do the following:
1. Send an email to edu@stealth-email.com[1] asking to be added to the EDU email list.
2.Forward this email to ONLY Local 3 members in your address book who you believe would be interested in receiving our information.(Local 3 members only! According to our Constitution and Bylaws we cannot publish our business outside of the Local so again, PLEASE Local 3 members and retirees ONLY!)
3. Contact us at edu@stealth-email.com[2] if you have questions, concerns or information that are ment to be usefull to Local 3 members.
We are trying to reach as large a Local 3 audience as possible in order to ensure that our Union remains strong and our elected leadership accountable for the promises they have made us. Remember this is "OUR' Union.
In Solidarity,
EDU
Links:
------[1] mailto:edu@stealth-email.com
[2] mailto:edu@stealth-email.com

---

**Post Id #76**
**Febuary 2007**
Date Posted on Website: 2007-02-15
Webmaster's Note: Thanks for the kind words, these EDU guys make some good points, I see I haven't had a gold ticket representive write in either. The main point for me was when I asked at the Stockton meeting if they had found any wrong doing done by the pervious (Bonilla) administration and Dan Redding said that no wrong doing had been found in their investigation(s). I rest my case, because everything else is pointless, everything. We got rid of the best administration and the most capable leadership this local ever had to a election platform based on lies and innundo, too bad for us. Firstly, I'm thrilled that you still have this website up and running. It is fortunate that the fire is still there, and enough of us are willing to burn the midnight oil ensuring that we stay in touch and maintain a vigilant eye on the new administration. Secondly, in response to Dean's request for information on the EDU; I can't help out. However, I am compelled to contribute as well. If any one has information on how I many do so, please let me know. Furthermore, I move to disposes of the reading of the executive board minutes, Seconded, Eyes, nays, Eyes have it. That's B.S. Next meeting I'm at, I'll buy you a beer if you'll "Nay," afterwards of course.
Sincerely,
District 20 Marketing and Geographical Committee Member, former dispatcher
Barry Morrissey

---

**Post Id #75**
**January 2007**
Date Posted on Website: 2007-01-16
Webmaster's note; Thank you Dean I'm glad someone is watching....I made no secret that I supported the green ticket during the election process, I made my choice after I had all the facts and made my choice accordingly. I would love to hear from the Gold Ticket or the current leadership of this union, this is still a netural site and will post all of what I receive in response to what I've posted.
First of all, I hope this site does not go away. I feel this is the only place to post questions, pass the word around on what is going on at Local 3, and to let the officers and "their" executive board know that the membership is paying attention. I received four pages of allegations and comments from something called EDU (Engineers for a Democratic Union). I know some of the comments are true, Kalani (Ha), was fired some something involving some gambling scheme. Russ sure could put out some info on this as it sounds pretty nasty. Russ also spend a lot of member money refurbishing his office and getting a new four wheel drive truck (for hunting, I guess).

My questions are: how much are the members paying to educate all the new district/business reps (Russ fired many experienced reps simply because they didn't agree with his politics and wouldn't kiss his ass), is the Union giving out Project Agreements to non union again (this takes away work directly from our members, don't let them say this is a good organizing tool, as it has been proven that it is not), is the Union filing sub contractor violations or is Russ telling the reps to ignore the violations.

Dodgin, keep us informed of the action regarding the election (Good Work).

If anybody knows who is helping the EDU, please contact me, as I will give them some money for postage, copying costs etc.

Keep your eyes on the Doser lawsuit, as I'm guessing that it will be settled with some BS about lawyer/court costs and for the good of the union. Remember, the executive board is not the members friend, they are owned by Russ and his gang.

BOHICA brothers and sisters,

Dean Dye (dean0283@comcast.net) glad not to be working for this bunch

---

**Post Id #74**
**Jan. 2007**
Date Posted on Website: 2007-01-14
Webmaster's Note; What up in Hawaii guys? Gambling? Strong Arm Business....Let me know.

---

**Post Id #73**
**Jan.2007**
Date Posted on Website: 2007-01-14
Webmasters Note; Marshell, don't know enough about your issues make any judgements on your local.
To Whom it may concern:
Is your web site still running? If you get this go to www.150united.com and see what kind of person Joe Ward is by looking at the Joe Files. Local 150 is a great local and Joe Ward is trying to ruin it.
Marshall Douglas
Respectfully Yours,
Marshall Douglas

---

**Post Id #72**
**Dec. 2006**
Date Posted on Website: 2007-01-14
Webmaster's Note; Bad behavior at retirement party, shame on you Sammy
Up date for all Local #3 Members
December 6. 2005
1. Fresno District Rep Sam Uhler swings at Local 3 member Otis Pierce.
2. Fresno District Rep Sam Uhler hits elderly woman sending her to the hospital.
3. Fresno District Rep Sam Uhler pulls knife on Local 3 members.
What a retirement party under the Gold Ticket Administration, sounds like the only way you will be safe at Local #3 function is to stay at home or bring a gun. Officer Fred Hershbach, the officer in charge of Fresno District, was asked what he was going to do about Sam Uhler's behavior. Fred's answer was, "I have to support my District Rep!" Fred was then asked about the elderly woman that Sam hit. Fred answers, "Shit Happens, she'll be alright."
Russ Burns, you hired Sam Uhler knowing that he had been convicted in the past of using a knife in a fight, so I guess you support this behavior.
Russ Burns, Charles Manson is coming up for parole pretty quick, maybe you could make him a Special Rep. Brothers and Sisters, Russ Burns sent out a letter a couple of months ago saying he might have to shut down the Fresno Hall. Russ , with the staff you have hired here in Fresno, it might not be a bad idea.
A note to Lynn Pankratz; we, the members of Fresno District, are sincerely apologetic. Please be assured that we do not support the actions of Fresno's District Rep, Sam Uhler. Sam Uhler, instead of Alcoholics Anonymous, maybe you should consider signing up for Knives Anonymous.
From,
Very Concerned Fresno District Members

---

**Post Id #71**
**Dec 2006**
Date Posted on Website: 2007-01-14
Webmasters Note; Financial report by Mike D.
The current rumor is that the Retirement Benefit Rate will be dropped from the 3%, To somewhere around 2% in early January or less. Hmmmmm isnt that why we are all throwing money into the "Pension Resoration and Guarantee Fund". Well the new fund had a nifty name. To bad it aint gonna work. I wonder what the money in the fund will be used for?
Ohhhh and from what I have heard in Hilo HI, the new adminsitration stated that our current rate of return is 9% soooo would that mean if our rate was 2.2% in the first quarter and 3.75% in the 2nd quarter and 4.5% in the 3rd quarter and 9% in the 4th quarter then we made somewhere around 6% Return for the year? that would mean we only missed our break even mark by 1.5% which would mean the FUND IS STILL BLEEDING.
Way to start off on the right foot. Ummm by the way did the Executive Board Approve the Raise for all the staff yet. At the last Semi Annual I believe the New Business Manager said that we had a surplus of a few million and the new administration plannned to give back to the membership. Has anyone received a check yet??? Or does that mean the surplus will go to the staff as the increase..... They are members too ... Right?
Fraternally,
Mike Dodgin

---

**Post Id #70**
**Dec 2006**
Date Posted on Website: 2007-01-14
Webmasters Note; You go Mike...
Just thought you might like to know that a protest to the election was filed. Because of the Ballot issue. The protest was denied by the Local and has

been appealed to the International, and the DOL.

It seems that a complaint was filed with the Post Office by a member of the local. Which initiated a internal investigation. The file number of that investigation is, Complaint No. 4383230,

The finding were that the mail clerk for the Union had the ability to request the information from the box, and the mail clerk actually did request the mail from P.O. Box 4016.

If this information turns out to be true, then there was another violation of the BYLAWS the CPA Firm was supposed to be the only entity with the authority to pick up the mail from the box.

During the Protest hearing Election Committee Chairmen Bill Burns was asked, "Did you personally direct Michael Quackenbush to Conduct an investigation into the ballot issue."

His response was, "No I didn't I called Jeannie Armstrong .... isn't she on the staff of the Recording Corresponding Secretary.

Michael Quackenbush was asked. Who Directed you to conduct the investigation. His Response was ... Rob Wise called him.

The CPA Firm is hired by the local to administer an election based on the rules and regulations set forth in our bylaws and constitution, and they are to answer to the ELECTION COMMITTEE as a whole not an individual on the committee, and certainly not to a current officer of the Union and definitely not to a candidate running for office.

The decision of the Executive Board acknowledges that the bylaws were adhered to but they feel that there is not enough evidence to warrant a re-election based on the amount of votes the gold ticket received.

Basically, Can anyone prove that the Ballots received had been tampered with in anyway.

I believe that if the rules that have been established by our bylaws and constitution to as sure a fair and impartial election were broken. Then wouldn't that raise another question?

Can anyone prove that the ballots received were valid?.

If the Gold Ticket did win by such an extreme margin and since part of the Gold Ticket platform is to bring back transparency and democracy to our Union then why are they fighting so hard to avoid a re-election. If a re-election were granted and the bylaws and the constitution were strictly adhered to, then there would be no Doubt whatsoever who really did win the election. If we are going to put the Doser/Bonilla Years behind us this time the Union Goes by all the rules as must we all. Or is the message being sent today, the same as its always been. BUSINESS AS USUAL

Fraternally,

Mike Dodgin

---

**Post Id #69**
**January 2007**
Date Posted on Website: 2007-01-14

Webmaster's Note; Excuse my absence, thought that the union and it's members needed a break after the election. I see that I've only received a couple of emails, maybe the union and it's members needed a rest also. I see there is trouble in paradise, Hawaii and a little trouble in Stockton with Mack the knife. People with the DOL breathing down the neck of the local don't you think the choices that the leadership makes would be a bit wiser, hey what do I know. So I really don't know if this site is necessary anymore anyway, maybe a little feedback might help me decide.

---

**Post Id #68**
**October 28th 2006**
Date Posted on Website: 2006-10-29

Brothers and Sisters get out and vote, remember vote your pocketbook!

---

**Post Id #67**
**Received via email Oct. 06**
Date Posted on Website: 2006-10-14

Webmaster's Note: We must guard our our Master Agreement by keeping our employers, contractors and sub contractors honest, report violations to your local office, keep reporting until something is done. I watch laborers on equipment all day and watch them scurry like rats when the BA shows up and scurry their asses back on when he leaves. Seems to me that it is a toothless bite at the best, maybe a fine or two might push the issue across. It's up to the leadership to set the pace and keep us working, you wanted it and now you got it so get to business boys.

Well, the sage continues: in District 20 (district rep Pete Figueiredo, appointed by Burns) has received verbal & written information from a number of OE3 members of a continuous manning violation ( a non union office engineer), working for De Silva Gates on the Highway 4 Project in Contra Costa County, has been doing grade checking and surveying, both covered work under OE3 contracts. This is costing members work at a time when construction is slowing down. So far nothing has been done. Ole' Burns and Wise were both adamant that this type of behavior would not be tolerated and that the former District 20 staff were not doing their jobs. After the election they were all fired for supporting Bonilla. Figueiredo supported the Gold (I guess that gives Figueiredo some leeway). Hum, once again, ole' Burns seems to have lied to the members and is up to his gutless tricks once again. This is the same behavior that I encountered when I tried to get Burns to follow up on subcontractor violations when I was the Director of Inspection and Survey. He flatly refused to go after these grievances even though our members were losing work. Stay tuned, I hear the same behavior is happening in the Sacramento, District 80. Members, do not let these subcontractor and manning violations continue, you are going to lose this work permanently. Let's keep these lightweights to their campaign promises. Bohica (goole it) brothers and sisters, Dean Dye (proud not to be working for this bunch)

---

**Post Id #66**
**Received via email Sept. 06**
Date Posted on Website: 2006-09-24

Webmaster's Note: The Gold Ticket won, enough said but keep watching the site for updates. Any member interested in L.150's fight contact Joe Ward at the email attached.

Please contact me I am interested in your campaign. I am currently in one myself here at 150.

thanks

JOE WARD jward@local150.org

---

**Post Id #65**
Date Posted on Website: 2006-09-24

Webmater's Note; Hopefully people are paying close attention to the Goldies actions.

Well, the slaughter has begun. Over 30 district rep, directors, agents, dispatchers and oth er employees have been fired for supporting the other tickets. These firings took place despite the promises made to the members that this would not happen. Many of these people were long term employees with great skills. Does the membership realize that even according to Burns, that it costs about $200k and 2 years before a agent is up to a competent level to represent the members in most details of the contracts, not to mention the political and employer contacts that have been lost. Around another 10 employees have resigned, including me, Dean Dye. I do not want to stand b y and watch my departments (Testing and Inspection and the Surveyors, total members about 1400) dismantled and returned to ranks of the Local 3 stepchildren. Russ told the remaining employees that he wants to keep any problems in house. Some much for a open administration. He also demand ed absolute loyalty for the officers. What next a loyalty oath for the absolute leader? Hang on folks, Local 3 is in for quite a ride with th ese lightweights in charge. By the way Carl Goff told me personally that he recommended that anybody who supported the other tickets should be fired . Rob Wise is busy getting even with anybody who he thinks has crossed him.

Bohica bothers and sisters (ex military will know what it means)

Dean Dye (former director and proud not to be working for this bunch

---

**Post Id #64**
**Received via email Sept 06**
Date Posted on Website: 2006-09-24
Webmaster's Note; Your correct I've been taken a couple of days off after the election which was a draining experience. Update's will follow.
You need to update your site. There is alot of important things going on in the union and t here are alot of people looking for updated information. All these sites seemed to end with the election.
Sonya Hoffman

---

**Post Id #63**
**Received via email August 06**
Date Posted on Website: 2006-09-03
Webmaster's Note; Let's us pull together now and repair the open wound and watch the progre ss of the new leadership
The members have voted and now it is up to the new leadership to take the reins. All should be watching to see if they actually start fullfilling the promised they made! They ran on a platform lets keep them to it. Also of interest they cond emed Jon Bonilla for firing people for supporting them. It will be interesting to see how many headstones their cematery acquires in the next few weeks. Members stay involved and lets remind them of their promises after all we have shown we have a voice which means we also have choices.
Fraternly
PGorman

---

**Post Id #62**
**Received via email August 06**
Date Posted on Website: 2006-09-03
Webmaster's Note; M T Bass or whatever your name is yes I will remain in the field, I'm a O perating Engineer and my name is Mike Preston if you need to speak to me face to face let me know and I'll arrange it, yeah first you have to si gn your name, coward.
It looks like you will remain in the field. mteebass@aol.com

---

**Post Id #61**
Date Posted on Website: 2006-08-27
Webmaster's Note; Congradulations to the Gold Ticket, yes it's unanimous the members have s poken. This is the time for healing and not the time for vengence and destruction. The local is reeling from this election so use your new found powers to benifit the members of Local 3 and this is what the election was all about anyway wasn't it?

---

**Post Id #60**
**Received via email August 06**
Date Posted on Website: 2006-08-26
Webmaster's Note; Mr. Gorman what is your point, yes it is my website and not a communal pi ssing post.
I agree that after the election, the Union should support the Officers, and go forward. Wha t I don't agree is your ability to censure what you want, and don't want said. But then again, this is your website.
Mr. Benifeld make several statements about my credibility that are far from being fact, and I wanted to address them. Just remember,"THE TRUTH WILL SET YOU FREE".
When you censure e-mails sent to you in your "OPEN FORUM", your forum is no longer open, an d the fact that your web site is LOCAL 3 MEMBERS FOR A DEMOCRATIC UNION, makes me wonder, how democratic are you?
Maybe you should stop and consider this, when you present both sides of an arguement, you p rovide an impartial platform for debate. I believe that this is democratic, your failure to do so, only proves that your not!
Doug Gorman

---

**Post Id #59**
**Received via email August 06**
Date Posted on Website: 2006-08-26
Webmaster's Note; I received my ballot on the 11th of August, all the meetings I attended d uring the last month told us that the ballots would arrive around that time and to return them as soon as possible. Alameda is the home of the recordi ng corrresponding secretary I believe.
What is the deal with the election ballots being recieved at the hall on the 16th of Augus t. Then they were sent back to the Post office in Alameda.
WTF

---

**Post Id #58**
Date Posted on Website: 2006-08-18
Webmasters Note; Received more letters from Mr. Elnick and Mr. Gorman which I'm not posting . The way I look at it guys is you had your cheap shots at Mr. Benfield who answered your accusations, story told. Cannot wait until the union starts acting like the brothers that we are....August 26th is around the corner and like Frank Herrera said so eloquently at the Burlingame meeting is his pride of association with Local 3 and that no matter who wins this election it is the time for us all to bind together and support our union's leadership.

---

**Post Id #57**
**Received via email August 06**
Date Posted on Website: 2006-08-18
Webmasters Note; This bogus email was recieved by me this week, I asked Larry Edginton at the Burlingame meeting yesterday if he had sent me and email asking me to remove my thoughts or remarks on these emails. He said no that his n ame was stolen and used to email several people including me. So people if you get an email from larryedginton@hotmail.com it is bogus and should be thrown out with the rest of the trash, weak, your shits weak guys.....
Michael,
We would appreciate it if you would take down all of your commentary from Alan Elnick, Benfield and the rest. This war not free speech. Wake up.
Sincelry Larry and John

---

**Post Id #56**
**Received via email August 06**
Date Posted on Website: 2006-08-13
Webmasters Note; Thank you Mr. Benfield for taking time out and sheding some light upon the se gentlemen.
Mr. Webmaster,
I have received many calls with regards to your website since a former Public Employee Business Agent by the name of Doug Gorman wrote to making several accusations and mis-stating the facts. To my surprise I log on and find that another former Public Employee Business Agent by the name of Alan Elnick has also visited your website and attempted the same feat. I have refrained from e-mail issues and complaints as it serves no ones time to get in an e-mail battle back and forth. Although after the several calls I hav e received I had to look this up and I have chosen to respond. Please note that as the supervisor in charge of The Public Employee Division I will refrain from stating the reason why these individuals were terminated and try to address the issues.
First Mr. Doug Gorman whom I will refer to as Doug from now on should not have said he hope s you post his statements as it is the truth. Actually it is not true. The webmaster is correct in that Mr. Gorman, like Mr. Elnick, Mr. Dietrich and Mr . Dean Cofer (author of all the staff for change material) and all former employees some from years ago do have a personal axe to grind. I would like to say they are former staff for a reason. Look any employee that gets terminated from any company they are not happy campers. To put it bluntly they were all terminated for just cause not for political reasons.
The issue that Doug states he was terminated for is simply not true. Others did not donate to the administrative ticket campaign which included Russ Burns, Carl Goff, Bob Miller, Robert Wise and Frank Herrera at the time and are still emplo yed to this day.
The issue Doug states regarding lies that members have not seen their current agent in over a year is just that, a lie. Sometimes members switch shifts, change schedules and do not see an agent every week due to schedules. My current ag ent in that area is Mike Minton, a very respected highly regarded Public Employee Business Agent that had significant experience in both represent ion and politics.Much more than Doug. Minton is highly regarded by both members and fellow staff and I am surprised to hear Doug speak that way ab out Minton as Doug was one of the first to compliment his replacement. I will be happy to advise Mr. Minton of Doug accusations and maybe he woul d like to address the untruths. The difference between Doug and Minton was that Doug blustered, bullied, and talked a good game but in the end did not get it done. Minton has the whole package and does not need to through his weight around to get to a contract. Local 3's relationships wi th various employers,and members has substantially increased with the hiring of Mike Minton.
I am sad to see Doug states that he knew I spoke with a forked tongue when he first met me. If that was the case would any normal person take the job? The truth is that Doug and I along with two other agents at the time a Mr. Helm and a Mr. Highbaugh became fast friends and close co-workers. Eventually Dougs relationship deteriorated with most if not all the public employee staff w ith the exception of three, Don Dietrich, Alan Elnick and Dean Cofer. Is this looking familiar?
It is true that many agents build friendships with some of their members and I surmise that is certainly the case with Doug. Although he makes it sound as if every member in every bargaining unit is a friend of his I know that is not the case. Doug was replaced in bargaining units at the request of the membership when he was employed at Local 3. Interesting however that he still states "my clients."
The truth about Doug and the membership asking question is that Doug after being terminated attempted and interfered with several bargaining units for months as we received calls from many that said he would not go away. This made for a v ery difficult transition for the new agent and the membership. This same scenario was repeated by former business agent Dean Cofer when he was terminated and then attempted to get bargaining units and members to de-certfy from Local 3 thereby harming the union. I ask union members is this true unionism? You do a poor job or screw up some how somewhere and get fired. So instead of taking responsibility for your actions you strike out at your employer and try to get members to leave the union so you can represent them. It is funny to see that Doug makes the same stat ement here in his e-mail that many units are unhappy with Local three and are contemplating leaving Local 3 if the Unity Ticket wins. Well, I sa y he is full of it. When both Doug and Dean Cofer were terminated both attempted to get many bargaining units to de-certify from the union and or cause total unrest within the bargaining unit. I am happy to say not one bargaining unit left Local 3! The sad commentary is that all these terminated f ormer Public employee staff are now doing it again as a result of this Local 3 internal election. There is hate, rumors, discontent, untruths being spread throughout the Public Employee Division by former staff. These former staff members some in construction also feel it is a last opportunity t o get back on staff if the Gold Ticket wins which is why they are supporting the Gold Ticket. I am saddend actually that the Gold Ticket has accepted the ir support as many on the Gold Ticket which I have friends on, are clearly aware of why these former members were terminated and the cancer th ey spread and damage to the union, but to each their own. If they do not remember then they may soon, because a wolf can only hide in sheep's cl othing for so long.
Why Doug states something about the military I do not know, I am aware that he held several law enforcement positions with several agencies and that he was working as a security guard at Leisure World Retirement Community in Southern C alifornia when we hired him.
I was going to ask you what or who is Robin Loxley and how does that matter when I scrolled down and saw what Doug was talking about. In my opinion Ms. or Mr. Loxley is either a current or former staff member and knows a lot about public employees and it appears district 90 (San Jose) in general. While reviewing Loxley blog or whatever these things are called I also discovered that former Public Employee Director Steve Boothe is now also in the picture. Did someone send out a distress call from the Gold Ticket to all forme r employees for support? I will be checking that later.
Doug then states to return the union to the membership and vote Gold! Although I have frien ds on Gold, generally employees are terminated or resign for a reason. Therefore by the names I have seen today, Doug Gorman, Don Dietrich, D ean Cofer, Alan Elnick and Steve Boothe it looks as if we are returning to the terminated or other former staff of Local 3 and away from the membe rship. Doug, the union is the membership which means

you cannot return what belongs to them. I did not realize I was a lackey and I am disappointed that you have taken that tone Doug. I always liked you and felt you would make a great friend and neighbor, just not a business agent as it turns out. I refuse to get personal with you and did not enjoy being the bearer of bad news for your termination but duty calls. I wish you the best and implore you to not try and damage the union any further than you have as have the other former employees.
Sincerely
Kurt Benfield

---

**Post Id #55**
Date Posted on Website: 2006-08-12
Webmasters Note;
Unity Ticket - www.unityticket2006.com
Red White & Blue Ticket - www.redwhiteandblueticket.org
Gold Ticket - goldticket.org
Good morning,
I am looking for a link to the Gold Party's website. I am not a current member of Local 3, but a past one and I am just trying to read all the nformation I can.
Thank you,
Janel Goff

---

**Post Id #51**
Date Posted on Website: 2006-08-12
Webmasters Note; Mr.Gorman seems to have an issue with Mr. Benfield, maybe someone can info rm Mr. Benfield and he'll answer to the charges of Mr. Gorman. To me it sounds like a personal deal that should be settled between the two of them, sour grapes maybe, time will tell. Thank you for your service to our country but really what does that have to do with the election? They said Custer was a hero too but we all know the truth now, like I said time will tell.
I hope you will post this, as the Truth Hurts.
I was hired as a Business Agent in 2002, and paid my initiation fee, and paid my dues up un til I was terminated in June of 2005. I was terminated when I failed to pay my $900.00 for the election of Bonilla and Crew.
What Bonilla and Benfield won't tell you is, that my clients are still my friends, and have called me numerous times to ask me questions, because they can't get ahold of their Business Agent, or he hasn't showed up at negotiations, or at the job site in over a year.
Since my clients are in Public Employment, they work on Public Grounds, which are open to the General Public. And since this is the United States of America, I still have the right to free speech, and freedom of assembly. I served in the Mi litary, did Bonilla or Benfield?
From the first day that I was hired, I knew that Mr. Benfield spoke with a forked tongue. I meet Bonilla while serving on the Granite strike line, and when I introduced myself as the Public Employee Agent, he gave me a look, that in most circ les would have started a fight.
In closing, I would ask that you think about this: Who is Robin Loxley, I believe it's Kurt Benfield. He is to afraid to give his real name. I would then ask, are you happy with your current representation now? I know alot of units in the Central Valley are not, and will be leaving this union, if the Unity Ticket wins. Return the Union to it's members, and vote for the GOLD TICKET!
My name is Doug Gorman, and I live in Madera County, if you would like to discuss the issues, you can e-mail me at GormanCIRRanch@aol.com. I will be happy to tell you about the leadership of Mr. Bonilla and his lacky Kurt Benfield.
Doug Gorman

---

**Post Id #50**
**Received via email August 06**
Date Posted on Website: 2006-08-10
Webmasters Note; Dear Mr. Elnick I do not owe you anything I believe the facts speak for th emselves
Fraternally Yours BP
Brother Preston:
I believe you at least owe me a retraction off of you Webmaster opinion.
Fraternally,
Alan Elnick

---

**Post Id #49**
**Received via email August 06**
Date Posted on Website: 2006-08-10
Webmasters Note; More Loxley.
Interesting that Brother Elnick likes to expouse integrity and supposed honesty when the Go ld Ticket he supports does and presents the opposite. Several violations, lies and as Doug Corson likes to say "half truths". One only needs to r eview the Gold Ticket web site for proof some of which you listed on your site already.
Here are just a few:
Fred Herschbach: In his remarks about himself Fred states he is responsible for organizing the largest construction company in the history of Local 3. We are sure he is reffering the good old jack-a-lone-e sparing all the real spelling as no one would know the pronunciation. This company has the worst contract ever thanks to Fred herschbach.
Fred states he supports and had one of the best CAT programs in the local. He did but no th anks to Fred who despised the CAT program and refused to run it in his district, which landed him in early trouble with the Business Mana ger. The real success of the CAT program in District 90 was because of the coordinator and the public employees division which Fred had nothing to do with.
Fred states that he had a part in organizing a very large public employee group which is an outright lie.He never organized any public employee units just ask the public employee guys that work in district 90!
Moving to Don Dietrich--states he was fired for political like Alan Elnick but was not--as you have already expressed on your face page of your web site. Hell the whole E-Board knows this and whats really strange is that the half of the E-Board that knows what the truth is ignores it to support the Gold Ticket then simultaneously states the honesty part on behalf of the Gold Ticket.
Brother Elnick wanted to get fired and made statements to others about the same. He knew he would be fired and was probably under orders to do s by the gold Ticket. No one would do what he did and expect to have a job the next day.

Dietrich states he is a loader operator on the ballot when he has never pulled a lever in his life. Got dispatched for one day then goes to the out of work list (when everyone and their grandmother is working) so he can be listed that way on the ballot. For a supposed man of integrity Dietrich has proved to all his former co-workers that he has none. How many people know this guy carries a gun to most Local 3 events?.

Steve Booth another former Local employee that has come out of the woodwork. appears on the web site as a supporter. Rumor has it he decided to pay his dues so he could be active and possibly a part of the new regime should the Gold Ticket win. Here is some integrity. Booth was caught having an affair with his secretary, which costs him his marriage but at the same time almost single handedly destroys the public employee division by apparently losing a 1000 man group then blaming it on a business agent and causing them to be fired. Then left the job for months on stress leave while receiving full pay.

Russ Burns says he is against nepotism--yet he is a 3rd generation Operating Engineer. So by those standards his son, or sons could NEVER work on staff as long as he was business manager correct? because that would be nepotism. I am sure it was not nepotism when Russ cleared the path for his son to get into cranes or told his son he did not have to participate in the CAT program in Fairfield, then asked the coordinator to fudge the hours in the CAT program, that would not have been Russ.So all these 2nd, 3rd, 4th generation operaters like Russ, or Dan Reding, or any of them were never assisted by their fathers, grandfathers in any way shape or form to be an iron jockey----yeah ok! If that were the case there would only ever be 1st generation hands.

Russ--the same guy that told Bonilla time and time again he would never run against then figured out a way to castrate Miller and get him out of the way--that Russ?

We will have more later--there is a new lie discovered every day as the Gold Ticket hopes to get the membership to vote based on those lies, the question is --Then what?

---

**Post Id #48**
**August 06**
Date Posted on Website: 2006-08-06
Webmaster's Note; I received another email from Brother Alan Elnick which I will not post.  This is not due to content of the email but the feeling I have that this string of emailings could go on back and forth forever.  In closing, I would like to thank Brother Elnick for his input to this website and his service to Local 3 which I'm sure was done to the best of his ability at all times.

---

**Post Id #47**
**Received via email August 06**
Date Posted on Website: 2006-08-06
Webmaster's Note; OK, Allen let's talk about the leadership qualities of the current administration which I think have been swept under the rug and replaced with innundos and outright lies to keep the focus of the membership off of the real issues of this election. The real issues are better contracts, more jobs with a quality health and welfare plan and a reliable pension program in place. Not the fact that you got yourself fired for writing a hit piece on union time or were replaced in mid-negotiation by another representative this is part of the misdirection of the facts that I've spoken of in the past. Checking on Article 16, section 6 this section applies to officers of the union and to my knowledge Kurt Benfield isn't an officer of the union. Now you might need to check out this article (Article 24, Sub-Division 1, Section A) in the Constitution because I beleive it applies to your sitution and your justified termination
Brother Preston:
The article I submitted was sent to Benfield and Bonilla as Editor In Chief of the Engineer's News prior to selection for inclusion to the Public Employee Section. It was submitted to the Gold Ticket Website subsequent to my termination for writing it.
Frankly, I was in negotiation with four bargaining units covering 700 local 3 members and dealing with a number of proposed layoffs for career public employees when Mr. Benfield kept bugging me for an article and finally set a deadline of 12 noon July 12. Now, if Brother Bonilla decides to terminate my employment because I complied with a demand from my supervisor that is his business. I have had no previous problems and have made substantial contribution to Local #3. The judgement of the business manager needs to be que stioned to find it necessary to immediately fire me over this little diatribe without concern for the issues that are unresolved for the people I represent.
Finally, Mr. Benfield who has gone suspended for non-payment of dues holds the position of Director of the Public Employee Division, and received a $15,000 raise when all the other local #3 employees received the same 22 cents per hour the Master Construction Agreement received. Now you know as well as I, you don't work if you go suspended, and particularly employees of the union subject to the International Constitution and Bylaws must be current at all times in their dues or have their duties revoked (Article 16, Sec. 6).
So talk to me about your Unity Ticket brethren and their leadership, because practically, this above is what it is really all about.
Sincerely,
Alan Elnick

---

**Post Id #46**
**Received via email August 06**
Date Posted on Website: 2006-08-06
Webmaster's Note; Allen only you and your boss know the real reasons why you were fired, it's not up to me nor anyone else to decide what or why you wrote the article the way you did. I went to the GT website and read your article which seems to me to be highly polictical in nature and if you were fired for campaigning on local 3 time this could be a justified release. I've read the entire Faris Report and it seems to me that you have selectively choosen snippets of the report to print which lean to one side rather heavily and since your on the GT website I must presume this action was planned to gain support for your cause, these are my thoughts on your articles.
To whom it may concern:
With my permission, the Gold Ticket reproduced the entire article I submitted for consideration of publication in the Engineers News. My article was in response to a deadline for an article imposed upon me by Kurt Benfield. It was not just a voluntary submission. I gather it is simply a sign of the times that events within the local cannot be reported to the membership. I made no endorsement of any candidate, and all information in my article was available to union members through any number of different sources, including the minutes of the Executive Board. Anything printed beyond what appears on the Gold Ticket site has been added since I left Local #3. Finally, it is news to me that my termination was for violation of Local #3 campaign policies as that is not how it was presented to me. Thank you for that information. If you will print this response, then I will know that you are true to the principles you seem to espouse in this website.
Sincerely,
Alan Elnick

---

**Post Id #44**

Date Posted on Website: 2006-08-05
Web Master's Note; Mr Hansen or is it Dietrich because that is what your return address states, is this Dietrich related to Don Dietrich the canidate on the Gold Ticket. First, I've never refused to post anything from anyone except flat out inflammatory remarks, exactly what several people are you referring to in your comment? Secondly I haven't been in the pocket of John Bonilla all along, but in the peocess of wading throught the information and mis-information I came to the fact that proven leadership is what this local needs to survive and thrive. Plus all my information is supported but factual documents that you can also view. This is from one pawn to the other isn't it? Look through the links on the web master opinion page and you make your own educated decision and you will come to the same decision I did, kleptocracy, please shouldn't you have been a professor instead of an iron jockey? People like me destroying the union, no pal it's people like me that keep your health & welfare and pension programs solvent....Brother Operator Preston to you....

Preston,
I know several people who have sent things to you and you have refused to put them on. Obviously you have been in the pocket of Bonilla all along. Among many Operating Engineers your credibility because of this is zero. In addition everything you have put up on your website supporting Bonilla you know is an outright lie by the Unity Ticket. So once again you are only a pawn in the game. If you were really for Union Democracy you would not be trying to assist one of Local 3's biggest thugs get elected to a post he cut a deal to obtain. That is not Democracy that is Kleptocracy but I doubt you(Professor, this word is not in Webster's ninth new collegiate dictionary)even know what that word means. People like you and Bonilla are what is destroying the Labor Movement. It saddens me to see the decline of unionism over the last 20 years but the corruption you are helping is only hastening it. I am glad I have retired because the whole thing makes me sick.

In Solidarity,
Operating Engineer
Richard Hansen
Allen Dietrich reformlocal3@qmail.com

---

**Post Id #42**
**Received via email August 06**
Date Posted on Website: 2006-08-05
Webmaster Note; Some information for you digest
I am VERY familiar with public employee division several notes are vital for your knowledge.

Don Dietrich was fired before he appeared on anyones ticket or paperwork as supporting the Gold Ticket. The fact that the gold ticket says he was fired for supporting them is bullshit because know one knew he was supporting the Gold Ticket.

If you were at the San Jose district meeting Don Dietrich does not like PE Director Curt Benfield who has done an outstanding job bring that division out of the red and organizing members. We can say that all but one PE afents supports the unity ticket and even with that all pe agents support benfield. Dietrich tried to take benfield on at the District 90 meeting because of his dues back in 2004 or 2005. Made personal comments about benfield then made statements that he (Don) is all about Honor and Integrity and Honesty. We don't think he expected Benfield to respond to him in Don's own home district, but man did he. Benfield proceeded to stae that Dietrich had no in tegrity and was not honest since he was lying about y he was fired, saying it was political.Benfield stopped short of stating y but got Don so mad he admitted it was for other than political. Then Benfield said don has no reason to talk about the unity tickets mis use of members dues money when Don had been caught while on the clock of local 3 during regular business hours working at his house on his 1965 collecters mustang! Then Benfield gave snames of people that can be contacted to prove it.

Also--Dietrich is listed on the ballot under Auditor as a Loader Operator. He has never ope rated or pulled a lever in his life. After getting himself fired Freddie pulled some strings with his good friends at Hoagie and got Don dispatched as a loa der operator!! Don never did anything but then went onto the out of work list so he could be listed as a loader operator on the ballot. Also PE Agent Joe Santella that is running on the Unity Ticket was a plant operator but Wise boys on the election committee failed to list that behind his name--same with Allan Parker

Lastly--Elnick--wanted to get fired so he could be a martyr--it was planned from the beginning--he told several of his members this--to try and get them to vote for Gold since they would be pissed he is gone. He stated thngs like I cant believe they took the bait---hell he left Bonilla no choice. Even Carl Goff was in the office when it happened and said he should be fired--of course he did--because Carl wanted him fired as well.

Also--Gold ticket utilizing several former staff and NON MEMBERS to campaign against Unity. These are staff that were fired years ago for good reason--- threatening members, bargaing pension that could not be obtained etc. Most of the hit piece flyers generated for the Gold Ticket are generated by former staff member Dean Cofer who resigned his membership in disgrace rather than facing trial in front of the members.

Doug Gorman who was fired 2 years ago was seen with Dietrich and Freddie in Fresno visiting job sites there--Gorman is non member which of course is a violation of election policy. Robin Laskey

---

**Post Id #40**
**Received via email June 2006**
Date Posted on Website: 2006-06-24
Webmaster note; Arley has some questions that I tried to answer to the best of my ability.
I HAVE SOME RULES THAT I HAVE KNOWN FOR THE PAST 27 YEARS AND THE BUSINESS AGENTS SAY THAT IT IS NOT A RULE. I WAS AN APPRENTICE AND I HAVE SEEN THE TOP DOGS HERE IN HAWAII COME AND GO. I KNOW THAT SOME RULES HAVE CHANGED AND THE CURRENT RED BOOK IS NOT UP TO DATE.
1. CAN A GRADESETTER OPERATE A MACHINE? THE RULE HAS ALWAYS BEEN THAT A GRADESETTER CAN NOT OPERATE A MACHINE AS I WAS REMOVED FROM A MACHINE WHILE I WAS A GRADESETTER. BUT NOW WE HAVE A GRADE SETTER THAT IS OPERATING A MACHINE WHILE THEY KEEP THE OPERATOR FOR THAT MACHINE HOME. THE BUSINESS AGENT HAS A DIFFERENT INTERPRETATION OF THIS RULE AND THEY ARE SAYING THAT THE GRADESETTER IS AN OPERATOR AND CAN OPERATE THE MACHINE. SINCE WHEN DID THIS RULE CHANGE?
Webmaster; Grade Setter is an Operating Engineer, most grade setters I know operate equipme nt and a lot of operators know a little grade setting. Never have seen this any other way.
2. IF I AM HIRED AS A VOLVO DRIVER AND FOR THE PAST 6 MONTHS, I WOULD SAY THAT THE COMPANY HAS KEPT ME OPERATING A 825 CAT COMPACTOR WHILE OTHER OPERATORS ARE DRIVING THE TRUCK, WHICH I DEFINETLY DON'T MIND BUT THEN WHEN THEY TOLD ME TO STAY HOME THE NEXT DAY BECAUSE THEY DON'T HAVE WORK FOR THE COMPACTOR. THEN THEY HAVE ANOTHER OPERATOR OPERATE THE COMPACTOR THE VERY NEXT DAY.
Webmaster; So you were hired to drive a haul truck? Operators driving trucks? Did you call your B.A.? Maybe they were upset with your work
3. THE RATIO FOR APPRENTICE TO JOURNEYMAN HAS CHANGED. IT IS NOW 5-1 BUT WHAT MAKES THE 5 JOURNEYMAN? DOES THE MASTER MECHANIC AND 2 WORKING FOREMEN COUNT TOWARD THAT RATIO?
Webmaster; I think if they are Operating Engineers they also count as Operators on the job. If anyone has other information email him at the address below.
THANKS IF YOU CAN COME UP WITH COME CLARIFICATION FOR ME...hawaiianoperator@yahoo.com

**Post Id #39**
**Received via email June 2006**
Date Posted on Website: 2006-06-10
Webmaster Note; I'm going to reiterate that the goal of this web site is to inform the membership and to stay neutral with that said I have to bring this email to the memberships attention. I didn't print the flyer attached to this email since I figured that it was too inflammatory. The basic concept is that Don Doser on June 8th, 2006 stood at the Redding meeting and stated his support for the Gold Ticket which they gladly accepted. My question is the same as the one brought up on the flyer; isn't this the guy that is being sued for misappropriation of funds to the tune of $768,000 by the membership of local 3? I'll let you connect the dots, that's not my job, if anyone as any other information on this issue please feel free to email me as I'm finding this a very interesting situation.
Mike
I have scanned a flyer I received at my job site today. Yes, we are working Saturdays making some good hours. Anyway, can you find out if this is true? I find it hard to believe that any of our officers or board members would want the endorsement of Don Doser, given that they are suing him? Can you find out?
C. Camacho

**Post Id #36**
**Received via email May 2006**
Date Posted on Website: 2006-06-04
Webmaster Note; Seem to me I've heard this before and the funny thing is that he seems to want to skirt the issue which is that he spent $50,000 of our monies on a witch hunt.
Editor,
As a eighteen year member of local 3 it was very disconcerting to me to learn at the Burlingame meeting that Rob Wise had initiated a secondary investigation of our local's leadership. Named for the lawyer used The Farris investigation has a high price to cover the cost the investigation which is over $50,000 and being that Rob Wise had been a business partner of this lawyer prior to him naming her to investigate our Union. To someone on the outside looking in this reeks of insider politics with a final agenda of being elected again under a different ticket. I also hear that the findings were sealed, what's wrong with that picture? Also that nothing new was uncovered in this investigation, can you check on that? The bottom line is he spent $50,000 plus to get us the facts we all ready had plus he used his old friend and helped her get a fat paycheck off of our backs and sealed the results so no one would know that it cleared the people it was suppose to catch and the bummer is it was our money used for it. I think his whole new "team" carries the same ethics and should be soundly defeated at the polls, we need strong honest leadership and the rats it seems to me have already jumped ship, hence the term "Yellow Ticket" which I heard in Sacramento.
Thomas DeHoyer

**Post Id #34**
**Received via email May 2006**
Date Posted on Website: 2006-06-03
Webmaster Note;
Bryan you must have Acrobat Reader installed in your computer to veiw the complaint.
Hi,
I'm a local 3 retiree, 45 years in the union. I've clicked on the link for the letter of complaint to Don Doser, but it won't open ? Has it been removed ?
Bryan Hackett

**Post Id #33**
**Received via email April 2006**
Date Posted on Website: 2006-06-03
Webmaster Note;
Some links from Local 18 in Ohio, check through them if you have the time
Check out: _www.groups.yahoo.com/group/OperatingEngineers_ (http://www.groups.yahoo.com/group/OperatingEngineers)
www.groups.yahoo.com/group/SeeYaSink_ (http://www.groups.yahoo.com/group/SeeYaSink)
www.groups.yahoo.com/group/DavesDirtyRatBastardsHuntingClub_ (http://www.groups.yahoo.com/group/DavesDirtyRatBastardsHuntingClub)
Your welcome to join for free and cross post as often as you wish. Questions?? Dave

**Post Id #32**
**Received via email April 06**
Date Posted on Website: 2006-06-03
Dear Mike,
I would like to commend you on your wed site, you have done a very nice job. The members of your local and our local have forever been kept in the dark, it is so nice to finally see other locals membership start the campaign of self educating. Our local has finally hit rock bottom and the members are finally standing up and speaking out. Check out our site at local37membersvoice.net. I wish you and your members the best and remember to keep the faith, good luck.
Mark Harkins
Member of Local 37

**Post Id #30**
**Received via email May 06**
Date Posted on Website: 2006-06-03
Webmaster note:
Ray Tucker, your six emails were unreadable. The four Jpeg text emails were broken, too small and unreadable and you used an rtf.application on two emails which was completely unreadable. If you could correct the text and resend it that would be fine, thank you.

---

**Post Id #29**
**Received via email May 2006**
Date Posted on Website: 2006-06-03
Webmaster note; As usual Greg some very insightful information about the upcoming election. Do not let your emotions carry you down a path that could spell trouble for the entire membership. Staying neutral is much harder then it looks , you start seeing things like people claiming to be free of all repoinbility which to me smells like misdirection, and being yellow doesn't look good on a nyone. Like Greg said what is best for our union is what the decision should be based on.
Greg Tedesco on the elections;
Brothers and Sisters of OE 3 as you may, or may not know (I hope you know) election of officers is comming soon. I would hope each and everyone of us would take time to find out about the candidates. The people we elect are going to be running OUR Union for Years. So please take time to listen to the canditates themselves.
Each and every candidate should answer your questions and concerns. Talk about the election s with other members on jobs sites etc. Please whoever you vote for be sure the person you do vote for is the best our Union and for the e ntire membership.
Brother Engineer, Greg Tedesco

---

**Post Id #28**
**Received via email 4/2006**
Date Posted on Website: 2006-04-09
In response to Mike Dunlap's emails received this month. The incident outside the Fresno me eting was unfortunate, I don't think posting a link to the DOL is the answer. We were all taught the golden rule and things happen, three sides to eve ry story, yours, mine and the truth. Secondly, your email about the updating of Local 3's archaic computer system and cost overruns. I've heard a lit tle about this issue and I'm in the process of following an informational trail that will give us a little more information on this issue. I'll post th at email when I get other details.
Webmaster

---

**Post Id #25**
**Response to email received March 2006**
Date Posted on Website: 2006-04-07
Norris,
Received your letter today, I see your bona fides below, thank you for your service to Loca l 3. Yes I did post that email and I have nothing to be ashamed for, I try to present both sides of the issue without the political spin. I'll read through the letter you sent and get to the facts, post it and let the readers find where they may also find the facts and that's what I try to do here. Thank you again Norris.
Webmaster

---

**Post Id #24**
**Received via email March 2006**
Date Posted on Website: 2006-04-07
I just returned from the semi-annual in Vallejo..I was handed one of the fliers with your i nfo on it...I was surprised to see a message from Joe McCray,who was my attorney when I ran for Business Mgr against Al Clem in 1972, and against Dale Marr in 1973...[the 1972 election was thrown out by the labor Dept. because of ballot box stuffing by the administration] ...I am very m uch alive and well..and involved heavily in the upcoming election...

I have always thought that anyone that puts out a political flier should have guts enough t o SIGN IT...I notice you published one that was anonymous..Shame

I put one out at Vallejo today..it was signed by me...

...If I can be of any assistance for information or other help.. contact me.. I am a sixty year memberof Local #3..retired for 18 yrs 11/1 of this year..I will always fight for Democracy in our Union...I will send you by snail mail a copy of the letter I sent to the International Pres.concerning the current administration..
Norrisacasey@aol.com

---

**Post Id #20**
**Response to email received April 2006:**
Date Posted on Website: 2006-04-07
Greg Tedesco,
Brother Greg, thank you for your views and insights into my web site. Let me try to make th is clear this web site is ninety five percent informational and five percent members forum. The objective of the web site is to try and get the informa tion to the membership and have them make their own decision, not have it made for them by someone else. I'm really doing the best I can to rem ain neutral, I'll even post your letter unedited but I do retain the right to edit as I see fit.
Webmaster

Web Master and Brother Engineer...If as you indicate your web site is not political then yo u should not be editing, adding or deleting any thing a member sends to you to post on the Web Site. As you profess this site is a sounding board f or members to post ideas and concerns for other members to read. A tool to provoke thought. Last night in Gilroy at the district 90 meeting John Bonilla was even preaching about "democracy in Local 3". But even last night members other than myself were concerned that items and discu ssions brought up at one district were not carried to other district meeting by the officers. These members concerns are also not in the official minutes of the meetings, which I might add are kept district by district. Plain and simple members from one district know nothing about what concerns me mbers of another district. And you know as well as I that the concerns and ideas are not brought up at the semi annual meeting. I know you know this because you were there. My point is if you are going to

have an "open forum" then let members send e-mails and you should post them in the "forum" section of your web site. I believe that the membership is intelligent enough to decide what is relevant and what is hog-wash. The only requirement is that a letter to be posted, be signed by the submitting member. Thank You for your work in putting this site together.
Fraternally Yours,
Greg Tedesco

---

**Post Id #19**
**Response to email received April 2006:**
Date Posted on Website: 2006-04-07
Mike,
Thank you for the heads up, will post the DOL link soon.
Webmaster

I dont know if your aware of it yet but the LM-2's for 2005 have been posted on the DOL site.
Fraternally,

Mike

---

**Post Id #18**
**Received via e-mail March 2006:**
Date Posted on Website: 2006-04-07
Mike,
Perhaps this information below would be helpful for all if someone could post it. I was able to get it but I'm sure others could have a difficult time. I was looking at the PAC FUNDS and they are very interesting! Let's open up the flood gates of information to the membership.
Thanks for being there.
Joe Trehern
Hawaii


ACCESS UNION REPORTS AND CONSTITUTIONS AND BYLAWS

I have tried to access the http://erds.dol-esa.gov/query/getOrgQry.do Union (Form LM-2, LM-3, or LM-4) reports to see where it is recorded that Doser was paid off that $760,000, but cannot input the right information to bring the reports up. Does anyone know the FILE NUMBER, UNION ABBREVIATION, AFFILIATION/ORGANIZATION NAME, UNION TYPE, and DESIGNATION NAME AND NUMBER for the Union, Trust Funds and PAC funds? Web site is http://erds.dol-esa.gov/query/getOrgQry.do
Webmaster
**http://erds.dol-esa.gov/query/getOrgQry.do**

---

**Post Id #17**
**Response to e-mail received March 2006:**
Date Posted on Website: 2006-04-07
Greg,
First, thank you for your service to local 3, twenty seven years. Received your email today and I'm going to try and answer the issues, you had good points but I can't post the email because some of the issues or "facts" you raise are innuendo and not proven and I'm trying not to be a political web site or tool but I'll try to answer the issues. First, yes, I agree with you I think the Engineer News should have a letter section to the editor, my opinion, but whose letters do you print? I think someone will always be upset that they are left off of the mailing and that their voice went unheard. Second, the adjournment motion, as I gather from your email your upset on how the meetings are adjourned without the full membership given a chance to speak their minds. From what I gather the meetings are governed by Roberts Rules of Order and any member can put forth a motion to adjourn the meeting which is non-debatable and has to be taken and voted on. I will get or try to get a link to Roberts Rules of Order if I can find them. Thanks for your input and I hope this answers some of your questions.
Webmaster

Mr. Don Incardona,
Excuse the delay in posting a response to the packet you sent me last week, my scanner is down and this is how I will get your printed word onto my computer so please excuse the delay, should just be a couple days. There are many pages to go through to get to the issues you raise without including any of the political points of view presented. I've said this before that this is not a political web site and I'm not going to post any defaming information or accusations about anyone, with the facts the members will make the correct decisions. I attempt to present both sides of the issue on the Open Forum page to a point and that point is my decision. If you would have emailed the information to me it would have all ready been completed, do you have an email address and if you wanted that packet returned you needed to include a return address on the correspondences. Well, thank you for your patience.
Webmaster

---

**Post Id #16**
**Response**
Date Posted on Website: 2006-04-07
**Webmaster Note: Based on the meetings I have attended and according to Joe Vieira Local 3 Controller these are the facts I've gathered. It takes $40 million per year to operate Local 3, there is $20 million in the general fund at present and no money is given to any political candidate out of this general fund. All political contributions come from separate PAC funds established in each district which are controlled by the districts Grievance/PAC Committee.
Webmaster

**Post Id #15**
**Received via e-mail February 2006:**
Date Posted on Website: 2006-04-07
In response to Jack.
Jack, you are so right, fat chance the International would go along. The way I see it is if we never take a shot, we will never get a point. The point I?m trying to make is, an E/B member with some history and knowledge of how the organization is suppose to function (without politics) could make sure the General Fund (our dues money) is used properly and not squandered. A member elected fro m each district, to the E/B with no political ambitions or financial obligations (meaning retired), would give the membership more confidence in th e union leadership. In every business, check and balance is the rule, the membership needs a way to put politics in check, and balance. Whether a re tiree pays full dues or not, is a mute point. Currently, E/B members dues are paid out of the General Fund. Your idea of electing a small group of retir ed advisors to the board is a good idea. One would have to be elected from every district, otherwise some areas may feel like their not represented properly. Thanks for your ideas; we have made our first points! Ask you current E/B member these questions. Or does anyone know? How much cash is i n the General Fund? What is the annual cost to run the union? How much of the GF is given to political candidates each election?
Joe Tree

---

**Post Id #14**
**Response**
Date Posted on Website: 2006-04-07
The last district meeting I attended was the Fairfield one the 2nd of March. At this meetin g we were informed that a DVD and Booklet were in the process of being mailed to every active participate; the booklet can be viewed on the docum ents and reports page or via the button on the home page. The big push seems to be that all of the membership; retiree and active are informed of the pension changes through their own meetings, even though it seems the retirees have nothing to worry about. The March issue of the engineer n ews has a pull out section containing information concerning the pension plan, there is also a pension comparison section. Read it and let th e facts speak for themselves, facts and not hype should be how decisions are formulated.
Webmaster
**booklet**

---

**Post Id #13**
**Received via e-mail February 2006:**
Date Posted on Website: 2006-04-07
The B/M and others staff members are saying the stock markets downward turn over the last 5 years, has been the cause for the $1.2B looses we have with the pensions' unfunded liability. If this be true, let's prove it or disprove it, by comparing another union' pension fund documents for the same 5 year period. Another union with similar investments and dollar amounts will have var iation, but an accountant could show the proportionate differences. Perhaps OE Local 12 would be a good comparison or example, and a neutral 3rd p arty could be the International Union OE. Do you have a better suggestion? Let's here it!
What do you think?

I received a letter from the Trust Fund recently that said at the district meeting in March they will make a special presentation to ACTIVE members about proposals to strengthen the pension fund. Why not put these special presentations and proposals on the Local 3 site or in a mail out, so all the members including retirees can see what you're going to be throwing at us at these meetings . This way, at least the members have been given consideration so there can be an in-depth discussion between the members, before the meetin gs. Rather than a shove it down you throat approach. Consider this; the member works hard all day, he or she shows up at the meeting and is told , these are the proposals to strengthen the pension fund we have to make in order to get the plan back on solid ground. What should a member do just set there and believe everything. The credibility of the administration is already shot, so what makes you think we will show up and just believe in everything that is said. From the members prospective, you screwed up once, why should we believe in you, you're going to screw it up again! If you're wondering why the membership is so upset about this pension plan problem, (and other things) it is the credibility and the tactics of the admin istration. Unions were founded on the idea of Consideration and Respect for others. If you have consideration and respect, you will have credibility. H ow do you feel when you're the last to know?
Joe Tree

---

**Post Id #11**
**Received via e-mail February 2006:**
Date Posted on Website: 2006-04-07
n response to Joe Tree-
I am a 22 year member.With all respect, I don't think retirees should be on the executive b oard. Reason is they are not working in the field and don't pay full dues or the working dues. I checked the bylaws that were posted and the rule in no t have retirees on the board came from the International. So the International bylaws would have to change to change this. Fat chance at that! An ide a would be to elect a small group, 3 to 5, retirees who could be advisors to the board. Food for thought....
Jack

---

**Post Id #10**
**Received via e-mail February 2006:**
Date Posted on Website: 2006-04-07
Considering the poor job the active Executive Board (E/B) members are doing, trying to keep the elected officers from flaunting the millions of dollars in the general Fund (amongst other things), the By-Laws and Constitution should be changed, so retirees could be given the option of being elected to the E/B. With a retiree in the E/B position he/or she would not be obligated to anyone b ut the total membership. Presently, all the B/M has to do is, refer in a casual or indirect way, to the active E/B member that there may be a job on staf f and what do you think that E/B members will do. If you consider the staff person could make $20K more than working in the field, then from that da y on, that active E/B member would be in a prejudice position and would not make a wise decision in the best interest of the membership. What do you think??
Joe Tree

**Post Id #9**
**Response**
Date Posted on Website: 2006-04-07
We are inviting all Local 3 members to submit their comments to the question asked by the f ollowing member. E-mail your comments to: contactus@local3democraticunion.org Information regarding the Executive Board can be found  in the Local 3 Bylaws, Article IX, Section 1 and Article XII, Section 1 (c) and (f). The International Constitution also speaks to this issu e.
Webmaster
**contactus@local3democraticunion.org**

---

**Post Id #6**
**Received via e-mail February 2006:**
Date Posted on Website: 2006-04-06
I am a retired member. I joined the Union in 1967 as a member of the staff under Al Clem. I  was in law school at the time and worked as the contracts administrator. CLem ran me off when I told him I thought he was leading LOcal 3 into some s erious trouble by faking the racial integration of the Local through the apprenticeship training program. Then I represented Norris Casey when he  took CLem and then Marr on in the early '70s. It was a brutal period for the Local and brought it a reputation of corruption. FInally, Stapleton,  Kinchloe, Casey, Ivy and Skidgel hired me to help when they ran against Bob - I am having a senior moment on his name. The green ticket won in 1982 and  I became General Counsel. I resigned in 1992 when it looked like the LOcal's administration was returning to bad old times. I finally retired in , I think, 2002. You people have given me hope and I encourage you. If Casey is still alive, go find him. He can tell you that the only way the Local gets anything done is when the rank and file makes it and when the rank and file is watching. I wish you a lot of luck. Let me know if I can help .
Joe McCray

---

**Post Id #5**
**Received via snail mail February 2006:**
Date Posted on Website: 2006-04-06
**Letter received from anonymous member**

---

Questions? **contactus@local3democraticunion.org**

---

Local 3 Members for a Democratic Union
P.O. Box 642
Murphys, CA 95247                                          _

**Reply Memorandum**

Exhibit 4



Login                                    Your cart is empty

## WHOIS Search Results

**WHOIS RECORD For**

IMAGE NOT
AVAILABLE

### mylocal150sucks.info

Services from Network Solutions:

Certified Offer Service - Let us help you get this domain name!

SSL Certificates - Get peace of mind with a secure certificate.

**SAVE over 70%**
when you TRANSFER your domains to Network Solutions — your trusted domain name provider!

Go

Choose Your Domain Name Provider Wisely and Transfer Domains for $9.99/yr

Maximize Results from your E-Commerce Store: Download our *8 Steps to Successful Selling Online*

Access to INFO WHOIS information is provided to assist persons in determining the contents of a domain name registration record in the Afilias registry database. The data in this record is provided by Afilias Limited for informational purposes only, and Afilias does not guarantee its accuracy.  This service is intended only for query-based access. You agree that you will use this data only for lawful purposes and that, under no circumstances will you use this data to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of Registry Operator, a Registrar, or Afilias except as reasonably necessary to register domain names or modify existing registrations. All rights reserved. Afilias reserves the right to modify these terms at any time. By submitting this query, you agree to abide by this policy.

Domain ID:D17836669-LRMS
Domain Name:MYLOCAL150SUCKS.INFO
Created On:16-May-2007 01:26:42 UTC
Last Updated On:16-May-2007 01:26:47 UTC
Expiration Date:16-May-2009 01:26:42 UTC
Sponsoring Registrar:Go Daddy Software Inc (R171-LRMS)
Status:CLIENT DELETE PROHIBITED
Status:CLIENT RENEW PROHIBITED
Status:CLIENT TRANSFER PROHIBITED
Status:CLIENT UPDATE PROHIBITED
Status:TRANSFER PROHIBITED
Registrant ID:GODA-031545717
Registrant Name:Michale Quigley
Registrant Organization:
Registrant Street1:5661 Aspen Dr.
Registrant Street2:
Registrant Street3:
Registrant City:St. Anne
Registrant State/Province:Illinois
Registrant Postal Code:60964
Registrant Country:US
Registrant Phone:+1.8159371790
Registrant Phone Ext.:
Registrant FAX:
Registrant FAX Ext.:
Registrant Email:quigsby1@comcast.net
Admin ID:GODA-231545717
Admin Name:Michale Quigley
Admin Organization:
Admin Street1:5661 Aspen Dr.
Admin Street2:
Admin Street3:
Admin City:St. Anne
Admin State/Province:Illinois

Search

Go



**PerformanceClicks™ from Network Solutions**
Create and manage your online advertising from as low as $125/month plus $99 one time set-up fee

**BUY THE AVAILABLE EXTENSIONS FOR THIS DOMAIN NAME**

| | | |
|---|---|---|
| mylocal150s... | ☑ | .com |
| mylocal150s... | ☑ | .net |
| mylocal150s... | ☑ | .org |
| mylocal150s... | ☑ | .mobi |
| mylocal150s... | ☑ | .biz |
| mylocal150s... | ☑ | .tv |
| mylocal150s... | ☑ | .us |
| mylocal150s... | ☑ | .cc |
| mylocal150s... | ☑ | .ws |
| mylocal150s... | ☑ | .bz |
| mylocal150s... | ☑ | .vg |
| mylocal150s... | ☑ | .gs |
| mylocal150s... | ☑ | .tc |
| mylocal150s... | ☑ | .ms |

Continue ✎

Billing Street:
Billing City:St. Anne
Billing State/Province:Illinois
Billing Postal Code:60964
Billing Country:US
Billing Phone:+1.8159371790
Billing Phone Ext.:
Billing FAX:
Billing FAX Ext.:
Billing Email:quigsby1@comcast.net
Tech ID:GODA-131545717
Tech Name:Michale Quigley
Tech Organization:
Tech Street1:5661 Aspen Dr.
Tech Street2:
Tech Street3:
Tech City:St. Anne
Tech State/Province:Illinois
Tech Postal Code:60964
Tech Country:US
Tech Phone:+1.8159371790
Tech Phone Ext.:
Tech FAX:
Tech FAX Ext.:
Tech Email:quigsby1@comcast.net
Name Server:NS49.DOMAINCONTROL.COM
Name Server:NS50.DOMAINCONTROL.COM
Name Server:
Name Server:
Name Server:
Name Server:
Name Server:
Name Server:
Name Server:
Name Server:
Name Server:
Name Server:

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record

**IP Address:** 68.178.232.100 (ARIN & RIPE IP search)
**IP Location:** US(UNITED STATES)-ARIZONA-SCOTTSDALE
**DMOZ**       no listings
**Y! Directory:** see listings
**Data as of:**  14-Jun-2005

**SEARCH AGAIN**

Enter a search term:

e.g. networksolutions.com

**Search by:**
◉ Domain Name
○ NIC Handle
○ IP Address

Search ✎

your domain name registration be included in a public database known as WHOIS. To learn about actions you can take to protect your WHOIS information visit www.internetprivacyadvocate.org.

NOTICE AND TERMS OF USE: You are not authorized to access or query our WHOIS database through the use of high-volume, automated, electronic processes or for the purpose or purposes of using the data in any manner that violates these terms of use. The Data in Network Solutions' WHOIS database is provided by Network Solutions for information purposes only, and to assist persons in obtaining information about or related to a domain name registration record. Network Solutions does not guarantee its accuracy. By submitting a WHOIS query, you agree to abide by the following terms of use: You agree that you may use this Data only for lawful purposes and that under no circumstances will you use

this Data to: (1) allow, enable, or otherwise support the transmission of mass unsolicited, commercial advertising or solicitations via direct mail, e-mail, telephone, or facsimile; or (2) enable high volume, automated, electronic processes that apply to Network Solutions (or its computer systems). The compilation, repackaging, dissemination or other use of this Data is expressly prohibited without the prior written consent of Network Solutions. You agree not to use high-volume, automated, electronic processes to access or query the WHOIS database. Network Solutions reserves all rights and remedies it now has or may have in the future, including, but not limited to, the right to terminate your access to the WHOIS database in its sole discretion, for any violations by you of these terms of use, including without limitation, for excessive querying of the WHOIS database or for failure to otherwise abide by these terms of use. Network Solutions reserves the right to modify these terms at any time.

Domain Names  |  Web Hosting  |  Web Design  |  SSL Certificates  |  Sell Online  |  Email Security  |  Pay Per Click  |  Online Marketing
Design a Website  |  Search Engine Optimization  |  Custom Logo Design  |  Press Release Services  |  Email Account  |  Web Analytics

  

"An outstanding customer service experience"
J.D. Power and Associates

© Copyright 2007 Network Solutions. All rights reserved.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*        )
                               )
           Plaintiffs,    )
                               )
          v.             )     No. 07-600 (RBW)
                               )
Vincent J. Giblin, *et al.*,        )
                               )
          Defendants.    )

**SECOND AFFIDAVIT OF PATRICIA KOHL**

1. My name is Patricia Kohl. I am one of the plaintiffs in this action. I make this affidavit in support of our motion for summary judgment and for a preliminary injunction.

2. During my deposition, I was asked several questions about whether I made particular efforts to mail or otherwise send information about my campaign to particular individuals or groups of individuals. I answered that I sent such information to the members who were eligible to vote for me. For example, I had very limited funds when I ran in 2002, and could not afford to send a mailing to the entire statewide membership of the local.

3. But I was never asked whether my election campaign web site was aimed only at members, or whether it was also aimed at the general public. Had I been asked that question, I would have reaffirmed what I said in my first affidavit – that I want the public to see my criticisms of the union and its leaders. Moreover, I do not want to have to keep statements about elections in my own local or other locals off my web site to avoid having to password protect the whole web site, exactly because it is important to me to be able to have the whole public see what the web site says.

4. During my deposition, I was also asked several questions about whether I thought the

union could discipline union insiders who disclosed secret information; then I was asked whether union leaders should disclose and debate various kinds of inside information during elections and whether it would make it easier for union leaders to disclose that information if they knew that password protection would prevent employers from seeing what they disclosed. The union's briefs say that my answers to those questions show my agreement with its argument that rank-and-file members discussion of those same issues is the sort of information that the union has the right to keep from employers. I was never asked whether I thought individual members who are not union officers should be subject to punishment for expressing their opinions publicly on such issues. Had I been asked, I would have said no.

5. During my deposition, I was asked about some small parts of the Local 18 Members Voice web site that include discussion forums. There are two such forums on our site. One has been taken over by spam and no members use it. The other one, which was the focus of questions at my deposition, is also hardly used at all. By contrast, I have had nearly 13,000 visitors to my web site. In order to have a good discussion site, I have been thinking that it might make sense to open a Local 18 Members Voice blog so that the blog host can control spam while we can have a good discussion about union issues without any login requirement. But because I do not know whether the password protection rule will be sustained, I do not want to open a blog and urge other members to visit and use it, because I understand that blogging web sites such as Blogger cannot be password protected under the union's system.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on June 13, 2007.

*Patricia Kohl*

Patricia Kohl

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael Quigley, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-600 (RBW) |
| | ) | |
| Vincent J. Giblin, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AFFIDAVIT OF MICHAEL QUIGLEY**

1.  My name is Michael Quigley.  I am one of the plaintiffs in this action.  I make this affidavit in support of our motions for summary judgment and for a preliminary injunction.

2.  At my deposition, I was asked about the formal operating rules for the union hiring hall and whether they were followed, and I said no.  I also indicated that many times I had occasion to advise the hiring hall dispatchers about whether a given member had the right experience for a given dispatch.  One of my most important jobs as a business agent was to ensure that the hiring hall met the needs of both our members and our contractors.  Some members have more experience than others with particular machines.  Some members have different work styles than other members.  For example, some work especially quickly, while others work more slowly but more methodically and carefully.  Various employers want workers of a particular experience or work style.  If a member is dispatched to a job where his experience and style do not match what that employer wants, that member is just going to end up back at the hiring hall looking for another job, and the employer is going to be unhappy that the wrong member got referred.  For that reason, hiring hall referrals frequently do not follow the precise order of the out-of-work list, and everyone is better off under this system.

3. The business agent also receives information about what new projects are coming into the area, and when jobs involving on those projects are likely to ready for referral from the hiring hall. When jobs that are particularly desirable – such as jobs that will last for a long time, involve better conditions, and/or pay more overtime – come into the hiring hall for dispatch, it is to the advantage of the members to be on and near the top of the out-of-work list. Members often consult with the business agent to try to decide whether a particular day is a good or bad one to get onto the out-of-work list. Naturally, members want to be on good terms with the business agent to get the benefit of his inside knowledge on such matters.

4. During my deposition, I was asked several questions about whether our campaign web site was aimed at members of the union, because they can vote (or contribute money to support the campaign). But I was never asked whether or not I wanted other people to be able to see the web site. Had I been asked that question, I would have said yes. Just as I have learned a great deal from reading web sites of members of other unions, especially other construction trades unions, I hope that members of other unions can learn from our criticisms of William Dugan, from our successes, our failures, and our experiences, as reported on our web site. Although the public is not the main target of our web site, it is among the intended audiences.

5. During my deposition, I was asked several questions about whether I thought employers might benefit from knowing various kinds of information. I was never asked whether I thought that ordinary members of the union (not officers) ought to be subject to punishment for discussing publicly issues in the union such as whether a strike is a good idea, and why. Had I been asked that question, I would have said no. I think the union can tell officers not to reveal inside information, such as secret bargaining strategies, but I do not think that a member's dissenting view, even if

potentially useful to the employer, is a union "secret" that we are forbidden to reveal.

6. In my opinion, there is nothing on the Team150 web site that reveals secret union information that the union could punish me for disclosing, even if those disclosures went straight to an employer.

> Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on June 13, 2007.

Michael J. Quigley

-3-

1                   UNITED STATES DISTRICT COURT

2                       DISTRICT OF COLUMBIA

3     MICHAEL QUIGLEY, et al.,            )

4                    Plaintiffs,          )

5              v.                         )  No. 07-600 (RBW)

6     INTERNATIONAL UNION OF OPERATING )

7     ENGINEERS, et al.,                  )

8                    Defendants.          )

9

10                             Washington, D.C.

11                             Monday, June 4, 2007

12    Deposition of MARK DAVID BRENNER, called for

13    examination by counsel for Defendants in the

14    above-entitled matter, the witness being duly sworn

15    by CHERYL A. LORD, a Notary Public in and for the

16    District of Columbia, taken at the offices of

17    BREDHOFF & KAISER PLLC, 805 15th Street, N.W.,

18    Washington, D.C., at 1:01 p.m., and the proceedings

19    being taken down by Stenotype by CHERYL A. LORD, RPR,

20    CRR.

21

22

1    APPEARANCES:

2

3    On behalf of Plaintiffs:

4        PAUL ALAN LEVY, ESQ.

5        GREGORY A. BECK, ESQ.

6        PUBLIC CITIZEN LITIGATION GROUP

7        1600 20th Street, N.W.

8        Washington, D.C.  20009

9        (202) 588-1000

10

11    On behalf of Defendants:

12        MATTHEW CLASH-DREXLER, ESQ.

13        ROBERT M. WEINBERG, ESQ.

14        BREDHOFF & KAISER PLLC

15        805 15th Street, N.W.

16        Washington, D.C.  20005

17        (202) 842-2600

18

19    ALSO PRESENT:

20        Joanna Pineda

21

22

1                    C O N T E N T S

2    WITNESS                        EXAMINATION

3                                   PAGE NO.

4    MARK DAVID BRENNER

5         By Mr. Clash-Drexler            5

6         By Mr. Beck                   299

7         By Mr. Clash-Drexler          306

8         By Mr. Beck                   314

9

10                    E X H I B I T S

11              (Exhibits attached.)

12    BRENNER EXHIBIT NO.             PAGE NO.

13    1    Declaration of Mark Brenner       34

14    2    Curriculum Vita                   37

15    3    People at Labor Notes             55

16    4    Campaign Website Resolution      155

17    5    Google Page Creator Help screen  161

18    6    Letter, 5-11-07                  189

19    7    The DigitalM                     231

20    8    Printout, AUD site               233

21    9    Labor Notes Online Donation      242

22    10   Web site access memo             249

1          E X H I B I T S   C O N T I N U E D

2     BRENNER EXHIBIT NO.                    PAGE NO.

3

4     11   The Use of the Internet by

5          America's Newspapers, 8-1-06        254

6     12   Printout, Washingtonpost.com        260

7     13   Registering for NYTimes.com         260

8     14   Printout, Register and Start

9          Using Facebook                      260

10    15   Printout, Windows Live              260

11    16   W3C Extended Log File

12         Format (IIS 6.0)                    270

13

14

15

16

17

18

19

20

21

22

```
1                    P R O C E E D I N G S

2

3    Whereupon,

4                    MARK DAVID BRENNER

5    was called as a witness by counsel for Defendants,

6    and, having been duly sworn by the Notary Public, was

7    examined and testified as follows:

8

9         EXAMINATION BY COUNSEL FOR DEFENDANTS

10              BY MR. CLASH-DREXLER:

11       Q.    Good afternoon, Dr. Brenner.

12              We're here for a deposition today in a

13   case, Quigley versus International Union of Operating

14   Engineers.

15              Have you ever been deposed before?

16       A.    No.

17       Q.    Okay.  Obviously today I'll be asking you

18   a series of questions, and you'll be obviously

19   answering those questions.  Just a few ground rules.

20   I imagine your counsel probably told you this

21   already.

22              If you can try to wait till I finish my
```

1    question, and then I will also try to wait till you

2    finish your answer so that the transcript is clear.

3              Secondly, if you can try to say yes or no

4    rather than shaking your head or m-hms, that also

5    helps out with the transcript.

6              Third, if you need a break at any time,

7    just let me know, and we can accommodate that at a

8    reasonable opportunity.

9              Next, I want you to make sure that you

10   understand the question that I'm asking, so if at any

11   point there's any confusion, I want you to let me

12   know, and we'll try to work through whatever that

13   difficulty is.  And I'll assume if you've answered

14   the question that you've understood it.

15             Is that okay?

16        A.   I understand that, yes.

17        Q.   When were you first contacted about being

18   an expert witness in this matter?

19        A.   I don't recall the exact dates.  I believe

20   it was about 2 months ago, perhaps 3.

21        Q.   And who contacted you?

22        A.   I was first contacted by Paul Levy from

1    Public Citizen.

2          Q.    Do you know, had the lawsuit already been

3    filed at the time you were contacted?

4          A.    I don't know.

5          Q.    You said the first time you were contacted

6    was by Mr. Levy?

7          A.    I believe that's right.

8          Q.    And that was by phone?

9          A.    I don't recall if it was by phone or by

10   email.  I believe it was by phone.

11         Q.    Did you know Mr. Levy before he contacted

12   you?

13         A.    I've known Paul for a number of years

14   through my labor activism.  I met him first I believe

15   in 1999 at a Labor Notes conference.  That's the

16   organization that I now work for, Labor Notes.

17               I believe it was 1999 when we first met.

18   Paul has been a long-time supporter of Labor Notes.

19   We've crossed paths on many occasions in the ensuing

20   years.

21         Q.    How has Mr. Levy supported Labor Notes?

22         A.    He's been a resource if we've had

1    questions about labor law issues.  I don't know

2    actually if --

3            THE WITNESS:  -- Paul, you've ever written

4    for a magazine --

5        A.    But he has been generally somebody we

6    could call on when we had, you know, legal issues or

7    wanted to try to get a perspective on a case that we

8    had been contacted about.  He was somebody -- among

9    labor lawyers that we've known, he's one of many that

10    we regularly have contact with.

11            BY MR. CLASH-DREXLER:

12        Q.    Has Mr. Levy ever contributed to Labor

13    Notes?

14        A.    I don't know.

15        Q.    Do you know whether Public Citizen has

16    ever made any contribution to Labor Notes?

17        A.    That I don't know either.

18        Q.    You said you met Mr. Levy you think at

19    this conference in 1999.

20            Have you -- have there been other

21    conferences that you met Mr. Levy?

22        A.    I don't know of any other specific

1    instance when we have ever crossed paths.  We --

2    Labor Notes held an event in Washington, D.C., in

3    January that he dropped by, so I did see him in

4    January of this year, but we didn't -- this never

5    came up, this case.

6             We just said hello, and he asked how

7    things were going, and chitchat.

8        Q.    So before this case, you had maybe seen

9    Mr. Levy in person at that Labor Notes conference in

10   '99 and then maybe again in January of this year?

11       A.    I would -- yes, that I am certain of.

12       Q.    Okay.  In your first conversation with

13   Mr. Levy about this case, what did he tell you?

14       A.    Not very much.

15            Paul indicated that they were looking for

16   an expert witness on issues related to Internet free

17   speech.  I believe that would be how it would be fair

18   to characterize -- I don't know if he used those

19   exact words.

20            And we talked a little bit about who in

21   our circle of contacts at Labor Notes did we know who

22   fit that bill, who worked on those issues, knew the

1    context of the labor movement, and in particular,

2    rank and file union reform, activists and other

3    allies, and who also understood the Internet side of

4    the question.

5         Q.    What do you understand the term Internet

6    free speech to mean?

7         A.    I don't know exactly what you mean by

8    that.

9         Q.    Well, you used the phrase Internet free

10   speech, in looking for an expert on Internet free

11   speech.

12             What did you mean when you said that?

13        A.    What I meant when I said that was an issue

14   of restricting rights of union members to make use of

15   the Web, whether it be limiting what is allowed under

16   international union rules and regulations to be

17   posted on personal Websites, the use of symbols,

18   logos, names of unions.

19             That's what I understand is the rubric

20   under which Internet free speech -- that's the

21   substance of what I understand to fall under the

22   rubric of Internet free speech.

1      Q.    Did Mr. Levy in that conversation identify

2  any specific questions that he was looking for an

3  expert witness to answer?

4      A.    Not that I recall.

5            It was -- my recollection is, it was a

6  very short conversation.  Paul is very efficient.

7      Q.    How long would you say it was?

8      A.    I would say it was no more than 3 to 5

9  minutes.

10     Q.    When was the next time you heard I guess

11 from anyone from Public Citizen about this case?

12     A.    It was shortly thereafter, probably a week

13 or 2.  I'm not really certain, but it wasn't months

14 later.

15           It was let's say weeks later, within

16 weeks.  And I believe it was again Paul who contacted

17 me to see if I would actually be interested in being

18 that expert witness, because he had heard I believe

19 from others and also in our exchange, recognized that

20 I had some of the requisite knowledge and expertise.

21     Q.    How long was that conversation?

22     A.    Again, I would say no more than perhaps 5

1    minutes, 10 minutes.

2        Q.    Again, did Mr. Levy identify any specific

3    questions that he wanted you to answer?

4        A.    Not that I recall.

5              I'm not quite sure I understand what you

6    mean by, specific questions.

7              Could you clarify?

8        Q.    Let me take a step back.

9              What did Mr. Levy say the case was going

10   to be about that they were looking for an expert

11   witness?

12       A.    He indicated that -- that there was an

13   initiative by the International Union of Operating

14   Engineers to place requirements -- password

15   protection requirements on Websites that members

16   inside the union established, and this was something

17   that was going to be challenged by some members in

18   the union, and they needed someone to discuss the

19   impact of password protection on both the utility of

20   these Websites say for campaigns for local union

21   office as well as some of the broader issues that

22   might be -- that might surround using the -- rank and

1    file union members using the Internet.

2            That's my recollection of the substance of

3    the conversation.

4        Q.    You used the word the utility of the

5    Websites.

6            What do you mean by that?

7        A.    Can you --

8        Q.    Sure.

9            Again, I asked for some background about

10   the case, and you said there were sort of 2 issues,

11   and correct me if I'm wrong, the first was, you said

12   that he wanted you to talk about -- or that part of

13   the issue was to look at what the utility of these

14   Websites was.

15           And so I just wanted to understand what

16   you meant when you used the word utility.

17       A.    I don't think that's what I meant.  If

18   maybe I could --

19       Q.    Just go ahead and say -- just tell me what

20   you meant.  That's fine.

21       A.    What I meant simply was what the impact of

22   password protection requirements would be on the -- I

1    guess I did use the word utility, of these sites

2    under the proposed regulations as they were briefly

3    explained to me.

4              And the substance of what I mean by that

5    is simply, how would that impact the way in which

6    rank and file union members would continue to use the

7    Web as a tool for horizontal discussion within their

8    union, within the broader labor movement, and

9    specifically how that might impact rank and file who

10   choose to run for union office, what would the impact

11   of password protection on say a candidate's Website

12   for local union office, what would that impact be.

13             So that was what I understood the

14   substance of the case to be about.

15   Q.    And you also used the word the broader

16   issues that surround rank and file -- rank and file

17   members using the Internet, and I think you collapsed

18   those 2 issues into one.

19             So the impact is on the utility of these

20   Websites.

21             And what you meant by that was how it

22   would affect rank and file members and particularly

1    candidates who would be running for office?

2        A.    Right.

3              As I understand it, the issues are

4    distinct, that rank and file union members through my

5    experience use the Web for a variety of purposes, one

6    subset of which is to promote campaigns that they

7    might launch for public -- for local union office or

8    higher office within their specific unions.

9              And so my sense of the regulation was that

10   it was going to impact at least within this union all

11   users of the Internet by members.

12       Q.    And why would -- what about -- was that

13   your sense at the time that Paul was talking to you?

14       A.    I'm characterizing the conversation that

15   we had when I was approached.

16             I really don't -- I understand it's an

17   evolving regulation, so that was my understanding at

18   the time.

19       Q.    Okay.  After that second conversation,

20   which was about a week after the first one, did you

21   tell Mr. Levy that you would be willing to be an

22   expert witness?

1          A.     I had to consult with the staff where I

2     work, and my co-director, and I told him that needed

3     to make sure that we would have time and clear it

4     through our, you know, organization, assuming that

5     those weren't issues, that I would be willing.

6          Q.     When did you get back to Mr. Levy?

7          A.     I don't recall for certain.  Let's say

8     within a week or 2 after that.

9          Q.     Did you call him?

10          A.     I probably emailed, but I might have

11     called.

12          Q.     And was that discussion anything more

13     than, I'd be willing to do it?

14          A.     No.

15               It was fairly brief.  Again, just, I'm

16     willing.

17               And we discussed I believe a timetable of

18     what the -- how long the case might take and when

19     things might happen, because that was something that

20     was an issue with me, trying to balance coming here,

21     for example, with my work schedule at work.

22          Q.     Did Mr. Levy ever say to you, we are

1  looking for you to offer an expert opinion on these

2  topics?

3          Did he identify those topics for you?

4      A.    I don't recall that formulation ever in

5  our discussions, although we've since then had

6  discussions that are wide-ranging about what the

7  issues were, touching on the various aspects of

8  the -- you know, some specific, some general, and --

9  but I don't recall that sort of formulation like,

10  will you be willing to -- will you provide expert

11  testimony on this, this, and this.  I don't recall

12  that sort of list.

13      Q.    There are these initial conversations, are

14  you interested in doing this.

15          When was the next time that you spoke

16  either with Mr. Levy or any other person at Public

17  Citizen about the case?

18      A.    I believe the next time was the

19  conversation that I had with Greg back at Public

20  Citizen about the case, and probably that was again

21  maybe 2 weeks later.

22      Q.    That was here in D.C.?

1        A.    No.

2              Again, on the phone.  This is the first

3     time I've come to D.C. related to the case.

4        Q.    And how long was that phone call?

5        A.    Most likely less than 15 minutes.  I don't

6     recall the exact time.  I don't keep a phone log at

7     work.

8        Q.    What was the subject matter of that

9     conversation?

10       A.    My recollection is that we talked mostly

11    about the logistics of the case that Greg explained

12    to me what the stages were going to be and what role

13    he was going to play in the process for Public

14    Citizen.

15       Q.    Let me just stop you there.

16             When you were talking about logistics, do

17    you mean anything other than scheduling?

18       A.    No.

19       Q.    And what did Greg tell you was his role in

20    the case?

21       A.    That he would be the point of contact with

22    me on this case and that he -- I recall correctly, he

1    also said he would handle a couple of other aspects

2    of the case that I don't really recall, like I

3    don't -- that I don't really recall.

4         Q.    When was sort of the next time that you

5    had a substantive discussion about your involvement

6    in the case?

7         A.    It was again probably a week or 2 after

8    the initial contact.

9              We had a phone call perhaps 45 minutes to

10   discuss what the various issues were in the case,

11   what some of the concerns that the plaintiffs I guess

12   were raising and what -- and he shared with me his

13   initial thoughts about what was at issue in the case.

14        Q.    And what were Mr. Levy's initial thoughts?

15        A.    No.

16             This was Mr. Beck.

17        Q.    Okay.  What were Greg's initial thoughts

18   about the case?

19        A.    Well, the thoughts about the case is

20   perhaps the wrong way to characterize it.

21             I think he was saying what the issues were

22   that he thought would come up in the case.

1          Q.    And what were those issues?

2          A.    They were the difficulty that rank and

3    file union members might have establishing Websites

4    that had password protection, what the impact of

5    password protection might be on readership of rank

6    and file union sites that were required to have union

7    protection, and the only other one that I can recall

8    distinctly from that conversation was the impact of

9    having a -- having either the international union or

10   a third party engaged by the international union

11   maintain the verification of the registration system

12   and what effect that might have on members'

13   willingness to sign in on a password-protected

14   Website.

15          Those were the 3 big issues that I

16   remember from that conversation.

17          Q.    Was this call in the last 2 weeks?

18          A.    No.

19          This call was probably -- I'm not exactly

20   sure when it was, but it was somewhere -- if the time

21   line was 3 months in total since our first contact,

22   which I think is the outside, 2 to 3 months ago, it

1    was halfway through the process, so let's say 6 weeks

2    ago, maybe, possibly a little longer, but I would say

3    6 to 8 weeks ago, is my recollection.

4         Q.    And were you told during that call that

5    the international was going to maintain the database

6    itself or through the use of a third party?

7         A.    No, I was not.

8         Q.    Were you told that was something that the

9    international was considering doing?

10        A.    Yeah.

11              That was something that was mentioned as a

12   possibility, yes.

13        Q.    So you mentioned 3 issues that Greg

14   raised.

15              Are those the 3 issues that you're

16   offering an opinion on in this case?

17        A.    Yes.

18        Q.    Are there any others?

19        A.    There are a few other issues that I'm

20   prepared to offer an opinion on, yes, but those are

21   the primary ones.

22        Q.    Okay.  Are those additional issues -- are

1    they in your declaration?

2         A.    Yes.

3         Q.    Why don't you tell me what those

4    additional areas are, just general categories that

5    are in addition to the 3 you've already provided.

6         A.    Well, can you -- I'm a little confused.

7         Q.    Sure.

8              You've identified -- let me just tell you

9    what I'm trying to do here.

10             I just want to understand what opinions

11   you're offering in this case.

12             Okay?

13             And you've told me -- you've listed 3.

14   You said the difficulty the rank and file members

15   might have in establishing a Website with password

16   protection, the effect that password protection would

17   have on readership.

18             Correct?

19             Is that right?

20        A.    M-hm.

21        Q.    Again, for the court reporter, yes or no.

22        A.    Yes.

1           I'm sorry.

2      Q.    No problem.

3           And then the third was the impact on

4      having the international or a third party working

5      with the international maintain the database and

6      operate the password protection system.

7           Those were the 3 areas.

8           And then I asked, are there any other

9      areas that you've offering an opinion on in this

10     case.

11     A.    Can I restate slightly what --

12     Q.    Sure.

13     A.    -- because it would make a little bit more

14     sense for me to say it this way.

15          My expertise is really bringing together 2

16     pieces that are important elements of this case.

17          Number 1, I understand very well through

18     my job and also through my past experience as a union

19     member the world of rank and file union activities,

20     the types of campaigns, discussions, interactions

21     that rank and file union members have amongst

22     themselves.

1          And then on the other hand, I have been

2     both a constructor of, user of Internet technologies

3     for union purposes as a rank and file union member,

4     and also counseled, advised, discussed those -- the

5     issues around use of Internet technologies with rank

6     and filers in my job and in my own experience had

7     related to those issues as a union member.

8          And so I really feel like what I'm here

9     today to offer expertise on is how those things come

10    together.  In the specifics of this case, they relate

11    to the issue of -- the central issue of password

12    protection of Websites for members of -- as I

13    understand it, password protection of Websites for

14    members of the International Union of Operating

15    Engineers.

16         Q.   We'll come back to all those areas of

17    expertise.

18         Were you ever sent any documents for you

19    to review in offering your opinion in this case?

20         A.   I believe I was, yes.

21         Q.   And what documents were you sent?

22         A.   Well, clarify, please, what you mean by,

1    documents.

2        Q.    What documents did you review to offer

3    your opinion in this matter?

4        A.    I was provided the declaration of

5    Ms. Pineda.

6        Q.    Anything else?

7        A.    I believe I was also provided a copy of

8    the -- an article about Internet use in -- that was

9    cited in my deposition.

10       Q.    In your declaration?

11       A.    I'm sorry.

12             In my declaration.

13       Q.    Is that the Bivings article?

14             B-I-V-I-N-G-S.

15       A.    No.

16             It's the specific article inside of the --

17   that's cited inside of that, the one from

18   Jacksonville, dot, com.

19             That's my recollection.

20       Q.    Other than Ms. Pineda's declaration, that

21   article, were you sent any other documents by

22   counsel?

1          A.    Yes.

2                After Ms. Pineda's deposition, they also

3     sent me a copy of her deposition, and a copy of

4     Mr. Levy's -- I don't know what you call it --

5          Q.    His filing?

6                I mean, was it a summary judgment motion?

7          A.    I don't -- a big document that Paul wrote

8     related to this case.  I assume it's the central

9     argument, statements of facts.

10               I'm sorry.

11               I'm not a lawyer.  I don't know the

12    technical terms for what it was that I received.

13         Q.    Did you read it?

14         A.    I did not read it very carefully, but I

15    skimmed it.

16         Q.    Now, at the time you received that packet

17    from Mr. Levy, you had already signed your

18    declaration?

19         A.    That's correct.

20         Q.    So you didn't rely on what he sent you in

21    offering your opinion.

22               Correct?

1       A.    No, I did not.  I had not seen that and

2  had not read it.

3       Q.    So in offering your opinion in this case,

4  did you rely on Ms. Pineda's declaration?

5       A.    One specific part of it -- I did read it,

6  but in particular, the part about where Ms. Pineda

7  discussed whether this would pose problems for union

8  members to include server-side scripting and password

9  protection.

10              I used that part of her declaration, which

11  I referred to in my declaration.

12       Q.    And did you read Ms. Pineda's deposition

13  before you signed your declaration?

14       A.    Did not, no.

15       Q.    Apart -- and those are -- again the

16  declaration from Ms. Pineda, her deposition

17  transcript, the article that you think was from

18  Jacksonville, dot, com, and the large packet of

19  papers that Mr. Levy sent you, are those the only 4

20  documents that you were sent by counsel?

21       A.    I believe there was an appendix or a set

22  of exhibits that came with the deposition of

1    Ms. Pineda that also came as a separate document.

2          Q.    Other than I guess now the 5 documents

3    that we've just listed, is there anything else you

4    received?

5          A.    That counsel sent me?

6          Q.    Correct.

7          A.    No, sir.

8          Q.    Did any of the plaintiffs send you any

9    information?

10         A.    No, sir.

11         Q.    Other than those -- I guess the

12   declaration from Ms. Pineda and the article from

13   Jacksonville, dot, com, were there any other

14   documents that you relied upon when offering your

15   opinion?

16         A.    Yes.

17               I did also review the Bivings study that

18   you referred to earlier.

19         Q.    Anything else?

20         A.    Can you be a little bit more specific?

21         Q.    Sure.

22               Any other document that you relied on when

1    you offered your opinion in this case.

2         A.    I'm still not -- can you provide me with

3    some examples of what you mean by that?

4         Q.    Well, in offering your opinion, did you

5    review, consider any documents that you looked at to

6    help you --

7         A.    My question is what you mean by -- I'm

8    sorry.

9               Finish, please.

10        Q.    Sure.

11              Well, you said, for instance, that you

12   read Ms. Pineda's declaration.

13        A.    Yes.

14        Q.    And that you responded to it.

15        A.    To a piece of it, yes.

16        Q.    Okay.  And you also said that you received

17   this article about the Jacksonville, dot, com.

18              Correct?

19        A.    Yes.

20        Q.    Okay.  And did you rely on that article?

21        A.    Yes.

22              I reviewed a specific piece of it where it

1    talked about a survey conducted by the Pew Research

2    Center about Internet use.

3        Q.    That's what I mean by, rely, that you

4    considered it, and you considered it in offering your

5    opinion in this case.

6        A.    Right.

7              My question was not about the word rely.

8              It was about the word document.

9              What counts as in your estimation a

10   document?

11       Q.    Any studies, any reports, emails, letters,

12   faxes, Internet articles.

13       A.    Okay.  That's what I needed clarification

14   on.

15             Yes, I did.

16             I reviewed several articles in various

17   Websites mostly online about some of these issues

18   about restrictions on Internet use by unions.

19       Q.    Are those articles cited in your

20   declaration?

21       A.    No, they're not.  They were more general

22   background reading.

1          Q.     Can you give me the cites for those

2     articles?

3          A.     Not offhand, but I could provide them if

4     you need them.

5          Q.     Can you remember any of them?

6          A.     Sure.

7                 One of the articles that I reviewed was

8     about a case inside AFSCME District Council 37 that

9     was published by the Association for Union Democracy

10    on their Website, another article also from the AUD

11    Website that I recall specifically related to a case

12    of restrictions on Internet usage by members of

13    IATSE, which is the stagehands union -- I-A-T-S-E --

14    which is the stagehands union.

15         Q.     Anything else that you can recall?

16         A.     I did look at the Websites of the

17    operating engineer members involved in this case as

18    well, although --

19         Q.     You looked at their Websites?

20         A.     Just to see who -- yeah, to see what their

21    Websites were.

22         Q.     And whose Websites did you look at?

1   A. The blog that is hosted by Mr. Mueller in

2 California.

3   Q. Okay.  When did you review that blog?

4   A. I reviewed it once in -- I don't recall

5 exactly when prior to, and again this morning.

6   Q. Had Mr. Mueller -- is that right?

7   MR. LEVY:  Mueller.

8   Q. Had Mr. Mueller even started his blog at

9 the time you signed your declaration?

10   A. I don't know.  I didn't review it prior to

11 my declaration.

12   Are you only focused on the declaration?

13   Q. Again, what I'm trying to understand here

14 is what you considered and relied upon in offering

15 your opinion.

16   A. For the declaration.

17   Q. For the declaration.

18   A. I'm sorry.

19   I was confused.  I thought you meant for

20 what I'm doing right this moment.

21   Q. We'll get back to that.

22   Just focused on your declaration, I

1    believe that Mr. Mueller hadn't created his blog by

2    the time that your declaration was signed, but we can

3    get into that later, but had you reviewed any other

4    IUOE -- any of the other plaintiffs in the case's

5    Website prior to signing your declaration?

6         A.    I had not.

7         Q.    The AUD -- 2 articles that you mentioned

8    from the AUD, had you reviewed those before signing

9    your declaration?

10        A.    I'm a regular reader of the Union

11   Democracy Review, so I have read -- I had read those

12   articles when the issue was released, but I did not

13   review them immediately prior to preparing my

14   declaration, so in answer to your question, no.

15        Q.    Why do you read the Association for Union

16   Democracy Website?

17              Do you find it a helpful site?

18        A.    Yes.

19        Q.    Do you trust the things they are posting

20   on the site?

21        A.    I do.

22        Q.    And why is that?

1      A.    I know the staff there.  They work in the

2  same building that we work in, and generally find

3  through my own experience that their material is both

4  interesting and relevant to the work I do at Labor

5  Notes and generally credible information.

6      Q.    I'm going to hand you what I'm going to

7  mark as Brenner exhibit 1.

8                        (Brenner Exhibit No. 1

9                         was marked for

10                        identification.)

11            BY MR. CLASH-DREXLER:

12      Q.    Can you identify that document for me,

13  Dr. Brenner?

14      A.    Yes.

15            It's my declaration.

16      Q.    When did you sign -- can you go to the

17  last page.

18      A.    Yes.

19      Q.    Is that your signature?

20      A.    There's my signature.

21      Q.    And I notice that there's no date there.

22            Do you recall what date that you signed

1    the declaration?

2        A.    I actually don't.

3              I remember it was a Friday if I'm not

4    mistaken, and it was -- it was within the last 2 or 3

5    weeks.  I just can't remember the exact date.

6              And I noticed at the time that I forgot to

7    put the date in.

8        Q.    Now, you just testified that -- well, let

9    me ask this:  Are you offering any opinions today

10   that are not contained in your declaration?

11       A.    I don't understand what you mean.

12       Q.    Well, you just mentioned that you've

13   reviewed some other documents since you submitted and

14   signed your declaration.

15             Correct?

16       A.    That is correct.

17       Q.    And you said -- I think you used the words

18   that you didn't review those documents for the

19   declaration, but you reviewed them for what you're

20   doing here today.

21             Is that a fair summary of what you said?

22       A.    That's a fair summary.

1    Q.    Okay.  And so are you here to offer some

2    different opinion based on the documents that you

3    reviewed since you signed your declaration?

4    A.    I still am not quite sure what --

5    MR. LEVY:  Can I -- you're going to ask

6    him a bunch of questions, and we have no control over

7    the questions that you ask.

8    It strikes me that you may ask him about

9    things that aren't in his declaration.

10    MR. CLASH-DREXLER:  Well, Mr. Levy, we're

11    entitled under the Federal Rules of Civil Procedure

12    to a document that contains the sum total of his

13    opinions in the case, so if he's saying that there

14    are opinions that he's going to offer that are not

15    contained in this report, that's all I'm asking.

16    MR. LEVY:  All right.

17    BY MR. CLASH-DREXLER:

18    Q.    Do you understand that question?

19    A.    Can you just state it again to me and not

20    to Paul so that I can make sure I understand it.

21    Q.    All right.  Under the rules, I'm entitled

22    to get from the other side, the plaintiffs in the

1    case -- for any expert, I'm entitled to get a

2    document that lays out all the opinions that they're

3    offering in the case.

4            And I have the document that we've just

5    marked as Brenner exhibit 1, which you've said is

6    your declaration in the case.

7            Correct?

8    A.    That's right.

9    Q.    Does this document contain all the

10   opinions that you intend to offer in this matter?

11   A.    Yes.

12   Q.    Okay.

13           MR. LEVY:  I mean, off the record --

14           MR. CLASH-DREXLER:  Sure.

15           (Discussion off the record.)

16           MR. CLASH-DREXLER:  Back on the record.

17           BY MR. CLASH-DREXLER:

18   Q.    I'll hand you what we'll mark as Brenner

19   exhibit 2.

20                        (Brenner Exhibit No. 2

21                         was marked for

22                         identification.)

1          BY MR. CLASH-DREXLER:

2     Q.    Can you identify that document for me?

3     A.    That's my CV.

4     Q.    Is this your current CV?

5     A.    It is my current CV prepared in May of

6     2007.

7     Q.    And your declaration says this, but you've

8     never served as an expert witness before.

9          Correct?

10    A.    No, I have not.

11    Q.    And you already stated that you've never

12    testified at a deposition.

13         Correct?

14    A.    That is correct.

15    Q.    Does this CV list all of your publications

16    for the last 10 years?

17    A.    To the best of my knowledge, to the best

18    of my memory, I have recorded everything that I've

19    written here.

20    Q.    Do any of those publications deal with the

21    issue of Website development?

22    A.    No, they do not.

1      Q.    Do any of those publications deal with

2   password-protecting a Website?

3      A.    No, they do not.

4      Q.    Do any of those publications deal with how

5   Internet search engines work?

6      A.    No, they do not.

7      Q.    Do any of the publications listed in

8   Brenner exhibit 2 deal with the impact of

9   registration requirements on a viewer's willingness

10  to read a Website?

11     A.    No, sir.

12     Q.    Do any of the publications in exhibit 2

13  have anything to do with any of the opinions that

14  you're offering in this case?

15     A.    No, sir.

16     Q.    Just at sort of high-level, can you just

17  give me your education, college, and since then, just

18  the background, where you went, what degrees you got.

19     A.    Apart from what's stated on the page?

20     Q.    Just summarize it for me.

21     A.    I received my bachelor's in economics and

22  history in 1991 at Lake Forest University.  I got a

1    master's in international development from the

2    American University here in Washington, D.C., in

3    1994.

4              I received a master's degree in economics

5    at the University of California, Riverside, in 1997.

6    I received a doctorate in economics from the same

7    university, University of California, Riverside, in

8    2000.

9         Q.    Have you ever taken any classes in any of

10   your formal education that deal with Website, Website

11   development, or password protection of Websites?

12        A.    No, sir.

13        Q.    Have you taken any classes in your formal

14   education that have anything to do with the issues in

15   this case?

16        A.    May I ask a clarifying question?

17        Q.    Sure.

18        A.    When you say, in my formal education, you

19   mean in the education that I just stated.

20        Q.    Correct.

21        A.    No, I have not.

22        Q.    Have you received any informal education

1      and however you want to define that term on any of

2      the topics that are in your declaration?

3           A.    Can you clarify what you mean by, informal

4      education.

5           Q.    Have I attended any conferences, any other

6      training on Website development?

7           A.    Yes.

8           Q.    And what was that training?

9           A.    I've done several courses, courses being

10     mostly seminars, 2-day or 4-day courses on

11     server-side scripting, CGI scripting using Perl.

12              I've done courses on basic HTML,

13     constructing Websites within the University of

14     Massachusetts system, which is particularly

15     configuration of servers.

16              I've taken classes on various other

17     aspects of Internet usage, not just the technical,

18     but also more how to -- classes that dealt with how

19     do you use the Internet effectively to promote

20     your -- in this case, it was at my former job, how to

21     promote our institute.

22              That would have been the way I would

1    characterize it.  It was for people at the

2    university, how to use the Website effectively for

3    your unit on the campus.

4        Q.    You mentioned an institute.

5              What institute was that?

6        A.    I for many years was employed at the

7    Political Economy Research Institute at the

8    University of Massachusetts.  I'm still an affiliated

9    research scholar there.

10       Q.    Who offered these classes on how to

11   promote -- is it the Website for the institute?

12       A.    How to use the Web to promote the

13   institute.

14             It was a general course offered to various

15   members of the university community on how to

16   effectively use the Web.

17       Q.    And who offered that class?

18       A.    The office of information technology at

19   the University of Massachusetts.

20       Q.    In your -- let me go back.

21             Have you taken any classes, seminars,

22   conferences, that deal with the issue of Web

1    security?

2        A.    Expressly?

3        Q.    Yes.

4        A.    No.

5            Security was an issue that we discussed

6    inside of the Perl scripting class I took, because in

7    the configuration we used it, there were log-in

8    issues that we had to deal with in the environment

9    that we worked in.

10       Q.    And that meant people were going to be

11   logging into your site?

12       A.    No.

13           It was a different set of security issues.

14       Q.    What were those security issues there?

15       A.    The server where CGI scripts were

16   processed was a secure server at the university, and

17   so there were protocols that had to be established

18   and followed in order for your Website to process CGI

19   scripts, which we read in Perl.

20           It was for general security on the campus.

21   They were trying to avoid having executable scripts

22   on the main server that hosted the campus Website, so

1    we had to learn how to operate in that environment

2    where they were processed by a remote server.

3        Q.    And did you develop Websites at the

4    University of Massachusetts?

5        A.    Yes.

6            In my former job, I built and

7    maintained -- I should say I helped build and

8    maintain the institute's Website, the Political

9    Economy Research Institute's Website.

10       Q.    And based on that class you took, what

11   were some of the lessons you learned about how to

12   promote the institute through the use of the Web, if

13   you recall?

14       A.    I don't really recall specifics.

15       Q.    What's the purpose of that institute?

16       A.    We do -- at the research institute where I

17   worked, we were primarily doing research around 3

18   issues, 3 key areas.

19           The first was labor markets and living

20   wage policies.  The second was globalization and

21   macroeconomic policies.  And the third was around

22   policies relating to development of peace building in

1    the environment.

2            Those were the 3 program areas at the

3    institute.  Most of my research was concentrated in

4    labor markets and living wages, but I also did

5    research inside of the development of peace building

6    in the environment program.

7        Q.    And the institute had a Website.

8            Correct?

9        A.    Yes.

10           We did.  We still do.

11           It still does, I should say.

12       Q.    And what's on that Website generally?

13       A.    A variety of things, including interviews

14   with staff, interviews with affiliated faculty,

15   people of interest, high-profile researchers who

16   aren't necessarily affiliated with the institute or

17   with the institution, PDFs of our working papers,

18   PDFs of other interests -- you know, research output

19   that we produced, various information about the

20   institute itself, information about the programs that

21   we run, conference announcements, advertisements for

22   jobs when we've had job advertisements, which isn't

1    very often, but we've posted them, a variety of

2    organizational and public relations-type material.

3        Q.    I believe this is in your declaration, but

4    when you were at the University of Massachusetts, I

5    think you wrote that you were in the development of

6    the online surveys?

7        A.    That's correct.

8        Q.    Is that part of your living wage work?

9        A.    That's right.

10        Q.    Was that the, evaluating the economic

11    impact of Boston's living wage ordinance?

12        A.    It was part of the grant.

13            Are you asking about the grant that I

14    received?

15        Q.    Is that where the online survey is done as

16    a part of developing that report?

17        A.    Yeah, I believe so.

18            Let me state what it was, and you tell me

19    if that's what you're asking.

20            The online survey was specifically a part

21    of a grant that I received from the Russell Sage

22    Foundation to examine the impact of the Boston living

1    wage ordinance.  We did surveys with the firms

2    affected by that law both online and some over the

3    phone.

4         Q.    And in fact, that report says you

5    surveyed -- or at least attempted to survey all of

6    the firms that were affected by the law.

7              Is that correct?

8         A.    That's correct.

9         Q.    What was the purpose of the survey?

10        A.    It was to provide data with which we could

11   estimate the impact of the law on covered businesses.

12        Q.    And why did you decide to survey every

13   single one of the firms?

14        A.    Because the universe was small enough that

15   we could do it.

16        Q.    I believe there's like 212, something

17   along those lines, number of firms in Boston affected

18   by that ordinance.

19             Does that sound about right?

20        A.    No.

21             I think you're referring to a separate

22   study that I did on the examining.  I've done 2

1    research projects around the effect of the Boston

2    living wage ordinance.

3                I believe the number that you're citing is

4    from the first, which was an examination of firms

5    that were covered under the initial Boston living

6    wage ordinance -- and I can't remember the year, but

7    somewhere in the earlier part of this decade, the

8    city of Boston substantially expanded their law, and

9    I had done a survey of firms covered under the

10   original law.

11               So we also wanted to go and survey firms

12   that were covered by the expansion.  We tried to

13   survey those firms before the law went into effect

14   and then after.

15   Q.    Why was it important to actually talk to

16   those firms?

17   A.    Most of my research in economics is very

18   data-driven and empirical, so you can't really do

19   empirical economics without data, so it was a data

20   collection exercise.  It was a question that we were

21   interested in examining.

22               There had been fairly little research done

1    looking at the impact before and after living wage

2    laws passed.  So this was a contribution to the

3    field.

4        Q.    Was there -- had there been studies on the

5    impact of living wage ordinances in other

6    jurisdictions?

7        A.    There have been, yes.

8        Q.    Why did you feel the need to do analysis

9    of what was going on in Boston in particular?

10        Why didn't you just rely on those other

11    studies?

12        A.    Well, what we were able to do with this

13    project, the grant that -- through the grant from the

14    Russell Sage Foundation, is, we were actually able to

15    apply a research methodology that had not been used

16    before in the examination of economic impacts of

17    living wage ordinances.

18        What we basically were allowed to do

19    because of this expansion of the law was to use what

20    we call a natural experiment methodology.  What it

21    allows you to do is to essentially have in some sense

22    a treatment and a control group.

1          In this case, the control group was, the

2     names were covered under the initial Boston living

3     wage ordinance.  They were already covered.

4          And we had the treatment group that

5     were -- the names were brought under coverage by the

6     expansion.  And so by looking at both groups before

7     and after the law, we were able to evaluate the

8     differential impact that the law had between the

9     treatment and control group.

10          That's a rough summary of the methodology.

11     This was the first time it had ever been done in the

12     arena of living wage policy.

13     Q.    At a high level, what was the information

14     you were seeking in those surveys?

15     A.    We were trying to find out what the

16     economic impacts were on employment, on provision of

17     benefits, on the viability of firms covered by

18     mandates such as living wage.  It's a big debate in

19     the economics profession, what happens when wage

20     floors are established.

21     Q.    What sort of analysis did you do once you

22     got the data back in?

1       A.    We did statistical analysis of the data.

2       Q.    Regression analysis of some sort?

3       A.    What are familiar?

4       Q.    Yeah.

5            What other analyses did you use?

6       A.    Just summary statistics.  We indicated

7  correlation coefficients.  I can give you more detail

8  if you're interested.

9       Q.    That's sort of the standard methodology in

10  your field as to --

11       A.    Regression.

12       Q.    No, no.

13            In doing survey work in analyzing the

14  results of the survey, did you follow the standard

15  methodology for reaching the conclusions that you

16  reached?

17       A.    Can you clarify a little bit what you

18  mean.

19       Q.    The steps that you took to develop the

20  survey and then to analyze the results of the survey.

21            Are those methodologies the standard,

22  accepted methodologies for doing both survey

1    collection -- or data collection using surveys and

2    then analysis of that data to examine what your

3    conclusion would be?

4         A.    To be clear, in the economics

5    profession -- it's a very big profession.  People use

6    all different kind of methods.

7              Some people use computer simulation

8    exercises.  Some people analyze time series data.

9    Some people analyze cross-sectional data, panel data,

10   high-level mathematical techniques to do pure theory.

11             So there's no one set of standard methods.

12   So --

13        Q.    I'm not saying that is the only method.

14             But the method that you selected is one

15   that is a recognized methodology.

16             Correct?

17        A.    That is correct.

18        Q.    As part of your efforts on living wage,

19   have you attempted to publicize the results of your

20   findings?

21        A.    Published both in popular and

22   peer-reviewed venues the results of my research, yes.

1        Q.    Any other steps -- did you attempt to get

2    out the fact that it had been published?

3              Did you do anything yourself with that to

4    let people know --

5        A.    Our institute publicized our research

6    through a variety of methods.

7              We sent copies of reports to interested

8    parties, journalists who had written about these

9    topics, other experts in the economics profession or

10   related disciplines like sociology or labor studies,

11   who might have an interest in our research.  The

12   institute maintained an email list of people who

13   liked periodic updates about what the institute was

14   doing.  We published it to that list of people.

15             I would regularly testify in front of city

16   councils or other subsets of public bodies like

17   county boards.  I might talk to the subcommittee of

18   the board of a particular city that dealt with

19   contracting issues about the findings of my research.

20       Q.    Did you send your research in that report

21   to politicians, or did the institute send the report

22   to politicians?

1      A.   To my knowledge, we only responded to

2   specific inquiries or in instances where we were

3   involved in providing -- or anticipated to provide

4   testimony, we would often send along materials that

5   we had written in advance of arriving on the day of

6   and providing in-person testimony.

7      Q.   I'd like to switch to talking about your

8   work at Labor Notes.

9      You mentioned it earlier.  Could you just

10   describe what Labor Notes is.

11      A.   Labor Notes is a project that is best

12   known for -- it's been around since 1979.  It's best

13   known for 3 types of activities.  We publish a

14   monthly magazine.

15      By our estimation, we're the largest

16   cross-union national publication in the United

17   States.

18      And we also hold conferences, national

19   conferences of union activists and other allied

20   organizations and individuals, which we typically

21   hold every 2 years, although over the 28-year period,

22   it hasn't been every 2 years.

1          We also organize trainings and workshops

2     and smaller educational events like 1-day schools for

3     union activists around the country.

4          Q.    What are your job responsibilities with

5     Labor Notes?

6          A.    I'm the co-director.  And that includes

7     everything from handling personnel issues and

8     tracking and monitoring the organization's finances

9     all the way to providing some of the content for our

10    monthly magazine.

11          I write stories on a fairly regular basis

12    for the magazine.  I also was the person who was in

13    charge of the redesign of our Website and continue to

14    play a technical role in our Website.  I'm the main

15    technical person on our staff for Website-related

16    issues.

17          Q.    Just staying for a second -- let me just

18    hand you what I'm marking as Brenner exhibit 3.

19                          (Brenner Exhibit No. 3

20                          was marked for

21                          identification.)

22          BY MR. CLASH-DREXLER:

1          Q.    Can you identify that document,

2     Dr. Brenner?

3          A.    Sure.

4                This appears to be a printout of the page

5     where we list the staff members at Labor Notes.

6          Q.    This is off your Website?

7          A.    That's correct.

8          Q.    When I used "you," I was talking about

9     Labor Notes.

10               It mentions in the section about you that

11    you currently cover SCIU, teachers, higher education,

12    and the living wage movement for the magazine; is

13    that correct?

14         A.    That is correct.

15         Q.    What does it mean that you cover SCIU?

16         A.    The way that we organize coverage in our

17    magazine is by a system of beats.  I don't know if

18    you're familiar with the beat system in journalism.

19         Q.    Give me a short description of what you

20    mean by that.

21         A.    What it means is that individuals at the

22    organization tend to follow developments inside of

1    unions and inside of specific industries that are

2    within their beat areas.

3         Q.    And how do you go about covering -- let's

4    take SCIU as an example.

5         A.    There's a variety of ways that we do our

6    beat work.

7         Q.    Let's talk about SCIU.

8         A.    This is true for SCIU as well.

9              They include reading what is published

10   about the organization or the industry in the

11   mainstream press, what is published by the

12   organization itself in the case of SCIU, what they

13   release in terms of their own publication, online

14   Websites that they establish.

15             I try to follow what they're doing as an

16   organization nationally and then also the various

17   locals within the union.  We try to maintain regular

18   contact with the subscribers and supporters who are

19   SCIU members.

20             So that involves periodic email and phone

21   conversations with people who are in that union.

22        Q.    And so you are the person at Labor Notes

1    who is the primary person with responsibility for

2    SCIU; is that right?

3        A.    Technically, yes.

4            SCIU is a very large union and it covers a

5    lot of work in the health care arena, and so because

6    it's so big, we actually separate health care

7    coverage between -- we separate SCIU coverage between

8    myself and the co-editor, William Johnson, who covers

9    the health care portion of SCIU's work, whereas I

10   cover most of the nonhealth care-related issues and

11   developments.

12       Q.    How much of your time would you estimate

13   is spent on contacting the subscribers or members

14   from any particular union?

15       A.    I don't have a precise estimate.

16           But I would say that at least a third of

17   my work in the organization relates to the magazine,

18   and some set of that -- a large set of that is

19   maintain contact.

20           It's a bit fuzzy sometimes, because for

21   example, there are people on our policy committee

22   that I relate to as part of our board, so to speak,

1   who also happen to be in my beat areas.  So I'm

2   relating to them as board members but also relate to

3   them as somebody who -- as people who have

4   information about the beats that I follow.

5           So the lines are a little blurry.  That's

6   a ballpark.  I wish I knew better as a manager.

7       Q.    That's okay.

8           Looking down on this exhibit 3, Chris

9   Kutalik, K-U-T-A-L-I-K, is that a he?

10      A.    It's a he.

11      Q.    He covers the Teamsters; is that correct?

12      A.    That is correct.

13      Q.    Are there different issues that are

14  affecting SCIU than issues that are affecting the

15  Teamsters?

16      A.    Yes.

17      Q.    And that's one of the reasons why you have

18  different people who it's their responsibility to

19  cover that; is that correct?

20      A.    This is correct, although with both the

21  Teamsters and SCIU, there's considerable amount of

22  overlap between beats.

1          For example the Teamsters union is part of

2     a newly formed labor federation called Change to Win.

3     They are 2 of the largest unions inside of Change to

4     Win, the Change to Win federation.

5          So to the extent we're covering issues

6     related to the Change to Win, national union

7     politics, the lines are very blurry.  Similarly,

8     there are developments around national political

9     issues or policy issues like the debate about health

10    care or immigration that happens in the country that

11    the unions are involved in that are not specific to

12    the units.

13         And so there's a lot of blurring of lines.

14    Q.    You'd agree with me that Chris is talking

15    to different people -- in his contacts with members

16    of the Teamsters, he's talking to different people

17    than you're talking to when you're reaching out to

18    members of SCIU?

19    A.    Sure, although there's overlap.

20         I have people that -- our beat lines are

21    not bright lines, let's say, that there are people

22    that I know through my past labor activism that

1    happen to be Teamsters that I continue to maintain

2    better and more intimate relations with than Chris,

3    but that's an accident of history in some sense.

4        Q.    Let's talk a little bit about your role in

5    developing the Labor Notes Website.

6              When was the site developed?

7        A.    The site was developed over a period of

8    about a year.  We started when I joined the staff --

9    my role in it began -- the process really began in

10   earnest when I joined the staff in 2005 in the fall.

11             My role was primarily to coordinate

12   discussions with staff and off-staff leaders about

13   what our needs were, to identify different technical

14   and technology-related considerations.

15             And specific, we had a lot of debate about

16   whether we wanted to employ a content management

17   system, if we did want to, and if so, which one.

18   There are many different content management systems

19   out there.

20       Q.    What is a content management system?

21       A.    It's a software package that resides on a

22   Web server that allows people managing a Website more

1    ease with which to maintain dynamic, fresh content.

2    It allows -- it simplifies the process of getting

3    content up on a Website by separating the content

4    creation, i.e., the authoring function of content

5    from the technical side of content formatting and

6    display.

7            So the content management system allows

8    you to deploy common format, let's say, for a

9    particular type of content.  In our case, for

10   example, Labor Notes is primarily a publication where

11   we write stories about issues, so we publish those

12   magazine stories, a subset of them online.  We have a

13   common format that we use.

14           So the content management system allows us

15   to be able to have the people who actually put the

16   content -- who create it and who put it up online to

17   not have to have the skills required to actually

18   format it to make it look pretty.

19           I'm trying to use lay language here.

20   Q.    Who would you describe as the audience for

21   the Labor Notes Website?

22   A.    Our primary audience has been and most

1    likely will always be rank and file union members and

2    their allies in various social justice movements,

3    peace movement, the civil rights movement, the

4    student movement.

5            So these are people who are engaged as

6    active union supporters, people who participate in

7    their unions who are supportive of unionism in

8    general.

9        Q.    When you started -- how long has Labor

10   Notes been in existence?

11       A.    We were founded in 1979, so 28 years.

12       Q.    And before you started in September of

13   2005, did Labor Notes have a Website?

14       A.    Yes, it did, although it had a static HTML

15   format whereby each page had to be created

16   individually and uploaded to our server using file

17   transfer protocol.

18           (Recess.)

19           BY MR. CLASH-DREXLER:

20       Q.    Dr. Brenner, before we broke, you were I

21   think just telling me that before you arrived at

22   Labor Notes, the Labor Notes Website was a static --

1     static pages with HTML format; is that right?

2         A.     M-hm, static HTML.

3         Q.     And I think you said each page was created

4     separately; is that right?

5         A.     That's correct.

6         Q.     Have you switched to using dynamic pages?

7         A.     We use a content management system on our

8     Website.

9         Q.     Does that mean that when a visitor is

10    seeking a document that it's drawing it from a

11    database?

12        A.     That is correct.

13        Q.     I notice that on your Website you have an

14    RSS -- you allow for RSS feeds?

15        A.     We have 3 I believe.

16        Q.     Is that built into your content management

17    system?

18        A.     It is.

19        Q.     Are any of the static HTML pages linked to

20    your RSS feeds?

21        A.     I'm sorry.

22              What do you mean by that?

1          Q.    Can somebody who signs up for an RSS feed

2    from Labor Notes -- does that access any of the

3    static pages on the Labor Notes Website?

4          A.    Are you referring to our old content?

5          Q.    I'm switching.

6                I'm sorry.

7                Because now you have under your new

8    system -- I assume you have static -- some static

9    HTML pages; is that right?

10         A.    There may be, although I can't -- it's

11   possible that there are, but in general, most of the

12   pages on our Website are actually -- even the ones

13   that are static pages are part of the content

14   management system and created through it, so the

15   static content is still stored in a database and

16   drawn from a MySQL database, so for example, this

17   page, people at Labor Notes, is a static page in my

18   estimation, but it's nonetheless information that's

19   stored in a database, and when you go to visit it,

20   that information is pulled down from the database and

21   displayed in realtime.

22         Q.    Is that static page included in your RSS

1    feed?

2        A.    No.

3            We -- in our RSS feed, we've tailored to

4    display 3 types of concept in our site, because for

5    our purposes, we want to promote extensively various

6    types of our information more than others.

7            For example, the biggest one that we

8    promote is our magazine articles, so we have an RSS

9    feed that's specific to our magazine stories.  The

10   way that it works inside of our content management

11   system that we have a custom content category that

12   every magazine story is created under, and the RSS

13   feeds pulls all of those specific types of content

14   and feeds them into the RSS feed.

15           Is that clear enough?

16       Q.    Yes.

17           I want to talk about that transition from

18   the older Website to the newer Website.

19           Again I think that process started when

20   you arrived at about September of 2005; is that

21   correct?

22       A.    That's right.

1          Q.    And who was responsible for actually the

2     mechanics of changing the Website, the technology

3     behind making the changes in the Website?

4          A.    The way that our Website was redesigned

5     involved several people.  We hired a person who was

6     an independent consultant who did graphics work, who

7     developed the look so to speak of the Website.

8               And then when we made a decision to

9     utilize a specific type of content management

10    system -- it's called Drupal, D-R-U-P-A-L.  It's a

11    very popular content management system, open source,

12    which means free to the public.

13              It is -- when we made the decision to use

14    this particular system, we also engaged a company

15    called Eggplant Active Media -- like the vegetable,

16    although technically may be a fruit.  I'm not an

17    expert on it.

18              They were -- they're a company that at the

19    time provided technical expertise taking designs and

20    Website deployment strategies that small

21    organizations like ours had and fitting it onto the

22    framework of the Drupal content management system.

1         So I worked very closely to take the idea

2    that the designer had for the new look of our site

3    and fit it both into the framework of the content

4    management system as well as the content management

5    system framework of Labor Notes' priorities in terms

6    of developing new Website functionality.

7         Q.    Were you writing the code for the Website?

8         A.    Can you be a little bit more specific what

9    you mean?

10        Q.    Who is responsible for -- let me ask this

11   question:  Did you play any role in any of the

12   programming -- programs that are on the current Labor

13   Notes site?

14        A.    One of the virtues of content management

15   systems is that that there are packages that have

16   already been written, so this was really a deployment

17   of a software that we were modifying to our specific

18   design.

19        I played a role in some of the templating.

20   I don't know if you're familiar with that term.  I

21   also wrote some custom PHP scripts for our new site.

22        Q.    What steps did you take to help with the

1      templating of the site?

2          A.    Well, in some instances, I was working

3      with a particular developer at Eggplant Active Media.

4      In some instances, I was working with a particular

5      developer to refine a template that he developed.

6                In other cases, I developed templates

7      myself, and in at least one instance got feedback

8      from this developer about improvement on my template,

9      and others, I just did it myself.

10         Q.    And how does one go about developing a

11     template?

12         A.    Without getting too much into the

13     specifics of the content management system, the way

14     Drupal works is, it has some categories of content

15     that are preprogrammed, built into the system.

16               For example if you want to have a blog, it

17     has the capacity out of the box to create a blog,

18     B-L-O-G.  Okay.  So -- but it also has the capacity

19     to create custom content types.

20               And when you create a custom content type,

21     you have to format the way in which it is displayed

22     on the Website.  So what that involves is, it

1  involves taking a PHP script that has been written

2  and modifying elements of it to in some cases hide

3  particular pieces of information, in other cases to

4  say display them in different order.

5           For example, if we had no template for a

6  magazine story, it would display the user name of the

7  person who put it into our site.  It would display

8  the date.  It would display whether that article is

9  available online or not.

10          There's a check box, and it would display

11  a yes or no.  It is available online.  It would

12  display other types of information like that that are

13  relevant to us in terms of how we manage content, but

14  aren't necessarily relevant to visitors to our site.

15          So we display certain key parts, title,

16  author, body of the story, and other pieces of

17  information related, but not other parts.  So I was

18  responsible for -- for those formatting questions,

19  how to make it look the way we want it, along with

20  our consultants.

21          But everything that's happened since we

22  launched the site in October of last year has been on

1    my shoulders.  We don't -- in other words, we don't

2    have an ongoing relationship with Eggplant Active

3    Media.  We finished our work with them last spring.

4        Q.    So you're responsible for any updates to

5    the site?

6        A.    That is correct.

7        Q.    How often do you update the site?

8        A.    Can you define what you mean by, update?

9        Q.    How often is any new information put onto

10    the Website?

11        A.    It varies.

12            We put information on the site sometimes

13    every day, sometimes once every 2 weeks.  It really

14    depends on the flow of information to us.

15            We have regular intervals that we publish

16    content around the publication of our magazine, but

17    we have all sorts of other types of content that we

18    publish in between the magazine publication schedule.

19        Q.    And every time -- I'm sorry.

20            Go ahead.

21        A.    May I clarify one thing?

22        Q.    Absolutely.

1   A.  When you said, update the Website, I

2 thought you meant update the technical updates.

3     You know, software, special source

4 software frequently is improved, and new versions are

5 published, so as a user, sometimes you want to update

6 for more functionality, other times because there are

7 security patches that you need to apply.

8     I handle what you might call the technical

9 back-end updates.  I'm not responsible for publishing

10 every piece of content that's put up on the Labor

11 Notes Website.

12     In fact primarily I don't deal with the

13 content that goes up on the site.  I deal with the

14 plumbing as we call it.

15   Q.  Who is responsible for publishing content

16 that goes on the Website?

17   A.  The 2 people who primarily put up the

18 content are Tiffany Ten Eyck -- her name is spelled

19 T-E-N, second word, E-Y-C-K -- and Ellis Boal,

20 B-O-A-L.

21   Q.  What are the steps to publish or put

22 content onto your Website?

1          A.     Drupal -- in order to publish on our site,

2    you have to have a user name and a password to log in

3    to be able to post content, so you go to a particular

4    URL, log in, and then you choose a new item, which

5    is, create content, and it allows you to create

6    different types of content depending on the

7    permissions that you have as a user.

8          Q.     Is that all done in sort of a structured

9    format?

10             Let me ask it differently.

11             Do they have the ability to change the

12    look of a page, or are they just putting information

13    up onto the Website?

14          A.     Can you explain a little bit what you mean

15    by, the look of a page.

16          Q.     Sure.

17             You talked about that you worked with

18    different consultants or developers to help with the

19    graphics, you said how it would appear, I think.

20          A.     That's correct.

21          Q.     When they're putting content onto the

22    Website, do they have any ability to change the way

1    the page appears?

2         A.    The answer is yes and no.

3              Within certain parameters, they can make a

4    page look different from another page.  For example,

5    if you are posting a magazine story that has a photo

6    associated with it, they can include the photo in the

7    story, or they can not include the photo, but they do

8    not change the banner, the blocks that are displayed

9    on the side of the page, the information that's

10   displayed at the footer of the page.

11             Those are things which are controlled in

12   the template, and are typically not things that you

13   want -- the goal is to have -- is not to have to have

14   the expertise to modify very fundamental part of the

15   Website but to isolate the pieces that you want

16   people to be able to modify and reduce the technical

17   requirements necessary for modifying those pieces so

18   that more people can participate in posting of

19   content.

20        Q.    Let's just take the example you gave of

21   adding a photograph to a page.

22             In the way your system is set up, do they

1    just click a button and it says, add photo here?

2              What's the process that they follow to add

3    that picture?

4         A.    To the best of my recollection, the steps

5    are -- there's 3 steps.

6              First you have to upload the image to the

7    site.  You do that through a Web interface.  You do

8    click a button that is the image of a photo.  That

9    brings up another window where you specify the

10   location of the photo on your hard drive.

11             You give it a title.  If you want to

12   include other identifying information, keywords or

13   whatnot related to the photo, you do that.  And then

14   you have to submit that piece of content.

15             The photo becomes another piece of

16   content.  And that has to successfully occur before

17   you can then go to the second step, which is to

18   actually insert the belong of code that is necessary

19   to display -- that's preprogrammed to display the

20   photo.

21        Q.    Is there a button on your content

22   management system where you -- say if you want to

1    insert a photo, there's -- like a lot of Web page

2    developers, you click a button that says, insert

3    photo, and then it let's you draw a little box and

4    the photo gets put in there?

5        A.    Ours is not that simple.  We want to have

6    slightly more control than what you're describing.  I

7    wouldn't say "slightly."  We want to have more

8    control than what you're describing over the

9    placement, the sizing, the actual HTML code which

10   will regulate the way that that image is displayed.

11            So the second step is the insertion of the

12   code, which will occur -- assuming the first step

13   goes successfully, the second step will go almost

14   automatically. And then, in the middle of your

15   content, you will see HTML code.

16            Now, in Drupal, the content management

17   system that we use, you do not have to place content

18   on the Website in HTML.  It's possible to upload

19   plain text and have it display.

20            Now, if you want it formatted a specific

21   way, for example, if you want a subhead to be bold,

22   larger case, if you want specific formatting of

1    paragraphs and whatnot, you can't just upload plain

2    text.  If you upload plain text, it will be displayed

3    in a specific way.

4            But it's possible to also then upload

5    different types -- different levels of HTML code,

6    like you can use plain text together with filtered

7    HTML, which will only recognize certain kinds of HTML

8    coding like a-tags or H 1s or H 2s.  We can control

9    what HTML tags are actually recognized and which ones

10   aren't.

11           You can upload full HTML or unfiltered

12   HTML.  You have a lot of options and control, which

13   is partly why we liked the content management system.

14           So getting to your last -- the last part

15   of your question about the steps to upload a photo,

16   the third step you have to take is, you have to

17   actually look at the code and decide, do you want the

18   photo displayed on the right or left side and how big

19   do you want the photo to be on your page.  You have

20   to set the pixel width of the photo.

21           Now, in our system of uploading content,

22   we've standardized sizes that we use for various

1    images that display on our site.  So you as a staff

2    person working with photos will presize a photo to a

3    specific pixel width before you upload it.

4           So then you usually don't have to set the

5    pixel width on an image.  It will just be reflected

6    from the size of the image that is uploaded.  That's

7    our protocol, but you then you need to at the minimum

8    set alignment left or right.  If you want to

9    eliminate the caption, you have to do that by hand.

10    Q.    We were talking a little bit earlier about

11    the RSS feeds on your Website.

12           When was that feature added to the Labor

13    Notes Website?

14    A.    I don't recall.

15    Q.    It was after you arrived?

16    A.    We added RSS feeds to our old site, or we

17    were in the process of developing RSS feeds for our

18    old site through a service that we never used to my

19    recollection.  We used RSS feeds from the content

20    management system once we set it up, although not

21    right away.

22           We had several -- if you've ever built

1    Websites and launched them, you probably had the

2    experience where you have certain things that have to

3    be done before you launch, certain things that you'd

4    like to be done, and certain things that you'll deal

5    with at some time after the site is launched.

6          The RSS feed was in the like to be done

7    category.  We didn't actually have it ready at

8    launch, but we added it shortly thereafter.

9    Q.    Is it possible to have an RSS feed from a

10   static HTML-formatted page?

11   A.    There are services that exist that can

12   provide this to you that can index your pages and

13   provide an RSS feed.  There do exist services that

14   can do that.

15   Q.    Is that a typical way that RSS feeds work?

16         Let me ask the question differently?

17         Do RSS feeds -- are they typically drawing

18   from static HTML pages?

19   A.    Let me answer the question the way I

20   understand it.

21         Most sites that have RSS feeds have the

22   RSS feed generated from within the site.  It's built

1    into the system that people use to manage the site.

2    Many sites build static HTML pages that are fed from

3    the RSS feed.

4                That's typically a feature of a site.

5    It's not something that is done through custom

6    scripting or other ways that could take a set of

7    static pages and generate the requisite information

8    required for an RSS feed.

9         Q.    So for instance the Website, Blogger,

10   B-L-O-G-G-E-R, has an RSS feed built into the system,

11   doesn't it?

12        A.    That is correct.

13        Q.    So what you were describing before is

14   typically -- typically people are using RSS feeds.

15   It's built into the functionalities of the program

16   they're using.  They're not creating it themselves.

17                Is that what your testimony was?

18        A.    What I think I said and believe is true is

19   that most sites that publish RSS feeds are generating

20   that RSS feed as part of the content management

21   system for that site.

22                Whether it is a commercial content

1    management system that is customized developed for

2    that particular Website like the Wall Street Journal

3    or The New York Times or whether it's something that

4    is a function of the Website itself like Blogger or

5    whether it's part of a content management system that

6    has been installed on a site such as Word Press or

7    Drupal, typically my experience has been that the RSS

8    feeds that both I use and other people I know and

9    have worked with use come from within the content

10   management on the site.

11        Q.    If your site does not employ a content

12   management system, what ability is there to have an

13   RSS feed in your Website?

14        A.    Services do exist that can come to your

15   site and index the static HTML pages that are on your

16   site and produce a feed from that.  It's also

17   possible to -- services also exist where you can go

18   and enter by hand information that you wish to be

19   displayed in an RSS feed.

20             As I said also, I'm not very familiar with

21   these services.

22        Q.    Would you be able to tell me how

1    widespread the use of those services are?

2         A.    I don't have any statistics as to the

3    proportion, no, I don't.

4         Q.    Have you ever installed one of those

5    systems on a Website?

6         A.    They typically aren't installed on sites.

7               There are services that you sign up for

8    that essentially if you do the installation correctly

9    are directed to your site and out of very delicate

10   coding, extract a feed from your static HTML page.

11        Q.    Have you ever installed one of these

12   services on a Website?

13        A.    No, I've never used one of these services.

14        Q.    Can you identify any of these services?

15        A.    Not offhand, but I'm familiar with them

16   and have seen them, visited their sites, read about

17   the services.

18        Q.    Now you've said you're familiar with them.

19   A few minutes ago, you said you weren't very familiar

20   with them.

21               Is it your testimony that you're aware

22   that they exist, but you have haven't utilized them?

1          Is that a fair characterization of your

2   testimony?

3       A.    What I would say is that I'm much more

4   familiar with RSS feed generated from within content

5   management systems as custom designed as part of a

6   service like Blogger or out of the  box like Drupal

7   than I am with these other services.

8          But I do know they exist, have read about

9   them, but have not installed them myself or utilized

10  them myself on a static HTML site.

11      Q.    I'd like you to turn to your declaration,

12  which is Brenner exhibit 1.  Turn to the second page,

13  to paragraph 5.

14         Are you with me?

15      A.    Yes.

16      Q.    It starts off, says:  I have worked with

17  the unions and directly with the union members to

18  teach them how to run effective union campaigns.

19         Do you see that?

20      A.    I do.

21      Q.    Which unions have you worked with?

22      A.    I've worked with many different unions,

1    various AFSCME locals.  That's A-F-S-C-M-E.

2         Q.    Can you tell me which locals?

3         A.    AFSCME Local 1000, Local 3299, Local 101.

4    I've worked with members in --

5         Q.    Let's keep with the unions.

6               Are there any other unions that you've

7    worked with?

8         A.    I've worked with the Communication Workers

9    of America.

10        Q.    With the international?

11        A.    Never with the international.  With

12   various CWA locals.

13        Q.    Do you remember which locals?

14        A.    I don't remember their numbers exactly,

15   but in California, some in New Jersey --

16        Q.    How many?

17        A.    -- in Massachusetts.

18        Q.    How many CWA locals?

19        A.    Campaigns more generally, or about

20   technology?

21              The statement I made is that I worked with

22   them to teach effective campaigns, which include the

1     use of technology.  I've worked with at least a half

2     a dozen different CWA locals.

3          Q.     On technology or generally?

4          A.     Generally.

5          Q.     And you gave me 3 AFSCME locals.

6                 Are there any others?

7          A.     Yes, although the numbers I don't want to

8     confuse, because in New York I believe there's about

9     60 different locals inside of the district council in

10    New York City proper.  And I've worked with several

11    of them.

12         Q.     How many AFSCME locals do you think?

13         A.     I would say maybe 2 or 3 conservatively.

14         Q.     In addition to the 3 that you already gave

15    me?

16         A.     Correct.

17         Q.     So maybe 5 or 6 is the right number?

18                You gave me AFSCME Local 1000, 3299.

19         A.     That's a fair estimate.

20         Q.     Other than AFSCME locals and CWA locals,

21    any other unions that you've worked with?

22         A.     Sure.

1          I've worked with a couple of Teamster

2     locals.  I've worked with NEA.

3          Q.    Let's start with the Teamster locals.

4                How many have you worked with?

5          A.    I would say half a dozen or less, being

6     conservative.

7          Q.    And NEA locals, how many?

8          A.    More because I came out of the NEA, so I

9     continue to maintain a fair amount of contact with

10    NEA.  I would say a dozen or less.

11         Q.    How long were you an NEA member?

12         A.    5 or 6 years.  I can't remember exactly

13    when my position became bargaining-unit-eligible, but

14    5 or 6 years.

15         Q.    And what was the local of NEA you were a

16    member of?

17         A.    The Massachusetts Society of Professors.

18    It was the faculty and librarian unit at the

19    University of Massachusetts.

20         Q.    Did you hold any leadership positions?

21         A.    I was the secretary of the local.

22         Q.    How big is that local?

1    A.    About a thousand people.

2    Q.    Is that an elected position?

3    A.    Yes.

4    Q.    When were you elected to that position?

5    A.    I don't recall what year.

6    Q.    Just generally, what were the 5 to 6 years

7    that you were in that local union?

8    A.    1999 or 2000 roughly to the time I left

9    the university, September 2005.

10    Q.    And how long did you serve as the

11    secretary?

12    A.    Probably about half of that time I believe

13    I was a local officer, part of the executive

14    committee.

15    Q.    You said you worked with about a dozen or

16    around that number of locals.

17         Can you identify the locals for NEA?

18    A.    If I had to come up with an exact list,

19    no.

20         I can tell you, mostly in Massachusetts,

21    also locals in Vermont, New Jersey, California.  I'm

22    not sure if the units that I've worked with in

1    Illinois are also NEA members.

2              The NEA and the FT have certain areas

3    where the locals have joint membership, so I've

4    worked with locals, some of which are joint NEA, FT

5    locals and some aren't, and sometimes it's confusing

6    which are which.

7         Q.    Let's just -- can you tell me what you

8    mean when you use the word union campaign in

9    paragraph 5?

10        A.    Sure.

11             It means a lot of things, but things like

12   contract campaigns.

13        Q.    What's a contract campaign?

14        A.    Contract campaign is typically an effort

15   by a local union, but it can also be an international

16   union or a regional union body, to initiate a process

17   of member mobilization, education, and activity in

18   advance of the expiration of a contract.

19             So it's a way unions have engaged their

20   membership to try to have better results in

21   collective bargaining.  It's a way of bringing to

22   bear the leverage of the membership with the

1    employer.

2         Q.    What else do you mean when you use the

3    word union campaigns?

4         A.    For example unions in the public sector

5    are often faced with reductions in force owing to

6    budget cuts.  For example in Massachusetts where I

7    lived for a number of years, our union and most of

8    the public sector unions in the state were faced with

9    fairly substantial budget cuts during the crisis in

10   2002, 2003, which the reverberations of which

11   continue today.

12         So our union initiated together with

13   public sector unions from across the state a campaign

14   to try to minimize the impact of budget cuts on

15   state-provided services such as health care,

16   education, and the like, where a large share of the

17   cuts were being made.

18         So we -- that type of campaign is the type

19   of campaign that I have worked with various unions

20   around.  For example next weekend I'm going to be at

21   Rochester working with a workshop at a conference for

22   members of AFSCME Local 1000 in the state of New

1    York.

2        Q.    When you say you're running this

3    conference for AFSCME Local 1000, have you been hired

4    by the union?

5        A.    I'm definitely not running it.

6              Yes.  I'll be providing a workshop.  I'm

7    being paid by the union to come up and provide the

8    workshop.  Labor Notes will actually receive the

9    money.  I'm providing the workshop.  I'm not going to

10   receive any individual remuneration for it.

11       Q.    Let's focus on the NEA locals again.

12             What was the nature of your work with the

13   NEA locals?

14       A.    Well, some of it revolves around these

15   types of issues around budget fight-backs or dealing

16   with contract issues.

17             But also last year I worked with some NEA

18   locals in Massachusetts as part of an initiative

19   to -- that the state union -- the Massachusetts

20   Teachers Association is engaging to transform their

21   union from a services model to an organizing model.

22             So I was part of a retreat of 12 different

1    locals in the state where we were essentially trying

2    to help develop a pilot organizing project or program

3    for these locals.  My focus was primarily on the ones

4    at the universities, of which there are 3, but I also

5    was meeting with other locals and talking with them

6    as a weekend retreat last spring, a year ago in the

7    spring.

8        Q.    Let's talk specifically -- I want to focus

9    on your work with unions -- on the second part of

10   that first sentence in paragraph 5 that your work has

11   included how to make effective use of technology and

12   how to use the Web to build communities of interest

13   around union election.

14           Did I read that correctly?

15       A.    M-hm.

16       Q.    So which unions have you worked with

17   related to that part in paragraph 5?

18       A.    Can you explain what you mean, work with?

19       Q.    I'm just using your terms.

20           You said, I've worked with unions to teach

21   them how to run effective union campaigns.

22           Then the sentence goes on from there.

1          I want to know which unions you worked

2     with to talk about how to make effective use of

3     technology and the rest of that first sentence.

4          A.    I would say that the majority of that

5     sentence, the emphasis of that part, including how to

6     make effective use of technology, applies to the

7     union members more than the unions, although for

8     example in the work we did around budget cuts and

9     fight-backs in Massachusetts, that had an Internet

10    component to it, which we discussed and talked about

11    and evaluated.

12         Q.    What was the Internet component of that

13    work?

14         A.    The local unions were interested in

15    figuring out what would be the best way to use the

16    Web to promote their efforts to preserve social

17    services in the state, and it involved both broad

18    discussions of how to effectively use the Internet

19    for campaigns that have both union members as

20    audiences as well as the general public, but also

21    some of the specifics about what would the

22    requirements be if you wanted to launch a Website,

1    what kind of Website is easy to maintain, you know,

2    helping the union members and locals in question

3    really have enough information to make an informed

4    decision about what they might want to do.

5        Q.    How big a part of your work in that

6    project dealt with these technology issues?

7        A.    It was -- it's hard to give an answer to

8    that question because it was a multiyear process that

9    I was involved in both as a member and also after I

10   left the bargaining unit.  It varied at different

11   stages.

12       Q.    Did you develop a Website for them?

13       A.    We did.

14       Q.    What role did you play in the development

15   of the Website?

16       A.    I built it and maintained it at one moment

17   in the campaign.  In a later phase, I provided

18   technical expertise so to speak to the person who

19   ultimately developed their Website.

20       Q.    What steps did -- what was the

21   organization or the union that this work was for?

22       A.    It was both my own union -- it was also

1    the other NEA-affiliated unions at the University of

2    Massachusetts.

3        Q.    If I refer to it as the Massachusetts NEA

4    project, we're on the same page?

5        A.    It wasn't just the NEA.  It was also --

6    all the --

7        Q.    Why don't I call it the Massachusetts

8    project.

9        A.    That's fine if you're looking for a

10   shorthand.

11            If you're trying to characterize it, we'll

12   have to talk some more.

13       Q.    No.

14            I'm just shorthand.

15            What steps did the unions in the

16   Massachusetts project take to publicize their

17   Website?

18       A.    They published it in their written

19   materials.  They circulated it via email to their

20   members, to supporters in the community, to local

21   officials and politicians.  The Website had many

22   different purposes.

1           Sometimes it was for information

2    dissemination.  Other times it was to help us

3    coordinate for example a large-scale action that we

4    did in Boston where we had buses coming from all over

5    the state.

6           A lot of it was getting statistical

7    information out to the people who were going to be on

8    the buses, that sort of stuff.

9    Q.    Other than the work you did on the

10   Massachusetts project, any of the other unions that

11   you've worked with, did it relate to the second part

12   of paragraph 5, how it make effective use of

13   technology?

14   A.    I'll say no for now.  There may be

15   examples.

16   Q.    If you remember something else, just let

17   me know.

18   A.    Will do.

19   Q.    So let's talk about the union member

20   component of paragraph 5.

21          Why don't you give me just sort of a

22   summary of the work you've done with union members

1    both to run effective campaigns in the full sense of

2    that word, and then we can talk a little bit more

3    about the --

4         A.    I thought you said I could get out of here

5    by 5.

6         Q.    That's why I just want a summary.  Let's

7    start with that.

8         A.    I really can't give an effective summary

9    of the bigger one, because this is sort of what we do

10   every day.  We get calls from around the country

11   almost every day of people looking for information,

12   for advice, people who for example have been

13   disciplined at work and can't get information out of

14   their steward or they don't have one, their local

15   union is nonresponsive to their inquiries.

16         People will call us and ask for advice all

17   the way from those kinds of examples all the way up

18   to situations where we're doing training of the kind

19   I just described that I'm doing with AFSCME Local

20   1000 next weekend.

21         So it runs the gamut in terms of the kinds

22   of issues that I may be asked to provide counseling

1    or expertise to union members on all the way up to

2    what I do in a more ongoing way with unions

3    themselves.  So it really covers the whole field.

4         Q.    Let's focus on the work you've done with

5    union members on technology issues.

6              Why don't you give me a general

7    description about that, and then we'll talk about it

8    in more detail.

9         A.    This is a heterogenous category.

10             What I do is, if somebody calls up and has

11   a question of -- or sends an email and has a question

12   about what should I do, I want to set up a Website

13   for my local, how can I do that, that email might get

14   forwarded to me, and I can just provide some basic

15   guidance to a union member who has those kinds of

16   questions.

17             Typically in that kind of a setting, I

18   might talk through with him the different kinds of

19   options, help assess their skills, what they know

20   about Web page creation and management, do they know

21   what file transfer protocol is.  If they don't, it's

22   a good sign that they might need something simple,

1    try to help find the right technology for their skill

2    level that also fits their needs.

3         It also goes all the way to talking with

4    people who are going to run for union office, helping

5    them figure out how to set up a campaign Website,

6    what that might look like.  I haven't ever helped

7    someone do that.

8         I just provide generally advice or

9    technology expertise to people.

10   Q.   So what information are you giving?

11        Let's take a step back.

12        How many union members have you spoken to

13   about creating campaign Websites?

14   A.   That's a hard question to answer.  I don't

15   have a real figure in mind.

16   Q.   50 members?

17   A.   No.

18        I would say less than a dozen.

19   Q.   What unions were those people members of?

20   A.   A variety of unions.

21        I can remember talking to people from -- a

22   teacher in particular, talked to people in the

1    Teamsters about this.  Trying to recall if there's

2    specific unions that jump out at me.

3              I can recall those 2 because they were

4    fairly recent or large-scale.

5         Q.    Any members of the International Union of

6    Operating Engineers?

7         A.    No.

8         Q.    Has any member of the IUOE -- I'll use

9    that shorthand for the International Union of

10   Operating Engineers -- ever contacted you about

11   technology issues?

12        A.    No.

13        Q.    How regularly are you getting calls from

14   union members about technology issues?

15        A.    I can't say.  I don't have a way to

16   estimate that.

17        Q.    Out of all the calls you get, would you

18   say it's 10 percent of your calls?

19        A.    No.

20              I get 30 calls a day.

21        Q.    Are half of those about technology issues?

22        A.    No.

1          The vast majority of the calls I get are

2     not related to technology, but I get so many calls

3     that that really isn't saying anything.

4          Q.    Out of those 30 calls that you get a day,

5     would you say as a general matter 5 of them are about

6     technology issues?

7          A.    No.

8               I really can't say.  I can't give you a

9     sense of it.  I don't spend the majority of my time

10    providing assistance on technology to union members.

11    I can say that with certainty.

12              I also would say that it's not just people

13    who call cold that we provide assistance to.

14    Sometimes people who we're talking about for other

15    reasons, like I'm doing a story about a wildcat

16    strike in West Virginia, or writing something about

17    what's happening with No Child Left Behind, these are

18    examples of my beat of stories I've written.

19              I might be talking with them about the

20    story, and some issues of technology might come up in

21    conversation, and I'll talk with them about it, and

22    it will turn into a conversation about these issues,

1    effectively, but it wasn't the purpose of the call.

2            So I talk very frequently with people

3    about these issues in ways that aren't initiated by a

4    call to our office about a technology question.

5            It's hard for me to provide you an

6    accurate answer.

7        Q.    Let's divide these up into 2 categories.

8            So the union members who are calling in,

9    maybe less than a dozen of those calls were about

10   creation of campaign Websites.

11           Correct?

12       A.    I think I said that, yes.

13       Q.    Has it ever come up in any of these calls

14   that you were just describing the issue of the

15   creation of a campaign Website?

16       A.    Sure.

17           I wouldn't say it comes up most of the

18   time.  I would say it comes up a minority of the time

19   that I'm talking with people.

20           The Internet is becoming more and more an

21   element of people's daily lives and of union

22   activity, so more and more frequently I find myself

1    discussing technology issues or Internet issues with

2    union members who are calling.

3        Q.    I just want to know how many times outside

4    of these cold calls you've talked with somebody about

5    the -- talked to a union member about the creation of

6    a campaign Website.

7        A.    I can't give you a number.

8        Q.    10 times?

9        A.    I would say definitely 10 times, probably

10   twice, 3 times.

11       Q.    So maybe 30 times?

12       A.    I said I can't say.

13       Q.    Is it a hundred times?

14       A.    I can't give a number.

15             How many times can I say that?

16       Q.    This is why I'm asking the question.

17             You are stating that you have a detailed

18   understanding of what it takes for a union candidate

19   to establish a Website, and I'm trying to understand

20   what your experience is in communication with union

21   candidates.

22             You said in your declaration that you have

1    worked directly with union members.

2         A.    This is correct.

3         Q.    So I'm trying to understand exactly what

4    you meant by this declaration.

5              If your answer is you don't know, that's

6    perfectly fine.

7         A.    No, that wasn't what I said.

8         Q.    I'm just saying, if you're unable to

9    answer the question, that's fine.

10             You've told me that it could be

11   anywhere -- I asked you, 10 times, and you said,

12   maybe 2 times, 3 times that.  That was your

13   testimony.

14             So my question to you:  Is it more than 30

15   times that you've had these calls?

16        A.    I can't say.  Again, I don't have a

17   measure.  I don't keep a logbook.

18             Dozens of times I've had conversations

19   with union members about these issues.  I can't be

20   more specific than that.  It's definitely not

21   something that's happened only once or twice.

22             It's happened dozens of times, both that

1    we receive specific inquiries and that in the course

2    of my general interactions with our base, our

3    constituency so to speak, that I talk about these

4    issues.

5        Q.    I'm just looking at the general

6    interactions you have with your base.

7            When was the last time you spoke with

8    somebody about the general interaction with your base

9    on the issue of creation of a campaign Website?

10       A.    The last specific conversation I remember

11   about that with somebody who is a supporter or

12   subscriber to Labor Notes was probably 4 to 6 weeks

13   ago.

14       Q.    What was that call about?

15       A.    I've had 2 in the last 4 to 6 weeks now

16   that I recall.

17           One was about using video and streaming

18   video online, looking for examples in how to do it.

19       Q.    I thought we were in the category of calls

20   where you were talking about a story you were writing

21   for the magazine and you said it just comes up in the

22   context.

1               What was the story --

2        A.    I didn't understand your question.

3        Q.    I want to talk about the less than a dozen

4    times that you talked to people who were cold

5    calling.

6               So when was the last time that you were

7    talking about some other issue?

8        A.    Yesterday.

9        Q.    And what was the issue that came up?

10       A.    We had -- Labor Notes had a policy

11   committee meeting.  It's our expanded board, a set of

12   leaders that we convene periodically throughout the

13   life of our organization to talk about the general

14   direction of Labor Notes.

15              And this conversation about technology

16   came up in that context yesterday because we were

17   describing what are the -- I was talking with a

18   member of our board about the pitfalls of this trend

19   towards more and more activity being done online.

20              And the board member was describing some

21   of what was going on in their union.  And I was

22   talking about ways that other unions that I've

1    observed have actually tried to counter that trend.

2         Q.    Let me stop you for a second.

3               I want to try to move the deposition

4    along.  I only want to focus on campaign Websites.

5               Did this call have anything to do with

6    campaign Websites?

7         A.    I'm sorry.

8               I didn't understand that.

9         Q.    All I'm talking -- what I want to know

10   right now, you said less than a dozen times --

11        A.    You mean electoral campaigns for union

12   office?

13        Q.    Correct.

14              When was the last time that you were

15   having a discussion about something else and the

16   topic of campaign Websites came up?

17        A.    That would have been maybe within the last

18   4 to 6 weeks.

19              I was talking with some people who are

20   activists in the United Federation of Teachers, and

21   we were discussing their campaign for office in that

22   union.  We started discussing what they were doing

1    with technology and how it had worked.

2              I had talked to them earlier, but we were

3    discussing the results of the election and actually

4    ended up discussing the technology side of how they

5    were trying to use the Web in specific.

6              Does that answer your question?

7        Q.    Yes.

8        A.    Sorry.

9        Q.    So is that sort of a general rule of

10   thumb, every 4 to 6 weeks you're getting a call like

11   that?

12       A.    If you're trying to come back to the

13   question of how many times I've had these

14   conversations, I can't give you that answer.

15       Q.    When was the time before the phone call 4

16   to 6 weeks ago that you were having a discussion

17   about some other topic and the issue of campaign

18   Websites came up?

19       A.    I don't recall.

20             MR. LEVY:  It's been about an hour since

21   the last break.

22             Are we at a breaking point?

1          MR. CLASH-DREXLER:  Let me go through one

2     other topic.  They can we can take a break.

3          BY MR. CLASH-DREXLER:

4     Q.    You mentioned in paragraph 5 that you've

5     taught union members Web design skills so that they

6     can create their own Websites; is that correct?

7     A.    Yes, that's what it says.

8     Q.    In what context have you taught members

9     Web design skills?

10     A.    Both informally in terms of helping people

11     work with campaign Websites or other -- by, campaign,

12     I don't mean union office campaign, but a contract

13     campaign or other kind of campaign, both ones that

14     I've done myself and ones that I've observed and been

15     asked to sort of help with.

16          The informal sort of advice about how do

17     you do X, like for example, how do you make this look

18     bigger than that, or how do you put a really cool

19     banner in this page.  Oh, it's just a white page, how

20     do I make it blue.

21          Those kinds of questions, all the way up

22     to the kinds of questions about layout design, what

1    makes for an attractive site.  We did a workshop at

2    the last conference that I helped organize, which was

3    in May of 2006, where we also broached these issues

4    as well as several others relating to using the

5    Internet effectively.

6              So these are the kind of things.

7         Q.    Apart from the informal, have you taught

8    formal classes for union members on Web design

9    skills?

10        A.    No, not specifically, no, sir.

11        Q.    How often are you providing this sort of

12   informal advice on Web design skills?

13        A.    I would say increasingly less often,

14   because when people come to me and start asking about

15   these types of technologies, I tell them to use

16   something like Blogger or some other service that is

17   typically free and doesn't really force them to learn

18   HTML or require them to use some of the design-type

19   skills that you're referring to.

20        Q.    I'm not referring to anything.  I'm just

21   talking about your declaration here.

22        A.    Okay.

1        Q.    When do you think you're providing this

2    sort of informal advice?

3             You said the frequency has become less.

4        A.    About specific design like how to do

5    something in HTML, the last time I did that was

6    probably a couple weeks ago.  But the frequency of it

7    is diminished, because as I say, more and more,

8    people are not using static HTML sites.  They're

9    launching sites that are associated with other types

10   of prepackaged services.

11            So the questions about design and layout

12   are much less central to people's online activities

13   as they used to be.  When you used to have to do

14   everything in static HTML, it was a much bigger

15   issue.  Most people were doing static HTML -- we were

16   up till October of 2006.

17            So in my experience with union activists,

18   we are sort of ahead of rank and file folk in terms

19   of what they're doing.  Now that more and more of

20   them are starting to get into these arenas, it's

21   becoming less and less of a need.

22            (Recess.)

1          BY MR. CLASH-DREXLER:

2          Q.    Dr. Brenner, I just want to go back to

3     your testimony about the less than a dozen phone

4     calls that you had about the creation of campaign

5     Websites.

6                Can you be more precise about that, about

7     how many calls you've had?

8          A.    I can't give an exact figure, but it's in

9     that range.

10         Q.    Can you identify the specific campaigns?

11         A.    You mean -- keep in mind, not all of them

12    actually end up resulting in electoral Websites of

13    the kind that you're describing, like some people

14    call and ask for advice, they don't ever necessarily

15    launch a Website.

16               I can give you an example of the one I was

17    just recently having.  I was talking with people who

18    were in -- I'm sorry.

19               You asked about cold calls.

20               Correct?

21         Q.    The less than a dozen or so that you were

22    talking about.

1          You mentioned generally the Teamsters, and

2     you said there were some teachers.

3          Could you be more specific which local

4     unions you're talking about?

5          And just to be clear, I'm talking about

6     the creation of an election campaign Website, not the

7     sort of broader term you were using campaigns.

8          Of those less than a dozen, can you be

9     more specific about which local unions it involved?

10    A.     Well, one example I was just talking about

11    for instance is the United Federation of Teachers,

12    which is New York teachers union.  I talked on more

13    than one occasion with members of the Teachers for a

14    Just Contract, independent community of educators

15    slate who ran in opposition to Randy Weingarten, the

16    incoming president and the administration caucus, the

17    unity caucus I believe is what it's called.

18    Q.     Did they create a campaign Website?

19    A.     They have a Website that preexisted the

20    campaign.  It started as a site around their

21    contract, and then evolved into an electoral

22    campaign.

1        Q.    Do you know what the Web address is?

2        A.    I think it's Teachers for a Just Contract,

3    dot, org, but I could be wrong about that.  If you

4    Google it, you'll find it.

5        Q.    And what was your role in the creation of

6    that Website?

7        A.    I didn't help create the site.   It

8    preexisted.

9            What I talked with them about was, in this

10    instance, they were interested in using video during

11    the campaign.  And I talked  with them about

12    different ways people do it.

13        Q.    Do you know, do they video on their

14    Website right now?

15        A.    I don't know if it's there now.  They did

16    use a video in their site.

17        Q.    And do you know how they put video on

18    their site?

19        A.    I don't actually know how they ended up

20    doing it.

21        Q.    Did you advise them as to how to put video

22    on the site?

1          A.    I talked to them about different ways

2     people do it, whether you use YouTube or Google video

3     or whether it's a small file, you can stream it

4     yourself.  I'll just cover the basics.

5               I think I might have even referred to

6     specific cases I knew of videos online already that

7     they could look at to get a sense of how union people

8     were using like YouTube for videos.

9          Q.    Any other local unions that you can

10    identify that you had calls regarding an election

11    campaign Website?

12         A.    I talked to a guy who is a Teamster about

13    this, whose name I can't remember.  He works in

14    upstate New York and is going to be running for

15    office sometime in the future, not distant and not

16    immediate.

17              I talked with him about what other slates

18    and campaigns have done and his situation.

19         Q.    Do you know whether that individual set up

20    a Website?

21         A.    I don't know.  His campaign is in the

22    future, and I don't know if he's done it yet or not.

1          Another example is, last year there was an

2     election for general president of the Teamsters

3     union, and I talked on more than one occasion with

4     the campaign manager for the challenger to the

5     incumbent.

6          His name is Tom Leedham, L-E-E-D-H-A-M.  I

7     talked to his campaign manager frequently before they

8     set up their Website.

9          Q.    Did the candidate to the general president

10    of the Teamsters union set up a Website?

11         A.    He did indeed.

12         Q.    Do you know what the address is for?

13         A.    I believe Leedham 2002, dot, org, but I

14    don't know if it's still being maintained or not.

15         Q.    The candidate was Tom Leedham?

16         A.    Yes.

17         Q.    Who was the campaign manager?

18         A.    I don't know their formal titles.  Person

19    I'm referring to is a guy named Dan Lutz, who was a

20    campaign staff.

21         Q.    And what advice did -- were they seeking

22    from you about their election campaign Website?

1          A.    We talked quite a bit about content

2     management systems, what were the pros and cons of

3     using them, which ones made sense.  We talked about

4     technical requirements for hosting, what would they

5     need if they were going to use a content management

6     system, Joomla!, J-O-O-M-L-A, or Drupal, or I think

7     it's -- E 107 is another one.

8               There's many, many of these content

9     management systems that are out there.  Most are

10    free, open-source.  I was talking about the ones that

11    I had familiarity with, what the strengths and

12    weaknesses were, what you would need in terms of a

13    Web host, what kind of capacity, what kind of price

14    you would have to probably pay to get those things.

15         Q.    Let's talk about that.

16               Let's take Drupal as an example.

17               What are they -- what are the steps that

18    would need to be taken to add Drupal to somebody's

19    Website?

20         A.    Typically you can't just add Drupal.  You

21    have to use it to build a Website.  It has to be the

22    Website.

1        So it's possible that you could have a

2    part of your Website that was sort of self-contained

3    that was running Drupal.  But most people use it as

4    the Website.

5        So to install it, there's different ways

6    that you can do it ranging in difficulty.  The most

7    basic way that you would install Drupal is, you would

8    download the source files from the Website Drupal,

9    dot, org, which is the project, the Website for the

10   Drupal project.  You would upload those to your Web

11   host.

12       And then you would unpack those files,

13   unzip them, using the UNIX equivalent in this case to

14   zipping and unzipping.  You would have to create a

15   MySQL database.

16       And let me be clear about this.  MySQL is

17   M-Y-S-Q-L.  I'll try to say MySQL.

18       THE WITNESS:  That will make it easier for

19   you.

20   A.    It's a type of database that runs on Web

21   servers and other kinds of servers.  And you would

22   have to configure the -- you would have to modify the

1    configuration files of the Drupal, the base software

2    that you have unzipped and placed in the correct

3    directories in order to do this.

4            Then with some luck, everything will work

5    properly, and you can start your first installation.

6    That's of course just the basic out-of-the-book

7    installation.

8            BY MR. CLASH-DREXLER:

9    Q.    I don't think we need anything more than

10   that.  That was fine.

11   A.    Okay.

12   Q.    So that's 3 examples.

13           What role did you play in the creation of

14   that Website, the Leedham 2006, dot, org Website?

15   A.    You have to give me a little -- I don't

16   quite understand what you're asking.

17   Q.    Dan Lutz called you up.

18           What did he ask you?

19   A.    He called me many times.

20           We talked frequently about this while the

21   site was being established, where they were debating

22   what they were going to do.  It ranged from

1    conversations about the specifics of Web hosting to

2    questions about content management systems.

3         It also involved questions about

4    consulting and who can do these kinds of things, do

5    we know somebody or where to find somebody with the

6    technical expertise necessary to build a site like

7    the kind we imagine we might need, if we don't have

8    those skills ourselves, how do we find someone.

9         Q.    Did they get a consultant to assist them

10   in developing their site?

11        A.    I believe so, yes.

12        Q.    How about the New York teachers union --

13   sorry -- the Teachers for a Just Contract slate?

14        Did they have an outside consultant

15   assisting them?

16        A.    I don't believe that they did.

17        I believe it's one of their members who

18   maintains that site.

19        Q.    This member who you think might be

20   maintaining the site, is that person on the slate?

21        A.    I don't believe so, but I could be wrong.

22        As I said, the organization emerged out of

1    a fight around a contract that was negotiated.  They

2    may be a member of the Teachers for a Just Contract

3    group but not a slate member.

4         Q.    So this was the slate -- you say you're

5    not sure about this, but your best recollection is

6    that the slate found a member with some technical

7    expertise to assist them in developing the site?

8         A.    I believe that is how they do it, but I'm

9    not sure.

10        Q.    We've talked about 3 examples.

11              Are there any others where again in the

12   less than a dozen instances where there were

13   discussions about election campaign Websites?

14        A.    That I can point to and say they did

15   establish a site and identify my roles?

16              I don't understand your question.

17        Q.    It doesn't have to be that they developed

18   a site.  I'm just trying to understand to the best of

19   your recollection these less than a dozen calls.

20   Maybe they created a Website, maybe they didn't.  We

21   have talked about 3.

22              And if you can remember any others.

1       A.    I can't remember any other specific

2    individuals, like names or instances, but these were

3    the kinds of calls that I get.  I've had not a large

4    number, but at least a dozen or so cold calls.  As I

5    mentioned these are things that come up in other

6    contexts in my work with different union members.

7       Q.    The content management system that you use

8    at Drupal, does that use include files?

9       A.    It can if you choose to use them.  It does

10    in some parts of the system.

11       Q.    What are the steps necessary to add a

12    script into the header part of a page?

13       A.    It depends how you want to use an include

14    file.

15       It's possible for example to add an

16    include file inside of the body of an entry if you do

17    it in unfiltered HTML and write the script necessary

18    to actually make the call to the include file in the

19    body.  You can to it right there.

20       We do that with -- I believe that's the

21    way that we're now doing our music page.

22       Q.    If I understand include files correctly,

1    once you've done that, then it will be on either

2    every page of the site or every page that you want it

3    to be on the site; is that right?

4        A.    No.

5            The way that we've used it, you would have

6    to put it on every page that you want, and there

7    would be some pages that you wouldn't be able to put

8    it on without -- I hesitate to say you couldn't ever

9    do it, but at least the way that we have our site

10   configured, it's not currently possible.

11       Q.    Can you tell me what the work is that

12   members of the International Union of Operating

13   Engineers performed?

14       A.    Broadly speaking, they operate heavy

15   equipment, cranes, bulldozers, the rollers that you

16   see on the highway when they're paving.  They also

17   represent people who operate steam rooms in high-rise

18   buildings, and other kind of related work.

19       Q.    What's the source of that information?

20       A.    My knowledge generally of the labor

21   movement and specific conversations with operating

22   engineers through the course of my work.

1      Q.    How many operating engineers -- if you can

2    answer this -- have you spoken to in the course of

3    your work?

4      A.    I can't say.  Probably very few.

5            I don't really cover the building trades,

6    although I have done a fair amount of work on the

7    building trades over the years, so I know the

8    industry fairly well, but I'm not an operating

9    engineer, and I've never worked in the union with it,

10   so I can't really answer your question.

11     Q.    I think my question was just how many

12   times that you had -- no -- it was about the source

13   of information.

14            I apologize.

15            Again, my question was just how you know

16   what you know about the operating engineers, but

17   you've provided an answer, so that's fine.

18            In paragraph 6 of your declaration, I want

19   to focus on the last sentence.

20            You say:  I also have a detailed

21   understanding of what it takes for a union candidate

22   to establish a Website and how rank and file union

1    members use Websites.

2        A.    M-hm.

3        Q.    Have you done a survey of IUOE members

4    about their technology capabilities?

5        A.    I have not.

6        Q.    Have you -- how many IUOE members have you

7    spoken to about how they use Websites?

8        A.    None.

9        Q.    Going back to your -- the work you've done

10    as an economist, particularly the Russell Sage

11    Foundation grant.

12            There you talked about a survey you

13    performed.

14            Right?

15        A.    That's correct.

16        Q.    And you said you sent out some online

17    surveys.

18            Correct?

19        A.    That is correct.

20        Q.    And I think you said that you wanted to

21    get information about the impact on employment.

22            Correct?

1      A.    One of the things we were trying to

2    assess, yes.

3      Q.    So you asked specific questions of the

4    people who were impacted by the living wage ordinance

5    on the impact the ordinance was having on employment.

6          Correct?

7      A.    No.

8          We asked them specific questions about the

9    organization, which the information from which we

10    used to make assessments about the impact on

11    employment, we didn't actually ask them.

12      Q.    What did you ask them to assess the impact

13    that it was having on employment?

14      A.    We asked a range of questions.  I don't

15    have the survey instrument in front of me, but we

16    asked questions such as, how many people are

17    currently working, both head count and full-time

18    equivalent, what was the percentage of your total

19    employment that's part-time.

20          We asked questions about benefits, about

21    other aspects of payee, what sort of policies they

22    had, other kind of HR policies that they have, in an

1    effort to assess whether those things changed over

2    time.  We didn't ask them to make evaluations of

3    that.

4         Q.    Obviously if you had not done the surveys,

5    you would not have been able to do the analysis that

6    you had in your report.

7               Correct?

8         A.    No, that's not correct.

9         Q.    But you -- why don't you explain that.

10        A.    There's a range of different ways in both

11   in my own work and in the academic world in general,

12   people gather information and do policy evaluation or

13   research.  Quantitative survey research methods are

14   just one form of that.

15              I've also done research around living wage

16   campaigns that involve qualitative extended

17   interviews with both beneficiaries of living wage

18   policies and employers considered by living wage

19   ordinances.

20              I've done media analysis and sort of

21   looked at the way that living wage coverage -- looked

22   at the way the living wage movement has been written

1    about and perceived in the media.

2              I've done research on -- trying to think

3    of the other methodologies I've used personally or

4    that exist out there.

5              I'll stop there, just to say that there

6    are a plethora of methodologies and all of them have

7    strengths and weaknesses.

8         Q.    Have you done a case study to identify

9    what the technology capabilities of members of the

10   International Union of Operating Engineers are?

11        A.    I have not.

12        Q.    Have you done a case study to determine

13   what the use of the Website by rank and file members

14   of the International Union of Operating Engineers is?

15        A.    I have not.

16        Q.    Have you done any analysis of the impact

17   that a log-in screen will have on the willingness of

18   a member of the International Union of Operating

19   Engineers to enter that information on a Website?

20        A.    I have not.

21        Q.    If a union had contacted you and asked

22   you -- said they were interested in creating a

1    password protection portion of their Website --

2    assume that fact for me -- and they said to you,

3    we're trying to figure out what our members, what are

4    they capable of, what are their -- how do they use

5    the Internet, we want to make this effective for our

6    membership, what's the information you would want to

7    know to advise that union?

8        A.    Can you be a little bit more specific?

9    I'm not following your question.

10       Q.    Let's say a local union calls you up,

11   AFSCME Local 1000, and they say, we've seen there's

12   some local union Websites that have password

13   protection portions of the Website, and we're

14   thinking about doing that, but we want to know, are

15   our members going to feel -- are they going to be

16   able to use that site, is it going to keep them from

17   accessing information.  We've got what we think is

18   pretty important information that we want them to

19   have, and we're coming to you, what information

20   should we as the union try to get to figure out

21   whether this is going to be an effective part of our

22   Website?

```
 1          A.     I don't know how you would answer that

 2     because it all depends.

 3                 What do you mean by, effective?

 4          Q.     What does it depend upon?

 5          A.     It depends on the goals of the union and

 6     how they would define what constitutes effective.

 7     I'd need a little bit more specifics from you before

 8     I could answer your question.

 9          Q.     They want to know whether the members of

10     their union are going to access this portion of the

11     Website when it has a password protection feature.

12     They're coming to you and saying, as somebody who has

13     a detailed understanding of what it takes for a union

14     candidate to establish a Website and how rank and

15     file union members use Websites, what are the things

16     we need to know from our membership in order to

17     figure out whether this password protection feature

18     on the specific portion of the Website is one that's

19     going to keep members from accessing that

20     information?

21          A.     I guess I'm really not understanding your

22     question.
```

1                    I'm sorry.

2          Q.    Okay.

3          A.    Can you rephrase it in a different way.

4    You keep saying the same thing, and I'm not getting

5    it.

6          Q.    A union wants to password-protect an area

7    of the Website and they've got a specific group of

8    members.

9                    You'll accept that proposition.

10                   Right?

11         A.    Yeah.

12         Q.    And they want to find out what the

13   technological -- they want to understand how their

14   membership uses the Internet.

15                   What would you advise them on how to find

16   that out and what information would be important to

17   know to assess whether the decision to

18   password-protect a portion of the Website is going to

19   deter members from wanting to get at that

20   information?

21         A.    I really -- there's so many things that

22   you haven't said that I would want to know before I

1    could actually make any kind of informed assessment

2    of even the question of what would they want to know.

3           For example, are you talking about

4    password protecting information around their contract

5    or negotiation, are you talking about things around

6    their health benefits?

7       Q.    Let's take contract negotiations.

8           What else -- do you need more information

9    to the hypothetical?

10      A.    I do.  I'm not even understanding -- I'm

11   not sure that I understand that we're talking about

12   the same thing.

13      Q.    I'm a local union.  I'm negotiating with

14   company A.  I want to inform all my membership on our

15   local union Website exactly what our proposal is at

16   the bargaining table, what we're going to be

17   proposing, what we have proposed, what the company's

18   response has been, everything, but I want to put that

19   in a password-protected site so only members of the

20   union can access it.

21          That's my plan.  I come to you and say,

22   Dr. Brenner, I want to do this, but I want to make

1    sure that my membership is going to feel comfortable

2    accessing this information, that it's consistent with

3    the way that they use the Internet.

4              What information should I be asking as a

5    local union officer to be able to assess whether

6    creating a password protection site is going to

7    achieve my goal of providing this information about

8    contract negotiations to my membership?

9        A.    Even with this particular example, I guess

10   I don't really know what you're after.

11             In the world of analysis and data

12   collection, social science, let's stick to the area

13   which I came out of.

14             To answer your question, you might say it

15   would be great if we could know what every individual

16   person thinks, have an extended discussion with them.

17   You might say, we have a good sense already, we don't

18   need to collect any more information.

19             You might say, we know what other unions

20   have done.  You might say that, we know even more

21   than other unions have done, we know what other uses

22   and applications of the Internet are already.

1         So people make decisions based on their

2    threshold of what do we need to know is the thing

3    that I can't answer the question for.  For some

4    people they want a lot of information before they

5    feel comfortable making a decision.  For others, they

6    have a much lower threshold.

7         Q.    Sure.

8               Maybe this will help.

9               They're coming to you to say, how would

10   you go about answering this question.  We don't know

11   what the answer to this question is, Dr. Brenner,

12   we're looking for you to help us decide whether this

13   is an appropriate system for us to use.  Should we be

14   having extended conversations with our membership.

15              How do you make that decision?

16        A.    Let me go back if it's all right with you

17   and say, if they were asking me -- you're assuming

18   the need for password protection.

19              Right?

20              That was the premise.

21        Q.    Yes.

22        A.    What I would say is, is that the right

1    premise, because there are many unions in the country

2    that do exactly what you're describing.  They put up

3    extensive amounts of information about where things

4    stand in bargaining, what their proposals are, what

5    management proposals are, the status of bargaining

6    sometimes in broad strokes, sometimes in specific

7    strokes publicly.

8            If somebody actually did come to me with

9    that question, the first thing I would do is ask

10   them, is that really the premise that you want to

11   begin with.

12        Q.    They say yes.

13        A.    Okay.

14        Q.    They say, maybe it's not worth it to put

15   up the information, Dr. Brenner, should -- we want to

16   find a means to get this information to our

17   membership, but we're not willing to do it on the

18   Internet unless we're assured that only our

19   membership can have access to it, but if you tell us

20   that nobody is going to access this site because --

21   for whatever reason, we won't do it, so we're coming

22   to you to figure out how to determine whether this is

1    a means to provide this information to our

2    membership.

3         A.    First thing, throughout the history of the

4    labor movement, it's pretty impossible to say that

5    you can be certain that information you provide will

6    only be seen and absorbed by the membership.  This

7    predates the Internet.

8              The issue of what employers find out from

9    union members has been a long-standing concern.

10   Employers find out what's going on in a union --

11        Q.    Again, I understand that you don't think

12   that password protection is a good idea.

13             Correct?

14        A.    Generally, yeah.

15        Q.    In fact, Labor Notes along with the

16   Association for Union Democracy doesn't believe that

17   any password protection feature on a union Website is

18   a good idea.

19             Correct?

20        A.    As far as I know, we haven't taken any --

21   Labor Notes doesn't usual take positions on things.

22             You're asking my personal opinion, not the

1    opinion of the organization, I think that password

2    protection in the context in which you're describing

3    it is going to have a dramatic impact on the spread

4    of the information that you're interested in

5    spreading.

6           It's just a fact that if you establish

7    barriers to accessing information online that that

8    reduces the number of people who access those things.

9    That's a fairly accepted fact in the world of online

10   communications.

11          That's why so many online firms spend so

12   much time making it easy for you to get things.  They

13   send you the Web link in an email.  You download your

14   email, and it's right there.  All you have to do is

15   push a button.

16       Q.    Let me just --

17             MR. LEVY:  He's answering the question the

18   best he can.

19             MR. CLASH-DREXLER:  He's not answering the

20   question.

21             BY MR. CLASH-DREXLER:

22       Q.    I'm not asking -- let me just start with,

1    identify for me a single article that -- can you

2    identify for me a single article that states the

3    conclusion you just stated?

4        A.    That we've published?

5        Q.    No.

6              Any article, anything.

7        A.    I just said --

8        Q.    You said it's a fact, so I just want to

9    know -- cite to me an article, something on the

10   Internet, something you got in an email.  Just tell

11   me something that says it is a fact that if you

12   password-protect that that's going to deter people.

13       A.    I don't have the wealth of things that

14   I've consulted in my many years doing Internet design

15   and Web building that actually says exactly what

16   you're after, but I guess I'm a little stunned by the

17   question, because there's certain things that you

18   mean -- people who do this work tend to, you know,

19   assume that the Web is a good thing, it's an

20   interesting and useful tool.

21             People don't write articles that say, the

22   Web is an interesting and useful tool.  There are

1    certain things that are taken for granted.  If you'd

2    like, I guess I could try to find some evidence that

3    would answer your question.

4        Q.    So in drafting your declaration and

5    signing, if you didn't read any articles that say the

6    fact that --

7        A.    Not that I can cite to you.

8        Q.    Let me finish the question.

9            You didn't review any articles that say

10   that password protection will deter people from

11   accessing a Website, did you?

12       A.    That I can cite you to?

13       Q.    Correct.

14       A.    No, but I have read that.  It is a

15   commonly accepted, you know, feature of Web

16   development.

17       Q.    You would agree with me, wouldn't you,

18   that if you had specific information about how

19   members of the International Union of Operating

20   Engineers use Websites that you would be able to

21   provide a better answer to the impact that the

22   unions -- the IUOE's campaign Website resolution will

1    have.

2            Isn't that true?

3        A.    Can you ask the question again.

4        Q.    You would agree with me that if you had

5    specific information about how members of the

6    International Union of Operating Engineers use the

7    Internet -- does that make sense?

8        A.    I understand the first part.

9        Q.    If you had that information, you would be

10   able to provide a better answer as to the impact of

11   the campaign Website resolution on the members of the

12   IUOE's willingness to visit campaign Websites; isn't

13   that correct?

14       A.    I think it depends, to be honest.

15            It depends on the information you're

16   describing.  The number of hours people spend online

17   is more specific information than I currently have.

18            If you had information on that, or the

19   days of the week that people consulted the Web, then

20   I could be specific, but I don't know that that would

21   necessarily give you a lot of insight into what kinds

22   of impact it would have.

1        Q.    You said, days of the week, hours they

2   would use the Internet.

3              What else of specific information about

4   the use of the Internet by IUOE members would you

5   want to know?

6        A.    I said that that wouldn't help you, by the

7   way.

8        Q.    Oh, that it wouldn't.  It wouldn't help

9   you to know --

10       A.    Not necessarily.  It possibly could.

11             My initial answer I said was, it

12  depends.

13       Q.    I'm asking if you had any information,

14  don't you think that your opinion would be better

15  informed?

16       A.    It depends what that -- no.

17             There are plenty of kinds of information

18  about operating engineers specifically that wouldn't

19  necessarily help me make a judgment about of impact

20  of password protection.

21       Q.    Is it your testimony as an expert witness

22  who is an expert with the detailed -- claiming to be

1    an expert with the detailed understanding of how rank

2    and file union members use Websites that there is not

3    a single piece of information about how International

4    Union of Operating Engineers members use the Website

5    that you think would inform your analysis?

6         A.    That's not what I said.

7         Q.    Well, what is that single piece?

8               Name one piece of information.

9         A.    I'm sorry.

10              Please ask the question again.

11              MR. CLASH-DREXLER:  Could you read the

12    question back.

13              (The reporter read the last and the

14              next-to-last question.)

15        A.    I'm sorry to be a pain about this, but I

16    don't understand how the last part of what you just

17    said fits with the first part.  Of course there's

18    types of information that make -- you know, that help

19    people make decisions.  And there are types of

20    information that might help make decisions around

21    this.

22              I guess I'm not quite sure how the

1     predictive part of your -- last part of your question

2     fits with the type of information.

3               BY MR. CLASH-DREXLER:

4          Q.   I don't want you to give me any particular

5     answer.

6               I just want you to tell me what your

7     opinion is.  So if your answer is that it would not

8     help your opinion in this case predicting what

9     International Union of Operating Engineers would do

10    to have specific information about IUOE members,

11    that's fine if that's your testimony.

12              Is that your testimony?

13         A.   That is not what I said.

14         Q.   Okay.  Well, then, what information -- so

15    is it your testimony that it would help your opinion

16    to have specific information about the International

17    Union of Operating Engineers members?

18         A.   We're back where we started, which is, it

19    depends on what kinds of specific information.

20              As I said, there are kinds of information

21    even about the Internet habits of the union members

22    that might but might not help you make an informed

1    decision about whether password protection would be a

2    deterrent to using a Website.

3        Q.    We're going to be here all day on this one

4    question.

5            MR. LEVY:  I think he's answered the

6    question.

7            MR. CLASH-DREXLER:  He's absolutely not

8    answered the question and the record will reflect

9    that.

10            BY MR. CLASH-DREXLER:

11        Q.    What you've just said is some information

12    might be helpful, some information might not.

13            Is that correct?

14        A.    Yes.

15            And I gave you examples of types of

16    information that I thought wouldn't necessarily be

17    helpful in making predictions about what this would

18    be.

19            Before we go further, let me say we're

20    talking about predictions.

21            Right?

22            It's a sort of assumed feature of this

1     kind of -- in a social science world, we recognize

2     that oftentimes we are asked to speculate on things

3     that haven't happened and we have no direct

4     experience with.  We can only try to look at the

5     past, other related types of situations, and draw a

6     reasonable assumption about what might or might not

7     occur.

8          Q.     Let me give you an example.

9                 MR. LEVY:  Was he done?

10                MR. WEINBERG:  Have you finished your

11     answer?

12                THE WITNESS:  No.

13         A.     Go ahead.

14                BY MR. CLASH-DREXLER:

15         Q.     If you haven't finished your answer, go

16     ahead.

17         A.     Its point is sort of lost, so go ahead.

18         Q.     Would it be helpful -- in your last

19     answer, you said there are some things that would be

20     helpful and some things that wouldn't be, and you

21     gave me 2 examples of things that you said would not

22     be helpful.

1     A.    Might not be helpful.

2     Q.    What are things that could be helpful?

3     A.    I mean, obviously the best case would be

4 if you had a local union that had implemented a rule

5 like this and you could examine if you had to sort of

6 a natural experiment.

7         If you had one local that allowed people

8 to engage in campaign elections without having

9 password protection and you had another case where

10 you actually imposed it, and you could compare what

11 was the traffic like on sites where you have password

12 protection and where you didn't.

13    Q.    Did you ask whether any IUOE candidate has

14 established a password-protected Website?

15        In offering your opinion, did you seek

16 that information?

17    A.    My opinion is much broader than what's

18 going on with the IUOE, but, no.

19        I'm not seeing where you're going with

20 this.

21    Q.    Did you ask Mr. Levy, can you get me

22 information about whether there are any candidates

1    for IUOE office who have ever password-protected

2    their Website?

3         A.    No.

4         Q.    Did you look on the Internet to see

5    whether there were any IUOE candidates for local

6    union office who have ever password-protected their

7    Website?

8         A.    Let me --

9         Q.    Why don't you answer my question first.

10        A.    Say it again.

11             I'm sorry.

12             MR. WEINBERG:  We'll be here all night

13   unless you just answer the question.  He asks a

14   question, you answer it.

15             THE WITNESS:  I'm just trying to

16   understand the question.

17             BY MR. CLASH-DREXLER:

18        Q.    The question was simple.

19             Did you go on the Internet to see whether

20   any candidates for IUOE local union office had

21   password-protected their Websites?

22        A.    I did not go on to see if any had password

1    protection.

2            MR. LEVY:  Yes-or-no question.  Answer it

3    yes or no.

4            BY MR. CLASH-DREXLER:

5        Q.    Did you ask Mr. Levy or any of the counsel

6    from Public Citizen Litigation Group whether any IUOE

7    local unions had password-protected portions of their

8    Website?

9        A.    I don't recall if I asked either one of

10   them that question.

11       Q.    Do you know the answer to that question?

12       A.    I think I do.

13       Q.    What is the answer?

14       A.    That some do have portions of their site

15   that are password-protected.  You are being -- I'm

16   partly confused, because there's a difference between

17   having part of the site password-protected -- we have

18   part of our site password-protected.  You don't even

19   know where it is because it's not for the public.

20            But versus as I understand it what we're

21   talking about with the rules, which is the whole

22   site, everything, would be password-protected.  So

1    I'm confused.

2         Q.    All I want you to do is answer my

3    question.

4         A.    If I'm confused by it, I can't really

5    answer it.

6         Q.    The question was simple.

7              Did you look on the Internet for local

8    unions who have password-protected their Websites.

9    That was the question.

10              MR. BECK:  He answered that.

11         A.    I did.

12              BY MR. CLASH-DREXLER:

13         Q.    Did you ask those local unions of the IUOE

14    who have password-protected the impact that that had

15    on members' willingness to log into those areas?

16         A.    I did not, no.

17         Q.    Did you read any studies that talk about

18    union members', not just the IUOE, union members'

19    willingness to enter log-in information to get to a

20    password-protected portion of the Website?

21         A.    I did not.

22         Q.    Are you aware of any data?

1       A.      No.

2               It's possible that it exists, not that

3       I've familiarized myself with.

4       Q.      Do you think it would be helpful to have

5       that information if the data did exist?

6       A.      It depends on what the specific is.  Your

7       point about the data is a little broad.

8               MR. WEINBERG:  Let's take a short break.

9               (Recess.)

10              BY MR. CLASH-DREXLER:

11      Q.      Dr. Brenner, if you could turn to page 10

12      of your declaration.  It's Brenner exhibit 1.

13              Are you there?

14      A.      Yes.

15      Q.      Okay.  In this paragraph, you talk

16      about --

17      A.      10?

18      Q.      I'm sorry.

19              Paragraph 10 on page 3.  This paragraph

20      refers to social networking sites.

21              Correct?

22      A.      That is correct.

1     Q.    And you identify a number of those sites

2  in that paragraph.

3       Correct?

4     A.    That is correct.

5     Q.    And I'm going to read here the third

6  sentence:  Social networking sites are increasingly

7  used by campaigns, even campaigns for president of

8  the United States, to communicate with supporters; is

9  that correct?

10     A.    Yes.

11     Q.    Do you know how many people are members of

12  Facebook?

13     A.    I don't have exact figures, but the

14  statistics I've read are millions.

15     Q.    How many IUOE members are members of

16  Facebook?

17     A.    I don't know.

18     Q.    How about MySpace?

19       How many IUOE are members of MySpace?

20     A.    I did research this and found dozens of

21  operating engineers on MySpace.

22     Q.    What kind of sites did they have, the IUOE

1    members who had MySpace pages?

2        A.    Mostly they were like other MySpace pages

3    of people talking both about their work lives, their

4    personal lives.  Some of them talked about their

5    union activity.

6            There was one in particular where there

7    was a picture of a guy driving his bulldozer.

8        Q.    Tell me about a discussion you recall

9    about people's union activities.  I'm just talking

10   about IUOE members.

11       A.    The ones that I looked at, which were not

12   all of the dozens that I found -- I recall one where

13   he's talking about his apprenticeship and how he was

14   becoming an operating engineer member.  I found a

15   forum on MySpace where people were talking about just

16   being operating engineers, what they were doing on

17   the West Coast, in Connecticut, mostly saying, hey,

18   you're an operating engineer, I'm an operating

19   engineer, how cool is that, connecting to each other,

20   not particularly anything substantive or detailed.

21       Q.    Apart from the one example where somebody

22   was talking about the apprenticeship program, you

1    don't recall seeing any substantive discussion about

2    union activities?

3        A.    I wasn't looking for it, so, no, I don't

4    recall.

5        Q.    How did you search on MySpace for members

6    of the International Union of Operating Engineers?

7        A.    I tried 2 ways.

8              I looked for the acronym IUOE.  And then I

9    also looked for operating plus engineers to see what

10   I could find, but I'm sure there are other ways.

11       Q.    Did you do any search for IUOE members on

12   Facebook?

13       A.    No.

14       Q.    What about Microsoft Live spaces?

15       A.    No.

16       Q.    What about Friendster?

17       A.    No.

18       Q.    How about Yahoo! 360?

19       A.    No.

20       Q.    So you have no ability as you sit here

21   today or when you drafted your declaration to know

22   whether there's a single IUOE member who is a member

1    of any of those social networking sites?

2        A.    That's correct.

3        Q.    So you wouldn't be able to say whether by

4    posting a page on any of those sites with the

5    exception of MySpace they're in fact communicating

6    with certain supporters?

7            (Discussion off the record.)

8            (The reporter read the last

9            question.)

10       A.    I would disagree with your statement.

11           I think that people communicating with

12   supporters doesn't equate with people having accounts

13   on those sites.  Even if only one operating engineer

14   had a site on Facebook, there are many people they

15   can be communicating with.

16           In other words, having an account is not

17   equivalent with being able to communicate with -- if

18   there's only 10 accounts, it doesn't mean only 10

19   people are talking.

20           MR. LEVY:  Off the record.

21           (Discussion off the record.)

22           BY MR. CLASH-DREXLER:

1          Q.    Let's try going through this

2     quickly.

3                On Facebook, can you view a Facebook page

4     without being a member of Facebook?

5          A.    My understanding is that, yes.

6          Q.    Have you tried to do that?

7          A.    Yeah, I have.

8          Q.    We'll get the computer out in a little bit

9     and try it.

10         A.    Okay.  It's been a while.  I could be

11    wrong.

12         Q.    Okay.  Let's just assume that you can't.

13    You have to be a member of Facebook.

14               You would agree with me, wouldn't you,

15    that if there are no IUOE members on Facebook but

16    one, the candidate who you're positing wants to put

17    their campaign Website on Facebook, that no IUOE

18    members will look at that site.

19               Correct?

20         A.    Yes.

21         Q.    I've handed you what we've marked as

22    Brenner exhibit 4.

1                      (Brenner Exhibit No. 4

2                      was marked for

3                      identification.)

4          BY MR. CLASH-DREXLER:

5    Q.    Have you seen that document before?

6    A.    No, sir.

7    Q.    I'll represent to you that this is the

8    resolution that was passed by the International Union

9    of Operating Engineers executive board that's the

10   subject of the lawsuit in which you've offered an

11   opinion.

12         Do you know whether under this resolution

13   somebody could have a page on MySpace that linked to

14   another Website?

15         Let's say I'm a candidate for local union

16   office.  I have a campaign Website.  And I create a

17   MySpace page that says, my name is Matthew

18   Clash-Drexler.  I'm running for business manager of

19   Local 150, to visit my campaign Website, go to,

20   inserts the address.

21         Do you know whether under this resolution

22   that would be permitted?

1     A.    I don't.

2          Is it possible for me to read this?

3     Q.    Please.

4     A.    Thank you.

5          (Discussion off the record.)

6          BY MR. CLASH-DREXLER:

7     Q.    Have you had an opportunity to review

8 that?

9     A.    I have.

10         Thank you very much.

11    Q.    Has that review allowed you to answer the

12 question whether somebody would be able to

13 essentially direct people to their campaign Website

14 from a social networking site?

15    A.    Is that the question as you originally

16 posed it?

17    Q.    Yes.

18    A.    It seems as though that would be possible,

19 yes.

20    Q.    In fact isn't that one of the purposes of

21 the Facebook sites the presidential candidates have

22 is to direct them to their more official campaign

1    Website?

2        A.    You mean the MySpace?

3              I didn't talk about the Facebook ones.

4        Q.    You said both candidates also have

5    campaign pages on Facebook.

6        A.    Right.

7        Q.    Okay.  So I'm asking, isn't it true that

8    those pages direct people to their campaign Websites?

9        A.    It's part of the strategy that they use to

10   generate traffic, yes, to their main site.

11       Q.    It's true, isn't it, that Facebook was

12   only recently opened up to people older than college

13   age?

14       A.    I'm not sure.  I don't know.

15             I know people who are not college age who

16   have Facebook pages.

17       Q.    Turning to paragraph 11, you talk about

18   Google Page Creator.

19             Correct?

20       A.    Yes.

21       Q.    I said paragraph 11, not page 11.

22       A.    Yes.

1      Q.    Are you familiar with Google Page Creator?

2      A.    Yes.

3      Q.    Describe for me how you create a page on

4   Google Page Creator.  Tell me the steps in creating a

5   page on Google Page Creator.

6      A.    If you -- from what?

7      Q.    From scratch.

8      A.    You mean, go to your computer, turn it on?

9            You mean like that?

10     Q.    Wherever you want to start the process is

11  fine.

12     A.    I guess -- how can I say this in a way

13  that's clear.

14            I went through the steps.

15            Could I tell you what to do right here?

16            I don't think I can provide you with that

17  answer.

18     Q.    Isn't it true is the first thing you do is

19  click on something saying, add a page, or, create a

20  page?

21     A.    You do that.  I don't know if that's the

22  first thing.  I don't remember whether --

1          Q.     You make a good point.

2                 First thing you probably have to do is set

3     up an account on Google.

4                 Right?

5          A.     I believe that is correct.

6          Q.     And you have to register for Google.

7                 Correct?

8          A.     Yes.

9          Q.     You probably have to provide them some

10    personal information.

11                Correct?

12         A.     I don't remember what I did when I set up

13    my account, but you probably do.

14         Q.     The next step is, you probably go to

15    pages, dot, Google, dot, com?

16         A.     That does sound familiar.

17         Q.     When you get there, I don't know whether

18    it's the first thing, maybe you have to say, do you

19    want to create a Website, but to start building the

20    site, the first thing you do is click on, add a page;

21    is that right?

22         A.     Yes.

1       Q.      What do you do to create a second page to

2   the Website?

3       A.      Don't you do the same step again?

4       Q.      I'm asking you the question.

5       A.      I believe that's what you do.

6       Q.      How do you link the first page to the

7   second page?

8       A.      I don't recall.

9       Q.      It's pretty easy, isn't it?

10       A.      I said, I don't recall.

11       Q.      As somebody who is here to be an expert in

12   the topics that you've listed, I would expect you to

13   know some of this information, but I'll represent to

14   you what you do is, you click the button that says,

15   add a link.

16           Does that sound familiar?

17       A.      Yes.

18       Q.      So to add a second page to a Website on

19   Google Page Creator, you have to do 2 things.

20           You have to click, add a page.

21           Correct?

22       A.      And then, add a link.

1    Q.    That's 2 steps.

2    A.    Yes.

3    Q.    After you've created the first page.

4          Correct?

5    A.    Yeah.

6    Q.    And is that process, creating a second

7    page, something that you feel that -- you're offering

8    a opinion in this case would be too difficult or

9    impose too technological of a burden on members to

10   do?

11   A.    No.

12   Q.    Isn't it true that -- let me stop you

13   there.

14         RSS is not available on Google Page

15   Creator, is it?

16   A.    I don't know.

17                        (Brenner Exhibit No. 5

18                        was marked for

19                        identification.)

20         BY MR. CLASH-DREXLER:

21   Q.    I've handed you what we've marked as

22   Brenner exhibit 5.

1              Have you ever seen this page before?

2        A.    I don't recall.

3        Q.    At the top, do you see the URL?

4        A.    I do.

5        Q.    Does that identify that it's a -- from the

6    Google, dot, com Website?

7        A.    Yes.

8        Q.    And this looks like it's from the page

9    Google Page Creator help screen.

10             Correct?

11       A.    Yes.

12       Q.    What does this say about the availability

13   of RSS?

14       A.    Not yet, but we're work working day and

15   night to implement our user suggestions.

16       Q.    So as of the time you signed your

17   declaration, RSS was not available on Google Page

18   Creator; is that correct?

19       A.    That is correct.

20       Q.    Isn't it the case that you could use

21   remote -- let me take a step back.

22             Are you aware of the password protection

1    system that the International Union of Operating

2    Engineers is seeking to implement under this

3    resolution, which we've marked as Brenner exhibit 4?

4         A.    I have general understanding, but my

5    understanding is also that it has been an evolving

6    plan.

7         Q.    What is your general understanding?

8         A.    My general understanding is, if the

9    international would like to require all campaign

10   Websites to include a snippet of code in a variety of

11   different flavors, could be Java, could be SAP, could

12   be THP, as I understood it, which would redirect a

13   person to a log-in site that would be remotely

14   authenticated or third-party authenticated that would

15   then once authenticated return the visitor to the

16   password-protected portions of the Website.

17        Q.    Isn't it true that a user of Google Page

18   Creator could insert code to make the user mode

19   authentication system work?

20        A.    I believe that's possible.

21        Q.    It's your testimony that union -- a

22   candidate for local union office could comply with

1    the resolution in this case and use Google Page

2    Creator.

3              Correct?

4        A.    I'm not sure for the following reason:  I

5    haven't actually built a full site and I haven't

6    tried remote authentication.

7              I do not know how when you return to the

8    site it would handle access.  I don't believe that

9    it's possible to actually restrict interior sites

10   to -- unless you authenticate every page you create.

11             So if you put authentication on every page

12   created, I believe it is possible to do what you're

13   saying.

14       Q.    But you haven't tried.

15             Correct?

16       A.    No.

17             I don't have a remote authentication

18   service.

19       Q.    You're not offering an opinion, then, in

20   this case as to whether or not a candidate could use

21   Google Page Creator to comply with the resolution.

22             Correct?

1    A.    I'm not offering an opinion about that.

2    Q.    So in fact, under the resolution, a

3    candidate does have ac- -- could have access -- let

4    me start take over.

5         So under the campaign Website resolution,

6    a candidate could have access to what you refer to as

7    the relatively easy way to set up a Website such as

8    Google Page Creator?

9         Correct?

10    A.    Yes.

11    Q.    Let's go on to paragraph 12.

12         In this paragraph, you're talking about

13    candidates who are buying a hosting package with

14    service like Yahoo! GeoCities.

15         Correct?

16    A.    Correct.

17    Q.    You testified earlier that between the

18    time that you signed your declaration and today, you

19    reviewed the Websites of the plaintiffs in this case.

20         Correct?

21    A.    No.

22         I looked at some, not all.

1   Q.  Which ones did you look at?

2   A.  I looked at Mr. Mueller's Website.  I

3 looked at the Website for the plaintiff out of Local

4 150 in Chicago.  Those 2.

5   Q.  Did you look at -- are you aware that

6 another plaintiff in the case comes out of Local 18?

7   A.  Yes.

8   Q.  But you didn't look at that Website?

9   A.  I don't believe so.

10   Q.  Are you able to tell me one way or the

11 other whether any of those sites have purchased a

12 hosting package like the one you described in

13 paragraph 12?

14   A.  Definitively, no, but I'm assuming they

15 did in the case of the Local 150.  It appeared as

16 though it was hosted commercially.

17   Q.  There would be an easy way to find out for

18 the Website for Local 18 if it's being hosted by --

19 if they bought a hosting package, wouldn't it?

20   A.  I assume so.

21   Q.  How would you do that?

22   A.  You could do a D and S search to figure

1    out where the D and S is being resolved, if it's

2    being resolved at a commercial Web hosting service

3    like network solutions or others.

4        Q.    Are you familiar with 1 in 1?

5        A.    Yes.

6        Q.    Would you be able to dispute if I told you

7    that the Website for the plaintiff, Pat Kohl, who is

8    out of Local 18, is hosted by 1 and 1?

9        A.    I would not.

10        Q.    I think you've testified to this before,

11    but other than those 2 Websites you've identified,

12    have you reviewed any other campaign Websites of an

13    IUOE member?

14        A.    I have not.

15        Q.    If you can turn to page 6, paragraph 18.

16    I want to focus your attention on the last sentence.

17            You say:  I also do not think Ms. Pineda

18    took into account that most union candidates will be

19    setting up their Websites themselves rather than

20    hiring someone with the technical expertise to set up

21    a complex campaign Website.

22            Did I read that correctly?

1          A.    Yes.

2          Q.    Out of the plaintiffs in this case, are

3     you aware of how many of them utilized a -- somebody

4     other than the candidate to set up their Website?

5          A.    I'm not -- I don't understand.

6          Q.    You stated that most union candidates will

7     be setting up their Websites themselves.

8                Correct?

9          A.    Yes.

10         Q.    And I'm asking you, do you know one way or

11    the other whether the plaintiffs in this case set up

12    the Websites themselves?

13         A.    I do not.

14         Q.    I'll represent to you that there was

15    testimony by plaintiff Michael Quigley that he had

16    assistance in setting up that Website.  There was

17    testimony by Patricia Kohl that she had assistance in

18    setting up and maintaining her Website.

19         A.    M-hm.

20         Q.    Let's go back to paragraph 12.

21               In this paragraph, you're describing the

22    insertion of scripts into the Website, and this is to

1    make the remote authentication system work; is that

2    right?

3        A.    Yes.

4        Q.    Tell me what steps a candidate who has --

5    let's use Yahoo! GeoCities as an example.

6            To a candidate who has a Website on Yahoo!

7    GeoCities, isn't it true that what they would have to

8    do to insert the relevant script is to open and edit

9    the Web page's HTML file?

10       A.    Yes.

11       Q.    Isn't it also true that the next step

12   would be to insert the specific script that is going

13   to be supplied to them into a specific part of the

14   code.

15           Correct?

16       A.    As I understand the proposed

17   authentication system, yes.

18       Q.    Is it your testimony that a candidate for

19   local union office in the International Union of

20   Operating Engineers will lack the technical ability

21   to insert that script into the HTML code?

22           That's a yes-or-no question, Dr. Brenner.

1          A.    No.

2          Q.    You go on in paragraph 12 to say that:

3     After a user has edited the HTML file, they will no

4     longer be able to use the Website building tools

5     without losing the inserted script and being forced

6     to insert it again.

7                Correct?

8          A.    Yes.

9          Q.    So your testimony is that if somebody

10    edits the Web page's HTML code, if they want to

11    continue using what I assume you're talking about,

12    templates or Yahoo! GeoCities' page builder, that

13    they will have to insert that code again.

14                Correct?

15         A.    Every time, as I understand it.

16         Q.    Are you familiar with any free HTML

17    editors?

18         A.    Yes.

19         Q.    So there are on the Internet HTML editors

20    that you can download onto your own computer and edit

21    a Website.

22                Correct?

1          A.     Yes.

2          Q.     And the steps that would be involved --

3     well, let's assume for a second that a candidate has

4     a Web page already developed.

5                 Okay?

6          A.     Okay.

7          Q.     And they want to create a second page.

8                 Let me change the hypothetical a little

9     bit.

10                The Website already has 2 pages on it.

11    The first page is a nonpassword-protected home page.

12                Okay?

13         A.     Okay.

14         Q.     The second page is now inside the password

15    protection.

16         A.     Okay.

17         Q.     And the candidate has already inserted the

18    relevant script into the code.

19         A.     In the second page.

20         Q.     Into the second page.

21                Correct?

22         A.     Correct.

1       Q.    Isn't it the case that a candidate using

2    one of these free HTML editors could simply download

3    the page to their computer -- correct?

4       A.    Is it possible, is that how you framed it?

5       Q.    Yes.

6       A.    Yes, it's possible but more difficult.

7       Q.    Well, isn't it true that under some of

8    these HTML editors, there's a button that says,

9    download page, and you simply insert the URL of the

10    page you want to download?

11       A.    I don't know the specific ones to which

12    you refer.  I've not personally had experience with

13    one that allows you to do that.

14           I believe you if you say it exists.

15       Q.    Again you're the expert here.

16           So I'm just saying, is it possible that

17    somebody -- that downloading a page using a free HTML

18    editor could be that simple?

19       A.    It's possible.

20       Q.    So now I've downloaded the page.

21           Using this free HTML editor, some of them

22    come with design view, don't they?

1      A.    They do.

2      Q.    And under, design view, I would never have

3  to look at the code of that Website to edit the page;

4  isn't that correct?

5      A.    Yes.

6      Q.    And in fact, I could under, design view,

7  delete all the content that's on that page.

8      Correct?

9      A.    It's possible.

10      If you've worked with these programs that

11  have design view, you would know it's rare that

12  you're able to do everything in design view.  You

13  typically have to go in and clean up some of the

14  code, because HTML is meant as a scripting language,

15  a markup language that was designed to be written as

16  code.

17      Now, we've developed frond ends for it.

18  You're describing one.  They work pretty well, but

19  they also have problems sometimes.

20      Q.    All programs have problems, don't they?

21      A.    Yes.

22      This has more problems than Microsoft

1     Office or Outlook Express or many other software that

2     you might be familiar with.

3          Q.     People run into problems with Google Page

4     Creator, don't they?

5          A.     I'm sure they do.

6          Q.     There is a Website of a forum where people

7     are commenting every day on the thousands of problems

8     they're having utilizing what you describe as the

9     relatively easy way to set up a Website, aren't they?

10         A.     Yes.

11         Q.     So here is where we are with the HTML

12    editor.

13                I've clicked the button that says,

14    download page.  And now I want to keep the background

15    of the page, but I want to change the text and the

16    content on the page.

17         A.     Could you help me out?

18                Do you have a specific free HTML editor

19    that you have in mind?

20         Q.     I can get one at a break.

21         A.     It's fine.  I was just curious.

22         Q.     The one I'm thinking of is called Evrsoft.

```
1                    Are you familiar with that?

2         A.    No.

3         Q.    And I could -- I've downloaded the site

4    one click of a button.  Second step, I now want to

5    change the information on the page.

6         A.    Okay.

7         Q.    That's doable, isn't it?

8         A.    Possible, yes.

9         Q.    That's really not much different than what

10   I would have to do if I were doing that using Google

11   Page Creator, is it?

12        A.    I'm sorry.

13              I don't follow what you're asking.

14        Q.    If I want to create a second page on

15   Google Page Creator, you said I would click, add a

16   new page.

17              Right?

18        A.    Yes.

19        Q.    Then what would I do, Google Page Creator

20   allows you to create a box and put some text in.

21              Right?

22        A.    Correct.
```

1          Q.    Has a button for add a photo if you want

2    to do that.

3          A.    Yes.

4          Q.    Has buttons to add links.

5                Correct?

6          A.    Yes.

7          Q.    So with this free HTML editor, I could

8    download a page.

9                Right?

10         A.    Yes.

11         Q.    And I could put whatever content I wanted

12   on that page using the free HTML editor.

13               Correct?

14         A.    Possible, yes.

15         Q.    Then I could save it.

16               Correct?

17         A.    You could.

18         Q.    And then I could upload it back to my Web

19   hosting service, couldn't I?

20         A.    It depends.

21         Q.    What does it depend on?

22         A.    To upload a file into your hosting

1    service, you have to know the user name and password

2    and the directory inside of which your files are

3    being stored.

4        Q.    Isn't it the case that -- take Google Page

5    Creator.

6            You have to know your log-in and password

7    to simply create a page, don't you?

8        A.    Yes.

9        Q.    And to set up just a Website on Yahoo!

10    GeoCities, you have to know your user name and

11    password.

12            Correct?

13        A.    True.

14        Q.    So there's nothing different about the

15    simple task of creating a page than there is about

16    then uploading the page in terms of the log-in and

17    password?

18        A.    Yes.

19            That is a big difference, because you're

20    talking about file transfer into a server that you're

21    remotely logging into.  You have to know the

22    specification of the directory that you're putting it

1    in.

2        Q.    And it's your testimony that the only way

3    to upload a page on Google Page Creator is through

4    FTP?

5        A.    No, I didn't say that.

6              You started talking about Google Page

7    Creator.  We were talking about Yahoo! GeoCities.

8              My understanding of Google Page Creator is

9    that you would edit HTML.  If you wanted to do what

10   we've been describing as the union's proposal, you

11   would edit the HTML and insert a script.

12             My understanding of using these front

13   end -- that's vernacular -- is when you start to edit

14   HTML, the only way to preserve that in the fashion I

15   think you're asking about is to copy the HTML, save

16   it, and then go back and paste it again.

17       Q.    That's what I was talking about.

18             You've downloaded it and now you're

19   uploading it?

20       A.    No.

21             That's not how to works in my experience.

22   You have to go into a window much like -- if you've

1    ever used Gmail or Yahoo! email, you have a message

2    window.  You have similar kind of box for entering

3    text in this instance.

4              You copy that.  That will have the HTML

5    code in it.  You have to copy that and place that

6    somewhere, whether into an HTML editor or you just

7    save it in some other fashion.

8              If you want to get that back up, the only

9    way to do that is to copy it and then paste it up

10   there again.  You can't just FTP it using the front

11   end.

12             It is possible to use this service in a

13   more traditional manner more associated with other

14   Web hosts where you design a page locally on your

15   local computer and transfer it to the server where

16   it's being hosted.

17             That is what -- if I understand -- the

18   problem I'm having is, I don't know Evrsoft, so I

19   don't know how it works.

20             I'm trying to relate it to the services

21   that I do know, free and commercial.  In those

22   instances, usually you're FTP'ing files back and

1    forth.

2              Once you get into that world, it is

3    substantially more complicated than simply clicking

4    on, create a page, and editing something or even

5    editing HTML and inserting a little snippet.

6        Q.    Okay.  Let's talk about FTP for a second.

7              To upload a page using FTP, you'd have to

8    get the FTP address; is that right?

9        A.    For some services, yes.  For others, you

10   can actually use it if you have -- if you try to log

11   into Labor Notes, dot, org, you can log in.  For

12   other Web hosts, you have to know a specific server

13   address like FTP dot, something, dot, something.

14       Q.    You'd find that on your Website of your

15   Web hosting service.

16             Correct?

17       A.    It would probably be in the support pages

18   or in the documentation that you receive when you

19   sign up.

20       Q.    So you'd need that information.

21             Correct?

22       A.    Yes.

1        Q.    And you'd need your log-in and password

2     information.

3              Correct?

4        A.    Yes, you would.

5        Q.    And then you -- so once you've done that,

6     then you pick the file that you've saved on your

7     computer that has the new page.

8              Correct?

9              I'm trying to upload my new page using

10    FTP.  So I've now logged in with the FTP address, and

11    I put in my log-in and password.

12             Correct?

13       A.    This is your hypothetical, so you say you

14    did.  Okay.

15       Q.    That's what you'd have to do, isn't it?

16       A.    I was trying to be patient and let you

17    finish.

18             The way you're describing it is not how

19    most FTP or even Web editing programs that have FTP

20    capabilities work.

21             Usually you have to actually set the FTP

22    settings in a separate part of the software package.

1    So for example I use a bit more sophisticated ones

2    like Dream Weaver.  You have to go in and say what

3    the site address is, what directory you have to put

4    everything in.

5         Q.    The directory, you're talking about the

6    directory on the server?

7         A.    Yes.

8              And you have to enter your user name and

9    password information.  Often you have to, depending

10   on the host -- most hosts use simple FTP.  Other --

11   I've had Websites hosted in environments where you

12   had to use secure FTP.

13             And you have to specify those types of

14   things typically as a separate step before you can

15   simply push a button and upload.

16        Q.    And to say where you want to place it on

17   the directory, when I go in and look for a document

18   on my server here in the office, and I go into my

19   computer, and then I go find the file where I want to

20   find that document, isn't that one way you find files

21   on computers?

22        A.    It depends on how the network is set up.

1       Q.      Is there one way to find a document on a

2       computer?

3       A.      It depends.

4               Not in my office.

5       Q.      Do you have a computer at home?

6       A.      I do.

7       Q.      Does it run Windows?

8       A.      It does.

9       Q.      So do you have a My Computer button?

10      A.      Yes.

11      Q.      When you click on My Computer, a bunch of

12      folders open up or drives open up?

13      A.      Yes.

14      Q.      Then you click on one of those drives

15      where you want to go.

16              Correct?

17      A.      Yes.

18      Q.      And then folders underneath that drive.

19              Correct?

20      A.      Yes.

21      Q.      And then you find the file that you're

22      looking for.

1         Right?

2    A.    That is correct.

3         And they're all local on my computer.

4    None of them are on the network.  So that's my

5    confusion.

6         I'm sorry.

7    Q.    When you're trying to decide where on the

8    directory you want to put that file, you're

9    essentially clicking through folders, aren't you?

10        I'm talking now about FTP.

11        You're trying to find out where using FTP

12   you want to put that file, you said you have to put

13   it in the right directory.

14        Right?

15   A.    I did say that.

16   Q.    And you do that by clicking through

17   folders to find the right directory, don't you?

18   A.    It depends on how you transfer files.

19        Often in the program that I use, I specify

20   the directory in advance, and so I just hit a button

21   that uploads the file.  But knowing what the right

22   directory is is crucial to get that correct.

1    Q.    Once you've uploaded it and you haven't

2    changed the underlying code at all, isn't it correct

3    that the script that had been added into the page I

4    downloaded would still be in the new page that I've

5    uploaded?

6    A.    But I thought you didn't upload a new

7    page.

8          I'm not following.

9    Q.    We started this example that I downloaded

10   a page, the second page that already had the script.

11   A.    Yes.

12   Q.    Then I changed whatever I changed on the

13   text.

14   A.    Yes.

15        Then, yes, the answer to your earlier

16   question is yes.  The script would stay intact

17   because you did not delineate it.

18        However, in the example you used earlier,

19   you were talking about being in design view, and in

20   that in many of these HTML editors, you can't know

21   whether you eliminated the script.  It's very

22   possible you could delete the script as you're

1    deleting content in design view, so you would have to

2    go most likely go back into HTML view and make sure

3    the script was intact.

4              It's my testimony that I think it would be

5    unlikely that you would be able to do what you're

6    describing without constantly going back into HTML

7    view to make sure that the script is intact, because

8    the script is the ultimate -- it is the thing that is

9    the ultimate objective as you're describing to be

10   able to have that authentication.  That's something

11   that is only verifiable in HTML.

12         Q.    But there's another way to verify it,

13   isn't there?

14         A.    If it works.

15         Q.    So if it doesn't work, what do you do?

16         A.    Then you have to go in and figure out why

17   it didn't using your HTML editor.

18         Q.    And somebody has already inserted the

19   code, so they know how to do that, don't they?

20         A.    In your example, yes.

21         Q.    You've already testified about that.

22         A.    That it's possible yes.

1        Q.    No, I don't think you said, possible.

2              There were -- remember, there were 2 steps

3    that somebody had to do.  So somebody has already

4    done those 2 steps to insert the script into their

5    code.  And so now they've put this page up there, and

6    they realize, the password protection isn't working

7    on this page, I have to do the same thing I already

8    did.

9              Isn't that the case?

10       A.    I'm sorry.

11             This is your hypothetical, so I'm not

12   quite sure how --

13       Q.    If you've now corrected a second page and

14   for a variety of reasons, the password protection

15   isn't working on that new page, what you do is, you'd

16   go back to your instructions and add the script

17   again, wouldn't you?

18       A.    Most likely, yes.

19       Q.    And in fact, if you had trouble figuring

20   out how to do that, there's assistance available to

21   you to get that done, isn't there?

22       A.    In many services, yes.  Sometimes it's

1    paid.  Sometimes it's not.

2          Q.    I have a better one for you.

3                The union has paid to have a consultant

4    available to help people with this.

5          A.    That wasn't in the resolution, so I wasn't

6    aware.

7          Q.    What if I told you here that the union has

8    in fact or will be in fact contracting with a

9    third-party consulting firm to provide assistance to

10   people, to candidates or supporters who are creating

11   campaign Websites to make sure that the password

12   protection system works.

13               Does that change your opinion in this

14   case?

15         A.    About how easy it is?

16         Q.    Yeah.

17         A.    No, because the question was how easy is

18   it for the candidates.  If I have to go and get

19   assistance, then that's much more difficult than if I

20   can do it using a front end by myself.  It would be

21   much more burdensome.

22         Q.    It's possible somebody could do it, and

1    you're telling me that you think it's an unreasonable

2    burden to have somebody called up a help line to get

3    assistance.

4              Is that your testimony?

5    A.    That is not what I said, no.

6    Q.    Before today, you had no idea that the

7    union was going to provide this technical assistance,

8    did you?

9    A.    What I understood was that this was an

10   evolving proposal.

11             I wasn't clear about the details of the

12   implementation of the resolution were.  That is what

13   I understood, was that it is still in formation.

14   Q.    I'm going to hand you what we'll mark as

15   exhibit 6.

16                          (Brenner Exhibit No. 6

17                          was marked for

18                          identification.)

19             BY MR. CLASH-DREXLER:

20   Q.    I apologize, Dr. Brenner, that you were

21   not informed by counsel for the plaintiffs of how

22   this system was going to work, but I take it that

1     you've never seen what I've just marked as Brenner

2     exhibit 6?

3            A.     No, I have not.

4            Q.     Okay.  This was sent out to all IUOE local

5     union business managers?

6            A.     May I have a second to read this, please?

7            Q.     Yes.

8                   (Pause.)

9                   BY MR. CLASH-DREXLER:

10           Q.     Just so you know -- feel free to read

11    through the document -- but I'm going to focus your

12    attention on point 2 on the front page, which is also

13    paragraph 2 on the second page as well.

14           A.     Right.

15                  (Pause.)

16           A.     Okay.

17                  BY MR. CLASH-DREXLER:

18           Q.     Again, you were not aware that the union

19    was going to provide affected members with this

20    assistance, were you?

21           A.     I have not seen this document.

22           Q.     It's also true that you were not aware

1    that the union was going to be providing that

2    assistance.

3            Correct?

4    A.    As I said, I understand it was an evolving

5    process, that the implementation was still evolving.

6    Q.    My question is really a simple one?

7            At the time that you signed your

8    declaration, did you know that the union was going to

9    be providing the assistance that is described in

10   paragraph 2 on the second page of exhibit 6?

11   A.    I did not know.

12   Q.    And it's your testimony sitting here today

13   that the fact that the union is providing that

14   assistance doesn't alter your opinion one bit?

15   A.    No.

16   Q.    You testified a few minutes ago that if

17   you ran into problems, there was support available

18   from maybe the Web hosting service.

19           Correct?

20   A.    Are you asking about my -- what's the

21   context?

22   Q.    I've created a Website, Google Page

1    Creator.  And I've run into a problem.

2         A.    Okay.

3         Q.    And I think you testified before I told

4    you that the union was providing the assistance that

5    there were other places for people to get assistance

6    when problems arose.

7               Correct?

8         A.    Yes.

9         Q.    And can you talk to a live person on

10   Google Page Creator if you need assistance?

11        A.    I don't know.

12        Q.    Did you explore that?

13        A.    I did not.

14        Q.    So in offering your opinion in this case,

15   you don't know one way or the other, do you?

16        A.    No, I do not.

17               I know that assistance is available.  I

18   don't know that you can talk to a live person.

19        Q.    What about on Yahoo! GeoCities?

20               Do you know whether you can talk to a live

21   person to get assistance?

22        A.    I'm not sure.

1    Q.    But I'm telling you that you can talk to a

2    live person under the union's plan, and they'll help

3    you to work through the problems with your password

4    protection.

5         And it's your testimony that you don't

6    think that that alters your opinion about the

7    technological burden imposed by the rule in one bit?

8         MR. BECK:  I object because you've asked

9    that question at least 2 times already.

10        BY MR. CLASH-DREXLER:

11   Q.    Go ahead, Dr. Brenner.

12   A.    No.

13   Q.    Let me point out another feature of the --

14   of what's on Brenner exhibit 6.

15        I assume because you hadn't seen this

16   before, you weren't aware that if somebody ran into

17   such difficulty implementing the password protection

18   system that the union is providing a waiver -- the

19   member can seek a waiver of the obligation to comply.

20        Were you aware of that?

21   A.    No.

22   Q.    And it's your testimony that -- does that

1    fact that a member can get a waiver from the rules

2    requirement alter your opinion about the burden,

3    technological burden imposed by the campaign Website

4    resolution?

5         A.    It would depend.

6               I don't know enough about the waiver

7    procedure, how much time that would actually take,

8    and those factors are pretty critical in deciding

9    whether or not this is actually a meaningful service

10   or option for members or not.

11        Q.    So it's your testimony that it could

12   affect your opinion; is that right?

13        A.    No, that's not what I said.

14        Q.    Are there any set of circumstances where

15   the waiver system would alter your opinion about the

16   burden imposed on affected members by the campaign

17   Website resolution?

18        A.    I guess I consider these things a non

19   sequitur.

20              The point I was trying to make is that

21   it's much harder to insert server-side scripting into

22   a Web page than it is to not be using these kinds of

1    services.  So to the extent which you're required to

2    do that, whether you have phone help or not, it is a

3    burden.

4              The phone help and the other things do not

5    diminish the fact that it's a substantially more

6    difficult procedure to use than to not.

7              That opinion is not changed by the fact

8    that those things exist.

9         Q.    You use the phrase substantially

10   difficult.

11             Right?

12             Those are your words.

13             Correct?

14        A.    I'd have to have it read back.

15        Q.    I'll represent to you that you just said,

16   substantially difficult.

17             We identified before 2 steps that are

18   involved in inserting the script; is that correct?

19        A.    We did.

20        Q.    Okay.

21        A.    But you have to do that for every page, so

22   that means that you're actually multiplying the work

1    involved in creating a campaign site quite

2    considerably, because every time in the example in my

3    declaration, you have to go back and do that.  You've

4    provided an alternative where you're FTP'ing.

5              Again that's a much more difficult

6    procedure.  It requires a much higher level in my

7    opinion technological capacity and familiarity than

8    being able to log into a Website, write something in

9    a little box and hit, submit.

10        Q.    Isn't it your testimony that candidates

11    for union office often don't have very complex or

12    hierarchical Websites?

13              They're normally one page as you described

14    it.

15              Didn't you state that in your declaration?

16        A.    I don't think I said, normally.

17              I said they can or may be.  I can't attest

18    to the "normally."

19        Q.    Is it your opinion that candidates for

20    union office typically have only a single page on

21    their Website?

22        A.    It depends.

1          There are tens of thousands of local

2     unions in the country, and candidates run campaigns

3     in a variety of different fashions, and Websites take

4     different forms.  I've seen hierarchical sites where

5     information is in some ways up and down and sites

6     where everything is on the front page.  I've seen

7     everything in between.

8          Q.    So it really varies?

9          A.    Yes.

10         Q.    Let's just look at page 6, paragraph 17,

11    which starts on page 5 actually, but I want you to

12    look at the sentence that starts on page 6.

13              Are you with me?

14         A.    Yes.

15         Q.    The first full sentence.

16              Why don't you read into the record.

17         A.    Most union candidates, however, structure

18    their Websites to fit as much information on the

19    front page as possible.

20         Q.    So is it your opinion that most union

21    candidates' Websites have multiple pages?

22         A.    I'm sorry.

1          Most union candidates in my experience try

2     to get a lot of information on the front page of

3     their site.

4          That's what I wrote.

5     Q.    What is your experience as a supposed

6     expert in this field about how many pages most union

7     candidates have on their Websites?

8     A.    It really depends.

9     Q.    So you don't know one way or the other.

10    It could be all over the map.

11          Right?

12    A.    I've seen examples in variety of different

13    forms.  I think as I said in my declaration, that

14    generally candidates like to get lots of information

15    on their front page, and often I've found candidate

16    sites that have all of their information on the front

17    page.

18          It's a feature of Web design and Web

19    building generally that if people are going to come

20    to the site, you'd like to get as much in front of

21    them as you can.  That way you don't lose readership

22    as you force them further into your site.

1          Q.    Let's go on to paragraph 13.

2                Can you tell me what a blog is?

3          A.    It's a colloquial name for a Web page that

4     is structured sort of like an online journal where

5     you make an entry.  Typically the latest entry

6     appears at the top of the page.

7                It's -- usually shows an excerpt or a

8     portion of a post, although you can configure it so

9     it shows an entire post on the front page of a blog

10    site.

11               Is this sufficient?

12         Q.    Yes.

13               Now, you identified 3 blogging platforms

14    in paragraph 13, didn't you?

15         A.    Yes.

16         Q.    Google's Blogger, is that also referred to

17    as Blogspot?

18         A.    Blogspot, dot, com, yes.

19         Q.    And it's true, isn't it, that Google's

20    Blogger, you could add script into the HTML page that

21    would allow the remote authentication system to

22    operate?

1        A.    I don't believe that's true.

2        Q.    Can you do HTML editing on Blogger?

3        A.    I don't know.

4        Q.    Then what's the basis of your statement

5    that you don't think you can, you can make the remote

6    authentication system work if you don't know that

7    piece of information?

8        A.    What's the question?

9        Q.    You just said that you don't think you

10   could make the remote authentication system work on

11   Blogger.

12             Correct?

13       A.    That's what I wrote, yes.

14       Q.    And my question to you is, wouldn't it be

15   important to know whether you are allowed to edit the

16   HTML code in Blogger in order to answer the question

17   of whether the remote authentication system would

18   work?

19       A.    It's not a sufficient piece of

20   informations.

21       Q.    Isn't it one of the critical pieces of

22   information?

1          Is it a piece of information you'd want to

2    know?

3          A.    It's something you would need to know,

4    yes.

5          Q.    What else would you need to know?

6          A.    Can you run a server-side scripting

7    script.

8          Q.    Will it support Java script?

9                Would that be one of the things you'd need

10   to know?

11         A.    It depends.  I don't know -- I haven't

12   heard definitively what language the authentication

13   program is going to be developed in.  I understand

14   that that might be one.

15         Q.    If Blogger allowed you to edit the HTML

16   code and supported Java script, wouldn't it be the

17   case that the remote authentication system would work

18   upon Blogger?

19         A.    I don't know.

20               I'd need more information about the remote

21   authentication server to be able to answer your

22   question.

1    Q.    You have no idea, because you don't have

2    that information, do you?

3         Correct?

4    A.    I do not know what the system being

5    proposed is in the details that would be necessary to

6    answer the question.

7    Q.    In any event, you're testifying here to

8    your opinion as an expert witness that the remote

9    authentication system is not possible for a member of

10   the International Union of Operating Engineers who

11   wants to have a blog on Blogger?

12   A.    That's my understanding, yes.  There's

13   insufficient information in my hands to be able to

14   draw a definitive conclusion.

15   Q.    What other information would you need?

16        HTML allows you to edit the HTML --

17   A.    Server-side scripting.

18   Q.    -- it supports Java script.

19        What else would you need to know other

20   than those 2 pieces of information?

21   A.    Is this where you want to start talking

22   about technical stuff?

1              Because there are different -- there are

2    shades of gray in server-side scripting, including

3    different languages.  It's not necessarily possible

4    that everything that you would be able to do with

5    Java scripting in one site is possible in another

6    site.  It's not a one size fits all.

7              I would need to know how it's going to

8    work and measure that against whatever Java support

9    might be provided, and then you would be able to

10   determine whether it was possible.

11        Q.    Your opinion that it wouldn't work is

12   simply a guess, isn't it?

13        A.    No.

14        Q.    Well, did you find out whether it supports

15   Java script in offering your opinion?

16              Did you find out whether Blogger supports

17   Java script when you offered your opinion in

18   paragraph 13?

19        A.    Specifically?

20              I did not explore Java, no.

21        Q.    Did you do that for TypePad?

22        A.    No.

1      Q.    Did you do that for LiveJournal?

2      A.    No, I did not.

3      Q.    What about the ability to edit the HTML

4  code?

5           Did you do that on Blogger?

6      A.    Yes.

7           I don't recall whether it's possible --

8  the answer to your question is also partly dependent

9  as I was describing on our site about to what extent

10  are you allowed to insert HTML into editable HTML

11  file.

12           So even if you're able to edit HTML, that

13  doesn't mean that you're going to be able to insert

14  the snippet of code that you are -- that we've been

15  talking about thus far into your page and have it

16  execute.

17      Q.    You don't have any idea one way or the

18  other whether it will work, because you didn't try

19  it.

20           Right?

21      A.    The remote authentication system doesn't

22  exist, how could I have tried it?

1          Q.     That's fine.

2                 I'm not trying to make you answer the

3      question.  All I want to know is whether you know the

4      answer.

5                 It seems to me like the answer is, you

6      don't know because you didn't try it.

7                 Right?

8          A.     The question that I understand you asking,

9      the answer is, no one can know, because the system

10     hasn't been built yet.

11                (Discussion off the record.)

12                BY MR. CLASH-DREXLER:

13         Q.     Let me try it again.

14                You don't know whether the remote

15     authentication system will work on Blogger, because

16     you don't have all the pieces of information that you

17     would need to answer that question; isn't that

18     correct?

19         A.     The pieces do not exist.

20         Q.     Right.

21                So you don't have those pieces of

22     information to answer that question.

1              Correct?

2       A.    The pieces do not exist.

3       Q.    We'll go around and around with this.

4              Either you had that information when you

5    offered your opinion or you didn't.

6              So did you have all the pieces of

7    information you needed to be able to determine

8    whether the remote authentication system would work

9    on Blogger?

10      A.    No, because the system had not been

11   developed yet, and therefore the pieces did not

12   exist.

13             MR. LEVY:  Can we go off the record?

14             BY MR. CLASH-DREXLER:

15      Q.    And the same fact is true of TypePad,

16   isn't it?

17      A.    This is true.

18      Q.    And the same affect is true of

19   LiveJournal, isn't it?

20      A.    This is true.

21      Q.    So the last sentence in paragraph 13, the

22   last 2 sentences of paragraph 13, you didn't have any

1     basis for that opinion, did you?

2          A.    Yes, I did.

3                In general, if server-side scripting

4     scripts are required on these commercial sites, of

5     course it's more difficult if server-side scripting

6     is not included to have blogging and password

7     protection.

8          Q.    Well, this is partly my mistake here.

9                I wanted to just refer you to the

10    second-to-last sentence where you said none of these

11    blogging platforms allow users to run server-side

12    scripts.

13               You said that didn't you?

14         A.    Yes.

15         Q.    But you didn't have all the information

16    you needed with respect to Blogger, TypePad, and

17    LiveJournal to make that opinion, did you?

18         A.    I'm sorry.

19               Can you restate that.

20               (The reporter read the last

21               question.)

22         A.    I did, yes.

1          MR. CLASH-DREXLER:  Okay.  Why don't we

2    take a break here.

3          (Recess.)

4          BY MR. CLASH-DREXLER:

5    Q.    Dr. Brenner, let's look again at that

6    second-to-last sentence in paragraph 13.

7          If I change the word server-side script to

8    client-side script, would that change your answer at

9    all about whether you have the ability to offer an

10   opinion about whether the blogging platforms would

11   permit the remote authentication system to work?

12   A.    Does the -- depends on the requirements of

13   the system.

14         Does the system work under client-side or

15   server-side?

16         My understanding is, it's a server-side

17   scripting application.  So --

18   Q.    When you're talking about the remote

19   authentication system -- in the question you asked

20   me, are you referring to the remote authentication

21   system that is being set up through the third-party

22   firm, who is going to contract with the union, or are

1    you talking about Blogger?

2        A.    I'm referring to the remote authentication

3    system.

4        Q.    What if I told you that it will -- that

5    Java script for example will be a supported language?

6            Does that change your answer about whether

7    Blogger, TypePad, or LiveJournal can be used with the

8    remote authentication system?

9        A.    I would have to have more information.

10        Q.    So does that change your opinion, then,

11    that none of these blogging platforms would allow

12    users to run client-side scripts?

13        A.    I'm not following.

14        Q.    You've said here, none of these blogging

15    platforms allow users to run server-side scripts.

16            Now, from that sentence, you're talking

17    about Blogger.

18            You're not talking about the remote

19    authentication system?

20        A.    That is correct.

21            (Discussion off the record.)

22            BY MR. CLASH-DREXLER:

1       Q.    Dr. Brenner, you testified, or your

2    declaration states, none of these blogging platforms

3    allow users to run server-side scripts.

4             Correct?

5       A.    Correct.

6       Q.    And there you're referring to Blogger,

7    TypePad.

8             Correct?

9       A.    That is correct.

10      Q.    You're not referring to the remote

11   authentication system?

12      A.    That is correct.

13      Q.    Do you know one way or the other whether

14   those blogging platforms allow users to run

15   client-side scripts?

16      A.    I do not.

17      Q.    So you would not be able to offer an

18   opinion, then, that none of the blogging platforms

19   allow client-side script.

20            Correct?

21      A.    Correct.

22      Q.    Therefore, you would not be able to offer

1    an opinion on whether or not a candidate with a

2    campaign Website would be able to use the remote

3    authentication system with a client-side script.

4              Correct?

5        A.    I do not believe you can do the remote

6    authentication without the server-side script.

7        Q.    So it's your testimony that with Java

8    script it's not possible to do the remote

9    authentication system?

10       A.    I would need more information, but I do

11   not think it will be possible.

12       Q.    What information would you need?

13       A.    Technical specifications about the remote

14   authentication system, more detail.

15       Q.    What detail would you need?

16             Let me explain why I'm asking the

17   question.

18             Because if I can provide you with that

19   information, maybe you'd be able to offer an opinion

20   about whether or not it works.  So I need you to tell

21   me what you need to offer that opinion.

22       A.    I cannot provide a full list of everything

1    I would need to make that decision here.

2        Q.    Do you need that same information to

3    determine whether the server-side scripts would work?

4        A.    For the remote authentication?

5        Q.    Yes.

6        A.    I don't know of examples of client-side

7    authentication systems.  More readily -- I have more

8    familiarity with server-side scripting solutions.

9        Q.    So you're not an expert in client-side

10   scripting solutions, are you?

11       A.    I'm not.

12       Q.    We talked about RSS feeds earlier today.

13       A.    Yes.

14       Q.    Do you know or did you explore how many

15   IUOE campaign Websites have RSS feeds?

16       A.    I did not.

17       Q.    How many rank and file IUOE Websites not

18   limited to campaigns have RSS feeds?

19       A.    I don't know.

20       Q.    Did you explore whether IUOE members

21   utilize RSS readers?

22       A.    I do not know.

1          MR. LEVY:  The question is, did you

2    explore, and I think he's entitled to an answer to

3    that question.

4          You said you didn't know whether they did,

5    but he asked, did you explore.  And I think that is a

6    yes-or-no question that you can answer.

7          Do you understand the distinction?

8          THE WITNESS:  Yes.

9          I'm sorry.

10         I do understand the distinction.

11    A.    I did not explore specifically whether

12    rank and file operating engineer Websites have RSS

13    feeds.

14         BY MR. CLASH-DREXLER:

15    Q.    And therefore, you don't know whether rank

16    and file Websites have RSS feeds.

17         Correct?

18    A.    Correct.

19         MR. LEVY:  That's the question he had

20    answered.

21         BY MR. CLASH-DREXLER:

22    Q.    If a --

1          MR. LEVY:  Is it okay for me to try it

2     move it along?

3          MR. WEINBERG:  Yeah.

4          BY MR. CLASH-DREXLER:

5     Q.    If a union member operating a campaign

6     Website has a static HTML page, tell me all the steps

7     that would need to be taken to allow an RSS feed to

8     work.

9     A.    I can't give you a complete inventory, but

10    the basic steps that I'm aware of that they would

11    most likely employ is to sign up for a service, free

12    or commercial, that creates RSS feeds from their

13    static site.  So they would have to sign up.

14          They would have to register their domain

15    name.  They would have to probably provide some more

16    information about their Website, and then the feed

17    would be created from a different source than their

18    site, would be the service that they're signing up

19    for.

20    Q.    Are you aware of any Web hosting service

21    that's offering RSS feeds for a static HTML page?

22    A.    I believe it exists.  I am not aware of

1    specific hosts.

2        Q.    Of the 2 -- you looked at the 150 election

3    site, correct, of Joe Ward?

4        A.    Briefly.

5        Q.    Isn't that an example of a static HTML

6    page?

7        A.    Yes.

8              It has a flash intro.  Below that, there's

9    static pages I believe, yes.

10       Q.    And you testified earlier that you --

11   you're familiar with the Association for Union

12   Democracy.

13             Correct?

14       A.    Yes.

15       Q.    And that you often go to their Website to

16   get information.

17             Correct.

18             Let me just take a step back from the AUD

19   site for a second.

20             Isn't it true that the Local 150 site

21   allows people to provide their email addresses to get

22   updates about what's going on in the campaign?

1    A.    I'm not sure.

2    Q.    Did you look for that?

3    A.    No, I did not.

4    Q.    How about your own site, Labor Notes?

5    A.    Yes, we do.

6    Q.    And where do you do that?

7    A.    We like to allow people who visit our site

8    to stay in touch with us in other ways than just the

9    Web.

10    Q.    And so that provides another mechanism to

11    let people know when there's new content on their

12    site?

13    A.    Correct.

14    Q.    Your next paragraph, paragraph 15, talks

15    about podcasts.

16         Do you have a podcast on the Labor Notes

17    site?

18    A.    We do not.

19    Q.    Can you identify a single IUOE campaign

20    Website that has a podcast?

21    A.    No.

22    Q.    When was the last time you got a call from

1    a person at one of those -- when was the last time

2    you got a phone call about someone seeking to add a

3    podcast to their campaign Website?

4         A.    About 3 months ago.

5         Q.    And who called you?

6         A.    It was a union member in upstate New York

7    who runs a radio show on his local radio station and

8    was interested in providing podcasts of his radio

9    show.

10        Q.    Is this the Teamsters?

11        A.    No.

12              This is a different person.

13        Q.    So this would be a fourth example of

14   somebody who called you?

15              Was this for a campaign Website?

16        A.    No.

17        Q.    When was the last time somebody called you

18   seeking advice about putting a podcast on their

19   campaign Website?

20        A.    I don't recall ever being asked that

21   question.

22        Q.    Going to be to paragraph 16.

1              You identify the site Flicker,

2    F-L-I-C-K-E-R.  That's a photograph-sharing program.

3              Can you identify anything in the campaign

4    Website resolution that would prevent a member from

5    sharing photographs?

6        A.    No.

7        Q.    And the next site you identify is -- I

8    will spell it:  D-E-L, period, I-C-I-O, period, U-S,

9    period.  I assume referred to as del.icio.us.

10             Are you familiar with that site,

11   Dr. Brenner?

12       A.    Yes, I am.

13       Q.    And you state in your declaration that

14   it's to share bookmarks?

15       A.    This is correct.

16       Q.    Did you search del.icio.us to see whether

17   any IUOE-related Websites had been bookmarked?

18       A.    I did not.

19       Q.    And what about the resolution would

20   prevent somebody from bookmarking a campaign Website?

21       A.    Nothing directly.

22       Q.    You mentioned Yahoo! for discussion

1    forums.  Isn't it true that you can set up a Yahoo!

2    discussion forum to be limited to only people I want

3    to allow onto the site?

4         A.    This is correct.

5         Q.    Is there anything in the resolution that

6    requires somebody to use the password protection

7    system set up by the international?

8         A.    I'm not sure.

9         Q.    You don't know one way or the other?

10        A.    I would have to refer back to the

11   resolution.

12        Q.    And it's Brenner exhibit 4.

13        A.    I do not know how you would use Yahoo!

14   discussion groups with members' registration numbers.

15        Q.    But isn't it true that a candidate who

16   wants to have a discussion forum on Yahoo! could take

17   the initiative to ensure that the people who seek to

18   sign up for that discussion forum are members of the

19   union?

20        A.    Possible, yes.  Difficult also, yes.

21        Q.    You haven't looked at the Pat Kohl site.

22              Right?

1          A.    I have not.

2          Q.    I'll represent to you that she has a

3    Yahoo! discussion forum on her site.

4                Are you aware that those sites allow

5    people to put in a description of about why the

6    moderator should grant them access to the site?

7          A.    Yes.

8          Q.    So isn't it possible that through that

9    system, somebody could seek to confirm whether or not

10   somebody is a member of the union?

11         A.    Possible, yes.  Difficult also, yes.

12         Q.    What about it is difficult?

13         A.    How do you verify that someone is

14   representing -- that is who they represent themselves

15   to be electronically.

16         Q.    So there might be some questions that need

17   to be asked to do that.

18                Wouldn't that be the case?

19         A.    Yes.

20         Q.    Are you aware of any campaign Website, not

21   just in the IUOE, that has sought to use a group

22   editable Web page as its campaign Website?

1     A.    Are you referring to a wiki?

2     Q.    Yeah.

3     A.    I have seen it.  I cannot give you the

4 specific examples.

5     Q.    How many have you seen?

6     A.    Very few.

7     Q.    And these again are election campaign

8 Websites?

9     A.    Exactly.

10     I'm trying to restrict my comments to

11 election-specific.

12     Q.    What was the subject matter of those

13 Websites?

14     A.    My recollection is that they were very

15 general in their content about the campaign and were

16 largely about getting people to participate in

17 building out the site.

18     At the stage that -- the one that I'm

19 recalling, which I'm sorry I can't give you more

20 specifics on, was pretty simple.  It wasn't a very

21 elaborate wiki, W-I-K-I.

22     Q.    Do you even know whether that page that

1    you looked at would be required to be

2    password-protected under the campaign Website

3    resolution?

4        A.    The one that I saw as I understand the

5    resolution, yes, it would, because it had information

6    about the campaign that was not just the name of the

7    person's office that they were seeking.  It had much

8    more information about the slate and general events

9    in the union on the front page.

10       Q.    What other information can you recall

11   about that page?

12             Let me ask it this way:  What was the

13   general information about the union that was on that

14   page?

15       A.    Information pertaining to the membership

16   meeting for nominations.  Information pertaining to

17   the key issues of the slate involved in the campaign,

18   which I don't recall the specifics of, but --

19       Q.    Are you able to discuss in any detail a

20   single other wiki page?

21       A.    No, I am not.

22       Q.    You also reference a YouTube page.

1               How did you find that page?

2        A.    I found it through counsel.

3        Q.    Did you try searching for it on YouTube?

4        A.    I did not.  I just watched it.

5        Q.    Do you know of any way to even find that

6   using search terms on YouTube?

7        A.    I have not tried.  I'm sure it is

8   possible.  Perhaps difficult.

9        Q.    Let's go on to paragraph 17.

10              (Discussion off the record.)

11              BY MR. CLASH-DREXLER:

12       Q.    I'm sorry.

13              I'm going to go on to paragraph 19.

14              Are you aware of any members who are

15   growing to be forced to move their sites to a new Web

16   host because of the campaign Website resolution?

17       A.    No, I'm not.

18       Q.    So you're just speculating that somebody

19   would have to do that.

20              Correct?

21       A.    The technical requirements involved in

22   server-side scripting would require some of the

1    examples I used earlier in the declaration to be

2    migrated to a commercial host.

3              That's a fact.

4        Q.    But you can't identify a single member of

5    the International Union of Operating Engineers who

6    would be required to do that, could you?

7        A.    No, I cannot.

8        Q.    And in the future, next year, for

9    instance, people will know what the rule is.

10             Correct?

11       A.    Ostensibly, yes.

12             Sir --

13       Q.    Your second sentence says --

14       A.    Sir --

15       Q.    Let's assume for a second that a candidate

16   does have to move their Website.

17             Okay?

18             And you state that it will cause existing

19   users to have difficulty finding the new site.

20             Is that what you're your declaration

21   states?

22       A.    For some, sure.

1      Q.    Well, is there anything about the campaign

2   Website resolution that would keep -- prevent

3   somebody from keeping their old site to say, this

4   site has moved to this new address?

5      A.    No.

6      Q.    Is there anything to prevent candidates

7   from sending an email to people saying, here is my

8   new Website address?

9      A.    Nothing in the resolution.

10     Q.    Is that technically difficult to put on a

11  Website, a piece of context that says, go visit my

12  Website at its new address?

13     A.    No.

14     Q.    Let's turn to paragraph 20.

15          Are you aware of the precise methodology

16  that Google uses to rank sites under its search

17  engine?

18     A.    My understanding is, that is a very

19  precious piece of information for that company.  The

20  basic structure of it I do think I understand.

21     Q.    And what about Yahoo!?

22          Do you know the precise methodology that

1    Yahoo! uses?

2        A.    I do not.

3              MR. LEVY:  Are you asking him if he knows

4    exactly the contents of the algorithm or whether he

5    knows that there's an algorithm?

6              BY MR. CLASH-DREXLER:

7        Q.    I'm asking whether you know the precise

8    algorithm.

9        A.    I do not know the precise algorithm

10   involved in either Yahoo! or Google.

11       Q.    Are you familiar with the general field of

12   search engine optimization?

13       A.    Yes.

14       Q.    What is that?

15       A.    It means many things to many people, but

16   the way in which I'm familiar with it is trying to

17   design your site in a fashion that will maximize your

18   position in various search engines through use of

19   keywords, metatags, strategic links with other sites.

20   There are several ways that you can increase and

21   boost your rankings that are known.

22       Q.    You'd agree with me that one of the

1    important ways to boost your rankings is based on

2    keyword content, wouldn't you?

3         A.    That is becoming a less important way to

4    do it, but it is a way to do it, yes.

5         Q.    In fact, when you testified a minute ago,

6    you used keyword content in talking about search

7    engine optimization, didn't you?

8         A.    That is correct.

9         Q.    And you can use keywords in a few places,

10    like you can put them in the URL?

11        A.    Yes.

12        Q.    You can put them in the title tag.

13              Correct?

14        A.    Yes.

15        Q.    It's also important in terms of ranking on

16    the search engines that your keyword content is high

17    up on the page; isn't that correct?

18        A.    It's my understanding.  It depends on the

19    specific search engine.  Algorithms differ, but in

20    general, that is what people do.

21        Q.    And would you say that it's generally

22    accepted that the search engines will tend to focus

1    primarily on the first 200 words, that they'll give

2    that more weight?

3         A.    I'm not sure that I would agree with that.

4               The issue of page ranking is one that is

5    not just important to users of Websites.  It's also

6    very important to the search engine companies.

7               And they have -- they continue to develop

8    their methods for ranking pages based on the

9    techniques and tricks so to speak that people use.

10   So because providing metatags or using keywords in

11   the title or a variety of other methods that we've

12   alluded to are known to them as well as to people

13   like me, their algorithms have evolved to address

14   some of this.

15              So it's a much less effective method and

16   continues to become much less effective as a method.

17        Q.    Well, I mean, content obviously is an

18   important element, right, because that says what your

19   Website is about, doesn't it?

20        A.    This is true.

21        Q.    What is the basis of your knowledge about

22   how the various search engines work?

1      A.    I've been involved in trying to place

2   various Websites that I have designed or helped

3   people design on search engines.  I have tried to

4   help improve the placement of Labor Notes, dot, org

5   in various search engines and several other Websites

6   that I've worked with over the years.

7      Q.    Have you worked with union members running

8   for elected office in their union on improving their

9   page rank on a search engine?

10     A.    Yes.

11     Q.    Can you give me one example of that?

12     A.    Sure.

13           In the example I gave earlier of the Tom

14   Leedham campaign for international president of the

15   Teamsters.

16     Q.    What did you advise Mr. Leedham?

17     A.    That -- I explained in brief my

18   understanding of the Google algorithm, because that

19   was the thing that his campaign manager was most

20   interested in.  And I stressed the need to develop

21   links on high-ranking pages to his site, that one of

22   the ways that search engines have tried to foil

1    metadata keywords is through referrals, Websites

2    referring to your site as a way of measuring what's a

3    valid or well-suited response to an inquiry in a

4    search engine.

5         Q.    But it's -- I mean, you used the word meta

6    keyword in your answer.

7              Correct?

8         A.    Metatags.

9         Q.    But the title tag is different than the

10   metatag, isn't it?

11        A.    Yes.

12        Q.    And the URL is obviously different than

13   the metatag.

14             Right?

15        A.    Yes.

16        Q.    I understand that the search engine

17   companies are moving away from metatags because of

18   abuse in that process, but is it your testimony that

19   they're also moving away from considering the title

20   tag or content at the top of the page as an important

21   factor in their rankings?

22        A.    My understanding is that they're searching

1     for other more reliable methods for ranking pages,

2     which include referring pages, and that as those

3     become more important, they necessarily make title

4     tags and URL words less important.

5          Q.     I'm going to hand you what I'm going to

6     mark as Brenner exhibit 7.

7                             (Brenner Exhibit No. 7

8                             was marked for

9                             identification.)

10              BY MR. CLASH-DREXLER:

11          Q.     I take it, Dr. Brenner, have you ever --

12     let me ask you this question:  Have you ever seen

13     this document before?

14          A.     I have not.

15          Q.     Are you familiar with Dimension Studio

16     publication?

17          A.     No, I am not.

18          Q.     In looking at the second bold text on the

19     first page, it says, all the right words in all the

20     right places.

21              Do you see that?

22          A.     Yes.

1        Q.    Okay.  And is there anything in that

2    paragraph there that you don't agree with, that first

3    paragraph?

4        A.    I wouldn't agree with putting 2 or 3

5    phrases in the title tag necessarily.

6        Q.    And why is that?

7        A.    Well, your title also serves a purpose for

8    the page.

9        So in our case for example, we want the

10    title of the page to reflect the title of the article

11    for a magazine story.  We wouldn't want to put words

12    that are -- phrases that are unrelated to the title

13    of that page.

14        So it depends.  In general, this is only

15    one piece of the way in way search engines look for

16    content.

17        Q.    Right.

18        It's one piece.

19        A.    Correct.

20        Q.    And one piece of that is content on the

21    home page.

22        Right?

1        A.    Correct.

2        Q.    I'm going to show you what we'll mark as

3   Brenner exhibit 8.

4                          (Brenner Exhibit No. 8

5                           was marked for

6                           identification.)

7              BY MR. CLASH-DREXLER:

8        Q.    Have you seen that document before,

9   Dr. Brenner?

10       A.    Yes, I have.

11       Q.    And what is it?

12       A.    It is a guide published by the Association

13  for Union Democracy for building effective rank and

14  file Websites.  It contains 50 guidelines in a sample

15  home page.

16       Q.    And again this is from the Association of

17  Union Democracy.

18             Right?

19       A.    Association for Union Democracy.

20       Q.    Well, let's look at page 2.

21             On the first guideline, and in the third

22  sentence, it says:  Use a separate About Us page.

1          Do you see where I am?

2     A.    I do.

3     Q.    Then it says, make sure your site title

4  and description, the first thing people see on the

5  home page gives people the basics.  This also is

6  helpful to search engines.

7          Do you agree with that statement?

8     A.    I do.

9     Q.    In your declaration, paragraph 20, you

10  state that the easiest way to locate the campaign

11  Website of plaintiff Joe Ward is to search Yahoo!

12  for, and then in quotes, Local 150 IUOE election Joe

13  Ward.

14          Is that what you anticipate people who are

15  searching for Joe Ward's Website will use as search

16  terms?

17     A.    Some combination, I believe that's a

18  likely combination.

19     Q.    So if you were advising Mr. Ward on his

20  Website, would it be accurate for you to say that

21  it's important for Mr. Ward to put those keywords

22  either in the title tag or on the home page of his

1    Website?

2        A.    He would want that, yes.

3        Q.    And in fact that would help him having his

4    site accessible on Google or Yahoo!.

5             Correct?

6        A.    Correct.

7        Q.    Let's just sort of take a step back.

8             The search engine optimization field --

9    the reason why there's such a business out there

10   trying to help people is because typically you'll

11   have a company who is trying to market a service.

12            And there are lots of other companies out

13   there who are marketing the same service; isn't that

14   correct?

15       A.    There are many companies that market many

16   services that use Websites, yes.

17       Q.    And so if there are many companies who are

18   marketing the same service, you need to find a way to

19   have your Website ranked higher than your competing

20   Websites.

21            Correct?

22       A.    That's one reason that people spend time

1    studying search engine optimization, yes.

2         Q.    Because people are going to put in the

3    same search terms to seek any of those Websites who

4    are competing in that same field.

5              Right?

6         A.    Not necessarily.

7         Q.    Let's take an example of Web development

8    consulting firms.

9         A.    Okay.

10        Q.    If you were going to do a search to find

11   Website development consulting firms in the

12   Washington, D.C., area, you wanted to find one, what

13   would your search be?

14        A.    It would not be Web development

15   consulting, Washington, D.C.

16        Q.    What would it be?

17        A.    I would actually not use a search engine.

18             If I did use a search engine, I would

19   probably try to find some publication -- some

20   regional industry publication that had reviews,

21   recommendations, or some other method for

22   independently assessing Web design consulting.

1                There in many industries are situations

2       where there's too much out there.  And the search

3       engine doesn't really help you find what you're

4       looking for.

5            Q.    Because essentially what you'd be getting

6       is the person who was best able to game the search

7       engine system, right, rather than maybe the best Web

8       consulting development firm.

9                Correct?

10           A.    I don't know the algorithm, so I don't

11      know whether they really gamed the system better or

12      just got lucky.

13           Q.    But in any event, you may not get the best

14      Web development consulting firm.

15               You're just going to get the one that set

16      up its site best to rise to the top of the countless

17      number of Web development consulting firms in the

18      Washington, D.C., area.

19               Correct?

20           A.    How you set up your site is not the only

21      factor that affects page ranking, so, no.

22           Q.    You're really making this issue too

1    difficult.

2              MR. BECK:  You answered the question.

3              Your question had an assumption in it, and

4    he disagreed with it.  He's answered your question.

5              BY MR. CLASH-DREXLER:

6         Q.    Okay.  Again, you'd agree with me, though,

7    that -- well, so you're saying that if you were

8    searching for a company to do a service for you, the

9    first place you'd look is not a search engine.

10              That was your testimony?

11         A.    It depends.  In the example you gave, yes.

12         Q.    Okay.

13         A.    I would not use keyword searches on a

14    search engine for the example you gave.

15         Q.    When would you use them?

16         A.    Often.

17         Q.    Give me an example.

18         A.    When I'm trying to locate the Website for

19    an SCIU local that I want to do a story about, I'll

20    search the local number in SCIU, for example.

21         Q.    You say in paragraph 20 that,

22    password-protecting a Website will make it invisible

1    to search engines and much more difficult to find.

2            Correct?

3        A.    Paragraph 20, yes.

4        Q.    Okay.  But you acknowledge as you did in

5    paragraph 21 that the campaign Website resolution

6    doesn't require you to password-protect the entire

7    Website.

8            Correct?

9        A.    Yes.

10       Q.    And assume that Mr. Ward's Website is set

11   up better than it is now and doesn't have a flash

12   page, which in fact is not searchable by the search

13   engines.

14           Correct?

15       A.    Yes.

16       Q.    So because of the campaign Website

17   resolution, he actually puts onto his home page, Joe

18   Ward -- you know, some data point there, but he says

19   his name, the members of his slate, his local union,

20   the position he's running for, and he also includes

21   some of those terms in his title tag.

22           Is it your testimony that that site will

1    not come up high on Google if somebody puts in, Local

2    150 IUOE election Joe Ward?

3        A.    It depends.

4        Q.    It depends on if other people are out

5    there using those keywords, doesn't it?

6        A.    That's not my understanding of the Google

7    algorithm.

8        Q.    So is it your testimony that if only the

9    home page is not password-protected, and a candidate

10   is allowed to put their name, their local union, the

11   members of their slate, and the positions they're

12   running for, that it is likely that that's not going

13   to show up even on the first page of a Yahoo! search

14   using the terms you identify in paragraph 20?

15       A.    I really don't know.

16       Q.    What about Google?

17             Do you know one way or the other?

18       A.    I don't think we can determine

19   definitively without the algorithm.  It's a trade

20   secret, so -- we could do an experiment and see.

21       Q.    Did you run that experiment?

22       A.    I did not.

1       Q.    You say in paragraph 22 that the way that

2    the remote authentication is going to be set up will,

3    quote, increase the possibility for problems because

4    of the various ways members may type in their names.

5          Do you see that?

6          Paragraph 22 on page 7.

7    A.    Yes, I do.

8    Q.    Do you know how the remote authentication

9    will address punctuation in a person's name?

10    A.    My understanding is that it will take

11    account punctuation.

12    Q.    I'm sorry.

13          What do you mean, it will take account

14    punctuation?

15    A.    That it will not be dependent on whether a

16    period is used after a middle initial, for example,

17    that that will not trip the system.

18    Q.    So the fact that that is a new piece of

19    information that you have since you signed this

20    declaration -- was that your testimony?

21    A.    Yes.

22    Q.    -- does that change your opinion at all in

1    paragraph 22?

2        A.    Not really, no.

3        Q.    You have on the Labor Notes site an

4    ability for people to donate to Labor Notes, don't

5    you?

6        A.    That is correct.

7        Q.    Let's take a look at that page.

8                        (Brenner Exhibit No. 9

9                        was marked for

10                       identification.)

11            BY MR. CLASH-DREXLER:

12       Q.    Can you identify that document for me,

13   Dr. Brenner?

14       A.    Yes.

15            This is a printout of the donation page on

16   the Labor Notes Website.

17       Q.    And you'll see at the bottom of the page,

18   you have the ability -- or Labor Notes has the

19   ability for people to donate using a credit or debit

20   card.

21       A.    Yes.

22       Q.    What happens if somebody enters their card

1    number incorrectly?

2        A.    The transaction does not get completed.

3        Q.    And what happens if somebody doesn't put

4    the name as it appears on their credit card?

5        A.    Similarly, the transaction is not

6    complete.

7        Q.    So is this system set up on Labor Notes to

8    keep people from being able to donate?

9        A.    No.

10       Q.    You think this is a reasonable method for

11   setting up an ability for people to donate to Labor

12   Notes?

13       A.    I would prefer that it is less

14   restrictive, but the system does not allow it to be

15   less restrictive.

16       Q.    Okay.  So given the realities, the

17   technological realities, you've developed a

18   reasonable system for that, haven't you?

19       A.    We've developed a system that makes it as

20   easy as possible for our supporters to give money

21   online.

22       Q.    Isn't it the case that if you're going to

1    buy really any product online, you're going to have

2    to enter in your credit card information and this

3    same system here is going to apply, that if you put

4    in the wrong card number or the wrong name to

5    purchase something; isn't that correct?

6         A.    Yes, that is.

7         Q.    You make a comment in paragraph 22 that

8    there are likely to be mistakes and typographical

9    errors that corrupt the user names or passwords of

10    some users.

11         You're not offering any opinion that the

12    data of the IUOE has any problem in it, are you?

13         A.    I have never had access to the membership

14    roster of the International Union of Operating

15    Engineers.  However --

16         Q.    You are unable to offer an opinion one way

17    or the other about whether the International Union of

18    Operating Engineers' record system has, quote,

19    significant errors, gaps in information, and lag time

20    in updating information to new members.

21         Correct?

22         A.    I was going to finish my sentence earlier.

1          Q.    Why don't you answer my question.  Then

2    you can go back and do that.

3          A.    Because the answer to your question

4    depends on what I was -- you wouldn't have asked your

5    question if you had let me finish.

6                What I would have said was that I have

7    worked, however, with union record -- union data from

8    all unions in the United States, including the

9    operating engineers that are submitted with the

10   Department of Labor through their filing requirements

11   under the LMRDA and have found in almost every union

12   that there are always errors, typographical, and

13   others, that exist, including in the operating

14   engineers.

15               (Discussion off the record.)

16               BY MR. CLASH-DREXLER:

17         Q.    Identify for me the areas that you noted

18   in the International Union of Operating Engineers,

19   LMRDA filings.

20         A.    In almost every union, there are

21   misspelled names.  There are names put in incorrect

22   blocks on the form.  There are dollar amounts listed

1    that are typed incorrectly, so a union that has 24

2    members reports 24 million dollars in revenue.

3         Q.    I just want to know whether you can

4    identify a specific error in the IUOE's filings.

5         A.    Misspelled name.

6         Q.    Whose name is misspelled?

7         A.    I can't give you that.  But I know I've

8    found a misspelled name in there.

9         Q.    How many names are misspelled?

10        A.    I can't recall.

11        Q.    When did you review the IUOE's LMRDA

12   filing?

13        A.    January of 2007.

14        Q.    Did you yourself review every single

15   union's LMRDA filing?

16        A.    Yes, I did.

17        Q.    What was the purpose of that?

18        A.    I was writing an article for Labor Notes

19   magazine for the February issue on officers salaries.

20        Q.    So how many LMRDA filings did you review?

21        A.    Every one that's available through the

22   Department of Labor.

1      Q.    How many is that?

2      A.    Thousands, tens of thousands.

3      Q.    And you did that all in the month of

4   January?

5      A.    I started a little bit in December, yes.

6   I used software as well.  It's not as hard as it

7   sounds.

8      Q.    Well, how did the software identify a

9   misspelled name?

10     A.    Because there were elements where you

11  would try to match names that you knew matched, and

12  you would go back and discover that there were

13  misspellings.

14     Q.    Have you identified -- do you have any

15  basis to say that the union's membership records are

16  incorrect in any way?

17     A.    No, I do not.

18     Q.    If I told you that the union would be able

19  to provide new members with a temporary number to

20  allow them to access the system, would that change

21  your opinion at all that you offer in paragraph 22?

22     A.    Probably not.

1   Q. Why not?

2   A. Well, first, paragraph 22 was under the

3 assumption that the verification system was going to

4 be relying on names, not numbers.

5   Q. Let me rephrase the question.

6   You talk about a lag time in updating

7 information from your members.  I assume what you

8 mean is, when a new member comes into the union,

9 they're not going to have the information they need

10 to be able to log onto the system because it won't be

11 in the database yet.

12   Correct?

13   A. Correct.

14   Q. And they won't have a union card to log

15 in.

16   Correct?

17   A. Correct.

18   Q. So now I'm changing your facts.

19   Now, the database will have that new

20 member's name and will have that person's number.

21 They're just going to get a temporary number while

22 they're waiting for their union card to get

1    processed.

2              Does that change at all the opinion you

3    offer in paragraph 22?

4        A.    No.

5        Q.    In paragraph 23, you state that the union

6    plans to assign passwords based on members 7- to

7    10-digit membership number.

8              Correct?

9        A.    As I understood it at the time, yes.

10        Q.    Do you have any different understanding

11    now?

12        A.    Based on what you just described that it

13    was the member number that is going to be the primary

14    key or the user name so to speak, not the name of the

15    individual.

16        Q.    Well, look at exhibit 10.

17                            (Brenner Exhibit No. 10

18                             was marked for

19                             identification.)

20              BY MR. CLASH-DREXLER:

21        Q.    Have you seen that document before?

22        A.    No.

1          Q.    I'll represent to you that this was

2     provided by myself to counsel for the plaintiffs as a

3     draft of what the log-in page would look like.

4               Okay?

5          A.    Okay.

6          Q.    And you'll see that members who are coming

7     to the Website are going to have to enter 2 pieces of

8     information, both their number and their name.

9               Right?

10         A.    Yes.

11         Q.    You state in paragraph 23 that if members

12    do not have this number memorized or readily

13    available, they'll be unable to log into the Website.

14              Right?

15         A.    Yes.

16         Q.    Are you aware that in some local unions in

17    the IUOE, to vote, you need to have your membership

18    number?

19         A.    Yes.

20         Q.    Are you aware that in some locals, you're

21    required to know your membership number to attend

22    union meetings?

1      A.    Yes.

2      Q.    And are you aware that in some locals,

3  you're required to have your membership card on the

4  job site?

5      A.    Yes.

6      Q.    So your opinion is, just the fact of

7  having to pull out your card and typing it in is too

8  onerous?

9      A.    What I said is that it's inconvenient and

10  it may deter some viewers from visiting the site.

11      Q.    Does the fact you have to pull out your

12  credit card to donate to the labor note site deter

13  people from donating?

14      A.    I'm sure it does.

15      Q.    Does the fact that you have to pull out

16  your credit card to buy something on Amazon.com deter

17  people from purchasing products?

18      A.    I'm sure it does.

19      Q.    What study can you point me to that

20  supports that opinion?

21      A.    I cannot.

22      Q.    In paragraph 25 --

1           MR. LEVY:  I need a break at some point.

2           MR. CLASH-DREXLER:  I have 2 more topics.

3           (Recess.)

4           BY MR. CLASH-DREXLER:

5      Q.    I just want to go back to one topic that

6  we were talking about with respect to the Labor Notes

7  donation page and to our Amazon.com.

8           You stated that people would be deterred

9  from having to pull out their card.

10          Correct?

11     A.    Yes.

12          It's my belief they are.

13     Q.    And in fact the reason why some people

14  might be deterred is because they're going to have to

15  provide their personal information online.

16          Correct?

17     A.    I'm sure for some, yes.

18     Q.    In fact the majority of people, that's

19  going to be the reason why they don't want to give

20  that information; isn't that correct?

21     A.    On the Labor Notes online donation site,

22  I'm not convinced that that's true.

1      Q.    But you don't know.

2            You don't have any basis to say one way or

3      the other?

4      A.    No one does.

5      Q.    Okay.  Let's turn to page 25.

6            MR. LEVY:  Paragraph 25.

7            MR. CLASH-DREXLER:  Thank you.

8            Paragraph 25.

9            BY MR. CLASH-DREXLER:

10     Q.    Is it your opinion in paragraph 25 that

11     the existence of a log-in requirement will deter

12     people from accessing campaign Websites?

13     A.    Yes.

14     Q.    And in your -- in paragraph 25 in your

15     declaration, you identify a study by The Bivings

16     Group.

17           Correct?

18     A.    Correct.

19     Q.    And you state that only 23 of the top 100

20     newspaper Websites required a log-in to view articles

21     online.

22           Correct?

1      A.   Yes.

2      Q.   Now, in fact what The Bivings Group

3  article was talking about was that it required

4  registration in order to access the information.

5           Correct?

6      A.   I believe registration and log-in.

7      Q.   Right.

8           But you first had to register.

9           Right?

10     A.   Yes.

11     Q.   I'll read this to you.

12          MR. CLASH-DREXLER:  Why don't we mark it

13  as exhibit 11.

14                     (Brenner Exhibit No. 11

15                     was marked for

16                     identification.)

17          (Discussion off the record.)

18          BY MR. CLASH-DREXLER:

19     Q.   I have a difficult time helping you get to

20  this page, but can you identify this document for me?

21     A.   Yes.

22     Q.   What is it?

1      A.    It is, the use of the Internet by

2    America's newspapers, a report by The Bivings Group,

3    prepared August 1st, 2006.

4      Q.    And this is the report that you cite in

5    your declaration.

6            Correct?

7            MR. LEVY:  I know the page he's going to.

8    Why don't I get him there.

9      A.    Sir?

10            BY MR. CLASH-DREXLER:

11      Q.    This is the article that you reference in

12    your declaration.

13            Correct?

14      A.    Yes, it is.

15      Q.    And I believe we're on the same page now.

16    The first --

17            MR. LEVY:  Could I suggest that you

18    identify it by the footnote number at the bottom.

19            MR. CLASH-DREXLER:  Sure.

20            We're looking at the page that has

21    footnote 22 at the bottom.

22            BY MR. CLASH-DREXLER:

1          Q.     Are you there?

2          A.     Yes.

3          Q.     The paragraph that starts, an encouraging

4     statistic.

5                 Do you see that?

6          A.     Yes.

7          Q.     That doesn't refer to log-in requirements,

8     does it?

9          A.     My understanding is, yes, but, continue.

10         Q.     Where in that first sentence do you see

11    the words log-in requirement?

12         A.     The word log-in requirement is not used.

13         Q.     In fact there's a difference between a

14    log-in requirement and a registration requirement.

15                Correct?

16         A.     Correct.

17         Q.     And what's the difference?

18         A.     The registration requirement is a stage at

19    which you typically collect information from an

20    individual.

21                The log-in requirement is where you

22    require individuals who have signed up and provided

1    usually on a one-time basis personal information or

2    other information relevant to the Website to return

3    to view the content that they're interested in.

4        Q.    And so the problem that they're

5    identifying here is focused on the registration

6    requirement.

7            Correct?

8        A.    That's not my read of it.

9        Q.    Okay.  Well, tell me -- point to one word

10    in that paragraph that we've been looking at that

11    refers to log-in requirements as opposed to

12    registration requirements.

13        A.    The words are not used.

14        Q.    What are you pointing to in that paragraph

15    that makes you think that what they're talking about

16    here has anything to do with log-in requirements as

17    opposed to registration requirements?

18        A.    The substance of the article at least as

19    it refers to registration requirements has to do with

20    being able to view articles online.

21            Now, in most of the instances that we're

22    discussing here, including ones that I'm sure

1    everyone in the room is familiar with, you have to

2    register, but you also have to log-in to view

3    content.

4         Q.    I understand that, but I'm asking you,

5    what in this paragraph or anything in this document

6    is telling you that the problem that they're

7    identifying is the log-in requirement, not the fact

8    that somebody is required to provide personal

9    information as part of the registration process.

10         A.    There are several places in the document

11    where they discuss the -- how about I say it this

12    way?

13              The issue as I understand it that this

14    article addresses in part is whether and under what

15    circumstances users are deterred from visiting

16    newspaper Websites.  And requiring registration is

17    synonymous in most of these cases with logging in.

18              If you don't have to log-in to view

19    content, you don't have to register.  Registration

20    and logging in go hand in hand.  They're

21    indistinguishable in this instance that I'm

22    describing.

1          Q.    Because in order to log-in on these sites

2     that they're referring to in the Bivings article,

3     you've had to register.

4               Right?

5     A.    Yes.

6          Q.    And so you can't do one without the other?

7     A.    Yes.

8          Q.    But does The Bivings Group make any

9     opinion whatsoever about somebody who all they have

10    to do is log-in?

11    A.    They do not.

12         Q.    In fact, on the -- I think you reference

13    this -- in order to subscribe to Labor Notes, you

14    have to register.

15              Correct?

16    A.    To subscribe to Labor Notes?

17         Q.    Right, to get information from Labor

18    Notes.

19    A.    We're mostly a print publication.  You can

20    visit our Website without registration.

21         Q.    Right, but to get -- you don't provide all

22    of your documents online, do you?

1        A.    Our magazine is not fully online.  We

2    provide about a third of our monthly content online

3    for free.

4        Q.    In order to get that, the full magazine,

5    you have to provide personal information.

6        Correct?

7        A.    You have to provide your name and address,

8    yes.

9        Q.    And people do it, don't they?

10       A.    People do subscribe, thank you, God.

11       Q.    Let's just look at some other registration

12    forms.  I'm going to mark a few here.

13                      (Brenner Exhibit Nos. 12-15

14                          were marked for

15                          identification.)

16        BY MR. CLASH-DREXLER:

17       Q.    Do you have exhibit 12 in front of you,

18    Dr. Brenner?

19       A.    I do.

20       Q.    And what is that?

21       A.    It is a printout of the registration

22    screen for The Washington Post, dot, com.

1       Q.   Do you have any reason to believe that

2   that's not an accurate copy of the registration page?

3       A.   I do not.

4       Q.   You'll see that you have to put in your

5   email address, your gender, your job title, your year

6   of birth, your job industry, and it goes on.

7            Correct?

8       A.   Correct.

9       Q.   Let's go to exhibit 13.

10           What is exhibit 13?

11       A.   It is the registration page for The New

12   York Times, dot, com.

13       Q.   And here you're required -- in addition to

14   creating an ID and password, you're required to

15   identify your gender and your year of birth.

16           Correct?

17       A.   Yes.

18           You are.

19       Q.   And some other information about yourself.

20           Correct?

21       A.   Also, yes.

22       Q.   Including your household income?

1          A.     Yes.

2          Q.     To -- once you've registered at the New

3     York Times, what do you have to do to log-in?

4          A.     It depends on how you come to the site.

5     If you're at this page, there's a box in the upper

6     right-hand corner that says, log-in.

7          Q.     So you would put in the ID and password

8     that you created.

9                 Correct?

10         A.     Correct.

11         Q.     Okay.  Let's go to the next exhibit.

12                Can you identify that for me?

13         A.     14.

14         Q.     Yes.

15         A.     It is the registration page for Facebook.

16         Q.     Okay.  And Facebook is one of the sites

17    that you said members may want to use for campaign

18    Websites.

19                Correct?

20         A.     Yes.

21         Q.     And in fact, to use Facebook and to see

22    sites on there, you have to register, don't you?

1        A.    Correct.

2        Q.    And you have to provide your name.

3              Correct?

4        A.    Yes.

5        Q.    And you have to talk about whether you're

6    in college or graduate school or at a company or in

7    high school.

8              Correct?

9        A.    Correct.

10       Q.    And you have to provide your email

11   address?

12       A.    Yes, you do.

13       Q.    And your birthday?

14       A.    Yes.

15       Q.    And what's the last exhibit I gave you?

16       A.    Exhibit 15 is the signup window for

17   Windows Live.

18       Q.    And you're required to, again, provide

19   personal information.

20             Correct?

21       A.    Yes.

22             Your name, first and last, gender, year of

1    birth, and other information, such as where you live.

2        Q.    The log-in page that's going to be used in

3    this case, I forget what our exhibit was -- number

4    for that --

5        A.    10.

6        Q.    10.

7              Do you have that in front of you?

8        A.    This is the one that you're referring to?

9        Q.    Correct.

10       A.    Yes, I do.

11       Q.    To log-in to the remote authentication

12   site, is somebody going to have to register for this

13   site?

14       A.    No.

15             MR. CLASH-DREXLER:  Excuse me for one

16   second.

17             (Discussion off the record.)

18             BY MR. CLASH-DREXLER:

19       Q.    Again, you said you were familiar with the

20   Association for Union Democracy?

21       A.    I am.

22       Q.    Are you aware that at least in past years,

1    they've identified top rank and file Websites?

2        A.    Yes, I am.

3        Q.    How did you become familiar with that?

4        A.    I have received email alerts to that

5    effect and seen information printed in their

6    bulletin, the Union Democracy Review.

7        Q.    Did you agree with their assessments of

8    what the top rank and file Websites were?

9        A.    I did not visit any other top choices.

10       Q.    Do you know that they included Websites

11   that had log-in requirements on them?

12       A.    My understanding is that they have had

13   winners that have some portions of their site that

14   are password-protected, yes.

15       Q.    Do you believe the Association for Union

16   Democracy made a mistake when they rank- -- when they

17   awarded those sites for that particular year?

18       A.    I have no basis on which to decide that

19   they made a mistake, but I do know that all the sites

20   that they included that had password protection had

21   password protection that was controlled by the owners

22   of the site, not a third party.

1          Q.     Okay.  So it's your testimony that it's

2     okay to have a password protection feature on the

3     site as long as it's maintained locally?

4          A.     No.

5                  I was just drawing the distinction between

6     Websites that have some portion or all of their site

7     that are password-protected where the owner of the

8     site controls the system by which passwords are

9     assigned, what is required for registration, and the

10     process by which people can be reminded of what their

11     passwords are versus sites where a third party is

12     doing so.

13          Q.     Would you rank a -- if you were doing a

14     ranking of the top rank and file Websites for a

15     particular year, could you imagine a circumstance

16     where you would put a site that had a password

17     protection feature in it?

18          A.     Sure.

19                  I could imagine it.

20          Q.     And why?

21          A.     Because there are many features that both

22     in my own estimation and for the Association for

1     Union Democracy that factor into evaluating what

2     constitutes a good site.  They explain I think in one

3     of your earlier exhibits some of what those criteria

4     are, which include how much information is posed, how

5     frequently it's updated, how easy it is to navigate.

6     There's many criteria.

7          Q.     And in fact don't the AUD list of the top

8     50 sites encourage people to collect personal

9     information about people who visit the site?

10         A.     I don't know.

11         Q.     Let's take a look at that.

12                MR. LEVY:  It's number 8.

13                BY MR. CLASH-DREXLER:

14         Q.     Do you have exhibit 8 front of you,

15    Dr. Brenner?

16         A.     I do.

17         Q.     If you could turn to page 5 of that

18    exhibit and paragraph 26.

19                Doesn't it say right there, use the

20    Website to collect names, emails, addresses, phone

21    calls, and other relevant information?

22         A.     It does.

1        Q.    And collecting that information from

2    people, do you believe that deters people from coming

3    to a site?

4        A.    It may, but their recommendation is not

5    that you require it, but that you do it where

6    possible, as I read the paragraph.

7        Q.    If you can turn back to the log-in page

8    that we were looking at, exhibit 10.

9        A.    Yes.

10        Q.    And I know you said you've never seen this

11    before today.

12            Correct?

13        A.    That was what I said, yes.

14        Q.    I'd like you to take a close look at the

15    disclaimer.

16        A.    Okay.

17        Q.    You state in paragraph 28 that you're

18    skeptical that -- I'm paraphrasing here -- that

19    what's in the disclaimer is true; isn't that right?

20        A.    I do say that.

21        Q.    And why are you skeptical of what's in the

22    disclaimer?

1          A.     Most Web servers maintain logs of almost

2     everything, every action that a server undertakes.

3     If a person visits a site, and that site -- that page

4     is served to a person out there in the world, that is

5     recorded.

6          If you log in to a Website as a user, for

7     example on our site, that information is recorded.

8     By default, almost everything that is done through

9     Apache or many other Web hosting software maintains

10    logs.  It helps debug.  It helps understand what's

11    happening.

12         It also helps you -- for people like us

13    track what's happening so we can track our visitors

14    coming from the United States, from other countries,

15    what times of day do people visit, et cetera.

16         Q.     You used an interesting word.

17         You said, by default, it collects that

18    information.

19         Right?

20         A.     Yes.

21         Q.     It's not your testimony that you can't

22    decide not to log certain information, is it?

1          A.     I don't have enough information to make

2     that determination.

3          Q.     Because is it your testimony you're not

4     familiar with the way logs work?

5          A.     That's not my testimony.

6                 I'm sorry.

7                 I'm being -- I was confused.

8                 My testimony is that in this instance

9     where remote authentication through a third party in

10    the fashion that you're describing both here in

11    exhibit 10 and more generally in our conversation, I

12    don't have enough information to determine whether

13    it's possible for that to be true.

14                MR. BECK:  Hold on one second.

15                I think he's asking, is it possible to

16    turn off logs on a Web server all together.

17                THE WITNESS:  Sure.

18                You can do almost anything in UNIX.

19                MR. CLASH-DREXLER:  Let me mark exhibit

20    16.

21                          (Brenner Exhibit No. 16

22                          was marked for

1              identification.)

2         BY MR. CLASH-DREXLER:

3         Q.    Hand you what I've just marked as exhibit

4    16.

5              Can you identify this document,

6    Dr. Brenner?

7         A.    Exhibit 16, it's the WC 3 extended log

8    file format.

9         Q.    And it's true that what this is is what

10   the default -- or -- I'm sorry -- what information

11   can be logged under that format.

12             Right?

13        A.    This is specific to Windows servers if I'm

14   not mistaken.

15        Q.    And let's assume for our discussion here

16   that the remote authentication site will be used a

17   Windows server.

18        A.    Okay.  I have no knowledge.

19        Q.    Did you ask counsel for that knowledge

20   when you were drafting your opinion?

21        A.    Not specifically, but we discussed their

22   general state of understanding of what the technology

1    was, and what was conveyed to me was that they were

2    unclear as to exactly how this was going to be

3    implemented, both how the procedure was going to be

4    used in terms of server-side scripting and what the

5    hosting situation -- the third-party authentication

6    service, what server that would be hosted on and

7    stuff.

8              Those details they did not have, I

9    believe.

10        Q.   Now that you know for the sake of this

11   discussion that it's a Microsoft server, it is

12   possible not to log certain information.

13             Correct?

14        A.   It appears so.

15        Q.   Look down this list for me and identify

16   any information on this list that you believe would

17   contain personal information about the person who is

18   logging into the remote authentication site.

19        A.   The most obvious one is the user name,

20   although there are other pieces of information that

21   could potentially reveal a specific individual.

22        Q.   Let's go through them.

1        Would the date identify which specific

2   individual logged onto the site?

3        A.    It depends on what other information --

4   just based on the information in the log, probably

5   not.

6        Q.    What about the time?

7        A.    Not without other information.

8        Q.    What about the client IP address?

9              Why don't you start off by telling us what

10   the client IP address is.

11        A.    It's the -- it's the Internet protocol

12   address, IP address that is the site originating the

13   call to the server.

14        Q.    So if I'm trying to access the 150

15   election, dot, com site, if the remote authentication

16   site were going to log client IP address, in the log

17   there would be an indication that I would come from

18   the 150 election, dot, com site.

19              Correct?

20        A.    I'm not exactly sure how the redirect

21   would work.  I don't believe that's true.

22              MR. CLASH-DREXLER:  Excuse me for one

1    second.

2              (Discussion off the record.)

3              BY MR. CLASH-DREXLER:

4         Q.    The client IP address, that would be the

5    IP address of the computer of the person?

6         A.    If this were a log for a Website being

7    hosted on a Microsoft Windows-based server, and it

8    was a publicly accessible site, generally this would

9    refer to the IP address of the person originating the

10   call of the page.

11             But in this instance of third-party

12   verification, I actually am not sure what this would

13   record.  I would have to actually research it to find

14   out whether the IP address that is recorded as the

15   one from which you're bounced, i.e., is it the IP

16   address of the host of the Website that then bounces

17   to the server for third-party authentication, or is

18   it the IP address of the individual who is making the

19   call?

20             I'm not sure.

21        Q.    I think the answer is the latter.

22             And if -- it's the IP address of the user.

1        A.    I wasn't sure.

2        Q.    Okay.  Would that have personally

3    identifiable information about somebody?

4        A.    That depends.  There are --

5        Q.    So it could?

6        A.    Absolutely.

7        Q.    And is it possible to not log that piece

8    of information?

9        A.    Yes, it is.

10        Q.    Okay.  And would you think that it would

11    be unprecedented for a server not to log client IP

12    address?

13        A.    I don't know -- I've never worked with

14    anyone designing a Website that's turned that off.

15    That's a fairly important piece of information.

16        Q.    Why is it important?

17        A.    It's important not only because most

18    people want to know where calls to their servers are

19    originating from generally.

20        Q.    Why do they want to know that?

21        A.    Sometimes they want to know that for

22    purposes of tracking like, is this -- is the example

1    I gave earlier for us, we want to know, is this an

2    international visitor.

3          But for troubleshooting as well, if you're

4    having a problem, like let's say that somebody is

5    trying to bombard your site with denial of service

6    requests, how does that happen, where is that coming

7    from.  If you don't have this turned on, you have no

8    way of figuring out who is attacking your Website.

9          If a malicious hacker wanted to try to

10   disable, to bring down third-party authentication,

11   without this information, you wouldn't know where it

12   was coming from.

13         Therefore, you wouldn't be able to take

14   some of the more simple measures such as denying a

15   specific request from an IP for example.

16       Q.    Is there any other information on this

17   list that you believe contains personally

18   identifiable information that you think is

19   unprecedented for a server log not to collect?

20       A.    In my experience, most people who do this

21   collect as much information as they can, because if

22   you're trying to use logs to problem-solve, to

1    trouble-shoot, to find errors, to find things like

2    where are attacks on your server coming from, et

3    cetera, if someone is trying to run a -- high-jack

4    your Website for other purposes, who is trying to

5    break in to see you, all these things can in

6    different contexts be useful.

7            So typically I don't know very many of

8    them that people turn off voluntarily.

9    Q.    Other than attacks on a server, is there

10   any other reason -- let me say this:  One reason why

11   people log is to collect a bunch of personally

12   identifiable information about people.

13           Correct?

14   A.    I don't think most people would

15   characterize it that way, but, yeah, to collect

16   information that's useful for identifying discrete

17   visits to your Website.

18   Q.    Okay.  Apart from that and apart from

19   attacks on servers, is there any other reason that

20   you can identify here today that not logging

21   personally identifiable information would be

22   unprecedented or problematic?

1        A.    No.

2              Those are the main ones.

3              MR. CLASH-DREXLER:  If you can give me a

4        minute to confer here, I still have a little bit

5        more, but I just want to tie down this topic.

6              (Recess.)

7              BY MR. CLASH-DREXLER:

8        Q.    Dr. Brenner, we talked about some of the

9        issues with logs, but your real point in paragraph 27

10       and 28 is that union members won't believe that the

11       information is being logged; isn't that correct --

12       not being logged.

13             Let me reask the question.

14             In paragraph 27 and 28, the opinion that

15       you're offering is that members won't trust the fact

16       that the union is saying that this information won't

17       be logged?

18       A.    That is part of what I'm asserting.

19             I'm also try to address the technical

20       component as well.

21       Q.    What do you mean by, technical component?

22       A.    That it is not common practice to turn off

1    logging of identifying information like IP address or

2    user name.

3         Q.    Right.

4               But the fact that it's being turned off is

5    not going to deter people -- no union member is going

6    to sit around and say, I'm not going to log onto this

7    site.  I'm deterred from logging onto this site

8    because they're not collecting my personally

9    identifiable information because it's unprecedented.

10              You're not saying that a union member is

11   going to say that, are you?

12        A.    I definitely don't think they would make

13   that sentence construction.

14        Q.    What you're saying, though, is that union

15   members will be deterred because they won't believe

16   the union is not logging the information.

17              Correct?

18        A.    I think that is a definite risk.

19        Q.    And you're aware -- and let's go back to

20   the log-in page, which is exhibit 10 -- that right

21   there on the log-in page, it tells the visitor that

22   this Website will not log any identifying

1    information?

2         A.    M-hm.

3         Q.    Correct?

4         A.    Yes, that is correct.  It says that.

5         Q.    And it gives -- gives some specifics,

6    register number, name.

7               Correct?

8         A.    It says, register number or name.  Yes.

9         Q.    And it says it won't log the fact that

10   they're accessing any particular Website.

11              Correct?

12        A.    Yes.

13        Q.    Okay.  And it won't log the IP address or

14   any other information that might indicate the

15   geographic location of where the member is seeking to

16   access.

17        A.    It does say that, yes.

18        Q.    Are you saying that there is additional

19   identifying information that you think is still being

20   logged?

21        A.    In addition to this disclaimer?

22        Q.    No.

1           I mean, is there other information that

2    will be logged outside of those categories that you

3    believe is personally identifiable?

4        A.    No, that's not what I'm saying.

5        Q.    So all you're saying, again, is people

6    aren't going to believe the disclaimer.

7              Correct?

8        A.    I'm saying that, and I'm also saying that

9    it will make the authentication process more

10   difficult to trouble-shoot if it's not being

11   collected, so it does pose a technical challenge that

12   I foresee as well.

13       Q.    Right.

14             But again what I'm focused on here is the

15   deterrence that you say --

16       A.    Yes, I do think it will deter.

17       Q.    And you're aware, aren't you, that the

18   contract between the international union and the

19   third-party hosting firm will provide that none of

20   that information is logged or provided to the union.

21             Correct?

22       A.    That is what I understand.

1      Q.   And what is your basis for believing that

2   the third-party hosting service will violate the

3   terms of its contract?

4      A.   I don't think what's at issue is what the

5   third-party hosting service will actually do, but

6   what members will think that they might do.

7      First, in this exhibit 10, there's nothing

8   about the third party involved.  It's talking about

9   the IUOE membership records department.  It's talking

10   about the IUOE union.

11      So for a visitor who saw this, it seems

12   reasonable that they would conclude that the union is

13   performing this authentication service, not a third

14   party.

15      Q.   Let's talk about that, and we'll go on to

16   your second one.

17      How would you recommend that this page

18   gets changed so that people know that it's a

19   third-party site?

20      A.   It seems that you could put some

21   information to that effect on this, that that would

22   introduce the idea that a third party is doing a

1    verification.

2        Q.    And it's your opinion as an expert in this

3    matter that if it did identify the fact that a third

4    party was providing that service, that that would

5    lessen the deterrent effect?

6        A.    I'm not certain that it would lessen the

7    deterrent effect, because the issue is about what

8    people believe will happen, not whether it will or

9    will not happen, and I do not -- I am not certain

10   that having a third party do the verification will

11   actually lessen people's concern that information

12   will be collected.

13           It's possible.

14       Q.    So it doesn't matter one way or the other

15   whether it's your testimony that it doesn't reference

16   the third party.

17           Correct?

18           MR. BECK:  He said there were more than

19   one point, and you're only on the first point still.

20           MR. CLASH-DREXLER:  But we're only talking

21   about his first point.

22           BY MR. CLASH-DREXLER:

1       Q.    You've testified with regard to your first

2    point now that it doesn't matter one way or the other

3    whether it identifies the third-party host.

4        Is that your testimony?

5    A.    No.

6        My testimony is that it is likely that if

7    a third-party verification system is explicitly

8    mentioned on the Website that that may still -- that

9    that may not mitigate the deterrent effect.

10    Q.    Okay.  Would it mitigate it for some

11    people?

12    A.    It's possible.

13    Q.    It's possible.

14        So if this page were changed in some way,

15    you would offer an opinion, then, that for some

16    people, the -- what you are contending is the

17    deterrent effect would go away; is that correct?

18    A.    It's possible.

19        What I'm testifying, it's possible that

20    might reduce the deterrent effect for some members.

21    Q.    Why can't you state this with certainty?

22    A.    This has never been done as I understand

1    it, so until we actually imposed an event, went back

2    and did extensive evaluation, we really couldn't

3    establish with certainty what happened.

4         Q.    So you couldn't establish with certainty

5    that people would be deterred.

6              Correct?

7         A.    I think there's reasonable basis on which

8    to conclude people would be deterred both based on my

9    experience with union elections and online Websites

10   in other unions and the political dynamics inside of

11   the operating engineers.

12        Q.    Have you ever seen a remote authentication

13   site that had a disclaimer like this?

14        A.    I've never seen a remote authentication

15   site for union elections, period.

16        Q.    Have you done a study of any union members

17   in any union to examine the deterrent effect of a

18   log-in requirement with a disclaimer like this?

19        A.    I've never seen a disclaimer like this --

20             MR. LEVY:  I think you can answer the

21   question yes or no.

22        A.    No.

1             BY MR. CLASH-DREXLER:

2     Q.    Have you read any studies that are talking

3  about the deterrent effect of a log-in requirement

4  with a disclaimer like this?

5     A.    No.

6     Q.    So you've testified you've never seen a

7  disclaimer like this before.

8             Correct?

9     A.    On a campaign Website?

10           No.

11     Q.    Where have you seen a disclaimer like this

12  before?

13     A.    I've never seen a disclaim that says it

14  will not collect identifying information specifying

15  IP address, campaign Website, or any other

16  information that might indicate geographic location.

17     Q.    Have you ever seen a disclaimer that talks

18  about not logging certain information?

19     A.    No, not that I can recall.

20     Q.    So you have no basis to offer an opinion

21  on how people would react to a disclaimer like this.

22             Correct?

1       A.      That's not correct.

2       Q.      And is the basis for your opinion your

3    experience talking to union members?

4       A.      It is.

5       Q.      Okay.  And in talking to those union

6    members, have you ever discussed with them the

7    deterrent effect of a log-in requirement?

8       A.      I have not.

9              MR. CLASH-DREXLER:  Give me one second,

10   and I think we're about done.

11             (Recess.)

12             MR. CLASH-DREXLER:  Let's go back on the

13   record.

14             BY MR. CLASH-DREXLER:

15      Q.      Do you have a clarification to your last

16   answer?

17      A.      Were you referring specifically to

18   log-in -- the impact of log-in requirements vis-a-vis

19   election campaign Websites, or more generally the

20   affect of log-in requirements on visiting sites?

21      Q.      Well, let's start with campaign --

22   election campaign Websites.

1          A.    No.

2          Q.    All right.  And the question was, have you

3    talked to a member of any union about the impact that

4    a log-in requirement will have on the willingness to

5    access the site?

6          A.    Sure.

7                I have done that.

8                I'm sorry for the confusion.

9                I've had conversations both in my own

10   union as an officer and with union members in a

11   variety of other unions about the effect of log-in

12   requirements in terms of participation.

13               What I found as a local officer when we

14   tried to establish a wiki in my union was that by

15   requiring people to log-in, very few people used it,

16   that having a log-in requirement was a steep

17   deterrent to participating.

18               Other rank and file activists that I've

19   discussed these issues with have made similar -- have

20   had similar experiences that even a log-in

21   requirement that is a user name and password that is

22   designated by a user can sometimes prevent people

1    from participating.

2              For example, if you used both email and

3    the Web, I've talked to union members who say, yeah,

4    the problem is, you get the email from whoever has

5    just posted something that they want you to look at,

6    and you look at it, you go click on it, and then you

7    have to log-in, and if you don't remember or you

8    haven't had your -- you don't have your user name and

9    password handy, you move on to something else and

10   think, I'll deal with it later, but people don't come

11   back and deal with it later unless it's really

12   important.

13        Q.   You would agree with me that a local union

14   election is pretty important, wouldn't you?

15        A.   It's important, especially for the

16   candidates.  However I think that for a lot of

17   participants in the election, it's a nonevent.  It's

18   something you have to work hard to generate interest

19   in.

20        Q.   And all we're talking about here is the

21   name and number or your membership card?

22              Right?

1          We're not talking about email addresses or

2     passwords.

3          Right?

4     A.    That is correct.

5     Q.    The situation you identified with your

6     wiki for your local union site, did you poll your

7     membership to determine why people weren't accessing

8     that sites?

9     A.    No, although we did have a meeting of the

10    people who were doing new technology in our union.

11         We had a committee that was trying to

12    introduce new technology.  We had a meeting between

13    that committee and the board to actually discuss the

14    question.

15    Q.    And how many people are on that new

16    technology board?

17         How many people were on that board?

18    A.    At the time there were 4 members.

19    Q.    How many people were on the executive

20    board?

21    A.    Approximately 20.

22    Q.    So you had 24 people talking about the

1    issue?

2         A.    In the room, correct.

3               But we had all tried to find out why other

4    activists in the union were not.

5         Q.    It's possible one of the reasons is,

6    people found the ideas of a wiki to be boring.

7               Right?

8               Is that a possibility?

9         A.    That wasn't a reason that was expressed,

10   but --

11        Q.    It's possible.

12        A.    -- it's possible, yes.

13        Q.    Because like you said, while candidates

14   might care about a topic, members might not.

15               Right?

16        A.    Correct.

17        Q.    So possibly your board thought it was

18   really important, but none of your members cared

19   about it.

20               Is that possible?

21        A.    The target of our wiki was our activists,

22   not just our -- it was a subset of our activists --

1     of our members who are activists, so I think it's

2     possible but not likely that those members found it

3     boring or not interesting.

4          Q.    Or not relevant.

5           It's possible?

6          A.    It is possible, but not very likely.

7          Q.    Let's go back for a second to the issue

8     about Google page ranks and the Google search engine.

9           You talked about the importance of links

10    in the page rank process.

11         Right?

12        A.    I did, yes.

13        Q.    But isn't the first step is that Google

14    will crawl the Websites and will collect essentially

15    the universe of sites that have those keywords in it,

16    and then it's going to use those links as the way to

17    rank them and to give it a hierarchy?

18        A.    That's not exactly how Google's crawler

19    works, as I understand it.  It does index millions of

20    Websites out there, but not -- definitely not the

21    universe, and in terms of how it processes the

22    information to determine the page ranking, again, the

1     algorithm is not known.

2         Q.    Right.

3               But all I'm saying is that certainly it's

4     possible that using Google, the rank for instance may

5     be affected by the number of links to a particular

6     site.

7               Correct?

8         A.    That is correct.

9         Q.    And there's nothing in the campaign

10    Website resolution that would keep people from

11    linking to a candidate site, is there?

12        A.    No.

13        Q.    And so my question is, is that in terms of

14    finding what the universe of -- what documents --

15    what Websites -- excuse me.

16              Let me start over.

17              When somebody puts in a search on Google,

18    part of what the search engine is doing, whether it's

19    Google or Yahoo!, is finding the Websites that have

20    those keywords in them.

21              Correct?

22        A.    Keyword has a very specific meaning.  In

1    some -- in earlier parts of our conversation, you

2    were using keyword very specifically to refer to

3    words that you put in the title are metatags.

4        Q.   If somebody searches for IUOE Local 150

5    election Joe Ward, what Google or Yahoo! is going to

6    be doing is looking for sites that have those words

7    maybe in the domain name or in the title tag, the

8    metatag, or in the actual content of the page; isn't

9    that correct?

10       A.   Right.

11            The search engine is fundamentally based

12   on words that you identify and use.

13       Q.   And then some of those other factors that

14   you were talking about like links will maybe

15   determine the priority of the sites that Google has

16   collected from that search; is that correct?

17       A.   Again I don't know the algorithm

18   specifically, but those are factors that matter, yes.

19       Q.   Now, you put in a search in Yahoo! for

20   those specific terms.

21       A.   Yes.

22       Q.   How many results did it return on Yahoo!?

1        A.    I really don't remember how many came.

2        Q.    And do you know --

3        A.    Thousands I'm sure.

4        Q.    Thousands?

5        A.    I'm sure.

6        Q.    And is it your -- and how about in Google?

7        A.    I don't recall.

8        Q.    And is it your testimony that the password

9    protection requirement here would put those thousands

10   of sites ahead of the team 150 election site?

11       A.    What's my testimony here is that it will

12   harm the ranking of that site, the password

13   protection requirement.

14       Q.    And how much will it harm the ranking of

15   the site?

16       A.    I cannot say.  I don't know the algorithms

17   enough to know.

18       Q.    Will it be off the first page of rankings?

19       A.    It's based not just on what they do but

20   also on what other people do, so it's impossible to

21   say whether this action for this site will definitely

22   move it off or onto the front page.

1          Q.    So you can't say with any reasonable

2    degree of certainty what if any impacts the password

3    protection requirement will have.

4               Correct.

5          A.    I don't think that's correct, no.

6               I think we can say with certainty that the

7    entire Website of a candidate if they have interior

8    pages allowed to be indexed that that will enhance

9    the rankings of that candidate, especially for

10   keywords such as the candidate's name, local union,

11   et cetera, because those keywords will appear not

12   only on the home page now but also probably on every

13   page on the site.

14              So rather than just having one page that

15   has these keywords, you'll have an entire site that

16   has 2, 3, 5, 10, a dozen depending on the candidate,

17   pages that have those keywords in them.

18              So it would definitely I think adversely

19   impact the page ranking.

20         Q.    Okay.  Let's just assume for the sake of

21   discussion here that having more content not

22   password-protected will enhance a ranking.

1          Can you state with any degree of certainty

2     the negative impact that password protection after

3     the home page will have on somebody's rank when

4     somebody puts in those specific search terms that you

5     identified, IUOE Local 150 election Joe Ward?

6          A.    Are you asking about introduction of

7     password protection after a site has already been in

8     existence or for new sites?

9          Q.    Well, let's talk about Joe Ward's site,

10    because that's in existence.

11         A.    Right.

12         Q.    So what impact -- how far down will Joe

13    Ward's site drop in Google after the password

14    protection system is implemented?

15         A.    It's impossible to say with certainty, but

16    there are several factors that are important to

17    consider.

18          Number 1, Google doesn't index every site

19    every day.  So there's lag time between -- if you

20    impose this change on Joe Ward's site, there would be

21    a lag time between the time that Google last indexed

22    its site and the present -- you know, the next time,

1    and between that, it's unlikely that except for these

2    other external factors to the site that it would have

3    any effect.

4         Q.    And what about for new sites?

5         A.    I think it's pretty clear that if a new

6    site was launched -- if 2 identical sites were

7    launched, one password-protected, one not, that

8    within a reasonably short period of time, the

9    nonpassword-protected site would have better

10   rankings.

11        Q.    Have you tried that experiment?

12        A.    I have not.

13        Q.    Have you read any studies trying that very

14   experiment?

15        A.    I have not.

16        Q.    In fact, it would also depend on how many

17   other people out there have sites with those same

18   content or similar content in it, wouldn't it?

19        A.    It depends on many factors as we said.

20        Q.    Wouldn't that be one factor?

21        A.    Absolutely.

22              MR. CLASH-DREXLER:  That's all the

1    questions I have.

2             MR. BECK:  Okay.  I have 2 or 3 topics

3    that I can get through really quickly, I think.

4

5             EXAMINATION BY COUNSEL FOR PLAINTIFFS

6             BY MR. BECK:

7       Q.    Do you remember when you were asked

8    questions about Google Page Creator?

9       A.    Yes.

10      Q.    And you were also asked questions about

11   Blogger and other blogging online platforms?

12      A.    Yes, I remember.

13      Q.    And you were asked if you knew whether

14   the -- whether Google Page Creator supports

15   scripting.

16             Do you remember that question?

17      A.    I do.

18      Q.    Do you remember -- and let me step back

19   one minute and ask:  In -- very quickly in general

20   terms, can you tell me what the difference is between

21   server-side scripting and client-side scripting?

22      A.    Very generally, scripts that are

1    server-side scripting require the execution of files

2    that are resident on the machine that is the server.

3            So it is the remote computer out there

4    somewhere in the world that is hosting the Website.

5    So the script has to be there, not resident on your

6    local computer.

7            Client-side scripting is the software --

8    the executable software has to be present on your

9    computer your browser has to be compliant with.

10           So basically it's about where is the

11   execution happening.  Is it happening where the

12   Website is being hosted versus your personal

13   computer.

14       Q.    And when you were working on your

15   declaration, were you working under the assumption

16   that the authentication system would use server-side

17   scripting?

18       A.    Yes, I was.

19       Q.    Are there other issues involving the

20   workability of the client-side scripting that you

21   haven't considered yet?

22       A.    I'm sure there are.

1      Q.    Does Google Page Creator allow server-side

2  scripting?

3      A.    To my knowledge, it does not.

4      Q.    And when you were asked about whether it

5  allowed scripting, you said that it was possible.

6            Why did you say it was possible?

7      A.    Because we were talking about Java, which

8  is a client-side script, at least the way we were

9  discussing it.

10      Q.    And you're talking about Java script?

11      A.    Yes.

12      Q.    And Java script is a client-side scripting

13  language in general.

14            Right?

15      A.    In general, it is, yes.

16      Q.    And what about Blogger?

17            Does that allow for server-side scripting?

18      A.    To my knowledge, it does not.

19      Q.    What about the other blogging platforms

20  that you mention in your declaration?

21      A.    To my knowledge, neither LiveJournal nor

22  TypePad allow server-side scripting.

1       Q.    But they may allow client-side scripting?

2       A.    They may.

3       Q.    When you were preparing -- before you

4    prepared your declaration, you spoke with me and Paul

5    Levy about possible ways that the authentication

6    system could be constructed?

7       A.    Yes, I did.

8       Q.    But we weren't able to tell you the

9    precise way that it would be constructed.

10      A.    That's correct.

11      Q.    And did you read the declaration of Joanna

12   Pineda before you signed your declaration?

13      A.    I did.

14      Q.    Were you aware that there was a

15   possibility that the union would provide technical

16   assistance to members for the remote authentication

17   process?

18      A.    Yes, I was.

19      Q.    But when you were asked about whether you

20   knew that the union would provide technical

21   assistance, you said no?

22      A.    Yes, that's correct.

1        Q.    Why did you say no?

2        A.    Because I interpreted the question to be

3    more specific about the free component -- in other

4    words, the description which I was asked about was

5    more specific than the knowledge that I had when I

6    was preparing my declaration.

7        Q.    So in other words, you didn't know for

8    sure whether the union would provide technical

9    assistance?

10            MR. CLASH-DREXLER:  Objection to the form

11    of the question.

12            BY MR. BECK:

13        Q.    What did you know about whether the union

14    would provide assistance?

15        A.    Counsel had informed me that it was likely

16    that the union would provide technical assistance,

17    that it was possibly going to be free, but no details

18    had been presented.

19        Q.    And is that why you said that you

20    weren't aware that the union would be providing

21    assistance?

22        A.    That's correct.

1          MR. CLASH-DREXLER:  Could you read back

2     the last question.

3          (The reporter read the last

4          question and the last answer.)

5          BY MR. BECK:

6     Q.    I want to move to one last topic.

7          You said that Google can't index pages

8     that are password-protected; is that right?

9     A.    Yes.

10    Q.    And you also said that linking to a page

11    is one factor determining how the page is ranked in

12    the Google search engine?

13    A.    That is correct.

14    Q.    Is it possible to link, to provide a link

15    to a password-protected site?

16    A.    It's possible.

17    Q.    And how will Google -- tell me generally

18    how Google will index a site that's

19    password-protected but is linked to by many other

20    sites?

21    A.    It will index the front page.

22    Q.    What about if there's a link to an

1    interior page besides the front page of the

2    site?

3              Let me give you a hypothetical?

4              Let's say there are --

5              (Discussion off the record.)

6              BY MR. BECK:

7         Q.    If a page -- if an interior page is

8    password-protected, of course it's through true that

9    nonunion members won't be able to access it without a

10   password.

11             Right?

12        A.    That's correct.

13        Q.    So how will they know to link to a site

14   that's behind a password or page on the site?

15        A.    They can't find it.

16        Q.    And will Google be able to accurately rank

17   the page that's not password-protected?

18             MR. CLASH-DREXLER:  Object to the form of

19   the question.

20             BY MR. BECK:

21        Q.    How will Google index a page that

22   other people link to but that is

1    password-protected?

2            How will it rank the page?

3    A.    Again, I don't know the exact algorithm

4    used by Google, but it will definitely -- the fact

5    that the page cannot be indexed will give it almost

6    necessarily a lower rank than it would have if it

7    were indexable.

8            MR. BECK:  That's all I have.

9            MR. WEINBERG:  Just give us a

10   second.

11           (Recess.)

12

13      FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS

14           MR. CLASH-DREXLER.

15   Q.    Dr. Brenner, this is just a point I want

16   to clarify:  We talked about Facebook earlier.

17           Correct?

18   A.    Yes.

19   Q.    And you have exhibit 14 in front of you

20   right now?

21   A.    Yes.

22   Q.    And that's the registration page for

1    Facebook?

2         A.    Correct.

3         Q.    I think I asked you earlier whether you

4    could even search pages under Facebook if you weren't

5    a member.

6              And I think you had said that you weren't

7    sure?

8         A.    I'm not sure.

9         Q.    Okay.  Has anything happened in the

10   deposition that would make you change that answer?

11        A.    No.

12             I'm still not sure.

13        Q.    Okay.  You testified at the beginning of

14   the deposition that before you signed your

15   declaration, you received the declaration of

16   Ms. Pineda.

17             Correct?

18        A.    That is correct.

19        Q.    And you read it?

20        A.    I did.

21        Q.    And you also testified that you

22   received Ms. Pineda's deposition; is that

1    correct?

2         A.    I did.

3         Q.    And that was before you signed your

4    declaration?

5         A.    No.

6               That was after.

7         Q.    It's true, isn't it, that Ms. Pineda's

8    declaration references that technical assistance will

9    be provided.

10               Correct?

11         A.    I haven't read her deposition.

12         Q.    I'm talking about her declaration.

13         A.    Her declaration, yes.

14         Q.    So her declaration says that members who

15    are required to password-protect their sites will get

16    technical assistance if they request it?

17         A.    Yes, it does.

18         Q.    And it also describes the remote

19    authentication that the international union will be

20    using.

21               Correct?

22         A.    In general terms, yes.

1      Q.    And again, you had that by -- well, it was

2    provided -- I'll represent to you that it was

3    provided to counsel for the plaintiffs on or about

4    May 12th.

5            Okay?

6      A.    Okay.

7      Q.    And when do you recall receiving it?

8      A.    I don't recall.

9      Q.    And I think you testified -- and you did

10   testify earlier that you signed your declaration less

11   than 2 weeks ago.

12           Correct?

13     A.    I was not clear of the date both then --

14   earlier and now.  I'm still not clear of the exact

15   date.

16     Q.    We know for a fact that we received your

17   declaration on about the 24th.

18           MR. LEVY:  The deal was, you would get it

19   on the 24th, and you got it on the 24th.

20           BY MR. CLASH-DREXLER:

21     Q.    So we got your declaration on the 24th,

22   which was a Thursday?

1   A.  That's correct.

2   Q.  Is that the day you signed your

3 declaration?

4   A.  I signed it the day that you received it,

5 then.

6   Q.  And you told us under oath now sitting

7 here under oath that you had all of the information

8 from Ms. Pineda's declaration at the time you drafted

9 and signed your declaration.

10   Correct?

11   A.  Yes.

12   Q.  And by the way, what steps did -- who --

13 did you draft your declaration?

14   A.  The way the process worked was 3-fold.

15   First, after I agreed to do this, I had an

16 extended conversation about the issues with Greg Beck

17 from Public Citizen.  Greg took the issues that we

18 highlighted and agreed on as part of my -- as to

19 what I would declare, worked them up, sent them to

20 me.

21   And then we discussed the draft that he

22 sent me.  We made further changes.  I made changes,

1    sent them to him.  He subsequently made changes, sent

2    them to me.

3          And I can't remember if there was

4    another round of discussion on top of that, but

5    basically, we collaborated from the first draft to

6    the end.

7          Q.    Can you identify any of the changes that

8    you made to the first draft?

9          A.    Let's see, I'm fairly certain that we

10   changed paragraph number 7.

11         Q.    How is it changed?

12         A.    I can't provide you word-for-word changes,

13   but change of emphasis in clarifying the point we

14   were trying to make in that paragraph, for example,

15   mostly clarifying.

16         Q.    Can you just give me a description of what

17   you were clarifying?

18         What was the point that you were trying to

19   clarify?

20         A.    I was just trying to bring out more

21   clearly the main thrust of this paragraph, which is

22   that Websites are important for various reasons in

1    union elections, not just that they cost less than

2    doing mailings to members, but that they have -- they

3    have the effect of leveling the playing field in a

4    way that other forms of communication don't do for

5    the same price, and just my recollection is that

6    there were some other points in there that I

7    thought weren't central and that we should strip them

8    out.

9        Q.    Were there any technical issues that you

10   disagreed with?

11       A.    That he included in the draft?

12       Q.    Yes.

13       A.    Not that I recall.

14       Q.    Any other changes that you can

15   recall?

16       A.    Sure.

17            From the initial draft, we -- in paragraph

18   17, I'm not sure, but my recollection is that if this

19   paragraph existed, it did not exist at all in the

20   form that it's in now, and that we either added or

21   dramatically expanded the paragraph about what the

22   impact of having password protection would be on a

1    site where no information was visible on the home

2    page.

3         We spent quite a bit of time discussing

4    the question of how users actually use different

5    types of Websites, including blogs and the like and

6    the way in which kind of stripping valuable

7    information off this -- of the home page would not

8    just affect it as far as search engines go, but

9    would also make it less effective as a campaign

10   tool.

11        Q.    Anything else?

12        A.    My recollection is that we also spent some

13   time honing paragraph 22 about the different issues

14   that might arise from having the union be the body,

15   the designated user names and passwords for the

16   members, as opposed to individuals create their own

17   user names and passwords.

18        We talked about the specifics and refined

19   the specifics around -- as I recall we talked about

20   refining specifics of the way in which you could make

21   mistakes spelling someone's name, et cetera.  And I

22   also added information about the -- my experience

1    directly with union record keeping of information,

2    like the list of officers of the local union, their

3    salaries and such that I had gleaned from working

4    with the LMRDA records.

5        Q.    But you didn't put that specific example

6    into your declaration, did you?

7        A.    The LMRDA?

8        Q.    Correct.

9        A.    No, but that is what I am referring to

10    when I say, and in my experience, a union's records

11    often have significant errors, gaps in information,

12    and lag time.

13        MR. CLASH-DREXLER:  I don't have anything

14    further.

15        MR. BECK:  Just one minute.

16

17    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

18        BY MR. BECK:

19        Q.    Do you remember the first time that we had

20    a substantive conversation about the issues in this

21    case?

22        A.    I don't remember the exact date.

1      Q.    But do you remember the conversation?

2      A.    Yes, I do.

3      Q.    About how long was that, approximately?

4      A.    Perhaps 2 and a half months.

5      Q.    And about how long was our initial

6  substantive conversation?

7      A.    Perhaps 45 minutes to an hour.

8      Q.    And did we discuss all of the issues that

9  were in the first draft of the declaration that you

10  received?

11      A.    I don't recall, because I didn't take

12  notes from our discussion.

13      Q.    Did you think that the first draft of the

14  declaration that you received accurately reflected

15  your views?

16      A.    I do -- I did.  And where they did not, I

17  tried to correct them.

18      Q.    Okay.  And when you were done with your

19  correction, did you feel that it accurately reflected

20  your views and the substance of our conversation?

21      A.    I did.

22      Q.    And is everything in this declaration your

1    own opinion?

2         A.    It is.

3              MR. BECK:  Okay.

4              (Whereupon, at 8:04 p.m., the taking of

5    the instant deposition ceased.)

6

7

8                        _____

9                        Signature of the Witness

10   SUBSCRIBED AND SWORN to before me this _____ day of

11   _____, 20_____.

12

13                       _____

14                       Notary Public

15   My Commission Expires:_____

16

17

18

19

20

21

22

```
 1                 CERTIFICATE OF COURT REPORTER

 2   UNITED STATES OF AMERICA    )

 3   DISTRICT OF COLUMBIA        )

 4              I, CHERYL A. LORD, the reporter before

 5   whom the foregoing deposition was taken, do hereby

 6   certify that the witness whose testimony appears in

 7   the foregoing deposition was sworn by me; that the

 8   testimony of said witness was taken by me in machine

 9   shorthand and thereafter transcribed by

10   computer-aided transcription; that said deposition is

11   a true record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in which

14   this deposition was taken; and, further, that I am

15   not a relative or employee of any attorney or counsel

16   employed by the parties hereto, or financially or

17   otherwise interested in the outcome of this action.

18

19                  CHERYL A. LORD

20                  Notary Public in and for

21                  the District of Columbia

22   My Commission expires April 30, 2011
```

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3      - - - - - - - - - - - - - - - - x

4      MICHAEL J. QUIGLEY, et al.,      :

5                      Plaintiffs,      :

6              vs.                      :   Civ. A. No.

7      INTERNATIONAL UNION OF           :   07-600 (RBW)

8      OPERATING ENGINEERS, et al.,     :

9                      Defendants.      :

10     - - - - - - - - - - - - - - - - x

11                               Washington, D.C.

12                               Wednesday, May 30, 2007

13             Deposition of PATRICIA ANN KOHL, a witness

14     herein, called for examination by counsel for

15     Defendants in the above-entitled matter, pursuant to

16     notice, the witness being duly sworn by KAREN YOUNG,

17     a Notary Public in and for the District of Columbia,

18     taken at the offices of Bredhoff & Kaiser, P.L.L.C.,

19     805 Fifteenth Street, Northwest, Washington, D.C.,

20     at 10:36 a.m. on Wednesday, May 30, 2007, and the

21     proceedings being taken down by Stenotype by KAREN

22     YOUNG, and transcribed under her direction.

```
 1    APPEARANCES:

 2        On Behalf of the Plaintiffs:

 3              PAUL ALAN LEVY, ESQ.

 4              Public Citizen Litigation Group

 5              1600 20th Street, Northwest

 6              Washington, D.C. 20009

 7              PLEVY@CITIZEN.ORG

 8              (202) 588-1000

 9

10        On Behalf of the Defendants:

11              LEON DAYAN, ESQ.

12              ROBERT M. WEINBERG, ESQ.

13              MATTHEW CLASH-DREXLER, ESQ.

14              Bredhoff & Kaiser, P.L.L.C.

15              805 Fifteenth Street, Northwest

16              Washington, D.C. 20005

17              rweinberg@bredhoff.com

18              mcdrexler&bredhoff.com

19              (202) 842-2600

20

21        ALSO PRESENT:

22              Richard Griffin
```

1

2                         C O N T E N T S

3    THE WITNESS:

4    PATRICIA ANN KOHL

5           By Mr. Dayan ............................... 6

6           By Mr. Levy ............................. 268

7           By Mr. Dayan ............................ 270

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

E X H I B I T S

KOHL EXHIBIT NO.                                    PAGE NO.

1    Charge of Discrimination, 6/8/05 .......... 44

2    Charge of Discrimination, 4/11/05 .......... 49

3    "Why I Was Fired!" ........................ 55

4    Affidavit of Patricia Kohl ................. 58

5    Protest of 2005 Election of Local 18 ....... 80

6    Rules for Nomination and Election -  ....... 80
         2005 Election

7    Letter to Christopher J. Hanley,  .......... 91
         11/16/05

8    AGC of Ohio Building Agreement ............. 98

9    Letter to Christopher J. Hanley,  ......... 106
         11/16/05

10   Printout from Web Site, Home Page ......... 108

11   Printout from Web Site, Members for  ...... 110
         Free Speech...

12   Printout from Web Site, MembersVoice ...... 113

13   Printout from Web Site, MembersVoice ...... 113

14   Printout from Web Site, Members for  ...... 114
         Free Speech...

15   Printout from Web Site, MembersVoice,  .... 115
         Join This Group

16   Printout from Web Site, MembersVoice  ..... 127
         Sign-In

17    Campaign Website Resolution ............... 139
18    Information about logging on to web ...... 193
          site

19    Printout from H.E.A.R.D. Web Site ......... 199

20    Printout from H.E.A.R.D. Web Site ......... 200

21    Printout from Union Democracy Review ..... 202
          Web Site
22    Printout from Union Democracy Review ..... 209
          Web Site

23    Printout from Pilots Web Site ............. 209

24    Printout from The PDP Free Speech Zone ... 209
          Web Site
25    Document from Citizen Complaint Bureau .... 213
26    Ethical Practices Code .................... 219
27    Article III, Referral System ............. 222
28    Court Order .............................. 221
29    Fadel memo to Local 18 Dispatchers and ... 223
          Representatives

30    Questions and Answers .................... 221

1                   P R O C E E D I N G S

2       Whereupon,

3                       PATRICIA ANN KOHL,

4                   called for examination by counsel for

5                   Defendants and having been duly

6                   sworn by the Notary Public, was examined

7                   and testified as follows:

8                           -   -   -

9           EXAMINATION BY COUNSEL FOR DEFENDANTS

10                  BY MR. DAYAN:

11      Q.      Please state your name for the record.

12      A.      Patricia Ann Kohl.

13      Q.      Are there any other names that you go by?

14      A.      Pat.

15      Q.      Pat Kohl?

16      A.      Uh-huh.

17      Q.      What is the name as it appears on your

18      union card?

19      A.      Couldn't tell you.

20      Q.      Do you have your card with you?

21      A.      No.

22      Q.      What would be your best guess as to what

1    it says on the card?

2    A.    I sign everything Patricia A. Kohl, but I

3    don't know if that's what's on my card or not.

4    Q.    Have you ever had your deposition taken

5    before?

6    A.    Yes, sir.

7    Q.    In what context?

8    A.    The first time was a lawsuit that involved

9    a contractor for an accident on the job.  The second

10   time was I was the president of a condo association

11   and the association was suing the developer.

12   Q.    Those are the only two times you've had

13   your deposition taken?

14   A.    There was another accident, but I am not

15   sure I gave a deposition.  It's been 25 years ago,

16   so I know I went to court but I don't remember if I

17   gave a deposition.

18   Q.    On the other two, were those within the

19   last ten years?

20   A.    The one with the condo association was.

21   The other one was not.

22   Q.    Okay.  Well, let me just give you the

1    basic ground rules then since you've been through

2    this before.  You're aware that you're under oath

3    just as if it were in a courtroom.

4        A.    Yes, sir.

5        Q.    And if you don't understand one of my

6    questions, ask for clarification.  Don't guess what

7    I was intending.  Do you understand that?

8        A.    I do.

9        Q.    Are you -- is there anything that would

10   prevent you from testifying accurately today, any

11   medications or anything like that?

12       A.    No.

13       Q.    Okay.  When did you graduate from high

14   school and from where?

15       A.    I graduated in 1967 from Gnadenhutten High

16   School.  Would you like me to spell that?

17       Q.    For the court reporter, yes.

18       A.    All right.  G-N-A-D-E-N-H-U-T-T-E-N,

19   normally said "Gnadenhutten" by people that don't

20   know how to pronounce it.

21       Q.    Where is that?  What city?

22       A.    That's the city.

1      Q.    Oh, okay.  You now know my knowledge of

2  Ohio.

3      A.    It is in the state of Ohio.

4      Q.    Okay.  And did you then have any secondary

5  -- any education after high school?

6      A.    While I was in high school, I went to

7  cosmetology school nights and weekends, and I was

8  the youngest person in the state of Ohio to ever --

9  and to this date I believe I am, to ever receive a

10  license in cosmetology at 16 years old, so I did

11  that.

12      Q.    So you graduated from high school at about

13  age 15 or 16?  What age did you --

14      A.    No, I graduated at 18.

15      Q.    Oh, I see.  So you did that at the same

16  time, okay.

17      A.    I did it at the same time while I was

18  going to high school.

19      Q.    And what was your work history since 1967?

20  You can give it in broad outline.

21      A.    Worked in many cosmetology salons.  My

22  husband was in the service in Germany, so we went to

1   Germany, and I did not work there.

2       Q.    What years were those approximately?

3       A.    '68 and '69 we were in Germany, and

4   through '71, we came back and we were in Fort

5   Leonardwood, Missouri.

6       Q.    So then you come back in '71.  What about

7   -- let's just start there then.  What was your work

8   history since '71?

9       A.    Cosmetology in different cities.  My

10  husband was also, once he got out of the service, he

11  was an operating engineer, so we did move regularly.

12  When we moved back to our -- what we call our home,

13  where we were both born and raised, I then went back

14  to school and to college, worked part time at a

15  bank.

16      Q.    Let's just take it one by one.  Where did

17  you go to school and for how many years?

18      A.    Kent State University.

19      Q.    Kent State.  What years roughly?

20      A.    '74 through probably '77 or '78 off and

21  on.

22      Q.    Did you ever graduate from there?

1      A.    No, I did not.

2      Q.    Okay.

3      A.    And I did work at -- I missed one.  I

4  worked as an instructor at a cosmetology school, at

5  a vocational school, a joint vocational school in

6  Newark, Ohio.

7      Q.    Would that have been before the Kent State

8  or after?

9      A.    Yes, right.

10     Q.    Before?

11     A.    Before, uh-huh.

12     Q.    Then after '77, what did you do next?

13     A.    I taught at another cosmetology school,

14  and then I went to work at a bank after that part

15  time.  I was raising my children so I didn't work

16  full time.

17     Q.    And again, just roughly, what were the

18  years you were working at a particular -- was it at

19  a particular bank?

20     A.    It was called BankOne at the time.

21     Q.    BankOne, okay.  And what were the years?

22     A.    It's changed names 20 times by now.

1      Q.    What were the years?

2      A.    '82, '3, in there somewhere.

3      Q.    Okay.  And then after that position, what

4  did you do next?

5      A.    Then I went through the state training

6  program for operating engineers.

7      Q.    And roughly what year?

8      A.    I started in '84.

9      Q.    How long of a program was that?

10      A.    It was by the hour, and it was -- took me

11  a little over two years.  Yeah, a little over two

12  years to complete that.

13      Q.    And did you get some sort of certificate

14  or --

15      A.    Yes.

16      Q.    So just adding the years, the certificate

17  would have been in roughly '86?

18      A.    Yes.

19      Q.    Okay.  Is your husband still an operating

20  engineer?

21      A.    Retired.

22      Q.    When did he retire?

1      A.     In 2004.

2      Q.     And was he -- what -- does he have the

3  same name?  What's his name?

4      A.     Michael W. Kohl.

5      Q.     And what local was he a member of?

6      A.     Eighteen.

7      Q.     Was he a member of 18 all the way -- well,

8  what years was he a member of 18?

9      A.     '65 until -- he still is.

10     Q.     After you got your certificate, did you

11  then begin to work as an operating engineer?  What

12  did you do after that?

13     A.     I worked as an operating engineer during

14  that time.  You were actually on jobs.  It was a

15  training program, and that's all you did, was work

16  and put in hours.  As soon as I completed that, then

17  I went to the union hall and signed up on permit and

18  went to work out of the union hall, out of Local 18.

19  I tried to get in Local 18's apprenticeship program,

20  but unfortunately I was too old and they allowed an

21  age discrimination back then.

22     Q.     Was your husband ever an officer of that

1      local?

2          A.    No.

3          Q.    Was he elected to anything on the local?

4          A.    He was on the rank and file committee,

5      which is not an elected office.  It's a social

6      organization.

7          Q.    When did you become a member of the IUOE?

8          A.    I got my -- I think I got my card in 1990.

9          Q.    It says in your affidavit that you've been

10     a member since 1988?

11         A.    I was on permit.

12         Q.    And that you received your parent body

13     card in 1990?

14         A.    Right.

15         Q.    Did you receive a local card or have some

16     document from the local showing you were a member

17     before the international card in 1990?

18         A.    You -- that's how it works when you're in

19     local -- whatever local you're in, once you join

20     that local, it's -- you're a member of the

21     international once you get your book.

22         Q.    No, I understand that.  I was just

1    wondering if you got a card from the local

2    separately from your international card.

3        A.    No.

4        Q.    It's just one card.

5        A.    When you pay your dues, you know, it --

6    your dues card says Local 18 of the International

7    Union of Operating Engineers.

8        Q.    When you were preparing this affidavit or

9    reviewing it, how did you verify that 1990 was the

10    year you got the parent body card and 1988 was the

11    year that you became a member?

12        A.    How did I verify it?

13        Q.    Yes.

14        A.    I have a union card that says that on it.

15        Q.    The union card says since --

16        A.    It says initiation.

17        Q.    1988?

18        A.    1990.

19        Q.    1990.

20        A.    That's when you're initiated into the

21    parent body.  You pay -- I paid -- I paid dues, you

22    have all benefits, you have insurance, you have

1    pension, you have everything, but your years of

2    service, your technical years of service for like --

3    in Local 18 is 30-year life membership, you don't

4    have to pay any dues, does not happen until you get

5    that card.  They let you buy -- what we call buy

6    your book, and your book's not a book.  It's a card.

7    And they kept me from buying that for several years.

8    They didn't really want women in the union.

9        Q.    When you were looking at the card in

10   reviewing the declaration, did you notice your name

11   on the card?

12       A.    No.

13       Q.    What -- so you had two years of training

14   to become an operating engineer; is that right?

15       A.    Through the state of Ohio.

16       Q.    What -- what did they train you in?  Can

17   you just describe what training you had?

18       A.    I worked for an asphalt contractor, so

19   basically that was my -- my training, it was on

20   asphalt equipment.

21       Q.    Has that equipment modernized over the

22   years?

1      A.     Oh, yeah.

2      Q.     And have you had updated training since

3  then?

4      A.     Oh, sure.

5      Q.     Does that equipment involve any -- what's

6  the technology involved in that equipment?

7      A.     What do you mean by technology?

8      Q.     Do you have to learn -- do you have to --

9  maybe I'll come back to it, but you describe for me,

10  what do you have to do -- what is the training

11  involved?  Do you have to learn how to -- is there

12  any computer chip involved in the machines?  Are

13  they advanced?  What's --

14      A.     Not in asphalt equipment.  There would be

15  in cranes and things such as that, but not in

16  asphalt equipment.

17      Q.     Okay.

18      A.     The most technology that's in those are

19  hydrostatic and, you know, the vibratory -- and the

20  gauges are digital today, which they weren't back

21  then.

22      Q.     So it requires -- it's a skilled trade

1    that you're in.

2        A.    Very much so, yes.

3        Q.    And would -- would you describe most of

4    your fellow operating engineers as intelligent and

5    skilled people?

6        A.    What do you mean by intelligent?

7        Q.    Well --

8        A.    Book smart?

9        Q.    Not book smart, but would you describe

10   them as technically proficient, able to understand

11   and operate new technology, adjust to changes in

12   technology?

13       A.    Adjust by taking additional training.

14       Q.    And most of them are able to take that

15   training and absorb it and improve their skills?

16       A.    It's difficult for some of them because

17   they're older and the new technology involves a lot

18   of book work, so it is kind of difficult for them,

19   but they've mastered it because they were operators

20   from the beginning and learned to operate -- the

21   machine they can operate.  The new things is a

22   little bit more difficult for them.

1       Q.    Since joining the IUOE in 1988, what --

2    just describe your activities within the union, when

3    you first became active in the union, when you first

4    ran for some kind of office and so forth.

5       A.    Probably right at 1990 after I finally got

6    my book, I was asked to be on a picnic committee by

7    then a district rep, Dennis McClausand.  I served in

8    that capacity and then was asked to be on the rank

9    and file committee, which is the -- more or less the

10   social organization within our local -- not within

11   our local.  I'm sorry.  Within our district.  Only

12   District 6 has a rank and file committee.  Shortly

13   thereafter, I believe it was in '91, I was asked to

14   be on the advisory board of District 6 and was

15   appointed to that position and held that position

16   until I retired.

17      Q.    Let me just make sure I understood that

18   last answer.

19      A.    Sure.

20      Q.    You were appointed initially to the

21   advisory board?

22      A.    Yes.

1      Q.    And then you had to run for reelection

2    thereafter?

3      A.    Yes.

4      Q.    And are those elections on the same three-

5    year cycle as other officers?

6      A.    That's correct.

7      Q.    And then when's the first time you ran for

8    office other than advisory board?

9      A.    In 2003.  No, 2002, I'm sorry.  I'm trying

10    to get the every three years right.

11      Q.    Right, I'm doing the same thing.

12      A.    It's five years, it's three years, and

13    then you get --

14      Q.    So in 2002 --

15      A.    Yes.

16      Q.    You ran for what?

17      A.    Again, for the advisory board, and then at

18    that time for the executive board.  You have to run

19    every election to maintain your seat on the advisory

20    board.

21      Q.    And did you win in 2002?

22      A.    Lost by 30 votes against three incumbents.

1      Q.    Against three incumbents.  How many

2   positions --

3      A.    Three.

4      Q.    How many board positions are there --

5   okay, 3.

6      A.    Twenty-one advisory board.  I'm sorry.

7   Twenty-one advisory board, three executive board.

8      Q.    Twenty-one advisory board, and you won the

9   advisory board slot again?

10     A.    Always, yeah.

11     Q.    And you lost the executive board slot by

12  30 votes against three incumbents?

13     A.    That's correct.

14     Q.    Was that a district executive board or the

15  locals executive board?

16     A.    It's the local.

17     Q.    It's the local's executive board.

18     A.    There's three executive board members from

19  every district that makes up the locals executive

20  board.

21     Q.    I see, and did you -- how many other

22  people were running for those positions other than

1    you?  It sounds like you came in fourth, but correct

2    me if I'm wrong.

3        A.    There were -- I don't think there was

4    anyone else.

5        Q.    Okay.  So the way the ballot appears is

6    you just vote for three -- people are told to pick

7    three, okay.

8        A.    Right, and they're listed alphabetically,

9    which they weren't in 2002.

10       Q.    What sort of campaign did you -- did you

11   run in 2002?

12       A.    I did one mailing, passed out flyers at

13   the meetings, speak at the state meeting.

14       Q.    Anything else that you can recall?

15       A.    Not specifically.

16       Q.    What did your opponents do as part of

17   their campaign?

18       A.    Their campaign was paid for by the

19   incumbent officers.  They -- their mailings were not

20   from any of them specifically.  They were from the

21   incumbent officers.

22       Q.    What do you mean by that?

1          A.     The incumbent officers sent out mailings

2    supporting those three -- executive board in each

3    district.

4          Q.     But out of their private funds.

5          A.     No, none, zero.

6          Q.     They didn't pay for the stamps?

7          A.     No.

8          Q.     How do you know that?

9          A.     I asked them.

10         Q.     Who told you that they didn't pay for the

11   stamps?

12         A.     I asked it in a meeting, and each of the

13   executive board members said they did not pay one

14   penny.

15         Q.     You say in your affidavit that you're

16   familiar with the LMRDA; is that correct?

17         A.     Somewhat.

18         Q.     Were you familiar with it in 2002?

19         A.     As to what extent?

20         Q.     Well, I mean, in your mind, was it a

21   violation for them to campaign with union funds and

22   send out literature and not pay for the stamps

1    themselves?

2         A.    I didn't think of it at that.  I just

3    thought it was wrong.  I didn't think of the LMRDA

4    in that instance.

5         Q.    Okay, maybe I'm not -- maybe we're talking

6    past each other.  Is it your position that the

7    officers spent union funds to pay for the stamps or

8    their own individual funds to pay for these three

9    other people who were down on the ticket?

10        A.    That's -- the incumbents have a fund, CEO

11   fund, Committee To Elect Officers.

12        Q.    Okay.

13        A.    And each staff member's required to pay a

14   hundred dollars a month.  It's done in their

15   orientation, that they pay a hundred dollars a month

16   to be part of it, and that's where their money

17   comes, so they have quite a bit of money for their

18   campaigns, and that's where that came from.  The

19   stamp on it says CEO, Committee To Elect Officers.

20   Not from union funds.

21        Q.    Okay.  And how did you -- did you raise

22   funds yourself?

1    A.    For that election.

2    Q.    For that election.

3    A.    I did not.

4    Q.    Okay.

5    A.    I spent my own money.

6    Q.    How much approximately did you spend?

7    A.    I'm going to say probably a couple

8  thousand dollars.

9    Q.    Did you do a mailing to the entire local

10  or just to your district?

11    A.    I just did my district.

12    Q.    Okay.

13    A.    That's the only offices I was running for,

14  that could vote for me, was within my district.

15    Q.    And what did your opponents do to

16  campaign?  Did they send out more than one mailing?

17    A.    Yes.

18    Q.    How many mailings?

19    A.    2002, this is going to be an estimate.  I

20  would say at least three.

21    Q.    Would it have been within your rights to

22  send a mailing to the entire local?

1          A.     Yes.

2          Q.     And did you make a decision not to do

3     that?

4          A.     I did.

5          Q.     What was the basis of that decision?

6          A.     Those people couldn't vote for me.  The

7     only people that can vote for the offices that I was

8     running for is my district.

9          Q.     So you were interested in getting your

10    message to the people who could vote for you.

11         A.     Right.

12         Q.     When did you get hired by the Ohio

13    Operating Engineers Apprenticeship and Training

14    Fund?

15         A.     In July of 1999.

16         Q.     Let me go back to the other topic.  When

17    you were running for the executive board position in

18    2002, did you criticize the incumbents?

19         A.     I'm sure I did.

20         Q.     When did you first start speaking out to

21    your fellow members about problems you perceived in

22    the way the union was being run?

1    A.    It was -- at that point it was mainly in

2    my district and democratic practices, and actually

3    Patrick Sink asked me not to run.  He told me I

4    could have a conversation with the incumbents and

5    maybe have lunch together and we would discuss it

6    and as soon as they would retire, then I would have

7    that position.  I refused.  I said --

8    Q.    Okay.  When did that conversation occur?

9    A.    It would have been in 2002.

10    Q.    2002.  Before 2002, had you ever spoken

11    out, criticized the leadership of the union in any

12    forum?

13    A.    Yes, I'm sure I did.  I can't cite -- if I

14    didn't feel something was right as an advisory board

15    member or at a union meeting or if there was an

16    issue, I always -- I always spoke out.

17    Q.    Would that have been starting from the

18    time you first got elected to the advisory board?

19    A.    From then, and -- yes, because I was

20    elected to the advisory board early on in my career.

21    Q.    And even before that first election, were

22    you someone who --

1      A.    I don't ever recall doing anything like

2   that.  That was, you know, very early on.  I didn't

3   even know a lot of the things back then at that

4   time.

5      Q.    Now, back to the apprenticeship and

6   training, but I'll just call it the fund --

7      A.    That's fine.

8      Q.    -- for purposes of the deposition.

9      A.    That's fine.

10     Q.    When were you hired to the fund?

11     A.    July of 1999.

12     Q.    And was your job -- it's stated in your

13  affidavit, assistant to the administrator?

14     A.    That's exactly what my job was,

15  instructor.  I did EEO, and then later I took over

16  the crane certification program.

17     Q.    Was it a full-time job?

18     A.    Yes, uh-huh.

19     Q.    And what was the salary roughly on that

20  job?

21     A.    In the 60s.

22     Q.    Meaning the 60,000 range?

1    A.    Yes.

2    Q.    $60,000 per year?

3    A.    To start with.

4    Q.    To start with?  It's no one's fault.

5    We're talking at the same time.  We want to make

6    sure the court reporter got it.  $60,000 per year to

7    start with?

8    A.    In that area.  I can't say exactly.

9         MR. LEVY:  Do you want to go off the

10   record?

11         (Discussion off the record)

12         BY MR. DAYAN:

13   Q.    Who hired you for that position?

14   A.    Technically the person I spoke with was

15   Donald Black, but he would have to hire me only

16   through the approval of the trustees and the

17   approval of the officers of Local 18.

18   Q.    What was Donald Black's title?

19   A.    Administrative manager.

20   Q.    Was he the highest managerial officer at

21   the fund?

22   A.    Technically Ray Orrand runs the

1    apprenticeship fund.  The way it's structured,

2    Donald Black is the administrator but Ray Orrand is

3    -- if you get paperwork and things like that, Ray

4    Orrand signs it.

5         Q.    What's his position?

6         A.    He's administrator of the health and

7    welfare and pension fund.

8         Q.    So Black was the person who told you

9    you're hired?

10        A.    That's correct.

11        Q.    Who interviewed you?

12        A.    Don Black -- Donald Black, Art Presas and

13    Tom Louis.

14        Q.    Now, at this time, in 1999, you had

15    already spoken out and criticized the leadership of

16    the local; is that correct?

17        A.    If there was something that I felt -- I

18    can't think of anything in particular at that time.

19    In fact, in 1998, I testified before the House and

20    Senate on prevailing wages for Local 18.

21        Q.    In 1988.

22        A.    '98.

1    Q.    In 1998, okay.  But you had been on the

2    advisory board since 1991.

3    A.    In that neighborhood, yes.

4    Q.    And your best recollection as you

5    testified a few minutes ago is that during that

6    period of time, you did, when you believed it was

7    called for, criticize the leaders of the local

8    union.

9    A.    Right.  If I felt they weren't doing their

10   job, weren't representing someone right, I would say

11   so.  I would ask questions as to why they did or did

12   not do -- if a member came to me, that was my job as

13   an advisory board member, is to represent the

14   members.

15   Q.    Were the advisory board positions you were

16   seeking contested positions?

17   A.    They were elected positions.  They could

18   be contested but --

19   Q.    Did you ever have opposition when you ran?

20   A.    No, I did not.

21   Q.    Okay, so --

22   A.    I'm sorry.  In the 2005 election I did.

1    Q.    You had opposition in the 2005 --

2    A.    Yes.

3    Q.    Okay.  Who at the fund told you you were

4    being terminated?

5    A.    Donald Black, with Fred Woods present.

6    Q.    Who is Fred Woods?

7    A.    Instructor in Cleveland.  Actually, he's

8    the coordinator of that training site.

9    Q.    And when did that meeting occur?

10   A.    That termination occurred in April of

11   2005.

12   Q.    And how did it occur?

13   A.    I was sitting in my office and no one else

14   was there that day except Don and I, and Fred Woods

15   came walking in and I knew what was going to happen.

16   There weren't any doubt in my mind, and Don asked me

17   to come into his office and he said as of today, you

18   no longer have a job, and I said okay, we'll pack

19   up.

20   Q.    How did you know that was going to happen?

21   A.    By the things that were occurring.

22   Q.    What were the things?

1        A.    Just duties that were taken away from me,

2    meetings that I was excluded from.  Approximately a

3    month before that, Don had Fred there at another

4    time and he asked -- gave me a list of rules he

5    wanted me to sign and I refused to sign them.

6        Q.    What were the rules he wanted you to sign?

7        A.    Things like not being in the office after

8    5:00 and just -- I can't even remember at this time

9    they were so ridiculous after -- it seemed like a

10   list of paranoia to me.

11       Q.    Did he tell you why he wanted to impose

12   those rules?

13       A.    I asked him.

14       Q.    And what did he say?

15       A.    He just had to do it.  Same answer he gave

16   me when he fired me.  I asked him why I was being

17   terminated and he said I can't say.

18       Q.    Did he ever express to you any

19   dissatisfaction with either your performance in the

20   job or your relationship with co-workers?

21       A.    My performance and my job, never.

22   Actually, he promoted me to coordinator's pay very

1    shortly after I came on staff, at the same time

2    telling me he was going to give me the pay and all

3    the percs so to speak that went with it but he could

4    not give me the title because they just couldn't do

5    that.

6        Q.    What about the other half of my question?

7        A.    Could you repeat it please?

8        Q.    Did he ever express -- could you -- could

9    you read back the question?

10        THE REPORTER:  Question:  "Did he ever

11    express to you any dissatisfaction with either your

12    performance in the job or your relationship with

13    co-workers?"

14        A.    No, he didn't express any relationship

15    with co-workers.  We had a secretary that was doing

16    some very unethical things and he refused to

17    discipline her in any way until I finally had to

18    bring it to their attention that she had stolen from

19    the apprenticeship and I proved that and then the

20    trustees made him let her go.

21        Q.    When did they make him let her go,

22    according to --

1          A.     January.

2          Q.     Of 2005?

3          A.     Yes.

4          Q.     Did Mr. Black or anyone else tell you that

5    at least some employees had complained that you were

6    logging onto their computer?

7          A.     No.

8          Q.     You never heard that before?

9          A.     No.

10         Q.     From anyone?

11         A.     No.

12         Q.     Did you log onto people's computers when

13   you had that job?

14         A.     We don't log on.

15         Q.     Did you use other people's computers?

16         A.     All the computers were property of the

17   apprenticeship and training fund.  When I went to a

18   training site, that was part of my job, was to enter

19   my -- my information from the class that day.  You

20   can't let somebody be in a class without making sure

21   that they're eligible to be in the class.  You can't

22   let them test unless they have the previous part of

1    the certification.  Those are all in the records, so

2    that was -- I could not perform my job without doing

3    that.

4        Q.    Were you told -- maybe I shouldn't have

5    used the word "log on."  Were you told by Mr. Black

6    or anyone else that there were any issues concerning

7    your use of other people's computers?

8        A.    That was one of the things that was on the

9    list, but he -- all he did was ask me to read the

10   list.  I read it, and he asked me to sign it.  That

11   was it.  There was no comments made as to anything

12   else on there.  Nothing.

13       Q.    At that meeting.

14       A.    Right.

15       Q.    Before that meeting or at any other time,

16   did he express to you concerns about use of other

17   people's computers?

18       A.    No, no.

19       Q.    Did you ever use those computers to update

20   your web site or work on your web site in any way?

21       A.    No.

22       Q.    Did anyone ever tell you that they thought

1    you were doing that at the time?

2       A.    No.

3       Q.    What do you think the reason for your

4    termination was?

5       A.    I feel it's a direct result of the meeting

6    that I had with Don and Pat Sink as to things that

7    were going on within the apprenticeship and some

8    other things within the local.  From that date

9    forward, I knew my days were numbered.  I just

10   didn't know how they would do it, but -- and at the

11   same time, I expressed the fact that I was going to

12   run, you know, for office.

13      Q.    Okay, so the meeting you just referenced

14   was in December of 2000 and --

15      A.    Four.

16      Q.    Four?

17      A.    Correct.

18      Q.    And what happened at the meeting that made

19   you think that your days were numbered?

20      A.    Any time you go and state the things that

21   I stated in the meeting and talk to them, if you've

22   ever been a part of the inside of a union like that,

1     you cannot disagree in that extent and keep your

2     job.

3          Q.     Well, what did you say at the meeting?

4          A.     What did I say.  It was a three-hour

5     meeting.  What do you want to know?

6          Q.     What -- well, what topics, what issues did

7     you raise, what complaints did you make, what issues

8     did you raise at the meeting?

9          A.     Would you like just sporadic examples?

10         Q.     Well, let's start with that.

11         A.     Okay.  One of the issues I brought up was

12    the secretary that had been -- they'd had a party

13    for in the back and she'd been on maternity leave,

14    paid 100 percent of her salary.  Although she should

15    have been on medical leave, they -- they did a --

16    not six weeks prior, but 12 weeks prior, they let

17    her stay longer.  She had taken a $400 gift card and

18    spent it on a camera and video game, so I brought

19    that to their attention.

20              I -- we had a coordinator at the Dayton

21    training site, which is Don Black's home district,

22    that had been drunk in there, slept on the floor of

1    his office all day, had been abusing apprentices,

2    and I brought those things to his -- I mean, three

3    hours' worth of things.  I don't -- I can't think of

4    them all.

5        Q.    Had you raised any of those issues before

6    December 2004?

7        A.    Yes, to Don Black, except the one about

8    the gift card, because no matter what I told him

9    that she was doing, he would cover up for her, and I

10    finally laid the proof on the table that day.

11        Q.    Did they know -- we'll come back to this a

12    little bit later, but did they -- did they, meaning

13    Don Black and Patrick Sink, were those -- by the

14    way, were those the only other two people at the

15    meeting?

16        A.    That's correct.

17        Q.    Did Don Black and Patrick Sink at that

18    time know that you were running for office?

19        A.    Yes.

20        Q.    Had you announced that you were running

21    for office?

22        A.    I had told the right people.

1       Q.     Who would they be?

2       A.     I told Robert Ferrell at a meeting a

3    couple nights before.

4       Q.     Anyone else?

5       A.     I'm sure I did, but I can't remember who.

6       Q.     Had you --

7       A.     It wasn't a secret.

8       Q.     Okay.  Did the topic of your running for

9    office come up in the three-hour meeting?

10       A.     I don't remember.

11       Q.     Well, could you just characterize in a

12    sentence what you believe the reason you were fired

13    was?

14       A.     Because I disagreed with them and I had

15    told them that if this continued and didn't change,

16    if they didn't try to make improvements in what was

17    going on, I would -- I would take it to the

18    membership, which the membership has a right to know

19    these things.

20       Q.     Any other reason that you believe you were

21    fired?

22       A.     Not to my knowledge.

1      Q.    Isn't it a fact that you filed an EEO

2    charge against the fund?

3      A.    After I was fired.

4      Q.    And isn't it also a fact that you alleged

5    in your charge that you were terminated because of

6    sex and retaliation?

7      A.    Yes, that was in there, uh-huh.

8      Q.    Was that -- in preparing your affidavit,

9    you didn't say in here, did you, that sex was one of

10   the reasons you were fired; is that correct?

11     A.    No, I didn't -- I didn't put any of that

12   in there.

13     Q.    In the affidavit.

14     A.    Right.

15     Q.    And I just asked you a minute ago what the

16   reasons you were fired, and you didn't mention sex

17   then either; isn't that correct?

18     A.    That's correct.

19     Q.    Well, were --

20     A.    I didn't mention it.

21     Q.    Were you fired because of the sex?  Is

22   that one of the reasons you were fired?

1      A.    It was one of my suspicions, but I didn't

2  know it for a fact.

3      Q.    But you alleged it anyway in the EEOC

4  charge.

5      A.    The retaliation definitely.  The EEOC put

6  in the sexual thing.

7      Q.    Who put that -- who put that in?

8      A.    The person that wrote it up, and I don't

9  remember who that person was.

10     Q.    Someone wrote up that form and not you?

11     A.    I wrote up the form.  Then they put it in

12 the format.

13     Q.    What office was that at?  Was that --

14     A.    Cleveland.

15     Q.    Cleveland office?

16     A.    Uh-huh.

17     Q.    And you signed the charge --

18     A.    I'm sure I did.

19     Q.    -- below the boxes that were checked sex

20 and retaliation.

21     A.    Right.

22     Q.    Did you read it before you signed it?

1        A.    Yes, I did.

2        Q.    Did you say to her I'm not so sure that

3    sex belongs on there?

4        A.    No, because my idea of sexual harassment

5    was not that -- it was the fact that I was a female.

6        Q.    Part of the reason you think you were

7    fired is because you were a female.

8        A.    And I was disagreeing with them.

9        Q.    Did men who disagreed with them do -- fare

10   any better in that local?

11       A.    Oh, yeah.

12       Q.    So men -- men could disagree and be

13   outspoken in your opinion and not get -- and not

14   have any action taken against them?

15       A.    Not -- not as likely.  You need to

16   understand, I was the first woman on staff, so it

17   was new ground.

18       Q.    But you didn't have -- you said a minute

19   ago that you suspected sex but you didn't have any

20   evidence of it; is that correct?

21       A.    You're going to have to rephrase what

22   you're saying.  I don't understand what you're

1    saying.  What -- you need to tell me what you're

2    saying in the term of sex.

3        Q.    Well, tell me why -- tell me why you

4    filled out the form and checked sex, or allowed --

5        A.    I didn't check sex.  Sexual --

6        Q.    Okay

7        A.    -- harassment.

8            MR. LEVY:  Try not to talk over each

9    other.

10            THE WITNESS:  I'm sorry.

11            MR. DAYAN:  Let me mark as Exhibit 1 --

12    can you mark this as Exhibit 1, charge of

13    discrimination.

14                            (Kohl Exhibit No. 1

15                              was marked for

16                              identification.)

17            BY MR. DAYAN:

18        Q.    When you went into the EEOC office, did

19    they give you a form like this?

20        A.    I didn't go in originally.  Most of it was

21    done by phone, and then when I did go in, this was

22    prepared for me to sign.

1        Q.    You provided the EEOC agent obviously your

2    name there at the top that's Patricia A. Kohl?

3        A.    That's correct.

4        Q.    And you gave her the phone number, home

5    phone number 614 et cetera?

6        A.    That's my cell number.

7        Q.    Okay, but you gave that to her.  She

8    didn't know that before she talked to you.

9        A.    No, she did not.

10        Q.    And gave her your date of birth?

11        A.    I'm sure I did.

12        Q.    And is that accurate, that date of birth?

13        A.    That certainly is.

14        Q.    Okay.  And did you tell her that you were

15    discriminated based on retaliation and sex?

16        A.    As a female.  It says I believe I was

17    discharged because of my sex, female.

18        Q.    And you told her that; is that correct?

19        A.    Yes.

20        Q.    She didn't just make that up or say that's

21    a better idea for you to put that in than

22    retaliation?

1      A.    No.

2      Q.    Okay.  And if you continue on in the sort

3   of -- the particulars are, that box, it says the

4   particulars are, was hired by the respondent on July

5   19th, 1999.  Is that correct?

6      A.    That's correct.

7      Q.    Okay.  And then you say, "I believe I was

8   discharged because of my sex, female, and in

9   retaliation for filing a previous charge of

10  discrimination."  What did you mean by I believe I

11  was discharged because of my sex, female, and in

12  retaliation for filing a previous charge of

13  discrimination?

14     A.    Could you state that again?

15     Q.    What did you mean when you said I believe

16  I was discharged because of my sex, female, and in

17  retaliation for filing a previous charge of

18  discrimination?

19     A.    Because I was a female and the retaliation

20  -- they were retaliating.

21     Q.    For filing a Title VII charge?

22     A.    You need to explain to me what Title VII

1    is.

2         Q.    Well, you were the EEO officer and

3    instructor at the operating engineers --

4         A.    Right.

5         Q.    -- apprenticeship.

6         A.    Only --

7         Q.    What training did you have as EEO officer?

8         A.    None.  It was to put my name on a piece of

9    paper because I was a female.  If there was any

10   decisions made, I was not permitted to make them.

11   They had to be made by the apprenticeship, by Don

12   Black and by the union.

13        Q.    Did your card say EEO officer on it?

14        A.    No.

15        Q.    Did you ever say to someone why am I being

16   given the title EEO officer, I don't know anything

17   about the EEO laws?

18        A.    I asked to go to classes.  They said I can

19   go, but never really allowed it.  I went to one

20   seminar.  I felt that I needed to find out more

21   about it.  I did sit in on some meetings, and that

22   was it.  If anything else occurred, I could not make

1    any decisions as to what to do.  My basic job as EEO

2    in a sense was to protect and assist the females in

3    the union, especially the apprentices.

4         Q.    Well, apart from that, what does -- in

5    your opinion, what does it mean if someone tells you

6    I believe I was discharged because of my sex,

7    female?  What would -- how would you interpret that?

8         A.    Because they were a female.

9         Q.    Right, and did you believe that you were

10   discharged from this fund because you were a female?

11        A.    Because I was a female and they were

12   retaliating against me for what I said.

13        Q.    For what you'd said about the way that the

14   fund was being run or for filing a Title VII charge?

15        A.    Everything.

16        Q.    Well, when did you file the Title VII

17   charge?

18        A.    At the same time.

19        Q.    It would have been after the December

20   meeting though, right?

21        A.    Uh-huh.

22        Q.    And you testified a few minutes ago that

1    when you left the December meeting, you knew you

2    were going to be fired.

3        A.    Uh-huh.  Just figured it was a matter of

4    time.

5        Q.    And you hadn't filed an EEO charge at that

6    time.

7        A.    No.

8        Q.    So when you put in here that you believe

9    one of the reasons that you were fired is because

10    you'd filed a previous charge of discrimination, you

11    weren't being candid with the EEO -- with the

12    office, were you?

13        A.    I think I might have filed in December.

14        Q.    Well, there will be a record of that

15    presumably.  Hold on.  Okay, let me mark this as

16    Exhibit 2.

17                            (Kohl Exhibit No. 2

18                             was marked for

19                             identification.)

20            BY MR. DAYAN:

21        Q.    Do you recognize Exhibit 2?

22        A.    Yes.

1     Q.    And did you speak with the same person

2     when you prepared this charge or was it a different

3     person?

4     A.    I don't remember.

5     Q.    Okay.

6     A.    You never really talk to the same person.

7     Q.    Did you read this before you signed it?

8     A.    Oh, I'm sure I did.

9     Q.    Okay, and in this one, which is dated --

10    do you see where the date on the lower left --

11    A.    I do.

12    Q.    Is that your handwriting, April 10th,

13    2005?

14    A.    That's correct.

15    Q.    Okay.  This one, just for the record,

16    let's look at Exhibit 1 together.  Is that also your

17    handwriting in the lower left?  It's dated --

18    A.    Yes.

19    Q.    Let me finish.  That's dated June 6th,

20    2005?

21    A.    Yes.

22    Q.    Okay.  So Exhibit 2 was filed before

1    Exhibit 1.

2         A.    Yes.

3         Q.    And in Exhibit 2, you only checked

4    retaliation; is that correct?

5         A.    That's correct.

6         Q.    And not sex.

7         A.    That's correct.  Could I say something?

8         Q.    Not until there's a question, but go

9    ahead.  What were you --

10        A.    It's coming back to me now.  This is what

11   I originally filed.

12        Q.    And you're indicating Exhibit --

13        A.    I'm sorry, yes.

14        Q.    Two.

15        A.    Exhibit 2, okay?  Nothing was happening.

16   I kept making phone calls.  Nothing was happening.

17   Then there was a meeting held with the fund attorney

18   and Don Black, and they offered me a sum of money to

19   disappear, which I refused.  Nothing -- no response

20   from that, nothing came out of that.  I kept calling

21   the -- Cleveland, and she advised me of this one,

22   and I honestly, although I signed this, I don't

1    remember -- I really don't remember a lot about

2    this.  This is the one I recall.

3         Q.    And you're indicating Exhibit 2.

4         A.    I'm sorry.  Exhibit 2.

5         Q.    Let's go back to Exhibit 1.  You prepared

6    -- you did sign Exhibit 1.

7         A.    I did sign it.  That's my signature.  I'm

8    sorry.

9         Q.    And it's a short form.  It's a one-page

10   form; is that correct?

11        A.    Yes, it is.

12        Q.    And it says in a box in about the middle

13   of the page, "Discrimination based on, check

14   appropriate boxes."  Do you see that?

15        A.    Uh-huh.

16        Q.    And retaliation and sex are checked in

17   Exhibit 1; is that correct?

18        A.    That's correct.

19        Q.    And you said before that you believe you

20   were discharged because of your sex, female, and in

21   retaliation for filing a previous charge of

22   discrimination.

1      A.    Uh-huh, that's correct.

2      Q.    And you've also testified that when you

3   left the meeting in December of 2004, which was

4   before either Exhibit 1 or Exhibit 2 was prepared,

5   you knew you were going to be fired.

6      A.    I felt that I would be fired.

7      Q.    And you knew when you left the meeting in

8   December 2004 that you hadn't filed any EEO charges

9   against the apprenticeship fund; isn't that correct?

10     A.    Not at that time.

11     Q.    But you still signed this document stating

12  that you believe you were discharged because of your

13  sex, female, and in retaliation for filing a

14  previous charge of discrimination.

15     A.    That's correct.

16     Q.    And this document, just for the record, is

17  Exhibit 1.  So you weren't -- I'll go back to my

18  previous question.  You weren't being entirely

19  candid in Exhibit 1 in signing a document that said

20  you believe you were discharged because of

21  retaliation for filing a previous charge of

22  discrimination.

1      A.    Why wouldn't I have been candid?

2      Q.    Because you -- you didn't believe that

3  that was the reason they fired you.

4      A.    I do believe that's the reason they fired

5  me.

6      Q.    You believe the reason they fired you is

7  because you had filed a charge of discrimination on

8  April 10th, 2005?  You believe that was the reason

9  they fired you?

10      A.    Only one of the reasons.  That was one of

11  the legal reasons that they fired me.

12      Q.    Well --

13      A.    The other were union reasons.

14      Q.    In your affidavit, you stated reasons for

15  why you were fired; is that correct?

16      A.    The reasons I was fired?

17      Q.    You stated that in your affidavit; isn't

18  that correct?

19      A.    I think I stated in my affidavit I've

20  never been told why I was fired.

21      Q.    But you stated the reasons why you

22  believed you were fired.

1    A.    Some of the reasons.  The possible

2    reasons.

3    Q.    You didn't say some of the reasons.  You

4    said these are the reasons that you were fired.  You

5    said -- well, let's read it.  Why don't we mark this

6    as an exhibit too since we're going to be using it a

7    lot anyway.  Exhibit 3, affidavit of Patricia Kohl.

8                              (Kohl Exhibit No. 3

9                               was marked for

10                              identification.)

11              BY MR. DAYAN:

12   Q.    Okay, let's read it together.  Paragraph

13   2, the first page, I'll start with, "I was fired in

14   April 2005."  Do you see where I am?

15   A.    I do.

16   Q.    Okay.  The next sentence says, "Although I

17   was never given the reason for my discharge, I am

18   sure it was the result of a meeting with Patrick

19   Sink, then and now the business manager of Local 18,

20   the ninth vice president of the IUOE and chairman of

21   the board of trustees of the apprenticeship fund,

22   and with Donald Black, apprenticeship

1    administrator."  Is that a true statement?

2        A.    That's true.

3        Q.    Do you believe that if all that had

4    happened to you was that you had this meeting where

5    you made some criticisms, and you've identified a

6    few of them, I realize not all of them, and you left

7    that meeting and continued to work, you would not

8    have been fired?

9        A.    Could you repeat that please?

10        Q.    That wasn't -- let me try it again.  When

11    you left the meeting in December 2004, you believed

12    you were going to be fired; is that correct?  Yes?

13        A.    Yes.

14        Q.    Okay.  And you believed -- did you believe

15    there was anything you could do to avoid being fired

16    after leaving that meeting on December 2004?

17        A.    I don't know.  I can't answer that.  I

18    don't know.

19        Q.    Do you believe that if you had continued

20    to speak out after December -- did you continue to

21    speak out after December 2004?

22        A.    Yes.

1    Q.    And did you campaign for office?

2    A.    Yes.

3    Q.    And by the way, when was the meeting in

4    April 2005 where they called you in and, you know,

5    and told you you were being fired?  Do you have the

6    date of that meeting?

7    A.    I'll be within a couple days when I tell

8    you this, but I think it was the 21st.  That has to

9    be close, 20th, 21st, somewhere around there.

10    Q.    So is this a fair statement, you left the

11    meeting in December 2004 believing you were going to

12    be fired.

13    A.    That's correct.

14    Q.    And believing that if you continued to

15    speak out, you were going to be fired?

16    A.    That's correct.

17    Q.    And continued to speak out about problems

18    you perceived about problems the fund was being run?

19    Is that the problems we're talking about?

20    A.    Are you asking if I believed that I would

21    be fired only if I continued to speak out?

22    Q.    Yes.

1        A.    No.

2        Q.    You believed you'd be fired anyway even if

3    you stopped speaking out.

4        A.    I believed my days were numbered.

5        Q.    And that was before you ever filed an EEO

6    charge; is that correct?

7        A.    Yes.

8        Q.    Is there any document other than Exhibit 1

9    -- well, strike that.  On your web site, you -- your

10   campaign web site, do you recall posting information

11   about why you believe you were fired?

12       A.    Uh-huh.

13       Q.    Did you include in that description that

14   --

15       A.    Yes.  Sorry.  I said uh-huh.  Caught

16   myself.

17       Q.    Okay.  Did you include in that description

18   that you believe you were fired because you filed an

19   EEO charge?

20       A.    I don't remember.

21            MR. DAYAN:  We can mark it -- let's mark

22   this as Exhibit 4.

1                              (Kohl Exhibit No. 4

2                              was marked for

3                              identification.)

4          BY MR. DAYAN:

5          Q.    Do you recognize this --

6          A.    Yes, I do.

7          Q.    -- document?  Did you write it?

8          A.    Yes, I did.

9          Q.    I don't want to sit -- have you read it in

10   preparation for this deposition?

11         A.    No, I have not.

12         Q.    Okay.  We might be taking a break later.

13   I don't want to take the time now and have you read

14   it and verify it.  I'll represent to you that I

15   don't see in here any reference to filing an EEO

16   charge.  Would that surprise you, if there's nothing

17   in here about the EEO charge?

18         A.    Would it surprise me?

19         Q.    Yeah.

20         A.    No.

21         Q.    Well, we can come back to it later.

22   Turning to Exhibit 3, which is the -- it's titled

1      the Affidavit of Patricia Kohl, what was the -- did

2      you draft this affidavit?

3          A.    Yes.

4          Q.    Did you personally write -- write it, or

5      did counsel write it and you reviewed it?

6          A.    We worked on it together.

7          Q.    Did you write a first draft of it?

8          A.    Yes.

9          Q.    In that first draft, did you include a

10     paragraph about why you were fired from the fund?

11         A.    From the first draft, I don't remember.

12         Q.    Was it -- well, did the idea for including

13     that come from you?

14         A.    Yes.

15         Q.    And did you provide counsel the reasons

16     for your discharge?  Just a yes or no.  I'm not

17     going to -- don't worry.  Did you describe the

18     reasons why you believed you were discharged?

19         A.    Not other than what's there.

20         Q.    As you sit here today, are you still,

21     quote, and I'm reading from your affidavit now, sure

22     that the discharge was the result of a meeting with

1     Patrick Sink and Donald Black in December of 2004?

2         A.    I'm sure it's a culmination of all the

3     things involved.

4         Q.    You didn't say in this affidavit though

5     that it was a combination of this and other facts,

6     did you?

7         A.    No.

8         Q.    And in your -- in Exhibit 1, which is the

9     June 6th, 2005 EEOC charge, you gave two reasons in

10    that document for your discharge; is that correct?

11        A.    That's correct.

12        Q.    And tell me again what your basis was for

13    putting sex as one of those two reasons.

14        A.    Because I was a female.

15        Q.    Did you have any evidence that that was

16    one of the reasons that they discharged you?

17        A.    Written evidence are you asking?

18        Q.    Any evidence.

19        A.    I don't think I can answer that question.

20    I don't -- if you could state it a different way or

21    rephrase it maybe?

22        Q.    You know what evidence is, right?

1       A.      I do.

2       Q.      Did you have any evidence that sex was one

3    of the reasons you were discharged?

4       A.      The way I was treated as a female.

5       Q.      Well, that's not evidence.  That's just

6    your -- that's your suspicion.

7       A.      I have no documentation, so you asked for

8    evidence.

9       Q.      Do you have any other evidence?  Did

10   anyone do anything or say anything to you that would

11   cause you to think that because you were a female,

12   that was a reason you were fired?

13      A.      In conversations with members, it was kind

14   of a joke, you know, you can't get away with that as

15   a female, you can't, you know, more or less, you

16   know, ask the union for clarifications on things

17   they're doing or bring things to their attention.

18   That's just kind of a known, a standing assumption

19   on most members' parts.

20      Q.      Members said that to you.  Did anyone with

21   authority to act on behalf of the fund say that to

22   you?

1       A.     No.

2       Q.     In fact, I think you testified earlier

3   that the fund wanted to hire women; is that correct?

4       A.     They -- no, no, I didn't state that.

5       Q.     What did you state?  You were about to say

6   they needed --

7       A.     There were no females on staff, so it

8   didn't look very good for the union not to have a

9   female on staff as large as Local 18 was.

10      Q.     So it was helpful for them to have a

11   female --

12      A.     It was helpful to them to be the token

13   female.

14      Q.     And if you had -- and with firing you,

15   there was no token female anymore?

16      A.     That's right.

17      Q.     In your characterization.

18      A.     That's correct.

19      Q.     Did anyone at the international union know

20   of the circumstances surrounding your termination

21   from the fund prior to this lawsuit?

22      A.     I couldn't answer that with certainty, but

1    I would assume yes.

2         Q.    But you don't know either way.

3         A.    I do not know.

4         Q.    You didn't notify anyone at the

5    international.

6         A.    Notify them that I was being terminated?

7         Q.    Correct.

8         A.    No, I did not.

9         Q.    Or file a complaint or a letter.

10         A.    No, I did not.

11         Q.    Okay.  And by the way, did you ever file a

12    lawsuit arising out of that termination?  I know you

13    filed the two charges, but did you file a lawsuit?

14         A.    Not yet.

15         Q.    Not yet, okay.  Let's leave it at that.

16    Have you considered filing a lawsuit?

17         A.    Yes.

18         Q.    Have you talked to an attorney about it,

19    without telling me what the attorney said.

20         A.    Yes.

21         Q.    But a different attorney, I take it, from

22    the attorney in this case.

1        A.    Yes.

2        Q.    What would that lawsuit allege as the

3    reason -- as the basis for the termination?

4        A.    At this time I'm not sure how it would be

5    stated.

6        Q.    I believe you said in one of the web site

7    documents that you taped this meeting with Mr. Sink

8    and Don Black?

9        A.    Yes.

10       Q.    Do you still have that tape?

11       A.    I haven't played it for a long time.  I

12   don't know if it's still on there or not.  It's

13   digital, so I don't know.

14       Q.    Did you tell them that you were taping the

15   meeting?

16       A.    No.

17       Q.    Did you have counsel before you taped that

18   meeting?

19       A.    No.

20       Q.    Did you think your employment was in

21   danger before that meeting?

22       A.    I thought my employment would be in danger

1     because of the meeting.

2          Q.     Because of what you intended to say at the

3     meeting.

4          A.     Yes.

5          Q.     Let's turn to paragraph 3 of your

6     affidavit.  We talked before about the elections up

7     to 2002.

8          A.     That's correct.

9          Q.     And I'll just summarize them, and if my

10    summary's wrong, tell me; that you had been elected

11    several times to the union's advisory board prior to

12    2005, and you had run once for an executive board

13    position in 2002 and lost.

14         A.     Correct.

15         Q.     And there were no other offices that you

16    ran for.

17         A.     Not --

18         Q.     Go ahead.

19         A.     Prior to 2005?

20         Q.     Prior to 2005, okay.  So let's focus on

21    2005 then for a minute.  In that campaign, you ran

22    for, if I'm reading your affidavit correctly, you

1     ran for president of Local 18; is that correct?

2         A.    Yes.

3         Q.    And an executive board position in

4     District 6?

5         A.    Yes.

6         Q.    And also the same advisory board position?

7         A.    Yes.

8         Q.    Okay.  How did you campaign in the 2005

9     election?

10        A.    I did two mailings, spoke at the union

11    meetings, spoke at the state meeting, and relied

12    heavily on my web site.

13        Q.    When did you set up the web site?

14        A.    Sometime in 2005.  I can't give you the

15    date.

16        Q.    Sometime in 2005.  So in 2004, you had at

17    least told some people you were going to run.

18        A.    Right.

19        Q.    And then the web site sort of came

20    obviously after that because it was in 2005.

21        A.    That's correct.

22        Q.    Anything else?  We'll go back to the web

1  site in a minute, but you did the two mailings, you

2  spoke at union meetings and state meetings.  By

3  state meetings, what do you mean by that?

4      A.    Local 18 has semiannual state meetings,

5  which is considered the general membership meeting,

6  since we have six districts.  We're in a district

7  form of government.  Each district has a union

8  meeting monthly.  Then twice a year there's a

9  meeting in Columbus for all the districts, and it's

10  called the semiannual state meeting.

11      Q.    Okay, so you had the two mailings, the

12  district union meetings, the state meeting, the web

13  site.  Anything else that you did?

14      A.    We had several small get-togethers of

15  interested members.

16      Q.    Anything else?

17      A.    Not that I can think of at this time.

18      Q.    Okay.

19      A.    I did hand out flyers also at the

20  meetings.

21      Q.    Handed out flyers at meetings, that you

22  prepared and drafted, okay.

```
1        A.      Yes.

2        Q.      And what district meetings did you go to?

3        A.      District 6.

4        Q.      You went to the -- okay.  Any other

5   district meetings that you attended?

6        A.      Not allowed to.

7        Q.      Well, when did you decide you were going

8   to run?

9        A.      A final decision I made in April.

10       Q.      Of 2005?

11       A.      Uh-huh.

12       Q.      But you were considered running --

13       A.      Uh-huh.

14       Q.      -- before.  Was your web site prepared

15  before April 2005?

16       A.      I don't know.

17       Q.      Okay.  And you weren't just considering

18  running in 2004.  You at least told some people you

19  were going to run.

20       A.      Right.

21       Q.      And in fact, you even believed that the

22  two gentlemen at the meeting, Donald Black and
```

1    Patrick Sink, believed you were going to run.

2        A.    Yes.

3        Q.    Okay.  How often are those district

4    meetings?  I think you said they were monthly?

5        A.    That's correct.

6        Q.    Did anyone prevent you from going to the

7    monthly meetings before April of 2005?

8        A.    Of another district?

9        Q.    Yes.

10       A.    No.

11       Q.    And then after April, you said you went to

12   your District 6 meeting; is that correct?

13       A.    Yes.

14       Q.    And was that the only meeting between

15   April of 2005 and the election in August of 2005?

16       A.    There's a monthly meeting every month.

17       Q.    There was one in May, June, July of 2000

18   --

19       A.    August.

20       Q.    And August.

21       A.    And there's one semiannual state meeting

22   in June.

1        Q.     Okay.  I might come back to this issue,

2     but let's move on.  What is -- tell me your

3     understanding of what the local union's meeting -- I

4     think you made a reference to being required to

5     attend meetings?

6        A.     That's correct.

7        Q.     Let's just call that the meeting

8     attendance rule for --

9        A.     For an election.

10       Q.     -- this discussion, yeah.  What is that

11    rule?

12       A.     That if you're a candidate for a statewide

13    office, you have to attend union meetings -- not

14    just for statewide office.  If you're a candidate

15    for office, you have to attend union meetings in

16    your own district.  You are not allowed to -- and if

17    you're not in your own district, you know, you're

18    ineligible.

19       Q.     Well, it doesn't count as a meeting

20    attendance for the purpose of the rule?

21       A.     I don't understand that.  Could you

22    rephrase that?

1    Q.    Let's go back.  How many meetings under

2    the rule do you have to attend?

3    A.    It says all meetings until the election.

4    Q.    All meetings between the date of the --

5    A.    Nominations.

6    Q.    -- nominations and the date of the

7    election?

8    A.    That's correct.

9    Q.    And your best recollection is that there

10   were three or -- there was -- well, is nominations

11   at the meeting in April?

12   A.    June.  Nominations are in June.

13   Q.    The nominations were in June.

14   A.    June.

15   Q.    Okay.  So you're -- at a meeting in June.

16   A.    At a meeting.

17   Q.    They combine the nomination process with

18   that June meeting?

19   A.    That's correct.

20   Q.    Okay.  Then in your best recollection is

21   that there was a July meeting and --

22   A.    August.

1      Q.     And an August meeting.  Does the election

2      take place after the August meeting or at the August

3      meeting?

4      A.     Ironically, the ballots are mailed the day

5      of the meeting.

6      Q.     So you don't have to go to that August

7      meeting.  The election starts that day, and -- go

8      ahead.  You explain it.

9      A.     No.

10     Q.     Okay.

11     A.     We were -- we were always under the

12     assumption that you had to be at that meeting also

13     because you had to sign in as a candidate.  They

14     announced that you had to be there.  Whether the

15     ballots were mailed at 1:00 that day or not, it

16     didn't matter, we were always required to be at that

17     meeting.  It was always told to us by the union and

18     by the officers we had to attend that meeting.

19     Q.     Let's talk about your web site for a

20     minute.  Who set up the web site?

21     A.     What do you mean by set up?

22     Q.     Well, let me ask a different question.

1    When did you decide that having a web site would be

2    a good idea?

3        A.    Probably April-May.  I can't say for sure.

4        Q.    Okay.  Whenever it was, what steps did you

5    take after deciding that a web site would be a good

6    idea to then make that a reality and have the web

7    site?

8        A.    I asked my son to help me.  I thought

9    maybe I could do it.  I found it too technically

10   challenging for my ability.  Through conversations

11   with other union members, I learned of the name of

12   Jim McGough, contacted him, and he agreed as an

13   advocate for union members, which he is in his labor

14   union, that he would help with our web site.

15       Q.    Is he from Ohio or --

16       A.    Chicago.

17       Q.    Chicago.  Jim McGough.  So you -- someone

18   referred that name to you?

19       A.    Yes.

20       Q.    You didn't know him before 2005.

21       A.    I did not.

22       Q.    And was he also described as someone who

1    had technical proficiency in web sites?

2        A.    Much more than me.

3        Q.    And did he ultimately do it or did your

4    son do it?  How did it come about?  Just describe

5    that.

6        A.    The design or the content?

7        Q.    Let's break those into different pieces.

8    How did you just -- who helped you just get a web

9    site up and a domain name and, you know, take the

10   first steps in setting up the web site?

11       A.    I think my son helped me with that

12   originally, and -- I think, because it was a

13   different web site originally.

14       Q.    Did it have a different tag -- well, a U

15   -- do you know what a URL is?

16       A.    Uh-huh.

17       Q.    Did it have a different URL?

18       A.    No.

19       Q.    Okay, so it was always --

20       A.    Well, dot com.

21       Q.    So it was -- so it's always been Local 18

22   --

1      A.    Local 18 MembersVoice.

2      Q.    Dot com, and then there was a dot org

3  version?

4      A.    And a dot net.

5      Q.    And a dot net version.

6      A.    Right.

7      Q.    But there was never anything with a

8  different basic title to it.

9      A.    I don't think so.

10      Q.    Okay.  And did you then, in setting up the

11  web site, did you contact a web hosting service?

12      A.    My son would have done that.  Originally

13  my son would have done that.

14      Q.    And do you know what web hosting service

15  he contacted or used?

16      A.    I can't remember it, but -- the name of

17  it.

18      Q.    Did he get different quotations on price

19  for you or how did that work?

20      A.    My son is like I am.  He found the

21  cheapest price.

22      Q.    Found the cheapest -- do you know what the

1    price was for that?

2        A.    No, but I could guess and say ten bucks a

3    month, you know, 20 bucks.  I don't remember.

4        Q.    How much -- let's take a big step back.

5    How much did you spend on that entire campaign in

6    2005?

7        A.    Probably eight to nine thousand dollars.

8        Q.    On the two mailings you described, since

9    you were running for Local 18 president, did you do

10   statewide mailings?

11       A.    Yes.

12       Q.    To every member?

13       A.    Yes.

14       Q.    So your son -- your recollection is that

15   your son helped you set it up, find the provider.

16       A.    Yes.

17       Q.    And then how much time passed from that

18   point 'til you had Mr. McGough help you?

19       A.    Maybe a month or so.  I honestly don't

20   remember.

21       Q.    That's all right.  Once Mr. McGough

22   started helping you, did he pretty much take over

1    the role of webmaster?

2        A.    Yes.

3        Q.    And your son moved on to other things, I

4    imagine?

5        A.    He lives in North Carolina, so it was --

6        Q.    Okay, okay.  How many members are in Local

7    18 approximately?

8        A.    They say 15,000.

9        Q.    Okay.  Does that include retirees as far

10   as you know or --

11       A.    Yes.

12       Q.    Did your mailing go out to retirees?

13       A.    Yes.  Retirees are allowed to vote.

14       Q.    Are contractors allowed to vote in your

15   local?

16       A.    If they're members of Local 18.

17       Q.    Owner/operators.  When I say contractors,

18   did you understand that to be the same as

19   owner/operators?

20       A.    Yes.  Even our attorney has a right to

21   vote.  He's a member.

22       Q.    Your attorney of Local 18?

1        A.      William Fadel.

2        Q.      So how much -- you think you spent about

3    $9,000 on the whole campaign.  How much of that was

4    on the web site?

5        A.      Very, very small amount.  If I had to give

6    you a figure, I would say under -- well under $500,

7    well under, and I'm trying to be realistic.

8        Q.      Right now, does your web site -- it's

9    still accessible right now.

10       A.      Yes.

11       Q.      And does it right now have a link to a

12   group forum called MembersVoice?  Maybe that's not

13   how you term it, but is there something called --

14   let's start over again.  Do you know what

15   MembersVoice is?  Have you heard of a web site or a

16   discussion group called MembersVoice?

17       A.      Just a discussion group called

18   MembersVoice?

19       Q.      Yes.

20       A.      That's not part of my web page?

21       Q.      Is it -- well, I'm not sure -- is it part

22   of web -- what is your web -- go ahead.

1          A.     That's a forum on the web page.

2          Q.     Okay.  And is that the forum you access by

3     clicking this Yahoo groups link button?

4          A.     I think.

5          Q.     Okay.  I'll show you some documents in a

6     minute.  I thought maybe you knew.  Yeah, okay.

7                 MR. LEVY:  At some point --

8                 MR. DAYAN:  Let's go off the record.

9                     (Recessed at 12:01 p.m.)

10                    (Reconvened at 12:26 p.m.)

11                              (Kohl Exhibit Nos. 5 and 6

12                               were marked for

13                               identification.)

14                BY MR. DAYAN:

15         Q.     We're back on the record.  During the

16    break, we've marked as Exhibit 5 a document dated

17    September 1, 2005 -- September 21, 2005, I misspoke,

18    a letter to the IUOE, Local 18 executive board from

19    Patricia Kohl, and Exhibit 6 is a document titled

20    "Rules for Nomination and Election, 2005 General

21    Election."  Let's look at Exhibit 6, okay, Ms. Kohl?

22    Do you recognize this document?

1    A.    I do.

2    Q.    Okay.  If you would look under the 16th

3    paragraph on the second column on the right --

4    A.    Got it.

5    Q.    Okay?  That paragraph says, "To be

6    eligible for election, all bona fide nominees for

7    officer or executive board member of Local 18 shall

8    have been in regular attendance at all regularly

9    scheduled Local Union 18 general membership meetings

10   and their home district membership meetings held

11   after nomination and before election."  And then it

12   goes on to say, "Subject, however, to reasonable

13   excuse based upon good cause," et cetera et cetera.

14   Okay.  That's the meeting attendance rule we were

15   talking about earlier; is that correct?

16   A.    That's correct.

17   Q.    And there was one meeting between the date

18   of the nomination meeting in June and the election

19   in August; is that correct?  There was one meeting

20   in July.

21   A.    July.  Is what you're asking?

22   Q.    Yes.

1    A.    There was a meeting in July, that's

2    correct.

3    Q.    And that was -- let's look at Exhibit 5.

4    Is Exhibit 5 the protest that you filed to the local

5    executive board regarding the election?

6    A.    Yes.

7    Q.    And let's look at page 3 of Exhibit 5

8    under item 2.

9    A.    Okay.

10    Q.    And there you quote the same rule; is that

11    correct?

12    A.    That's correct.

13    Q.    Okay.  And then we turn to B on page 4,

14    little B at the very top of page 4, and there's a

15    reference to the district union meeting held on

16    August 8th, 2005, and you say here that it was after

17    the ballots were printed but still within the rules

18    that states that all candidates for office must

19    attend their district union meetings before the

20    election.  So when you filed this protest, it was

21    viewed that you needed to be at the August 8th

22    meeting also; is that correct?

1          A.    That's correct.

2          Q.    Now, at the end of the day, was this

3    protest denied?

4          A.    Oh, absolutely.

5          Q.    And the international union said that the

6    August 8th meeting was not one that people had to

7    attend; is that correct?

8          A.    That was also their position.

9          Q.    Okay.  And it was clear that the July one

10   was one that you had to attend.  You said that a

11   minute ago, right?

12         A.    That was clear.

13         Q.    Now -- and did you -- you then filed the

14   complaint -- I'm sorry.  You filed the complaint --

15   after your protest with the international, you filed

16   a complaint with the Department of Labor?

17         A.    That's correct.

18         Q.    And the Department of Labor decided not to

19   bring a lawsuit; is that correct?

20         A.    They decided that what I had presented

21   would not change the outcome of the election, so

22   they did not file charges.

1      Q.    Okay.  Did they find a violation on this

2    meeting attendance rule issue?

3      A.    They did not.

4      Q.    Okay, thank you.  Now, I just want to

5    clarify something we said before.  The rule did not

6    prevent you from attending other meetings of other

7    districts; is that correct?

8      A.    Yes, it did.

9      Q.    Well, in the sense that -- let's just talk

10    about the July meeting.  When you said it did, you

11    mean in the sense that you had to be at your own

12    July meeting --

13      A.    Yes.

14      Q.    -- so you couldn't be at another?  And

15    were all of those meetings in all of the districts

16    held on the same day?

17      A.    Yes.

18      Q.    So that no candidate, even -- even if it

19    weren't for the rule, no candidate could have gone

20    to more than one meeting that day; isn't that

21    correct?

22      A.    That's correct.

1          Q.    It would have been physically impossible.

2    Before June, which is when the nomination meeting --

3    well, let me start --

4          A.    Yes.

5          Q.    The June was the nomination meeting; is

6    that correct?

7          A.    Yes.

8          Q.    Before June, so let's take May, the rule

9    didn't prevent you from going to any meetings in

10   May; is that correct?

11         A.    That's correct.

12         Q.    Okay, and the same would be true for

13   April, March and going back to the time you decided

14   to be a candidate.

15         A.    That's correct.

16         Q.    Okay.  We also talked about

17   owner/operators.  Could you look at paragraph 8 of

18   Exhibit 6?  Paragraph 8 says -- I'll read it into

19   the record.  "No member who is an owner/operator, an

20   employer contractor, or other bona fide employer of

21   members of Local Union 18 or its branches shall be

22   considered eligible to run for office, to nominate

1    candidates, or to vote for nominees in this 2005

2    general election."  This accurately states the rule,

3    doesn't it?

4        A.    Yes.

5        Q.    Okay.  So you had gotten the rule wrong

6    before when I asked you about it.

7        A.    No.

8        Q.    Well, it says what it says.  This does

9    accurately state the rule.

10        A.    This says to vote for nominees.  That

11    means at the union meeting to vote for the people

12    that were nominated.  It doesn't say for candidates.

13        Q.    So your interpretation -- your

14    interpretation of this rule for what it's worth is

15    that they can vote for people who have been

16    nominated -- well, what is your interpretation?  I

17    don't understand it.

18        A.    My interpretation is if they're members of

19    Local 18, they can vote in the election.  They can't

20    vote to nominate someone.  They can't nominate or --

21        Q.    Except the previous clause says to

22    nominate candidates.

1        A.    Yeah, they cannot nominate.

2        Q.    Right, and the rule 8, paragraph 8

3    separately deals with the fact that they can't

4    nominate, and then it says they can't vote for

5    nominees either.  I mean, it's not -- you don't have

6    any basis for reading this -- let me say it again.

7    The rule says what it says.

8        A.    It says what it says.

9        Q.    And you don't have any basis for saying

10   that contractors have been allowed to vote in

11   elections.

12       A.    I've always believed that contractors are

13   allowed to vote in elections.  They're members of

14   Local 18.  I believe that.

15       Q.    You believe that but you're not -- you

16   don't know for a fact whether it's been interpreted

17   that way by election committees or by the union.

18   It's just your opinion of what that says.

19       A.    Yes.

20       Q.    It's nothing more than that.

21       A.    Yes.

22       Q.    Okay.  Let's go back to -- I think it's

1    Exhibit 4, whatever your affidavit is.  Exhibit 3.

2    Excuse me.

3         A.    Three.

4         Q.    Paragraph 3, at the end of paragraph 3 of

5    that exhibit, you say you won the vote for the

6    statewide office of president in your own district

7    as well as another district.

8         A.    Yes.

9         Q.    What was the other district?

10        A.    I believe it was 4.

11        Q.    And even defeated the incumbent president

12   in his own district.  What district was that?

13        A.    Six.

14        Q.    In your election complaint that's Exhibit

15   5, didn't you complain that the local didn't make

16   available the district-by-district tallies; isn't

17   that correct?

18        A.    I did.

19        Q.    How are you able to make this allegation

20   in paragraph 3?

21        A.    The election committee chairman told me I

22   did.

1          Q.     When did he tell you?

2          A.     On the phone.

3          Q.     Around the time of the election results?

4          A.     Shortly, very shortly thereafter.

5     Probably Monday or Tuesday thereafter.

6          Q.     And this was a complaint that you made in

7     your November 16th, 2005 -- excuse me.  In your -- I

8     got the date wrong.  In your September 21st, 2005

9     protest; is that correct?

10         A.     Yes.

11         Q.     And did you continue to protest that

12    aspect of the election when you appealed to the

13    international?

14         A.     Yes, I did.

15         Q.     And did you continue to appeal that to --

16    or protest that in your complaint to the Department

17    of Labor?

18         A.     Yes, I did.

19         Q.     Did the Department of Labor investigate

20    that?

21         A.     Yes, they did.

22         Q.     Did they know the tally?  Did you tell

1    them what the tally was?

2        A.    Did I tell them?  No.

3        Q.    Did you tell them that you knew what the

4    tally was?

5        A.    I told them that I knew I had won.  I

6    didn't tell them anything about a tally.  That I had

7    won in my district.

8        Q.    And you told them that you believed you

9    won in your district?

10       A.    Yes, I did.

11       Q.    And you told them that your source was the

12   election committee?

13       A.    Yes.

14       Q.    Did you tell the international in your

15   protest that you personally knew that you had won in

16   your district?

17       A.    I don't remember.

18       Q.    But it would be in the protest.  If you

19   made that claim --

20       A.    It would.

21       Q.    -- it would be in the protest.  Let me

22   have exhibit -- marked as Exhibit 7, November 16th,

1    2005 document.

2                             (Kohl Exhibit No. 7

3                                was marked for

4                                identification.)

5         BY MR. DAYAN:

6         Q.    Is this Exhibit 7 the appeal to the

7    international union?

8         A.    Yes.

9         Q.    Okay.  By the way, if you look at -- let's

10   look at the last page of that document.  It has one,

11   two, three, four -- seven signature lines on it?

12        A.    That's correct.

13        Q.    Did any of those -- all seven of those

14   signatories have their register numbers, didn't

15   they?

16        A.    Yes.

17        Q.    Including you.

18        A.    Including me.  Frank Mazur.  His wasn't on

19   there, but I think it's on the original.

20        Q.    It's on the original?

21        A.    Uh-huh, yes.

22        Q.    So they were all able to find their

1    register number to file this protest; is that

2    correct?

3        A.    They had to have their register numbers to

4    be candidates for office.

5        Q.    And they were all able to get that number

6    and find it when you were filing your protest on

7    November 16th; is that correct?

8        A.    I would have taken these register numbers

9    from the document that they gave me for nominations,

10   which had them on there.  So for this day, no, they

11   wouldn't necessarily have had those.

12       Q.    But they had them at the nomination

13   meeting.

14       A.    I don't know.  They didn't --

15       Q.    They had them when they -- when they

16   accepted their nomination, they had them obviously.

17       A.    No.

18       Q.    Well, what -- what did you get the numbers

19   from?  What document?

20       A.    When -- for nominations --

21       Q.    Yes.

22       A.    Someone nominates you.  You can nominate

1    yourself.

2        Q.    Right.

3        A.    But when you do the nomination, you have

4    to have a piece of paper.  It doesn't mean your

5    card.  You don't have to show your card.

6        Q.    Right, I understand.

7        A.    Okay?  All you do is stand up and say my

8    name is Patricia Kohl, give my register number, I

9    nominate Paul T. Gonter for the position of --

10   register number, da da da, for the position of.

11   They gave you that document -- they give you a piece

12   of paper with their register number written on it

13   before the nominations.

14       Q.    So you were able to get all those numbers

15   before the nominations.

16       A.    Right.

17       Q.    And then you had them readily available

18   for your protest as well.

19       A.    Right.

20       Q.    Did you tell anyone -- what else did the

21   election committee person -- what was the name of

22   the election committee person who told you that you

1    won your district?

2         A.    Warren Wright, spelled W-R-I-G-H-T.

3         Q.    Did he tell anyone else who won in

4    district by district?

5         A.    I do not know.

6         Q.    Did he tell you by how much you won in

7    your district?

8         A.    No.

9         Q.    What else did he tell you about the

10   results other than, you know, the winners and

11   losers?  I mean, did he tell you any other district

12   results, any other winners in other districts?

13        A.    No.  He said, "And I believe you won in

14   one other district."

15        Q.    And then did you say -- did you ask him --

16        A.    I asked him was it possibly 4.

17        Q.    Okay.

18        A.    And he -- possible.

19        Q.    Possible.

20        A.    He wasn't a hundred percent positive.  He

21   did not have a copy with him.

22        Q.    And did you ask him -- did you ask him if

1    he knew the margins or the tallies?

2        A.    No, I did not.

3        Q.    Okay.  Let's skip ahead to paragraph 19 of

4    your affidavit.  In the middle of paragraph 19, do

5    you see where it says, "For example, we have a large

6    contractor in our local Beaver Excavating"?

7        A.    Yes.

8        Q.    "And both owners, the Sterling brothers,

9    are members of Local 18."

10       A.    Yes.

11       Q.    Isn't it a fact that they have not been

12   members of Local 18 for -- since 1976 and 1982?

13       A.    If you're saying that, then I don't know

14   that for a fact, no, I don't.

15       Q.    So you don't know whether they -- whether

16   they are members now.

17       A.    I do not now, no.

18       Q.    And you don't know whether they were

19   members in 2005.

20       A.    No, I don't know that for a fact.

21       Q.    Okay.  So you made the allegation in

22   paragraph 19 without knowing whether it was

1    accurate?

2        A.    I felt it was general knowledge because

3    they've always said they're members of Local 18.

4        Q.    But you didn't personally know or have

5    records that would verify that.

6        A.    I didn't have records, I did not.

7        Q.    In the previous sentence, you say, "Many

8    large and small contractors are members of the local

9    who also have register numbers."  How many?

10       A.    Statewide?

11       Q.    Yes.

12       A.    If I had to guess, and it would be a

13   guess, maybe a thousand.

14       Q.    So you'd be guessing about -- about any

15   number, wouldn't you?

16       A.    I sure would.

17       Q.    And you were even guessing about whether

18   the Sterling brothers are members; isn't that right?

19       A.    No, I don't think I was guessing.  I think

20   I believed that.

21       Q.    But you didn't have any documents to

22   confirm or verify your belief; is that correct?

1        A.    I did not.

2        Q.    Okay, the last sentence of paragraph 19

3    says, "This is true of numerous large contractors,"

4    meaning from the previous sentence, that -- well,

5    from the previous two sentences, are you suggesting

6    there that numerous large contractors are members of

7    Local 18?

8        A.    Yes.

9        Q.    Do you know how many large contractors are

10    members of Local 18?

11        A.    No.

12        Q.    So this is a statement not based on your

13    personal knowledge; is that correct?  The third

14    sentence is a statement not based on your personal

15    knowledge?

16            MR. WEINBERG:  When you say the third

17    sentence --

18            BY MR. DAYAN:

19        Q.    The third sentence of paragraph 19.

20    Excuse me.  Let me -- the last sentence.  Strike the

21    whole -- strike the whole question.  Thank you.  The

22    last sentence of paragraph 19 is one not made on

1    your personal knowledge; is that correct?

2    A.    Yes.

3          MR. DAYAN:  Is this a good time for you to

4    do lunch?

5          MR. WEINBERG:  You tell me.

6          MR. DAYAN:  I think it is.

7                (Recessed at 12:46 p.m.)

8                (Reconvened at 1:50 p.m.)

9                          (Kohl Exhibit No. 8

10                            was marked for

11                            identification.)

12         BY MR. DAYAN:

13    Q.    I've had marked as Exhibit 8 a document

14    entitled "AGC of Ohio Building Agreement."

15    Ms. Kohl, do you recognize this document?

16    A.    Yes, I've seen one of those books before.

17    Q.    And is this the collective bargaining

18    agreement between the -- between Local 18, and I

19    guess on the space, it says the Labor Relations

20    Division of the AGC of Ohio?

21    A.    The building trades, right.

22    Q.    The building trades.  What do you call

1    this agreement, just --

2        A.    The building trades agreement.

3        Q.    The building trades agreement, okay.  If

4    you could turn to page 41 of the agreement and

5    paragraph 100 --

6        A.    100.

7        Q.    And take a look at that for a moment, are

8    you familiar with paragraph 100?

9        A.    Vaguely.

10       Q.    I'll read it into the record.  It says,

11   "When an employer hires an owner/operator with one

12   machine and the owner/operator himself operates such

13   single machine, the owner/operator will be placed on

14   the employer's payroll."  Now, doesn't that mean

15   that the owner/operator will be treated as an

16   employee under this agreement?

17       A.    If he is hired by an employer.  He can

18   have his own jobs.  He can be the general.

19       Q.    But if an employer hires the person, even

20   if he's bringing his own machine to the job, under

21   this provision, the owner/operator is an employee of

22   that employer and is covered by this agreement;

1    isn't that correct?

2        A.    Could you rephrase that?

3        Q.    If an owner/operator has his own machine

4    and he brings that machine to a job of another

5    entity, right, and is hired by that other entity

6    who's called the employer in paragraph 100, the

7    owner/operator is treated as an employee of that

8    employer.

9        A.    If he goes to an employer and he is not on

10    his own.  Only if.

11        Q.    And even if he brings his own machine.

12        A.    Right, and -- yeah, as the paragraph

13    reads, it would say that.

14        Q.    And then the next sentence of the

15    paragraph says, "In the event that the

16    above-mentioned machine requires two employees, such

17    employees," plural, "shall be placed on the

18    employer's payroll."  So that means, does it not,

19    that if we start with the example we had before and

20    now the person doesn't just bring the machine, but

21    brings another person so that there's now two people

22    operating it, they're both treated as employees

1     under this agreement?

2          A.     Yes, if they were hired as an owner/

3     operator.

4          Q.     And that means that they would get the

5     wages and benefits of this agreement; is that

6     correct?

7          A.     That would be correct under those

8     conditions.

9          Q.     So that -- let's look at paragraph 19 of

10    your affidavit.  That's Exhibit 3, and I'm looking

11    at the second sentence that says, "First of all."

12    "First of all, in Local 18, all owner/operators, in

13    other words, individual members who may own a back

14    hoe and a truck and who may employ one or two other

15    members to operate that equipment, operating in

16    effect a very small company, are book-carrying

17    members of Local 18, so they have register numbers."

18    Do you see that statement?

19         A.     I do.

20         Q.     The owner/operators that you're speaking

21    of in paragraph 19 would be covered by the two

22    sentences of paragraph 100 that I read, wouldn't

1    they, if they were hired by an employer?

2        A.    That's not what my statement says.

3        Q.    No, no, no.  I'm not saying your statement

4    says that.  I'm just saying do you agree with this

5    statement.

6        A.    Could you say it again please?

7        Q.    I'm sorry.  That all -- I was referring to

8    your statement just to identify the people you were

9    talking about in the parentheses there, individual

10   members who may own a back hoe and a truck and who

11   may employ one or two other members to operate that

12   equipment.  All I'm asking is that if an employer

13   hires an individual member who may own a back hoe

14   and a truck and who may employ one or two other

15   members, the employer and the employee that the

16   person brings with him are covered by the agreement;

17   isn't that correct?

18       A.    I would think so.  I am not a hundred

19   percent positive of that.

20       Q.    And they would get -- if they were

21   covered, they would get the wages and benefits of

22   that agreement.

1      A.    If that fell under that, yes.

2            MR. CLASH-DREXLER:  Can we just go off the

3      record for one second?

4            (Discussion off the record)

5            BY MR. DAYAN:

6      Q.    I think we understood the same thing, but

7      the record's probably unclear on that.  My question

8      was was it your understanding that if an owner/

9      operator brings his own equipment with the employee

10     and they're hired by an employer, the owner/operator

11     and the person he brings with him are employees

12     under this agreement, Exhibit 9.

13     A.    Are you asking me if --

14     Q.    Yeah, I'm asking you if that's your view,

15     and that's what I intended to be asking you before.

16     I might have worded it imprecisely.

17     A.    Under the AGC agreement.  I'm not --

18     Q.    Yes.

19     A.    I'd have to see it under the OCA

20     agreement.

21     Q.    Okay, I'm with you, okay.  And then the

22     follow-up was the same, which is that they're

1    therefore receiving the same wages and fringe

2    benefits as employees.

3         A.    If they were employees.

4         Q.    Under this agreement.

5         A.    Under those circumstances.

6         Q.    Right, right.

7         A.    If they were not hired, you know, as their

8    own general.  If they were a general themselves,

9    they would not qualify.

10        Q.    But if they're hired by an employer who

11   brings them on the job, even if they bring their own

12   equipment, then they can be employees.

13        A.    That's what that says.

14        Q.    Okay.  Do you know the percentage of

15   owner/operators in Local 18 who fit the description

16   of your parentheses, which is that they have a piece

17   of equipment and one or two employees?

18        A.    No.

19        Q.    Do you know the percentage -- or let me

20   strike that.  Do you know what percentage of the

21   typical owner/operator of the kind described in your

22   parentheses, do you know what percentage of that

1    person's work is work where they're hired by another

2    employer under this agreement as opposed to their

3    own job where they're, as you put it, the general?

4        A.    No, I don't.

5             MR. DAYAN:  I'm going to have marked as

6    Exhibit 9 a document -- 10.

7             MR. LEVY:  You just characterized this as

8    Exhibit 9 in the question.

9             BY MR. DAYAN:

10       Q.    Did I mess up?  Does yours -- hers is the

11   important one.  Does yours say Exhibit 8 for the

12   collective bargaining agreement?

13       A.    Eight.

14            MR. LEVY:  Eight, okay.

15            MR. DAYAN:  There's a series of questions

16   going back several questions, references to 9 and to

17   the agreement should be to 8.  Do we all agree that

18   -- I misspoke that the 9 should be 8s?

19            MR. LEVY:  Right.

20            MR. WEINBERG:  If you did --

21            MR. LEVY:  Mr. Weinberg's not so sure.

22            MR. DAYAN:  I might have said 9 because I

1    might have written it down on my own copy.  Okay.

2                    MR. LEVY:  What is 8?

3                    MR. DAYAN:  Let's go off the record.

4                       (Discussion off the record)

5                    MR. DAYAN:  Could you mark this as Exhibit

6    9?  This is the true Exhibit 9.  Should we call it

7    -- should we call it 9?

8                    MR. LEVY:  I think the record's clear.

9                    MR. DAYAN:  The record's clear, okay.

10   Let's call it 9.

11                                   (Kohl Exhibit No. 9

12                                     was marked for

13                                     identification.)

14                   BY MR. DAYAN:

15       Q.    I showed you a document earlier that's

16   similar to this.  Do you recognize this document?

17       A.    Yes.

18       Q.    Okay.  This is the November 16th, 2005

19   appeal of your protest regarding the election of

20   2005; is that correct?

21       A.    Yes.

22       Q.    And this document, in addition to having

1     -- after page 4 where there are the signatures we

2     talked about before, there are a series of it looks

3     like signed --

4          A.    Yes.

5          Q.    -- individual pages from individual

6     members; is that right?

7          A.    Yes.

8          Q.    Did you prepare the form that is

9     represented beginning on page -- it's a double-sided

10    document, so the fifth page of the document that

11    begins, "As a member of Local 18, I have read" --

12         A.    They are all the same.

13         Q.    Did you prepare that form?

14         A.    Yes, I did.

15         Q.    And you'll see -- let's just look at the

16    first one, Dwaine Steed.  That's how I'm reading his

17    handwriting.

18         A.    That's correct.

19         Q.    That's not your handwriting, is it?

20         A.    No, that is not.

21         Q.    That would be his handwriting?

22         A.    That's correct.

1      Q.    And that's all the way through, including

2    the register number?

3      A.    I would testify to they are not my

4    handwriting.

5      Q.    Okay, that's fair enough.  Let's mark the

6    next one as Exhibit 10.

7                          (Kohl Exhibit No. 10

8                          was marked for

9                          identification.)

10          BY MR. DAYAN:

11     Q.    Is this a copy of the web page that you're

12    currently operating?

13     A.    Yes.

14     Q.    By the way, do you know if this web site

15    supports scripting?

16     A.    No, I don't.

17     Q.    Do you know what scripting is?

18     A.    Just from reading depositions.

19     Q.    In this case?

20     A.    In this case, I understand it has

21    something to do with being able to password-protect

22    something.

1      Q.    Right, but you're not a technical expert

2    on things like scripting and setting up web sites, I

3    take it?

4      A.    No.

5      Q.    And you haven't become one since the case

6    started.

7      A.    No.  I'd like to, but --

8      Q.    Okay.  We've marked it as Exhibit --

9      A.    Ten.

10      Q.    Ten.  Did I already say that?  Okay.

11      A.    Okay.

12      Q.    Let me start by asking you about this

13    little box -- if you look at the box in the middle

14    of the page that says, "Yahoo groups join now" --

15      A.    Uh-huh.

16      Q.    And then right under there, that it says,

17    "Click to join MembersVoice"?

18      A.    Uh-huh.

19      Q.    Can you describe what is supposed to

20    happen when you click that button?

21      A.    No, I haven't looked at this for quite

22    some time, so no, I can't say that specifically.

1  Q. What is -- is MembersVoice part of your

2 page?  When you join that and then get on

3 MembersVoice, is that part of your web site?

4  A. Anything MembersVoice seems to be.

5  Q. Okay.

6  A. Whatever McGough did, the links and stuff,

7 I'm not sure.

8   MR. DAYAN:  Now, let me have this marked

9 as Exhibit 11.

10     (Kohl Exhibit No. 11

11      was marked for

12      identification.)

13   BY MR. DAYAN:

14  Q. Do you recognize this page that's marked

15 as Exhibit 11?

16  A. No.

17  Q. Would you have any reason to disagree with

18 me if I told you that this popped up after you

19 clicked that join MembersVoice?

20  A. No, I would not disagree.

21  Q. Did you write the content for this page

22 that says "Welcome to MembersVoice, the portal site

1     for rank and files of the members of the Operating

2     Engineers International Union"?

3         A.    No, not to my knowledge, I didn't write

4     that.

5         Q.    Would it have been run -- who would have

6     written it?

7         A.    McGough.

8         Q.    And would he have run this by you and

9     gotten your approval --

10        A.    No.

11        Q.    -- for the content?

12        A.    No.

13        Q.    So you -- what was his role?  How would

14    you describe his role now and at the time of your

15    campaign in running your web site?

16        A.    The technical parts of the links and

17    setting up things he pretty much did, would say to

18    me I'm going to set up maybe a forum or this or

19    that, fine.

20        Q.    Uh-huh.

21        A.    You know, nothing more than that.  If I

22    had documents that I wanted, then I would send those

1    to him and he would put them on.

2        Q.    Uh-huh.  Did you look at what he did when

3    he added links to it?  Did you have some general

4    awareness of what he was doing?

5        A.    Very vague as far as things like this

6    went.

7        Q.    Are you aware that there was -- regardless

8    of the details, are you aware that there was a forum

9    where a member could look at your site, click that

10   link and then go into this MembersVoice page?  Were

11   you aware that that was something that members could

12   do?

13       A.    Could you repeat that?

14       Q.    Were you aware that a member who visited

15   your site could get into this MembersVoice page or

16   series of pages, represented -- the first page of

17   which is this Exhibit 11.

18       A.    All of my -- I would assume anything that

19   they clicked on my page would take them --

20       Q.    Uh-huh.

21       A.    -- into those things, because that's --

22   you know, we wanted people to be able to do that.

1          MR. DAYAN:  Right, okay.  Let me ask you

2      -- let's have this marked as Exhibit 12.

3                          (Kohl Exhibit No. 12

4                           was marked for

5                           identification.)

6          BY MR. DAYAN:

7      Q.    Do you recognize this page?

8      A.    I have seen this, yes.

9          MR. DAYAN:  Okay.  And let me have this

10     next exhibit marked as 13.

11                         (Kohl Exhibit No. 13

12                          was marked for

13                          identification.)

14         BY MR. DAYAN:

15     Q.    Do you recognize this page?

16     A.    Yes, I do.

17     Q.    And on Exhibit 13, do you recognize these

18     references to posts by a BTO Local 18 and a

19     Mr. Goodwrench?

20     A.    I recognize those.  I couldn't tell you

21     who they were today, their names.

22     Q.    Now, for those individuals to have posted

1    on this page we're looking at on Exhibit 13, isn't

2    it the case they would have had to register for

3    MembersVoice?

4        A.    And when you say register, what do you

5    mean?

6        Q.    Means that they have to submit information

7    about themselves.

8        A.    I would -- no, I wouldn't say that.  I --

9    I think all you have to do is ask through your

10   e-mail address to -- that's it.  Nothing else.

11       Q.    Let me show you another page.  Let's mark

12   this as Exhibit 14 I believe.

13                        (Kohl Exhibit No. 14

14                         was marked for

15                         identification.)

16             BY MR. DAYAN:

17       Q.    Are you familiar with this form?

18       A.    No, I'm not.  Never seen it before.

19       Q.    Do you have any reason to doubt that

20   people would have had to fill this form out to get

21   into that section we were --

22       A.    Yes.

1       Q.    -- describing?  You do have a doubt.

2       A.    I do.

3       Q.    What's the basis for your doubt about

4    that?

5       A.    Because I went into it and all I had to do

6    was put in my e-mail address originally.  That was

7    it.

8       Q.    Let me show you another page, Exhibit 15.

9    Well, let's mark 15.  I'm going to ask you a

10   question about another document first, but let's

11   just mark this as 15.

12                        (Kohl Exhibit No. 15

13                         was marked for

14                         identification.)

15              MR. LEVY:  Can we go off the record for a

16   moment?

17              MR. DAYAN:  Uh-huh.

18              (Discussion off the record)

19              BY MR. DAYAN:

20      Q.    So Exhibit 15, which we just marked, says,

21   after a couple of banner ads, it looks like it says,

22   "MembersVoice operating engineer MembersVoice, join

1    this group."  That's Exhibit 15.  Well, let me just

2    ask you about 15 right now.  Do you recognize this

3    document?

4        A.    No.

5        Q.    Look at the bottom of this Exhibit 15 page

6    1.  Do you see where it says, "Comment to owner,

7    please tell the group owner about yourself and why

8    you would like to join the group"?

9        A.    Yes.

10       Q.    "200 characters maximum"?  Does that

11   refresh your recollection about this page?

12       A.    No.

13       Q.    That this page is part of --

14       A.    I've never seen this before.

15       Q.    Let me finish the question just so the

16   court reporter can get it.  Do you recall --

17   regardless of whether you remember this page, do you

18   recall whether people submitted 200 character or

19   less descriptions of themselves and why they wanted

20   to join the group?

21       A.    Do I recall?

22       Q.    Whether that happened, whether --

1        A.    Not to my knowledge.

2        Q.    Okay.  At the top of page 15 where it says

3    "MembersVoice" in bold face and then "Operating

4    Engineers MembersVoice," is that your web site and

5    the name of your web site?

6        A.    Where are you referring to again?

7        Q.    It's below the banner ads.  It's the first

8    text below the banner ad about a quarter of the way

9    down the page.

10       A.    Where it just says "MembersVoice"?

11       Q.    Yes.

12       A.    And then "Operating Engineers

13   MembersVoice"?

14       Q.    Yes.

15       A.    And your question is?

16       Q.    Is that a reference to your web site?

17       A.    Possibly.

18       Q.    Let's go back to Exhibit 11 and I'll

19   identify that one more fully.  Exhibit 11 says,

20   "Members for Free Speech & Democracy," and then on

21   the left side -- do you see what I'm referring to?

22       A.    I do.

1    Q.    Do you recall that when you got in, that

2    you -- that you -- do you recall ever seeing this

3    page to get into that discussion forum?

4    A.    No.

5    Q.    What is your understanding of what it

6    means in the middle of the page where it says,

7    "Please register as a member to post on the bulletin

8    board and read the help file as well as the privacy

9    statement"?

10    A.    Could you state that question again

11    please?

12    Q.    What is your understanding of what it

13    means when it says, "Please register as a member to

14    post on the bulletin board and read the help file,

15    as well as the privacy statement"?

16    A.    I would assume it would be register as a

17    member at Yahoo.

18    Q.    Okay, and let's go back to Exhibit 12.

19    This was the one that I believe you said you

20    recognized, Exhibit 12, which at the very top says

21    "Welcome to MembersVoice, sign in, join, FAQ," and

22    then just below that in large bold letters it says,

1    "MembersVoice"?

2          A.    I see this, yes.

3          Q.    This is one that you did recognize before?

4          A.    I went on and looked around a little bit

5    last night and saw this.

6          Q.    Okay.

7          A.    I don't remember it from any other time

8    than last night.

9          Q.    Is it a correct statement of what

10    MembersVoice is, the paragraph at the bottom of the

11    page there, beginning, "MembersVoice is the

12    award-winning platform."

13          A.    Could you repeat the question now?

14          Q.    Is the paragraph at the bottom of Exhibit

15    12 an accurate statement of what MembersVoice is?

16          A.    I don't think so, no.

17          Q.    How is it inaccurate?

18          A.    Because of the owner of this URL, I don't

19    recognize some of these platforms that he states

20    here, what's stated.

21          Q.    Well, let's take it sentence by sentence.

22    Is there any problem with the first sentence of that

1    paragraph?

2        A.    I don't know that I've ever won any award

3    for anything.

4        Q.    Okay, that's one.  Other than it claiming

5    to win an award, is there any problem -- if we

6    struck "award winning," would that first sentence be

7    accurate?

8        A.    I can't say yes or no to that.  I don't

9    know what an on-line community is.

10       Q.    Well, is it -- is it at least this much.

11   Is it a platform for allowing members of the

12   operating engineers' union to discuss the union with

13   other members?

14       A.    Yes.

15            MR. DAYAN:  Can we take a short break?

16                 (Recessed at 2:20 p.m.)

17                 (Reconvened at 2:28 p.m.)

18            BY MR. DAYAN:

19       Q.    We have a projector.  Ms. Kohl, is this

20   your web site page, home page?

21       A.    Yes, sir.

22       Q.    Okay.  Is that the same as Exhibit 10?

1      A.    Looks like it to me.

2      Q.    Okay.  Now, if --

3            MR. LEVY:  Off the record.

4               (Discussion off the record)

5            BY MR. DAYAN:

6      Q.    On Exhibit 10 in the middle of the page,

7   there's a scroll that doesn't finish the thought,

8   but you agree that it's reflected on the screen that

9   we're all looking at.

10     A.    I agree.

11     Q.    Now, if you were to click that Yahoo

12   groups join now, or join MembersVoice -- well, let's

13   click the Yahoo groups, join now, do you recognize

14   that page, join this group, which is Exhibit 15.

15     A.    No.

16     Q.    But you would agree that that is what

17   someone would find if they clicked that link on your

18   site?

19     A.    As long as that's what he clicked, yes, I

20   do.  I agree.

21           MR. LEVY:  I think the record would

22   reflect that what we saw on the screen was that the

1    little hand was clicking there and that there was a

2    time thing showing and then we went to that page.

3            MR. DAYAN:  Okay.

4            MR. LEVY:  Hour glass.

5            MR. WEINBERG:  You're not disputing that

6    if you make that click, you get to this, which is

7    the same as this exhibit.

8            MR. DAYAN:  Exhibit 15.

9            MR. LEVY:  I think it was clear from

10   observing it that by clicking on that, you went to

11   that screen.

12           BY MR. DAYAN:

13   Q.    Now, to join -- if this were your first

14   visit, you'd have to join the group.  Is that

15   correct, Ms. Kohl?

16   A.    I don't know.

17   Q.    You don't know.  Who would know the answer

18   to these questions?

19   A.    Possibly Jim McGough.

20   Q.    Who is Jim McGough?  Could you describe

21   what he does and who he is?

22   A.    He's a retired laborer out of Chicago, and

1    he -- this is what he does.  He helps with research,

2    he helps with web pages for other unions and things

3    such as that.

4        Q.    Do you know when he retired from the

5    laborers roughly?

6        A.    Maybe last year.  Officially retired?

7        Q.    Yes.

8        A.    I don't know.  I know he hasn't worked for

9    the last few years as a laborer.

10        Q.    Have other members of your local used him

11    as a resource for web sites and communications and

12    that kind of thing?

13        A.    Could you be more specific as other

14    communications?

15        Q.    Has anyone else in your local as far as

16    you know worked with him on anything?

17        A.    I know other members of my local have

18    spoke with him, but I don't know what capacity.

19        Q.    Okay.  And I think you testified earlier

20    that someone referred you to him.  Who was it who

21    referred you to him?

22        A.    A gentleman by the name of Jim Thomas.

1     Q.   And is Jim Thomas a member of Local 18?

2     A.   Yes.  No, no, I'm sorry.

3     Q.   Sorry.

4     A.   He's not a member of Local 18.

5     Q.   Who is he?

6     A.   I don't know what his local number is, but

7 he's an operating engineer, retired.

8     Q.   And was he retired back then?

9     A.   Yes.

10     Q.   All right.  Well, let's go back to that

11 home page which was Exhibit -- strike that.  Is it

12 your understanding that you have to be a Yahoo

13 member to get to this page?

14     A.   No.

15     Q.   Do you know either way how to get to this

16 page or what you need to get to this page?

17     A.   No.

18     Q.   Why don't we go back.

19     MR. WEINBERG:  When he said this page, you

20 were talking about Exhibit --

21     BY MR. DAYAN:

22     Q.   We were talking about Exhibit 15, that was

1 up on the screen.  Now we're back to Exhibit 10, and

2 there's another link to a discussion forum that

3 we'll click right now.  Do you recognize this page?

4   A. I have seen that page before.

5   Q. And if you would look at the hard copy

6 Exhibit 12, does that -- hold on.

7     MR. LEVY:  Do you want to go off the

8 record?

9     MR. DAYAN:  Yeah, off the record.

10    (Discussion off the record)

11     MR. DAYAN:  We're back on the record.

12 We're stipulating that Exhibit 12 is the -- reflects

13 the document that appears on the screen when you

14 click "Discussion Forum" on Exhibit 10.  And one

15 other point.  When we're looking at the screen, the

16 formatting and fonts are different, but we've all

17 agreed that when you go into print, what appears on

18 the screen, it comes out the way that Exhibit 12

19 comes out in the hard copy.

20     MR. LEVY:  And when you go to print

21 preview, it looks identical to 12.

22     BY MR. DAYAN:

1      Q.    Okay, fair enough.  Let's look at the

2  screen version together.  Do you see the last set of

3  words after "MembersVoice server is maintained by

4  Laborers for Justice.  One must sign in to post."

5  Do you agree that it says that?

6      A.    It does say that.

7      Q.    And have you seen -- I believe you

8  testified that you've seen this page or a page that

9  looks like this one before; is that --

10     A.    Yes, last night.

11     Q.    Okay.  And what -- it's also the case that

12  to go further, you do need to sign in; is that

13  correct?

14     A.    I don't know.

15     Q.    Let's -- Mr. Clash-Drexler's going to

16  click on the sign-in tab, which is really faint but

17  it's there.  It's on the document.  It says sign-in

18  on Exhibit 12.  Can you click on it?

19         MR. LEVY:  Can you show me where it is?

20  Oh, I see, up there, okay, yes.

21         BY MR. DAYAN:

22     Q.    And this screen requires a sign-in name

1    and a password; is that correct?

2        A.    That screen may, but could you just please

3    go back and click on forums from the other page and

4    see if it goes directly there without a sign-in?

5        Q.    Okay, we'll do that.  We're going to go

6    back.

7            MR. LEVY:  Go back.  Can I suggest that

8    you go back, because that's not what you want to

9    show.

10           MR. DAYAN:  Can we go off the record

11   again?

12           (Discussion off the record)

13                     (Kohl Exhibit No. 16

14                      was marked for

15                      identification.)

16           MR. DAYAN:  I just want the record to

17   reflect certain things we've looked at and then

18   we'll move through this quickly.  I just had marked

19   as Exhibit 16 a sign-in page titled "Welcome to

20   MembersVoice sign-in," and that is the printout of

21   what happens when you click "sign-in" on Exhibit 12.

22           MR. LEVY:  And could you show me so I --

1          MR. DAYAN:  Okay, we will verify that one

2     more time.

3          MR. LEVY:  Can I just -- if we looked at

4     the screen?

5          MR. DAYAN:  Okay.

6          MR. LEVY:  That's better.  Here.  Why

7     don't you look over here.  What he's doing is he's

8     clicking on this thing, sign-in.  May I click on it

9     so we see what happens?

10          MR. CLASH-DREXLER:  You may.

11          MR. LEVY:  So we click on that and that's

12     what comes up.

13          THE WITNESS:  Okay.

14          BY MR. DAYAN:

15     Q.    And do we agree that that is what you get

16     when you click "sign-in"?  That's all I'm asking.

17     I'm asking whether Exhibit 16 is the printed out

18     version of when you get when you click "sign-in" of

19     Exhibit 12.

20     A.    No.  This shows these options.

21     Q.    But counsel stipulated that it's just in a

22     different format.

1          MR. LEVY:  Why don't you show her.

2          THE WITNESS:  I don't agree, because if

3     you click on "forums," it will come up without

4     signing in.

5          MR. CLASH-DREXLER:  Off the record.

6          (Discussion off the record)

7          BY MR. DAYAN:

8     Q.    The question is when you click "sign-in"

9     on Exhibit 12, do you get the print -- do you get

10    Exhibit 16 -- do you get -- when you click -- let's

11    start over.  When you click "sign-in" on Exhibit 12,

12    do you get a document that when you click "print

13    preview" on that document, you get Exhibit 16?

14    A.    Yes.

15    Q.    Okay, thanks.  Now, let's leave Exhibit 16

16    up there for a moment on the screen.  Do you know

17    whether you need to enter a sign-in name and a

18    password to move to the next -- to enter comments on

19    your web site?

20    A.    I believe you do not.

21    Q.    Do you know why that page appears?

22    A.    No.

1      Q.    Let's look at Exhibit 14.  Do you know why

2   Exhibit 14 appears when you click "register"?

3      A.    No.

4      Q.    Let's look at Exhibit 15.  Do you know why

5   Exhibit 15 appears when you try to join the group by

6   clicking the Yahoo link on Exhibit 10?

7      A.    No.

8            MR. DAYAN:  Can we go off the record?

9            (Discussion off the record)

10           BY MR. DAYAN:

11     Q.    Do you know -- let's look at Exhibit 12.

12  Do you know why it says on Exhibit 12 one must sign

13  in to post?

14     A.    No.

15     Q.    Okay, thank you.  Now let's go back to

16  Exhibit 10.  Exhibit 10 -- you testified earlier you

17  do recognize Exhibit 10; is that correct?

18     A.    Yes.

19     Q.    And I believe you also said you haven't

20  visited your site for a while or --

21     A.    I looked around last night.

22     Q.    Last night, and before that, you hadn't?

1     A.    Every once in a while I look at it.  I

2    don't work on it.  I haven't updated it other than

3    the banner recently.

4     Q.    Oh, okay.  So when did you update the

5    banner?

6     A.    A week or so ago.

7     Q.    After you filed the lawsuit obviously.

8     A.    Yes.

9     Q.    Why did you put the banner on there?

10    A.    Because I support Local 150 in their

11   endeavors.

12    Q.    Do you know Joe Ward?

13    A.    I talked to him several times, yes.

14    Q.    When did you first meet him or talk to

15   him?

16    A.    Can't give you a date, but I met him at an

17   apprenticeship conference.  It might have been at

18   the convention, but I have met him.

19    Q.    What year?  Roughly what year?

20    A.    If it were the convention, it would have

21   been in '98.

22    Q.    When did you learn that he was going to be

1    running for office in Local 150 for this 2007

2    election cycle?

3         A.    A few months ago.

4         Q.    At that point did you know you were going

5    to support him when you found out that he was

6    running?

7         A.    What do you mean by know I was going to

8    support him?

9         Q.    Well, did you decide to support him --

10   when did you decide to support him?

11        A.    After reading through some things and

12   speaking with, you know, some other people, I

13   decided that I would like to support his cause.

14        Q.    And roughly when was it that you made that

15   decision?

16        A.    Maybe a month ago.

17        Q.    So it would have been after the campaign

18   web site resolution was adopted; is that correct?

19        A.    I couldn't tell you that.

20        Q.    But your best estimate is about a month

21   ago?

22        A.    That's a guess.

1    Q.    Have you read his opponents' web site?

2    A.    No.

3    Q.    Have you spoken to his opponents?

4    A.    No.

5    Q.    And asked them what their program is?

6    A.    No.

7    Q.    Did you speak to -- did you speak to

8  Mr. Ward before you decided to support his

9  candidacy?

10   A.    No, I did not.

11   Q.    Who did you speak to?

12   A.    I spoke to Mike Quigley.

13   Q.    Anyone else?

14   A.    Not directly from 150, no.

15   Q.    Had you met Mike Quigley before --

16   A.    No, I had not.

17   Q.    Well, let me just finish the question.

18  Had you met Mike Quigley before you filed the

19  lawsuit in this case?

20   A.    Not met him.  Spoke with him before.

21   Q.    How long before you filed the lawsuit?

22   A.    Maybe a month or so.

1   Q. So would you have spoken to him after the

2 campaign resolution was adopted but before the

3 lawsuit was filed?

4   A. Could you restate that?

5   Q. Did you speak with him after the campaign

6 web site resolution was adopted but before the

7 lawsuit was filed?

8   A. I think I spoke to him before that.

9   Q. What was the occasion for your speaking to

10 him?  Who called whom?

11   A. He contacted me.

12   Q. And what did he tell you?

13   A. He just discussed the election and -- our

14 election and our web site and things such as that.

15   Q. Had he ever met with you -- you said

16 before, he'd never met with you or spoken to you

17 before then.

18   A. Not before that time.

19   Q. How did he get your name?

20   A. From my web site probably.

21   Q. Did he tell you that's how he got your

22 name or are you --

1      A.    I think I did.

2      Q.    -- guessing?

3      A.    I think he did tell me that.

4      Q.    Did he tell you that he had retained any

5   counsel --

6      A.    No.

7      Q.    -- to challenge any -- let me finish the

8   question.

9      A.    Sorry.

10      Q.    Did he tell you he had retained counsel to

11   challenge any international union rules?

12      A.    Not at that time.

13      Q.    Did you later discuss the lawsuit with

14   him?

15      A.    When you say later, when do you mean?

16      Q.    After your first conversation with him.

17      A.    After my first conversation.

18      Q.    Yes.

19      A.    I can't say.

20      Q.    Did you discuss the lawsuit in the first

21   conversation?

22      A.    No.

1        Q.    So you're not sure -- have you ever

2    discussed the lawsuit with him?

3        A.    Yes.

4        Q.    So it would have been after the first

5    conversation.

6        A.    Right, but not the next one.

7        Q.    That wasn't my question, but it was after

8    the first -- when was it?

9        A.    I couldn't tell you for sure.  I don't

10   know exactly when it was.  In one of our

11   conversations.

12       Q.    Prior to the lawsuits being filed?

13       A.    Yes.

14       Q.    Okay.  And what was the substance of that

15   conversation?

16       A.    He wanted to know my feelings about the

17   web pages and things such as that, and we both

18   agreed that we felt that we ought to be able to put

19   on our web page what we wanted to put on our web

20   page, and that was basically the substance.

21       Q.    Is there anything in the campaign web site

22   resolution that prevents you from putting on your

1    web page whatever you want to put on your web page?

2        A.    If it became a campaign web site, yes.

3        Q.    Well, what -- explain to me, why would it

4    require you to put anything different on your web

5    site than what you already would want to put on your

6    web site?

7        A.    I think Giblin's deposition said something

8    about a billboard, which I don't know what a

9    billboard basically is.

10       Q.    But wouldn't -- when did you hear that --

11       A.    Giblin's deposition.

12       Q.    Yeah, and when did you -- and your

13   conversation with Ward was before Giblin's

14   deposition though, wasn't it?

15           MR. LEVY:  Conversation with Ward?

16           MR. WEINBERG:  Quigley.

17           MR. DAYAN:  What did I say?

18           MR. CLASH-DREXLER:  Ward.

19           BY MR. DAYAN:

20       Q.    I'm sorry.  Your conversation with Quigley

21   was before the Giblin's deposition, was it not?

22       A.    That's correct.

1       Q.    So it couldn't have been about the banner,

2    could it have been?  Your conversation with Quigley

3    couldn't have had anything to do with the banner;

4    isn't that correct?

5       A.    The banner?

6       Q.    You just referred to the billboard.  I'm

7    sorry.  My fault.  Your conversation with Quigley

8    didn't refer to the billboard.

9       A.    No.

10      Q.    And is there anything other than the

11   billboard that would require you to do anything

12   different in terms of the content of your web site

13   under the resolution?

14      A.    I don't know.

15      Q.    You can't think of anything right now,

16   isn't that correct, that you couldn't say or that

17   you -- there's nothing that you couldn't say on your

18   web site now before the rule was in effect that you

19   couldn't say after the rule takes effect; isn't that

20   correct?

21      A.    I don't know that for sure.  I don't -- I

22   don't know the entire substance of the resolution.

1       Q.    Did you read the resolution?

2       A.    I have read it.

3       Q.    Does it say -- do we have a copy of that?

4             MR. DAYAN:  We'll mark this as Exhibit 17.

5       It's going to be the campaign web site resolution.

6                         (Kohl Exhibit No. 17

7                          was marked for

8                          identification.)

9             BY MR. DAYAN:

10      Q.    Is there anything in this resolution,

11      Exhibit 17, that regulates what the content of your

12      web site can be?

13      A.    Where it mentions whereas, Article 24, I

14      would have a question about that.

15      Q.    The question on the table is just whether

16      there's anything in the resolution that regulates

17      the content of what union a union member can put on

18      a campaign web site.

19      A.    I think that paragraph does.

20      Q.    Just explain to me what speech you think

21      would be prohibited on a web site because of that

22      whereas clause.

1        A.     I thought free speech included having a

2    web page without being password protected, so

3    therefore, if the general executive board deems that

4    my web page needs to be password protected if it is

5    a campaign web page, then I would assume also that

6    the general executive board could put other rules

7    and regulations in it -- inside this paragraph.

8    That's my interpretation.

9        Q.     That's your interpretation.

10        A.     Right.

11        Q.     All right, but there's nothing on the face

12    of the resolution right now that prohibits you from

13    posting whatever you would want to post if you were

14    going to operate a campaign web site.

15        A.     I wouldn't be sure of that.

16        Q.     All right.  Let me ask you this.  Is there

17    any -- can you identify a single thing that you

18    would want to say on a campaign web site that would

19    be prohibited by that paragraph of the resolution or

20    anything in the resolution?

21        A.     Could you state that question again

22    please?

1     Q.   Can you identify --

2     MR. WEINBERG:  Just have it read --

3     MR. DAYAN:  Okay, read back the question.

4     - - -

5     THE REPORTER:  Question:  "Can you

6  identify a single thing that you would want to say

7  on a campaign web site that would be prohibited by

8  that paragraph of the resolution or anything in the

9  resolution?"

10     - - -

11     BY MR. DAYAN:

12     Q.   It should say can you identify a single

13  thing that you would post on a campaign web site

14  that you'd be prohibited from posting under the

15  resolution.

16     A.   Yes.

17     Q.   And what would that be?

18     A.   Without having a billboard on the front of

19  it, I couldn't say what I wanted to say.  The

20  billboard has to say what the union wants it to say,

21  the content.

22     Q.   Putting aside the billboard, is there

1    something that you would affirmatively want to say

2    that you would be prohibited from being -- that you

3    would be prohibited from saying under the

4    resolution?

5        A.    Prohibited from saying or be punished for

6    saying?

7        Q.    Either one.

8        A.    I would say that there could be something

9    that I would want to say, but I can't think of a

10   specific thing.  I don't know what they consider

11   their sensitive opposed to what I consider sensitive

12   information that's in my web site.

13       Q.    Is it your understanding of the rule that

14   the international union is prohibiting the posting

15   of sensitive information on a password-protected web

16   site?

17       A.    Could you repeat that please?

18       Q.    Is it your understanding of the resolution

19   that the international union is prohibiting or

20   punishing the posting of sensitive information on a

21   password-protected web site?

22       A.    A password-protected campaign web site,

1    right, is what you're referring to?

2        Q.    Yes.

3        A.    If it's password protected, is your --

4        Q.    Yes.

5        A.    If it's password protected, then I would

6    say that supposedly we could say anything we wanted

7    to say.

8        Q.    Is there any information -- I'm now

9    speaking more generally, kind of changing the topic

10    a bit.  Is there any information that you would

11    share with a fellow union member but that you would

12    not share with an employer?

13        A.    That's on my web page now?

14        Q.    No, in general, in your experience as a

15    union member going back to 1988, is there anything

16    you've learned as union member that you would want

17    to share with or communicate to a fellow union

18    member but you wouldn't want to communicate that

19    same thing to the employer?

20        A.    I can't think of anything off the top of

21    my head.

22        Q.    Have you ever been on a negotiating

1    committee?

2        A.    No.

3        Q.    Are you familiar with what a negotiating

4    committee does?

5        A.    I am.

6        Q.    Are you familiar with the fact that the

7    union's negotiating committee will meet with the

8    employer's negotiating committee?

9        A.    I am.

10       Q.    Are you familiar with the fact that in

11    that process, there are discussions in a room

12    perhaps like this between both sides, employer and

13    union?

14       A.    Yes.

15       Q.    And are you familiar with the fact that

16    there are caucuses often at intervals in the meeting

17    where each side meets just with its own committee?

18       A.    Yes.

19       Q.    Are you aware that in those caucuses, one

20    of the things that the union committee might talk

21    about, for example, would be what is the union's

22    bottom line on a particular issue of wages or

1      benefits?

2           A.     I would say that would be part of their

3      discussion.

4           Q.     And would you also agree that part of

5      their discussion would be what the negotiation

6      position should be above that bottom line?

7           A.     Yes.

8           Q.     And if, for example, a member of the union

9      negotiating committee during that caucus was taking

10     notes of what the union's back-and-forth positions

11     were and what its -- and what the committee's final

12     view was of the bottom-line position, it would be

13     inappropriate for that member of the committee to

14     hand over those notes to the employer before the

15     bargaining resumed?

16          A.     Yes.

17          Q.     So that would be information that if you

18     had access to it by reason of being a negotiating

19     committee member you would share with other members

20     but you wouldn't share with the employer.

21          A.     If I were a member of the negotiating

22     team.

1    Q.    Okay.  Do you believe that a union should

2    have the ability to take action against someone, in

3    my example, who handed over to the employer notes

4    saying what the union's bottom-line position was and

5    its negotiation position was?

6    A.    If they were a member of the negotiating

7    team.

8    Q.    What if they were just a member whom a

9    member of the negotiating team conveyed that

10   information to and then that member turned it over

11   to the employer?

12   A.    How would you know it was true?

13   Q.    Well, I'm asking you the question.  Would

14   a member -- would that member who told the employer

15   that, say, Smith on the negotiating committee told

16   me that our bottom line was ten dollars an hour,

17   would you believe it would be inappropriate for that

18   member to convey that information to the employer?

19   A.    If he had been told it was confidential

20   information, then I would say so.  If he had not

21   been told it was confidential, then no.

22   Q.    And with respect to the example of the

1    negotiating committee member himself, you testified

2    earlier that you believed that it would be

3    inappropriate for that person to turn over this

4    information; is that correct?

5        A.    That's correct.

6        Q.    And would it be appropriate then for the

7    union to take some sort of disciplinary action

8    against the person for doing that?

9        A.    If that so falls within, you know, the

10   guidelines of the constitution.

11       Q.    Are you aware of a provision in the

12   constitution that would allow the union to take

13   action against a person like that?

14       A.    Not for that specific example that you

15   gave.

16       Q.    But would you -- would you endorse or

17   support the proposition that the union could have a

18   provision in its constitution designed to impose

19   discipline for someone who committed that kind of

20   act?

21       A.    If it was indeed confidential information

22   that no one else knew.

1     Q.    That no one outside of the union

2    membership knew?

3     A.    Outside of the bargaining unit -- the

4    people sitting at the bargaining table.

5     Q.    Well, what if it's something that the

6    bargaining committee shared with a large group of

7    rank and file members?

8     A.    Never happened.

9     Q.    It would never happen?  What if they

10    shared it with a small group of rank and file

11    members?

12     A.    It would never happen.

13     Q.    Yeah, I mean -- I'm sorry.  My question is

14    if they did that, it's a hypothetical question.  I

15    mean, there have been a series of examples.

16     A.    I can't answer a hypothetical question on

17    that because I have been in union meetings for

18    years, and it has never ever happened.  They do not

19    share anything with the general membership.  The

20    officers, and that's it.

21     Q.    Well, do you think it would be a good

22    thing if they did?

1       A.    To share it with the membership?

2       Q.    Yeah.

3       A.    Absolutely.

4       Q.    So would it be a good thing if there were

5   some difficult negotiations ahead and an officer who

6   was -- decided to share with as many members as

7   possible his views about what the union's bottom

8   line ought to be and state what the other officers

9   believed it to be and asked for the members' input

10  about that?  In other words, would it be a good

11  thing if the officers of the union could convey to

12  the members what their views were about the proper

13  negotiating position and the proper bottom-line

14  position?

15      A.    Would it be a good thing?

16      Q.    Yes.

17      A.    Is that what you're asking?

18      Q.    Yeah.

19      A.    That they did ask the membership before

20  they made agreements?

21      Q.    Yes.

22      A.    I think they should.

1      Q.     And is there any -- well, let's see.  I

2      should -- let me just ask you this.  You're saying

3      -- you said a few minutes ago that it never has

4      happened that the union's negotiating committee or

5      officers advised the members of what the union's

6      position would be in collective bargaining before

7      reaching an agreement with the employer; is that

8      right?

9      A.     Never have I ever heard that.

10     Q.     And that's in your experience as a member

11     of Local 18.

12     A.     That's correct.

13     Q.     So you can't testify about whether that's

14     happened at other locals within the membership.

15     A.     I cannot.

16     Q.     Okay.  Would you agree that in a local

17     where that kind of communication occurred, it would

18     be helpful in the course of an election campaign for

19     union offices to have a discussion and a debate over

20     whether -- over what the union's bargaining position

21     ought to be in upcoming negotiations?

22     A.     Could you repeat that please?

1      Q.     Would you agree that it would be helpful

2    in a union where the officers were willing to share

3    with members information relevant to bargaining and

4    the officers' sense of what the union's bottom-line

5    position should be, that that discussion be part of

6    a campaign for office?

7      A.     I really don't understand the question.

8      Q.     Would you -- it might have been -- would

9    you agree that it would be a healthy thing to have

10   debated in a campaign for union office whether the

11   officers' view of what the union's position ought to

12   be in bargaining be a part of the debate?

13     A.     The incumbent union officers -- you'll

14   have to repeat that.

15          MR. DAYAN:  Yeah, read it please.

16          THE REPORTER:  Question:  "Would you agree

17   that it would be a healthy thing to have debated in

18   a campaign for union office whether the officers'

19   view of what the union's position ought to be in

20   bargaining be a part of the debate?"

21     A.     In very vague general terms, that is

22   usually part of it, what they've done and what they

1    plan to do.

2        Q.    And you think that's a healthy and good

3    thing to have debated in the course of a campaign.

4        A.    What they've done or what they are

5    planning on doing?

6        Q.    Both.

7        A.    Yeah, I think it would be, accomplishments

8    and -- and, you know, lack of accomplishments.

9        Q.    And plans for the future and ideas for the

10   future.

11       A.    But not specific.

12       Q.    You don't think it would be a good thing

13   to have a debate on the specific plan for the future

14   with respect to bargaining?

15       A.    You mentioned a ten dollar limit.  That

16   would not be -- better wages would be a statement.

17       Q.    I just want to make sure I understand your

18   position.  You're saying that it would not be a good

19   thing to have the membership be included in a debate

20   about the specifics of what kind of wage increase

21   and the level of a wage increase that the union

22   ought to fight for in upcoming negotiations?

1       A.      To be a part of their campaign?

2       Q.      Yes.

3       A.      The members do say those things.

4       Q.      And is it -- the question is is that a

5  proper and appropriate and healthy thing to have

6  debated in a campaign.

7       A.      To have debate?

8       Q.      Yes.

9       A.      Yes.

10       Q.      And have that issue debated, the issue of

11  how much specifically the union should fight for in

12  terms of higher wages, for example.

13       A.      Yes, because it does come up.

14       Q.      And would you also agree that an employer

15  would be very interested if it could figure it out

16  in -- strike the question.  Would you also agree

17  that an employer in upcoming negotiations would be

18  very interested in learning, for example, what the

19  union's bottom-line position would be in upcoming

20  negotiations on wages?

21       A.      Not necessarily.

22       Q.      You don't agree that an employer would be

1    interested in that information?

2    A.    He goes into what he has in his mind

3    anyhow.

4    Q.    Yeah, but sometimes -- have you ever

5    negotiated anything?

6    A.    Yeah, with your kids.

7    Q.    Well, have you ever come out better in a

8    negotiation than your bottom line?

9    A.    Yes.

10   Q.    Okay, and you can't disagree that

11   sometimes an employer will come out of negotiations

12   better than its true bottom line and that sometimes

13   a union will come out of negotiations better than

14   its true bottom line?

15   A.    That's true.

16   Q.    So it would be helpful, would it not, for

17   each side to know the other side's bottom line if

18   someone would leak that information about it.

19   Wouldn't that be helpful to them?

20   A.    Yes.

21   Q.    Thanks.  And do you -- so would you agree

22   -- I think you've agreed that it would be a healthy

1    and appropriate thing for the members to debate what

2    the union's bottom line ought to be in upcoming

3    negotiations; is that correct?

4        A.    Not to debate what the bottom line should

5    be.  To debate the issue of wages.

6        Q.    But not to make it anything more specific

7    than we should have better wages.  That's your view

8    of what a debate should be?

9        A.    That's how much of the debate we get.

10       Q.    Well, I'm not asking how much you get or

11   you've gotten in the past.  I'm asking you how much

12   you think it would be appropriate to have debated.

13       A.    I think they should be able to debate

14   whatever suggestions members send in when they ask

15   for the suggestions.

16       Q.    And do you think that ideally, every rank

17   and file member would know and be privy to the same

18   information that the officers were privy to with

19   respect to negotiations?

20       A.    No.

21       Q.    Oh, you don't think that.

22       A.    No.

1        Q.    So --

2        A.    They're not privy to it.

3        Q.    No, but do you think it would be a better

4    world or more ideal world if the rank and file

5    members were privy to the same information about

6    collective bargaining strategy --

7        A.    No.

8        Q.    -- as the leaders?

9        A.    Not the exact information that they plan

10   to use in a negotiation.

11       Q.    Why not?  Why don't you think that the

12   members should have that if they could?

13       A.    Because basically once the word goes out

14   to something like that, by the time it reaches the

15   second, third, fourth, sixth, seventh, eighth,

16   ninth, tenth person, it's changed, and it's not fact

17   any longer.

18       Q.    Well, you're changing the question.  My

19   question is -- my question is would it be better to

20   have the members know the same information that the

21   officers know in negotiating a contract.

22       A.    Verbally or written?

1      Q.    Either way.  Just know it and be privy to

2      the same information, the same factors, the same

3      considerations that the negotiating committee

4      members are privy to.

5      A.    I believe the members should have

6      knowledge of what they're going to the table to

7      negotiate.

8      Q.    And is there any information that you

9      believe that the committee should keep from the

10     members?

11     A.    You'll have to give me an example.

12     Q.    Can you come up with an example?

13     A.    No.

14     Q.    Is there -- can you think of -- well, and

15     you've agreed that there is some information that a

16     union negotiating committee would be in possession

17     of that it should keep from the employer; is that

18     correct?  You've agreed to that already.

19     A.    Yes.

20     Q.    And I believe you state in your

21     declaration that one of the advantages of the

22     internet is that it makes it easier for members to

1    communicate with other members; is that correct?

2        A.    Yes.

3        Q.    And easier for a union to communicate with

4    its own members; is that correct?

5        A.    If they do, yes.

6        Q.    So would you also agree that if the union

7    could use the internet or -- let's start with the

8    internet.  Would you agree that if the union could

9    use the internet to inform members of the kind of

10   facts that the negotiating committee has, that that

11   would be a positive thing?

12       A.    If they could inform the membership

13   electronically --

14       Q.    Yes.

15       A.    -- of their negotiating strategies --

16       Q.    Yes.

17       A.    The bottom -- I would say vaguely.

18       Q.    You think it would be a good thing if they

19   could vaguely inform them.  Is that your answer?

20       A.    Not saying that we're going after three

21   dollars, two dollars and one dollar and we will not

22   take anything else.

1      Q.     Uh-huh.

2      A.     It's a negotiation, so, you know, if they

3   know that they're going after that, then I think the

4   members deserve to know, but this should be way

5   before the negotiations.

6      Q.     Okay, and if the negotiations happen to be

7   before -- be overlapping with an election, just as

8   one example --

9      A.     It doesn't happen.

10     Q.     Or coming shortly after an election -- I'm

11   not asking --

12     A.     Separate years.

13     Q.     I'm not asking whether it happened.  I'm

14   just asking whether -- if there are negotiations

15   that are coming up, it would be helpful if the union

16   could do it efficiently, to provide the information

17   to the members that the committee is privy to.

18     A.     Could you repeat that please?

19     Q.     I'm asking you if it would be helpful for

20   a union to be able to communicate to the members

21   through the internet what the information that the

22   negotiation committee is privy to.

1    A.    Before an election or during an election,

2    you've mentioned election in that, prior to that.

3    Q.    Well, would it be helpful for them to do

4    that in a period before an election?

5    A.    That would be part of their campaign.

6    What they intend to do, and we all know people that

7    campaign don't always do what they can -- say

8    they're going to do in their campaign, so they would

9    never get specific on it.

10    Q.    Well, that's your speculation of --

11    A.    That it --

12    Q.    -- what candidates would do, but I'm just

13    asking you, would it be -- would it be a good thing

14    for a candidate -- you're a reformer, right?  You

15    hope to win.

16    A.    Okay.

17    Q.    You hope to win your election.  You hope

18    to do things differently than people had done it in

19    the past at your local; isn't that correct?

20    A.    Okay, yes.

21    Q.    Okay.  So suppose there is -- an officer

22    decides he wants to do things differently and share

1    more information with the members than has been

2    shared in the past in that local, wouldn't you agree

3    that it would be a good and positive thing for that

4    member to be able to have -- for that negotiating

5    committee member to be able to have the membership

6    know what he knows about the situation confronting

7    the union in negotiations?

8         A.    And this is just a negotiating committee

9    member that you're speaking of?

10        Q.    Let's start with that, yes.

11        A.    And he's running for office.

12        Q.    Yes, yes.

13        A.    Against the incumbent slate.

14        Q.    No.  In my example, he is an incumbent and

15    he wants to explain the full situation to the

16    members and disclose everything that a negotiating

17    committee member would know about the negotiation.

18        A.    I'm sorry.  If you're a member of the

19    incumbent slate, you would never do that if you were

20    told not to do it.

21        Q.    But you were running to change things.  If

22    you were an incumbent, would you think that that

1    would be -- would you laugh at that if you were an

2    incumbent, would you think that's absurd, I would

3    never share the information I have with ordinary

4    members?

5        A.    No, not if I were, because I wouldn't be

6    being told what I could say and what I couldn't say.

7        Q.    Well, that's fine.  Let's say you're

8    elected, you win your election.  You just don't win

9    two districts you won, you actually win.  Would you

10   laugh at the idea that there are members not part of

11   the officer ranks whom you could share more detailed

12   information with than the kind of information that

13   had been shared in the past?

14       A.    I'm sorry.  I don't understand that

15   question.  Could you rephrase it?

16       Q.    My question is if you were to be an

17   officer so that you had, you know, the ability to

18   implement the program you wanted, would you believe

19   it would be a good thing to make ordinary members

20   aware of the kind of information that in the past

21   only negotiating committee team members knew.

22       A.    The only way that choice could be made is

1    if you were the business manager.

2        Q.    Well, fine.  Would it be a good thing --

3        A.    I can't say.  I didn't run for business

4    manager.

5        Q.    Right.  So would it be a good thing for a

6    reform business manager -- you say you supported

7    reform candidates in other locals.  You're

8    supporting Joe Ward.  Would you think that a

9    business manager who thinks geez, I can do things

10    differently, I can share more -- more information

11    with the members than has historically been shared,

12    would that be a positive attribute of that kind of

13    business manager?

14        A.    Yes.

15        Q.    Okay.  And now what if that same business

16    manager wants to do this, wants to share more

17    information with the members, wants to have the

18    members understand all the constraints that you're

19    operating under in negotiations and all the positive

20    things you have as well but doesn't want the

21    employer to know the same information.  Would you

22    agree that if there was a way that the information

1    could go to the members but not to the employer,

2    that would also be a good thing?

3        A.    Yes.

4        Q.    And would you agree that one way that

5    would not work for more information of the kind I

6    just described to go to the members but not to the

7    employer would be to have the business manager in

8    the example posted on his campaign web site?

9        A.    Could you restate that please?

10       Q.    Yeah.  Would you agree that one method

11    that would not work for this business manager who

12    wanted to share more information with the members

13    than traditionally had been shared and to keep the

14    same information from the employer, would you agree

15    that one method that wouldn't work would be posting

16    that information on his campaign web site with no

17    password protection?

18       A.    If I understand the question correctly, I

19    agree.

20       Q.    It wouldn't work.  You agree that it would

21    not work.

22       A.    If it were not password protected?

1   Q. Yes.

2   A. Password protect wouldn't have anything to

3 do with it.

4   Q. But I guess --

5   A. Remember, people could still get in.

6   Q. Well, my question -- I think you answered

7 -- I think the record -- the answer was that it

8 wouldn't -- that -- I'm sorry, that the business

9 manager who wanted to share information with the

10 members, more information than traditionally had

11 been shared but who did not want to share that

12 additional information with the employer would not

13 be able to accomplish that goal through posting the

14 information on his web site.

15   A. Period, web site, not password protected,

16 just web site.

17   Q. Just web site.

18   A. Correct.

19   Q. And it would not work by definition if the

20 web site were not password protected.  Your answer

21 would be the same, right?

22   A. Posting it, whether it was password -- I

1    don't understand specifically your question.

2    Posting it password protected or nonpassword

3    protected would make no difference.

4        Q.    To you.

5        A.    Anybody can get in.

6        Q.    But let's just break it down one at a

7    time.  You're agreeing with the first part.  You're

8    agreeing that if it's not password protected, that

9    won't work.  Yes or no?

10       A.    Right, general public can get it.

11       Q.    And then you're also saying that in your

12   opinion, it wouldn't work even if it were password

13   protected.

14       A.    That's correct.

15       Q.    And -- and I think you're explaining on

16   that second answer, what is your basis for saying

17   that it wouldn't work even if it were password

18   protected?

19       A.    Because if you use a register number and

20   name, the register numbers are out there everywhere.

21       Q.    Well, I'll get back to that, but that's --

22   that's a criticism of the particular password

1    protection system that we're talking about; is that

2    correct?

3        A.    That's right.

4        Q.    What about a password protection system

5    that was in your view more secure and that -- and

6    that wasn't out there for employers.  Would that --

7    if you could have that kind of password protection,

8    would your answer change as to whether a way of

9    communicating this additional information to members

10   could be through a web site?

11       A.    I couldn't say because I don't know enough

12   about the technology of more secure -- what you mean

13   by more secure.

14       Q.    Fair enough.  Are you aware that an

15   employer who tried to go into a password-protected

16   web site of the kind that's been described where you

17   have to enter your register number and your name,

18   and that said only members could enter, are you

19   aware of the laws that would regulate whether an

20   employer could do that?

21       A.    I don't understand your question.

22       Q.    As far as you know, are there any laws

1    that would prohibit you -- let's forget about an

2    employer.  You go to a web site and the web site

3    says only a member of -- well, let's strike that.

4    Only an employee of the ABC General Contracting

5    Administration can access this web site, and it says

6    that right there on the portal page.

7        A.    Okay.

8        Q.    And then it says please enter your

9    employee identification number and your password.

10   Are you aware of any laws that would prohibit

11   someone who wasn't authorized to go into that site

12   because he wasn't an employee of that company from

13   going into that site even if he had obtained an

14   employee's password?

15       A.    I'm aware of no law.

16       Q.    You're aware of no law either way.  You're

17   not -- you're just not aware of that whole -- okay.

18       A.    No.

19       Q.    Is there -- we've talked about sensitive

20   collective bargaining information like what the

21   union's bottom line would be as shared among members

22   of a negotiating committee.  Is there similar

1     information that -- that a union's officers and

2     maybe an organizing committee would know but that it

3     wouldn't want a target employer to know?

4         A.    Not to my knowledge.

5         Q.    Let me just put it this way.  Let's --

6     have you ever been a union organizer or worked on an

7     organizing campaign?

8         A.    No.

9         Q.    One of your campaign pledges though was to

10    improve or -- I don't want to put words in your

11    mouth, but it was to promote organizing in Local 18;

12    is that correct?

13        A.    I don't recall that.

14        Q.    You don't recall whether that was one of

15    your pledges or points?

16        A.    I don't recall that right now.

17        Q.    Did you think that it would be a good

18    thing for Local 18 to engage in more organizing

19    activity?

20        A.    Organizing gets more market share, so

21    organizing is good.

22        Q.    Right.  Are you familiar with an

1    organizing technique called salting?

2    A.    Yes.

3    Q.    And what is that in your words?

4    A.    Salting is when a union member goes to a

5    nonunion job as an employee and makes an effort to

6    organize.

7    Q.    And does that require that the -- does

8    that -- does that kind of campaign work better if

9    the employer doesn't know that the applicant is a

10   salt?

11   A.    Upon hiring, yes.

12   Q.    So a salting strategy would be something

13   that you wouldn't be able to share in advance with

14   an employer; isn't that correct?

15   A.    That's correct.

16   Q.    Would it be a subject that would be

17   appropriate for ordinary members to be -- to debate

18   and consider and offer their opinions on?

19   A.    If a job should be salted?

20   Q.    If the union -- well, we could break it

21   down into two parts, but first of all, if the union

22   should use salting as a technique, would that be an

1    appropriate thing for members to debate?

2         A.    Yes.

3         Q.    Would it be an appropriate thing for

4    members to debate whether particular employers,

5    nonunion employers, should be organized through an

6    effort to salt them?

7         A.    Could you repeat that?

8         Q.    Would it be a good thing for members to be

9    involved in a discussion as to whether certain

10   nonunion employers should be organized through this

11   technique of salting?

12        A.    Specific employers; is that correct?

13        Q.    Yes.

14        A.    Like naming an employer, we're considering

15   salting that employer.

16        Q.    Saying there are three employers, for

17   example -- I'll just give you an example -- that

18   we've been trying to organize for years

19   unsuccessfully.  We know who they are, they're the

20   big ones, should we try to do salting for them.

21   Would that be something that members should be

22   involved in the discussion of?

1      A.    Probably not.

2      Q.    Why not?

3      A.    Because even though the members I don't

4  think would specifically go to a contractor and say

5  that that's going to happen, with a lot of people

6  involved, eventually that information might get out.

7      Q.    So that's the kind of information that

8  should be kept secret?

9      A.    Possibly.

10     Q.    What about these kinds of issues relating

11  to salting, what about -- do you think the members

12  should be involved in a debate about how much money

13  the union should be spending on salting as an

14  organizing technique?

15     A.    Yes.

16     Q.    And whether the union should substantially

17  increase its budget for salting from what it had

18  been in the past?

19     A.    Yes.

20     Q.    Is that a kind of debate that if you could

21  prevent employers in the jurisdiction of the local

22  from knowing was going on, it would be a good thing

1    to prevent them from knowing about?

2        A.    That --

3        Q.    That Local 18 --

4        A.    Had a budget for salting?

5        Q.    That Local 18, that there was significant

6    debate in Local 18 and a proposal, for example, to

7    radically increase the amount of money spent on

8    salting.

9        A.    And your question is would it --

10       Q.    Would it be -- would it potentially

11   undermine that proposal if it were to be adopted

12   that it got out to employers that the union was

13   about to substantially ramp up its organizing

14   efforts specifically in the area of salting.

15       A.    Possibly.

16       Q.    So that's something that the members

17   ideally, if you could keep the information separate,

18   that the members should be involved in debating, but

19   that the employer should -- that the employers and

20   the target employers should not be made aware of.

21       A.    Yes.

22       Q.    I think you've said in your affidavit that

1    -- well, let me ask you this.  Have you been advised

2    and informed of what the proposal is from the

3    international as to what would go up on a campaign

4    web site if the rule we're talking about today were

5    implemented?  Have you been told that there would be

6    -- I'll show you.  You know, what the member would

7    see when they went up on the web site, the password

8    protection box, have you been told what that would

9    --

10         A.    No.

11         Q.    Would be?  Okay.  Have you been told that,

12    however the box would appear, that the information

13    -- that the register number and password would be

14    routed through a remote web site?  Have you been --

15    has that been described to you?

16         A.    Only what I read through the depositions.

17         Q.    Right, and in your declaration or

18    affidavit -- let me find the paragraph.

19              MR. WEINBERG:  Do you want to take a

20    break?

21              MR. DAYAN:  Yeah, let's take a break.

22                   (Recessed at 3:44 p.m.)

1          (Reconvened at 3:58 p.m.)

2          BY MR. DAYAN:

3     Q.    We went through some page on your web site

4     a while ago.  You recall that?

5     A.    I do.

6     Q.    And there were some pages that you were

7     not sure how they got up there; is that correct?

8     A.    That's correct.

9     Q.    And you believe that Mr. McGough was

10    probably responsible for those pages that we talked

11    about?

12    A.    I would assume so.

13    Q.    Do you know what -- you obviously didn't

14    put up the password or registration pages we showed

15    you; is that correct?

16    A.    That's correct.

17    Q.    So you didn't know what it took for him to

18    create those pages; is that correct?

19    A.    That's correct.

20    Q.    And you don't know, do you, how much money

21    it would cost to add a password-protection feature

22    to your site of the kind that's been discussed in

1     the context of the campaign web site resolution?

2          A.     I do not, no.

3          Q.     And do you know how much time it would

4     take for someone to -- for you, let's start with

5     you, to put up a password protection feature of the

6     kind that's been described?  You, yes.  You don't

7     know.

8          A.     I'll probably be dead and gone before I

9     would figure that out.

10         Q.     And you don't know how long it would take

11    Mr. McGough to --

12         A.     I do not.

13         Q.     Have you had any conversation with

14    Mr. McGough about how difficult or costly it would

15    be to comply with the campaign web site resolution?

16         A.     No.

17         Q.     When you were running for office -- let's

18    just focus on the 2005 election.  I asked you some

19    questions about what you did to campaign, and you

20    testified you had a web site; is that correct?

21         A.     Yes.

22         Q.     And you testified you went to some

1     meetings?

2          A.     Yes.

3          Q.     Did you write any letters to the editor of

4     newspapers in the course of your campaign?

5          A.     I did not.

6          Q.     Did you distribute any communications to

7     non-members of your local?

8          A.     Yes.

9          Q.     Which communications would those be?

10         A.     Some of the flyers that --

11         Q.     Who would have been the recipients?

12         A.     Other -- other labor unions, family,

13    friends.

14         Q.     How did you send those out?

15         A.     Some e-mail, some handed out, physically

16    handed out.

17         Q.     And who would the recipients have been?  I

18    think you testified friends.  Who else?

19         A.     Family, other -- other labor

20    organizations.

21         Q.     And what was your purpose in sending the

22    information let's say to your family?

1   A. To see what I was doing at that point in

2 time.

3   Q. And what would have been the reason for

4 sending it to the other activists or other members

5 of other labor organizations?

6   A. They're always interested in the

7 happenings of other unions because ultimately

8 usually it affects them.

9   Q. How much did you spend on that kind of

10 communication?

11   A. I couldn't tell you.

12   Q. Just -- how many letters did you send out

13 approximately?

14   A. Letters?

15   Q. Or e-mails.

16   A. I couldn't tell you.  I have no idea.

17   Q. Did you communicate with any employers?

18   A. Pardon me?

19   Q. Did you communicate or send letters to any

20 employers?

21   A. No.

22   Q. Did you send your literature to employer

1    trustees of any union funds?

2        A.    I did send an e-mail to the trustees of

3    the apprenticeship fund.

4        Q.    And when did you send that in relation to

5    when the election was?

6        A.    I'm not sure, but it was after I was

7    dismissed.

8        Q.    But before the voting took place?

9        A.    Yes, I think so.

10       Q.    What was the purpose of that

11   communication?

12       A.    To make the trustees aware what was going

13   on in the apprenticeship.

14       Q.    Was it literature that you specifically

15   prepared for them or was it just your general

16   campaign literature?

17       A.    Just what I -- I just sent them an e-mail.

18       Q.    That had literature --

19       A.    It might have had the attachment.

20       Q.    And the attachment would have just been

21   material that you prepared for the general use in

22   the campaign.

1       A.      Yes, yes.

2       Q.      You weren't asking or hoping to enlist

3    them in your election campaign though, were you?

4       A.      No.

5       Q.      We talked about your current web site and

6    your home page and the little streamer that ran

7    across the page that you added.

8       A.      Yes, scroll.  I call it a scroll.

9       Q.      Scroll.  I don't know the buzz words like

10   Paul does.

11      A.      This is mine.

12      Q.      Okay, the scroll is as good a word as any.

13   You testified that you added the scroll or the

14   streamer recently.  It doesn't --

15      A.      That's correct.

16      Q.      Just establish -- okay.  Do you have any

17   plans to post anything else on the web site in the

18   near future?

19      A.      I have plans to revamp the web site,

20   update it.

21      Q.      What kinds of materials would you -- are

22   you hoping to post in the next three to six months?

1     A.    Possibly some support for candidates in

2    other locals.  We have an election coming up next

3    year.

4     Q.    Okay, so in the 2008 election.  What is

5    the -- in your local, when do election campaigns

6    usually start in relation to the election?

7     A.    There's no specific time.  It just depends

8    on when the candidates decide that they're going to

9    commit.

10     Q.    Okay.  When is the earliest in your

11    experience a campaign in your local has started?

12     A.    Maybe a year.

13     Q.    Before the August election?

14     A.    Before the June nominations.

15     Q.    Before the June nominations, but do you

16    have any -- right now I guess you don't have any

17    specific plans for what you would post.

18     A.    Not specific, no, I do not.

19     Q.    Have you taken any steps to ask the

20    international union for an opinion on whether your

21    web site as it's currently constituted would be a

22    campaign web site?

1      A.    No.

2      Q.    Why not?

3      A.    I don't think we're going to have to use

4  password protection.  I don't think they're going to

5  have to determine that.

6      Q.    So -- okay.  Do you think right now that

7  your web site as it's currently constructed is a

8  campaign web site?

9      A.    No.

10     Q.    Are you familiar with how discipline works

11  within the IUOE generally, discipline of members?

12     A.    The international level?

13     Q.    At the local level and then through the

14  international level and what the international's

15  role would be.

16     A.    Somewhat.

17     Q.    Have you ever filed a charge against

18  another member?

19     A.    Against another member?

20     Q.    Yes.

21     A.    Not to my knowledge.  Not that I can

22  remember.

1      Q.    Have you filed a charge against an

2   officer?

3      A.    No, not a charge.

4      Q.    Let me just characterize it and you can

5   tell me if I'm mischaracterizing it.  A member can

6   file a charge against another member; is that

7   correct?

8      A.    That's correct.

9      Q.    And then there's a hearing and a trial?

10     A.    That's correct.

11     Q.    And if the person is found guilty, that

12  person can appeal to the international union?

13     A.    That's correct.

14     Q.    And would that be the international

15  union's involvement in discipline typically in your

16  experience?

17     A.    I would assume so.

18     Q.    And the international executive board

19  would be the body that would hear appeals from

20  disciplinary decisions?  Is that your understanding?

21     A.    I don't think the board hears it.  I think

22  a committee hears it.

1       Q.    Do you have faith in the fairness and

2   accuracy of the decisions made by the international

3   union in reviewing discipline cases?

4       A.    Absolutely not.

5       Q.    Do you have faith -- well, do you believe

6   that they would discriminate against people that

7   they disagreed with on internal politics?

8       A.    Yes.

9       Q.    And would favor people they agreed with on

10   internal politics?

11       A.    Yes.

12       Q.    Are you aware of -- you say you speak with

13   and try to learn about other unions; is that

14   correct?  Is there any international union in the

15   United States that you think is fair and democratic?

16       A.    I couldn't say that because I don't know

17   completely about all other unions.

18       Q.    So you can't -- there's not one that you

19   are familiar with that you could vouch for and say I

20   have faith that they --

21       A.    No.

22       Q.    -- are.

1      A.    No.

2      Q.    We talked before about how if -- we had

3    the example of the organizing committee member who

4    handed over the union's secret bottom line to the

5    employer and how in your view that person at least

6    would be someone who could appropriately be

7    disciplined under union process; is that correct?

8      A.    Could you restate that?

9      Q.    Yeah, I'm just giving you the example, the

10   example you agreed to pretty readily, which was that

11   you're a negotiating committee member who hands over

12   to an employer representative information that

13   reflects the union's bottom line in bargaining

14   strategy.

15     A.    I don't believe you stated it that way.  I

16   believe you said they handed it over to a friend.

17     Q.    Well, let's -- it doesn't matter what I

18   said.  Let's say they hand it over to the employer.

19   Would you agree that that would be something that

20   would be inappropriate and a subject for discipline?

21     A.    I couldn't say.  These are all

22   hypothetical.  I don't know the answer to those --

1    some of those.

2        Q.    Would that offend your sense of -- you're

3    a union democracy advocate.  Would that offend your

4    sense of what a union could properly do with its

5    disciplinary procedures, having charges brought

6    against someone who disseminated that kind of

7    information to an employer.

8        A.    I guess I don't believe that the

9    information given would be a hundred percent

10   accurate from the union.

11       Q.    And you don't believe that the

12   disciplinary process would figure out who was guilty

13   and who was innocent?

14       A.    Not fairly.

15       Q.    And you don't believe that the

16   international union would be a body that would help

17   ensure evenhanded treatment at the appellant level?

18       A.    Could you explain that please?

19       Q.    Well, I think you testified before that

20   you don't trust the international's process for

21   deciding disciplinary appeals.  You don't have

22   confidence that it's fair and equal; is that

1    correct?

2        A.    That's correct.

3        Q.    You said in your declaration that you

4    would like to reach all international union members

5    with your web site but that some will be afraid to

6    log on if there's a password protection?

7        A.    That's correct.

8        Q.    And before the break, I was asking you if

9    you were aware of what the password protection would

10   look like if the resolution were to be implemented.

11       A.    Right.

12             MR. DAYAN:  I'd like to mark as Exhibit 18

13   this document.

14                           (Kohl Exhibit No. 18

15                            was marked for

16                            identification.)

17             BY MR. DAYAN:

18       Q.    Have you been informed that when someone

19   -- if the resolution were to be implemented, someone

20   would search for your web site or a campaign web

21   site and see those boxes that have "enter your name

22   and password," is that your understanding?

1       A.      For this implementation.

2       Q.      Yeah, let's not look at the document for a

3   second.  We'll get to it in a second.  Yeah, for

4   this implementation.  Let me ask you this.  Have you

5   ever used a web site to shop for things?

6       A.      Yes.

7       Q.      Have you ever used any web site that

8   requires you to enter some sort of user ID and

9   password?

10      A.      Not to get into the site.  Not until I was

11  purchasing something.

12      Q.      Okay, well, even at that stage, you've

13  encountered ones where you have to enter some sort

14  of user ID and password?

15      A.      No.  Well, no, I don't.

16      Q.      To purchase something.

17      A.      No, I don't usually use that route at all.

18  You can skip that part, and usually -- where I shop,

19  and go direct to continue with purchase.

20      Q.      In a different context, have you ever even

21  seen -- I'm just trying to establish something

22  really basic here.  Have you ever seen -- I think

1    the technical word is a dialogue box or a box that

2    says enter your user name, enter your password to go

3    further?

4         A.    To continue, enter your name or password.

5         Q.    Yeah.  Have you seen that kind of box?

6         A.    I have seen that, yes.

7         Q.    Has it been explained to you or is it your

8    understanding that the box -- that a box like that

9    would appear if the resolution were to be

10   implemented?

11        A.    Yes.

12        Q.    And is it your understanding -- has it

13   been explained to you that a third-party provider

14   will be administering the process of verifying user

15   register numbers and passwords?

16        A.    Until I read depositions, I wasn't aware

17   of that.

18        Q.    In your affidavit -- in your affidavit,

19   you say that --

20             MR. LEVY:  Do you want her to look at the

21   paragraph?

22             BY MR. DAYAN:

1    Q.    Yeah, let's find the right paragraph here.

2    A.    Let's find the declaration.

3          MR. LEVY:  As I recall, that's near the

4    end, but I'm not sure.  Somewhere in 10, but let's

5    see.

6          MR. DAYAN:  Paragraph 10.

7          MR. LEVY:  Page 4.

8          BY MR. DAYAN:

9    Q.    Yeah, let's look at paragraph 10 on page 4

10   of your affidavit, Exhibit 3.  Bottom of page --

11   bottom of page 4, there's a sentence that says --

12   well, there's two sentences.  One says, "If members

13   have to enter their register numbers, I believe that

14   this very process would drive home to them that the

15   union has the right to control access to the web

16   site, and they would be even more afraid that

17   somehow the union could find out that they had

18   visited it."  And then the next sentence says, "That

19   is particularly true because the identification and

20   verification process is going to be handled

21   centrally, by a technology firm under contract at

22   the international."  So you were advised of that

1    much; is that correct?

2        A.    Yes.

3        Q.    And were you advised that this technology

4    firm is independent of the international union?

5        A.    And you mean independent --

6        Q.    That they have their own employees,

7    they're not using international union employees.

8        A.    Yes.

9        Q.    That they're their own firm.

10       A.    I would assume that to be true.

11       Q.    A preexisting firm that's been in business

12   for some years.

13       A.    I do.

14       Q.    And are you aware that that firm would not

15   be able to tell -- would be able to set up the

16   system so that it won't be able to tell what web

17   site the person is trying to visit.

18       A.    Am I aware that they will not be able to?

19       Q.    Are you aware that they have -- that the

20   system that is being proposed is one where the

21   technology firm, let's just start with them, won't

22   track what web sites they're being redirected from

1    to verify the password and the register number?

2        A.    No.

3        Q.    You haven't been advised of that.

4        A.    Well, it says so in the -- I think in one

5    of the depositions, but I don't believe that.

6        Q.    You don't believe it.

7        A.    No.

8        Q.    Have you ever heard of Matrix, the company

9    that we're talking about?

10       A.    Not until I read the deposition.

11       Q.    Do you have any basis for believing that

12   they're a dishonest company or a company that would

13   violate its commitments?

14       A.    They're being paid by the international.

15   That's their employer.  They lose their money if

16   they don't do what they're supposed to do.

17       Q.    Do you know how many clients they have?

18       A.    I do not.

19       Q.    Do you know how many clients they would

20   lose if they developed a reputation for not keeping

21   commitments?

22       A.    I do not.

1    Q.    And you have no evidence that any employee

2    or officer of that company is in any way corrupt; is

3    that correct?

4    A.    I have no evidence of that.

5    Q.    Turning to Exhibit 18, have you been

6    advised that the web site is going to say something

7    like what's on Exhibit 18?

8    A.    Yes, I've read this.

9    Q.    And do you see the disclaimer, "This web

10    site will not log any identifying information,

11    register number or name about IUOE members seeking

12    access to any particular campaign web site"?

13    A.    I do see that.

14    Q.    And it's your position that you don't

15    believe it.

16    A.    I do not.

17    Q.    Has any other member of the union told you

18    that they wouldn't believe it either?

19    A.    Yes.

20    Q.    Who?

21    A.    I can tell you Paul Gonter said it

22    specifically, Mike Quigley said it specifically.

1       Q.    You showed this to them?

2       A.    Any password system, they would not trust

3    that they would not be tracked.  Not just this or

4    this company.

5       Q.    Any others than those three or four?

6       A.    We've had discussion with many people

7    about that.

8       Q.    Well, how many?

9       A.    I don't know exactly how many.

10       Q.    How many discussions did you have along

11    the lines you just described with other members

12    about whether they could trust the company not to be

13    tracking this information?

14       A.    I don't know.  I can't tell you how many

15    discussions I had.

16       Q.    Well, you only learned about it fairly

17    recently; is that correct?

18       A.    No, we've always had the discussion about

19    password protection and that type of thing, that

20    even, you know, going --

21       Q.    Go ahead.

22       A.    During my campaign, there was questions if

1    these people could be tracked.  They were worried

2    that they could be tracked.

3        Q.    On your own web site even.

4        A.    Right.

5        Q.    On your own web site.

6        A.    Right.

7        Q.    By you, they were worried they could be

8    tracked by you or Jim McGough or --

9        A.    They're not technically savvy.  They --

10   they're not aware of what can happen and what can't

11   happen, and a lot of members just asked to remain

12   anonymous, and I totally respect that.

13       Q.    Although you didn't know before today that

14   your web site has these log-in and registration

15   features.

16       A.    Right.

17       Q.    Have you had any discussions -- you said

18   you had discussions going back before you found out

19   the particulars of how this would work; is that

20   correct?

21       A.    Could we back up one minute please?

22       Q.    Yes.

1        A.    I wasn't aware of the pages that are

2   connected to the forum; not to the rest of my web

3   site.  Just to the forums.

4        Q.    Okay.  Now, going back to these

5   discussions, have you -- you said you had

6   discussions before you even learned about the

7   particulars.

8        A.    Uh-huh.

9        Q.    Since you learned about the particulars,

10  have you had any discussions with any of those

11  people or other members about whether the system

12  could be trusted not to be tracking that

13  information?

14       A.    Yes.

15       Q.    How many discussions of that kind have you

16  had?

17       A.    I'm not sure.  I just spoke to several

18  people about it in conversations.

19       Q.    And did any of them have any information

20  about this Matrix firm?

21       A.    No.

22       Q.    So people were just expressing their fears

1    at this meeting.  They weren't expressing any

2    experience or evidence of people who have gotten in

3    trouble with a union or any other institution for

4    having entered a user name and a password.

5        A.    No.

6        Q.    Are you aware of -- what's -- have you

7    heard of the AUD?

8        A.    Yes.

9        Q.    That's the Association for Union

10   Democracy?

11       A.    That's correct.

12       Q.    When did you first become aware of that

13   organization?

14       A.    Probably in 2002-2003.

15       Q.    Around the time you were -- you campaigned

16   in 2005, so it would have been before your 2005

17   campaign.  What's your opinion of that group?

18       A.    They've been very helpful.

19       Q.    And have you visited their web site?

20       A.    Yes.

21       Q.    Do you believe they provide credible and

22   reliable information?

1   A. I do.

2   Q. Are you aware that they have a contest for

3 rank and file member web sites?

4   A. Yes, I am.

5   Q. Have you checked any of those web sites?

6   A. No.

7   Q. Is it your view that by putting up a

8 password-protection feature on a web site, you're

9 going to lose a substantial number of members who

10 would otherwise visit?

11   A. Yes.

12   Q. Are you aware that a lot of rank and file

13 union democracy web sites have password-protection

14 features and members-only sections?

15   A. No.

16   Q. Have you heard of the group -- a reform

17 group called HEARD, H-E-R-D -- H-E-A-R-D NY, or

18 restaurant employees local in New York?

19   A. No.

20   MR. LEVY:  Off the record.

21   (Discussion off the record)

22   MR. DAYAN:  Let me have this marked as

1    Exhibit 19.

2                              (Kohl Exhibit No. 19

3                                was marked for

4                                identification.)

5              BY MR. DAYAN:

6         Q.    Is it understandable to you why a reform

7    group would want to have a members-only section on

8    their web site?

9         A.    Not really.

10        Q.    Do you believe that there are a lot of

11   union reform activists who may want to change their

12   union, but they also believe that their union, under

13   whatever leadership, has to be strong against the

14   employer that the union deals with?

15        A.    I don't know.

16        Q.    What's that?

17        A.    I'm sorry, to me.  To me that's

18   hypothetical.  I don't know what their reasoning is,

19   what their -- what they don't want known.

20        Q.    You don't -- do you think a reasonable

21   group could be of the opinion that a members-only

22   section would be useful?

1      A.    No.

2      Q.    You don't even think it's reasonable that

3  there would be a good use for a members-only --

4      A.    For myself, no.

5      Q.    No, okay.  Are you aware that the web site

6  reflected on Exhibit 19 was one of the winners of an

7  AUD award for most effective web sites --

8      A.    No.

9      Q.    -- for rank and file?

10       MR. LEVY:  Off the record.

11         (Recessed at 4:30 p.m.)

12         (Reconvened at 4:42 p.m.)

13                (Kohl Exhibit Nos. 20

14                through 24

15                were marked for

16                identification.)

17       BY MR. DAYAN:

18      Q.    I've marked a series of -- I've had the

19  court reporter mark a series of exhibits, 20, 21,

20  22, 23 and 24, which are materials from three

21  different web sites.  The first one is Exhibit 20,

22  and it's the home page of the web site of the group

1    that we talked about before the break that put out

2    Exhibit 19 also, by a group called Hotel Employee

3    Advocates for Real Democracy.  On Exhibit 20, could

4    you just review it quickly, Ms. Kohl?  I'll just

5    draw your attention to the statement at the -- in

6    the fourth full paragraph of text in the middle that

7    says, "This site is for union members only.  If you

8    are part of a management, please buzz off"?

9        A.    I see that.

10       Q.    Okay.  Again, would you say that it's

11   unreasonable for a union reform group to want to

12   have a site that's for its members -- for the

13   members of the union only?

14       A.    If it's their choice and they're not

15   mandated to do it by their union, that's their

16   choice to do it.

17       Q.    And it could be a reasonable choice in

18   your mind?

19       A.    If they choose to do it.  It may not be

20   for me or someone else, but for them, that's their

21   choice.

22       Q.    And so -- and it could be a reasonable

1    choice in your -- in your opinion from their point

2    of view.

3        A.    I don't know their point of view so I

4    can't say.

5        Q.    But it could be reasonable for them to say

6    that we want the members to say as much as -- to say

7    -- to feel free to say whatever they want on this

8    site and to post whatever they want on this site

9    without a fear that the employer will be monitoring

10   what might be posted.  I mean, would it be

11   reasonable for a reform group to think that?

12       A.    It just depends on their -- their views.

13   I can't speak for them.

14       Q.    In your opinion, would it make a web site

15   -- a reform web site ineffective to have

16   members-only access?

17       A.    To the entire web site, yes.

18       Q.    What about to a substantial portion of the

19   web site?

20       A.    Yes.

21       Q.    Exhibit 21, let's just move to that one.

22   That is a printout from the AUD web site of an

1    article captioned "AUD Announces Winners of Best

2    Rank and File Web Site Contest," and I would just

3    draw your attention to the fourth page of that

4    exhibit where it says, "The AUD has awarded this web

5    site third place for best rank and file web site."

6        A.    On page 4?

7        Q.    It's the fourth -- let me count.  Yeah, it

8    should be -- no, I'm sorry, the fifth page.  Fifth

9    page of that document.

10       A.    Okay.

11       Q.    And it says -- I'll just read briefly.

12   "Our third prize winner is more typical of the

13   majority of rank and file web sites than the first

14   and second place sites.  Most rank and file web

15   sites are not based on single-issue campaigns or

16   fights to get out from under a trusteeship.  Most

17   are not created in the context of a prairie fire

18   member indignation and activism, and most are not

19   the product of long-established reform groups."

20            And then it goes on and says, "In most

21   cases, union reformers start from scratch, working

22   along or with one or two co-workers, teaching

1    themselves how to design web sites, and use them to

2    organize in those precious hours between work and

3    sleep," and then it goes on.  I won't read the whole

4    thing.  It goes on and identifies what the AUD

5    believes were the best ideas in that web site.

6          And then if you skip a couple of pages --

7    excuse me, two pages, it identifies some weaknesses,

8    and it does not identify as a weakness that there's

9    a members-only section or a members-only orientation

10   to it.  Would you have a reason to believe the AUD's

11   standards for effectiveness are flawed or in any way

12   misguided?

13         MR. LEVY:  Do you want her to read the

14   whole thing?  You characterized what's in here.

15   I've scanned it, and I must admit, I haven't read

16   the whole thing.

17         BY MR. DAYAN:

18   Q.    You can take your time and read it.  I'm

19   sorry.

20   A.    You want me to read the entire web site?

21   Q.    No, no, just the entry on the third place

22   best rank and file web site contest.

1              MR. LEVY:  I confess, I have not looked at

2       this web site.  Are you representing that this is a

3       password-protected web site?

4              MR. DAYAN:  Are we on the record?

5              MR. LEVY:  On or off.  I mean, I see what

6       you see there about buzzing off.  I don't see -- I

7       mean, I see lots of -- I mean --

8              MR. DAYAN:  Go ahead, go ahead.

9              MR. LEVY:  I see lots of things on what

10      seems to be the main page, including its campaign

11      platforms going down the page, and then I see these

12      things called explanation.  I don't know whether --

13      I'm assuming that explanation is a link that goes

14      into the page, and I don't know whether -- is

15      password protection required to get into the

16      explanation?

17             MR. DAYAN:  Okay, I'll represent that the

18      exhibit before the break, Exhibit 19, is the page

19      that shows that there is a members-only section of

20      the web site that does require the user ID and

21      password, and it says in Exhibit 19, "The

22      members-only section contains video and letters that

1    have been sent out to our union officials that are

2    not to be shared with management, thus the reason

3    for strict access to these files."

4           And it says, "Once you receive a user ID

5    and password, you may click on the hyperlink

6    provided in your e-mail access or access from this

7    link."  And then it goes on and it says that to get

8    the password, you have to indicate your name, the

9    hotel you work for, your local and your department,

10   and then it takes 24 hours to verify that the

11   person's an employee of the hotel.

12          MR. LEVY:  And I take it what you're

13   representing is that so far as you've been able to

14   tell by investigating this web site, there are a

15   number of buttons down the bar on the left-hand

16   side, and I take it that it's only within the

17   section that's called members only that there's

18   password protection.

19          MR. DAYAN:  That is correct, that is

20   correct, and I'll say -- I'll say this much, that

21   the members only is password protected.  I didn't

22   click every button.  I don't know --

1          MR. LEVY:  Right.

2          MR. DAYAN:  The forum might be.  I might

3    have clicked that, but I don't want to represent

4    either way on that.

5          MR. LEVY:  All right.

6          BY MR. DAYAN:

7     Q.    So the only question is would you fault

8    the AUD's judgment that this is an effective web

9    site.

10    A.    That is --

11    Q.    That it is an effective rank and file web

12    site.

13    A.    That this site is.

14    Q.    Yes.

15    A.    No.

16    Q.    So you wouldn't think a members-only

17    section would disqualify --

18    A.    I didn't say that.  I said this -- their

19    interpretation of their site, which doesn't

20    specifically speak to that.

21    Q.    Okay.  Do you believe, aside from the

22    AUD's explanation, which doesn't speak to the

1    password-protection feature --

2        A.    Right.

3        Q.    Do you believe that a members-only section

4    would disqualify a rank and file site from being an

5    effective web site?

6        A.    I think I answered that question already.

7    Would you repeat it again please?

8        Q.    Do you believe that having a members-only

9    section on a web site disqualifies it from being an

10    effective rank and file member web site?

11        A.    Again, I would answer as long as it was

12    their own decision to have that section and they

13    were not mandated by their union to do so.

14        Q.    So the answer is that it doesn't

15    disqualify it.  The mere fact of members-only access

16    doesn't disqualify the site by itself from being an

17    effective web site.  That's another way of saying

18    your answer; is that correct?

19        A.    If you took out -- you're saying is if you

20    took out the members-only section, would it still be

21    the same site?

22        Q.    No, my question is does the existence of a

1    members-only section on a rank and file web site by

2    itself disqualify that site from being an effective

3    rank and file web site.

4        A.    If it's mandated by the union, it would

5    disqualify it.

6        Q.    But not otherwise.

7        A.    Right.  If it was of their own free will.

8        Q.    I'll represent to you that Exhibit --

9    Exhibit 22 is another article from the AUD web site

10   awarding best rank and file web sites for the year

11   2005, and --

12           MR. LEVY:  Can we go off the record?

13           MR. DAYAN:  Yeah.

14           (Discussion off the record)

15           BY MR. DAYAN:

16       Q.    All I'll say is Exhibit 22 is another

17   article from the AUD web site awarding certain web

18   sites best rank and file awards, and again, on the

19   third place winner on page 5, APA pilots' web site,

20   and Exhibits 23 and 24 are pages that I printed out

21   from the pilots' web site, the Exhibit 23 being the

22   home page, and it also has a members-only section,

1    as reflected in the button at the top, members area.

2    And it's also got a section, as reflected in the

3    button on the left, called the Free Speech Zone.

4         And Exhibit 24 is the home page or the

5    front page for the Free Speech Zone, and the Free

6    Speech Zone says, "If this is your first visit,

7    please be sure to check out the FAQ by clicking the

8    link above.  You have to register before you can

9    post."  And then it goes on, "You need to be

10   validated before you can access the American

11   Airlines' forums.  The validation process may take

12   up to 72 hours."  And it says there are additional

13   American Airlines' forums available only to American

14   Airlines pilots who are registered and logged in.

15        So again, it's another example of a rank

16   and file site that has password-protected

17   members-only areas, and this one in the Free Speech

18   Area.  And I take it your answer would be the same,

19   that this doesn't disqualify in your opinion the

20   this site from being an effective rank and file web

21   site.

22        A.    Could you say that again please?

1        Q.    The fact that the APA web site pages we

2    just looked at have members-only sections and

3    require -- and limit access to pilots for American

4    Airlines doesn't disqualify it from being an

5    effective rank and file web site.

6        A.    My answer would be the same.  If it's

7    mandated by their union, then it would disqualify

8    it.

9        Q.    All right.

10        A.    Do you know if these are --

11            MR. LEVY:  Could you characterize the APA

12    site versus the APEP site, right?    That's what you

13    meant?

14            BY MR. DAYAN:

15        Q.    If I said APA and it's called the APAPDP

16    site -- yes, I'm sorry, because APA might have

17    implied that it was union's own site.  It would be

18    the APAPDP site, the references I made to APA.

19    Thank you.  Why do you think that the issue of

20    whether the union mandates it or whether it's a

21    voluntary choice affects whether it's an effective

22    web site for rank and file members?

1    A.    Because it's only effective if they feel

2    free to go on it and look at it.  Otherwise they

3    don't go on.

4    Q.    You wouldn't -- you're speculating on

5    whether people would go on and look at it.

6    A.    You asked me a hypothetical question.

7    Q.    You don't in fact know whether rank and

8    fils web sites' members-only areas keep substantial

9    numbers of otherwise interested members out.

10    A.    I do not know.

11          MR. LEVY:  Can I just take a moment?  I

12    would like to make a list of these.

13          MR. DAYAN:  Go ahead.  We'll take a

14    two-minute break but in the room.

15              (Recessed at 4:58 p.m.)

16              (Reconvened at 5:03 p.m.)

17          BY MR. DAYAN:

18    Q.    Paragraph 14 of your affidavit, that's

19    Exhibit 3 --

20    A.    Paragraph what?

21    Q.    Fourteen.  In this paragraph, you say you

22    follow the story of Jim Archie.

1        A.    Yes.

2        Q.    Isn't it a fact that Archie only proffered

3   a charge against the person who beat him up and that

4   he didn't proffer any charges against any union

5   officers?

6        A.    I don't know that.

7        Q.    Did you ever ask him to send you the

8   charge or a transcript of the proceedings or

9   anything like that?

10       A.    I do think I saw a copy of the police

11  report on his web site.

12       Q.    Of the police report, and was the -- and

13  who do you recall the police report charging with a

14  crime?

15       A.    I can't remember his name.

16       Q.    But not an officer of the union.

17       A.    I can't remember the name so I don't know

18  if it was an officer or not.

19            MR. DAYAN:  Let's mark this as Exhibit 25.

20                          (Kohl Exhibit No. 25

21                           was marked for

22                           identification.)

1          BY MR. DAYAN:

2     Q.    Is this -- is this what you saw posted on

3  his web site?

4     A.    I think so.

5     Q.    Okay, and on the last page of this

6  three-page exhibit, do you see defendant's name,

7  Robert L. Wooten?

8     A.    Yes, I do.

9     Q.    Does that ring a bell?

10    A.    The name, yes, now it does, uh-huh.

11    Q.    And you don't know whether he was a rank

12  and file person or an officer; is that --

13    A.    I do not know.

14    Q.    And again, you testified you didn't know

15  whether he proffered internal charges against any

16  officer; is that correct?

17    A.    I do not know.

18    Q.    So you wouldn't be in a position either

19  way to -- let me strike that.  You wouldn't be in a

20  position to dispute the following points; first,

21  that he proffered a charge only against the

22  perpetrator of the assault; second, he didn't

1     proffer a charge against any officer of the local or

2     the international; and third, that the perpetrator

3     -- I'll take that advice.  Let's go one at a time.

4     You don't -- you don't -- you're not in a position

5     to dispute that he proffered a charge against

6     Mr. Wooten internally, and only Mr. Wooten.

7          A.     I don't dispute it.

8          Q.     Yes.

9          A.     From this paper, I don't dispute it.

10         Q.     And from any other knowledge you've got.

11    You just don't know what happened.  You don't know

12    who he proffered a charge against.  That's all I'm

13    asking.

14         A.     Yes.  Just Wooten because of the document.

15         Q.     And you don't know who he proffered any

16    internal union charge against.  Is that also

17    correct?

18         A.     I don't.

19         Q.     And do you know whether Mr. Wooten

20    expressed satisfaction that the --

21              MR. WEINBERG:  Mr. Ritchie you mean.

22              BY MR. DAYAN:

1    Q.    I'm sorry.  Strike the whole last

2    question.  And are you aware that the perpetrator,

3    Mr. Wooten, was found guilty in the internal union

4    process?

5    A.    Yes.

6    Q.    And are you aware that a fine against him

7    was upheld by the international executive board?

8    A.    I'd have to say vaguely because I don't

9    remember reading that or what the amount was.

10   Q.    And you wouldn't be in a position to

11   dispute whether that happened.

12   A.    No, not at this point.

13   Q.    Because again, you just don't know.  And

14   you wouldn't be in a position to dispute whether

15   Mr. Archie at the end of the process was satisfied

16   that the appropriate person was punished and an

17   appropriate sanction was levied.

18   A.    No, not specifically.  I don't know that.

19   Q.    Do you agree with the following statement

20   of philosophy about the rights and obligations of a

21   member in a democratic union.  I'm just going to

22   read you a statement.  In a democratic union, as in

1    a democratic society, every member has certain

2    rights, but she or he also must accept certain

3    corresponding obligations.  Each member shall have

4    the right to freely criticize the policies and

5    personalities of union officials; however, this does

6    not include the right to undermine the union as an

7    institution, to vilify other members of the union

8    and its elected officers, or to carry out activities

9    with complete disregard of the rights of other

10   members and the interests of the union, or to

11   subvert the union in collective bargaining or to

12   advocate or engage in dual unionism.

13        A.    Part of it's very broad and it would be

14   subject to interpretation I believe, so I can't say

15   that I agree with that 100 percent.

16        Q.    What part don't you agree with?

17        A.    You want to read it again?

18        Q.    Yeah.  Let's go through it sentence by

19   sentence.  Every member shall have the right freely

20   to criticize the policies and personalities of union

21   officials.

22        A.    I agree.

1    Q.    However, this does not agree the right to

2    undermine the union as an institution.

3    A.    Depends on what that means.  I don't

4    understand what that means.

5    Q.    It does not include the right to vilify

6    other members of the union and its elected officers

7    or to carry on activities with complete disregard of

8    the rights of other members and the interests of the

9    union.

10   A.    I don't understand what that means either.

11   Q.    And it does not include the right to

12   subvert the union in collective bargaining.

13   A.    What does "subvert" mean?

14   Q.    What do you think it means?

15   A.    Undermine, tell something.  I don't know.

16   I'm asking for a clarification of a word.

17   Q.    In terms -- okay.  As undermine, would you

18   agree that a member's right does not include the

19   right to undermine the union in collective

20   bargaining?

21   A.    That was my word, so no, I can't agree

22   with that because I'm not -- in that context, I

1    would need specifics on that.

2         Q.    Well, I don't want to be -- do you --

3    yeah, do you know -- did you -- are you familiar

4    with a document called Ethical Practices Code that

5    -- well, let me show it to you.  I'm sorry.

6         A.    That would be good.

7              MR. DAYAN:  It's Exhibit 26.

8                        (Kohl Exhibit No. 26

9                         was marked for

10                        identification.)

11             THE WITNESS:  Do you want me to read this

12   entire thing?

13             BY MR. DAYAN:

14        Q.    No.  Do you recognize the document?

15        A.    No.

16        Q.    Did you post it on your web site during

17   the campaign or any other time?

18        A.    I myself did not.

19        Q.    Who made decisions about what to post on

20   your web site?

21        A.    If it was public information that was

22   available, then usually Mr. McGough did so.

1    Q.    So Mr. McGough was posting some content on

2    your web site.  It wasn't just helping you make the

3    buttons work and the links connect to the forums?

4    A.    If this is on my web page, I would assume

5    that it was a link that you clicked on to get to

6    some -- to get to something.

7    Q.    We could look at Exhibit --

8         MR. DAYAN:  Let's go off the record.

9         (Discussion off the record)

10        BY MR. DAYAN:

11   Q.    Do you recognize this as coming from your

12   web site?

13   A.    Now that I read it down here below, I do.

14   Q.    And do you see that there's a link to it

15   on Exhibit 10, which is up on the screen there,

16   that's the home page we referenced earlier?

17   A.    I see it now.  Yes, I do.

18   Q.    We're going to click that link.  Okay.  So

19   you -- you agree that it was up on your web site.

20   A.    Yes.

21   Q.    And it's linked to on the home page.

22   A.    Yes, uh-huh.

1          MR. DAYAN:  Can we take a five-minute

2     break right now?

3               (Recessed at 5:13 p.m.)

4               (Reconvened at 5:29 p.m.)

5                    (Kohl Exhibit Nos. 27

6                    through 30

7                    were marked for

8                    identification.)

9          MR. DAYAN:  We've marked a series of

10    exhibits.  Mr. Clash-Drexler will identify them.

11         MR. CLASH-DREXLER:  Okay, Exhibit 27 has a

12    section of the collective bargaining agreement

13    describing the referral procedure.  Exhibit 28 is a

14    court order related to the referral procedure.

15    Exhibit 29 is advice given to, as it says, to Local

16    18 dispatchers and district representatives, again

17    regarding the court order and the referral

18    procedure, and Exhibit 30 are, again, as it says,

19    questions and answers almost like frequently asked

20    questions related to the referral procedure.

21         MR. LEVY:  In the preinternet context.  I

22    assume that that's --

1              BY MR. DAYAN:

2        Q.    So Ms. Kohl, let's just go through these

3    one by one.  Do you recognize the first of these

4    documents, Exhibit 27?

5        A.    I do.

6        Q.    And is that the portion of the collective

7    bargaining agreement that deals with the hiring hall

8    referral system at Local 18?

9        A.    Yes, it is.

10       Q.    And let's turn to the next one.  Exhibit

11   28 -- do you recognize that document?

12       A.    Yes.

13       Q.    And is that a court order regarding the

14   operation of the Local 18 hiring hall?

15       A.    Yeah, that's one of them.

16       Q.    And you're familiar with what's in this

17   order generally.  I'm not going to give you a quiz

18   on it, but you're familiar with the order and what's

19   in it.

20       A.    Basically, that they can't discriminate,

21   you know, and -- against members for whatever they

22   do I believe.

1    Q.    Okay.  Or retaliate against --

2    A.    Or retaliate, right, yeah.

3    Q.    Against members?

4    A.    And that's also in the '75 court order

5    from Shimmans' case also.

6    Q.    Okay.  And have you seen the next

7    document, 29, which is a --

8    A.    No.

9    Q.    But you have no reason to doubt its

10    authenticity as a memorandum from Mr. Fadel to Local

11    18 dispatchers and district representatives, do you?

12    MR. GRIFFIN:  She's laughing because his

13    name is pronounced Mr. "Fidell."

14    THE WITNESS:  He would cringe at that one,

15    Fadel.  You should use that though.

16    BY MR. DAYAN:

17    Q.    You have no -- that's all right.  You have

18    no reason to doubt that it is what it purports to

19    be, which is a memorandum from Mr. Fadel to all

20    Local 18 dispatchers and district representatives?

21    A.    I have no doubt.

22    Q.    By the way, what's your understanding of

1    what the role of the dispatcher is in the hiring

2    hall at --

3        A.    Dispatcher numbers take -- well, when the

4    dispatcher is there, they'd take phone calls and

5    dispatch members to jobs.

6        Q.    And the last of the four documents, are

7    you familiar with this one?

8        A.    Uh-uh.

9        Q.    Questions and answers?

10       A.    No.

11       Q.    Any reason to doubt that it's questions

12   and answers prepared for dispatchers to assist them

13   in administering the hiring hall?

14       A.    I see nowhere where it says it on that,

15   that that's what it is.

16           MR. DAYAN:  Okay.  That's that.  Let's go

17   off the record a second.

18               (Discussion off the record)

19           BY MR. DAYAN:

20       Q.    The court order that we talked about and

21   the collective bargaining agreement, are those the

22   documents that govern the hiring hall referral

1    process at Local 18?

2        A.    They're what they're supposed to do.

3    Whether they do that or not's a different story.

4        Q.    But they're the documents that set forth

5    the rules for the operation of the hiring hall.

6        A.    That's true.

7        Q.    And the court order has been in effect

8    since at least the 1980s; is that correct?

9        A.    '75 was about discrimination also in the

10   hiring hall, but not specifically with the referral

11   system.

12       Q.    Okay, we don't need to -- all I'm asking

13   you is at least the 1980s.

14       A.    At least.

15       Q.    So these rules have been in place for at

16   least 20 years.

17       A.    Right.

18       Q.    Thanks, okay.  In paragraph 24 of your

19   affidavit, that's Exhibit 3?

20       A.    Twenty-four?

21       Q.    Yeah, paragraph 24.  It actually runs from

22   pages 11 to 12.  It starts at the bottom of 11.

1    A.    Okay.

2    Q.    In the sentence that begins at the very

3    bottom of page 11 and continues on to the top of

4    page 12, you say that when the business manager of

5    Local 18 meets with other groups of unions, other

6    union leaders and politicians to talk about whom the

7    union is going to support, you want that leader to

8    know that the people with whom he is meeting know

9    about the bad things that are happening at his

10   local.  Is that correct?

11   A.    That's what I said.

12   Q.    Have you ever written a letter or other

13   correspondence to a politician to state your opinion

14   as to whether the leaders of your local are not

15   carrying out their duties properly?

16   A.    Not that I remember.

17   Q.    Are you aware of any politician visiting

18   your web site or chancing upon it?

19   A.    No.

20   Q.    If you wanted a particular politician to

21   learn about your view of the misconduct of a

22   particular officer, how would you go about educating

1    that politician on that?

2         A.    Probably the easiest way, may send a link

3    to my web page.

4         Q.    You would reach out and send a letter to

5    that politician or an e-mail to that politician; is

6    that correct?

7         A.    If it got to that point where it was

8    necessary, yes.

9         Q.    You wouldn't hope that he might just be

10   surfing the web one night and see Local 18

11   MembersVoice?

12        A.    That would be fine.

13        Q.    But you wouldn't -- you wouldn't -- if you

14   wanted to reach that politician and it was important

15   to you, you wouldn't use the hope that he might trip

16   upon it as your method of reaching him, would you?

17        A.    If I -- if I wanted politicians, I would

18   -- I would somewhat rely -- if they were interested

19   in unions per se, I would hope that if they Googled

20   it or did some search engine, that something about

21   my web page would come up and they would go to it.

22        Q.    But if you wanted to educate a politician

1    about a problem, you might hope that that would

2    happen, but you wouldn't rely on that as an

3    effective method of reaching that politician, would

4    you?

5        A.    That would be my first avenue of trying to

6    reach him.  If there was no response from that, then

7    I would probably use other avenues.

8        Q.    How would you know whether a politician

9    visited your web site and educated himself about the

10   officers of your local?

11       A.    I'm sorry.  I misunderstood your question.

12   I thought you were talking about --

13       Q.    About the letter or the e-mail.  Oh, I'm

14   sorry.  I withdraw the question.  Okay.  You also

15   reference in here that the --

16       A.    Same paragraph?

17             MR. LEVY:  Wait for the question.

18             BY MR. DAYAN:

19       Q.    It's the next paragraph, paragraph 25, you

20   reference that there are employers who sit on the

21   boards of your union funds who you might wish to

22   educate as to your view of the conduct of the union

1    leaders; is that correct?

2        A.    That's correct.

3        Q.    And again, how would you go about

4    educating those board members if you believed it was

5    important to alert them to a particular charge that

6    you were making about those officers?

7        A.    If it were a charge, I would be sure they

8    received a copy.

9        Q.    I'm using "charge" in a more generic

10   sense.  If it were an allegation or a description or

11   information about the construct of that officer, you

12   would -- would your answer be the same, that you'd

13   make sure they received a copy?

14       A.    Yes.

15       Q.    So you would send it to them.

16       A.    Most likely first via e-mail with a link

17   to my page included in it.

18       Q.    Is there anything in the campaign web site

19   resolution that would prohibit you from identifying

20   the relevant pages that you would be linking to and

21   sending those pages directly to the politician or

22   the trustee who you wanted to educate about an

1   officer?

2        A.    Is there anything on my site right now?

3   Is that what you're asking?

4        Q.    No, I'm asking if there's anything in the

5   rule that would prohibit you if you wanted to say

6   something about an officer or criticize an officer,

7   is there anything in the rule that prohibits you

8   from reaching a politician or a member of the board

9   of the funds by sending them an e-mail of the

10  information that you would be posting on your web

11  site about that.

12       A.    If I sent them a link to my web page and a

13  way to get into it, yes, if it were password

14  protected.

15       Q.    What if you just -- do you know how to cut

16  and paste text?

17       A.    Sure do.  I'm good at that.

18       Q.    Is there anything about the web site

19  resolution that would prevent you from just cutting

20  the relevant text, pasting it into the e-mail and

21  sending it to the board member or the politician?

22       A.    Yeah, a fear of being fined.

1      Q.    That's -- what exhibit was the resolution?

2            MR. LEVY:  Three?  No.

3            THE WITNESS:  It's a single page, wasn't

4      it?

5            MR. LEVY:  It was a single page.

6            THE WITNESS:  Seventeen.

7            BY MR. DAYAN:

8      Q.    Thank you.

9      A.    Yeah, 17.

10     Q.    Take a minute to review it and see if you

11     can identify a provision that would prohibit you

12     from taking some text that you believe contained

13     relevant information about a union officer and

14     copying that text and sending it to a politician or

15     an executive -- I mean or a trustee board member.

16     A.    The results of the resolution, if it were

17     determined that it was a campaign web site, would

18     make me fearful that I would be fined the way

19     Beasley and Hayes were.

20     Q.    By e-mailing some content that you had

21     written and put on your web site but also decided to

22     send the same content to a particular board member?

1      A.    After the Beasley and Hayes incident,

2   everybody's concerned about being fined by the union

3   unfairly.

4      Q.    Let me ask you this.  The Beasley and

5   Hayes incident -- did that occur before the campaign

6   web site resolution was adopted?

7      A.    Yes.

8      Q.    So did the campaign web site resolution

9   have anything to do with the reasons for what

10   happened with Beasley and Hayes?  It's impossible

11   that it could if it wasn't even in existence; isn't

12   that right?

13      A.    Then you answered your own question.

14      Q.    Is it a correct answer to that question?

15      A.    Yes.

16      Q.    Okay.  What provision in here, what words

17   in here would you be afraid you'd be running afoul

18   of if you simply sent some text of an allegation

19   about an officer to a member of the board of

20   trustees?

21      A.    The fact that it is a web site campaign

22   resolution, and I don't know what the outcome of

1    that would be.

2        Q.    Well, let me -- let me tell you this.

3    What if it became crystal clear -- I mean, I could

4    ask -- I mean, what phrase in here are you even

5    concerned about that would be interpreted to

6    prohibit that conduct?  Is there a particular

7    sentence or phrase?

8        A.    The resolution itself is what concerns me,

9    that you can be punished for it for something.

10   They've already -- the union's already punished

11   people for doing things, so making a resolution that

12   you have to have your web site campaign -- if they

13   deem it to be a campaign web site, password

14   protected, makes you fearful that anything you do is

15   going to be scrutinized and maybe you would be made

16   an example of.

17       Q.    Well, let me ask you this.  I mean, not

18   every member of the union has a web site.

19       A.    Right.

20       Q.    What if a fellow member of yours who

21   doesn't have a web site wrote up something about an

22   officer of your local and sent it by e-mail to a

1    member of the trust fund's board.  Would that person

2    be in any serious danger in your mind of being

3    disciplined because of the campaign web site

4    resolution?

5        A.    I don't think so.

6        Q.    So your interpretation of it I guess is

7    that if you have a campaign web site, every

8    communication you make, even if it's one that you're

9    sending outside of the web site, subjects you to

10    discipline under this rule?

11        A.    Yes.

12        Q.    All right.  If it were stated in bold

13    letters that this resolution does not apply to

14    communications that are made through means other

15    than web sites, would you still be afraid that if

16    you sent an e-mail to a member of the board of

17    trustees of a trust fund, that that e-mail could

18    subject you to discipline under the resolution?

19        A.    You'll have to repeat that please.

20        Q.    If it were made clear by the international

21    union in bold face --

22        A.    Is that a guaranty?

1      Q.    -- letters --

2      A.    As a resolution?

3      Q.    As a resolution or as an interpretation of

4    this resolution from the highest officials in the

5    union, from the full executive board, and it said a

6    member who e-mails materials to a member of the

7    public, a politician, a trust fund board member or

8    anyone else is not subject to discipline under the

9    campaign web site resolution for that e-mail, would

10   that assure you that you could send that e-mail

11   without this rule having anything to do with it?

12     A.    Only if the information that was taken, if

13   it was taken from the web site of what was deemed to

14   be a campaign web site, I would have concern.

15     Q.    That would still concern you.

16     A.    Yes.

17     Q.    Even if it were stated that specific,

18   okay.  Well, what would satisfy you coming from the

19   international executive board that would make you

20   not be afraid to send an e-mail to a member of the

21   board of trustees of material that happened also to

22   be material you chose to put on your web site?

1     A.    Tear this up and throw it away.

2     Q.    Okay.  So there's -- the words of it don't

3 really matter to you.  You're just saying the very

4 fact that the resolution exists is making you

5 fearful of doing stuff that's not covered by the

6 terms of the resolution.

7     A.    That's correct.

8     Q.    In the context of a campaign, why is it

9 important for a campaign web site to be available to

10 the general public?

11     A.    To educate them on issues that are also

12 happening within the union.

13     Q.    Could you look at paragraph 17 of your

14 affidavit, page 8?

15     A.    Uh-huh, yes, I've read it.

16     Q.    Are you under the impression that under

17 the campaign web site resolution, a member who's

18 traveling to another local would be unable to access

19 a campaign web site that's password protected?

20     A.    Unable or want to?

21     Q.    Are you under the impression that there's

22 anything in the campaign web site resolution that

1    would prevent a traveling member who's now in

2    another local for a temporary period of time from

3    getting on a password-protected web site under the

4    resolution?

5        A.    If he entered his register number and

6    name?

7        Q.    Yes.

8        A.    Is there anything to prevent him from

9    entering his register number and name?

10       Q.    Yes.

11       A.    Not if he chooses to do so.

12       Q.    So there's nothing about the web site

13   resolution that would interfere with your ability to

14   accomplish what you're talking about in paragraph 17

15   of reaching traveling members; isn't that correct?

16       A.    Still, they wouldn't want to go on the

17   site because of it being password protected.

18       Q.    But that's -- go ahead, go ahead.  But the

19   question is that the resolution wouldn't prevent

20   them -- wouldn't make it -- wouldn't make your web

21   site inaccessible to them.

22       A.    Don't know.

1     Q.    The resolution would not -- if that person

2     entered their register number and their password,

3     they would be able to see your full web site under

4     the campaign resolution; isn't that correct?

5     A.    I can only assume that.  It hasn't

6     occurred, so again, it's hypothetical how it will be

7     implemented.  It's not implemented.

8     Q.    Yeah, if it's hypothetical how it's being

9     implemented, why are you challenging it right now?

10    Why don't you wait and see if it's as bad as you

11    think it's going to be?

12    A.    Well, because number one, it was supposed

13    to be implemented in April, so --

14    Q.    But that doesn't answer my question.  I

15    mean, my question is you filed the lawsuit before

16    April 15th, didn't you?

17    A.    Before the date.

18    Q.    Right, and you filed the lawsuit not

19    knowing exactly how it would be implemented and not

20    knowing whether some of your concerns were going to

21    be illusions, because in fact, people would be able

22    to get on the web site from other locals; isn't that

1    correct?

2         A.    My concern was any time you password-

3    protect anything, it violates the members' rights to

4    get on the web site because they feel threatened,

5    and the members don't like that.

6         Q.    In your opinion.

7         A.    In my opinion and many, many more.

8         Q.    And we've asked you about how many members

9    you've talked to about whether they would be afraid

10   to go on the web site.

11        A.    Many.

12        Q.    How many?

13        A.    I don't know how many.

14        Q.    In the course of your career with the

15   local, have you made a number of criticisms of union

16   officials?

17        A.    Yes.

18        Q.    Has anyone filed charges against you?

19        A.    No, but they've threatened to.

20        Q.    Nobody -- nobody threatened to?

21        A.    No, but they did threaten to.

22        Q.    Who would that have been?

1    A.    Pat Sink, Joe Lucas, Steve DiLoreto, Dave

2    Kline, all in an executive board meeting.

3    Q.    Those individuals said to you what?  What

4    did they say?

5    A.    One of the individuals stood up and asked

6    if there was anything they could do about me having

7    a web site and printing the information that I

8    printed on it, and Pat Sink accused me of how much

9    -- asked me how much the ABC paid me for running my

10   web site.  Just total harassment.

11   Q.    Well, wasn't that his free speech?

12   A.    Right.

13   Q.    I mean, if Pat Sink did something that you

14   thought was a good deal for an employer but not such

15   a great deal for your members, wouldn't you have

16   every right to say to him hey, are you on the

17   payroll of the ABC, Pat?  What's the deal?

18   A.    He had the right to say it.

19   Q.    And if you said that to him, do you think

20   he'd be afraid that you were going to then file a

21   charge against him?

22   A.    He may.

1     Q.    But he didn't say to you I'm filing

2   charges against you if you don't pull that down.  He

3   didn't say that to you, did he?

4     A.    No, he did not.

5     Q.    And no one else said anything like that to

6   you.  Isn't that a fact?

7     A.    No, never directly that they were going to

8   file charges.  Just threats.

9     Q.    But the threat wasn't do this or you're

10   going to see a charge against you soon.  You're

11   interpreting criticisms of you as implied threats.

12     A.    No, the question was what can we do to her

13   for posting these things on her web site.  The

14   question was posed to the president.

15     Q.    And what did the president say?

16     A.    It was very vague.  They'd have to look

17   into it, was the answer.

18     Q.    Okay.  And in fact, no charge was brought

19   against you in 2005.

20     A.    No.

21     Q.    I think we've established at this point in

22   the deposition that you're not an expert on how web

1    sites work technically; is that correct?

2        A.    That is correct.

3        Q.    And is it also fair to say that you don't

4    understand how Google's search engine picks up web

5    sites in response to search terms.

6        A.    No, that's why we have an expert witness.

7    I don't know.

8        Q.    You don't know, okay.  And is it also the

9    fact that you don't know and are not an expert on

10   password security?

11       A.    Am not.

12       Q.    And I asked about Google, but I'll expand

13   it.  I assume the answer is the same.  You don't

14   know how any of the major search engines would

15   respond to key words or words entered in by a user.

16       A.    I know how they respond.  You type in

17   Patricia Kohl and my name -- all the things come up.

18       Q.    But you don't know --

19       A.    I don't know how it does it.

20       Q.    You don't know how Google does that, what

21   it looks for,

22       A.    No.

1       Q.    Or Yahoo's --

2       A.    I know it looks for key words.

3       Q.    And you don't know the algorithm of either

4    Google or Yahoo or any of the major search engines?

5       A.    No.

6       Q.    Okay.

7            MR. LEVY:  And if you know the algorithm,

8    a lot of people would pay good money.

9            BY MR. DAYAN:

10      Q.    And -- and just to close it out, just to

11   close it out so the record's clear, you not only

12   don't know how it picks up certain words and links

13   them to certain web sites; you don't know how it

14   prioritizes them so that something comes up higher

15   on the page than another item.

16      A.    No, I don't.

17      Q.    In your campaign for the presidency of

18   Local 18 and the executive board in 2005, was -- one

19   of your issues was you didn't believe it was

20   appropriate for an officer to campaign on a slate

21   with executive board members?  Do you recall taking

22   that position?

1      A.    Yes.

2      Q.    Do you still believe that's right?

3      A.    I think it's wrong.  The executive board

4  is the ruling body of the union, the watchdog, so to

5  speak, of everything that goes on within the union.

6  They have to approve everything, all right?  Our

7  executive board members, I've been to executive --

8  I've missed maybe three executive board members in

9  the past 12 -- meetings in the past 12 years.  Even

10  though I wasn't a member, I still went.  I never

11  heard over one dissent in the entire time except

12  when I became a member and I voted not to approve

13  the minutes.  They're the ruling body.

14      Q.    So -- and that's -- that's your rationale

15  for thinking it wasn't a good practice to have

16  officers run on the same slate with --

17      A.    Not the executive board.  The line

18  officers.

19      Q.    Right.

20      A.    Yes, but the executive board they're

21  buying because they paid for their campaigns.

22      Q.    Oh, I understand that, but I just want to

1    make sure I understand your position.

2        A.    That's my position.

3        Q.    That you think it would be a good reform

4    and a good -- a good thing if an officer didn't say

5    I'm on a slate with these three executive board

6    candidates as well.

7        A.    No, I think it would -- if they did not

8    pay for their campaigns.

9        Q.    If they did not pay for --

10       A.    The executive board campaigns.

11       Q.    Out of their own pocket.

12       A.    Out of their committee money.

13       Q.    Oh, even out of their committee money.

14       A.    Right.  That's --

15       Q.    So if they raise money as a slate even

16   together, you have a problem with that.

17       A.    Yes, because the executive board members

18   don't pay into that, yet they pay for their

19   campaigns with it.

20       Q.    Do you know whether Joe Ward in Local 150

21   is running with a slate of executive board member

22   candidates?

1        A.    I don't know.

2        Q.    Did you ask him his views on that?

3        A.    No.

4        Q.    In the course of your campaign, did any

5  rank and file union members criticize you or your

6  campaign?

7        A.    Where?  Under what circumstance?

8        Q.    Did you ever hear any member of the local

9  say I really disagree with what Pat Kohl is up to?

10       A.    Yes, uh-huh.

11       Q.    How many members -- did you hear more than

12  a few of those comments?

13       A.    No.

14       Q.    But you heard some.

15       A.    Just basically from the officers and the

16  paid staff.

17       Q.    But I asked about rank and file people.

18  Did any rank and file people say --

19       A.    Very few, very few.

20       Q.    Did you believe you had a chance of

21  winning that election?

22       A.    Yes.

1        Q.    Do you think that it was perceived within

2    the local that you were a credible candidate who had

3    a chance of winning?

4        A.    Yes.

5        Q.    Who else did you run against -- who did

6    you run against for president?

7        A.    Kenny Triplett and Mike Murphy.

8        Q.    And Mike Murphy.

9        A.    Yeah.  Michael Murphy.  It's a different

10   one.

11       Q.    That's okay.

12       A.    I know what you're thinking of the

13   lawsuit.  It's not the same one.  He's passed away.

14       Q.    That's okay.  And was Murphy a rank and

15   file guy?

16       A.    Yes.

17       Q.    Did people criticize him in his platform?

18       A.    Yes.

19       Q.    Did people think he had a chance of

20   winning?

21       A.    No.

22       Q.    But people thought you had a chance of

1    winning.

2         A.    Yes.

3         Q.    And some criticized you.

4         A.    Sure.

5         Q.    Why did you retire from the executive

6    board one year into your three-year term?

7         A.    Because I retired from the union.

8         Q.    From employment within the union's

9    jurisdiction?

10        A.    Right, I took my retirement.

11        Q.    Okay.  Did you look for work after that or

12   did you just figure you're retiring from work?

13        A.    No, my name was on the -- I registered for

14   work.

15        Q.    But then you decided to retire --

16        A.    When I became old enough.

17        Q.    Oh, I see, but after you became old

18   enough, you weren't looking for work either as an

19   operating engineer or in any other line of work.

20   That's what I'm asking.

21        A.    No, not after I retired.

22        Q.    Okay.  Going back to paragraph 17 of your

1    affidavit, in your campaign in 2005, did you -- I

2    believe I asked you this, but -- and I apologize if

3    I did.  Did you send any of your communications to

4    the general public, like to newspapers or to public

5    forums?

6        A.    No.

7        Q.    And would you agree that in terms of

8    campaigning for a union office, the people you were

9    trying to reach are the voters.

10       A.    Yes.

11       Q.    And that reaching the general public is

12   not what you need to do to win an office in the

13   union as part of your campaign; isn't that right?

14       A.    No, not to win an office.

15       Q.    Paragraph -- I believe it's 5 of your

16   affidavit, and in paragraph 5 on page 2, you say

17   that it is hard to campaign for office by visiting

18   job sites where our members work, and then you say

19   that there are a very large number of work sites

20   within the local with a relatively small number of

21   members working on every site?

22       A.    That's correct.

1    Q.    How often does a union officer or staff

2    employee visit a typical work site within the local?

3    A.    Generally they're expected to try to stop

4    by each job site every week or so.

5    Q.    That's -- and they're -- okay.  And how

6    frequently is it that an officer -- that a staff --

7    staff employees are full-time staff employees --

8    A.    Yes.

9    Q.    -- of your union?

10    A.    Yes, that's correct.

11    Q.    So if you're staff employee, you're not

12    also trying to pick up jobs in the trade, by and

13    large.

14    A.    For yourself?

15    Q.    For yourself.

16    A.    No.

17    Q.    So when you're -- when you're out on a

18    construction site with one of these ones that you

19    described with a relatively small number of members,

20    those people working there are all rank and file

21    members.  They're not staff employees; is that

22    correct?

1      A.    That's correct.

2      Q.    So there is time for them to speak with

3   each other about the union; is that correct?

4      A.    I'm sure there is.

5      Q.    And you can do a lot of talking with your

6   fellow members without fearing that there's a staff

7   representative breathing down your neck at a job

8   site; isn't that correct?  You're indicating yes?

9      A.    I'm sorry.  Yes.

10     Q.    In your 2005 election protest that you

11  filed with the local and then appealed to the

12  international, you made a number of claims; is that

13  correct?

14     A.    That's correct.

15     Q.    Among those things, there wasn't one that

16  the incumbents were using the union newspaper to

17  promote their candidacy, was there?

18     A.    I don't remember if that was in there or

19  not.

20     Q.    If it's not in there, it's not in there.

21     A.    Right, but I don't see that right now so I

22  can't say whether it was in there or not.

1      Q.    If you believed they were doing that,

2  would you have included that with your charges?

3      A.    If they were illegally campaigning?

4      Q.    If they were using the newspaper to put

5  out their own campaign literature basically, their

6  own campaign --

7      A.    Oh, yes.

8      Q.    Would have you made that a basis?

9      A.    If they put campaign literature in there,

10  yes.

11      Q.    You would have made that a charge.

12      A.    Yes, I would have.

13      Q.    Because it's your understanding the union

14  newspaper's allowed to deal with issues, but not to

15  promote candidacies; is that right?  Is that your

16  understanding of the proper role of a union

17  newspaper?

18      A.    Yes, proper.

19      Q.    You say in your affidavit, I believe it's

20  in paragraph 7 -- oh, the last sentence of paragraph

21  7, "I have no doubt that the real reason for the new

22  rule," meaning the campaign web site resolution, "is

1    that the international officials are afraid of

2    members' web sites and want to make them less

3    effective"?

4        A.    Yes, that's what it says.

5        Q.    No one from the international union has

6    told you that that was the international's reason

7    for the rule; is that correct?  No one's told you

8    that that was the real reason.

9        A.    No union official told me that, no, they

10   didn't.

11       Q.    And do you have any evidence that that was

12   what any of the executive board members who voted

13   for the resolution were trying to accomplish?

14       A.    Do I have any proof?

15       Q.    Yes.

16       A.    No proof, but that's what I believe.

17       Q.    Is there any rule that the union in your

18   view could adopt that would address the problem of

19   sensitive information like negotiation strategy,

20   organizing strategy, from falling into the hands of

21   employers other than the campaign web site

22   resolution?

1      A.     Could you repeat that?

2      Q.     Yeah.  Is there any -- read it back, if

3  you could read it back?

4           THE REPORTER:  Question:  "Is there any

5  rule that the union in your view could adopt that

6  would address the problem of sensitive information

7  like negotiation strategy, organizing strategy, from

8  falling into the hands of employers other than the

9  campaign web site resolution?"

10      A.     Other than.

11      Q.     Yes.

12      A.     I'm sure there would be other ways.

13      Q.     Have you thought of -- have you thought

14  well geez, if that's what they're concerned about,

15  here's a better way to do it?

16      A.     No.

17      Q.     In paragraph 11 of your affidavit, you

18  allege that you have seen that the international

19  union's web site has a private portion link from the

20  page of the international's web site at a URL, and

21  that that section of the web site is supposedly not

22  open to rank and file members but only to union

1    officers and staff, and that when you clicked it,

2    you got into the private section; is that correct?

3        A.    That's correct.

4        Q.    How did -- did you just go in one day on

5    your own or did anyone suggest that you do that?

6        A.    A nonmember told me.

7        Q.    To try that?

8        A.    Uh-huh.

9        Q.    Which nonmember -- of the union.  I'm

10    sorry.  Which nonmember?

11        A.    I can't say.  It's confidential.

12        Q.    Well --

13        A.    That's how I got it.

14        Q.    How -- why would this person -- he's not a

15    member of the union.  Why would he be in any danger?

16            MR. LEVY:  Can I -- I think I know what

17    she's about to say.  You sort of backed into a

18    privilege issue.

19            MR. DAYAN:  Oh, oh, okay, okay.  Fair

20    enough.  I won't pursue it then.

21            MR. LEVY:  You can ask her when it

22    happened though.  It might contradict something else

1    that's in the record.

2              BY MR. DAYAN:

3        Q.    When did that happen?

4        A.    A couple months ago.

5              MR. DAYAN:  Can I just -- off the record

6    for one second.

7                   (Discussion off the record)

8              BY MR. DAYAN:

9        Q.    When staff employees of the union make

10   visits to job sites, is one of the things that they

11   do ensuring that the employer's hiring union

12   employees, union members?  In other words, is there

13   any effort to ensure that the contractors are

14   following the agreement and hiring people who are

15   union members?

16       A.     That usually comes within the other

17   members there.  If they -- if someone's there

18   getting on a piece of equipment that's not a union

19   member, not, you know, operating engineer, they will

20   call the agent to come to the job.

21       Q.    How many -- there's 18,000 members of your

22   union; is that correct?

1          A.     Fifteen.

2          Q.     I'm sorry.  15,000 members?

3          A.     That includes retirees.

4          Q.     Including retirees, but there's several

5     thousand at least active employees.

6          A.     Yes.

7          Q.     How does -- if there's a situation where

8     an employee believes someone's not a union member,

9     what do they do to find out if that person's a union

10    member?  If they say --

11         A.     If someone new comes to the job?

12         Q.     Yeah, if someone new -- if one of the

13    union members is there on a job and sees someone who

14    he doesn't recognize as a union member --

15         A.     As an operating engineer.

16         Q.     As an operating engineer.  Well, there

17    that's that issue too.  There could be a laborer

18    who's not --

19         A.     Right.

20         Q.     -- in the jurisdiction.  Why is it always

21    a laborer?

22         A.     Because it is.

1    Q.    But they see someone who they don't

2    recognize as an IUOE member, either because they

3    don't believe he's not a union member at all or they

4    believe he's with a different outfit and a different

5    union.  What do they -- what does that person do to

6    verify that his judgment, his initial judgment is

7    correct, that this person's not an IUOE member?

8    A.    They would ask to see their union cards.

9    Q.    So people bring their cards to the job

10   site?

11   A.    Not necessarily.  I've been asked to see

12   my card one time in the years that I've been in the

13   union.

14   Q.    You're pretty well known though in the

15   union, aren't you?  You might be one of the best

16   known members.

17   A.    Probably.  I don't know if that's good,

18   but --

19   Q.    And you might also be one of the most

20   recognizable; is that correct?  Okay.

21   A.    Possibly.  Let me say, when a person, an

22   operator's dispatched to a job his first day, he has

1    to be dispatched from the hall.  The steward or the

2    master mechanic on that job knows he's coming

3    because nine times out of ten, the master mechanic

4    sent the order in for an operator, so basically they

5    know that he's a union operating engineer.  They

6    also know he's current in his dues.  Otherwise he

7    would be suspended and his name would be pulled from

8    the list.

9        Q.    And does the dispatcher check the union

10   cards from time to time?

11       A.    The union cards or the union dues?  They

12   don't check their cards, no.

13       Q.    But they do check to see if they're

14   current on their dues.

15       A.    They get a report monthly on who's going

16   in arrears on their dues.

17       Q.    Are you aware that Joe Ward or a member of

18   his slate has called the password protection

19   resolution Nazi like?

20       A.    I did read that.

21       Q.    Do you agree with that?

22       A.    It's a strong term.

1     Q.    So you don't agree with it.

2     A.    No.

3     Q.    Are you aware of any candidate for union

4  office who has a MySpace page?

5     A.    Right now, no.

6     Q.    Facebook page?

7     A.    No, but those are all things that I think

8  we'll be looking at.

9     Q.    Are you aware of any candidate for a

10  public office who has a MySpace page but not a web

11  site?

12     A.    I don't -- I mean, I know that all the

13  political candidates right now have web sites, and a

14  lot of them have MySpace and --

15     Q.    And the web site.

16     A.    Yeah, so I don't know if there's any that

17  just have a web site.

18     Q.    Who is Dave Jenkinson?

19     A.    Oh, how do you describe him?  He is a well

20  meaning but not well taken or well presented

21  dissident of the union.

22     Q.    Did he run for any office in 2005?

1      A.    He was retired.

2          MR. DAYAN:  We're getting close to the end

3  but I want to do my due diligence here.  Thank you

4  for your indulgence.

5          MR. LEVY:  I will have a couple of

6  questions.

7          BY MR. DAYAN:

8      Q.    You testified earlier that you weren't

9  sure whether under the pass -- under the campaign

10  web site resolution, you could take the same text

11  that would be something you'd post on your web page

12  and e-mail it or mail it to a politician or an

13  employer trustee.

14      A.    Without reprisal from the union.

15      Q.    You recall that testimony, that you

16  testified to that?

17      A.    That's --

18      Q.    Okay.

19      A.    I couldn't do that without being worried

20  that I would be fined.

21      Q.    Turn to page 9 paragraph 20 of your

22  affidavit.  The first sentence there says, "In fact,

1    because the rule only applies to campaign web sites,

2    any member of the operating engineers who had access

3    to my web site through the use of his or her

4    membership name and register could visit my site,

5    download everything that is posted there and repost

6    it on his own web site without using any password

7    protection, thus making it available for the entire

8    world to see, including employers."  What made you

9    think that the resolution wouldn't apply to that

10   person?

11       A.    Because a nonmember could do it, and the

12   union has no jurisdiction over nonmembers.

13       Q.    Well, except that the first -- the

14   sentence says any member of the operating engineers

15   could do this.

16       A.    Okay.

17       Q.    Why -- what makes you think that the rule

18   -- that that person wouldn't, you know, be worried

19   about the rule applying to them?

20       A.    Because they could apply it to a web site

21   without the union knowing who the web site belonged

22   to, without I guess a court order to --

1        Q.    I thought the reason you were saying that

2    is because it wouldn't be -- it might not be a

3    campaign web site, but maybe -- did you -- did you

4    -- you talked before about drafting this affidavit.

5    Was that sentence one that was -- originated from

6    you in your draft?  Was there a sentence analogous

7    to that in your initial draft of the affidavit?

8        A.    I can't say.  I wrote -- we expanded upon

9    it.

10           MR. LEVY:  You're getting into some very

11    sensitive areas.

12              THE WITNESS:  Yes.

13              MR. DAYAN:  Okay, I'll leave it alone.

14              MR. WEINBERG:  No, I don't think it's

15    sensitive at all.  She signed a declaration.  He's

16    asking her what --

17              BY MR. DAYAN:

18        Q.    Yeah, I think your answer was -- I mean,

19    you gave an answer on the record which was --

20              MR. LEVY:  Fine.

21              MR. DAYAN:  What was it?  Could you read

22    back the answer?

1          THE REPORTER:  Answer:  "I can't say.  I

2     wrote -- we expanded upon it."

3          BY MR. DAYAN:

4     Q.    In the 2002 campaign, you didn't have a

5     web site; is that correct?

6     A.    That's correct.

7     Q.    In the 2005 one, you decided it would be a

8     good idea to have one?

9     A.    The technology had advanced and my

10    technology had advanced to the computer.

11    Q.    Okay.  How did you let people know that it

12    was up there as a web site?  How did you make it

13    known that you had a campaign web site?

14    A.     Put it on my flyers that I handed out,

15    e-mailed it to people.  Any way I could think of.

16    Q.     Did you reference your web site URL in one

17    or both of the mailings that you did in 2005?

18    A.     Yeah, I think it was in there.  I'm sure

19    it was on there.

20    Q.     If you recall your earlier testimony about

21    some web sites that got prizes from the AUD, do you

22    recall that testimony?

1      A.    I recall you pointing them out and --

2      Q.    Let me just ask this question a little

3  different from the ones I asked then.  Do you

4  believe that having members-only access to

5  substantial parts of those web sites crippled them

6  from being effective?

7      A.    Yes, I think so.

8      Q.    So the people who did that were making a

9  misjudgment in your view.

10      A.    Possibly.  I don't know how many people

11  visited the members-only.

12      Q.    Uh-huh.

13      A.    Which I don't think there -- you know, I

14  think there was some numbers along the edge that

15  said how many hits or something, opposed to how many

16  hits the entire site has.  For example, on my web

17  sites, we have only 12,000 in some hits, I call

18  hits.  Again, my terminology and my technical

19  knowledge is not there, but that's the number that's

20  on the counter, whereas how many people visited

21  those forums were very, very few.

22      Q.    Do you have access to that number?

1        A.    To what number?

2        Q.    To how many visited those forums?

3        A.    Just what you showed me here.

4        Q.    Those were -- just so that we're clear,

5    those were -- we could only tell from the face of

6    this who appeared to have posted on your forums; is

7    that correct?

8        A.    Yeah, who --

9        Q.    You're talking about your own web site

10    right now in this line of questions?

11        A.    The one that you said that you had to have

12    a pass -- or had to register to get into.

13        Q.    Right, and that had a few items that

14    appeared to be posted by some people with some

15    acronyms.

16        A.    Right.

17        Q.    Or shorthand names.  That's -- we're both

18    talking about the same thing.

19        A.    Yes.

20        Q.    Okay.  You don't know how many people read

21    that page and viewed what they had to say?

22        A.    Not the forum part of it, because only

1    that viewed the web page.

2        Q.    I guess my question is pretty simple,

3    which is you say you had about 12,000 hits on your

4    web page.

5        A.    I think that's what's on there right now.

6        Q.    Does the technology or the feature of your

7    web hosting software that allows you to know that

8    there's 12,000 hits on your web page allow you also

9    to know how many hits there were deeper within your

10   web page on secondary pages and so forth?

11       A.    No.

12       Q.    Or if it does, you don't know how to use

13   that part of it.

14       A.    Correct.

15       Q.    Okay, so you don't know how many people

16   viewed what we just viewed.  That's all I'm saying.

17   You just don't know.

18       A.    I don't know that.

19       Q.    Okay.

20            MR. DAYAN:  Can I just take three minutes

21   with these folks to make sure I haven't --

22            MR. LEVY:  We'll step out.

1          (Recessed at 6:32 p.m.)

2          (Reconvened at 6:35 p.m.)

3          MR. DAYAN:  I'm done, and I appreciate

4    your patience.

5          EXAMINATION BY COUNSEL FOR PLAINTIFFS

6          BY MR. LEVY:

7    Q.    I have a couple of questions.  Directing

8    your attention to Exhibit 24 --

9    A.    Okay.

10   Q.    Looking down the column on the right-hand

11   -- lower right-hand side of the page, do you see the

12   numbers under the words "threads" and "posts"?

13   A.    Yes, I do.

14   Q.    Do you have any knowledge about the

15   relationship between -- what do the numbers, so far

16   as you know, the numbers under the column posts

17   represent?

18   A.    With my limited knowledge, I think that's

19   one of the easier questions for me.  Someone went on

20   and posted something there, and that's the number of

21   people that posted something.

22   Q.    And do you have any idea what the

1    relationship between those relatively paltry numbers

2    is and the total number of people who voted --

3    visited the APAPDP dot web site overall?

4        A.    I don't see a counter on there, so I have

5    no idea.

6        Q.    And you have no idea whether the

7    registration and password requirement had an impact

8    on the number of people who posted.

9        A.    If that's the amount of people that

10   visited their web site, if that's it, it isn't worth

11   too much anyhow because nobody visited it.

12       Q.    Have you ever revealed your name and

13   register number to a nonmember, to your knowledge?

14       A.    Yes.

15       Q.    On what occasion or occasions?

16       A.    We're required at a union meeting, at the

17   state union meeting, semiannual state meeting,

18   before we're allowed to speak, whether it's before

19   an election or any time, if you're just a rank and

20   file member or whether you're an executive board

21   member, you have to stand and say your name and your

22   register number.

1          These meetings are open to the public.

2     They're a semiannual state meeting, but at those

3     meetings, members are honored for 50-year, 30-year

4     of service.  There may be a hundred to 150 people

5     that are honored.  They're allowed to bring their

6     families.  There's no registration when you -- the

7     only people that have to sign in when you come in

8     are the members because they track how many members

9     from each district attended the state meeting.

10          So there may be 20 family members for one

11    person to receive their 50-year pin and there's no

12    checks of who that person is.  There could be ten

13    ABC officials that walk in the door, there could be

14    -- anybody.  It's the general public and there's no,

15    you know -- there's absolutely no checking of those

16    people, who they are, no identification whatsoever.

17          MR. LEVY:  I have no further questions.

18     FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS

19          BY MR. DAYAN:

20     Q.    I'll just ask one or two.  Do you know of

21    any ABC members who were at one of those meetings?

22     A.    I don't think they'd let us know, so I

1    don't know that.

2         Q.    You don't know one way or the other

3    whether at any of the meetings you've been to of the

4    kind you just described there were ABC members.

5         A.    I don't know that there wasn't.

6         Q.    And you don't know that there was.

7         A.    Correct.

8              MR. DAYAN:  I've got nothing further.

9              THE WITNESS:  Could I make one statement?

10   It's very general.

11             MR. DAYAN:  No.  It's not within the

12   rules.  Off the record you can say something.

13             THE WITNESS:  That's fine.

14             MR. LEVY:  Wait for the question and

15   answer the question.

16             THE WITNESS:  No, it's nothing really to

17   do with --

18             MR. DAYAN:  Okay.  We are closing the

19   deposition now.  I'm done, Mr. Levy's done.  Thank

20   you very much, again, for being with us all day.

21             THE WITNESS:  Thank you.

22

1              (Whereupon, at 6:39 p.m., the taking of

2      the instant deposition ceased.)

3

4                         _____

5                         Signature of the Witness

6

7      SUBSCRIBED AND SWORN TO before me this _____

8      day of_____, 200__.

9                         _____

10                              NOTARY PUBLIC

11

12     My Commission Expires _____.

13

14

15

16

17

18

19

20

21

22

1    UNITED STATES OF AMERICA  )

2                              ss:

3    DISTRICT OF COLUMBIA      )

4            I, KAREN C. YOUNG, a Notary Public within

5    and for the District of Columbia, do hereby certify

6    that the witness whose deposition is hereinbefore

7    set forth was duly sworn and that the within

8    transcript is a true record of the testimony given

9    by such witness.

10           I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this _____day of_____, 200__.

16

17

18                    _____

19

20

21   My Commission Expires:

22   July 31, 2009

# Rules for Nomination and Election—2005 General Election

## CONDUCT AND SUPERVISION

1. The twelve (12) members of the Election Committee, elected at the April, 2005 District Membership meetings, plus the Chairman appointed by the Business Manager, held their first meeting April 16, 2005 to formulate rules and to supervise the nomination and election of Officers, Executive Board members and District Advisory Board members, in accordance with the International Constitution and in accordance with Article XIII of the Local 18 By-Laws.

All meetings of the Election Committee are executive meetings. A quorum of the Election Committee consists of seven (7) members.

2. Proper notification had been given to all members that the Election Committee would be elected – two (2) members from each District – and that nominations for office of Local 18 would be made at the regular district meetings on June 13, 2005. These notices were published in the "Buckeye Engineer".

3. In accordance with provisions of Article XIII, Section 10 of the Local Union By-Laws, the Election Committee has engaged the services of Graff, Ballauer, Blanski & Friedman, P.C., C.P.A.s to assist in the conduct of the election. The C.P.A.s, under the direction of the Election Committee, shall carry out the election procedures and operations. They shall assist the Election Committee in determining from the Local Union's records, the eligibility of nominees for office and the eligibility of members to receive ballots. Questions as to election procedures should be addressed to Graff, Ballauer, Blanski & Friedman, P.C., Two Northfield Plaza, Suite 200, Northfield, IL 60093. Their telephone number is 1-847-881-2540. The direct E-Mail address is mblanski@gbbfcpa.com.

Tallying of computer ballot cards shall be carried out by Pacific Election Systems at the Local 18, I.U.O.E. headquarters office in Cleveland, Ohio.

## OFFICES TO BE FILLED

4. In accordance with the By-Laws of Local 18, I.U.O.E., the Officers to be elected shall be: Business Manager, President, Vice President, Recording-Corresponding Secretary, Financial Secretary, Treasurer, three (3) Trustees, and from each District, three (3) representatives to the Executive Board. In addition to these Constitutional Officers, there shall be elected three (3) Auditors, a Conductor and a Guard. The term of office of the foregoing officers shall be three (3) years.

The Business Manager, President, Vice President, Recording-Corresponding Secretary, Financial Secretary and Treasurer are, by virtue of their offices, delegates at large from the Local Union to the International Convention.

5. There shall be twenty-two (22) Advisory Board members to be elected in each of the six (6) Districts of Local 18 who shall represent the following interests insofar as said interests are represented within the District: Local 18, Local 18A, Local 18B, Local 18C, Local 18G, Local 18S, Local 18RA, Building Construction, River and Lake Construction, Heavy Construction, Paving Construction, Excavating Construction, Sewer Construction, Supply Yard Dealers, Equipment Dealers, State Employees, County Employees, City Employees, Sand and Gravel Employees, Slag Pit Employees, Scrap Yard Employees and Plant Stationary Maintenance Engineers. These twenty-two (22) members, together with the District Representative and District Business Agents, will comprise the Advisory Board of the District. The term of office of Advisory Board members shall be three (3) years.

## ELIGIBILITY FOR NOMINATION AND ELECTION

6. To be eligible for election as an Officer, Executive Board member or Advisory Board member, a member of Local Union 18 and its branches must have been a member of the Local Union for a period of not less than two (2) years immediately prior to the election. In addition, to be eligible for election, a member must have been in continuous good standing for a period of one (1) year preceding the month of nomination. However, to be eligible for election to the office of Business Manager, a member must have been a member in continuous good standing for a period of two (2) years preceding the month of nomination. In order to be a member in continuous good standing, dues must have been paid within the thirty (30) day grace period, pursuant to Article XXIV, Subdivision 7, Section (c) of the International Constitution.

The eligibility of the members of Local 18 and its branches who are candidates for Officers, Executive Board members and District Advisory Board members to be nominated, elected and hold office, shall be established under, and consistent with, the eligibility rules contained in the Constitution of the International Union of Operating Engineers, as amended at the 36th International Convention in April 2003, and subsequent rule changes by the General Executive Board, and the By-Laws of I.U.O.E. Local 18.

7. Nominations will take place at the regular district meetings on the night of June 13, 2005. The names of all candidates must have been placed in nomination by a member in good standing. Nominations must be accompanied by a written submission of each nominator's and nominee's name and register or social security number to avoid uncertainty or ambiguity. Election Committee members present from that District can visually inspect said written submissions. The Election Committee members of each district shall supervise and assist in conducting the nomination of candidates for Officers, Executive Board members and Advisory Board members in their district. The Chairman of the District meeting shall be responsible for aiding the nominator in providing the necessary register and social security numbers of the nominee, if necessary.

At all District Membership meetings of Local 18 on the night of June 13, 2005 the Election Committee members present may appoint one (1) or more good standing members in attendance, but not to exceed three (3) including Election Committee members, to assist the two (2) Election Committee members in supervising and assisting in the nominations within that district of candidates for Officers, Executive Board members and Advisory Board members.

If, for any reason, neither of the members of the Election Committee for that district is present at the June 13, 2005 District Membership meeting, the Chairman of the District meeting shall appoint good standing members from the members present, up to a total of three (3), to assist in the nominations.

8. No member who is an owner-operator, an employer contractor, or other bona-fide employer of members of Local Union 18 or its branches shall be considered eligible to run for office, to nominate candidates, or to vote for nominees, in this 2005 General Election. An owner-operator is a member who owns either directly or indirectly (marriage and/or family) an economic interest in a business which engages in the work scope, as defined in any of Local 18's collective bargaining agreements, utilizing any construction equipment described therein.

9. Members presently retired from the craft or on pension, and registered apprentice engineers, will not be eligible for nomination and election. However, they shall be entitled to vote if they meet the membership eligibility requirements to receive a ballot, and they

shall be entitled to nominate candidates at the June District Membership meetings.

10. The district in which an Executive Board Member is nominated to serve must be his/her home district (district where their membership records are held) and, unless exempt under Article XXIV, Subdivision 1, Subsection (b) of the Constitution of the International Union of Operating Engineers, they must have been continuously registered or referred to work from that district for one (1) year immediately prior to the month of nomination.

11. No member shall be eligible for election who has not, during the year – and in the case of one seeking the office of Business Manager, two (2) years – immediately prior to the month of nominations, been continuously employed at the trade, or who has not actively sought continuous employment at the trade. (This restriction, however, shall not apply to any member employed by or working for a Local Union or for the International Union, or who has been assigned by his Local Union or the International Union to perform work in furtherance of the interests of organized labor, in either case in a sufficiently time-consuming capacity so as to preclude meeting the requirement of continuous employment at the trade or active seeking of continuous employment at the trade.)

12. Retired members who, at least one (1) year, and in the case of one seeking the office of Business Manager, at least two (2) years, immediately prior to the month of nominations, have ceased to accept retirement benefits and returned, or actively and continuously sought to return, to full time work at the trade are eligible for election.

13. Within five (5) days after the nominations, the Recording-Corresponding Secretary shall mail to each member nominated, at his or her last known home address, notice of their nomination to be a candidate for office. The notification for nomination is mailed by certified mail to the nominee's most recent mailing address in the Union's records. It is the nominee's responsibility to obtain his or her mail from such address, from the United States Postal Service or from the Recording-Corresponding Secretary. No member of Local 18 or its branches shall be eligible to be a nominee, nor be elected as an Officer, Executive Board member, or Advisory Board member, unless he or she shall have filed a written acceptance of nomination to office, or to position on the Advisory Board, with the Recording-Corresponding Secretary of Local Union 18 within ten (10) days after having received the aforementioned written notice of nomination from the Recording-Corresponding Secretary.

The Recording-Corresponding Secretary shall read, or cause to be read, the name of each nominee and the office to which such nominee seeks election at each regularly scheduled Local Union General Membership and District Membership meeting held after receipt of the nominee's written acceptance of nomination.

14. The names of all nominees who have timely filed their acceptances of nominations for office shall be published in the "Buckeye Engineer", and shall be posted in each District office. A subsequent list of all nominees declared eligible by the Election Committee, together with the office to which nominated, will be sent to each District office and then posted on the bulletin board, and published in the "Buckeye Engineer".

15. A nominee whose name has been placed in nomination and who has accepted the nomination in writing can withdraw his or her name as a nominee, providing he or she does so by certified or registered mail, requesting withdrawal. This letter must be sent to the Chairman of the Election Committee, 3515 Prospect Avenue, Cleveland, Ohio 44115, and must be received on or before the close of business, July 6, 2005.

16. To be eligible for election, all bona fide nominees for Officer or Executive Board Member of Local 18, shall have been in regular attendance at all regularly scheduled Local Union 18 General Membership meetings, and their home District Membership meetings held after nomination and before election, subject however, to reasonable excuses based upon good cause such as working at the trade or on behalf of the Union, physical incapacity or death in the immediate family. Such excuse must be communicated by the nominee in writing to the Chairman of the Election Committee at 3515 Prospect Avenue, Cleveland, OH 44115, before the close of business on July 15, 2005, to be considered in determining eligibility. It is understood that informational meetings held in the District shall not be considered a regularly scheduled Local Union membership meeting or home District Membership meeting.

Each nominee for office shall be certified in attendance at the required meetings by the members of the Election Committee present at the meetings.

## RIGHTS AND RESPONSIBILITIES OF CANDIDATES

17. Nominees will have the right to inspect, during normal business hours, Monday through Friday, the membership records containing the names and last known addresses of all members, during the thirty (30) day period prior to July 31, 2005, to exceed two (2) eight hour days, at the Local Union Headquarters, 3515 Prospect Avenue, Cleveland, OH, in order not to disrupt the normal operations of the business office of the Local Union, nominees will be assisted in their inspection by an employee of the Local Union who is familiar with the records of the organization. The request to inspect must be made by a bona fide nominee, in writing to the Chairman of the Election Committee at 3515 Prospect Avenue, Cleveland, OH 44115. Nominees making such timely requests will be notified at least seventy-two (72) hours in advance of the date and time when they may inspect the membership records.

18. Campaign literature will be mailed under these rules applying to all candidates:

A. A candidate may request this service for one (1) or more Districts in writing by certified or registered mail to the Chairman of the Election Committee at 3515 Prospect Avenue, Cleveland, OH 44115.

B. All campaign literature must bear the name of the candidate or slate, and a return address.

C. Advance notice of at least three (3) business days will be required for all mailings.

D. The cost of distribution will be paid for in advance by the party requesting the service. The labor costs for preparing address labels and placing them on material furnished will be determined at the time of application for this service. The postage will be charged in addition and according to the class of service desired. The Union shall be responsible for the mailing out of all submitted campaign literature, and shall affix the postage thereon.

19. All members have the right to express their views on the qualifications of candidates running for office. However, in accordance with Article IX, Section 5(b) of the current By-Laws of Local 18 and its branches, the posting of campaign literature on Union property – outside of Union buildings, or inside of Union buildings – is strictly forbidden. Any person or persons violating this rule may be subject to prosecution for damaging or defacing Union property. This rule shall be strictly enforced on all Union properties and buildings, including rental properties, within the jurisdiction of Local 18.

20. The General Membership meeting and each District meeting shall set aside, subsequent to nominations, as part of its agenda, a specific portion of that meeting for all candidates for

*Continued on Page 26*

# Rules for Nomination and Election *Continued from Page 24*

Constitutional office set forth in Article XXIV, Subdivision 1(a) of the International Constitution, and for all Executive Board candidates, to speak to the membership and set forth their position on the relevant issues of the election. Each candidate shall be allowed five (5) minutes, to be monitored by the Election Committee members present.

21. No candidate (including a prospective candidate) for Local Union office and no supporter of a candidate for Local Union office, may solicit or accept any direct or indirect financial support from any non-member of the International Union of Operating Engineers or from any foundation, corporation or other entity whose funds are derived in whole or in part from any person not a member of this International Union.

## MAILING AND COUNTING OF BALLOTS

22. In accordance with Article XIII, second paragraph of Section 10, and Section 14, of the current By-Laws of Local 18 and its branches, the Election Committee orders that the ballot shall be prepared in the following manner:

It shall be a slate-type ballot. An incumbent slate shall be placed on the ballot in accordance with Article XIII, Section 14, of the By-Laws. The candidates of each non incumbent slate shall be listed on the ballot in the same position for each office, in the order in which written notice of duly nominated candidates of each non incumbent slate is received by the Election Committee. All non-slate candidates will follow in alphabetical order.

A written notice of a slate of candidates shall not be valid unless received by the Election Committee at 3515 Prospect Avenue, Cleveland, OH 44115 within seventy-two (72) hours of nominations. A slate shall consist of the following officers: Business Manager-President, Vice President, Recording-Corresponding Secretary, Financial Secretary, Treasurer, three (3) Trustees, three (3) Auditors, Conductor and Guard.

Candidates' names will appear on the ballot as they appear on the official Union records at the time of nominations. All eligible candidates will be listed on the ballot.

23. Ballots shall be mailed from LaGrange, Illinois by 3:00 p.m. on August 8, 2005, to all eligible members whose dues are paid through June 30, 2005 according to the following schedule: Receipt of dues shall include dues which are sent by mail and postmarked no later than June 30, 2005 and received in the Union headquarters office no later than July 1, 2005, or dues which are paid by hand and received in the Union headquarters or district offices no later than June 30, 2005. Opening and counting of the ballots shall take place on Saturday, August 27, 2005 at the Union headquarters, 3515 Prospect Avenue, Cleveland, OH 44115.

24. Eligible candidates or their observers shall have the right to be present and observe the preparation and mailing of the ballots, and also the opening and counting of the ballots. Observers must be members in good standing of Local 18 and certified in writing by the candidate to the Local Union's President at least seven (7) days before the mailing or tally of the ballots.

As in prior elections, ballots which the post office is unable to deliver are returned to the Certified Public Accountants, for possible remailing if a better mailing address becomes available. In addition, members who lose or spoil ballots will have the right to contact the Certified Public Accountants for a replacement.

Eligible nominees or their observers shall have the right to be present at such remailings, which will occur on August 12th, August 18th and August 22nd, 2005 at approximately 4:00 P.M. at the office of the Certified Public Accountants.

25. Any challenge of a member's right to cast a ballot in this 2005 Local 18 election shall be made prior to the opening of the return envelope which contains the sealed unidentified ballot envelope. No challenge or inspection of the master control list of eligible voters shall be permitted subsequent to the opening of the return envelopes.

26. WRITE-IN VOTES SHALL NOT BE COUNTED AND WILL DISQUALIFY THE ENTIRE BALLOT.

## CONCLUSION AND ADOPTION OF RULES

27. The foregoing rules are the result of a careful study, by the Election Committee, of the Constitution of the International Union of Operating Engineers as amended at the 36th International Convention in April, 2003 and any subsequent rule changes by the General Executive Board, of the current By-Laws of Local 18 and its branches, and applicable law. If any of the preceding rules are now or later found to be in violation of the Constitution, current By-Laws or any applicable laws, the rule or rules will be considered null and void and will have no effect on the remaining rules, which shall remain in full force and effect.

The foregoing rules are agreed upon, approved and adopted by the Election Committee. Members of the Election Committee are:

Warren T. Wright, Chairman

| | |
|---|---|
| Michael T. Bell | Arthur B. Fisher III |
| Ronald P. Rodgers | Kelli R. Price |
| Ronald E. McComas, Sr. | Stephen R. Cognian |
| Kipton A. Sissel | Jennifer L. Denney |
| Bradford Brumage | Steven C. Davis |
| Robert D. Davidson | Glenn L. Haught |

1           UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3    ------------------------------:

4    MICHAEL QUIGLEY, et al,        :

5                                   :

6        Plaintiffs,                :

7                                   :

8        v.                        :   Case No.:

9                                   :   07-600 (RBW)

10   VINCENT J. GIBLIN, et al,      :

11                                  :

12       Defendants.                :

13                                  :

14   ------------------------------:

15

16                                  Washington, D.C.

17                                  June 1st, 2007

18

19   Deposition of:

20                   MICHAEL QUIGLEY,

21        Called for oral examination by counsel for

22   Defendant, pursuant to notice, at the offices of

23   Bredhoff & Kaiser, PLLC, 805 15th Street, N.W.,

24   Suite 1000, Washington, D.C., beginning at 9:10 a.m,

25   before Teague Gibson of Alderson Reporting, a Notary

26   Public.

27

28                   *    *    *    *    *

29

1     ON BEHALF OF THE PLAINTIFF:

2                    PAUL ALAN LEVY, ESQ.

3                    Public Citizen Litigation Group

4                    1600 20th Street, N.W.

5                    Washington, D.C. 20009

6                    (202) 588-1000

7     ON BEHALF OF THE DEFENDANT:

8                    ROBERT M. WEINBERG, ESQ.

9                    Bredhoff & Kaiser, PLLC

10                   805 15th Street, N.W.

11                   Suite 1000

12                   Washington, D.C. 20005

13                   (202) 842-2600

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1                    C O N T E N T S

2    EXAMINATION BY:                        PAGE

3    MR. WEINBERG                              5

4    MR. LEVY                                166

5    MR. WEINBERG                            167

6

7                    E X H I B I T S

8    QUIGLEY   DEPOSITION EXHIBITS:          PAGE

9    1        Quigley Affidavit              19

10   2        Website Printout               23

11   3        Commissioners' Scoreboard      30

12   4        May 21, 2007 Letter            31

13   5        Reports Page                   53

14   6        Local 150 Bylaws               61

15   7        Local 150 Newspaper            63

16   8        Copy of Union Card             64

17   9        Password Authentication Section 65

18   10       Team 150 Link                  70

19   11       Hiring Procedures              85

20   12       Archey Union Charge            88

21   13       Resolution                     97

22   14       Guidelines                    106

1                          E X H I B I T S (Continued)

2        QUIGLEY    DEPOSITION EXHIBITS:                    PAGE

3        15         HTM Page                            116

4        16         Document                            116

5        17         Operating Engineers Issue           141

6        18         Website Link                        145

7

8

9

10

11                   (Exhibits retained by court reporter)

12

13

14

15

16

17

18

19

20

21

22

1                   P R O C E E D I N G S

2    WHEREUPON:

3

4                   MICHAEL QUIGLEY,

5    called for examination, having been duly sworn to

6    tell the truth, the whole truth and nothing but the

7                   truth, testified as follows:

8

9            EXAMINATION BY COUNSEL FOR DEFENDANT

10

11   BY MR. WEINBERG:

12       Q    Would you please state your name for the

13   record?

14       A    Michael J. Quigley.

15       Q    And what is your address?

16       A    5661 Aspen Drive, St. Anne, Illinois.

17       Q    You're a plaintiff in this lawsuit,

18   correct?

19       A    Yes.

20       Q    Have you testified before in depositions?

21       A    Yes.

22       Q    How many times?

1        A      Three that I can recall for sure.

2        Q      Why don't you, starting with the most

3   recent, describe each case?

4        A      Two of them were, I think it's called the

5   303 case when I was working for the Local, all for

6   the Local.  One was a case where I was accused of

7   some things on a picket line.  I had to give a

8   deposition in those three cases.

9        Q      Let's take each one separately.  What was

10  the most recent case in which you testified at a

11  deposition?

12       A      I don't recall which one's more recent.

13       Q      Taken separately.  Give me each one

14  separately?

15       A      What do you want to know about it?

16       Q      I want you to tell me what the case was

17  about and what your role was in the case?

18       A      One of them was a case where I believe the

19  Local ended up being sued over something that was

20  said in a phone conversation and supposedly there

21  was a charge of tortious interference with a

22  contract.  We went to court.  I had to give a

1    deposition.  I gave testimony.

2         Q    That is the BE&K case.

3         A    Yes, that's one of them.

4         Q    The union was found liable in that case,

5    wasn't it?

6         A    I believe it was, yeah.

7         Q    It was found liable on the basis of your

8    conduct; is that correct?

9         A    That's what they said in court, yeah.

10        Q    That's what the court found, right?

11        A    Well, they can find what they want, but

12   that's not the truth, but that's what they found.

13        Q    And what was the second case?

14        A    A picket line incident.  I can't recall if

15   it was the wording on the picket.  It was an on

16   strike for failure to pay fringes and benefits

17   against a contractor in Morris, Illinois and they

18   sued the union.

19        Q    And what was it, they sued the union for

20   what, what kind of violation of the law?

21        A    I don't recall.

22        Q    What was your role in the case?

1        A    I was a business agent at the time.

2        Q    And were you a witness?  Were you accused

3    of doing something wrong?  What was your role in

4    that case?

5        A    I don't believe I was accused of anything.

6        Q    You were just a witness?

7        A    I was a witness.  It was my picket, union

8    got sued.  I don't recall if it was language on the

9    sign.  If I recall I know the guy who it was, it was

10   Hanson Construction and I think his claim was we

11   didn't have a contract with him to begin with and we

12   had a collective bargaining agreement with him.

13       Q    You testified in a deposition?

14       A    Yes, I did.

15       Q    Did you testify at trial?

16       A    Yes, I did.

17       Q    What was the result of the case?

18       A    I believe the union lost that case.

19       Q    What was the third case?

20       A    The third case was a -- I was supposedly

21   accused of throwing some type of object and

22   flattening some tires.

1     Q     Your deposition was taken in that case?

2     A     Yes.

3     Q     Did you testify at trial in that case?

4     A     Yes.

5     Q     What was the outcome of that case?

6     A     It was dismissed.

7     Q     Since you're an experienced deposition

8     testifier, I just want to make clear how this is

9     going to work.  I'm going to ask you questions.  I

10    want you to be sure that you understand the question

11    before you answer it but I want you to listen very

12    carefully because I'm asking the questions and

13    you're answering the questions.  And I expect you to

14    answer the questions unless you don't understand

15    them.  If you need to take a break, then just let me

16    know and we'll take a break at the first convenient

17    moment.  Do you have any questions?

18    A     No.

19    Q     Tell me how you prepared for this

20    deposition?

21    A     By reading my affidavit that I had gone

22    over before.

1        Q    Did you read anything else?

2        A    I perused my website to make sure that I

3    was pretty much aware of the content that was there.

4        Q    Anything else?

5        A    Not that I can recall right now.

6        Q    No other document?

7        A    All the way back to infinity.  I read Pat

8    Cole's affidavits.

9        Q    I'm talking about what you did to prepare

10    for this particular deposition?

11        A    Just read through the affidavits, read

12    through my affidavit, some of the case stuff that

13    Paul sent me.

14        Q    What was that?

15        A    I don't know.  There was different

16    documents that were sent.  I don't recall which ones

17    they are just read through them to see if there's

18    anything in there that I disagreed with or agreed

19    with.

20        Q    Did you meet with counsel in this case?

21        A    I did.

22        Q    Or agents of counsel?

```
 1        A     No, I just met with Paul yesterday.

 2        Q     That was the only meeting you had with

 3   counsel in preparation for the deposition?

 4        A     There was some phone conversations we had

 5   just instructing me of what he wanted me to look

 6   through.

 7        Q     How long was your meeting yesterday?

 8        A     Couple hours.

 9        Q     What's your educational background?

10        A     Dropped out of high school, went back and

11   got my GED.  Then went back to college when I got

12   out of the Service.  So I got two years of junior

13   college.

14        Q     Where was that?

15        A     Kankakee, Illinois.

16        Q     Was what the name of the college?

17        A     Kankakee Junior College.

18        Q     When did you become an operating engineer?

19        A     1968.

20        Q     When did you first become involved

21   actively in the union?

22        A     1968 when I was a member.
```

1          Q      What role did you play, we're talking

2     about Local 150?

3          A      You mean as far as being with the Local?

4          Q      Yeah, playing any role within the Local?

5          A      I was a union steward on several jobs as

6     an operating engineer appointed by the business

7     agent.

8          Q      When was that?

9          A      There was two jobs.  There was a sewer

10    plant job and a highway job in Kankakee and I was a

11    steward on both those jobs.

12         Q      When?

13         A      I couldn't tell you the years.  It's

14    within maybe the first 10 years of my career.

15         Q      Did you ever hold elective office within

16    the Local?

17         A      No.

18         Q      Could you tell us the first time you ever

19    had a paid job with the union?

20         A      When I was appointed business agent.

21         Q      Who appointed you business agent?

22         A      I was recruited by Joe Ward and I was

1    hired by Bill Dugan.

2        Q    And what were their respective roles at

3    that time?

4        A    Same as they are today, president and

5    business manager and treasurer.

6        Q    Just for the record, which one -- who

7    holds what office?

8        A    Bill Dugan is president and business

9    manager and Joe Ward is the treasurer.

10       Q    And they both assumed office at the same

11   time initially, right?

12       A    Yes, 1986.

13       Q    And they ran together in a slate in 1986,

14   correct?

15       A    Yes.

16       Q    Were you involved in the campaign for that

17   slate?

18       A    Yes and no.  I supported Bill Dugan as a

19   candidate only because of Joe Ward's influence and

20   that was just as a member.  I had no role in the

21   party or the politics.

22       Q    How long did you hold that job as business

1    agent?

2          A    Till 1999.

3          Q    And were your responsibilities basically

4    the same over that entire period?

5          A    Pretty much, some roles changed some

6    lessened.

7          Q    Give us your responsibilities as a -- from

8    1999, your last year on the job, as a business

9    agent?

10         A    From 1999 back?

11         Q    No, in 1999 your last year?

12         A    I was a business agent.  I was also

13   president of the Will Grundy Building Trades

14   Council.  I did lobbying.

15         Q    Just give me your responsibilities as a

16   business agent.

17         A    The main role was to work with the members

18   and to enforce the collective bargaining agreement

19   on behalf of the members and I basically worked for

20   the members.

21         Q    What for example, did you have any

22   particular responsibilities with respect to the

1    hiring hall?

2        A    No, we're a part of it.  We didn't, quote,

3    unquote, dispatch.  They have dispatchers for that.

4        Q    Your job did not involve making decisions

5    or having any role in the operation of the hiring

6    hall; is that correct?

7        A    Sometimes it did, yeah.

8        Q    Give us -- explain what those were?

9        A    Sometimes the dispatchers, you have to

10   remember that dispatchers are not operating

11   engineers for the most part they have been, most of

12   them are young ladies, very good professional

13   secretaries but have nothing and know nothing about

14   operating heavy equipment, sometimes do not know the

15   nomenclature of the equipment or what it can do,

16   what it can't do, whether a person is suited to run

17   that equipment.  I many times gave my advice to the

18   dispatcher on whether a person was particularly

19   suited to that machine or whether he could the job

20   based on my knowledge of that member and our

21   membership and seeing them on the job site, knowing

22   what they can do.

1      Q    When you gave that advice was that advice

2  requested by the dispatcher?

3      A    Sometimes it was.  Sometimes it wasn't.

4  Sometimes I just gave it.

5      Q    You said you held another office at the

6  same time as you were business agent?

7      A    I was president of the Will Grundy

8  Building Trades Council for 10 years.

9      Q    And how did you first obtain that office?

10     A    I was elected.

11     Q    What was the constituency?

12     A    The building trades of the local areas are

13  made up of delegates who are normally business

14  agents from the different Locals in the area, could

15  be plumbers, electricians, basic building trades

16  crafts.

17     Q    What were your responsibilities in that

18  position?

19     A    Well, kind of a diplomatic/political.  Our

20  mission really was to ensure that we had union

21  projects and that projects went union to interface

22  with political entities that controlled projects

1     coming into the area.  Later on we put together our

2     own project labor agreement and had that and we used

3     that along with our labor management group of

4     contractors that was part of our organization.

5          Q     And when in 1999 did you cease being a

6     business agent?

7          A     When I was appointed to the executive

8     director of the Indiana Illinois Iowa Foundation for

9     Fair Contracting.

10         Q     Who gave that appointment?

11         A     Bill Dugan.

12         Q     What were your responsibilities in that

13    job?

14         A     Well, it morphed into something that

15    was -- there was an -- the Indiana Illinois Iowa

16    Foundation is a labor management group funded by

17    labor management.  It's purpose was to oversee

18    prevailing wage projects to make sure that in our

19    area the prevailing wages were being enforced, lived

20    up to.  We did a lot of political work and

21    legislative work to make sure we could strengthen

22    those Bills, the Prevailing Wage Act of Illinois.

1          But also I inherited with that job we had

2     an organization called Target Construction Research,

3     TCR.  TCR was a database tracking program that did

4     just what Dodge does on a global scale, tracks

5     construction projects.  We took it a step further

6     and tracked them in our area and tracked union and

7     non-union jobs and kept a database of what jobs were

8     coming, what were union.  We used that database to

9     be on the forefront of any situations where we had

10    to try to get a job that was coming in union and try

11    to get it turned around non-union.  It was an

12    excellent program.  We ended up taking that program

13    and actually making it an integral part of the

14    IIIFFC.  So I ran that operation.  I had a staff.  I

15    had a budget.

16         Q    Were you involved in any issues respecting

17    the classification of operators as independent

18    contractors or employees?

19         A    No.

20         Q    Is that an issue that came up?

21         A    Well, I think it's an issue that's out

22    there but it's nothing that we dealt with

1    specifically.  When I left we were currently working

2    on legislation to change some of the independent

3    contract language in Springfield to make sure that

4    independent contractors could be, I guess for lack

5    of a better word, brought into the system so they

6    could tax and they couldn't have an unfair advantage

7    against our contractors.

8         Q    Do you know whether or not that

9    legislation was enacted?

10        A    It failed I think the first couple times

11   but I think it's up again and it's got a lot of

12   support from what I understand.  It may pass this

13   time.

14        Q    Let me show you what we'll have marked as

15   Exhibit 1.

16             (Quigley Exhibit No. 1 was marked)

17        Q    Can you identify that document?

18        A    It looks like the affidavit that I -- my

19   affidavit.

20        Q    Take a look at the second to the last

21   page, page 13?

22        A    Yes.

```
1        Q    Is that your signature at the bottom?

2        A    Yes, it is.

3        Q    Did you draft this affidavit?

4        A    No, I believe it was drafted by Paul based

5   on -- excuse me, no, I didn't.

6        Q    You stated at the end that I certificate

7   under penalty of perjury that the foregoing is true

8   and correct, right?

9        A    I did.

10       Q    Is it your testimony that you have

11  personal knowledge as to the truth of everything

12  that you stated in this declaration?

13       A    To the best of my ability I do.

14       Q    Well, that's not a best of your ability

15  question.  I'm asking you whether you have personal

16  knowledge of the truth of everything in this

17  declaration?

18       A    Yes.

19       Q    Do you know what personal knowledge means?

20       A    Yes.

21       Q    That means you have firsthand information?

22       A    Yes.
```

1          Q     You said you didn't participate in the

2     1986 campaign.  Did you participate in the 1989

3     Local 150 campaign?

4          A     You have to refresh my memory.  I'm not

5     sure which campaigns --

6          Q     I'm assuming there's one every three

7     years?

8          A     Bill Dugan hasn't had any opposition for

9     20 years, so there's been no campaigns except for

10    two that I know of.

11         Q     When were those?

12         A     I couldn't tell you the year.  I know that

13    we had an opposition campaign against Joe Ward for

14    treasurer and then I think there was -- I don't

15    think it was the same year but in another year there

16    was a campaign against the executive board for

17    District 7 which is Indiana.  Those are the only two

18    that I'm aware of.

19         Q     Up until the present one?

20         A     Correct.

21         Q     The campaign in which Joe Ward had

22    opposition did you play a role in that campaign?

1    A    A role as a -- I guess I did.  I supported

2    Joe.  I worked for Joe out of the same office as

3    Joe.

4    Q    You worked for him.  Are you saying you

5    worked for him in the campaign?

6    A    No.  No, because there wasn't a campaign.

7    That election consisted of passing out palm cards

8    and sending out a mailer which I had a part in and

9    that was it, nothing like this campaign, nothing.

10    Q    You had no role in passing out the palm

11    cards or?

12    A    No, that's done at the meetings.

13    Q    Did you campaign in any way, form or

14    fashion for Mr. Ward in that campaign?

15    A    In an official capacity, an official sense

16    of campaigning, I don't think I did.  I certainly

17    let the membership that I knew know that he was the

18    guy that we were going to voter for.

19    Q    What about the other campaign, the

20    District 7?

21    A    I had nothing to do with that.

22    Q    So until this present campaign, is it fair

1    to say you have not been an active participant in

2    any Local Union election campaign?

3        A    Yes.

4            (Quigley Exhibit No. 2 was marked)

5        Q    Take a look at Exhibit 2 which has a

6    number of pages in it.  Can you identify what

7    Exhibit 2 is?

8        A    Looks like stuff off the website.  It's

9    apparently -- it looks like the stuff that's off one

10   of the beginning pages of the website that outlines

11   who the candidates are on the slate.

12       Q    When you're talking in your declaration

13   about the paragraph 3 that's Exhibit 1, about Joe

14   Ward and a slate of candidates these are the

15   candidates you're talking about, this is the slate,

16   correct?

17       A    Yes.

18       Q    Let's go through the slate.  Joe Ward is

19   the treasurer, correct?

20       A    Yes.

21       Q    And he was the elected treasurer of the

22   union beginning in 1986 to the present, correct?

1          A     Yes.

2          Q     When we say the present, he is today

3     signature in the office of treasurer of the Local,

4     correct?

5          A     He still has the title but he's not

6     sitting in his office.

7          Q     He has the title and the powers of the

8     office, does he not?

9          A     No.

10         Q     You're saying that under the powers that

11    are given to the treasurer of 150 under the

12    constitution and bylaws have been taken from

13    Mr. Ward?

14         A     Yes.

15         Q     That he does not have his powers under

16    the --

17         A     That's my opinion, yes.

18         Q     Are you authorized to speak for the Ward

19    campaign?

20         A     I wouldn't speak out of turn but I'll

21    speak on the knowledge that I have.

22         Q     I'm asking you, you're here today as a

1    plaintiff in this case.  Are you a plaintiff in your

2    capacity as what you describe as a webmaster?

3        A    I'm a webmaster.

4        Q    Listen to my question.

5        MR. LEVY:  Can I --

6                (Off the record)

7    BY MR. WEINBERG:

8        Q    Are you here as a plaintiff in your

9    individual capacity or are you purporting to be a

10   plaintiff representing the Ward campaign?

11       A    I don't represent the Ward campaign.

12       Q    Your only role is webmaster for this

13   particular website; is that correct?

14       A    Yes.

15       Q    Exhibit 2, I'm looking at the second page

16   now, Mr. Jim Miller who has held union office since

17   1986 according to his biography; is that correct?

18       A    He was appointed as a business

19   representative in 1986, correct.

20       Q    He was also assistant to the president of

21   the Local, correct?

22       A    He was but I don't remember what year that

1    was, not that whole time.

2        Q    And he has been a trustee of the pension

3    plan, correct?

4        A    I believe so.

5        Q    Is he currently a trustee of the pension

6    plan?

7        A    I don't think so.

8        Q    Look at the next page Roger Allen.  Roger

9    Allen is currently on the -- today as we sit here on

10   the executive board of Local 150, is he not?

11       A    Yes.

12       Q    He's the executive board member

13   representing District 4, correct?

14       A    Yes.

15       Q    And the next page, Frank Studer.  He has

16   served as a business agent for Local 150, has he

17   not?

18       A    Yes.

19       Q    How many years did he serve as a business

20   agent for Local 150?

21       A    I'm not sure of the dates how many years.

22       Q    Look at the next page, Wayne Snider, he

1     also served as business agent to Local 150, has he

2     not?

3          A     Yes.

4          Q     And the next page, Mr. Craig Jorsch, he

5     was appointed as one of the safety coordinators of

6     the Local, correct?

7          A     He was, yes.

8          Q     The next page, Mr. Don Matteson, he is

9     today a member of the executive board of Local 150,

10    correct?

11         A     Yes.

12         Q     And he's the incumbent on the executive

13    board from District 2, correct?

14         A     Yes.

15         Q     The next page, Mr. Ray Stevens, he is

16    presently a member of the executive board of Local

17    150, is he not?

18         A     Yes.

19         Q     And he is the present incumbent executive

20    board member from District 3, correct?

21         A     Yes.

22         Q     The District 4 the present incumbent is

1    Roger Allen, correct?

2        A    Yes.

3        Q    We've already seen that Roger Allen is on

4    the slate as candidate for recording correspondent

5    secretary, correct?

6        A    Yes.

7        Q    Turn the page to District 5, Mr. Lance

8    Yednock is presently on the executive board of Local

9    150, is he not?

10       A    Yes.

11       Q    He's the incumbent executive board member

12   representing District 5, correct?

13       A    Yes.

14       Q    Mr. Tim Loftus is presently on the

15   executive board of Local 150, is he not?

16       A    Yes.

17       Q    And he is the incumbent seeking

18   re-election as representative of District 6,

19   correct?

20       A    Yes.

21       Q    And the next page Mr. Greg Allen, he is

22   presently a member of the executive board of 150, is

1    he not?

2        A    Yes.

3        Q    And he is presently seeking re-election as

4    the incumbent executive board representative for

5    District 7, correct?

6        A    Yes.

7        Q    The next page, Mr. Roger Hoffman, he is

8    presently on the executive board of 150, is he not?

9        A    Yes.

10       Q    And he is the incumbent executive board

11   member representing District 8, correct?

12       A    Yes.

13       Q    And he's seeking re-election to that spot?

14       A    Yes.

15       Q    The next page we see candidates for

16   auditors, correct?

17       A    Correct.

18       Q    Mr. Jerry Jorsch is an incumbent auditor

19   seeking re-election to that position, correct?

20       A    Yes.

21       Q    And Mr. Jason Ness is an incumbent auditor

22   seeking re-election to that position, correct?

1      A    I think so.  I'm not positive if he was an

2   incumbent before.

3      Q    Look at the trustees Mr. Mike Quale and

4   Quale is presently a trustee, is he not?

5      A    Yes, he is.

6      Q    He's running for re-election as a trustee?

7      A    Yes.

8      Q    Take a look at Exhibit 3.

9         (Quigley Exhibit No. 3 was marked)

10     Q    Mr. Quigley, can you identify Exhibit 3?

11     A    It looks like the election commissioners

12   scoreboard that's on the website.

13     Q    When you say the election commissioners

14   scoreboard, what do you mean by that?

15     A    Prior to an election there has to be a

16   board of election commissioners who make decisions

17   about how the election is run and the rules and

18   they're elected from each District they run.  This

19   year there was a slate, two slates, and they ran and

20   this is the total of Team 150 and the united

21   engineers party.

22     Q    Team 150, just so we're clear, is it fair

1    to refer to that as the Ward slate?

2        A    Yes.

3        Q    And United Engineers party is it fair to

4    refer to that as the Dugan slate?

5        A    Yes.

6        Q    According to this Exhibit 3 the Ward's

7    slate has elected 10 of the 16 election

8    commissioners for Local 150, correct?

9        A    Yes.

10       Q    Isn't it true that Team 150 also won in

11   District 7 which is blank there?

12       A    You probably copied this before the last W

13   got down there.

14       Q    So it is correct?

15       A    Yes.

16       Q    Let's get Exhibit 4 marked.

17            (Quigley Exhibit No. 4 was marked)

18       Q    Do you know who Mr. Roger Gold is?

19       A    Yes.

20       Q    Who is he?

21       A    He's a labor lawyer.  I believe he was the

22   lawyer that was hired by Team 150 to represent us.

1      Q      He represents the Team 150, correct?

2      A      I believe that's correct.

3      Q      And he also represents the Local 150

4      election commissioners, correct?

5      A      I believe that's correct.

6      Q      Take a look at page 4.  That's a letter on

7      Mr. Gold's stationery.  The last page of that letter

8      you see his signature, correct?

9      A      Okay.

10     Q      And if you read the first sentence of the

11     letter it says that Mr. Gold is the attorney for

12     IUOE Local 150 election commissioners, correct?

13     A      Yes.

14     Q      That's consistent with your understanding,

15     right?

16     A      Yes.

17     Q      And who is Mr. Vincent J. Giblin?

18     A      He's the general president of the IUOE.

19     Q      Have you seen before the exchange of

20     correspondence in Exhibit 4.

21     A      No.

22     Q      Take a look at the second page of the

1    letter for Gold and Mr. Giblin?

2        A    Okay.

3        Q    Let me represent to you the letter will

4    speak for itself that Mr. Gold was seeking approval

5    for certain election procedures, one of which was to

6    get permission for the Local to stop requiring

7    members to sign the outside of the ballot envelope

8    with their name and their Social Security number and

9    instead to use a bar code with information as to the

10   name address and registration number of the

11   individual voter.

12           With that understanding, I want to direct

13   your attention down to the bottom of page 2 where

14   there's a sentence that says, "it is my

15   understanding that there are at least three or four

16   elections the requirement that Social Security

17   numbers be placed on the envelope has been

18   disregarded."  Do you see that?

19       A    Yes.

20       Q    Do you know of your own knowledge whether

21   that's true or not?

22       A    I have no idea.

1          Q    Do you know whether or not there are

2     issues or concerns that members of IUOE have about

3     using their Social Security numbers for various

4     purposes?

5          A    You mean the ballot, as far as the ballot

6     goes?  I'm not sure I understand.

7          Q    Any purpose having to use their Social

8     Security number on any kind of a document that gets

9     submitted anywhere, do you know whether there are

10    any concerns about privacy interests with respect to

11    Social Security numbers?

12         A    Speaking as a member for myself I don't

13    like my Social Security number on anything.  I might

14    have had an occasional -- I've talked to members who

15    don't like putting their Social Security numbers and

16    having them available for everybody to see.

17         Q    Other than your own view and maybe a few

18    conversations, you wouldn't have any knowledge as

19    to, other than speculation, as to what most members

20    think about that, correct?

21         A    Well, I think I have a pretty good feel of

22    what our membership likes and not likes.  I serviced

1    a lot of members in my career.

2         Q    What's the answer to my question?

3         A    Give me the question again.

4              (Record was read)

5         A    Yeah.

6         Q    Yes, that's correct?

7         A    Yes, members have told me that they don't

8    like Social Security numbers being used on materials

9    that are involved with the Local.

10        Q    I'm trying to get a common understanding

11   of what we mean personal knowledge.  You know your

12   own feelings about having your Social Security

13   number used for some public purpose, correct, and

14   based on some conversations with other members you

15   said a few conversations with other members you know

16   what those other members have told you, correct?

17        A    Yes.

18        Q    But beyond that, any knowledge, any sense

19   you have of what the members think is your own

20   speculation or judgment; isn't that correct?

21        A    Could be my judgment, yes.

22        Q    But it's not based on your personal

1    knowledge of what they actually think is it?

2        A    Well, yeah, when you talk to a member you

3    understand what they tell you, you understand how

4    they think.  Part of my job as an agent was to know

5    that information, that's what I did.  So based on

6    that they don't like it.

7        Q    The "they" would be the "they" of the

8    people you've talked to, correct?

9        A    The many members that I have talked to

10    over the years as an agent, that's what I'm

11    referring to.

12        Q    Now we've gone from a few to many members

13    that you've talked to about use of Social Security

14    numbers?

15        A    To me it's relevant.

16        Q    I'm asking you a question.  You started

17    out with a few, now it's many.  What's the correct

18    answer as to how many members of Local 150 have you

19    had a discussion with about their feelings, about

20    the use of their Social Security numbers on

21    documents that other folks can see?

22        A    Do I have an exact number?  No.

1    Q    I'm not asking whether you have an exact

2    number, you said a few and you've said many?

3    MR. LEVY:  Actually I'm not sure --

4    A    It's the same thing to me.

5    Q    What is your definition of many?

6    A    You know what, many could be 30, many

7    could be a thousand.  My district was made up of

8    3000 members and I probably talked to every single

9    one of them at some point.

10    Q    You talked to everyone of them about

11    Social Security numbers?

12    A    No.

13    Q    I'm asking you how many you talked to

14    about Social Security numbers?

15    A    I can't tell you, I don't know.

16    Q    There's a lot of distance between 30 and a

17    thousand.  I think you can do better than that.  You

18    tell me, give me your best estimate as to how many

19    people you talked to about privacy issues around the

20    use of their Social Security numbers?

21    A    I don't have a number.  I couldn't tell

22    you a number, sir.

1        Q    Is it closer to 30 or a thousand?

2        A    If I told you either one I'd be lying.   I

3    just recollect that it was many.

4        Q    So for now on when we see the word "many"

5    or hear the word "many" we should interpret that as

6    many as a thousand?

7        A    You can interpret it any way you like.

8        Q    I'm asking you what you mean when you say

9    many members?

10        A    Depends on the circumstance.

11        Q    I'm trying in this circumstance.   You

12    don't know whether you talked to more than 30 people

13    about this, correct?

14        A    I really -- I don't know what the number

15    would have been.

16        Q    You don't know that you've talked to more

17    than 30 people in Local 150 about this issue of the

18    privacy around the use of their Social Security

19    numbers, correct?

20        A    I don't know whether it's 30 or a

21    thousand.

22        Q    So the answer to my question is yes, isn't

1    it?

2        A    Maybe it would be.  I guess.  I don't

3    know.

4        Q    Don't guess.  Give me an answer to my

5    question yes or no?

6        A    Are you asking me for a number?

7        Q    I'm going to read the question back and

8    you answer this question yes or no because it's a

9    question you can answer yes or no.

10                (Record was read)

11       A    If have I talked to more than 30, I think

12   I have, yes.

13       Q    So when you said before you didn't know

14   whether it was between 30 -- somewhere between 30

15   and a thousand and you didn't know what it was you

16   were not giving an accurate statement then, were

17   you?

18       A    Yeah, I'm giving an accurate statement.

19   I'm telling you what I know, sir.

20       Q    You also are telling us what you don't

21   know and you've now given different answers as to

22   what you don't know.  So I'm asking you are you now

1    saying that you know that you have talked to more

2    than 30 members of Local 150 about the issues

3    privacy issues related to the use of their Social

4    Security numbers?

5         A    I'm pretty sure it's more than 30, yeah.

6         Q    What about more than 40?

7         A    I don't know whether it was more than 40,

8    maybe it was more than 50.  I can't remember.  I

9    spent 13 years on the job.

10        Q    If you don't know there's more than 40,

11   then it is a true statement that you cannot say that

12   you talked to more than 40 people in Local 150 about

13   the privacy issues related to the use of their

14   Social Security numbers, correct?

15        MR. LEVY:  Can we go off the record?

16        MR. WEINBERG:  I want him to answer this

17   question.  This is a question you can answer yes or

18   no based on what you said.  There's only one answer

19   you can give that's consistent with everything

20   you've said and so far, for the record, it's taken

21   about four minutes and the witness is just sitting

22   there trying to figure out what his answer is.

1      You're here to tell the truth, sir, you ought to be
2      able to answer the question.
3          A      You know what, to me it's not a yes or no
4      answer.  I talked to many, many people over the
5      years.  I can't remember how many.  I certainly know
6      it's more than 40 and it's between 40 and a
7      thousand.
8          Q      So now your testimony is you talked to
9      more than 40; is that right?
10         A      As best I can recall, I am pretty sure.
11     It's somewhere between 40 and a thousand.  I don't
12     know.  I can't remember.
13         Q      Then if you don't know then you don't know
14     that you've talked to anyone that you've talked to
15     more than 40 people?
16         A      Okay.  Then the answer is no.
17         Q      Then it's no to what, what was the
18     question?  I'm going to ask you a question and you
19     give me an answer.  You don't know, do you, that you
20     talked to more than 40 people in Local 150 about the
21     issue of -- privacy issues related to the use of the
22     Social Security numbers, correct?  Let the record

1    show that once again the witness is sitting there

2    not answering the question.

3        A    I'm not answering it because I feel

4    uncomfortable answering it the way you're asking it.

5    There doesn't seem to be in my mind a yes or no

6    answer.  I'm not trying to be evasive at all.

7        Q    The question is what you know and what you

8    don't know and if you don't know, as you've said

9    several times whether it was 40 or a thousand, that

10   means you don't know whether you talked to more than

11   40 people in Local 150 about the privacy issues

12   related to Social Security numbers, is that a

13   correct statement or not?

14       A    Well --

15       Q    Is that yes or no, is that a correct

16   statement or not?

17       A    Is what a correct statement?

18       Q    The statement I just made?

19       A    That I don't know whether I talked to 40

20   people?  I'm pretty sure I did.

21       Q    Is that the question that you were asked,

22   sir?

1       MR. LEVY:  Why don't you read back the question

2  as it was.

3       A    I guess that would have to be a correct

4  statement since I can't remember whether it was 40

5  or a thousand.  Then I guess that's correct.

6       MR. LEVY:  Can we go off the record?

7       MR. WEINBERG:  Sure.

8                  (Off the record)

9  BY MR. WEINBERG:

10      Q    Take a look at Exhibit 4.  Look at the

11  first letter in the exhibit which purports to be a

12  letter from Mr. Giblin in response to Mr. Gold and

13  I'll represent to you that's what in fact it is.

14            I want to direct your attention to the

15  second paragraph that begins with the word

16  "unfortunately" in the last sentence of that

17  paragraph which begins "finally" and I'll read it

18  into the record, "since we are all familiar with a

19  number of concerns, legal and otherwise, that have

20  been raised about the use of Social Security numbers

21  as identifiers and because of number of locals that

22  have moved or are moving to use register numbers for

1    member identification purposes, the commissioners

2    proposed substitution of register numbers for Social

3    Security numbers is approved."  Were you aware of

4    that determination, sir?

5        A    No.

6        Q    Are you aware of the fact that when

7    members sent in their ballots that at the back of

8    their ballots in the envelope that contains their

9    ballots it's going to contain their name and their

10   register number?

11       A    I think I am.  It's been a long time since

12   we've had to do that ballot process so I don't

13   remember picturing what was on it.  I know that the

14   signed ballot went inside or something.  It's been a

15   long time since we've used that procedure, so it's

16   vaguely familiar.

17       Q    According to this letter, the two letters,

18   in the past Social Security numbers were used, now

19   in this current election rather than Social Security

20   numbers register numbers are going to be used.  Do

21   you understand that?

22       A    Yes.

1          Q    Members are going to need to know their

2    register numbers in order to voter, are they not?

3          A    If that's going to be the procedure, then

4    they'll have to have the numbers some place.

5          Q    Let me go back to your Exhibit 1, your

6    declaration.  Whether or not there was in the

7    various elections that have occurred every three

8    years since 1986 whether or not there were

9    oppositions, the officers still ran as a slate, did

10   they not?

11         A    Yes, sir.

12         Q    Mr. Dugan, Mr. Ward and the others were

13   all in the same slate, were they not?

14         A    Yes.

15         Q    As your lawyer has told you, wait until

16   the question is asked.  In your declaration you

17   describe yourself as a webmaster for a website

18   150election.com?

19         A    Yes.

20         Q    That's the website of the Ward's slate,

21   correct?

22         A    Yes.

1      Q      And as a webmaster what precisely is your

2   role?

3      A      About whatever it takes to make the web

4   run on the Internet.

5      Q      Look at the second sentence of paragraph

6   3.  It says, "I create and input the basic content

7   and design for the website.  Although we are lucky

8   to have a volunteer retired member of our Local who

9   is a computer systems engineer and who maintains and

10   oversees the overall technical aspects of my designs

11   so they are in the right format for display on the

12   Internet."  Did I read that accurately?

13      A      Yeah.

14      Q      So I'm trying to figure out what your role

15   is as the person who creates and inputs the basic

16   content and design for the website.

17      A      Sometimes I'm sent material, I put it up,

18   sometimes I convert Word documents to PDFs and put

19   them in the proper links so that they can be viewed,

20   anything that has to do with changes in the website

21   I generally do that, visual changes or flash

22   content.

1        Q    Who's the campaign manager for the Ward

2    slate?

3        A    I don't know that we have a manager per

4    se.

5        Q    Can you decide on your own what content to

6    put on the website or do you have to get

7    authorization from someone?

8        A    For the most part I put stuff up on my

9    own.

10       Q    And who is the volunteer retired member

11   that you mentioned?

12       A    Randy Baker.

13       Q    And what is his role in connection with

14   the website?

15       A    He helps me with the IT part of it, the

16   server end of it, the more technical complicated

17   stuff.  I think he owns the domain.  I don't know

18   what the acronym is, Microsoft Solution something.

19   He's got different certifications that he's going to

20   school for through Microsoft so he knows Sequel

21   Server and different database programs and how to

22   write programs and stuff like that.  He's probably a

1    lot more technically advanced than I am.

2        Q    How would you describe your own state of

3    your technical knowledge about the running of

4    websites?

5        A    I'm self taught.  I've had website -- I

6    created websites for family websites, created

7    websites for other people.  I've created websites

8    for the IIIFFC when I was there.

9        Q    When you say you created the website, you

10   mean you did all the technical work with respect to

11   the website?

12       A    Well, basically what I have done in the

13   past is that I buy templates, and you can think of a

14   template as a container that you put stuff in so

15   that's basically what I do.  I don't write any HTML

16   code.  I know enough to be dangerous, I suppose

17   enough to screw things up.

18       Q    And in this instance your website is not

19   simply based on a template, is that correct, the

20   website you're running here the 150election.com is

21   not simply based on taking a template?

22       A    Yeah, it is.  It was a purchased template

1    from a company called Blue Marble.

2        Q    So what is it that Mr. Baker is doing

3    beyond --

4        A    He has the capability of changing content.

5    When I'm not around he has the skills to do the same

6    thing I can do, but it's very time consuming so I do

7    it.

8        Q    Is there anything he does with respect to

9    the website that you can't do?

10       A    He has the knowledge of -- more knowledge

11   about database and back-end programming.  He owns

12   the domain and he was the one who set up, I believe,

13   the remote server that we're on.  So he has a lot

14   more knowledge about that kind of stuff than I do.

15       Q    And if hypothetically you had to install

16   or had to put into place what's necessary to comply

17   with the campaign website resolution, who would be

18   doing that?

19       A    Randy would do that.  I wouldn't do that.

20       Q    Other than your responsibilities with

21   respect to the website, do you have any other role

22   in the Ward slate campaign?

1     A     No.

2     Q     Are there meetings of people who are

3 involved in the campaign that you participate in?

4     A     Yeah, I participate, yes.

5     Q     And what kind of meetings are those?

6     A     Just meetings to go over campaign strategy

7 with the candidates and there's a group of

8 volunteers that are just operators out working in

9 the field that sit in on it.  We have a full-time

10 secretary.

11     Q     And you're involved in those meetings?

12     A     On and off, not all of them, some of them

13 I am, some I'm not.

14     Q     You're generally aware of the campaign

15 strategy; is that correct?

16     A     Not so much strategy.  All I go to the

17 meetings for is to see if there's anything that

18 could be useful on the website.

19     Q     Are you aware of what other kinds of

20 campaign activities are being conducted in addition

21 to what you're doing on the website?

22     A     You mean in our campaign?

1        Q      In your campaign?

2        A      Just other than meet and greets because I

3    post all those, like when there's meetings and meet

4    and greet campaign stops I put -- usually I get that

5    information.  I either design a flier for it or I

6    get one that somebody's already put together and put

7    the content up and then I add it to the calendar.

8        Q      You're aware that the campaign has done

9    mailings, correct?

10       A      Some of them, yeah.

11       Q      What do you mean?

12       A      Not all of them, there's been a lot of

13   them.

14       Q      How many mailings have there been?

15       A      I couldn't tell you.

16       Q      Give me your best estimate?

17       A      I know at least four that I can picture in

18   my head.

19       Q      Who do those mailings go out to?

20       A      I believe the general membership.

21       Q      How many members are there in Local 150?

22       A      To my best recollection, the number that's

1     bantered around is 23,000, but that could or could

2     not be accurate.  I'm not sure.

3          Q    You know that the campaign has these

4     campaign vans, correct?

5          A    Yes.

6          Q    How many vans does it have?

7          A    I think there's three.

8          Q    Are those vans owned by the campaign or

9     rented?

10         A    I don't know that.

11         Q    What are those vans used for?

12         A    To my knowledge just to go to the job

13    sites.  I think they're being used with the

14    candidates to go to sites and rallies to the best of

15    my knowledge.

16         Q    Just so the record is clear, when you said

17    the mailings went to the general membership you're

18    talking about the general member of Local 150,

19    correct?

20         A    Yes.

21         Q    Other than the mailings and the vans has

22    the campaign put out leaflets?

1        A    Actually the leaflets that I've seen

2    have -- yes.

3        Q    You were about to describe the leaflets

4    that you've seen, go ahead?

5        A    Leaflets, just stuff that comes off the

6    website.  They print them up and take them to

7    different job sites.  I think they bring some in the

8    vans I think.  I have never been in one so I don't

9    know.

10       Q    Tell us where the vans go?

11       A    I believe they go to job sites and

12   campaign rallies.

13            (Quigley Exhibit No. 5 was marked)

14       Q    Let's have this marked as our next

15   exhibit.  Have you had a chance to review Exhibit 5?

16       A    Yes, sir.

17       Q    Can you identify that?

18       A    This looks like the District reports page

19   and it's a page that we put announcements of where

20   our rallies and team meetings will be.

21       Q    This is what you were referring to before

22   as the kind of events?

1          A     Yes.

2          Q     And as you go through the document looking

3     at a document, it is the fifth page of the document

4     where it says, Team 150 forward for all members and

5     it has meet the candidates, when, Sunday June 3rd;

6     do you see that?

7          A     Yes.

8          Q     So that's an announcement for a particular

9     meeting, is that what you meant by something off the

10    website that gets turned into a leaflet?

11         A     Yeah, yes.

12         Q     That would be true of the bike rally which

13    is the next page and then the Heritage Plaza banquet

14    facility which is the next page?

15         A     Yes.

16         MR. LEVY:  Do you want him to turn the pages

17    with you or?

18         Q     Yeah, if I'm going too fast.  You've

19    answered the question.  I'm not trying to get ahead

20    of you.  That's true of the announcement about the

21    Sunday, June 24th?

22         A     I know they use the rally, the things for

1    rallies to hand out on job sites because -- it just

2    is a matter so the members that they see in the

3    field will know what the rallies were.

4        Q    Some of these documents I'm looking now at

5    the event that would meet the Team 150 candidates

6    and learn about their platform Sunday, June 24 at

7    the National Athletic Club?

8        A    Yes.

9        Q    That one and some of the others talk about

10   donation at the bottom, correct?

11       A    Okay.

12       Q    Those are donations to what?

13       A    I'm assuming they go to the campaign, I

14   think.

15       Q    You're aware of the rule on the

16   International Union constitution that campaign

17   contributions can only be accepted by members of the

18   union, correct?

19       A    I'm vaguely familiar with it.  I've heard

20   of it, yeah.

21       Q    So it's fair to assume that these events

22   were designed for members of Local 150 of the

1    International Operating Engineers, right?

2       A    Yes.

3       Q    Do you have any knowledge as to the

4    overall budget for the campaign?

5       A    No.

6       Q    Do you have any knowledge as to how much

7    was spent on the mailings?

8       A    No.

9       Q    Obviously we had a 41 cent stamp, the cost

10   of the envelope, the cost of the paper, but that is

11   what it is, you know nothing more than that?

12      A    No.

13      Q    And other than these donations we're

14   talking about do you know how money is being raised

15   for the Ward campaign?

16      A    No.

17      Q    As far as you know in the mailings that go

18   out to folks, is the website referred to in the

19   mailings?

20      A    I think it is.  I think there's a www on

21   them.  I'd have to see one.  I think there is.  I

22   don't have anything to do with them but I believe I

1    remember on the ones I got at my house had the

2    website location on it, I think.

3        Q    As the webmaster have you made any efforts

4    to make sure that in these various communications to

5    the members that the website is mentioned?

6        A    I haven't.

7        Q    Other than the various mailings, leaflets,

8    meetings, the website, the vans, are there any other

9    activities of the Ward campaign that you can

10   identify or are aware of?

11       A    No.

12       Q    How much has the website cost the campaign

13   to date?

14       A    Nothing.

15       Q    When you say nothing, explain how that

16   could be?

17       A    I bought the template.  I work on it.  It

18   was my idea.

19       Q    So the website is sort of your

20   contribution to the campaign?

21       A    Yeah, you could say that.

22       Q    Financial and otherwise?

1        A    You could say that, yeah.

2        Q    How much does the website cost you?

3        A    I paid for the template.  I paid to have

4    the template reworked for the color, which cost

5    me -- I might have had to buy a couple pieces of

6    software that I used, but I think that the template

7    was like 70 bucks and the extra work on the -- I

8    think I might have had them do some work on a logo

9    that I had to have that I didn't do myself and so

10    maybe 150 bucks.  I can't be sure.  But I don't

11    think it's any more than that.

12        Q    When you say you had them do some work,

13    who?

14        A    The company that I bought the template

15    from allows you a little bit of free -- they

16    customized it a little bit if you want it, so I

17    think I paid, I can't remember, something didn't

18    look right and I had them do a logo and put it in

19    for me.  I think that was it.  That cost me a little

20    extra.  Then I had the red, white and blue theme put

21    in it that was not part of the original template.

22        Q    Is Mr. Baker also donating his services?

1          A      I believe he is, yeah, but I couldn't say

2    for sure.

3          Q      Is Mr. Baker paying for the domain name?

4          A      I believe he did.

5          Q      Do you know how much that cost?

6          A      I couldn't tell you what he paid for it.

7    I just know he bought it.

8          Q      If you add up all the numbers what would

9    the cost be?

10         A      Excluding my time?  Probably just what I

11   told you, it's just time consuming.  It's the cost

12   for the template.  I did the revisions that I paid

13   them for.  I'm trying to remember if I had to buy a

14   couple extra pieces of software that updated the

15   flash stuff, I worked on that, might have been

16   another 60, 70 bucks I think I did but I don't

17   remember.

18         Q      I take it you're not charging anybody for

19   your time?

20         A      No.

21         Q      Am I correct that you retired as executive

22   director of the Indiana Illinois Iowa Foundation for

1    Fair Contracting?

2       A   I did.

3       Q   When was that?

4       A   A year ago in April.

5       Q   Have you been employed since that time?

6       A   No.

7       Q   Are you expecting your retirement to be a

8    permanent status or are you thinking about going

9    back to work?

10      A   I'm retired.

11      Q   Look at paragraph 4 of your declaration.

12    As you acknowledge you need a union card to get into

13    a membership meeting Local 150, correct?

14      A   Yes.

15      Q   And non-members are not allowed into Local

16    150 meetings, correct?

17      A   There are occasions when political

18    speakers come in but basically it's members only.

19      Q   Do you have knowledge of why it is that

20    Local union meetings are closed to members?

21      A   That's just always been.

22    MR. LEVY:  Closed to non-members.

1      Q    Well, depending on the definition of the

2    word closed.  You understand what I'm saying?

3      A    Yeah.

4      Q    Why members only can attend the meetings?

5      A    Just always been that way.  It's our

6    Local.  It's your membership.  It's your dues.  And

7    I guess that's just the way it's been since I've

8    been a member.

9      Q    You need your register number in order to

10    be able to have an effective ballot because it has

11    to be on the outside of the envelope, correct?

12      A    Yeah, that was the one you showed me.

13          (Quigley Exhibit No. 6 was marked)

14      Q    Can you identify that document?

15      A    Looks like the Local 150 bylaws, but I

16    don't know which version it is because I don't see

17    the year.  It looks like our bylaws.

18      Q    Look at the second to the last page of the

19    exhibit.  See down in the lower right you see a

20    date?

21      A    Yes.

22      Q    Is it fair to say these are the current

1    bylaws of Local 150?

2         A    I believe so.

3         Q    Direct your attention to page 23.  Section

4    7 on page 23 it says, specific prohibited acts in

5    accordance with the provisions of Section 6 of this

6    article no member shall commit any of the following

7    acts.  Am I reading that correctly?

8         A    Yes.

9         Q    One of the following acts is Subsection D,

10   see that?

11        A    Yes.

12        Q    One of the following prohibited acts is to

13   refuse to show membership card or dues receipts when

14   requested to do so by the business representative or

15   job steward or any member, correct?

16        A    I see that, yes.

17        Q    And I read that correctly?

18        A    Uh-huh.

19        Q    And that is a bylaw of Local 150; is it

20   not?

21        A    Yes.

22        Q    And it would be a violation of the bylaws

1    for a member to be on the job without a membership

2    card, would it not?

3        A    Yes.

4            (Quigley Exhibit No. 7 was marked)

5        Q    Can you identify this document?

6        A    Local 150 Engineer.  It's the Local 150's

7    monthly newspaper.

8        Q    Turn to the very last page of Exhibit 7.

9    You see a little box about halfway down the page,

10   I'll read this into the record:  Don't recognize the

11   operator next to you?  Card him or her.  Do you see

12   that?

13       A    Yes.

14       Q    Did I read that accurately?

15       A    Yes.

16       Q    Isn't it correct that that box is in every

17   copy of this monthly newspaper?

18       A    It could be.  I see it very often but I

19   couldn't swear it's in every one.

20       Q    And this paper goes out the members of

21   Local 150, does it not?

22       A    Yes.

1          Q     This is something that the members of 150

2     at least have the opportunity to see on a monthly

3     basis, correct?

4          A     Yes.

5          Q     When it says card him or her, what does

6     that refer to?

7          A     It's referred to on the job site if you

8     see an operator running a piece of equipment and you

9     don't recognize him, you go over and pull out your

10    card and say I'm Mike Quigley, this is my card, can

11    I see yours.

12              (Quigley Exhibit No. 8 was marked)

13         Q     Can you identify Exhibit Number 8,

14    Mr. Quigley?

15         A     Looks like a copy of my union card.

16         Q     You'll note that the Social Security

17    number is blanked out?

18         A     Thank you.

19    MR. LEVY:  I would say it's pursuant to court

20    rule because the court requires that documents have

21    Social Security numbers be redacted.

22         Q     Over on the lower right hand side of the

1    card there's something that says REG.NO, then a

2    number.  Do you see that?

3        A    Yes.

4        Q    What is that?

5        A    I believe that's my union registration

6    number.

7        Q    When you were referring before to it's

8    also sometimes referred to as the register number,

9    is it not?

10       A    Could be.

11       Q    When you were referring before to the

12   card, the union card, this is the union card, is it

13   not?

14       A    Yes.

15       Q    In your declaration you state that it's

16   going to be a real problem for people to figure out

17   the right name to put in on the log in for the

18   remote authentication site that's part of the issue

19   in this case, correct, paragraph 4?

20       A    Okay.

21            (Quigley Exhibit No. 9 was marked)

22       Q    Can you identify Exhibit 9, Mr. Quigley?

1       A    Looks like some type of a language that

2   might be on a website or something.

3       Q    Let me represent to you that this is the

4   current version subject to improvement of what would

5   appear in the password authentication section in

6   order to get on the password protected website that

7   the International Union is proposing pursuant to the

8   campaign website resolution that there will be a

9   remote authentication system and this is the page

10  that a member would see when he tries to enter a

11  password protected portions of the website.

12          It says, in order to access this website

13  you must be a member of the International Union of

14  Operating Engineers, correct?

15      A    Yes.

16      Q    And if you are an IUOE member you must

17  enter the following information below, correct?

18      A    Yes.

19      Q    The first line, please enter the register

20  number as it appears your union membership card,

21  correct?

22      A    Yes.

1    Q    You said members are not going to know

2    their register number, right?

3    A    Yeah.

4    Q    We've already seen that members are

5    required to have their card with them on the job

6    site, correct?

7    A    That's what the bylaws says, yes.

8    Q    We've also seen that in order to vote

9    they're going to need their register number, right?

10    A    Yes.

11    Q    And to get into membership meetings they

12    need their register number?

13    A    Not all the time.

14    Q    They need their card, don't they?

15    A    No.

16    Q    You just said earlier you need your card

17    to get into a membership meeting?

18    A    That's what the bylaws says.

19    Q    So I guess if a member doesn't know his

20    register number you don't really need to worry about

21    that member because he's not going to be able to

22    vote, right?

1          A    I didn't understand that.

2          Q    You're trying to reach your campaign site,

3     you're trying to reach potential voters?

4          A    Yes.

5          Q    In the election?

6          A    Yes.

7          Q    In order to vote a member's going to need

8     to have a register number to put on the outside of

9     the envelope, correct?

10         A    Yes, looks like that's the new rule.

11         Q    If the member doesn't have the register

12    number to get on the website the member's not going

13    to have to the register number to vote; isn't that

14    right?

15         A    No.

16         Q    Look right under those two numbered

17    paragraphs it says, if you don't have access to your

18    membership card, please contact the IUOE membership

19    record department at, then a phone number, for

20    assistance, correct?

21         A    Yes.

22         Q    So if you don't have your card

1    notwithstanding the bylaws and everything else you

2    don't have your card, there's a place to get the

3    information, correct?

4         A    Looks like it, yes.

5         Q    So is it your testimony that members are

6    not going to be able to have access to their

7    register number in order to get on the website?

8         A    I don't know that.  I don't know if the

9    number will be busy, I don't know if they'll take

10    the time to dial the number.

11        Q    You don't know whether they're going to

12    have their card either, are you?

13        A    No, I don't.

14        Q    And when people are trying to access the

15    website most often they're going to be at home,

16    right?

17        A    I would think so but I don't know that.

18        Q    So the question isn't whether they carry

19    their card in the wallet, the question is whether

20    they have their card somewhere in their general

21    possession; isn't that correct?

22        A    The question is what?

1          Q     Is whether they have the card somewhere in

2     their general possession, somewhere in their house?

3          A     You're asking me whether they would or

4     not, I'm assuming they would.

5          Q     They would have their card at the house?

6          A     I'm only assuming they would, yes.

7          Q     Look at number two, you raise some issues

8     about not knowing in paragraph 4 how to enter their

9     name.  If you look at number 2 it says, please enter

10    your name as it appears on your union membership

11    card, correct?

12         A     Yes.

13         Q     That tells people how to enter their name,

14    does it not?

15         A     It does.

16         Q     If they're using some other name or

17    sometimes they use their middle initial or not they

18    don't have to guess about it, they could just get it

19    off their membership card, correct?

20         A     I suppose they could.

21           (Quigley Exhibit No. 10 was marked)10

22         Q     Can you identify what's been marked as

1     Exhibit 10?

2         A    Looks like the content from the support

3     Team 150 link.

4         Q    That's a link to your website, correct?

5         A    It is, yes.

6         Q    And the purpose of that link is to provide

7     a means for supporters of Team 150 to make

8     contributions to the campaign, correct?

9         A    Yes.

10        Q    And in order to make a legal contribution

11    to the campaign you have to be a member, correct?

12        A    Yes.

13        Q    What leads do you use to assure that the

14    contributions they received through these leads are

15    received only through members?

16        A    I don't know.

17        Q    Look at the page which is the second to

18    the last page in Exhibit 10.  Do you have any credit

19    cards, Mr. Quigley?

20        A    Yes.

21        Q    When you are using your credit card from a

22    remote location you have to, among other things, put

1    your name down, don't you?

2        A    You mean like purchasing something on

3    line?

4        Q    Yeah.

5        A    Yes.

6        Q    Some people use their middle initial,

7    sometimes some people don't?

8        A    Yes.

9        Q    Some people use nicknames, some people

10   don't?

11       A    I guess they may.

12       Q    But on your credit card you have to use

13   your credit card, you have to put your name as it

14   appears on the card, right?

15       A    Yes.

16       Q    In fact it says right here on this sheet

17   credit or debit information first name as it appears

18   on card, correct?

19       A    Yes.

20       Q    Last name as it appears on card, correct?

21       A    Yes.

22       Q    People manage to do that because they just

1    look at their card.  They get their name as it

2    appears on the card, right?

3        A    Yes.

4        Q    That's the same way in which the log in

5    page that you were looking at a minute ago works,

6    correct, the log in page?

7        A    You mean the in the proposed?

8        Q    Yeah.

9        A    According to this that's the way it works,

10    yeah.

11        Q    You say in paragraph 4 that many members

12    will be unwilling to answer the register number at

13    the time they might be looking at the website,

14    correct?

15        A    Yes.

16        Q    Can you give me a reason why they would be

17    unwilling?

18        A    From the way this is laid out they

19    automatically would see that the IUOE has something

20    to do with it rather than just a freedom to go to

21    your computer and click on whatever you want and go

22    where you want.

1          Q    And because the IUOE is the International

2     Union, correct?

3          A    Yes.

4          Q    Why would the fact that the IUOE have

5     something to do with it keep people from wanting to

6     put their --

7          A    The IUOE is the parent organization of

8     Local 150.

9          Q    Right.  Why is there an organization to

10    which each of these people is a member, right?

11         A    Yes.

12         Q    Why would they be reluctant to put their

13    name and register number?

14         A    Because they would feel --

15    MR. LEVY:  Let him finish.

16         Q    In order to log into a website?

17         A    Because they would feel that somebody was

18    watching them where they go.

19         Q    Let me direct your attention -- on your

20    website do you track people or log information about

21    people who log onto your website?

22         A    No.

1      Q     How does somebody entering your website

2    know that that's true or not true?

3      A     They probably don't.

4      Q     Look at Exhibit 9, you see the word

5    disclaimer?

6      A     Yes.

7      Q     This website will not log any identifying

8    information register number or name about IUOE

9    members seeking access to any particular campaign

10   website or the IP address and any other information

11   that might indicate the geographic location of any

12   member seeking to access any particular campaign

13   website.  Do you see that?

14     A     I do.

15     Q     Do you have any reason to think that's not

16   a correct statement?

17     A     I don't have any reason to believe it is

18   or isn't.  It's just a disclaimer.  It says what it

19   says.

20     Q     Do you have any reason to think that the

21   independent company that's running this remote

22   authentication system is not making an accurate

1    statement when they make that disclaimer?

2        A    I don't know that.

3        Q    Do you have any reason to believe that

4    they would be inaccurate?

5        A    Personally?

6        Q    Yes.

7        A    I wouldn't trust them, that's just me.

8        Q    You don't know who the company is?

9        A    I have no idea.

10       Q    The company that's being retained a

11   company called Matrix.  Do you know that company?

12       A    Not familiar with them, no.

13       Q    It's an independent company and has a lot

14   of clients, I can represent that to you.  And let me

15   further represent that it is in evidence in this

16   case the specification of the contract that Matrix

17   is entering with the IUOE is that it will not log or

18   track any identifying information and in addition

19   will not convey any information of that sort to the

20   International Union that's a matter of contract?

21       MR. LEVY:  I'm not sure, we've not seen a

22   contract.  We've been told what the contract would

1    contain.

2        Q    That's the way I phrased my question?

3        A    Was that a question?

4        Q    Yeah.  The question is if I represent that

5    to be true you would still disbelieve that?

6        A    Yeah.

7        Q    You're saying it's your testimony that the

8    membership of Local 150 in seeing this disclaimer

9    like you they're going to disbelieve this

10   disclaimer?

11       A    That's my feeling, yeah.

12       Q    What's that feeling based on?

13       A    If the International knows that then the

14   Local's going to know.  Not the Local, yeah, the

15   Local, because the Local is the one that's in power,

16   the incumbents more or less.

17       Q    What's your basis for that?

18       A    This campaign.

19       Q    Mr. Giblin has not taken any position in

20   this campaign, has he?

21       A    That's your opinion.

22       Q    Has he announced his support of one

1    candidate or the other?

2        A    Not to my knowledge, I have no idea.

3        Q    Mr. Giblin has not announced support or

4    opposition to either of the candidates in this

5    campaign, has he?

6        A    I don't believe he has, no.

7        Q    And you're saying notwithstanding what

8    this says and notwithstanding what I'm representing

9    to you is evidence that the contract is about to be

10   entered into between Matrix and the International

11   Union that this information is going to be provided

12   that members are going to believe that this

13   information is going to be provided, is going to be

14   collected by Matrix, conveyed to the International

15   Union and then conveyed to the Local union, correct?

16       A    That's my opinion.

17       Q    And do you have an opinion as to whether

18   members or many members of Local 150 are going to

19   believe all of those things that Matrix is lying

20   when it says it's not collecting the information,

21   that the contract is not going to be enforced when

22   it says Matrix is not going to prove any identifying

1    information to the International Union and that the

2    International Union is not going to -- is going to

3    convey information to the Local that all of that --

4         A    They may.

5         Q    You don't have any basis for saying

6    whether they will or they won't, do you?

7         A    No.

8         Q    Direct your attention back to Exhibit 1

9    paragraph 5 of your declaration where you state as a

10   fact that it takes several months for new members

11   after they join the union for the union database to

12   contain their membership number.  Am I accurately

13   stating what your declaration says?

14        A    Ask me again.

15        Q    Let me read for the record what you say in

16   the first sentence of paragraph 5:  Moreover, the

17   union's databases do not contain members' membership

18   numbers for new members until several months after

19   they join the union.  Is that a true factual

20   statement, Mr. Quigley?

21        A    I believe it is.

22        Q    Do you have personal knowledge that that's

1    true as we sit here June 1 of 2007?

2         A    Based on my past experience I'm not aware

3    as of today of any changes that have happened in the

4    International that would make that inaccurate,

5    register numbers are still linked to members.

6         Q    You talk about a situation, you said the

7    problem was brought home forcefully to you when the

8    Local was running a database allowing employees to

9    hire newly trained crane operators by using a

10   register number?

11        A    Yes.

12        Q    When was that?

13        A    When I was working for the IIIFFC.

14        Q    I want you to give me a year, was it last

15   year, the year before last, two years ago?

16        A    Maybe within the last four, five years.

17   As far as I can recollect it was during my time with

18   the IIIFFC, I know it because the IT person that was

19   at the apprenticeship site I talked to him daily

20   when they were setting that particular system up.

21        Q    You're thinking it was four, five years

22   ago?

1    A    I am.

2    Q    Are you aware, sir, of changes that

3    have -- technological changes that have taken place

4    in how this whole process is done since that period?

5    A    No.

6    Q    Are you aware that the membership numbers

7    are all e-mailed to the new members?

8    A    No.  I'm sorry, are what?

9    Q    E-mailed?

10   A    I said really.

11   Q    Your answer is you're not aware?

12   A    No.

13   Q    If the union gave a temporary number to

14   people new members while they're waiting for their

15   card would that solve the problem that you're

16   referring to?

17   A    Would it solve what problem?

18   Q    The problem that you were concerned about

19   here in paragraph 5 of your declaration?

20   A    Not in my opinion, no.

21   Q    You were concerned that new members

22   wouldn't be able to log in and get the remote

1    authentication because they wouldn't have their

2    membership number, correct?

3        A    That was one of my concerns.

4        Q    That's the concern you talk about in

5    paragraph 5, is it not?

6        A    Uh-huh.

7        Q    And that's the only concern you talk about

8    in paragraph 5, is it not?

9        A    Yes.

10       Q    And my question to you is if the union

11   gave new members a temporary number that they could

12   use right from the beginning while they're awaiting

13   their card, would that solve the problem?

14       A    No.

15       Q    Why not?

16       A    You just stated that they e-mailed them

17   their new membership numbers.  I would be skeptical

18   as to whether all the members in our Local have

19   e-mail, number one.  Number two, you don't know what

20   the mail glitches are, it may be an interact that we

21   have many Hispanic and foreign people who do not

22   live in this country and sometimes do not collect

1    their mail.  There are many, many issues that remain

2    unresolved that will convince me that that's the

3    answer.

4         Q    You're saying that no matter what this

5    would be true of any system, you say no matter what

6    there's no way for a new member, it's just an

7    unsolvable problem.  There's no way for a new member

8    to be able to get a number so that the new member

9    can log on to the remote authentication system?

10        A    I'm not saying they couldn't get it.  I

11   would be very skeptical whether or not they would

12   all get them.  If the election comes down to one

13   vote and one guy didn't get it that's the one I'm

14   concerned with.

15        Q    If the guy didn't get it he wouldn't be

16   able to vote either, would he?

17        A    No.

18        Q    Let's take a short break.

19                   (Off the record)

20   BY MR. WEINBERG:

21        Q    We basically have talked about the

22   contents of paragraph 6, except that you state a

1    concern in paragraph 6 that you didn't articulate

2    when you were testifying and that is what members

3    will be worried about, I'm reading from paragraph 6

4    of your declaration, I'm quoting, members worry

5    about whether an official will prevent them from

6    getting a good job through the union's hiring call

7    when the current job runs out.  When you talk about

8    an official will prevent them, who are you referring

9    to?

10        A    Probably the closest member would be the

11   business agent.

12        Q    You described your role with the hiring

13   hall earlier which was basically that you were not

14   involved with the day-to-day operation of the hiring

15   hall except to give advice occasionally to the

16   dispatchers, correct?

17        A    That's true.

18        Q    The hiring hall operates pursuant to a

19   pretty lengthy and very specifically set forth set

20   of rules, does it not?

21        A    It does.

22             (Quigley Exhibit No. 11 was marked)

1        Q    Can you identify that document.  I've

2    handed the witness Exhibit 11.  Can you identify

3    that?

4        A    I believe it's the hiring procedures of

5    the hiring hall addendum.

6        Q    These are the procedures that govern Local

7    150 hiring hall, correct?

8        A    I believe they are.

9        Q    Direct your attention to page 6 paragraph

10   entitled list placement, do you see that?

11       A    Yes.

12       Q    It says subject to Sections 8A through 8D

13   of this addendum number one, all registrants on list

14   one through four shall be dispatched in order of the

15   registrant's date of registration as available for

16   work in accordance with their experience as

17   operating engineers in the construction industry,

18   i.e. the earliest registered individual with the

19   required experience first as established by the

20   written statement of the registrant required by

21   Section 3J above and thereafter in order of date of

22   registration; is that correct?

1      A      Yes.

2      Q      Is that in fact the way the hiring hall

3      works to your knowledge?

4      A      No.

5      Q      The next sentence, a registrant shall have

6      the right to submit any dispute to the joint

7      arbitration board by the arbitration clause of this

8      contract.  In accordance with a paragraph 13 of this

9      addendum, correct?

10     A      That may be the first time I've ever heard

11     that sentence but that's what it says.

12     Q      You're saying that even though you weren't

13     involved in the day-to-day operations of the hiring

14     hall and you haven't been a business agent since

15     1999 that these procedures don't accurately state

16     the way the hiring hall works?

17     A      Correct.

18     Q      In what way are they inaccurate?

19     A      Number one, there may be occasion when

20     that person is never available and you have to jump

21     the list to go to somebody else.  There is occasion

22     when members are not as qualified as the other

1    member and I have that knowledge and the dispatcher

2    does not have that knowledge so this is a case of

3    perception versus reality.

4        Q    You stated in your declaration that you

5    were proud to say, I'll quote you, when I was a

6    business representative I am proud to say that we

7    never took advantage of our power at the hiring hall

8    to discriminate against members based on what they

9    said or did not say, correct?

10       A    Exactly, right.

11       Q    And that was through all your time as a

12   business agent up till 1999?

13       A    That's right.

14       Q    And the current administration at the

15   Local was the administration at that time, was it

16   not?

17       A    Yes.

18       Q    And you have absolutely no evidence that

19   since that time a single person has discriminated at

20   the hiring hall based on what they said or did not

21   say; isn't that right?

22       A    That's correct.

1        Q     Direct your attention to paragraph 8 of

2    your declaration.  You mentioned as an example of

3    violence an attack on Jim Archey at a meeting of

4    Local 37 in Baltimore and that's become known to the

5    membership, correct?

6        A     Yes.

7        Q     And do you have personal knowledge of what

8    happened to Mr. Archey in Local 37?

9        A     Only what I read on line blogs and

10   articles.

11       Q     Did you know that when Mr. Archey filed

12   his internal union complaint he did not complain

13   about the conduct of any officer or employee of the

14   Local?

15       A     I don't know.

16           (Quigley Exhibit No. 12 was marked)

17       Q     The court reporter handed you Exhibit 12,

18   Mr. Quigley.  I'm going to represent to you that the

19   first four pages of this document is is an internal

20   union charge preferred by Mr. Archey against

21   Mr. Wooten, first five pages.  The next two pages

22   are part of a citizens complaint that Mr. Archey

1    filed against Mr. Wooten based on the alleged

2    assault and the very last page of the exhibit are

3    the minutes of the internal union trial proceedings.

4              These exhibits show and you don't have any

5    basis to dispute, do you, that Archey filed his

6    internal union complaint only against a rank and

7    file member and not against any officer or agent of

8    the Local union, correct?

9         A    Correct.

10        Q    The criminal complaint that was filed was

11   only against a rank and file member and not against

12   anyone else, isn't that correct?

13        A    Looks like it.

14        Q    And the internal union proceeding on the

15   internal union charge that Mr. Archey filed, was

16   there not?

17        A    There was a what?

18        Q    An internal union trial proceeding on the

19   internal union charge that Mr. Archey had filed

20   against a rank and file member who he said had

21   assaulted him, correct?

22        A    Yes.

1   Q  And in fact at that proceeding the rank

2 and file member who was accused pled guilty, did he

3 not?

4   A  Looks that way, yes.

5   Q  And he received a fine, did he not?

6   A  Yes.

7   Q  And Mr. Archey said that he was happy with

8 the results of the proceeding, correct?

9   A  Yes.

10   Q  And you have no basis to dispute any of

11 that, do you?

12   A  No.

13   Q  So when you say members in our area are

14 aware of the attack at a meeting of Local 37, what

15 they're aware of is that there was bad conduct by a

16 rank and file member and that member was in fact

17 disciplined by his Local union; isn't that correct?

18   A  Yeah.

19   Q  And when you talk about problems in Local

20 18 Ohio, correct?

21   A  Yes.

22   Q  You have no personal knowledge of any

1    problems in Local 18 in Ohio, do you?

2        A    Only what I've read on some of the

3    Internet sites and blogs.

4        Q    That's the basis for what you put in your

5    declaration, correct?

6        A    Part of it, yes.

7        Q    Well, it's the basis for what you put in

8    your declaration in Local 18, isn't it?

9        A    Yes.

10        Q    And even by whatever you read on the

11    Internet accounts and blogs the violence that

12    occurred in Local 18 occurred in the 1970s and early

13    1980s, didn't it?

14        A    I think so.

15        Q    You refer to -- you acknowledge that

16    violence has not been a problem in Local 150?

17        A    Yes.

18        Q    In fact, the only incident you refer to is

19    an accusation that a Dugan supporter was attacked by

20    a Ward supporter, isn't that correct?

21        A    I acknowledge that, okay.  Yes.

22        Q    So the fact is that members of Local 150

1    have no reason to be worried about any kind of

2    violence being -- being subject to violent attack by

3    officers of the union whether in the Ward slate or

4    the Dugan slate, do they, that's not been the

5    history of this Local?

6        A    Not necessarily so.  Some of the last

7    meetings have been pretty contentious.

8        Q    Other than the violent act that you

9    described here which was an act by -- an alleged act

10   by members of the supporters of the Ward slate you

11   haven't identified any other violent act in your

12   declaration, have you?

13       A    Not in the declaration I haven't, no.

14       Q    You're saying you put in a violent act in

15   your declaration allegedly by members of the Ward

16   slate but you left off other violent acts?

17       A    There are other ones I could have

18   mentioned.

19       Q    You have a sentence that says "happily

20   such violence has never been a problem in our

21   Local."  Is that accurate or inaccurate?

22       A    That's an accurate statement.

1                    (Off the record)

2    BY MR. WEINBERG:

3        Q    Are you presently aware of the system that

4    will be used to implement the campaign website

5    resolution the remote authentication system?

6        A    Vaguely.

7        Q    What's your understanding of it?

8        A    I understand that it's going to be a third

9    party site that will control this message on a page

10   when you go to whatever the name of my website is, I

11   think.

12       MR. LEVY:  By this you're referring to Exhibit

13   9.

14       A    Yes, this language.  I'm assuming that's

15   what it is.

16       Q    There are certain things you could have on

17   your website that would be outside the password

18   protection area, the basic things like the logo, the

19   name of the slate, the identification of the

20   candidates, their pictures if you want, what office

21   they're running for, what the date of the election

22   is, et cetera, and then maybe some other things but

1    that basic information?

2         A    Splash page.

3         Q    Basically what you've got up there at the

4    beginning and then to go further you would then get

5    that page which would be the page being Exhibit 9

6    where you would be sent off to this remote

7    authentication site which would have a database of

8    names and numbers as they appear on cards and would

9    be able to provide instantaneous authentication.  Is

10   that your understanding of the system?

11        A    I assume that's what it's going to be,

12   yeah.

13        Q    When you -- is that your understanding

14   when you drafted this declaration?

15        A    Was that my understanding that this was

16   how -- I have no idea how it was going to work when

17   I did that.  I just assumed it would be something

18   like that.  I'm familiar with password sites.

19        MR. LEVY:  Should we go off the record?

20        MR. WEINBERG:  Sure.  Off the record.

21                    (Off the record)

22   BY MR. WEINBERG:

1       Q     If you turn to the last page of Exhibit 1

2     your declaration it says that you executed the

3     declaration on May 22nd, 2007.  Is that accurate?

4       A     Yes, you mean that's the day I signed it?

5       Q     Is that what you meant by executed?

6       A     Yeah, I signed it.

7       Q     On May 22nd?

8       A     Yes.

9       Q     On the date you signed that declaration

10     were you aware that the system that was going to

11     be -- the password protection system that was going

12     to be implemented would use this remote

13     authentication site?

14     A     I wasn't aware for sure but I could only

15     guess that's what they were going to do because I

16     couldn't imagine the International handing me the

17     registration numbers and names.  So I assume it

18     would have to be some type of system like this which

19     I'm a little bit familiar with.

20     Q     The paragraph 9 that is contained in your

21     declaration doesn't really have any application to

22     that kind of a system, does it?

1          A     No, I don't think so.

2          Q     What was the reason why paragraph 9 was

3     included in your declaration?

4          MR. LEVY:  Are you asking him for the legal

5     strategy decision behind including that?

6          Q     It's his declaration.  I'm asking him why

7     he included paragraph 9 in his declaration?

8          A     I imagine because that's probably the way

9     we thought we were going to handle it at the time,

10     handle the log in.

11          Q     But you just said on May 22nd you

12     understood that wasn't going to be the way that it

13     would be done?

14          A     I don't think I said that.

15          Q     If you want to correct --

16          A     No, this is when we signed this and this

17     is the way that we thought we might work it.  We

18     were aware that there was other ways to go on the

19     outside but at the time I don't think we had the

20     knowledge of that.

21          Q     You're saying you understand now that

22     what's in paragraph 9 would be inapplicable to the

1    system that's going to be used but you didn't know

2    that on May 22nd?

3        A    Yeah.

4            (Quigley Exhibit No. 13 was marked)

5        Q    Exhibit 13, Mr. Quigley.  Take a look at

6    that, can you identify that document?

7        A    I think it's the resolution that came from

8    the International.

9        Q    You say the resolution?

10       A    The campaign website resolution.

11       Q    Is that the resolution that your lawsuit

12   seeks to invalidate?

13       A    Yes.

14       Q    You say in paragraph 9 in your declaration

15   as originally announced the obligation to use

16   passwords imposed an onerous burden on website

17   operators, correct?

18       A    Yes.

19       Q    Where is it in this campaign website

20   resolution has it placed that onerous obligation on

21   website operators?

22       A     Where is it?  If I think you're asking me

1    correct, it's in the last paragraph.

2        Q    The very last paragraph?

3        A    That we have to have password protection

4    mechanisms.

5        Q    The last paragraph says "be it further

6    resolved that the International Union shall work

7    with the Local unions and their election committees

8    to establish appropriate password protection

9    mechanisms using member's register number or another

10   appropriate mechanism to identify membership

11   statistics."  Is that a correct reading of that?

12       A    Uh-huh.

13       Q    Does that provision state exactly, does it

14   prescribe a particular system for how it's going to

15   be done?

16       A    It gives a vague idea of how it can be

17   done.

18       Q    You say as originally announced in your

19   paragraph 9.  In fact as originally announced it

20   doesn't specify the system that you address in

21   paragraph 9, did it?

22       MR. LEVY:  Are you representing that this is

1    the only original announcement, Mr. Weinberg?

2        Q    Right now I'm referring to the campaign

3    website resolution?

4        A    I'm not trying -- I'm a little confused.

5    Are you asking me if it describes what I said?

6        Q    I took the campaign website resolution to

7    be the initial announcement, were you referring on

8    some other announcement?

9        A    The letter that went with this and this as

10   a whole, it was a whole parcel that was the letter

11   from the International and this I guess.

12       Q    And the -- did that letter specify in a

13   particular mechanism that locals were going to have

14   to apply to comply with the resolution?

15       A    It alludes to a mechanism.

16       Q    The resolution what it alludes to is that

17   it was going -- the International Union was going to

18   work with Local unions, correct?

19       A    That's what it says.

20       Q    And their election committees?

21       A    That's what it says.

22       Q    But it doesn't say exactly what the Local

1    unions are going to be required to do, does it?

2        A    Well, I'm assuming -- no, it doesn't.  It

3    doesn't say that -- it does.  It says use password

4    protection.

5        Q    Other than that?

6        A    And other appropriate mechanisms and I

7    have no idea what that means.

8        Q    Paragraph 9 as you indicated you deal with

9    a particular methodology of implementing a password

10    protection system, correct?

11        A    That methodology is what the other people

12    are going to use.  It's the same methodology they

13    have to have a back-end service to use this.  It's

14    the same methodology.

15        Q    It's not the methodology you were going to

16    have to use, correct?

17        A    Now that I'm going to have to use now?

18        Q    Yes.

19        A    If this is implemented you mean?

20        Q    Yes.

21        A    Sure it is.  The third party's going to

22    have to do everything I outlined here.

1        Q    When I say you, your campaign website is

2   not going to have to do the things that you outline

3   in paragraph 9, is it?

4        A    If this is passed now we would not be

5   responsible for doing this, correct.

6        Q    In paragraph 10 of your declaration I take

7   it you're addressing the kind of remote

8   authentication system that in fact is going to be

9   used; is that correct?

10       A    What I've said in here?

11                 (Record was read)

12       A    I believe it is.  Sounds like it.

13       Q    You said before that your declaration was

14   drafted by others but based on your input?

15       A    Uh-huh.

16       Q    Is that true of paragraph 10 as well?

17       A    Yes.

18       Q    So you refer in paragraph 10A to the

19   scripts that Ms. Pineda is talking about but what

20   scripts are you referring to?

21       A    The scripts are what I understood to

22   believe what is going to be written into the

1    background that directs the individual in and out of

2    the website once you've logged on.

3        Q    How did you know that that's what

4    Ms. Pineda was recommending?

5        A    Because I'm familiar with websites.  You

6    can't -- if you go into a logged in website you

7    can't -- if somebody's not smart you could actually

8    without having a script you could actually bookmark

9    that inside page and come back to it without

10    re-logging in again and access all through the site.

11        Q    How did you know that there was a

12    Ms. Pineda and that she was recommending or talking

13    about a certain kind of script?

14        A    Because I think I read an affidavit from

15    her but I still knew what that meant.

16        Q    So you read Ms. Pineda's declaration at

17    the time you drafted your affidavit, your affidavit

18    was drafted?

19        A    I read it at some point in time certainly

20    wouldn't have been when we were doing the affidavit

21    or script over whatever you call this.

22        Q    You want to answer that, repeat your

1    answer?

2         A    I think you asked me how I knew what the

3    script information was and it was from reading -- I

4    don't know what you call affidavit or whatever that

5    I received and read the information that was in

6    there.

7         Q    All I'm asking you is you read that

8    declaration of Ms. Pineda after the time you were

9    working on this declaration?

10        A    Yes.

11        Q    Direct your attention to the last sentence

12   in paragraph 10.  You begin with "on the other

13   hand."  You said I believe that many members will

14   distrust the promise that their data will not be

15   logged or that the log data will not be subject to

16   review by the IUOE.  Am I reading that correctly?

17        A    Uh-huh.

18        Q    So at the time you did this declaration

19   you were aware that there was, as you call it, a

20   promise that the data would not be logged and would

21   not be subject to review by the IUOE, correct?

22        A    I guess you're right, yes.

1     Q   You were aware of that from Ms. Pineda's

2  declaration among other places, correct?

3     A   It must have been from that, if that's

4  where it was.

5     MR. LEVY:  Are you representing that that was

6  in the Pineda affidavit as opposed to another

7  affidavit?

8     Q   I'm not trying to stick you with which

9  declaration you read?

10     A   I read a lot of stuff.

11     Q   Did you read more than just Ms. Pineda's

12  declaration at the time?

13     A   Yeah.

14     Q   Did you read other declarations at that

15  time?

16     A   I believe I did.

17     Q   Do you know who Mr. Chism is?

18     A   IT guy.

19     Q   Is that your answer?

20     A   I think that's who it is from my

21  recollection.  I don't know Mr. Chism.

22     Q   Did you in fact try to call Mr. Chism at

1    some point?

2         A    I did.

3         Q    You know who he is?

4         A    Only from the name on the papers that I

5    read, yes.

6         Q    You read Mr. Chism's declaration as well

7    as Ms. Pineda's?

8         A    I did.

9         Q    Did you read any other declarations?

10        A    I believe I read everything that was sent

11   to me.

12        Q    Did that include any other declarations?

13        A    It could have.  There was lots.  They

14   changed, then I had to read them again so I read

15   them.

16        Q    Those declarations at least Ms. Pineda's

17   and Mr. Chism's you remember reading while you were

18   doing your work on this declaration?

19        A    To be honest with you I read them, would I

20   remember from which ones right now, it's probably

21   unclear.

22        Q    What you do remember is that you read

1    Ms. Pineda's declaration and Mr. Chism's declaration

2    while you were in the process of working on your own

3    declaration, correct?

4        A    I believe.

5            (Quigley Exhibit No. 14 was marked)

6        Q    You've been handed Exhibit 14.  Have you

7    had a chance to review Exhibit 14, Mr. Quigley?

8        A    Yes.

9        Q    Can you identify that document?

10       A    I can't remember if I read this one before

11   but I don't remember seeing this one.  I may have.

12   I thought there was something that was a lot smaller

13   than this.  I read it.

14       Q    Are you aware of the substance of the

15   guidelines that are set forth?

16       A    I am now.

17       Q    Were you prior to reading it just now?

18       A    I don't know if this is one of the ones

19   that I read with some of the other stuff I have.  I

20   don't know.

21       Q    Take a look at the guideline number one.

22   You can look either on page 1 or page 2 of the

1    Exhibit 14 reading from page 2.  Number one, only

2    persons who are not members of the International

3    Union must be excluded by the password protection

4    feature described in the resolution.  Did I read

5    that accurately?

6    A    Yes.

7    Q    Were you aware that the International

8    Union had adopted that implementation guideline or

9    rule?

10    A    I can't say whether I was aware of it or

11    not.  I thought that was what this said.  These must

12    be the more definitive details.  I just can't

13    remember whether I read them or not.

14    Q    You understand what that says is that --

15    A    If you're not a member you can't get in.

16    Q    If you're not a member of the

17    International Union, correct?

18    A    Yes.

19    Q    So that a member of another Local, Local

20    18 would not be excluded from your website, correct?

21    A    Correct.

22    Q    And you have known that for sometime,

1    correct?

2        A    I don't know if I've known it for sometime

3    or not.

4        Q    When you wrote your declaration on May

5    22nd you knew that the password protection that was

6    being required was only password protection as

7    respected non-members of the International Union of

8    Operating Engineers, correct?

9        A    I believe so, yes.

10        Q    And when you look at paragraph 11 of your

11    declaration you talk about the ability of members --

12    one Local running a campaign website and one local

13    to be able to communicate with other IUOE locals?

14        A    Correct.

15        Q    There's nothing in the campaign resolution

16    website that precludes that, is there?

17        A    I guess not.

18        Q    Don't guess, tell me the answer?

19        A    Talking about the resolution or the rules.

20        Q    The resolution?

21        A    Are we talking these as one thing.

22        Q    Yeah.

1     A    Then yes.

2                 (Off the record)

3     MR. LEVY:  As I recall the statement of

4   material facts does not rely on paragraphs 11, 12 or

5   13 without going back and looking at it, but we

6   certainly recognize the password protection system

7   that's been adopted and as implemented provides

8   access subject to the other problems that have been

9   raised in the papers but that the system is intended

10  to allow members of every Local to get into the

11  website of every other local, of candidates and

12  their supporters in other every other Local.

13                (Off the record)

14    MR. WEINBERG:  During the break Mr. Levy

15  indicated that he wanted to amend a statement he

16  made for the record earlier.

17    MR. LEVY:  I stated before we broke that

18  paragraphs 11, 12 and 13 were not relied on because

19  we recognize that the password protection system as

20  implemented is intended to allow members of any

21  local to enter a name and register number to gain

22  access to a website operated by a member of any

1    local and not only their own.  There is content in

2    paragraph 13 that relates in addition to the issue

3    of a desire to reach out to members of locals with

4    reference to the election of officers in 2008 and

5    the timing of the adoption of the rule a certain

6    period of time before the convention and in

7    indicating that we don't rely on 11, 12 and 13 for

8    the purposes stated I did not intend to say that we

9    are not relying on the timing issue and the

10   desirability of reaching other locals for that

11   reason in light of the various problems that we

12   raised, concerns that we've raised, about the way in

13   which the password protection rule as a practical

14   matter interferes with access to websites.

15        Q    Let's go to that issue in paragraph 13 of

16   the declaration.  Summed up in the last sentence of

17   paragraph 13 which I'll quote "so I do not think it

18   is a mere coincidence that this new rule was adopted

19   barely a year before the next IUOE convention in

20   April 2008."  Did I read that correctly?

21        A    Yes.

22        Q    I take it from the rest of paragraph 13

1     that you think that it's not a coincidence because

2     there is a ground swell of opposition growing to the

3     leadership of the International Union and that

4     somehow this website resolution is intended to

5     diminish or affect that ground swell of opposition;

6     is that correct?

7          A     Yes, the ground swell would be quelled.

8          Q     Look at Exhibit 13 and taken together with

9     the other exhibit that we've already been looking at

10    which as Mr. Levy just stated makes it clear that

11    any member of any local of the Operating Engineers

12    could, consistent with the campaign website

13    resolution, have access to any campaign website of

14    any candidate in any local of the IUOE.  Explain to

15    me what it is in this resolution that in any way

16    would interfere with the ability of members of that

17    opposition to engage in all the communication they

18    wanted in their campaign websites?

19         A     It's the same answer.  It's the fear of

20    feeling somebody is watching over your shoulder

21    either the Local or the all powerful International

22    may or may not be, or may or may perceive to be

1  looking over your shoulder and looking at stuff that

2  they're able to see.

3      Q    It's entirely dependent -- that concern is

4  entirely a function of the fact that the disclaimer

5  on the log in sheet is not true, correct?

6      A    I didn't say it wasn't true.  I said I

7  don't know if I would believe it and I'm not sure

8  that other members would.

9      Q    That's your sole basis for your conclusion

10  in paragraph 13?

11      A    Yeah, that's my conclusion.

12      Q    That's your sole basis for that

13  conclusion?

14      A    I don't know about the sole basis that's

15  my conclusion.

16      Q    What's your basis for that conclusion?

17      A    The basis for the conclusion is the

18  knowledge that I have of the members and the

19  membership to perceive a real fear of oversight from

20  the International or the Local union.

21      Q    Have you done some kind of a survey?

22      A    No, I have not.

1          Q     Of the 4,000,000 members of the

2     International Union?

3          A     No, I have not.

4          Q     We talked about the disclaimer.  Have you

5     talked to members of the International Union as to

6     whether they believe that disclaimer to be false?

7          A     No.

8          Q     So as we speak here today you don't have

9     any direct knowledge that anybody other than you

10    would feel the way you do, do you?

11         A     I have knowledge of members I've talked to

12    and people I talked to that don't like it just like

13    I do that are supporting us on this issue.

14         Q     They don't like it but do the people you

15    talk to are aware of the disclaimer that's going to

16    appear?

17         A     I don't know if they are or not.

18         Q     You don't know whether if they knew about

19    that disclaimer they would be concerned?

20         A     No, I don't.

21         Q     Your answer to that was no, I don't?

22         A     No, I don't.

1      Q    When you're talking about it's not a mere

2  coincidence you're referring to the motivation

3  behind the adoption of the rule, are you not?

4      A    Part of the motivation.

5      Q    And other than what you stated do you have

6  any personal knowledge of the motivation behind the

7  adoption of the rule?

8      A    I believe it's part of them of the --

9  MR. LEVY:  Just answer the question.

10      Q    Other than what you've stated, do you have

11  any personal knowledge of the motivation behind the

12  adoption of the campaign website resolution?

13      A    No.

14      Q    Just so we're clear, there's nothing in

15  the resolution that prohibits any campaign website

16  from putting any content of any kind on the website,

17  is there?

18      A    It doesn't say there's not but I don't see

19  where it says it does, no.

20      Q    There's nothing in this campaign website

21  resolution that prevents or prohibits a campaign

22  website posting information critical of the

1    International officers, is there?

2       A    None that I can see.

3       Q    Is there any content that you plan to put

4    on the website that would be prohibited by this

5    campaign website resolution?

6       A    I don't know.

7       Q    Is there any content whatsoever that you

8    can point to that would be prohibited by this

9    resolution?

10      A    I don't know that because that other sheet

11   of paper that you gave along with me seems to

12   indicate that it has to go before some kind of

13   review board.

14      Q    No.

15      A    Isn't that what you're asking.

16      Q    I'm asking -- read that if it'll help you.

17      MR. LEVY:  I think I can get us through this if

18   you'd like some help.

19      MR. WEINBERG:  That's fine.

20              (Off the record)

21              (Record was read)

22      A    No.

1          (Quigley Exhibit No. 15 was marked)

2          (Quigley Exhibit No. 16 was marked)

3     Q     Can you identify Exhibit 15?

4     A     It's an HTM page on the website from a

5     link that I can't remember.

6     Q     Do you know who wrote this material?

7     A     I did.

8     Q     Direct your attention to the very first

9     sentence where you're asking brothers and sisters to

10    take time to read all the articles to "see how the

11    Dugan administration and the IUOE are conspiring to

12    keep all the membership from knowing what goes on

13    behind the hallowed halls of the elite of the Local

14    and International Union."  Did I read that

15    correctly?

16    A     Yes.

17    Q     That's a statement you wrote?

18    A     I did.

19    Q     And what you're referring to in that

20    sentence is the campaign website resolution,

21    correct?

22    A     Part of it.

1      Q    Is it your belief that the campaign

2   website resolution is a product of a conspiracy to

3   keep all the membership from knowing what is going

4   on behind the hallowed halls of the elite of the

5   Local and International Union?

6      A    Yes.

7      Q    And who exactly are the conspirators?

8      A    Well, the two I'm convinced of it's Giblin

9   and Dugan.

10      Q    And do you have any knowledge whatsoever

11   that Mr. Dugan played a role in the adoption of the

12   campaign website resolution?

13      A    No.

14      Q    So the answer to my question is no?

15      A    No.

16   MR. LEVY:  Yes, the answer is no.

17      Q    This resolution does not prevent any local

18   union campaign website from saying anything

19   whatsoever about what happens behind the hallowed

20   halls of the elite of the Local and International

21   Union, does it?

22      A    The resolution doesn't, no.

1   Q And the resolution is what the issue is in

2 this lawsuit, isn't it?

3   A The resolution that invokes the password,

4 yes.

5   Q That's the resolution we're talking about?

6   A Yes.

7   Q And the next sentence you say there is

8 very good reason they want to eliminate all websites

9 during a campaign or any other time.  Is that a

10 statement you made?

11   A Yes.

12   Q And are you saying that the campaign

13 website resolution with will eliminate all websites

14 during the campaign or any other time?

15   A I'm not sure because I don't really know

16 what's been described as a campaign website

17 resolution but -- ask me again.

18   Q You stated there's very good reason they

19 want to eliminate all websites and my question is

20 are you saying that the campaign website resolution

21 will eliminate all websites during a campaign?

22   A No.

1      Q    And if the campaign website resolution is

2  upheld by the court, your website will abide by that

3  resolution, won't it?

4      A    That's up to Joe.

5      Q    But as far as you're concerned it wouldn't

6  eliminate your website, would it?

7      A    No.

8      Q    You're not aware of any campaign website

9  in the Operating Engineers union that would be

10 eliminated as a result of the campaign website

11 resolution, are you?

12     A    Not now.

13     Q    The answer is no, correct?

14     A    No.

15     Q    Look at Exhibit 16.  Let me read this for

16 the record "these websites" says Quigley "show that

17 you can challenge authority.  It is a way to

18 overcome fear of the business agent in all trades,

19 fear their control over the dispatch office and fear

20 of officers who belong to the administration.  They

21 show you can speak out and survive."  Did I read

22 that accurately?

1          A     Uh-huh.

2          Q     And that Quigley, the Quigley that's

3     referred to, is that you?

4          A     Yes.

5          Q     Did you make that quote?

6          A     I did.

7          Q     Explain to me how the campaign website

8     resolution would in any way undermine the ability of

9     these websites to challenge authority?

10         A     Say it again.

11         Q     You've got the website resolution, does

12    that resolution in any way eliminate or undermine

13    the ability of these websites to challenge

14    authority?

15         A     No.

16         Q     It doesn't in any way undermine the

17    ability of these websites to speak out and survive,

18    does it?

19         A     No.

20         Q     Look back at Exhibit 9.  Paragraph 14 and

21    15 of your declaration you refer to ways in which

22    unscrupulous employers could get on the website,

1    correct?

2         A    Uh-huh.

3         Q    Explain to me how they would do that under

4    a password protection system?

5         A    Because the name and the password is not a

6    guarded secret.  It's available to many staff

7    members.  It's been found on blog sites.  In fact in

8    this issue that you just gave me are the letters to

9    the paper that list the name and the register number

10   of four people.

11        MR. LEVY:  He's asking you specifically about

12   paragraph 14.

13        A    There are a lot of different ways you can

14   buy over the Internet hacks that hack just strictly

15   numerical or alphanumerical types of sequences, I

16   guess like cracking a safe, you try long enough then

17   you could get in I suppose if you had the will.

18        Q    Look at Exhibit 9, the log in sheet, and

19   read the very first thing up at the top of the page.

20   Read the next line, too, this log in specifically

21   says the only people permitted to log in are IUOE

22   members, correct?

1       A       Yeah.

2       Q       And anybody who is not an IUOE member who

3   was hacking into the system would be doing something

4   that is explicitly not permitted by this log in

5   document, correct?

6       A       I suppose, yeah.

7       Q       Are you aware that there are federal laws

8   that prohibit anyone from gaining access to a

9   website like this which is limited to specific

10  people by using improper means to do so?

11      A       No.

12      Q       And are you aware that somebody did

13  exactly what you just said they'd be committing a

14  federal crime?

15      A       No.

16      Q       Do you have any reason to dispute that

17  that's the case?

18      A       I don't have knowledge of what you're

19  talking about.

20      Q       If somebody were committing that crime is

21  it -- if that were a federal crime, is it still your

22  opinion that this is a major problem for the

1    password protection system that the employers who

2    you deal with are going to go around committing that

3    crime?

4         MR. LEVY:  He testified he doesn't know whether

5    it's a crime.

6         A    I don't know whether it's a crime.  It

7    seems like a hypothetical question whether they

8    could or couldn't.

9         Q    I said assuming it's a crime, which we

10   will be able to establish, I can give you the

11   citation to it?

12        A    Okay.  If it's a crime, then it's a crime.

13        Q    And so do you still -- if it's a crime are

14   you still concerned that unscrupulous employers are

15   going to be doing what you said they'd be doing?

16        A    Am I still concerned --

17        Q    What you say in the last sentence?

18        A    I think if they're unscrupulous they're

19   going to continue to do what they want to do.

20        Q    If there's no password protection then any

21   employer anywhere can sit down in the comfort of his

22   own home or office and put his hands on the keyboard

1    and in very short order, it took me about 15

2    seconds, access your website, correct?

3         A    Yeah.

4         Q    And they could do so any time they want

5    whether you know it or not, correct?

6         A    Yes.

7         Q    And if you have a password protection

8    system they couldn't just do that, could they?

9         A    No.

10        Q    And in order to get on your website at

11   that point or at least the password protected

12   portions of the website they would have to do

13   something which would amount to representing

14   themselves either through the numerical process you

15   described or some other process to be something that

16   they're not, correct?

17        A    Yes.

18        Q    I've asked you to assume that that would

19   be a violation of federal law?

20        A    I can't assume it because I don't know if

21   there is a law.

22        Q    That's the premise of the question?

1         MR. LEVY:  He's not an expert witness.

2         Q    I'm asking him to assume I'm correct.  If

3    on the assumption I'm correct, I'm not asking you to

4    make a legal judgment because maybe I'm not correct,

5    I'm asking you to assume that I am correct, there

6    would be a difference in the ability of that

7    employer to access your website if there was a

8    password protection system, would there not?

9         A    I said that, yes.

10        Q    That's equally true, go to paragraph 15 a

11   minute.  You attach to your declaration an exhibit,

12   correct, you call it Exhibit A and you reference it

13   in paragraph 15, right?

14        A    Yes.

15        Q    Take a look at that exhibit.  We're now

16   looking at Attachment A which is part of Exhibit 1.

17   You point to the fact that there is a member, a

18   Local 150 member, there who put his register number

19   on his post, correct?

20        A    Uh-huh.

21        Q    Explain to me how using that information

22   an employer or any other unscrupulous person could

1   get on your website?

2       A    Depending on if they knew that this guy

3   might have bragged about writing on the blog, it

4   might be a member who blogs all the time.  Judging

5   by the numbers of the serial number he's probably,

6   looks like he's a little bit more newer than I am.

7   I guess it would take a lot of investigation work to

8   do that, but that might not have been the best

9   example I should have used but it's an example.

10      Q    In other words, you couldn't use the

11  information on Exhibit A to get into your website if

12  it were password protected unless you also had the

13  person's name as it appears on the registration

14  card, right?

15      A    Yes.

16      Q    In order to put the name on the

17  registration card onto a website if you weren't that

18  person you'd be putting a false name, you'd be

19  entering a false name in that log in, correct?

20      A    Yeah.

21      Q    Do you have any knowledge as to whether or

22  not it's a violation of federal law to gain access

1     to a website which is restricted to a particular

2     group by using false identification?

3          A     No.

4          Q     Go to paragraph 16 of your declaration.

5     In your first sentence you say we have literally

6     thousands of members of our Local who are owner

7     operators or contractors big or small.  Is that a

8     true statement, sir?

9          A     I believe it is, yes.

10         Q     What's your basis for that statement?

11         A     In my tenure as a business agent I signed

12    up literally hundreds and hundreds in my district of

13    owner operators.  Our Local was typically noted for

14    going after even the smallest contractor and

15    typically though we ended up being owner operators

16    in some portion and many of them moved on to get to

17    position where they could hire more Operating

18    Engineer employees and got to be bigger contractors

19    and that based on my knowledge of the Local and

20    other areas there was probably actually more than

21    that because the outlying areas typically had a lot

22    smaller contractors than maybe the Chicago

1    metropolitan area would.

2        Q    Would you sign up an owner operator, they

3    have a special kind of union card, doesn't he?

4        A    Some do, some don't.  When I was there it

5    was typically you could tell, I don't know if it was

6    00 or 0, but there was a designation on their card

7    that they were owner operator.

8        Q    There are records of how many owner

9    operator cards?

10        A    I imagine there is.

11        Q    Those records don't show that there are

12    literally thousands of owner operators, do they?

13        A    They should.

14        Q    I'm representing to you that they don't.

15    And there are also dues records right which show

16    what kind of member you are, correct?

17        A    Yes.

18        Q    And those dues records don't show that

19    there are thousands of owner operators, if I say

20    that do you have any reason to dispute that?

21        A    No.

22        Q    And the fact is that to the extent there

1      are owner operators in the Local, almost all of them

2      are these very small owner operators that have just

3      one or two pieces of equipment; isn't that right?

4          A    No, there's all kinds.  We still have

5      owner operators that own companies that have

6      operating engineers cards in their pocket that have

7      million dollar companies.

8          Q    We can tell how many there are in each

9      category by the dues records, can't we?

10         A    I'm not sure of that.  I have never seen

11     the dues record database.

12         Q    The dues records show how many are on na

13     hourly basis and how many are on salary?

14         A    Maybe.

15         Q    And if they show that the ones who are on

16     the hourly basis are not big contractors, are they?

17         A    I don't know that.

18         Q    If I told you that there were only 30, in

19     the whole Local there were only 30 people of owner

20     operator status who were on salary and therefore

21     work for big contractors, would you be able to

22     dispute that fact?

1       A    I wouldn't be able to dispute it but I

2    don't believe it.

3       Q    You believe that the dues records of the

4    union are wrong?

5       A    I don't know that.  I' never seen them.

6       Q    Can you name more than 30 owner operators

7    who working for big companies?

8       A    Not off the top of my head, no.

9       Q    A small owner operator is somebody who can

10   be referred out of the hiring hall, correct?

11      A    I don't know that.  There was a point in

12   time when they were not allowed to do that but that

13   might have changed.  I don't know.

14      Q    You don't know whether a small owner

15   operator could be referred out of the hiring hall?

16      A    I don't know.

17      Q    The answer is yes you don't know, just

18   want to get the record correct.

19      MR. LEVY:  I think that's what the testimony

20   reflects.

21      Q    Can you identify an owner operator who has

22   been privy to -- gone to union meetings, do you know

1    any operators who are on a salary basis who go to

2    union meetings?

3        A    Yeah.

4        Q    Who would that be?

5        A    At our last union meeting for the election

6    commission election there were -- I ran into two,

7    both the Chellino brothers who run a multi-million

8    dollar crane operation who both still run cranes who

9    both still have their cards in their pocket and they

10   hire hundreds of operators per year and I think

11   there's probably more of them.  I can't remember

12   right now but there were other owner operators

13   there.  I believe Randy Bisaillon was there a

14   contractor I had known for years out of the Kankakee

15   area who still operates equipment, has maybe 20

16   operators throughout the year at peak season.

17       Q    Anybody else?

18       A    Not that I can recall right now but they

19   were there.

20       Q    You say there are -- many owner operators

21   participate in contractor negotiations on the

22   employer side, are you talking about collective

1    bargaining negotiations with the union, correct?

2         A    Yes.

3         Q    I want you to tell me when you say many

4    how many are you talking about?

5         A    Couple.

6         Q    Two?

7         A    Two that I think I remember.

8         Q    Who are those two?

9         A    Dave Snelton is one and I can't think of

10   the other guy that's on the other board, but Dave

11   Snelton happens to sit on the pension board, the

12   underground excavators on the contractor side and

13   several other boards.

14        Q    When you say board, are you talking about

15   a joint board?

16        A    A joint board.

17        Q    A joint board isn't a position where

18   you're representing an employer in a collective

19   bargaining negotiations, is it?

20        A    No, but Dave Snelton also sits on the

21   negotiating board for, I believe it's the

22   Underground Contractors Association.

1      Q    Are you personally involved in those

2   negotiations?

3      A    No.

4      Q    Do you have personal knowledge of whether

5   he's part of that --

6      A    I wasn't part of the team but I'm pretty

7   sure that he sits on that board.

8      Q    That's not based on any personal knowledge

9   that you have?

10     A    No.

11                (Off the record)

12  BY MR. WEINBERG:

13     Q    Paragraph 17, look over that.  Am I

14  understanding you to say that in a local like Local

15  150 there's really not any such thing as sensitive

16  information that union members have that should be

17  protected from employers?

18     A    Not in my opinion, no.

19     Q    There's nothing?

20     A    No.

21     Q    What about the area of organizing, is

22  Local 150 engaged in organizing activities?

1      A    Yes.

2      Q    There are no union construction companies

3  within Local 150's jurisdiction?

4      A    That's correct.

5      Q    There are some pretty big non-union

6  companies?

7      A    Yes, sir.

8      Q    One of those would be the company we

9  talked about earlier the BE&K company, correct?

10     A    That's not a good comparative.  They come

11  in once in awhile and many times they've come in and

12  done it under a PLA.

13     Q    When they come in you would like to

14  organize BE&K, wouldn't you?

15     A    I think anybody would.

16     Q    And you'd also like if you can't organize

17  them you'd like to keep them out of any jobs in your

18  jurisdiction, right?

19     A    Just like any other contractor, yes.

20     Q    And you have a variety of tactics you use

21  and things that you do to try to accomplish -- as a

22  union to try to accomplish those purposes, right?

1      A    Yeah.

2      Q    And you've been involved in strategizing

3  within the Local union as to things that could be

4  done to keep a declaration from getting or keeping a

5  particular construction project within Local 150's

6  jurisdiction, correct?

7      A    Any non-union contract, yeah.

8      Q    But you think it's fine if what was being

9  said in those strategy sessions were conveyed to

10  BE&K?

11      A    No.

12      Q    So that would be sensitive information

13  that you wouldn't want an employer to have, wouldn't

14  it?

15      A    Yes.

16      Q    And you know what the word salting means?

17      A    Yes.

18      Q    Why don't you explain that for the record,

19  what is does salting mean?

20      A    It's having a union member hire on to a

21  non-union contractor to get overt and covert

22  information that's critical to our organizing

1     campaign.

2          Q     Local 150 uses salts?

3          A     They have.

4          Q     And there are times when Local 150 has

5     spent quite a bit of money on salts, hasn't it?

6          A     I believe so, yes.

7          Q     The issue of whether to use salts, that

8     could be an issue of people might want to debate in

9     a Local union election campaign, right?

10         A     No.

11         Q     Everybody in a Local union would be in

12    agreement on that?

13         A     I believe so.

14         Q     And how much money should be spent on

15    salts, is that an issue that people in the Local

16    might want to debate?

17         A     It's not an issue that's ever been left up

18    to the membership.

19         Q     Are you saying that that's not an issue

20    that a candidate for election in Local 150 would be

21    somehow prohibited from raising the issue of whether

22    the Local's spending too much or not enough on

1    salts?

2        A    Nothing would prevent that from raising

3    it, I suppose.

4        Q    And if anybody ever raised the issue of

5    that kind of issue that the Local was spending too

6    much or not enough on salts, would you consider that

7    to be sensitive information?

8        A    No.

9        Q    Would you consider it to be sensitive

10   information as to whether salts would be used on a

11   particular campaign or not?

12       A    No.

13       Q    You have no problem letting the employer

14   know that you're going to be salting his operation?

15       A    I don't.  I never did.

16       Q    If the employer knew that you were going

17   to be salting the operation, wouldn't the employer

18   take extra care in the hiring process to make sure?

19       A    Exactly what I want him to do.

20       Q    In expressing all these opinions you're

21   expressing your opinion?

22       A    Not in my opinion.  I learned that in

1    organizing school.  You can use it either way.

2    Sometimes it's to your advantage to let them know,

3    sometimes it's not.

4         Q    There are times when it's not your

5    advantage to let him know?

6         A    There could be.

7         Q    In those situations you don't want the

8    employer to know, do you?

9         A    Some people may not.  I really don't care.

10        Q    You just said there are times when you

11   don't want the employer to know?

12        A    It might be convenient for him not to know

13   but I've never adopted that attitude so it doesn't

14   matter to me.

15        Q    But you can understand how it might matter

16   to how a union could decide that it was sensitive

17   information, how it ran its salting program?

18        A    Yes.

19        Q    And how much, for example, individual

20   salts were going to be compensated that could be an

21   issue too, right?

22        A    Not to me, but yes.

1      Q    What about bargaining, in collective

2  bargaining negotiation as a strategy, right?

3      A    Yes.

4      Q    It should have anyway, right?

5      A    I hope so.

6      Q    And it has tactics, right?

7      A    It may.  I have been involved with some

8  negotiations, never in our main collective

9  bargaining agreement so I'm not aware what that

10  procedure is.

11      Q    This is a general matter, you know enough

12  about labor relations to know that in collective

13  bargaining negotiations the respective parties have

14  strategies and tactics, correct?

15      A    Sure.  Everybody has a number.

16      Q    And you're not -- in collective bargaining

17  negotiations as in any negotiation you don't want

18  the other side to know what your strategy and

19  tactics are, do you?

20      A    Probably not.

21      Q    So the strategy and tactics that a union

22  has in collective bargaining negotiations would be

1    sensitive information, wouldn't it?

2        A    I'd say so, yes.

3        Q    But the strategy and tactics that a union

4    is using might be the subject of debate within a

5    union election campaign, might it not?

6        A    I don't know that.  It's not in ours, so I

7    guess any anything could be the subject of debate

8    but I don't know.

9        Q    For example, going into negotiations a

10   union might want to do everything it could to make a

11   strike threat credible to the employer, right?

12       A    They could.

13       Q    That would be not only legitimate but a

14   frequently used strategy or tactic in negotiations,

15   correct?

16       A    I think so, yeah.

17       Q    Yet at the same time if there were an

18   election campaign going on the members might want to

19   debate whether they thought a strike was appropriate

20   in the context of those negotiations, right?

21       A    Yes.

22       Q    And if the employer were to learn that in

1    fact the membership was divided on that issue then

2    the employer would be learning sensitive

3    information, wouldn't he?

4         A    Okay, yes.

5         (Quigley Exhibit No. 17 was marked)

6         Q    Can you identify Exhibit 17?

7         A    This is the May issue of the Operating

8    Engineer that just came out.

9         Q    Have you seen this particular issue?

10        A    Yes.

11        Q    Did you see this particular article?

12        A    Yes.

13        Q    Paragraph 17 you indicate that there

14    aren't big employers the way there are in a

15    stationary engineer's local.  Am I reading your

16    declaration correctly?

17        A    It's hard to compare employers with a

18    stationary Local because a stationary Local could

19    represent a factory that has a thousand people.

20    Stationary locals aren't limited to just Operating

21    Engineers.  You're an Operating Engineer member but

22    you could be working on an assembly line.  There

1    could be -- like a UAW in a GM, that's kind of the

2    reference I'm making here.

3        Q    There are large construction companies

4    that have a number -- a sizable number of operating

5    engineers in their employ correctly on any one

6    particular project?

7        A    Yes.

8        Q    And there are collective bargaining

9    agreements with employer associations that cover

10   very large numbers of people, correct?

11       A    Well, they cover by district.  In our area

12   we have district agreements so.

13       Q    This article refers to?

14       A    District 1, 2 and 3 agreement.

15       Q    This agreement covers, as you put it,

16   Local 150's District 1, 2 and 3.  And the collective

17   bargaining agreement, the two agreements that are

18   being negotiated according to this article cover

19   over 10,000 employees; is that correct?

20       A    Yeah.

21       Q    And that agreement is being negotiated as

22   we speak, is it not?

1        A    I think it is, yeah.

2        Q    And the deadline was May 31st with a 30

3    day extension window, correct?

4        A    Uh-huh.

5        Q    And what this article is all about is

6    getting Operating Engineers prepared for a strike,

7    correct?

8        A    No.  It's a political clap trap.

9        Q    This is what it says.  With that in mind I

10   want each and every Local 150 member to focus on the

11   following fact.  If we do not get a contract

12   proposal from management that is acceptable to the

13   membership then we will be on strike probably

14   beginning July 1, 2007.  I want every Local 150

15   member to prepare themselves for the prospect of a

16   strike.  Get as many hours in as possible.  Put up a

17   little extra money in savings if you can.  Maybe

18   wait until after the contract is done to buy that

19   new kitchen.  Maybe put off remodeling the kitchen.

20   Think of it as an investment in our collective

21   future, the most important investment we will make

22   this year.  Did I read that accurately?

1        A     Yes.

2        Q     That's what this article says, right?

3        A     Uh-huh.

4        Q     And in fact whatever your likelihood of a

5    strike is you certainly want the employers to

6    believe that you're prepared to take whatever action

7    you need to get leverage in negotiations, right?

8        A     Done that forever, yes.

9        Q     You certainly want the employers to

10   believe that you have a credible strike threat, do

11   you not?

12       A     Yes, that would be a smart thing to do.

13       Q     At the same time it might be an issue in

14   the debate in the election campaign whether this

15   really should be a strike or whether it's even

16   necessary; is that right?

17       A     There should be?

18       Q     Whether people should be talking about a

19   strike and whether a strike is necessary?

20       A     Should there be debate.

21       Q     There could be?

22       A     Sure, yeah.

1     Q   And if there were debate like that and the

2   employer knew about it it would certainly undermine

3   the message that this article was conveying of a

4   credible strike threat; isn't that right?

5     A   I don't think so, no.

6     Q   Look at the next exhibit.

7     (Quigley Exhibit No. 18 was marked)

8     Q   Can you identify Exhibit 18?

9     A   It's a link on our website.

10     Q   Did you draft this document?

11     A   I did.

12     Q   Am I reading this document correctly in

13   interpreting it to say that no strike would be

14   necessary to obtain a good contract?

15     A   No.

16     Q   Look at what's in the box and quote what's

17   in the box, "when you look at the facts it's easy to

18   see we have all the ingredients necessary for a good

19   contract.  In fact we have so many issues on our

20   side, a monkey could negotiate our contract.  Enough

21   said."  Did I read that correctly?

22     A   Yes, you did.

1          Q     Would a monkey need a strike in order to

2     successfully negotiate the contract?

3          A     Except the employer.

4          Q     In the first paragraph of text the second

5     sentence says, "Steve Cisco said the sky is falling.

6     Jim Sweeney wants everyone on strike and Bill Dugan,

7     well, he has no clue."  Did I read that accurately?

8          A     You did.

9          Q     Fair reading of that is that the reader's

10    supposed to think that a strike isn't necessary;

11    isn't that right?

12         A     No, it might be a little bit of levity but

13    it just says we have all the necessary ingredients

14    to get a good contract right now.

15         Q     You certainly don't mention that in the

16    reading that says the willingness of the membership

17    to go out on strike?

18         A     I'm sorry.

19         Q     You're certainly not saying one of those

20    ingredients is the willingness of the membership to

21    go out on strike?

22         A     I don't think the members are ever willing

1    to go on strike.

2         Q    An employer reading this would doubt the

3    preparedness of this Local to go out on strike,

4    wouldn't it?

5         A    I don't think so.

6         Q    Let that be a subject of interpretation?

7         A    Sure.

8         Q    In the second sentence you mention Steve

9    Cisco on Exhibit 18.  He's one of the union

10   negotiators on the MARBA contract negotiations?

11        A    I believe so.

12        Q    Jim Sweeney is one of the negotiators in

13   that contract also?

14        A    I believe so.

15        Q    You were the one who chose the two people

16   who are negotiating that contract?

17        A    Yup.

18        Q    Do you know a company called Levy?

19        A    Yes.

20        Q    The Local's been on strike with Levy for

21   about 13 months, right?

22        A    Yes.

1      Q    And the big issue in that strike is

2    whether the strike is an unfair labor practice

3    strike or an economic strike, right?

4      A    Maybe.  I'm not -- other than they're out

5    on strike and I don't know all the details of it.

6      Q    You're aware that there's been litigation

7    whether it's an economic strike or are unfair labor

8    practice?

9      A    I know there's been litigation but I have

10    not been privy to what the litigation's about that I

11    recall.

12      Q    Assume for the moment that there's an

13    issue as to whether the strike is an economy strike

14    or an unfair labor practice strike, are you aware of

15    the ramifications of it being one or the other for

16    the employees who are out on strike?

17      A    I should but I don't know if I recall it

18    right now.

19      Q    Without going through them it's pretty

20    significant whether it's an unfair labor practice

21    strike or economy strike for the members, isn't it?

22      A    Either way, they're losing either way.

1     It's been awhile.  I don't remember all the ins and

2     outs.

3         Q     If it's an unfair labor practice strike

4     you have a lot of rights you don't have if it's an

5     economic strike?

6         A     I understand.

7         Q     The way you decide that is what were the

8     real reasons for the strike, why did people go out

9     on strike?

10        A     Yes.

11        Q     But at the same time with a 13 month

12    strike in that context of an election it could be a

13    reasonable assumption whether there was good reason

14    to go out on strike or not in a company like Levy;

15    isn't that right?

16        A     Yes.

17        Q     If there was debate on websites about

18    whether there should or shouldn't have been a strike

19    and the reasons for the strike that debate could be

20    revealing sensitive information to an employer,

21    couldn't it?

22        A     It could.  I don't know that.  I haven't

1    seen any information so I don't know.

2        Q    Just in general terms, if it's an

3    important issue whether it's an unfair labor

4    practice strike or an economic strike and you were

5    having a debate in a campaign the reasons for the

6    strike that could well end up producing sensitive

7    information for the employer?

8        A    I don't know that.  It could.  I don't

9    know that.

10       Q    The fact that an employer sits on a joint

11   board, a pension board or an apprenticeship a

12   training board, that doesn't make the employer privy

13   to sensitive union information, does it?

14       A    I don't know, could.  They certainly know

15   the shape of our pension plan so I don't know what

16   sensitive information is.  It could.

17       Q    You just acknowledged that there are a

18   number of issues that could be sensitive

19   information?

20       A    Because it's an opinion, what I think is

21   sensitive somebody else may not and what I don't

22   think somebody else may.

1     Q    A reasonable union could conclude that

2     some of the areas we talked about involve

3     information that would harm the union's interest if

4     the employers knew about it, right?

5     A    Somebody could interpret it that way, yes.

6     Q    And it could be a reasonable

7     interpretation to interpret it that way, right?

8     A    I don't know what's reasonable, I guess it

9     could be.

10    Q    Look at paragraph 18 of your declaration.

11    In your Local the Ward slate for whom you run the

12    website have the majority of the present members of

13    the executive board, correct?

14    A    Yes.

15    Q    They have the overwhelming majority of the

16    members of the election committee?

17    A    Yes.

18    Q    You refer to something called

19    unionfacts.com.  Do you know what that is?

20    A    No, it's a website that I found that was

21    able to get to the information about our Local.

22    Q    If I told you that was a well-known

1    antiunion website, would you have any reason to

2    dispute that?

3        A    No.

4        MR. WEINBERG:  Why don't we take a short break.

5                    (Off the record)

6    BY MR. WEINBERG:

7        Q    Let's talk about paragraph 19.  How long

8    has your website been up?

9        A    This is the second generation.  There was

10   an earlier one that was more simplistic that was put

11   up hastily.  I want to say around I think it was

12   July of last year, after the business agent got

13   fired I put it up.

14       Q    Was that a Team 150 or Ward slate campaign

15   website?

16       A    Yes.

17       Q    So you've had either that website or your

18   current website?

19       A    I just don't remember what the time period

20   was.

21       Q    One or another has been up since

22   approximately July of 2006?

1       A    Yes.

2       Q    What efforts have you made to this point

3  to direct the members of the press to that website

4  or those websites?

5       A    Other than information on our fliers and I

6  think we've sent out several press releases, I

7  didn't but the campaign did, and our website was on

8  them so they did go to whoever, I'm not even sure

9  what the distribution list of the press people on

10 it.

11      Q    You recall that the website was on the

12 information in the press packet?

13      A    Yes.

14      Q    Was that at your request?

15      A    I don't know if it was mine or Linda just

16 did it on her own or whoever wrote up the press

17 list.

18      Q    You said you set up a website when you

19 were with the Indiana Illinois Iowa Foundation for

20 Fair Contracting?

21      A    Yes.

22      Q    You also talked about being at some issues

1    with some the political issues with the legislature

2    trying to convince them to do or not do certain

3    actions, correct?

4         A    To support prevailing wage issues.

5         Q    When you were doing that how did you reach

6    out to the legislators?

7         A    I was a lobbyist, went down and saw them.

8    We wrote letters.

9         Q    If you want the press to know about your

10   website, is the best way to do it to just sort of

11   publicize your website is the best way to do it is

12   just sit there and hope they stumble over the

13   website?

14        A    I don't know.  I'm not sure I understand.

15        Q    If you want the press to pay attention to

16   your website, wouldn't you take direct action to

17   communicate to the press that you have the website?

18        A    I don't know.  I don't know if I would or

19   not.  Only contact that I've had with the press is

20   just from the issues that I told you.  I think the

21   logo was on our -- I think there was a couple

22   campaign packets developed with information on them

1     that had stuff on there.  Other than that I

2     haven't -- I don't have communication with any press

3     people.

4          Q     In paragraph 19 you talk about search

5     engines.  Do you know whether Google or Yahoo or

6     other search engines, do you know how they index or

7     rank websites?

8          A     I know that they do it.  How they do it I

9     don't have that technical information.  I know they

10    do it.  I know you can -- some stuff comes up better

11    than others, some stuff doesn't.

12         Q     Do you have any basis for knowing one way

13    or the other whether a campaign website operating in

14    compliance with the resolution would be locatable

15    through the use of any of these search engines?

16         A     My understanding is that if it has to go

17    through a third party site then I've been told it's

18    not going to come back and find our site, just like

19    I've been told our site's hard to find because I

20    have a flash element on the front rather than words

21    confined.

22         Q     The flash element we talked about before

1    are material that the resolution does not require to

2    be password protected, do you recall that?

3         A    Yeah.

4         Q    We talked about how you could have a page?

5         A    You said a banner page, but that would

6    require me to change the look on my website.

7         Q    Maybe it would, maybe it wouldn't.  You

8    could have a banner page, you could put on it

9    information about your logo, your name of your team,

10   your candidates, what they were running for, when

11   the election was, I'm asking you assuming you can do

12   that consistent with the resolution, do you have any

13   knowledge one way or the other whether your website

14   if you did that would be locatable through the use

15   of these search engines?

16        A    I've been told it couldn't, it would be

17   harder.

18        Q    Who told you?

19        A    Randy Baker.

20        Q    With the banner pages, the page we just

21   talked about?

22        A    I don't know about with the banner because

1    I have mine the way it is.

2        Q    Answer the question that I ask you, okay.

3    Why don't you read back that question?

4        MR. LEVY:  I think he was actually answering

5    and you started asking again.

6        Q    Maybe.  I want you to assume that that

7    campaign website resolution allows you to have a

8    portion of your website that's not password

9    protected, that could include things like the name

10   of your logo, the name of the people who are running

11   for various offices, the offices they're running

12   for, the date of the election, that kind of thing,

13   on the assumption that you had that kind of material

14   on your website outside the password protection

15   area, do you have any way of knowing one way or the

16   other or do you know one way or the other as we sit

17   here whether that website would be locatable through

18   the use of these search engines we've been talking

19   about?

20       A    I don't know.  There's no way for me to

21   tell whether that would be possible or not without

22   having executed a new one.

1      Q    As we sit here you don't know the answer

2   one way or the other?

3      A    I don't know.

4      Q    Direct your attention to the last couple

5   sentences of paragraph 22 of your affidavit.  This

6   is in the particular context of minutes but I

7   suppose you could broaden it if you want.  If there

8   was something sensitive in material that was being

9   posted on the website that the proper approach would

10  be to address that particular sensitive material and

11  not to do an across the board rule like a password

12  protection rule, is that a fair summary of what

13  you're saying?

14     A    I'm not sure.  I think what that was

15  supposed to talk about the union should take issue

16  with the disclosure of that particular information.

17     Q    Do you want the question read back?

18     A    I think so.

19              (Record was read)

20     A    I'm not sure if that is or not.  I'm

21  trying to recall why I said that in that particular

22  way.  I think I wanted to make sure that they

1    shouldn't use that some little piece of information

2    in the minutes of a meeting should be used as the

3    basis to shut down the website by using password

4    protection.

5         Q    That doesn't shut down the website, does

6    it?

7         A    I guess impose password protection is what

8    I meant to mean, as you know by now I'm opposed to

9    it.

10        Q    I think what you're saying is if there

11   were something hypothetically there were something

12   sensitive in a set of minutes or there was something

13   else sensitive that was being put on a website that

14   the right way to deal with that would be to address

15   the particular material and not to impose a password

16   protection rule?

17        A    I don't think so.  I'm still under the

18   belief that the minutes of the executive board in

19   fact part of our platform is going to be that we're

20   going to have the minutes of the executive board

21   posted at the hiring hall on the bulletin board.  So

22   whatever is in those minutes are going to be on that

1    board.  In fact members right now can go up to our

2    executive board member and ask him every detail of

3    the meeting.

4        Q    You're talking about members having access

5    to minutes, right?

6        A    Yes, or anybody else.

7        Q    You're saying in your view you don't think

8    there are sensitive material in minutes?

9        A    I don't think so.

10       Q    But your last two sentences say, but even

11   if there were, the union should take issue with the

12   disclosure of that particular information?

13       A    The union could take issue.  I guess

14   that's what they should do.  They can address it

15   however they're allowed to address it.  If there's

16   something that they disagree with that's on there

17   but I don't think there's anything --

18       Q    We talked before about certain

19   categories -- did you finish?

20       A    Yeah.

21       Q    We talked before about certain categories

22   of information that you acknowledge could be

1    sensitive?

2        A    They could be, that was hypothetical.

3        Q    So if hypothetically there was something

4    sensitive on a website, am I understanding you

5    correctly to be saying that the way to deal with

6    that would be to address that particular sensitive

7    material as opposed to opposing a password

8    protection?

9        A    I'm saying there's a way deal with it.

10   I'm not outlining any specific way to deal with it

11   because I'm not in a position to let anybody tell

12   anybody or direct anybody or listen to anybody.

13       Q    What would be a way to deal with it?

14       A    Honestly, I don't know.

15       Q    Well, you've already said you don't trust

16   the International Union, right?

17       A    That's a fair statement.

18       Q    And you wouldn't want the International

19   Union sitting there combing through campaign

20   websites deciding what they thought was sensitive

21   and what wasn't, would you?

22       A    That sounds like communist Russia.

1          Q     That wouldn't be a very good solution,

2    would it?

3          A     I don't think it would be.

4          Q     Look at paragraph 23.  Personally do you

5    have a Face Book page?

6          A     No.

7          Q     Do you have a My Space page?

8          A     No.

9          Q     Do you know any Local 150 member who has a

10   My Space page?

11         A     I'm not aware of anybody, no.

12         Q     Are you aware of any 150 member that has a

13   Face Book page?

14         A     No.

15         Q     We went and searched My Space or Face Book

16   or both looking for Operating Engineers to have My

17   Space or Face Book pages.  Do you know how many we

18   found?

19         A     I have no idea.

20         Q     I think we found virtually none of the

21   whole universe of 4,000,000.  You say that there are

22   presidential candidates want to use Face Book

1     because they want their campaign message to be out

2     in the social networks where the people are,

3     correct?

4          A     Yeah.

5          Q     Those social networks aren't where the --

6     My Space and Face Book aren't where the Local 150

7     people are, are they?

8          A     Not yet.

9          Q     Not now?

10         A     Not now.

11         Q     Not next month?

12         A     I don't know that.  If I decide to put up

13    a My Space or U Tube I could probably e-mail them

14    and let them know and let the word start.

15         Q     What you're saying in this declaration is

16    you want the people who are searching around on My

17    Space or Face Book to find your website not the

18    other way around?

19         A     I talk about how I haven't figured out how

20    to use these medium effectively, but I certainly

21    have been looking at them to figure out using a blog

22    spot and different other types of things, on line

1    petitions, all kinds of things to connect.

2        Q    You talk about the Edwards and McCain Face

3    Book sites.  Isn't it a fact that those Face Book

4    sites are linked to their campaign websites, they're

5    a way to drive the community of people who happen to

6    go to Face Book or My Space, the way to sort of

7    drive them into their campaign website, isn't it?

8        A    I suppose it could.

9        Q    And they're looking for people who are

10   already in the My Space and Face Book community to

11   try to grab them, not trying to put people into the

12   My Space community; isn't that right?

13       A    I don't know what they're theory is behind

14   using the stuff that they're using.  They're using

15   it, from what little I've seen of it, it looks like

16   it can go back and forth, the website can drive them

17   there and drive them back.  That's the way I

18   envisioned it and envisioned the way I might use

19   things now for the future.

20       Q    Isn't it true that under the campaign

21   website resolution that depending on what you put on

22   a My Space page or a Face Book page you could have a

1    My Space or Face Book page that was linked to your

2    protected site and it wouldn't be at all in

3    violation of the campaign website resolution?

4        A    I don't know.

5        MR. WEINBERG:  Why don't you give us a minute.

6                (Off the record)

7    BY MR. WEINBERG:

8        Q    I have one or two questions to ask.  Am I

9    correct that you testified a few minutes ago that

10   you were told that the flash feature on your site

11   makes it harder to locate your site through a search

12   engine?

13       A    Did I say that?

14       Q    Yeah.

15       A    I believe I did.

16       Q    When were you told that?

17       A    I think when we first put the site up.

18   Randy mentioned it to me because it didn't have --

19   something to do with the way the -- reads the script

20   or the words or something that makes it

21   recognizable.

22       Q    You decided to go ahead and do it that

1    way?

2        A    It was already part of my package.  I had

3    no way to change the package.

4        MR. WEINBERG:  I have nothing further.

5    BY MR. LEVY:

6        Q    Do you have any union related domain

7    names?

8        A    Yes.

9        Q    For what purpose do you intend to use

10   those union related domain names?

11       A    To possibly put up some blog sites or

12   websites that have to do with the International that

13   will reach out to the membership of the IUOE and let

14   them try to keep them informed of issues that they

15   normally wouldn't be able to get ahold of through

16   other channels.

17       Q    Do those issues relate in any way to the

18   2008 convention?

19       A    Yes.

20       Q    In what way?

21       A    For the purposes of the election that's

22   coming up to let IUOE members know that there may or

1    may not be a campaign to support or not support and

2    let them know about what's going on at the

3    International level and hopefully give them a voice

4    if they happen to be a delegate out there.

5        Q    Do you have any concern about the impact

6    of the campaign website resolution on your possibly

7    intended website?

8        A    I do.  It's causing me concern, a little

9    bit about how I'm going to develop the sites and if

10    after I develop them they're not going to fall under

11    some password protection or I'm under password

12    protection, or I can be sanctioned or whether I

13    support a candidate or not but, yeah, it's a little

14    chilling on me.

15        MR. LEVY:  No further questions.

16    BY MR. WEINBERG:

17        Q    If I understand you correctly you want to

18    have one or more sites on which you discuss issues

19    within the union maybe of national relevance?

20        A    And Local.

21        Q    Some of those issues would relate to the

22    2008 general convention?

1          A      General convention.

2          Q      Of the International Union of Operating

3    Engineers?

4          A      Yes.

5          Q      I want you to take a look at Exhibit 13.

6    I want you to point to anyplace in that campaign

7    website resolution that you think would make that

8    resolution applicable to the websites that you just

9    discussed?

10         A      I don't know whether it's going to be

11   applicable or not because the copy that goes with

12   this still continues to say that it's going to be up

13   to the general executive board or the general

14   president as to whether it will be a campaign

15   website or not and there's nothing that I've seen,

16   there's nothing that tells me in this thing whether

17   I have a campaign website.

18         Q      To the extent you're talking about

19   candidates for election to the International office

20   the resolution isn't even applicable, right?

21         A      I don't know whether it's going to be

22   applicable and that's what concerns me.

Q    It says free speech by candidates and
Local union elections, am I correct?

A    Where are you at?

Q    Now therefore be it resolved that?

A    Starting with Local elections, correct.

Q    Local unions and their election committees
shall require all candidates and their supporters
you believe you read that as being applicable to
issues that arise at the International Union?

A    Yeah, because I would like to put on there
what's going on in other locals and direct them to
those sites and put some of their content on my
site.

Q    First of all, there's nothing that even if
you had a campaign website and it was covered by the
resolution you could do on all that, could you?

A    I don't know if I could or not.

Q    Is there anything in this resolution that
would stop you from doing that?

A    Enough of what I read that's attached to
this resolution makes me skeptical that they won't
come in and try to fine me.

1       Q    Show me what you're talking about?

2       A    The one piece that's saying, it says that

3    a decision and opinion from the general president's

4    office will be available to resolve questions from a

5    member who is in doubt about whether his or her

6    website is a campaign website subject to the

7    resolution.  So under that in my opinion I have to

8    create a site, then I get a site up and he says,

9    well, that's a campaign website.

10      Q    If it's not covered by the plain language

11   of the resolution, then you wouldn't have any doubt

12   that you need to have resolved by that process,

13   would you?

14      A    I don't want to have it resolved by

15   anybody.

16      Q    What I'm saying is if it's not covered in

17   the resolution itself then you shouldn't have any

18   reason to have it covered by anybody, should you?

19      A    Well, no, I guess I don't understand how

20   you're trying to explain that to me.  If this and

21   this is part and parcel, then this is enough for me

22   to be very concerned that whatever I try to put

1    together, whether it's on the Local level or the

2    International level and have information on there is

3    going to cause me some grief because here I am I

4    don't have to ask my mother permission for anything

5    anymore and I don't have to ask my damn

6    International for permission anymore.  If I want to

7    put up a website I'm going to put it up and I

8    shouldn't have to go begging to them to say whether

9    it's a campaign website.  That's my problem.  And I

10    want to be able to talk to everybody in the

11    International, some of these people may be delegates

12    and those are the people I want to try to reach.  I

13    don't want anybody telling me it's a campaign

14    website and I think it --

15        Q    You could sit here and say that anything

16    in the world including your family website could be

17    a campaign website and therefore you have that

18    concern, but what you're describing is a website

19    that doesn't come within the terms of the campaign

20    website resolution?

21        A    In your opinion it doesn't.  In mine it

22    does.

1          MR. WEINBERG:  Off the record.

2                     (Off the record)

3          MR. WEINBERG:  We have nothing further.  The

4      deposition is closed.  Thank you very much.

5                (Reading and signing was waived)

6          (4:00 p.m. the deposition was concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1          I, TEAGUE GIBSON, the officer before whom the

2     foregoing deposition was taken, do hereby certify

3     that the witness whose testimony appears in the

4     foregoing deposition was duly sworn by me; that the

5     testimony of said witness was taken by me in

6     stenotypy and thereafter reduced to typewriting

7     under my direction; that said deposition is a true

8     record of the testimony given by said witness; that

9     I am neither counsel for, related to, nor employed

10    by and of the parties to the action in which this

11    deposition was taken; and, further, that I am not a

12    relative or employee of any counsel or attorney

13    employed by the parties hereto, nor financially or

14    otherwise interested in the outcome of this action.

15

16                    Teague Gibson

17               Notary Public in and for

18                the District of Columbia

19

20

21

22    My commission expires:

23    June 14, 2010

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael Quigley, *et al.*                )
                                         )
            Plaintiffs,                  )
                                         )
        v.                               )        No. 07-600 (RBW)
                                         )
Vincent J. Giblin, *et al.*,             )
                                         )
            Defendants.                  )

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I filed the accompanying Reply Memorandum in Support of Summary Judgment or in the Alternative for a Preliminary Injunction, with accompanying statement of material facts,  and supporting affidavits, deposition transcripts and exhibits, through the Court's ECF system, thus causing copies to be served on all counsel.

                                    _____/s/ Paul Alan Levy_____
                                    Paul Alan Levy (DC Bar No. 946400)

                                     Public Citizen Litigation Group
                                     1600 - 20th Street, N.W.
                                     Washington, D.C. 20009
                                     (202) 588-1000

                                     Attorney for Plaintiffs

June 14, 2007