# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| MICHAEL QUIBLEY, <u>et</u> <u>al</u>., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | )   Civil Action No. 07-600 (RBW) |
|  | ) |
| VINCENT GIBLIN, <u>et</u> <u>al</u>., | ) |
|  | ) |
| Defendants, | ) |

_____)

## <u>MEMORANDUM OPINION</u>

The plaintiffs[1] filed this action on March 29, 2007, against the defendants[2] alleging violations of §§101(a)(2) of the Labor-Management Reporting and Disclosure Act of 1959 ("The Labor Act"), 29 U.S.C. §411(a)(2) (2006), and 101(a)(4) of the Labor Act, 29 U.S.C. §411(a)(4)(2006).  Complaint ("Compl.") ¶¶ 41, 46.  The plaintiff contends that the defendant International Union of Operating Engineers' ("Union") General Executive Board's "website password protection rule violates section 101(a)(2) of the [Labor Act], 29 U.S.C. §411(a)(2)."  <u>Id.</u> ¶ 41.  In addition, the plaintiffs allege in their complaint that Article XVII, Section 4 of the

_____

[1] The plaintiffs are Michael Quigley and Joseph Ward who are members of defendant International Union of Operating Engineers ("Union") Local 150.  Complaint ("Compl.") ¶ 3.  The plaintiffs Patricia Kohl and Paul Gotner, who are members of defendant Union Local 18, <u>id.</u>, and Paul Muelle, who is a member of defendant Union Local 39.  <u>Id.</u>

[2] The defendants are the Union and Vincent Giblin, President of defendant Union.  Compl. ¶¶ 4-5.  The Union is a labor organization within the meaning of section 3(I) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §402(i).

Union Constitution "is void under section 101(b) of the [Labor Act], 29 U.S.C. §411(b)."[3]  Id. ¶ 46.

Currently before this Court is the defendants' motion for summary judgment and judgment on the pleadings ("Defs.' Mot.") and the plaintiffs' motion for summary judgment or in the alternative, for a preliminary injunction ("Pls.' Mot.").[4]  After carefully reviewing the pleadings filed in this case, and the exhibits submitted with the parties' papers, the Court concludes for the reasons set forth below that it must grant the defendants' motion for summary judgment and the deny the plaintiffs' cross-motion for summary judgment, or in the alternative, their motion for a permanent injunction.[5]

---

[3] On March 4, 2008, the parities filed a joint stipulation advising the Court that the plaintiffs are dismissing Count II of their complaint.  Joint Stipulation Dismissing Count II.  The parties subsequently submitted the Joint Stipulation dismissing Count II of the plaintiff's complaint as moot because "[o]n July 18, 2007, the General Executive Board of the [Union] . . . voted to propose an amendment to the [Union] Constitution that would remove the penalty provision of Article XVII, Section 4 from the [Union] Constitution."  Id. at 2.

[4] The Court notes that when the plaintiffs' motion for summary judgment, or in the alternative, their motion for a preliminary injunction was docketed, only their motion for summary judgment was recorded. Therefore, their motion for a preliminary injunction was not recorded as a pending motion on the docket. In addition, upon review of the record and the plaintiffs' complaint, it appears that they are requesting permanent injunction.  Compl. at 11.

[5] The following documents have also been filed in connection with the parties' motions: (1) the Defendants' Memorandum in Support of Motion for Summary Judgment and Judgment on the Pleadings ("Defs.' Mem."); (2) the Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment, Opposition to Plaintiffs' Motion for Summary Judgment, and Opposition to Plaintiffs' Motion for a Preliminary Injunction (Defs.' Opp'n and Reply"); (3) the Plaintiffs' Opposition to the Defendants' Motion for Summary Judgment; (4) Memorandum in Support of Plaintiffs' Motion for Summary Judgment, or in the Alternative for a Preliminary Injunction, and in Opposition to Defendants' Motion for Summary Judgment; and (5) the Plaintiffs' Reply in Support of Their Motion for Summary Judgment or in the Alternative for a Preliminary Injunction ("Pls.' Reply").

# I.  FACTUAL BACKGROUND[6]

## A.        THE INTERNATIONAL UNION OF OPERATING ENGINEERS

The Union "is an international labor organization with approximately 396,000 members

and with 138 chartered and autonomous local unions across the United States and Canada."

Defs.' Mem., Exhibit ("Ex.") 1 (Declaration of Vincent J. Giblin ("Giblin Decl.")) ¶ 6.  It

"primarily represents Operating Engineers, who work as heavy equipment operators, mechanics,

and surveyors in the construction industry, and Stationary Engineers, who work in operations

and maintenance in building and industrial complexes, and in the service industries."  Id. ¶ 8.

The Union "also represents approximately 3,600 registered nurses and other medical personnel."

Id. ¶ 8.  The governing document for the Union is its Constitution.  Id., Attachment ("Attach.") 1

(Constitution of International Union of Operating Engineers ("Union Constitution") at 1).  The

principal officer of the Union is defendant Vincent J. Giblin, its General President.  Defs.' Mem.,

Ex. 1 (Giblin Decl.) ¶ 1.  Giblin has served as the General President since March 1, 2005, and

before becoming the General President he was the General Secretary-Treasurer of the Union, the

second highest ranking officer, from December 1, 2002 until he became the General President.

Id. ¶¶ 1, 3.

The General President serves "as the chairman of the [Union's] General Executive

Board."  Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 2.  "When in session, the Union is governed by the

General Convention," which, according to Article III, Section 3 of the Union Constitution, "is

composed of legally elected officers of the [Union], members of the [Union] General Executive

Board and the Board of Trustees, and representative delegates from [Union's] local unions."  Id.

---

[6] The facts as set forth below are undisputed unless otherwise indicated.

¶ 9 & Attach. 1 (Union Constitution) at Art. III, § 3.  "The General Convention meets every five years," and its most recent convention was scheduled for April 2008.  Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 9.  Between "[G]eneral [C]onventions, the [Union] is governed by the General Executive Board, which meets at least quarterly."  Id.  The Union Constitution sets forth the "laws, rules and procedures by which Local Unions [that are chartered by the [Union] shall conduct their affairs."  Id., Attach. 1 (Union Constitution) at Art. XXIV.

Subject to other constraints, the Union Constitution establishes the requirements for candidates to run for local union offices and the procedure for how those elections will be conducted.  Id. at subdivs. 1(a), 1(e).  The Union Constitution mandates that local union elections "shall be held in the month of August" and that the "nominations shall be made at a regular meeting . . . no . . . earlier than the May meeting preceding the election."  Id. at Article XXIV, Subdivision 1(e).  Additionally, the Union Constitution includes an "outsider rule" that prohibits candidates for local union offices from accepting campaign contributions from persons other than members of the Union.  Id.

**B.     THE CAMPAIGN WEBSITE RESOLUTION**

"[I]n January of 2007, the [Union] adopted the Campaign Website Resolution ("Resolution")."  Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 24 & Attach. 2 (Campaign Website Resolution).  The Resolution in part provides:

> NOW THEREFORE BE IT RESOLVED THAT the General Executive Board, in order to assure the fullest expression of free speech by candidates in Local Union elections while protecting the Local Unions from adverse actions by employers, directs that, starting with Local Union elections to be held in 2007, Local Unions and their election committees shall require all candidates and their supporters who have set up or wish to set up campaign websites to include a password protection function.

Defs.' Mem., Ex. 1 (Giblin Decl.), Attach. 2 (Resolution).  In a letter sent on May 11, 2007, to

the Business Managers of all Union local union affiliates, General President Giblin reported that

the General Executive Board had adopted a Campaign Website Resolution.  Defs.' Mem., Ex. 1

(Giblin Decl.) at Attach. 5 (Letter from Giblin to Union Local Union Business Managers dated

May 11, 2007) ("Giblin's May 11, 2007 Letter").  The letter informed the Business Managers that

the guidelines and procedures that govern the Resolution require that "only nonmembers of the

International Union must be excluded pursuant to the resolution's password protection

provisions;" that the Union would retain "an independent outside information technology firm to

be available to assist affected members in their compliance with the resolution, and provide for a

waiver procedure in the event . . . [of] technological difficulties;" and that the guidelines and

procedures would lay out "the usual procedure for obtaining a Decision and Opinion from the

General President's office . . . to resolve questions from a member who is in doubt about whether

his or her website is a 'campaign' website subject to the resolution."  Id.

General President Giblin's letter also provided that the Union would make assistance

available at no cost to the affected members, Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 31(ii), and

further noted that "[i]f the consulting firm [was] unable to resolve promptly any technological

problems members might experience in establishing compliant campaign websites, the affected

member [could] seek and obtain a waiver of the Resolution's requirements."[7]  Id. ¶ 31(iii) &

Attach. 5 (Giblin's May 11, 2007 Letter) at 2.  The letter also advised that the General President's

---

[7] The plaintiffs contend that technological problems cannot be overcome with respect to many important
forms of web hosting technologies that are increasingly used in union campaigns.  Plaintiffs' Response to
Defendants' Statement of Facts ¶18, Ex. 4 (Declaration of Mark Brenner) ("Brenner Decl.")  ¶¶9-16; Ex. 9
(Deposition of Joanna Pineda) ("Pineda Dep.") at 108-10.  Further, the plaintiffs allege that waivers will
not be available in all situations because a web host's inability to support scripting will not be a sufficient
basis to obtain a waiver.  Id.

opinions regarding the application or scope of the Resolution would be available to all members of the union.  Id.  Finally, the General President relayed that a member who truthfully discloses the facts underlying a request for clarification and relies on the advice provided by the International Union that his or her website is, in whole or in part, outside the coverage of the Resolution, will not be subject to any discipline for failure to comply with the Resolution.  Id.

## C.    IOUE'S REASONS FOR ADOPTING THE RESOLUTION

Before the use of the Internet, "a candidate's principal method for distributing campaign literature was to mail the literature to the members at their home addresses – a process that is more costly and cumbersome than posting the information electronically."[8]  Id., Ex. 1 (Giblin Decl.) ¶ 13.   As a result of "the speed at which information can be disseminated and updated on [a campaign] website[] and the ability [of members] to access that information from anywhere and at any time[,] . . . candidates and the members who visit [campaign] websites [are able] to debate the issues before the union in a manner that cannot be accomplished through other means."  Id.  "[S]ome campaign websites have incorporated discussion forums or chat rooms to allow for a more interactive discussion and debate of the issues between candidates and the members of the union."  Id.  "[T]he [Union] has created its own website – www.iuoe.org – and nearly [sixty of the Union's] local union[] [affiliates] have created local union websites."  Id., Ex. 1 (Giblin Decl.) ¶ 12.

---

[8] Another way to distribute literature was distribute it to employees at the workplace.  Pls.' Mem., Ex. 2 (Affidavit of Patricia Kohl) ("Kohl Aff.") ¶5; Ex. 8 (Deposition of Vincent Giblin) ("Giblin Dep.") at 52.

Despite the benefits derived from use of the Internet,[9] concerns about use of this medium by its membership caused the Union General Executive Board to adopt the Resolution based on its understanding that "there have been instances where employers have misused information obtained from candidates' websites to the detriment of [the Union's local union affiliates] in organizing campaigns and contract negotiations."[10]  Defs.' Statement of Facts at ¶ 32; see also Defs.' Mem., Ex. 1 (Giblin Decl.) ¶¶ 15-16.  The Union's General Executive Board therefore determined that local union campaign websites accessible to nonmembers are potentially harmful to the union's interests because local union elections frequently involve discussion and debate on sensitive union matters, including collective bargaining or organizing goals, strategies, and tactics.  Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 19 & Attach. 2 (Campaign Website Resolution) (stating that campaign "websites . . . allow . . . access to frequently sensitive information about the Local Unions").  Moreover, it further concluded that due to the use of Internet chat rooms and discussion forms, campaign websites "pose the additional concern that outsiders to the union could intervene improperly in the elections themselves."  Id., Ex. 1 (Giblin Decl.) ¶ 23.

When the Resolution was adopted, General President Giblin "was aware that 'candidates for local union office and their supporters have taken advantage of the ease of communication over the Internet to establish websites to promote their candidacies' and that campaign websites

---

[9] The Union "General Executive Board first became aware of the risk posed by campaign websites through a dispute that arose in . . . Local Union 30 that involved, among other things, the use of campaign websites in a local union election." Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 17. "During the hearing on International Supervision for Local 30, which was attended by more than 750 members and included the testimony of 100 members of the local union, [General President Giblin (who was then the Union's General Secretary-Treasurer)] learned that employers had been monitoring campaign websites of Local 30 candidates and were using the information found on the websites to defeat organizing campaigns and to improve their position at the bargaining table." Id. ¶ 19.

[10] The plaintiffs challenge this claim on the grounds that there is no admissible evidence to show that this has ever happened.  Plaintiffs' Response to Defendants' Statement of Material Facts ¶ 32.

'have become a common feature of contests for Local Union office.'"  Defs.' Statement of

Material Facts Not in Dispute ("Defs.' Statement of Facts") ¶ 24.  In fact, General President

Giblin noted that the increasing use of websites by candidates for local union offices has the

potential to expand the quality of local union elections, and that campaign websites provide an

inexpensive means for candidates to express their views about issues affecting the local union.

Defs.' Mem. (Giblin Decl.) ¶ 13 & Attach. 3 (Giblin's Feb. 12, 2007 Letter).  However, Giblin

was also "aware that[] in past elections[] candidates ha[d] created campaign websites that [were]

accessible by nonmembers in elections in at least the following [Union] local[] [affiliates]: Local

3, Local 12, Local 18, Local 30, Local 39, Local 49, Local 66, Local 139, Local 302, and Local

501."  Defs.' Mem. (Giblin Decl.) ¶ 14.  This situation caused

> the [Union] General Executive Board [to] determine[] that local
> union campaign websites that are accessible to nonmembers of the
> [Union] – particularly to employers with whom [the Union] might
> deal – are potentially harmful to the interests of the union because
> local union elections frequently involve the discussion and debate
> of sensitive union matters, including collect bargaining or
> organizing goals, strategies, and tactics.[11]

Id., Ex. 1 (Giblin Decl.) ¶ 15.  The General Executive Board concluded that the potential harm

could "significantly compromise[]" its "ability to represent its members . . . if these sensitive

matters are disclosed to employers or other adverse parties."  Id.

The Union "considered alternatives to the [Resolution's] password-protection

requirement, including constantly reviewing campaign websites for sensitive information[,] . . .

contacting candidates who had posted such information, and asking them to remove it."  Id. ¶ 28.

---

[11] The plaintiffs challenge this assertion on the grounds that the defendant has proffered no evidence
which shows that campaign website create any genuine risk to the interests of the Union.  Plaintiffs'
Response to Defendants' Statement of Material Facts ¶ 31.  The plaintiffs further contend that there is no
admissible evidence to show that this has ever happened.  Id.

However, the Union rejected the alternatives to the Resolution for several reasons, including that "policing campaign websites for sensitive information would create the perception that the union was favoring certain types of speech over others or targeting specific candidates;" that "reviewing each individual campaign website would impose a substantial administrative burden on the [Union];" and it would be "too late to protect the information from dissemination to nonmembers" if the Union merely requested removal of offending posted material.  Id.  The Union adopted the Resolution "to assure the fullest expression of free speech by candidates" by fostering robust and uninhibited debate and discussion between and among members of the union on campaign websites without the impact of member speech that would occur if the debate and discussion were readily accessible by nonmembers, including employers.  Id., Ex. 1 (Giblin Decl.), Attach. 2 (Campaign Website Resolution).  The Union sought to balance its interest in protecting sensitive information from disclosure to nonmembers with the goal of not limiting in any way the content of what a candidate can post on his or her campaign website.  Defs.' Mem., Ex. 1  (Giblin Decl.) ¶ 26 & Attach. 3 (Giblin's Feb. 12, 2007 Letter).

On February 12, 2007, General President Giblin sent another letter to the Business Managers of the Union's local union affiliates stating that the Resolution "will not in any way limit the content of what is said on [campaign] websites; it will merely attempt to assure that sensitive information concerning Local Union affairs is shared among members, and is not available to employers and others with interests contrary to those of the Local Unions as institutions."  Defs.' Statement of Facts ¶ 20; see also Defs.' Mem., Ex. 1 (Giblin Decl.) ¶ 29 (stating that "the [Union] adopted a rule that imposes no limitation on what a candidate can post on his or her campaign website, including criticism or dissent of the [Union], any local union of

9

the [Union], any of their officers, or any of the actions or decisions made by the unions or their

officers").  On February 12, 2007,

> General President Giblin stated in his . . . letter to [the Union's]
> local union [affiliate] business managers that "unprotected web
> sites are open to anyone with access to a computer and the Internet,
> and allow non-members, including employers, access to such
> sensitive information. . . .  [T]he Board was also concerned about
> the ability of unscrupulous non-members to take advantage of
> website-generated information to harm Locals in negotiations and
> organizing, as well as the potential for such non-members to
> intervene improperly in the elections themselves."

Defs.' Statement of Facts at ¶ 34 (quoting Ex. 1 (Giblin Decl.) at Attach. 3 (Giblin's Feb. 12,

2007 Letter).

## D.    THE UNION'S PASSWORD PROTECTION SYSTEM TECHNOLOGY

The technology chosen by the Union requires that it "will contract with an independent

third-party web hosting service to provide remote authentication of [Union] members' User IDs

and passwords so that . . . only [Union] members can readily access the information on any

campaign website." Defs.' Statement of Facts at ¶ 48 (citing Defs.' Mem., Ex. 3 (Declaration of

Don Chism) ¶ 4).  "Remote authentication of [Union] members' User IDs and passwords means

that the database containing the list of User IDs and corresponding passwords will be hosted by

an independent third-party web hosting firm."  Id. ¶ 49 (citing Defs.' Mem., Ex. 2 (Declaration of

Joanna Pineda) ("Pineda Decl.") ¶ 9).  "Joanna Pineda, [the d]efendants' expert witness,

concluded that installing a password protection feature on a website through remote

authentication will impose little to no additional cost on members, above and beyond the cost of

establishing and maintaining a campaign website in the first instance."  Id. ¶ 50 (citing Defs.'

Mem., Ex. 2 (Pineda Decl.) ¶¶ 10, 13).  "The most basic web hosting package provided by

Network Solutions and GoDaddy.com will allow remote authentication at no additional cost." Id. ¶ 51 (citing Defs.' Mem., Ex. 2 (Pineda Decl.) ¶ 13).  On the other hand, "YahooGeoCities.com and Brinkster.com require a user to pay three or four dollars per month extra (beyond the most basic package of each service) to enable remote authentication."  Id. ¶ 52.

**E.     THE PLAINTIFFS' WEBSITES**

"Plaintiffs Michael Quigley and Joseph Ward . . . are members of [Union] Local 150," which has approximately 22,000 members and represents members in northern Illinois, northwest Indiana, and southeastern Iowa.  Compl. ¶¶ 3, 7; Answer to Complaint ("Answer") ¶ 7.  Quigley is the webmaster of the website for a slate of candidates called Team 150.[12]  Pls.' Mem., Ex. 1 (Affidavit of Michael Quigley) ("Quigley Aff.") ¶ 3.  At the time of the filing of the plaintiffs' complaint, Plaintiff Joseph Ward, a member of Local Union 150, was a candidate for Business Manager of the local union, the highest elected office in that local, in the upcoming August, 2007 election.  Answer ¶ 22; Pls.' Mem., Ex. 1 (Quigley Aff.) ¶ 3.  Ward was already an officer of Local 150, having been elected and re-elected to the position of treasurer several times, and was also on the payroll of that local for many years as a staff employee.  Id.  Plaintiffs Patricia Kohl and Paul Gonter are members of Local 18, a local Union affiliate with 15,000 members in Ohio and northern Kentucky.  Compl. ¶¶ 3, 7; Answer ¶17.  During the 2005 election, Kohl operated a website,[13] which presented statements made by her and Gronter about their reasons for running for office as well as various information about Local 18 and criticisms about the incumbents.  Pls.' Mem., Ex. 2 (Affidavit of Patricia Kohl) ("Kohl Aff.") ¶ 8.   Kohl

---

[12]  The website can be found at www.150election.com.

[13]  The website can be found at www.local18membersvoice.org.

alleges that she "intend[ed] to support candidates for election . . . in . . . Local 18," which was

scheduled to occur in August of 2008.  Compl. ¶ 23.  She also represents that she will use her

website to support candidates for local union office in the upcoming election.  Id.   Two of the

other plaintiffs, Gonter and Mueller, were not running for any offices, but represent that they

intend to do so in the future.  Compl ¶¶ 23-24.

## II.  STANDARD OF REVIEW

Awarding summary judgment under Rule 56(c) is appropriate "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c). When ruling on a motion for summary judgment, the courts must view the

evidence in the light most favorable to the non-moving party. Bayer v. U.S. Dep't of Treasury,

956 F.2d  330, 333 (D.C. Cir. 1992). In addition, "the court must draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or weigh the

evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, the

non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific

facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986) (citation omitted). Under Rule 56, "if a party fails to establish the existence

of an element essential to that party's case and on which that party will bear the burden of proof

at trial," summary judgment is warranted. Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C.

1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). The party moving for

summary judgment bears the burden of establishing the absence of evidence that supports the

non-moving party's case.  Id.

### III.  LEGAL ANALYSIS

The defendants assert in support of their motion for summary judgment that its Campaign Website Resolution is a facially valid, reasonable rule and does not violate §101(a)(2) of the Labor Act because: (1) it "serves a legitimate objective of a labor organization as an institution . . . [by] keeping sensitive information–e.g., negotiating, organizing, and grievance handling strategy and tactics–from falling into the hands of employers who are the union's adversaries," Defs.' Mem. at 16, (2) it "imposes no restrictions . . . on 'the views, arguments, or opinions' (§101(a)(2)) that may be expressed by a member on a campaign website, or elsewhere[,]" id. at 22, and (3) it "merely imposes a modest and neutral time, place, and manner restriction on one specific medium of communication, websites–a medium particularly vulnerable to being monitored by employers or other parties with interests adverse to the union, and under circumstances where the candidate is not likely to intend, and may well not even expect, that the information posted will fall into the hands of such parties[,]" id. at 22.

In opposition, the plaintiffs' respond that the defendants' motion for summary judgment should be denied and summary judgment should be granted in their favor because (1) "[i]n addition to improperly restricting members' right to communicate to non-members, the web site restriction rule also interferes with union members' right to use the Internet to communicate with members of the [Union][,]" Pls.' Mem. 36-37, (2) "[t]he log-in procedure is likely to discourage member viewing by making entry into the web sites more difficult and threatening to privacy" id. at 20-21, (3) the undisputed facts cast substantial doubt on "whether the union's rule will actually do much to serve the purpose of keeping campaign web sites from the purview of employers who are determined to see what is there," id. at 22, and (4) "although the term 'candidate' is relatively

clear, the terms 'campaign web site' and 'supporters' are less clear," <u>id.</u> at 40, and thereby, "[t]he vague and ephemeral nature of the restriction simply enhances its chilling effect, and the 'rule' should be struck down for vagueness," <u>id.</u> at 43.  The plaintiffs also request that the Court issue a preliminary injunction barring enforcement of the rule if it determines that there are genuine issues of material fact that prevent the grant of summary judgment in their favor.

## A.

The primary question before this Court is whether the Union's campaign website resolution that requires all campaign web sites to have password protection allowing access only to union members violates section 101(a)(2) of the Labor Act, 29 U.S.C. §411(a)(2).  Congress enacted the Labor Act in 1959 to regulate the relationship between union members, their union and its leaders. Congress sought to promote full and active participation of union members in their union "through processes of democratic self-government." <u>Wirtz v. Hotel, Motel & Club Employees Union, Local 6</u>, 391 U.S. 492, 497 (1968); <u>see also</u> <u>United Steelworkers of Am. v. Sadlowski</u>, 457 U.S. 102, 110-113 (1982); <u>Am. Fed'n of Musicians v. Wittstein</u>, 379 U.S. 171, 182-83 (1964). Title I of the Labor Act affords basic protections to all union members, including equal voting rights, the right to free speech, and the right of free assembly.  <u>Wirtz</u>, 391 U.S. at 496.  Although the Labor Act granted these rights to union members, it also clarified the right of unions to adopt and enforce reasonable rules for its members.  Section 101(a)(2) of the Labor Act, titled "Freedom of Speech and Assembly," provides that:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing

14

> herein shall be construed to impair the right of a labor organization
> to adopt and enforce reasonable rules as to the responsibility of
> every member toward the organization as an institution and to his
> refraining from conduct that would interfere with its performance
> of its legal or contractual obligations.

29 U.S.C. §411(a)(2) (2006).[14]

The case most analogous to the circumstances in this action is United Steelworkers of Am. v. Sadlowski, 457 U.S. 102 (1982).  In Sadlowski, the defendant, the United Steel Workers of America ("Steel Workers Union"), appealed the the District of Columbia Circuit's ruling in favor of the plaintiffs, union members of the Steel Workers Union, that a provision of the Union's Constitution (its outsider rule), violated the right-to-sue provision of the Labor Act, and that the provision also violated § 101(a)(2) of the Labor Act, the "freedom of speech and assembly" provision of the statute.  457 U.S. at 107.  The plaintiffs originally filed suit against the Steel Workers Union in this Court alleging, "inter alia, that the outsider rule violated the 'right to sue,' provision of Title I of the [Labor Act], §101(a)(4), 29 U.S.C. §411(a)(4), because it would prohibit a candidate from accepting nonmember contributions to finance campaign-related litigation."  Id. at 106.  A former member of this Court found that the outside rule violated §101(a)(4) and invalidated the rule.  Id.  The District of Columbia Circuit affirmed the judgment with modifications not relevant here, Sadlowski v. United Steelworkers of Am., 645 F.2d 1114 (D.C. Cir. 1981), and the Supreme Court granted certiorari, 454 U.S. 962 (1981).  The Supreme Court acknowledged "that §101(a)(2) confers upon union members rights equivalent to the rights established by the First Amendment," but found that "[i]n light of [its] legislative history, . . .

---

[14] Section 411(b) of the Labor Act provides that "[a]ny provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect." 29 U.S.C. § 411(b).

§101(a)(2) [should not] be read as incorporating the entire body of First Amendment law so as to require that the scope of protections afforded union members by the statute coincide with the protections afforded by the Constitution."  457 U.S. at 108-09.  Upon review of the legislative history, the Supreme Court reasoned that §101(a)(2) "was designed to guarantee every union member equal voting rights, rights of free speech and assembly, and a right to sue."  Id. at 109 (internal citations omitted).  However, the proviso that appears in §101(a)(2) which preserves the union's right to adopt reasonable rules governing the responsibilities of its members was designed "to assure that the amendment would not 'unduly harass and obstruct legitimate unionism.'"  Id. at 110 (citation omitted).  Specifically, the Supreme Court found that

> the legislators intended § 101(a)(2) to restate a principal First Amendment value – the right to speak one's mind without fear of reprisal. However, there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical to the scope of the First Amendment. Rather, Congress' decision to include a proviso covering "reasonable" rules refutes that proposition. First Amendment freedoms may not be infringed absent a compelling governmental interest. Even then, any government regulation must be carefully tailored, so that rights are not needlessly impaired. Union rules, by contrast, are valid under § 101(a)(2) so long as they are reasonable; they need not pass the stringent tests applied in the First Amendment context.

Id.  at 111 (emphasis added) (internal citation omitted).  The Supreme Court established a two prong rule for determining whether a union rule is valid under the statute.  Id.  The Court held that first it had to "consider whether the rule interferes with an interest protected by the first part of §101(a)(2)."  Id.  If there is no such inference, then the question becomes "whether the rule is 'reasonable' and thus sheltered by the proviso to §101(a)(2)."  Id.  The Court noted that "[t]he critical question is whether a rule that partially interferes with a protected interest is nevertheless reasonably related to the protection of the organization as an institution."  Id. at 111-12.  Under

this two-step analysis, the Supreme Court concluded that "the outsider rule [was] valid," holding

that "[a]lthough [the rule] may limit somewhat the ability of insurgent union members to wage

an effective campaign, an interest deserving some protection under the statute, it is rationally

related to the union's legitimate interest in reducing outsider interference with union affairs."  Id.

at 112.

Here, the plaintiffs challenge the defendants' campaign website resolution on the grounds

that it interferes with their rights "'to express any views, arguments, or opinions,'" by improperly

restricting members rights to communicate with non-members and members, Pls.' Mem. at 24,

36-37 (quoting 29 U.S.C. § 412).  Applying the two-step analysis established in Sadlowski, the

Court finds that the campaign website resolution does interfere with an interest protected by the

first part of §101(a)(2).  Despite this interference, the Court finds that the union's resolution is

reasonable and covered by the proviso to §101(a)(2).

The defendants contend that the campaign website resolution "serves a legitimate

objective of a labor organization as an institution: keeping sensitive information –e.g.,

negotiating, organizing, and grievance handling strategy and tactics–from falling into the hands

of employers who are the union's adversaries."[15]  Defs.' Mem. at 16.  Further, the defendants

assert that the campaign website resolution "would have the effect of enriching member-to-

member speech by fostering more open and robust communications among union members, who

would be apt to feel less inhibited by the prospect that their webiste communications could easily

---

[15] The plaintiffs acknowledge that there is some union information that would harm the union's interest if
disclosed to employers or other adversaries.  See, e.g., Defs.' Reply, Ex. 2 (Kohl Deposition Excepts) at
170 (testifying that union's strategy regarding the use of "salts" should not be shared in advance with the
employer); Defs.' Reply, Ex. 3 (Quigley Deposition Excerpts) at 135-41, 151 (testifying that it would be
inappropriate to share union's strategies with employers and that information regarding division among
the membership regarding a strike threat is sensitive information).

be intercepted by employers."   Defs.' Opp'n and Reply at 9 n.2; Defs.' Mem. at 19-22.   The

Court agrees that the defendants' interest in maintaining integrity and confidentiality in the

electoral process is reasonably related to the steps that the Union has taken to protect the

integrity and the free flow of communication between its members in conjunction with union

elections.   Section 101(a)(2) "incorporates 'a principal First Amendment value – the right to

speak one's mind without fear of reprisal,' although its scope is more limited than the First

Amendment." Callihan v. United Ass'n of Journeymen and Apprentices of the Plumbing and

Pipe Fitting Industry, No. Civ. A. 00-2988, 2002 WL 799590 at *2 (D.D.C. Mar. 6, 2002)

(quoting Sadlowski, 457 U.S. at 111 (in determining validity of union rule, First Amendment

principles "may be helpful, although they are not controlling")); see also Semancik v. United

Mine Workers of Am. Dist. 5, 466 F.2d 144, 152-53 (3d Cir. 1972); Stojanov v. Rochester Tele.

Workers Ass'n, 257 F. Supp. 2d 584, 591 (W.D.N.Y. 2003) ("[t]he rights guaranteed by Section

101(a)(2) are not meant to be coextensive with the Constitutional right to free speech guaranteed

by the First Amendment.").   This provision does not require union rules to be "carefully" tailored

to meet a "compelling" interest, as the First Amendment would require of governmental bodies.

Sadlowski, 457 U.S. at 111.   Instead, union rules "are valid under section 101(a)(2) if they are

reasonable." Id.   Section 101(a)(2) gives unions "three specific grounds on which they could

discipline  members' speech.   Unions could provide reasonable rules: (1) for conducting union

meetings; (2) for insuring individual responsibility to the union as an institution; and (3) for

preventing any interference with the union's performance of its legal or contractual obligations."

Semancik, 466 F.2d at 152-53; see Callihan, 2002 WL 799590 at *2.

The Court finds the union's campaign website rule reasonable for several reasons.  First, it is uncontested that the campaign resolution does not restrict all mediums of communication.  It only imposes a limited restriction on campaign website use and does not regulate other channels of communication, including, but not limited to, email, postal mail, telephonic communications, correspondence sent to editors of newspapers, or leaflets.  Specifically, the campaign website resolution regulates only campaign websites, where the paramount interest of the speaker is in reaching the union's electorate, primarily the union's membership.  Pls.' Reply, Ex. 2 (Kohl Dep.) at 249; Pls.' Reply, Ex. 3 (Quigley Dep.) at 55-56, 68.  Second, although the plaintiffs contend that the "[defendants] have not introduced evidence of [the] serious harms," that may arise without password-protection for campaign websites, Pls.' Mem. at 31, "[t]he rule does not have to be necessary to be protected by the proviso of section 101(a)(2)."  Massey v. Inland Boatmen's Union of the Pacific, 886 F.2d 1188, 1190 (9th Cir. 1989).  In fact, the rule "only need[s] to be reasonable . . . ."  Id.  The plaintiffs challenge on this score is undermined by the circumstances in Sadlowski, where the union did not present any formal proof that any elected official in the union with the assistance of outsider funds had been compromised or corrupted by such assistance.  457 U.S. at 116.  Rather, the union merely "feared that officers who received campaign contributions from nonmembers might be beholden to those individuals and might allow their decisions to be influenced by considerations other than the best interests of the union."  457 U.S. at 115.  The Supreme Court found this a "legitimate purpose that Congress meant to protect."  Id. at 116.  The union in Sadlowski expressed similar concerns as the Union here to justify the application of the outsider rule; namely that the "purpose in adopting the outsider rule was to ensure that nonmembers would not unduly influence union affairs and that

the union leadership would remain responsive to the membership." Id. at 103.  Accordingly, the

Court finds that the union's campaign rule is reasonable.

**B.**

The plaintiffs' vagueness challenge is predicated on the position that "although the term

'candidate' is relatively clear, the terms 'campaign web site' and 'supporters' are less clear," Pls.'

Mem. at 40, and that "[t]he vague and ephemeral nature of the [campaign website rule] simply

enhances its chilling effect, and the 'rule' should be struck down for vagueness[,]" id. at 43.  In

opposition, the defendants contend that the plaintiffs' argument fails on multiple levels because

(1) "the [Labor Act] itself includes a provision, §401(c), [codified at 29 U.S.C. 481(c),] that

presents line-drawing issues precisely analogous to those presented by the [c]ampaign [w]ebsite

[r]esolution, and the judicial interpretation of that provision, will provide guidance interpreting

the [r]esolution," Defs.' Mem. at 27, and (2) "even if [the] [p]laintiffs' facial 'vagueness'

challenge had some substance, the challenge evaporates once it is recognized that the [Union]

has in place an established procedure according to which members can obtain from the [Union]

prompt determinations – issued often within days – as to the application of [a Union] election

rule to particular proposed conduct," id. at 27.

The overbreadth doctrine is "a principle developed in the context of First Amendment

cases to invalidate laws that can be validly applied in some circumstances but are so broad that

they inhibit the protected speech of other parties." Callihan, 2002 WL 799590, *1 (D.D.C.

March 6, 2002); see Sec'y of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 965

(1984) (statute is overbroad when "there is no core of easily identifiable and constitutionally

proscribable conduct that the statute prohibits").  To assert a successful First Amendment facial

challenge, the plaintiffs need to show that "the challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'" Am. Library Ass'n v. Barr, 956 F.2d 1178, 1188-89 (D.C. Cir. 1992) (quoting City Council v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984), quoted in New York State Club Ass'n v. New York City, 487 U.S. 1, 11 (1988)); see also Hatchigian v. Int'l Bhd. of Elec. Workers, Local Union No. 98, No. 87-7131, 1990 WL 2795, *4 (E.D. Pa. Jan. 17, 1990) (under the overbreadth doctrine, a "plaintiff is required to show from the text of the provisions and from 'actual fact' that a substantial number of instances exist in which the provision cannot be permissibly applied.").

On its face, the text of the Resolution is sufficient to provide a fair warning to those it affects as to when their conduct triggers the password protection requirement. The terms "campaign websites" and "supporters" must be given their ordinary meaning, just as the plaintiffs have in interpreting the term "candidate" and concluding that the word is "relatively clear" when considered in context. Pls.' Mem. at 40. When this approach is employed, the reach of these terms is patently clear. The plaintiffs' vagueness argument rests on the contention that because the resolution applies only to campaign websites, it may not be clear in every circumstance that could be hypothesized whether a particular website would constitute a covered campaign website or a non-covered issue website. Pls.' Mem. 40-43. However, when "it is clear what [activity] the [Resolution] as a whole [covers]," a facial vagueness challenge fails, and "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute [(and in this situation the Resolution)] when it is surely valid in the vast majority of its intended applications." Hill v. Colorado, 530 U.S. 703, 733 (2000) (internal quotation

omitted); see also Grayned v. City of Rockford, 408 U.S. 104, 110 & n.15 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language," and "[i]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in [sic] nice question.'").  The Court therefore need not reach the question of whether the Union's procedure through which members can receive a prompt determination on a case-by-case basis sufficiently narrows the provision's application so as to defeat a vagueness challenge.  Accordingly, the Court finds that the defendants' campaign website resolution is not defeatable on vagueness grounds.

## IV.  CONCLUSION

Based on the foregoing analysis, the Court finds that the defendants' website password protection rule does not violate § 101(a)(2) of the Labor Act, 29 U.S.C. § 411 (a)(2), and is not invalid on vagueness grounds.  Accordingly, the defendants' motion for summary judgment must be granted, and the plaintiffs' cross-motion for summary judgment, or in the alternative for permanent injunction must be denied.[16]

**SO ORDERED** this 22nd day of October, 2008.

_____/s/_____
REGGIE B. WALTON
United States District Court Judge

---

[16] An Order consistent with this Court's Memorandum Opinion has been issued.